**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| COUNTY OF COOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BANK OF AMERICA CORPORATION, | ) | Case No. 14-cv-2280 |
| BANK OF AMERICA, N.A., | ) | |
| COUNTRYWIDE FINANCIAL | ) | Judge Elaine E. Bucklo |
| CORPORATION, | ) | |
| COUNTRYWIDE HOME LOANS, INC., | ) | |
| COUNTRYWIDE BANK, FSB, | ) | |
| COUNTRYWIDE WAREHOUSE LENDING, | ) | |
| LLC, BAC HOME LOANS SERVICING, LP, | ) | |
| MERRILL LYNCH & CO., INC., MERRILL | ) | |
| LYNCH MORTGAGE CAPITAL INC., and | ) | |
| MERRILL LYNCH MORTGAGE LENDING, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

THE COUNTY'S CLAIM ............................................................................................................ 3

ARGUMENT ................................................................................................................................ 5

I.      THE COUNTY'S ACTION IS TIME-BARRED ............................................................ 5

        A.      The Lawsuit is Outside the Two Year Limitations Period. ................................... 5

        B.      The Limitation Bar is Not Extended Under A "Continuing Violation"
                Theory. .................................................................................................................... 6

                1.      The County was on notice of its claims. ..................................................... 6

                2.      The conduct is not alleged to be continuing. .............................................. 9

                3.      The continuing violation doctrine is not available here. ........................... 12

II.     THE COUNTY'S COMPLAINT MUST BE DISMISSED FOR LACK OF
        STANDING. ...................................................................................................................... 13

        A.      The County Has Failed to Demonstrate Injury in Fact. ........................................ 13

        B.      There Is No Injury Fairly Traceable To Defendants' Conduct. ............................ 15

                1.      Loan Terms Cannot Be Causally Linked to Foreclosures. ....................... 15

                2.      The Complaint Does Not Plausibly Link Foreclosures to the Injuries
                        the County Alleges .................................................................................... 20

III.    THE COUNTY'S LAWSUIT DOES NOT FALL WITHIN THE FHA'S ZONE OF
        INTEREST ......................................................................................................................... 24

IV.     THE COMPLAINT MUST BE DISMISSED UNDER RULE 12(B)(6). .......................... 27

        A.      The Reverse-Redlining Disparate Impact Claim is Deficient ............................... 27

                1.      The FHA Does Not Recognize Disparate Impact Claims. ........................ 27

                2.      The County Has Not Sufficiently Alleged a Disparate Impact ................. 28

        B.      The Reverse-Redlining Intentional Discrimination Claim Fails. .......................... 29

CONCLUSION ............................................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*520 South Michigan Ave. Assocs., Ltd. v. Shannon*,
549 F.3d 1119 (7th Cir. 2008) ..........................................................................7

*Ass'n of Am. Physicians & Surgeons, Inc. v. Koskinen*,
2014 WL 1056495 (E.D. Wis. Mar. 18, 2014) ...................................................18

*AZ Holding, L.L.C. v. Frederick*,
2010 WL 500443 (D. Ariz. Feb. 10, 2010)........................................................21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................10

*Bloch v. Frischholz*,
587 F.3d 771 (7th Cir. 2009) .............................................................................27

*Brooks v. Ross*,
578 F.3d 574 (7th Cir. 2009) .............................................................................29

*Burns v. Mundelein Bldg. Dep't*,
1999 WL 965855 (N.D. Ill. Sept. 29, 1999) ......................................................18

*Cherosky v. Henderson*,
330 F.3d 1243 (9th Cir. 2003) ...........................................................................13

*Chin v. Port Auth.*,
685 F.3d 135 (2nd Cir. 2012).............................................................................13

*City of Birmingham v. Citigroup, Inc.*,
2009 WL 8652915 (N.D. Ala. Aug. 19, 2009) ............................................ passim

*City of Los Angeles v. Wells Fargo & Co.*,
2014 U.S. Dist. LEXIS 72818 (C.D. Cal. May 28, 2014) ...................................16

*City of Memphis v. Wells Fargo Bank*,
2011 WL 1706756 (W.D. Tenn. May 4, 2011) ...................................................14

*County of Cook v. HSBC North America Holdings, Inc.*,
14-cv-02031 (N.D. Ill. March 31, 2014)..............................................................3

*DeKalb County v. HSBC N. Am. Holdings, Inc.*,
2013 U.S. Dist. LEXIS 185976 (N.D. Ga. Sept. 25, 2013) .................................16

*Denius v. Dunlap*,
330 F.3d 919 (7th Cir. 2003) ...................................................................................7

*Deutsche Bank Nat'l Trust Co. v. Christian*,
2013 WL 6283584 (N.D. Ill. Dec. 4, 2013)...........................................................18

*DH2, Inc. v. SEC*,
422 F.3d 591 (7th Cir. 2005) .................................................................................18

*Doe v. R.R. Donnelley & Sons Co.*,
42 F.3d 439 (7th Cir. 1994) .............................................................................10, 11

*DT Apartment Grp., LP v. CWCapital, LLC*,
2012 WL 6693192 (N.D. Tex. Dec. 26, 2012) ................................................25, 27

*Estate of Davis v. Wells Fargo Bank*,
633 F.3d 529 (7th Cir. 2011) ...................................................................................5

*Estate of Young v. United States*,
2012 WL 6585327 (D. Mass. Dec. 17, 2012) ........................................................21

*Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*,
141 F.3d 71 (3d Cir. 1998)....................................................................................24

*Florida Ass'n of Med. Equip. Dealers v. Apfel*,
194 F.3d 1227 (11th Cir. 1999) .............................................................................21

*Garry v. Geils*,
874 F. Supp. 195 (N.D. Ill. 1995) ............................................................................7

*Gilty v. Village of Oak Park*,
919 F.2d 1247 (7th Cir. 1990) ..........................................................................13, 30

*Gladstone Realtors v. Vill. of Bellwood*,
441 U.S. 91 (1979)................................................................................................26

*Hardaway v. CIT Grp./Consumer Fin. Inc.*,
836 F. Supp. 2d 677 (N.D. Ill. 2011) .......................................................................7

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)..................................................................................10, 12, 26

*Hernandez v. Sutter W. Capital*,
2010 WL 3385046 (N.D. Cal. Aug. 26, 2010) .......................................................11

*Hoffman v. Option One Mortgage Corp.*,
589 F. Supp. 2d 1009 (N.D. Ill. 2008) ...................................................................27

iii

*HOME v. Cincinnati Enquirer, Inc.*,
   943 F.2d 644 (6th Cir. 1991) .......................................................................26

*Hope, Inc. v. County of Du Page*,
   738 F.2d 797 (7th Cir. 1984) .......................................................................16

*Hous. Opportunities Project for Excellence, Inc. v. Wedgewood Condo. Ass'n, Inc.*
   *("HOPE")*,
   2012 WL 4193969 (S.D. Fla. Sept. 19, 2012) ...................................................25, 26

*HSBC Bank USA v. Fequiere*,
   2010 WL 4884560 (Conn. Super. Ct. Aug. 10, 2010) ...........................................18

*Kaing v. Pulte Homes, Inc.*,
   2010 WL 625365 (N.D. Cal. Feb. 18, 2010), *aff'd*, 464 F. App'x 630 (9th Cir. 2011) ..........21

*Kaing v. Pultegroup, Inc.*,
   464 F. App'x 630 (9th Cir. 2011) .................................................................16, 17

*Kimbrew v. Fremont Reorganization Corp.*,
   2008 WL 5975083 (C.D. Cal. Nov. 17, 2008)......................................................12

*Kormoczy v. HUD*,
   53 F.3d 821 (7th Cir. 1995) .......................................................................29

*Krieman v. Crystal Lake Apts. Ltd. P'ship*,
   2006 WL 1519320 (N.D. Ill. May 31, 2006)..........................................................6

*League of United Latin Am. Citizens (Lulac) of Wisconsin v. Deininger*,
   2013 WL 5230795 (E.D. Wis. Sept. 17, 2013).....................................................25

*Ledbetter v. Goodyear Tire & Rubber Co.*,
   550 U.S. 618 (2007)................................................................................11

*Lewis v. Xerox Corp.*,
   1998 WL 160893 (N.D. Ill. Mar. 31, 1998)...........................................................11

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014)........................................................................2, 24, 26

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..........................................................................2, 13, 15

*Lyons v. First Am. Title Ins. Co.*,
   2009 WL 5195866 (N.D. Cal. Dec. 22, 2009).......................................................11

*Macon County, Ill. v. MERSCORP, Inc.*,
   742 F.3d 711 (7th Cir. 2014) .......................................................................30

*Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A. (Baltimore I),*
    677 F. Supp. 2d 847 (D. Md. Jan. 6, 2010) ................................................................14, 15, 23

*Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A. (Baltimore II),*
    2010 U.S. Dist. LEXIS 95812 (D. Md. Sept. 14, 2010) .........................................................23

*Moskowitz v. Trustees of Purdue Univ.,*
    5 F.3d 279 (7th Cir. 1993) ........................................................................................................6

*Murungi v. Texas Guaranteed,*
    693 F. Supp. 2d 597 (E.D. La. 2010) .....................................................................................17

*Nat'l R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002) ...........................................................................................................12, 13

*People of the State of Illinois v. Countrywide Financial Corp., et al.,*
    No. 08 CH 22994 (Cook Cnty. Cir. Ct. June 25, 2008) ...........................................................9

*People of the State of Illinois v. Countrywide Financial Corp., et al.,*
    No. 10 CH 27929 (Cook Cnty. Cir. Ct. June 29, 2010) ...........................................................9

*Plotkin v. Ryan,*
    1999 WL 965718 (N.D. Ill. Sept. 29, 1999) ..........................................................................18

*Pozzie v. United States Dep't of Hous. and Urban Dev.,*
    48 F.3d 1026 (7th Cir. 1995) ..................................................................................................17

*Retired Chicago Police Ass'n v. City of Chicago,*
    76 F.3d 856 (7th Cir. 1996) ....................................................................................................13

