

Not Reported in F.Supp.2d, 2011 WL 1557759 (D.Md.)
**(Cite as: 2011 WL 1557759 (D.Md.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Maryland.
MAYOR AND CITY COUNCIL OF BALTIMORE,
Plaintiff
v.
WELLS FARGO BANK, N.A., et al., Defendant.

Civil Case No. JFM–08–62.
April 22, 2011.

John Peter Relman, Relman Dane and Colfax PLLC, Glenn Schlactus, Relman and Dane PLLC, Megan Moran–Gates, Relman Dane and Colfax PLLC, Washington, DC, George A. Nilson, Baltimore City Law Department, Suzanne Sangree, City of Baltimore Law Department, Baltimore, MD, for Plaintiff.

Andrew L. Sandler, Benjamin Barnet Klubes, Jonice Gray Tucker, Valerie L. Hletko, Buckleysandler LLP, Washington, DC, for Defendant.

*MEMORANDUM*
J. FREDERICK MOTZ, District Judge.

**\*1** The Mayor and the City Council of Baltimore ("the City") have filed a cause of action against Wells Fargo Bank, N.A. and Wells Fargo Financial Leasing, Inc. (together, "Wells Fargo") under the Fair Housing Act of 1968 ("FHA"), 42 U.S.C. §§ 3601 *et seq.* Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b) (6), Wells Fargo has filed a motion to dismiss the City's Third Amended Complaint on the theory that the City lacks Article III standing because it has not demonstrated a fairly traceable causal connection between its claimed injuries and Wells Fargo's alleged conduct. (Defs.' Mem. at 1.) For the reasons stated below, Wells Fargo's motion to dismiss is denied.

I. *BACKGROUND*

In January 2008, the City filed a complaint alleging that Wells Fargo had violated 42 U.S.C. §§ 3604–05 of the FHA by engaging in "reverse redlining," a practice described by the City as the "targeting [of] African–American neighborhoods in Baltimore for deceptive, predatory, or otherwise unfair mortgage lending practices ." (Third Am. Compl. ¶ 335.) The case, originally assigned to Judge Legg, was reassigned to me on August 6, 2009. (Order of Recusal, Aug. 6, 2009, ECF No. 120.) In an opinion dated January 6, 2010, I granted Wells Fargo's motion to dismiss the City's First Amended Complaint. I held that the City had failed to allege a plausible causal connection between the widespread damages it sought and Wells Fargo's lending practices, but I granted the City leave to file an amended complaint seeking more limited damages. *Mayor of Baltimore v. Wells Fargo Bank, N.A.,* 677 F.Supp.2d 847, 851 (D.Md.2010).

The City filed a Second Amended Complaint seeking narrower, property-specific damages in April 2010. In September 2010, I again granted Wells Fargo's motion to dismiss the Second Amended Complaint. In a letter opinion setting forth that decision, I noted that while the Second Amended Complaint properly focused on property-specific, rather than generalized, damages, these damages were still premised on the assumption that the properties in question would not have been vacant but for the improper loans made by Wells Fargo. Letter Op. at 1, Sept. 14, 2010, ECF No. 174. Without alleging this factual premise, I held, the City could not state a plausible causal connection between its damages and the allegedly improper lending activities of Wells Fargo. Nonetheless, I granted the City leave to file a third amended complaint incorporating this allegation—if it could do so consistent with Rule 11. *Id.* at 2.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1557759 (D.Md.)
**(Cite as: 2011 WL 1557759 (D.Md.))**

The City filed its Third Amended Complaint on October 21, 2010. On December 3, 2010, Wells Fargo moved to dismiss.

II. *ANALYSIS*

Wells Fargo moves to dismiss the City's Third Amended Complaint on the ground that the City lacks standing because any injury it may have suffered is not fairly traceable to Wells Fargo's alleged conduct. For the reasons that follow, I conclude that the City has plausibly alleged injuries that are fairly traceable to Wells Fargo's alleged conduct, and Wells Fargo's motion is therefore denied.

A. Standard of Review

**\*2** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." ' *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Although easily stated, the plausibility standard sometimes proves difficult to put into practice, and its application is often "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir.2009) (quoting *Iqbal,* 129 S.Ct. at 1950). While a plaintiff is required to "articulate facts ... that show that the plaintiff has stated a claim entitling him to relief," the Supreme Court has emphasized that the plausibility standard is "not akin to a probability requirement." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 557). Rather, the plausibility requirement is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* As I have noted previously, the plausibility standard applies equally to allegations concerning standing. *Mayor of Baltimore,* 677 F.Supp.2d at 850.