*Rummery v. Ill. Bell Tel. Co.,*
    2000 WL 343469 (N.D. Ill. Mar. 30, 2000) ..........................................................................29

*Ryan v. Homecomings Fin. Network,*
    253 F.3d 778 (4th Cir. 2001) ..................................................................................................21

*S.-Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors,*
    935 F.2d 868 (7th Cir. 1991) ..................................................................................................29

*Shaikh v. City of Chicago,*
    2001 WL 123784 (N.D. Ill. Feb. 13, 2001) ..........................................................................26

*Shanoff v. State of Ill. Dep't of Human Servs.,*
    258 F.3d 696 (7th Cir. 2001) ....................................................................................................6

*Simon v. Eastern Kentucky Welfare Rights Org.,*
    426 U.S. 26 (1976) ..................................................................................................................13

*Simovits v. Chanticleer Condo. Ass'n*,
933 F. Supp. 1394 (N.D. Ill. 1996) ...................................................................24

*Smith v. City of Jackson*,
544 U.S. 228 (2005)...............................................................................27, 28

*Soto v. City of West Chicago*,
2010 WL 4810612 (N.D. Ill. Nov. 19, 2010) ...........................................................6

*Stevens v. Housing Auth. of South Bend*,
720 F. Supp. 2d 1013 (N.D. Ind. 2010) .................................................................11

*Stewart v. CPC Int'l, Inc.*,
679 F.2d 117 (7th Cir. 1982) ..............................................................................11

*Thompson v. North American Stainless, LP*,
131 S. Ct. 863 (2011).........................................................................24, 25, 26

*Tingley v. Beazer Homes Corp.*,
2008 WL 1902108 (W.D.N.C. Apr. 25, 2008) ..................................................17, 21

*Tomlinson v. Goldman, Sachs & Co.*,
682 F. Supp. 2d 845 (N.D. Ill. 2009) ......................................................................7

*Trafficante v. Metro. Life Ins. Co.*,
409 U.S. 205 (1972)........................................................................................26

*Union County, Ill. v. MERSCORP, Inc.*,
735 F.3d 730 (7th Cir. 2013) ..............................................................................30

*Wal-Mart Stores v. Dukes*,
131 S. Ct. 2541 (2011)......................................................................................28

*Wards Cove Packing Co. v. Atonio*,
490 U.S. 642 (1989)........................................................................................28

*Watkins v. Chicago Housing Auth.*,
527 F. App'x 504 (7th Cir. 2013) .........................................................................11

*Whittaker v. St. Lucie Cnty. Sch. Bd.*,
2011 WL 3424564 (S.D. Fla. Aug. 5, 2011).............................................................25

*Williams v. Giant Food Inc.*,
370 F.3d 423 (4th Cir. 2004) ..............................................................................13

STATUTES

35 Ill. Comp. Stat. 200/1-1, *et. seq.* ..................................................................19

29 U.S.C. § 623(a)(1)..............................................................................28

29 U.S.C. §§ 701-97 ................................................................................25

42 U.S.C. § 3601 *et seq.*............................................................. passim

42 U.S.C. § 3605(a) .................................................................................28

42 U.S.C. § 3604(c) .................................................................................30

42 U.S.C. § 3613 .......................................................................................24

42 U.S.C. § 3613(a)(1)(A) .........................................................................5

42 U.S.C. § 3614(a) ..................................................................................13

Chi. Mun. Code §§ 13-12-126, 13-12-127 (2011)....................................8

Cook Cnty. Land Dev. Ord. §§ 102-19, 102-20 (ordinance passed Dec. 14, 2011).......................8


RULES

Fed. R. Civ. P. 12(b)(1)...............................................................................2

Fed. R. Civ. P. 12(b)(6)............................................................................27

Fed. R. Evid. 201(b).....................................................................................7


OTHER AUTHORITIES

*A Citizen's Guide to Your Property Tax Bill*, Cook Cnty. Comm'r .............................22

Balt. Report on the Progress of the Multi-City Litig. Work Grp. on Foreclosures (Apr. 14, 2009), *available at http://legistar.baltimorecitycouncil.com/attachments/4439.pdf*................9

Balt. Resolution 09-06 (Jan. 12, 2009) ......................................................9

Chi. Journal of the Proceedings (April 13, 2011) .......................................8

Chi. Journal of the Proceedings (Dec. 14, 2011) ........................................8

Chi. Journal of the Proceedings (July 9, 2008) ..................................................................8

Cook Cnty. Bd. of Comm'rs Meeting, Item #4 (Sep. 17, 2008) ......................................8

Cook Cnty. Bd. of Comm'rs Resolution, 08-R-37 (Jan. 9, 2008) ...................................7

Cook Cnty. Bd. of Comm'rs Resolution, 10-R-02 (Dec. 1, 2009) ..................................7

Cook Cnty. Treasurer's Office website, https://www.cooktaxsale.com/faq.cfm .........................19

Cynthia Dizikes, *State sues bank over minority lending; Countrywide gave riskier
    subprime loans to blacks, Latinos, lawsuit alleges*, Chi. Tribune, June 30, 2010 ...................9

David Greising, *Deal to Help 21,000 in State Keep Homes*, Chi. Tribune, Oct. 6, 2008 ...............9

Francine Knowles, *Lenders get subpoenas; Were blacks, Latinos unfairly steered to high-
    cost home loans?*, Chi. Sun Times, March 7, 2008 ................................................9

Int'l Municipal Lawyers Ass'n Foreclosure Lit. Working Grp., *available at
    http://www.imla.org/foreclosure-litigation-working-group* .......................................9

*Overview: Annual and Scavenger Property Tax Sales,* Office of Cook Cnty. Treasurer
    Maria Pappas, October 3, 2012 .....................................................................19

Richard M. Daley, Analysis of Impediments to Fair Hous. Choice & Fair Hous. Plan,
    Chi. 2010 ..........................................................................................8

Plaintiff Cook County's rambling 142-page, 477-paragraph Complaint makes up in length what it lacks in substance. This is a one-count lawsuit for alleged lending discrimination, brought under a federal statute with a two-year statute of limitations. Yet, while chock-full of allegations of purported wrongful conduct by any entity even remotely associated with mortgage lending, the Complaint contains no allegations that any defendant engaged in the alleged discrimination at any time in the *five* years leading up to this lawsuit. The County's inevitable reliance on the "continuing violation" doctrine does not help. The doctrine is unavailable here because the County has been on notice of its claims for years (meaning this suit is barred under Seventh Circuit law), there is no allegation of a continuing practice, and its application is barred by Supreme Court precedent. For this reason alone, the case must be dismissed.

The County's Complaint also fails to show that it has standing for Article III purposes. Cook County contends that nine separate companies, including Bank of America, N.A. and Countrywide Home Loans, Inc., as home mortgage lenders, and Merrill Lynch & Co., as involved in loan securitization, violated the Fair Housing Act, 42 U.S.C. § 3601 et seq. ("FHA"), by engaging in discriminatory mortgage lending by targeting minority borrowers in the County for predatory loans – so called "reverse redlining." The result, the County claims, was increased defaults, foreclosures, and property vacancies, which, in turn the County says, hurt property values and consequently tax revenues, resulted in a drop in recording fee income, and required expenditures related to vacant properties. That it takes 477 paragraphs to explain how there is a claim and to detail the basis for suing the nine companies who, at the time of the alleged lending, were competitors of each other, is indicative of how tortured the County's theory is. In the end, the Complaint's aggregation of different lenders, different conduct, and highly attenuated causation contentions does not identify a "concrete" injury that is "fairly traceable" to the

conduct of the Defendants, and so must be dismissed for lack of standing under Rule 12(b)(1). *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

As other Courts have found in examining similar discrimination claims, a causation theory like the County's is constitutionally suspect because even if the loans made by some Defendants had "predatory" features, the County's injuries in the form of smaller tax revenues and recording fee income and more spending are not fairly traceable to the parties sued given all that goes into why loans default and homes are foreclosed and why government revenues and expenditures fluctuate. Nor could the County's claimed injuries on a loan foreclosed by Defendants even be isolated to the Defendants' conduct, given the hundreds of thousands of other loans in the very same neighborhoods that also fell into foreclosure (but that the County does not challenge here because they were made by other lenders).

The County's suit also flounders on a different standing principle: the County's interests in maintaining and maximizing its tax and fee income and in minimizing its costs are not within the "zone of interests" protected by the FHA, and so it has no right to sue to protect those interests. The FHA is an anti-discrimination statute designed to remedy discriminatory acts and to foster integrated housing patterns. The County's claim that it lost money – if one stitches together a series of causal links that start with alleged predatory loans – does not bring it within the scope of those whose interests Congress contemplated protecting. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014) (holding the "zone of interest" test limits claims under all federal statutes to the types of interests Congress intended to protect).

In addition to the time-bar and standing deficiencies, the Complaint also fails to state a cognizable FHA claim, and so it must be dismissed.

**THE COUNTY'S CLAIM**

Despite its sprawling allegations, the Complaint asserts only a single cause of action under the FHA based on residential mortgage loans provided to minority borrowers. The allegations are directed to the mortgage origination practices of three groups of entities: Bank of America, Countrywide and Merrill Lynch, the latter two families of companies Bank of America Corp. acquired in mid-2008.[1] The Complaint in this action is substantially identical to (and often copied verbatim from) a FHA action filed against various HSBC entities shortly before this complaint was filed. *County of Cook v. HSBC North America Holdings, Inc.*, 14-cv-02031 (N.D. Ill. March 31, 2014) ("HSBC Complaint") (Amended HSBC Compl. attached as Ex. A).[2]

The County alleges that beginning in 2000, and peaking in 2004-2008, Defendants (and other industry participants) originated, purchased and/or funded "high cost" "subprime," and other "predatory" loans made disproportionately to borrowers in minority communities; this is so-called "reverse redlining," i.e., the practicing of making loans on less favorable terms to minority borrowers. *E.g.*, Compl. ¶¶ 4, 7, 436-40, 325, 445. The County alleges that these "predatory" loans increased a borrower's likelihood of delinquency and default. *See, e.g.*, *id.* ¶¶ 4, 7-8, 45, 48-49, 56-58, 60, 219, 333, 407.