B. Constitutional Standing and Fair Traceability

"Standing concerns whether the plaintiff is the proper party to bring the suit.' " *ProEnglish v. Bush,* 70 Fed. App'x 84, 87 (4th Cir.2003) (per curiam) (quoting *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)). Although the standing inquiry "involves both constitutional and prudential limitations on its exercise," the Supreme Court has made clear that the constitutional and prudential limitations merge in a FHA case because standing under the FHA is "as broad as is permitted by Article III of the Constitution." *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 108, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). Thus, in a FHA claim, a court need only assess the three requirements of constitutional standing: (1) "the plaintiff must have suffered an injury in fact;" (2) "there must be a causal connection between the injury and the conduct complained of;" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." [FN1] *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citation and internal quotation omitted).

> FN1. In its motion to dismiss the Third Amended Complaint, Wells Fargo challenges only the causation and injury-in-fact prongs of the constitutional standing inquiry. The decision not to contest redressability is unsurprising, as it is clear that the City's injuries would be redressed by a favorable decision.

Wells Fargo's motion to dismiss focuses primarily on the second of these factors, the causation requirement, which requires that a plaintiff "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). If "the line of causation ... is too attenuated" or "highly indirect," the plaintiff's injury is not "fairly traceable" to the defendant and the plaintiff will not have standing. *Id.* at 757. Unfortunately, "[w]hat constitutes a fairly traceable' causal connection that is not too attenuated'

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1557759 (D.Md.)
**(Cite as: 2011 WL 1557759 (D.Md.))**

amounts to something like a moving target that must be plotted on a case-by-case basis." *City of Birmingham v. Citigroup, Inc.,* No. CV–09–BE–467–S, 2009 U.S. Dist. LEXIS 123123, at *9 (N.D.Ala. Aug.19, 2009). Nonetheless, courts agree that "traceability does not mean that plaintiffs must show to a scientific certainty that defendant's [conduct] caused the precise harm suffered by the plaintiffs." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 161 (4th Cir.2000).

**\*3** In dismissing the City's Second Amended Complaint, I noted that the City had "cured the fundamental flaw I found to exist in the first amended complaint by focusing upon 'property specific,' rather than generalized, damages." [FN2] Letter Op. at 1, Sept. 14, 2010, ECF No. 174. I further observed, however, that these damages were fairly traceable to the allegedly improper loans made by Wells Fargo only insofar as the City could allege "that the properties foreclosed upon by Wells Fargo would not have been vacant ... but for the improper loans made by Wells Fargo." *Id.* Although the City had not adequately alleged this factual premise in its Second Amended Complaint, I indicated that making such an allegation in an amended complaint would likely satisfy the City's burden of establishing standing and would allow it to survive a motion to dismiss. Thus, the issue at the heart of the instant motion is whether the City has plausibly alleged that the properties in question would not have become vacant but for the allegedly improper loans made by Wells Fargo.

> [FN2.] Consistent with the allegations of the Second Amended Complaint, the City's Third Amended Complaint again specifies two types of property-specific damages resulting from Wells Fargo foreclosures and vacancies: the cost of increased municipal services and lost property tax revenue. The City has identified 190 vacant Wells Fargo foreclosure properties at which it has had to provide municipal services such as "inspecting, boarding, cleaning, cutting grass and weeds, prosecuting, condemning, sending fire personnel, sending police personnel, and more." (Third Am. Compl. ¶¶ 116, 119–308.) Additionally, the City claims damages based on reduced property tax revenues from thirty-seven specific "sub-neighborhoods," in which a disproportionately large number of Wells Fargo foreclosures and vacancies have had a "significant and deleterious effect" on property values. (*Id.* ¶ 320.)

In its Third Amended Complaint, the City identifies two types of illegal lending activity allegedly engaged in by Wells Fargo and maintains that both practices created vacancies that would not otherwise have occurred. First, the City states that Wells Fargo deliberately steered African–American borrowers who qualified for prime loans into more onerous subprime loans. (Third Am. Compl. ¶¶ 96–97.) As a result, says the City, borrowers who would have been able to keep up with mortgage payments under the terms of a less expensive prime loan became unable to make the more demanding payments required by subprime loans. The City asserts that this practice caused foreclosures and eventual vacancies in properties that otherwise would have remained occupied had the borrowers been given prime loans. (*Id.* ¶ 97.)