The Complaint contains a welter of allegations about the supposed origination and compensation practices of Countrywide and of certain subprime lenders in the 2000-2008 time period – allegations admittedly copied from complaints in other cases. *See, e.g.*, *id.* ¶ 10. But

---

[1] The County erroneously asserts that the three "Bank of America defendants" are successors in interest to the three "Countrywide defendants" and to the three "Merrill Lynch defendants." Compl. ¶¶ 448-76. Since the Complaint fails on multiple levels, this Motion does not address those allegations in detail. Suffice it to say, however, that the broad and sweeping allegations are wrong. The allegations do not even make sense, as it is absurd on its face for the County to contend that three companies collectively labeled as "Bank of America" are all alleged successors to the same predecessors.

[2] For substantially verbatim allegations, *compare, e.g.*, Compl. ¶¶ 402-447, *with* HSBC Compl. ¶¶ 282-325; Compl. ¶¶ 368-84, *with* HSBC Compl. ¶¶ 259-71.

the Complaint has no allegations of any policies or practices evidencing discriminatory lending post-2008. *See id.* ¶¶ 157-311. Indeed, the Complaint concedes that the alleged predatory lending conduct ceased at the onset of the financial crisis in 2007-2008. *See, e.g.*, *id.* ¶¶ 74, 368; *see also id.* ¶¶ 37-45, 51, 74, 110, 126-29, 136-37, 154-56, 179, 187, 210-11, 251, 258, 272, 275, 277, 279-82, 291-92, 294, 318-27, 334-38, 359-61, 426 (alleging discriminatory lending practices occurred in 2008 or earlier). The only conduct alleged in more-recent years is that Defendants "continue to service" and "receive periodic payments" on the alleged predatory and discriminatory loans they originated or funding in the 2004-2007 time period. *Id.* ¶¶ 368-401. Those allegations do not form the basis of an independent claim for relief, but instead assert that Defendants "continue to carry out their [predatory loan] scheme through the foreclosure process." *Id.* ¶ 447; *see also id.* ¶¶ 113, 115, 213, 368-80, 401, 407. And, while the County assembles a list of non-discriminatory grievances collected from other actions filed against Defendants (*id.* ¶¶ 381, 387-92, 399-401), it alleges no facts that Bank of America's servicing and foreclosure practices were conducted in a discriminatory manner or with a discriminatory effect. *See id.* ¶¶ 368-401.[3]

The sole cause of action is premised on the contention that the County itself has suffered injury that supposedly can be ultimately traced to the reverse redlining. *Id.* ¶¶ 407, 409. It identifies three forms of alleged injury: (1) diminution in property values and tax assessments for

---

[3] While largely devoid of relevant details, the Complaint is rife with extraneous material concerning allegations of wrongdoing by a variety of mortgage lenders, servicers, or related entities over the past decade or more. *See, e.g.*, *id.* ¶¶ 36-63 (alleging trends and findings within the subprime mortgage industry); ¶¶ 64-83 (alleging subprime lending caused the nationwide economic recession); ¶¶ 340-63 (alleging MERS deprived the County of recording fees and "obfuscated" ownership of a property); ¶¶ 364-67 (alleging that the securitization process allowed industry participants to lend irresponsibly); ¶ 389 (allegations of robo-signing). These distractions, while adorned with charged language, lack any connection to the County's FHA claim. For the sake of judicial efficiency, Defendants do not move to strike this vast array of impertinent material, but reserve the right to do so. Moreover, by not addressing them in any detail, Defendants do not concede that any of those allegations are true.

foreclosed homes and neighboring homes (the "Reduced-Value" theory); (2) an alleged increase

in the cost of governmental services provided to foreclosed, vacant, or abandoned properties (the

"Governmental Services" theory); and (3) lost recording fees. *Id*. ¶ 9, 408; *see also id*. ¶¶ 402-

11, 417, 425-31, 433-34 (general injury allegations); ¶¶ 412, 418-23 (Reduced-Value theory); ¶¶

413-14, 416, 424 (Governmental Services theory); ¶¶ 415, 432 (MERS and lost recording fees).[4]

The County concedes that its economic losses are a result of reverse redlining by many other

lenders and securitizers (*id.* ¶¶ 4, 79, 422), but contends that Defendants are responsible for the

percentage of damages that "equates to Defendants' percentage share of predatory mortgage

lending activity." *Id.* ¶ 423.

## ARGUMENT

## I.    THE COUNTY'S ACTION IS TIME-BARRED.

### A.    THE LAWSUIT IS OUTSIDE THE TWO YEAR LIMITATIONS PERIOD.

This Complaint must be dismissed because it is barred by the FHA's two-year statute of

limitation.  42 U.S.C. § 3613(a)(1)(A).  A cause of action under the FHA for making

discriminatory loans begins to run from the date of loan closing.  *See Estate of Davis v. Wells*

*Fargo Bank*, 633 F.3d 529, 532 (7th Cir. 2011).  The County's FHA claim is premised on

Defendants' origination of allegedly "predatory" loans to minority borrowers, *i.e.*, reverse-

redlining (*e.g.*, Compl. ¶ 445), so it is timely only if the County alleges that these loans were

made within the last two years.  But the County does not allege that any such loan originations

occurred within the two years prior to the filing of the complaint, and in fact concedes the

---

[4] The County also vaguely alludes to "various other injuries resulting from the deterioration and blight" of
certain neighborhoods, but provides no details on the nature of those alleged injuries.  *Id.* ¶ 408.

purported reverse redlining ceased in 2008.[5]  *See* Compl. ¶¶ 368, 74, 126, 277.  The County's

FHA claim is thus time barred and subject to dismissal.

### B.   THE LIMITATION BAR IS NOT EXTENDED UNDER A "CONTINUING VIOLATION" THEORY.

The County attempts to invoke the "continuing violation" doctrine in an effort to save its

claim from dismissal, alleging the conduct at issue is a "continuing … broad scheme to

maximize profits at the expenses of FHA protected minority borrowers…."  Compl. ¶ 444.  The

continuing violation doctrine is inapplicable here for three reasons.

### 1.   The County was on notice of its claims.

The County has been aware of its purported claim here for years.  Its delay in waiting

more than two years to file suit after it was on notice precludes the County as a matter of law

from taking advantage of the continuing violation doctrine.  The Seventh Circuit has repeatedly

held that even in the continuing violation context, a claim accrual period will begin to run as

soon the underlying conduct "becomes sufficiently palpable that a reasonable person would

realize" he had a claim, *i.e.* a plaintiff "cannot procrastinate" in bringing his claims.  *Shanoff v.*

*State of Ill. Dep't of Human Servs*., 258 F.3d 696, 703 (7th Cir. 2001); *Moskowitz v. Trustees of*

*Purdue Univ.,* 5 F.3d 279, 282 (7th Cir. 1993) (plaintiff "may not sit back and accumulate all the

discriminatory acts and sue on all within the statutory period applicable to the last one.").  The

accrual period for FHA claims begins to run after the claim is first discoverable.  *See Krieman v.*

*Crystal Lake Apts. Ltd. P'ship*, 2006 WL 1519320, at *5 (N.D. Ill. May 31, 2006); *see also Soto*

*v. City of West Chicago*, 2010 WL 4810612, at *6 (N.D. Ill. Nov. 19, 2010).

---

[5] The Complaint alleges that the alleged discriminatory lending practices occurred from 2000-2008.  *See*
Compl. ¶¶ 37-45, 51, 74, 110, 126-29, 136-37, 154-56, 179, 187, 210-11, 251, 258, 272, 275, 277, 279-
82, 291-92, 294, 318-27, 334-38, 359-61, 426.

Here, the County was on actual notice of its claim prior to March 31, 2012 (two years before it filed suit), or, at the very least, the County is charged with notice under the Seventh Circuit's "reasonable person" standard. Initially, this is evidenced by the Complaint itself, which relies almost exclusively on data and factual evidence – which the County alleges proves the plausibility of its claim – that has been publicly available for far more than two years prior to the Complaint being filed.[6] Indeed, the County alleges nothing at all about why it has waited so long to file suit.

But even beyond this, the public records of the County and its encompassed communities show that the County has been on notice of all the facts constituting its claim for years prior to March 31, 2012.[7] Since at least the 2007-2008 financial crisis, the County has publicly pronounced its awareness of the very same allegations and alleged injuries cited in its Complaint: that "many foreclosure are a result of predatory lending in violation of state and federal laws,"[8]

---

[6] This evidence includes: publicly-available financial data about the economic terms of all loans made by Defendants from 2004-2007 that the County claims evidences an FHA violation "on its face" (Comp. ¶ 325 (so-called HMDA data), *see also id.* ¶ 312-39); numerous reports, studies, articles and press releases published over two years prior to the filing of this action (Comp. ¶¶ 39-44, 46-51, 53, 57-63, 78, 82-86, 109, 118-21, 123, 125, 128-31, 135-37, 148, 153-56, 179-81, 186-87, 189, 229-31, 267, 278, 294, 351, 379, 398, 403-04, 410-12, 426-27); and prior government and private-plaintiff actions filed against Defendants between 2010-2011 (Comp. ¶¶ 10, 147, 210-11, 234, 253-54, 263, 265, 296, 307, 387-91, 399).