These allegations clearly provide the missing causal link between Wells Fargo's alleged steering and the vacant properties identified by the City. As I observed in my earlier letter opinion, in such cases of steering, the borrowers presumably "would have continued to make payments on their mortgages and would have remained in possession of the subject premises" absent the alleged discriminatory treatment. Letter Op. at 1, Sept. 14, 2010, ECF No. 174. Thus, the City has standing to pursue its claims for its steering-related injuries, as these harms are fairly traceable to Wells Fargo's alleged conduct.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1557759 (D.Md.)
**(Cite as: 2011 WL 1557759 (D.Md.))**

The City also alleges that Wells Fargo approved unqualified African–American borrowers for refinance or home equity loans when Wells Fargo knew or should have known that these borrowers would be unable to make the required monthly payments.[FN3] (Third Am. Compl. ¶¶ 98–104.) According to the City, these unqualified borrowers then defaulted on their mortgage payments, causing additional foreclosures and vacancies. Importantly, refinance and home equity loans are given to borrowers who already own and occupy their homes, and the City asserts that the borrowers in this case owned their houses subject to modest, "comfortably afford[able]" mortgages—or no mortgage at all—prior to taking on these allegedly improper loans. (*Id.* ¶ 98.) Consequently, the City maintains that if not for these refinance and home equity loans, "the subject properties would not have become vacant and would have remained occupied during the period for which the City claims damages." (*Id.*)

> [FN3]. The City explains that these refinance and home equity loans most commonly take the form of "cash out" refinance loans, whereby a homeowner receives money to make home improvements to the property, or debt consolidation, in which unsecured debts are consolidated with an existing mortgage to create a larger loan. (Third Am. Compl. ¶¶ 99–100.)

**\*4** By limiting its allegations to those situations involving borrowers who were already owning and occupying their homes, the City again successfully fills in the gap between its claimed injuries and Wells Fargo's alleged conduct. Presumably, absent Wells Fargo's allegedly unaffordable refinance and home equity loans, these homeowners would have continued to make their monthly mortgage payments and occupy their properties. It is therefore plausible that any injuries arising from these vacant Wells Fargo foreclosure properties are fairly traceable to Wells Fargo's alleged predatory lending to unqualified borrowers.

Wells Fargo argues at length, however, that the new allegations in the Third Amended Complaint fail to establish causation because they do not identify specific individual borrowers who vacated their properties because of Wells Fargo loans. (Defs.' Mem. at 5–12.) Wells Fargo claims that without details about specific individual borrowers, the City's allegations amount to theoretical "guesses" and "speculat[ion]" about "phantom borrowers," not plausible allegations that its lending practices caused a concrete injury. (*Id.* at 6.) Accordingly, Wells Fargo concludes, the City "has no factual basis to link its causal chain from even one allegedly discriminatory loan ... to its damages." (Defs.' Reply at 2.) This argument is unpersuasive.

Under *Iqbal,* the critical question is whether the City's causal chain is plausible, and Wells Fargo has cited no authority for the proposition that the City is required to identify individual borrowers in order to plausibly allege a fairly traceable causal connection. Rather, plausibility demands only that the allegations allow the court to draw a "reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal,* 129 S.Ct. at 1949, and even without identifying specific individual borrowers, the Third Amended Complaint's factual allegations are sufficient to satisfy this standard. For example, the City provides an in-depth explanation of how targeting homeowners with predatory refinance and home equity loans of the type allegedly made by Wells Fargo can create vacancies in homes that would otherwise be occupied. (Third Am. Compl. ¶¶ 98–104.) The City then avers that even in the "limited instances where the City has been able to identify and contact borrowers," its investigation "has shown that Wells Fargo has engaged in at least some of the practices [described above] at properties located in Baltimore's African–American neighborhoods which are the subject of this lawsuit." (*Id.* ¶ 108.) Additionally, the Third Amended Complaint further states that "[l]oan data analyzed by the City" demonstrates that "in numerous instances, Wells Fargo gave ... refinance or home equity loans to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1557759 (D.Md.)
**(Cite as: 2011 WL 1557759 (D.Md.))**

owners of occupied properties at issue in this Complaint that significantly increased the borrower's mortgage debt and/or replaced the borrower's fixed rate loan with an adjustable rate loan." (*Id.* ¶ 107.) Thus, contrary to Wells Fargo's argument that the City's allegations depend on mere "guesses" or "speculation," it is apparent that the asserted causal chain is in fact grounded on contact with real borrowers and analysis of hard data.[FN4] Consequently, I conclude that the absence of allegations related to any one individual borrower does not prevent the City from plausibly stating a fairly traceable causal connection between its injuries and Wells Fargo's lending activity.

> FN4. The plausibility of the City's causal allegations is further supported by direct and statistical evidence of Wells Fargo's alleged discriminatory lending set forth in the Third Amended Complaint. This evidence includes declarations from former Wells Fargo employees Elizabeth Jacobson and Tony Paschal describing discriminatory lending practices targeting predominantly African–American neighborhoods, (Third Am. Compl. ¶ ¶ 46–71, 84), and statistical evidence indicating that Wells Fargo's foreclosure rate in neighborhoods that are 80 percent or more African–American is significantly higher than the average foreclosure rate of other major lenders in Baltimore, (*id.* ¶ 40). This proffered evidence also undermines Wells Fargo's claim that the City's allegations identify nothing more than "industry-wide wrongful practices" common to all lenders. (Defs.' Mem. at 5.)