[7] Defendants have attached various publicly available documents to prove the County's notice of its claim, and not to establish the truth of the matters asserted therein. This Court may take judicial notice of public records, complaints and news articles without converting the motion to one for summary judgment. Fed. R. Evid. 201(b); *520 South Michigan Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1137 n.14 (7th Cir. 2008) ("A court may "take judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies...."); *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (taking judicial notice of contents of government website); *Garry v. Geils*, 874 F. Supp. 195, 198 n.5 & n.6 (N.D. Ill. 1995) (taking judicial notice of public court documents); *Tomlinson v. Goldman, Sachs & Co.*, 682 F. Supp. 2d 845, 847 & n.2 (N.D. Ill. 2009) (taking judicial notice of "news releases and articles"); *Hardaway v. CIT Grp./Consumer Fin. Inc.*, 836 F. Supp. 2d 677, 686 (N.D. Ill. 2011) (taking judicial notice of "documents available to the public via the Cook County Recorder of Deeds website").

[8] Cook Cnty. Bd. of Comm'rs Resolution, 10-R-02 (Dec. 1, 2009); *see also* Cook Cnty. Bd. of Comm'rs Resolution, 08-R-37 (Jan. 9, 2008) (finding that "foreclosure rates of homes in Cook County … is rapidly increasing" and that Congress has not addressed the "larger issue of fraudulent loans, and loans issued to people who cannot repay loans 'reset' at dramatically higher rates"). (Attached hereto as Ex. B & C).

that such predatory lending was concentrated in predominantly minority and lower-income

neighborhoods,[9] and that the County and encompassed communities have suffered injuries from

the foreclosures and abandoned properties, including "decline in property values, loss of home

equity for both a foreclosed homeowner and neighboring homeowners; [and] an increase in

crime."[10] And, for many years now, the County has contemplated and devised numerous

strategies to hold lenders and servicers accountable for the harm it and its communities have

allegedly suffered from the foreclosure crisis.[11] Indeed, the City of Chicago was aware of and

actually contemplated filing or joining suit against Defendants Countrywide Financial Corp. and

Countrywide Home Loans, Inc. for predatory lending in 2008.[12] Further, the fact that similar

loan steering discrimination claims were filed years ago against Countrywide by the State of

Illinois in the Cook County Circuit Court, make it impossible for the County to argue that a

---

[9] Richard M. Daley, Analysis of Impediments to Fair Hous. Choice & Fair Hous. Plan, Chi. 2010 at 21-22 (reporting on fair lending practices within the City of Chicago and finding that the "geographic lending patterns of now defunct sub prime lenders whose loans fueled the foreclosures currently devastating communities across the country" were concentrated in black, Latino and lower-income communities); *see also id* at 32. (Excerpts attached hereto as Ex. D).

[10] Cook Cnty. Bd. of Comm'rs Meeting, Item #4 (Sept. 17, 2008); Chi. Journal of the Proceedings, at 115962-63 (April 13, 2011) (finding foreclosures are "devastating for neighborhoods because [they] depress home values, weaken the tax base, breed crime, and drive up governmental costs as municipalities bear the burden of securing and maintaining these properties."); Chi. Journal of the Proceedings, at 18220-22 (Dec. 14, 2011) (citing the GAO report findings set forth in paragraphs 410-12 of the Complaint). (Excerpts attached hereto as Ex. E to G).

[11] *See, e.g.*, Cook Cnty. Land Dev. Ord. §§ 102-19, 102-20 (ordinance passed Dec. 14, 2011) (requiring mortgagee to inspect properties for vacancy and, in certain circumstances, to register the property and perform various property maintenance actions, with $500-1000 fines for each day of each occurrence of non-compliance) (excerpts attached hereto as Ex. H); *see also* Cook Cnty. Bd. of Comm'rs Meeting, Item #4 (Sep. 17, 2008) (proposed resolution finding that the foreclosure crisis should be addressed by the "mortgage lenders, predatory and otherwise, who have contributed to the mortgage and foreclosure crisis . . .") (Ex. E); Chi. Journal of the Proceedings, at 115962-63 (April 13, 2011) (resolution seeking to hold mortgage lenders responsible for maintaining and securing foreclosed and vacant properties) (Ex. F); Chi. Mun. Code §§ 13-12-126, 13-12-127 (2011) (Chicago vacancy ordinance placing additional responsibilities on servicers and holding servicers responsible) (attached hereto as Ex. I).

[12] Chi. Journal of the Proceedings, at 33715 (July 9, 2008) (proposed resolution urging Corporation Counsel to explore the feasibility of joining the lawsuit filed by the Attorney General of Illinois against Countrywide for predatory lending or pursuing similar legal action against Countrywide and/or other lending institutions). (Excerpts attached hereto as Ex. J).

reasonable person would not have been on notice of its claims prior to March 31, 2012. *See e.g.*

*People of the State of Illinois v. Countrywide Financial Corp., et al.*, No. 10 CH 27929 (Cook

Cnty. Cir. Ct. June 29, 2010) (alleging Countywide engaged in discriminatory lending practices

that resulted in a disparate impact and disparate treatment of minority borrowers) (attached as

Ex. K); *see also People of the State of Illinois v. Countrywide Financial Corp., et al.*, No. 08 CH

22994 (Cook Cnty. Cir. Ct. June 25, 2008) (alleging Countrywide made subprime loans in a

predatory manner) (attached as Ex. L).[13] And, since at least 2009, Chicago has been a member

of a multi-city working group dedicated to jointly devising legal strategies to address the

foreclosure crisis, including by municipalities initiating FHA suits against lenders like this

case.[14] The County's attempt to jump on this (well-publicized) bandwagon over four years too

late is barred by limitations.

### 2. The conduct is not alleged to be continuing.

Even if the County had not knowingly slept on whatever claims it thinks it has, the

continuing violation doctrine does not apply because the Complaint does not allege continuing

conduct, *i.e.,* that Defendants engaged in discriminatory loan origination conduct prior to and

---

[13] *See also* Francine Knowles, *Lenders get subpoenas; Were blacks, Latinos unfairly steered to high-cost home loans?*, Chi. Sun Times, March 7, 2008 (reporting that the Illinois Attorney's General subpoenaed Countrywide to investigate whether it unfairly steered minority borrowers in violation of fair lending laws and noting that Chicago area foreclosure are largely concentrated in high-minority communities); David Greising, *Deal to Help 21,000 in State Keep Homes*, Chi. Tribune, Oct. 6, 2008 (discussing Illinois Attorney's General lawsuit alleging Countrywide steered borrowers into confusing and risky mortgages, and its subsequent settlement); Cynthia Dizikes, *State sues bank over minority lending; Countrywide gave riskier subprime loans to blacks, Latinos, lawsuit alleges*, Chi. Tribune, June 30, 2010. (Attached hereto as Ex. M to O).

[14] *See* Balt. Resolution 09-06 (Jan. 12, 2009) (noting FHA claim filed by the City of Baltimore and supporting formation of the multi-city litigation work group to hold lenders accountable); Balt. Report on the Progress of the Multi-City Litig. Work Grp. on Foreclosures (Apr. 14, 2009), *available at http://legistar.baltimorecitycouncil.com/attachments/4439.pdf* (last accessed May 15, 2009) (listing Chicago as a member of the group); *see also* Int'l Municipal Lawyers Ass'n Foreclosure Lit. Working Grp., *available at http://www.imla.org/foreclosure-litigation-working-group* (last accessed June 3, 2014) (same). (Attached hereto as Ex. P to R).

during the two-year limitations period. It is well-settled under Supreme Court and Seventh

Circuit precedent that the continuing violation exception cannot come into play if there is "no

violation during the limitation period that can serve as the anchor for the earlier conduct." *Doe*

*v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir. 1994); *Havens Realty Corp. v.*

*Coleman*, 455 U.S. 363, 381 (1982). Not only does the Complaint fail to allege any "anchor" – a

specific act of loan origination discrimination within the limitations period – but the County

acknowledges that any alleged predatory lending ceased long-ago, no later than 2007-2008. *See,*

*e.g.*, Compl. ¶ 368. Any contradictory conclusory allegations of "continuing" harm (*e.g.*, Compl.

¶ 447) are insufficient because such conclusions are too generalized to support a plausible claim

for relief where the limitations bar is patent on the face of the Complaint. *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007).

     The County's only allegation of conduct continuing into the limitations period is that,

since 2008, "Defendants have engaged in predatory and discriminatory mortgage loan servicing

that was part and parcel of their predatory and discriminatory mortgage lending scheme." *See*

Compl. ¶ 377; *see also id.* ¶¶ 384, 394. These allegations are solely for limitations purposes, as

the County's FHA cause of action (*id.* ¶¶ 436-45) is based entirely on purported discriminatory

mortgage lending and makes no mention of discriminatory servicing practices. *E.g.*, *id.* ¶ 442.

     The allegations that defaults, foreclosures and vacancies have been exacerbated on the

subject loans because of how some of the Defendants serviced those accounts, even if true

(which they are not), do not permit this Court to find that the alleged discriminatory lending

conduct was continuing from before and into the two-year limitations period. Alleging that

purportedly discriminatory loans continue to be *serviced* is not the equivalent of alleging that

discriminatory *lending* conduct continued to occur. Servicing a loan account such that a loss

10

arising from earlier discrimination became more likely is at most the continuing effect of the prior alleged wrongful originations, and not an independent event of the same type that could preserve untimely claims. *See Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 625-28 (2007) (Title VII claim untimely because, for limitations purposes, a court must look to when the alleged discriminatory practice occurred, and not to when the effects of the practice are felt).[15] In fact, just last month the Seventh Circuit reaffirmed this very principle. *See Watkins v. Chicago Housing Auth.,* 527 F. App'x 504, 506 (7th Cir. 2013) ("Lingering effects of old injuries do not count under [the continuing violation] doctrine").

Even if servicing is viewed as some sort of independent act of discrimination, it still would not save the untimely loan-origination claim that is the only cause of action the County brings. The two practices of loan origination targeted to minority communities and loan servicing are not "related closely enough to constitute a continuing violation." *Doe*, 42 F.3d at 446. The prolixity of the Complaint once again proves this point: having spent 83 pages alleging the factual basis for the cause of action (improper loan origination), the County needs to take another 12 pages to explain the factual grounds for how the "conduct" is continuing (through improper servicing). Different conduct, that occurred in a different era, fails to salvage the County's continuing violations argument. *Lewis v. Xerox Corp*., 1998 WL 160893, at *6 (N.D.