**\*5** Aside from its primary contention that the City's allegations are insufficient because they do not identify individual borrowers, Wells Fargo also advances several other arguments in an attempt to defeat standing. First, Wells Fargo claims that any injuries suffered by the City are caused by a "complex weave of social and economic factors" rather than its own lending activities. (Defs.' Mem. at 3.) Yet this argument, which has been pressed by Wells Fargo throughout the pendency of the suit, singles out the problem that the City has already "cured ... by focusing upon property specific,' rather than generalized damages." Letter Op. at 1, Sept. 14, 2010, ECF No. 174. While I previously recognized that "the external conditions affecting the value of real estate in Baltimore City may ultimately have some relevance to the City's damage claims," *id.,* these societal factors do not break the fairly traceable causal chain between Wells Fargo's lending practices and the City's narrowed damages.

Next, Wells Fargo asserts that the holdings from a trio of cases—all of which denied standing for lack of causation are "applicable verbatim" to this case. (Defs.' Mem. at 9–12.) These cases are not binding, however, and even a brief examination reveals that they are not particularly analogous to the facts of this case either. In fact, one of the cases, *City of Cleveland v. Ameriquest Mortgage Securities, Inc.,* 615 F.3d 496 (6th Cir.2010), did not even involve a FHA claim. Instead, *City of Cleveland* concerned a nuisance claim, and the outcome turned on prudential limitations associated with a "directness requirement" that is not at issue under the FHA's constitutional standing analysis. *Id.* at 502–06. The other two cases, *City of Birmingham,* 09–BE–467, 2009 U.S. Dist. LEXIS 123123 (N.D.Ala. Aug. 19, 2009), and *Tingley v. Beazer Homes Corp.,* 07–cv–176, 2008 U.S. Dist. LEXIS 34303, 2008 WL 1902108 (W.D.N.C. Apr. 25, 2008), are similarly inapposite. In both, the plaintiffs sought sweeping damages but presented only general and conclusory allegations of harm.[FN5] In contrast, the City's Third Amended Complaint seeks only narrow damages and makes specific allegations of discrimination based on direct and statistical evidence. Given these obvious differences, the dismissals of the claims in *City of Birmingham* and *Tingley* are of little, if any, persuasive value in this case.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1557759 (D.Md.)
**(Cite as: 2011 WL 1557759 (D.Md.))**

FN5. In fact, the City notes that the plaintiff's allegations in *City of Birmingham* apparently were copied directly from the City's original Complaint in this case. (Pls.' Opp'n at 37.) As the City has since completely overhauled its original Complaint by amending it three times, the allegations evaluated in *City of Birmingham* can hardly be compared to those contained in the City's Third Amended Complaint, the operative pleading in this case.

Finally, as a last resort, Wells Fargo contends that not only has the City failed to show causation, but also it has failed to allege a cognizable injury-in-fact in the first place. An injury-in-fact involves the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560. Seizing upon this language, Wells Fargo maintains that the City's increased spending on municipal services provided at vacant houses is merely a conjectural injury because it is speculative to assert that the City's injuries were caused by Wells Fargo loans and not a range of other social and economic conditions. (Defs.' Mem. at 12–13.) This argument, however, conflates the injury-in-fact analysis with the causation prong of the standing inquiry, for to say that the *cause* of an injury is speculative is not the same as saying that the *injury itself* is speculative or conjectural. *City of Birmingham,* which Wells Fargo itself relies upon heavily, demonstrates the importance of pulling apart these two strands of the standing inquiry and analyzing them separately. Although the court in *City of Birmingham* eventually denied standing due to a lack of causation, it initially determined that Birmingham's allegations of "increased spending on police and fire protection and increased spending to secure foreclosed homes" did constitute a concrete injury-in-fact. 2009 U.S. Dist. LEXIS 123123, at *8. Likewise, despite Wells Fargo's contention that it did not cause the City to increase its municipal expenditures, the increased expenditures themselves clearly constitute a concrete financial injury.

III. *CONCLUSION*

**\*6** Although the City had previously taken steps to narrow its damages and supplement the details of its complaint in an effort to establish standing, the causal chain it asserted had yet to plausibly allege that the subject properties would not have been vacant but for Wells Fargo's lending practices. The Third Amended Complaint fills in this gap, and I therefore hold that the City has standing to pursue its claims. Although I am denying Wells Fargo's motion to dismiss, it is, of course, still free to assert any applicable factual defenses to the City's claims in a motion for summary judgment.

For the foregoing reasons, Wells Fargo's motion to dismiss is denied. A separate order is being entered herewith.

D.Md.,2011.
Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A.
Not Reported in F.Supp.2d, 2011 WL 1557759 (D.Md.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.