---

[15] *See also Stewart v. CPC Int'l, Inc*., 679 F.2d 117, 122 (7th Cir. 1982) (rejecting application of the continuing violation theory because "perpetuating the harm done by a past discriminatory practice" is not itself unlawful); *Stevens v. Housing Auth. of South Bend*, 720 F. Supp. 2d 1013, 1027 (N.D. Ind. 2010) (holding the continuing violation exception did not apply to an FHA claim where "the alleged harm is actually continual ill-effects stemming from an original violation."); *Hernandez v. Sutter W. Capital*, 2010 WL 3385046, at *3 (N.D. Cal. Aug. 26, 2010) (holding that the servicing of allegedly discriminatory loans was not a continuing violation because "the payments Plaintiff made pursuant to the loans were effects of any violation, not new violations in their own right"); *Lyons v. First Am. Title Ins. Co*., 2009 WL 5195866, at *4 (N.D. Cal. Dec. 22, 2009) ("The fact that plaintiffs continue to pay premiums, based on the single refinancing act, constitutes only a continuing effect ….").

Ill. Mar. 31, 1998) (rejecting the continuing violation exception because the untimely acts related to "earlier time periods, different forms of discrimination, and different [] employees.").

### 3.  The continuing violation doctrine is not available here.

Finally, a continuing violation argument is not even available.  When the Supreme Court recognized a continuing violation as an exception to FHA's limitations rule in *Havens*, it specifically elected not to extend the exception to the types of claims brought by the County here.  In *Havens*, the Supreme Court found a continuing violation exception to the FHA limitations rule in order to save a cause of action for residents having been deprived of the ability to live in an integrated neighborhood, reasoning that the timely-challenged conduct perpetuated the harm caused by otherwise time-barred conduct.  455 U.S. at 381.  However, as to claims by other individuals for having being denied accurate housing information because of their race, the Court held the doctrine did not apply.  Its holding was based on the conclusion that those claims related to discrete incidents of discrimination that resulted in individualized harm, such that a plaintiff with an untimely claim was in no way re-injured when a different individual was given untruthful information within the limitations period.  *Id*.  Thus, under *Havens*, the exception cannot be based on actions occurring within the limitation period that result in separate and different harm than the untimely conduct.  *Id*.; *Kimbrew v. Fremont Reorganization Corp.*, 2008 WL 5975083, at *3-4 (C.D. Cal. Nov. 17, 2008) (rejecting continuing violation theory for certain FHA claims based on interpretation of *Havens*).  The Supreme Court has since reinforced this limitation in the employment context: "discrete discriminatory acts are not actionable if time barred, even when they are related to acts" that occurred within the limitations period.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002) ("discrete acts" are those that are

"separate[ly] actionable" such as "termination, failure to promote, denial of transfer, or refusal to hire"); *see also infra* n.16.

The Supreme Court's analysis requires dismissal here. The County's claim is identically deficient because it is premised on "discrete acts" that occurred at or before the time of each loan's origination. Thus, even if those discrete acts continued into the limitations period (and there is no such allegation here), they still would not invoke the continuing violation doctrine. There is no allegation, for instance, that a foreclosure on a 2013 loan in any way caused the County to suffer renewed harm as to a 2005 loan that resulted in foreclosure.[16]

## II. THE COUNTY'S COMPLAINT MUST BE DISMISSED FOR LACK OF STANDING.

### A. THE COUNTY HAS FAILED TO DEMONSTRATE INJURY IN FACT.

The County lacks standing to sue because it has not identified an injury that is sufficiently "concrete and particularized." *Lujan*, 504 U.S. at 560-61. As the party seeking to invoke federal jurisdiction, the County bears the burden of demonstrating that each element of standing is met. *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996). Article III does not permit a plaintiff to seek redress for an injury based on "unadorned speculation." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 44 (1976). Here, the County claims it was injured by (i) a reduction in tax revenue it would have otherwise collected when the values of foreclosed properties and surrounding properties decreased due to

---

[16] The Complaint's throw-away reference to a "pattern or practice" (Compl. ¶ 442) is immaterial as it cures none of the above-identified defects, and it is inapplicable to the continuing violation doctrine. *See Chin v. Port Auth.*, 685 F.3d 135, 156-58 (2nd Cir. 2012) ("[E]very circuit to consider the question after *Morgan*" has held that the continuing violations doctrine cannot resurrect untimely challenges to discrete acts "even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period."); *accord Williams v. Giant Food Inc.*, 370 F.3d 423, 429-30 (4th Cir. 2004); *Cherosky v. Henderson*, 330 F.3d 1243, 1244 (9th Cir. 2003). Moreover, only the Attorney General or a class of private plaintiffs can bring a "pattern or practice" claim in any event. *See Gilty v. Village of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990); 42 U.S.C. § 3614(a).

foreclosure or vacancy/abandonment; (ii) "out of pocket costs" for government services it rendered to "affected properties and neighborhoods" due to vacancies causes by foreclosures; (iii) the loss of "other tax revenue;" (iv) lost recording fees due to MERS; and (v) "various other injuries." Compl. ¶¶ 408, 413-14. Items (iii)-(v) should be rejected out of hand as the County never explains what it refers to by "other tax revenue" or "various other injuries," and the MERS damages theory has been directly rejected by the Seventh Circuit (*infra*, n.27). The two remaining theories fare no better as they too are only pled in a generalized and conclusory fashion. The County does not identify a single property, let alone vacancy, connected to either of these theories, nor does it identify a single specific additional service it provided or expense it incurred for any given property. *See generally* Compl. ¶¶ 402-34. Its allegations thus fail to satisfy the constitutional standing requirement.

The Complaint's suggestion of possible injury is not enough, especially because the County certainly possesses tax records, as well as public safety or other administrative records, that would show how much it has allegedly lost or expended. In a similar lawsuit, brought by the City of Baltimore, the district court required just such particularized allegations. *Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A. (Baltimore I)*, 677 F. Supp. 2d 847, 850-51 (D. Md. Jan. 6, 2010) (dismissing reverse redlining claim for failure to allege "specific damages allegedly suffered by the City in regard to specific houses that became vacant"); *see also City of Memphis v. Wells Fargo Bank*, 2011 WL 1706756, at *9 (W.D. Tenn. May 4, 2011) (highlighting identification of 50 specific property addresses as grounds for not dismissing complaint). As the Complaint makes no allegation that such concrete expenses were incurred, the only conclusion to draw is that the County actually has no facts to state a plausible claim. On its face, none of the Complaint's harm theories involves a constitutionally-sufficient injury.

14

### B.     THERE IS NO INJURY FAIRLY TRACEABLE TO DEFENDANTS' CONDUCT.

The County independently fails the second prong of the standing inquiry, which requires

that the claimed injury must be "fairly … trace[able] to the challenged action of the defendant."

*Lujan*, 504 U.S. at 560.  The County cannot shift blame onto an individual lender for the effects

of a local, state, and nationwide economic downturn or for the particular circumstances of

individual borrowers that may have caused them to default in the midst of that recession.

### 1.     Loan Terms Cannot Be Causally Linked to Foreclosures.

Causation presents a fundamental—and incurable—problem with the County's claim that

reverse redlining caused lower property tax revenue and increased governmental expenses.  In

2008, the federal district court for the Northern District of Alabama dismissed a strikingly-

similar lawsuit filed by the City of Birmingham against Countrywide and others.  *City of

Birmingham v. Citigroup, Inc.*, 2009 WL 8652915, at *1 (N.D. Ala. Aug. 19, 2009).  What that

court said then remains true today: there can be no constitutional standing to sue a lender for

somehow causing municipal injury by supposed reverse redlining because "a series of

speculative inferences must be drawn to connect the injuries asserted with the alleged wrongful

conduct" due to the fact that borrowers "could have defaulted on their mortgages for a number of

reasons, none of which related to the Defendants' alleged 'reverse redlining.'"  *Id*. at *4 (*citing

Tingley v. Beazer Homes Corp*., 2008 WL 1902108 (W.D.N.C. Apr. 25, 2008)).  The

*Birmingham* court dismissed the complaint, holding that the "alleged injuries to the City are too

tenuously connected, and so not fairly traceable, to the Defendants' alleged misconduct."  *Id*. at

*5.  Other courts have found no standing in similar cases.  *Baltimore I,* 677 F. Supp. 2d at 849-51

(dismissing FHA claim for lack of standing); *Kaing v. Pultegroup, Inc.*, 464 F. App'x 630, 631 (9th Cir. 2011).[17]

 This Court should do the same as the *Birmingham* court did, because the County's suit suffers from the identical defect. To establish that its injury is "fairly traceable" to the Defendants' supposed reverse redlining, it is not enough for the County to allege that certain loans ended up in foreclosure; instead, in order to meet the constitutional requirements for alleging traceability to these particular lenders the County must plausibly allege that the Defendants' reverse redlining *caused* the foreclosures to occur. And, even if it shows that, the County still would have to show the second step, that the foreclosures caused the County to be harmed. *E.g.*, *Hope, Inc. v. County of Du Page*, 738 F.2d 797, 807 (7th Cir. 1984) (FHA claim failed because plaintiffs did not "allege or subsequently prove the causal connection between the County Board's activity and their asserted injury."). The County cannot make either showing.

 The County does assert that the loan terms from Countrywide and others were the cause of foreclosures. Compl. ¶¶ 80, 219, 438. But this is not a plausible allegation, as there are both borrower-specific and macro-economic factors at play when it comes to divining the cause of any given borrower's default. It is common sense that a borrower's default is often triggered by an event that is unrelated to loan terms, such as "unemployment, health problems, a general weakening in the economy, [] other financial conditions" or the "intervening decisions by the mortgage assignees to foreclose the defaulted mortgages rather than to restructure the loans."

---

[17] Defendants acknowledge that two courts have recently decided municipalities have standing in cases with similar FHA allegations. *See City of Los Angeles v. Wells Fargo & Co.*, 2014 U.S. Dist. LEXIS 72818 (C.D. Cal. May 28, 2014); *DeKalb County v. HSBC N. Am. Holdings, Inc.*, 2013 U.S. Dist. LEXIS 185976 (N.D. Ga. Sept. 25, 2013). Defendants respectfully submit that both cases were wrongly decided on the standing issue. Further, the statute of limitations issue here is distinct (and determinative): the Ninth Circuit has not adopted the Seventh Circuit's notice standard for the continuing violations doctrine, the allegations of continuing conduct in *Los Angeles* are distinct from those here, and the *Dekalb* court did not have similar evidence of the county's notice before it at the motion to dismiss stage (and has since ordered bifurcated discovery and summary judgment briefing focused on the time bar issue).

*Birmingham*, 2009 WL 8652915, at *3; *Tingley*, 2008 WL 1902108, at *4 (same); *accord Kaing*, 464 F. App'x at 631.  Additionally, other personal factors can also play a role in default, including excessive non-home debt, such as credit cards, investment losses that depleted savings that were to be used to repay the mortgage, a personal bankruptcy, or, despite an ability to pay, a borrower's decision to walk away from the mortgage because the expense was not justified by the property's declining value.  *See Pozzie v. United States Dep't of Hous. and Urban Dev.*, 48 F.3d 1026, 1030 (7th Cir. 1995) (discussing HUD handbook identifying borrower-specific reasons for default, including "[d]ecreases in family income caused by unemployment or underemployment; loss, reduction or delay in receipt of [government or private] benefit[] payments …; loss of support payments; or other loss of income because of divorce, illness or death."); *Murungi v. Texas Guaranteed*, 693 F. Supp. 2d 597, 606-07 (E.D. La. 2010) ("A person might default on a loan for a variety of reasons").  The County neither attempts to deny the importance of these factors nor explain how its causal theory is plausible in light of them.

The County's conclusory allegation that Defendants' "reverse redlining" will cause "approximately 60%" of "approximately 95,000" loans to end up in foreclosure (Compl. ¶ 431) is implausible.  First, the loss is not fairly traceable to Defendants unless the cause of a particular default and foreclosure was because a loan was discriminatory or "unfair" (and thus in line with the County's claims).  By conceding that not all "predatory" loans enter foreclosure (*id*. ¶ 431), the County has conceded that there are factors beyond Defendants' conduct that determine whether a loan will default.  This is exactly what the *Birmingham* court concluded: borrowers default for any number of reasons that may be entirely unrelated to their loan terms.

Next, the Complaint's traceability problem is compounded by its refusal to acknowledge the involvement of borrowers and third parties that affect whether or not a default occurs and

17

whether or not a foreclosure is initiated or completed—and, so, whether the County was ultimately harmed by the supposed reverse redlining. *See Birmingham,* 2009 WL 8652915, at *4; *see also DH2, Inc. v. SEC*, 422 F.3d 591, 597 (7th Cir. 2005) (causation cannot "hinge[] on the decisions of independent actors").[18]  The County repeatedly highlights the importance of third parties in the foreclosure chain by making the loan securitization process a bedrock of the Complaint.  Compl.  ¶¶ 64-79, 364-67.  Although the Complaint contains a conclusory allegation that Defendants retained servicing rights to "virtually every predatory mortgage loan," (*id*. ¶ 114), it concedes that many of these loans are actually owned by other entities, who necessarily have a say in whether a foreclosure is initiated or completed.  *Id*. ¶¶ 364-67.  The County nowhere explains how its supposed losses could be "fairly traceable" to the Defendants' loan origination practices when such third parties play such an admittedly large role in the servicing and foreclosure process.  *See, e.g.*, *Deutsche Bank Nat'l Trust Co. v. Christian*, 2013 WL 6283584, at *1 (N.D. Ill. Dec. 4, 2013) (noting trustee of a securitized pool of mortgages filed foreclosure action); *HSBC Bank USA v. Fequiere*, 2010 WL 4884560, at *5 (Conn. Super. Ct. Aug. 10, 2010) (same).

The undeniable role of third parties is particularly salient because, in some cases, the County itself may have taken the determinative action that resulted in foreclosure.  This is

---

[18] *See also Ass'n of Am. Physicians & Surgeons, Inc. v. Koskinen*, 2014 WL 1056495, at *6 (E.D. Wis. Mar. 18, 2014) ("Plaintiffs' primary claim fails to establish standing because it relies on a series of discretionary acts by third parties.); *Plotkin v. Ryan*, 1999 WL 965718, at *4 (N.D. Ill. Sept. 29, 1999) ("several independent decisions by third-party employees … intervened, creating too many links in the chain of causation to allow Plotkin standing for this injury"); *Burns v. Mundelein Bldg. Dep't*, 1999 WL 965855, at *3 (N.D. Ill. Sept. 29, 1999) ("the trials and tribulations which may have been visited upon the plaintiff may very well have been the result of economic forces and decisions of third parties rather than directly and immediately caused by the defendants' actions.").

necessarily true because during the relevant time period the County sold tens of thousands of tax liens on properties that made those properties susceptible to foreclosure.[19]

Further, any examination of what led to any particular foreclosure could not occur without a detailed consideration of the larger macro-economic issues that play significant roles in foreclosure rates. Once again, the County's own allegations are instructive: the County has identified a host of macro-economic factors that it contends led to the "downward spiral in home prices and a rapid increase in loan delinquencies" (Compl. ¶ 66), including the overall operation of the mortgage market (*id.* ¶¶ 46-52), the development of the loan securitization process (*id.* ¶ 67), actions of regulators (*id.* ¶ 71), spikes in interest rates (*id.* ¶ 72), freezing of credit markets (*id.* ¶ 76), and the increasing unemployment rate (*id.* ¶ 77). The County alleges these factors caused substantial job losses and unemployment that hit minority communities particularly hard. *Id.* ¶¶ 60, 81. These complicated macro-economic factors necessarily play a significant role in the causation chain leading up to borrower default, and belie the assertion later in the Complaint that Defendants' lending conduct caused the drop in tax revenues and increase in expenses.

It is simply not plausible for the County to claim in sweeping terms and without detail, as it does, that the terms of loans made by Defendants caused any given foreclosure (never mind the 50,000+ foreclosures it claims are at issue). *Id.* ¶ 431. The Complaint's generalized allegations do not overcome the County's inability to prove that making particular loans caused a "fairly traceable" injury to the County. The complex factual analysis to determine the cause of any foreclosure (let alone all of them) cannot be swept aside with unadorned speculation.

---

[19] *See* Cook Cnty. Treasurer's Office website, https://www.cooktaxsale.com/faq.cfm, last visited June 2, 2014; 35 Ill. Comp. Stat. 200/1-1, *et. seq.*; *Overview: Annual and Scavenger Property Tax Sales,* Office of Cook Cnty. Treasurer Maria Pappas, October 3, 2012, at 5 (purchaser of tax lien may petition court for a tax deed to transfer title if property owner does not pay lien within statutory period, which is typically 6-24 months), 12 (since 2009 the County has sold over 80,000 tax liens) (attached as Ex. S). In fact, Cook County even runs a Biennial Scavenger Sale where the specific advantage is a shorter redemption period for the homeowner, *i.e.* it is faster and easier to affect title transfer based on the tax lien sale. *Id.*

### 2.    The Complaint Does Not Plausibly Link Foreclosures to the Injuries the County Alleges.

The second, equally incurable, problem with the County's position that it has standing to sue is that there is no fairly traceable connection between any particular foreclosure and the County's claimed injuries.  Even accepting that the County has lost tax revenue and spent money on vacant properties formerly secured by a Defendants' loan (neither of which is at all clear, *supra* Section II.A), it still does not necessarily follow that any such injury can be traced back to the terms of the original loan.  Instead, the causation analysis for this link in the chain once again involves a series of intervening factors and parties that necessarily preclude standing.

As noted above, the County has several theories of loss traceable to Defendants' lending. The County's Reduced-Value theory of loss depends on its ability to prove that its supposed reduction in tax revenues happened as a result of the loans that Defendants made.  That requires the County prove two things: that property values went down because of the alleged discrimination and that revenues went down because values went down.  As the court in *Birmingham* explained, both assertions are too tenuous to meet constitutional standards:

> [I]t is quite speculative that the depreciation in value of the neighboring homes in the City was caused by the foreclosures of minority borrowers' properties rather than as a result of 'a myriad of other factors,' [including] . . . 'rising unemployment in the region, changes in the housing market, or other economic conditions.' . . . . [Similarly], [t]he loss of tax revenue from property taxes and the increase in spending, like the depreciation in home values, could have been caused by any number of factors having nothing to do with the Defendants' alleged 'reverse redlining.'

2009 WL 8652915, at *4 (quoting *Tingley*, 2008 WL 1902108, at *5).

The factors identified by the court in *Birmingham* are but a few of the numerous interconnected factors that contributed to the reduction in housing prices.  On this point, too, the County itself has identified a host of macro-economic factors that led to the "downward spiral in

20

home prices." Compl. ¶ 66; *see also id.* ¶¶ 46-52, 67-77 (home prices affected by mortgage market, loan securitization process, regulators, spikes in interest rates, freezing of credit markets, and the increasing unemployment rate); *AZ Holding, L.L.C. v. Frederick*, 2010 WL 500443, at *7 (D. Ariz. Feb. 10, 2010) ("It is common knowledge that the current recession, beginning in the later part of 2007, has had a major adverse effect on real property values ...."); *Estate of Young v. United States*, 2012 WL 6585327, at *1 (D. Mass. Dec. 17, 2012) ("Over the summer of 2009, … the United States was in the midst of a financial crisis that caused property values to plummet."). The interrelatedness of these factors overwhelms any attempt to link any particular property's drop in value to a single event like a foreclosure sale in the same neighborhood. *See Birmingham*, 2009 WL 8652915, at *4; *Tingley*, 2008 WL 1902108, at *4; *Kaing v. Pulte Homes, Inc.,* 2010 WL 625365, at *5 (N.D. Cal. Feb. 18, 2010) ("a decline in value that is tied to a purely economic change to a neighborhood is … likely to change with the broader economy," as well as depending on "other economic factors that can have unpredictable effects on the housing market"), *aff'd*, 464 F. App'x 630 (9th Cir. 2011); *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 783 (4th Cir. 2001) ("in the volatile, modern real estate market, substantial price variations occur with weekly or monthly regularity").[20]

Of course, and as the County acknowledges, Defendants were hardly the only lenders making similar loans in Cook County during the relevant time. The County's allegations and its

---

[20] These macro-economic issues equally foreclose any attempt to link foreclosures with resulting governmental services. The type of police, upkeep, and administrative services outlined in the Complaint (¶¶ 413-16) are just as likely to be attributable to economic and socio-economic factors wholly unrelated to Defendants, as well as to third parties not before the Court, such as other entities involved in the finance or housing industry, holdover tenants, squatters, or criminals. The County cannot "pick and choose" among all the possible causes of its alleged increase in governmental services and attempt to hold Defendants singularly accountable. *See Birmingham*, 2009 WL 8652915, at *4 ("additional costs for crime and fire prevention … could have been caused by any number of factors having nothing to do with the Defendants' alleged 'reverse redlining.'"); *see also Florida Ass'n of Med. Equip. Dealers v. Apfel*, 194 F.3d 1227, 1231 (11th Cir. 1999).

nearly-identical, parallel action against HSBC demonstrates that it obviously believes other lenders in the market were engaging in the same alleged conduct resulting in the same alleged injuries.  HSBC Compl. ¶ 46 (alleging HSBC was one of the largest originators, purchasers, securitizers and/or servicers of subprime mortgages within Cook County); *see also* Compl. ¶ 79 (highlighting the "predatory lending of other industry participants") (Ex. A).  Since the County provides absolutely no explanation for how it can trace reductions-in-value back to these Defendants, as opposed to any of the macro-economic factors identified above or the conduct of the other lenders the County believes are also to blame (let alone the unrelated foreclosures that necessarily occurred on non-predatory loans), the Complaint does not sufficiently allege that the drop in values is fairly traceable to these Defendants.

The County does allege that it can identify properties and damages through "GPS mapping" and unexplained "statistical regression techniques," and that Defendants are responsible for damages equaling their "percentage share of predatory mortgage lending activity."  Compl. ¶¶ 419, 423.  But these statements provide this Court with no plausible basis to conclude that the County is capable of tracing any alleged injury back to the Defendants' conduct.  In fact, the nature of the County's theories, its suit against HSBC, and its own allegations demonstrate that this cannot be done here.[21]

The County's Governmental Services injury theory is premised on the idea that the County "has incurred out-of-pocket costs with respect to specific vacant and pre-foreclosure

---

[21] The County also is unable to prove that foreclosures result in lower tax revenues because during the relevant time period, the County specifically excluded foreclosure sales in determining the property value for tax assessment purposes. *See A Citizen's Guide to Your Property Tax Bill*, Cook Cnty. Comm'r, at 4 ("Foreclosure sales are not taken into account when calculating fair cash value") (excerpts attached as Ex. T). Additionally, the County's tax revenues are only loosely based on assessed values in any event, in light of an ever-expanding list of exemptions that reduce the total amount owed on property tax bills. *Id.* at 9 (specifying exemptions for homeowner, long-time occupant, senior homeowner, senior freeze, disabled person, and others).

properties secured by [Defendants' loans]… that would not have been necessary if such properties were occupied…." Compl. ¶ 413. There is, however, no attempt in the Complaint to causally link any alleged property vacancy to any specific foreclosure (let alone to any loan made or securitized by any of the Defendants). As the court in *Baltimore* recognized, to satisfy minimal standing requirements, a governmental entity bringing such a claim must identify specific properties that were "(1) occupied before the sale facilitated by the 'bad' [] loans, and (2) would have remained occupied during the period for which the City claims damages." *Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A. (Baltimore II)*, 2010 U.S. Dist. LEXIS 95812, at *3 (D. Md. Sept. 14, 2010). The Complaint utterly fails in this regard, as it does not identify any specific allegedly vacant property or any period of vacancy or any governmental service provided as a result of any alleged vacancy. *See Baltimore I,* 677 F. Supp. 2d at 850-51 (city must identify "specific damages allegedly suffered by the City in regard to specific houses that became vacant").[22]

The only example the County identifies of these alleged damages is time spent by its "building code enforcement" staff to "inspect, investigate and respond to violations at such vacant properties…." Compl. ¶ 414. Yet this example illustrates the County's own causal deficiency, as even assuming the building code enforcement staff accurately recorded vacancy status, the County has no way to link such a vacancy back to the Defendants. This is true because a vacancy could have been caused by any number of reasons unconnected to Defendants' conduct, including, for example, the borrower moving for work or personal reasons,

---

[22] In *Baltimore*, the City's complaint was repeatedly dismissed for lack of a causal connection between the City's alleged increased costs and the bank's loans. The City's claim was only allowed to proceed, after a third amendment, as to 190 properties that the City alleged: (1) would not have been vacant but for the bank's conduct, and (2) had specific increased municipal costs attributable to each property. *See Baltimore II*, 2010 U.S. Dist. LEXIS 95812, at *2 (City required to "focus[] upon 'property specific,' rather than generalized, damages").

the borrower never having occupied the property to begin with (*e.g.*, investment or second

homes), or the property suffering damage that the borrower could not afford to repair.  Neither

can the County causally connect any specific building code violation back to Defendants because

there are innumerable potential causes for any such violation unrelated to Defendants.  For

example, faulty wiring causes fires in occupied homes too, and it is facially absurd to claim the

Defendants can be blamed for a vacancy or violation caused by such an event.

### III.    THE COUNTY'S LAWSUIT DOES NOT FALL WITHIN THE FHA'S ZONE OF INTEREST.

The Complaint must also be dismissed because the County's claims do not fairly fall

within the "zone of interest" that the FHA seeks to protect.  As clarified in a pair of recent

Supreme Court decisions, a plaintiff may not sue under a federal statute unless the interests that

it is seeking to protect are within the "zone of interest" that Congress meant to protect in

enacting the statute.[23]  *Lexmark*, 134 S. Ct. at 1388-89 (2014).  The FHA allows claims by

"aggrieved persons," (42 U.S.C. § 3613), and in considering that phrase this court should

conclude that a county seeking to recover lost tax revenue and out-of-pocket expenses for

governmental functions is not within the FHA's "zone of interest."

In *Thompson v. North American Stainless, LP*,  131 S. Ct. 863, 869-70 (2011), the

Supreme Court interpreted Tile VII, which also gives the right to sue only to aggrieved persons.

It held  "that the term 'aggrieved' must be construed more narrowly than the outer boundaries of

Article III,"  rejecting the argument that the term should extend to the full limits of constitutional

authority because, the Court reasoned, this would invite "absurd consequences" involving highly

---

[23]  This test had previously been referred to as prudential in nature and not applying to certain statutes, including the FHA. *See, e.g.*, *Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 87 n.3 (3d Cir. 1998) ("The 'zone of interest test' does not apply to standing to pursue an action under the Fair Housing Act."); *accord Simovits v. Chanticleer Condo. Ass'n*, 933 F. Supp. 1394, 1399-1400 (N.D. Ill. 1996).

attenuated causal chains (such as the County's here, *supra* Sect. II.B). Instead, the proper "zone of interest" test for statutes permitting actions by "aggrieved" persons, the Court concluded, "enabl[es] suit by any plaintiff with an interest arguably sought to be protected by the statutes, while excluding plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions …." *Id*. at 870 (quotations and citations omitted). Significantly, this interpretation prevents suits where "the plaintiff's interests are so marginally related to ... the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id*. As already recognized by some courts post-*Thompson*, this same logic dictates how the "zone of interests" test be applied to the FHA, because the language at issue in the two statutes is effectively identical and there is no reason to construe the two civil rights statues differently. *DT Apartment Grp., LP v. CWCapital, LLC*, 2012 WL 6693192, at *15 (N.D. Tex. Dec. 26, 2012) ("given the Court's reasoning in *Thompson*, this Court concludes that it must apply the zone of interests test when addressing whether FHA plaintiffs have standing"); *Hous. Opportunities Project for Excellence, Inc. v. Wedgewood Condo. Ass'n, Inc. ("HOPE")*, 2012 WL 4193969 (S.D. Fla. Sept. 19, 2012) (applying *Thompson* to standing analysis); *see also Thompson*, 131 S. Ct. at 870 (referencing similarities in Titles VII and VIII on a related issue).[24]

The County's monetary claims for taxes, fees and budget items fail to meet this test because the government's interest in funding falls outside the interests sought to be protected by the FHA, namely to protect individuals from actual discriminatory conduct and to promote

---

[24] *Thompson*'s general application to non-Title VII cases has been recognized as well with regard to a variety of statutes involving similar "aggrieved persons" language. *See, e.g., League of United Latin Am. Citizens (Lulac) of Wisconsin v. Deininger*, 2013 WL 5230795, at *2 (E.D. Wis. Sept. 17, 2013) (test applies to Voting Rights Act because of similar "aggrieved" language); *Whittaker v. St. Lucie Cnty. Sch. Bd.*, 2011 WL 3424564 (S.D. Fla. Aug. 5, 2011) (same as to the Rehabilitation Act, 29 U.S.C. §§ 701-97).

diverse and integrated neighborhoods for the benefit of individuals and the citizenry generally. *See* 42 U.S.C. § 3601(FHA's stated purpose is "to provide, within constitutional limitations, for fair housing throughout the United States"); *Shaikh v. City of Chicago*, 2001 WL 123784, at *4 (N.D. Ill. Feb. 13, 2001) ("The overall purpose of the FHA is to further equal housing opportunity and to eliminate segregated housing") (quotations and citation omitted); *HOME v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 652 (6th Cir. 1991) (FHA purposes are "to eradicate housing discrimination and to promote integrated housing"). There is nothing in the FHA caselaw, or the statute itself, that supports any conclusion that the FHA was enacted to protect a county's tax base or budget. The County's attempt to reap a financial reward from a distant act of alleged discrimination is exactly the kind of "absurd consequence" that *Thompson* cited in concluding that the 'aggrieved person' limitation defined the scope of plaintiff's claim narrower than Article III might permit.

The County may argue that it meets the *Lexmark* test because other governmental bodies have been permitted in the past to bring FHA claims. Significantly, the trilogy of Supreme Court cases that have recognized standing for a government under the FHA have all concerned plaintiffs who, unlike the County here, principally claimed to suffer injury because discrimination caused a community that was not racially integrated. *See Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972); *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982). Cases applying the zone of interest test post-*Thompson* have concluded, as this Court should, that a plaintiff (other than someone actually denied housing opportunities) falls within the FHA's "zone of interest" only when it seeks to recover for the impact of discrimination on the benefits of living in an integrated community. *See HOPE,* 2012 WL 4193969 (zone of interest met because claim

26

focused on integrated community benefits); *DT Apartment Grp., LP*, 2012 WL 6693192, at *16 (zone of interest not met because, unlike prior Supreme Court cases on FHA standing, there was no allegation that plaintiffs "suffer[ed] from a lack of interracial association").

Here, the County makes no claim of injury arising from any alleged impact on the diversity of its community. Rather, the County's claim is that it lost tax revenue and had higher expenditures as an indirect consequence of foreclosures that allegedly resulted from bad loans that allegedly were discriminatory in some way. Even if it might have standing if it had sued to protect interests fostered by the FHA, *e.g.* racial integration, the County seeks to protect interests outside the statute's intended reach, and outside the "zone of interest" the FHA seeks to protect.

## IV.    THE COMPLAINT MUST BE DISMISSED UNDER RULE 12(B)(6).

### A.    THE REVERSE-REDLINING DISPARATE IMPACT CLAIM IS DEFICIENT.

#### 1.    The FHA Does Not Recognize Disparate Impact Claims.[25]

The County's theory that Defendants' lending practices had a disparate impact on minorities (Compl. ¶¶ 437, 439) fails because disparate impact is not a cognizable theory of recovery under the FHA. In *Smith v. City of Jackson*, 544 U.S. 228 (2005), the Supreme Court found that whether a federal statute allows for recovery based on disparate impact depends on its *text*, and specifically on whether "the text focuses on the effects of the action … rather than the motivation for the action." *Id*. at 236. Applying that rule, the Court found that one section of the Age Discrimination in Employment Act ("ADEA") recognized disparate impact claims, but another section did not, because in that section there was no reference to providing any remedy

---

[25] Defendants acknowledge that this Court has recognized disparate impact FHA claims even in light of *City of Jackson*, *see Hoffman v. Option One Mortgage Corp.*, 589 F. Supp. 2d 1009, 1012 (N.D. Ill. 2008), and that, without substantive analysis, the Seventh Circuit has also recognized disparate impact FHA claims after *City of Jackson*, *see, e.g.*, *Bloch v. Frischholz*, 587 F.3d 771, 784 (7th Cir. 2009). Defendants respectfully submit that *City of Jackson* and the FHA's statutory language require otherwise.

for the effects of a defendant's conduct. *Id.* at 236-38 & n.6. Significantly, the relevant language in the FHA is identical to the section of the ADEA the Court held to be insufficient to create disparate impact liability. *Compare* ADEA § 4(a)(1), 29 U.S.C. § 623(a)(1), *with* FHA § 805(a), 42 U.S.C. § 3605(a). As *City of Jackson* counsels, "when Congress uses the same language in two statutes having similar purposes … it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." 544 U.S. at 233. As a result, this authority requires the conclusion that the FHA does not allow disparate impact claims.

### 2. The County Has Not Sufficiently Alleged a Disparate Impact.

Even assuming disparate impact claims under the FHA are cognizable, the County has not adequately plead such a claim here because it has not identified any specific practice that has caused a disparate impact on minorities, and its cited statistics are deficient. The County has essentially alleged that the entire loan origination process – from loan pricing discretion to appraisals to underwriting to MERS – disadvantages minorities. *E.g.*, Compl. ¶¶ 103, 105-08, 340-56. But this kind of shotgun theory does not "isolat[e] and identify[] the *specific* [] practices that are allegedly responsible for any observed statistical disparities." *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989) (emphasis added); *see also Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2554 (2011) ("[P]olicy of allowing discretion … should itself raise no inference of discriminatory conduct."). This is particularly true because the County has not offered any statistics that control for relevant credit factors. *Wards Cove*, 490 U.S. at 650-53 (a plaintiff's statistics must compare "the racial composition of the *qualified persons* in the [relevant] market and the persons [receiving] at-issue" loans in order to show disparate impact) (emphasis added). Instead, the County offers only a single conclusory sentence that the "differences cannot be explained by differences in borrower credit score or other objective

criteria." Compl. ¶ 324. But this kind of bald statement, without any identified support, is not sufficient to state a claim.[26]

### B.    THE REVERSE-REDLINING INTENTIONAL DISCRIMINATION CLAIM FAILS.

The County's allegations that Defendants committed intentional discrimination are also woefully deficient. In order to establish a disparate treatment claim, the County has the burden of establishing that the Defendants had "discriminatory intent." *Kormoczy v. HUD*, 53 F.3d 821, 824 (7th Cir. 1995). Conclusory allegations alone are not sufficient to carry this burden. *Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009). Nor can the County merely allege that Defendants made unfavorable loans to minority borrowers; rather, the County must allege that Defendants purposefully did so specifically "*because of*" those borrower's minority status—as opposed to, for example, because of those borrowers' credit worthiness. *S.-Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors*, 935 F.2d 868, 883 (7th Cir. 1991). But nowhere does the County allege that Defendants' lending was motivated by racial animus, and in fact it alleges only that Defendants' "intent was to maximize corporate profits" (Compl. ¶ 157), not to discriminate. The statistics cited by the County (*e.g.*, *id.* ¶ 312) are also deficient because "[t]he Seventh Circuit has held that 'statistics are improper vehicles to prove discrimination in disparate treatment (as opposed to disparate impact) cases.'" *Rummery v. Ill. Bell Tel. Co.*, 2000 WL 343469, at *13 (N.D. Ill. Mar. 30, 2000) (quoting *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 348 (7th Cir. 1997)). And even if statistics were proper vehicles to prove discrimination, the County's statistics and allegations would still be deficient, because proving disparate treatment through

---

[26] In fact, the County acknowledges that the at-issue loans were made to borrowers who would not have qualified for better loans. Compl. ¶ 174 ("[Defendants were] targeting borrowers who were typically living in urban areas, who have less access to traditional credit, limited credit histories, lower income, lower credit scores and homes with lower values but, relatively untapped home equity.").

indirect evidence requires allegations that a borrower "despite being qualified, was rejected."

*Gilty*, 919 F.2d at 1251. The County does not allege (much less support with statistics) that the

at-issue loans were given to borrowers who qualified for better loans.[27]

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Complaint be

dismissed with prejudice and in its entirety.


Dated: June 3, 2014                    Respectfully Submitted,

                                       By:     /s/ Thomas M. Hefferon

                                               J. Erik Connolly
                                               *EConnolly@winston.com*
                                               WINSTON & STRAWN LLP
                                               35 West Wacker Drive
                                               Chicago, Illinois 60601
                                               Tel.: (312) 558-5600
                                               Fax: (312) 558-5700

                                               Thomas M. Hefferon
                                               *THefferon@goodwinprocter.com*
                                               James W. McGarry (*notice of appearance* to be
                                               filed upon admission)
                                               *JMcGarry@goodwinprocter.com*

---

[27] The Complaint fleetingly alleges (at ¶ 445) that Defendants violated section 3604(c), which prohibits discriminatory advertisements and statements made "with respect to the sale or rental of a dwelling." 42 U.S.C. § 3604(c). But given the lack of any supporting factual detail in the Complaint, this conclusory allegation can be quickly set aside. The Complaint also makes allegations regarding "robo-signing" and other foreclosure activities that were the subject of Federal Trade Commission and Office of the Comptroller of the Currency consent orders. Compl. ¶¶ 387-90. These allegations are irrelevant; they do not claim that these practices were targeted at minorities or even that they had a disparate impact on minorities. Instead, they amount to miscellaneous complaints about the Defendants' servicing of loans that have nothing to do with the cause of action under the FHA. Finally, in apparent ignorance of binding Seventh Circuit precedent, the County claims that the Mortgage Electronic Registration System ("MERS") is somehow illegal, and that it is entitled to recover lost mortgage recording fees. Compl. ¶ 408; *see also* ¶¶ 340-56; 364-67. These allegations are wholly-frivolous as the Seventh Circuit has twice recently affirmed the legality of MERS, and the inability of county recorders to sue for lost recording fees. *Macon County, Ill. v. MERSCORP, Inc.*, 742 F.3d 711, 714 (7th Cir. 2014); *accord Union County, Ill. v. MERSCORP, Inc.*, 735 F.3d 730, 733-34 (7th Cir. 2013).

Matthew S. Sheldon (*notice of appearance* to be
filed upon admission)
*MSheldon@goodwinprocter.com*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
Tel.: (202) 346-4000
Fax: (202) 346-4444

*Attorneys for Defendants Bank of America
Corporation, Bank of America, N.A., Countrywide
Financial Corporation, Countrywide Home Loans,
Inc., Countrywide Bank, FSB, Countrywide
Warehouse Lending, LLC, BAC Home Loans
Servicing, LP, Merrill Lynch & Co., Inc., Merrill
Lynch Mortgage Capital Inc., and Merrill Lynch
Mortgage Lending, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 3, 2014, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.


/s/ Thomas M. Hefferon
One of the attorneys for Defendants