IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COUNTY OF COOK, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
|   v. | )  No. 14 C 2280 |
| | ) |
| BANK OF AMERICA | ) |
| CORPORATION, *et al.* | ) |
| | ) |
|       Defendants. | ) |

MEMORANDUM OPINION AND ORDER

Cook County ("the County") alleges that Defendants--collectively referred to as "Bank of America" or "BOA" for purposes of this opinion--discriminated against African American and Hispanic borrowers in violation of the Fair Housing Act of 1968 ("FHA"), 42 U.S.C. § 3601 *et seq*.

BOA has moved to dismiss the County's complaint on the grounds that it lacks Article III and statutory standing; is attempting to bring time-barred claims; and has failed to state any FHA claims upon which relief may plausibly be granted. I deny BOA's motion to dismiss for the reasons stated below.

I.

At the motion to dismiss stage, I must accept the County's factual allegations as true and draw all reasonable inferences in its favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The County alleges that Defendants targeted minority borrowers and made approximately 95,000 home loans with less favorable terms and conditions than loans made to similarly situated white borrowers. *See* Dkt. No. 9 ("Compl.") at ¶¶ 6, 431. The intentional targeting of minority borrowers for the extension of credit on unfavorable terms is known as "reverse redlining." *Id*. at ¶ 325; *see also United Companies Lending Corp. v. Sargeant*, 20 F. Supp. 2d 192, 203 n.5 (D. Mass. 1998) ("Redlining is the practice of denying the extension of credit to specific geographic areas due to the income, race, or ethnicity of its residents...Reverse redlining is the practice of extending credit on unfair terms to those same communities."). Approximately sixty (60) percent of the 95,000 discriminatory loans identified in the complaint "already have or can be expected to become delinquent, default and eventually be foreclosed upon." *Id*. at ¶ 431.

Defendants allegedly structured home loans to strip equity from minority homeowners while home prices were at historic highs using the following practices:

> (a) unchecked or improper credit approval decisions for minority borrowers, resulting in borrowers being approved for and receiving refinance and home equity loans they could not afford and consequently were likely to become delinquent and/or default on;
>
> (b) subjective surcharges on minority borrowers of additional points, fees and other credit and servicing costs over and above an otherwise objective risk-based

2

> financing rate for such loan products, increasing the likelihood of delinquencies and/or defaults on such loans;
>
> (c)...steer[ing] [minority borrowers] into higher cost loan products, also increasing the likelihood of delinquencies and/or defaults on such loans; and
>
> (d) undisclosed inflation of appraisal values of minority residences in order to support loan amounts to minority borrowers, further increasing the likelihood of delinquencies and/or defaults on such loans.

*Id*. at ¶ 7; *see also id*. at ¶ 103 (alleging additional discriminatory terms and conditions such as pre-payment penalties); ¶ 299 (same). These discriminatory terms and conditions allegedly continued into the servicing period of each loan as minority borrowers were required to make higher monthly mortgage payments on higher loan balances than similarly situated white borrowers and incurred a disproportionate share of loan delinquencies, defaults, foreclosures, and home vacancies. *Id*. at ¶¶ 8, 80.

In support of its claims, the County cites statistical evidence that African American and Hispanic borrowers (1) were more likely to receive higher interest rate loans that similarly situated white borrowers at the national level between 2003 and 2007, *id.* at ¶¶ 36-45; (2) accounted for a disproportionate share of completed foreclosures and seriously delinquent loans in the Chicago metropolitan area between 2004 and 2008, *id*. at ¶ 82; and (3) received a disproportionate share of high cost

3

mortgage loans made in Cook County between 2004 and 2007, *id*. at ¶¶ 318-24, 332, 334-38. The County also asserts there is a direct relationship between the concentration of minority homeowners in a particular neighborhood and the foreclosure rate between 2004 and 2006. *Id*. at ¶ 332.

The County allegedly sustained numerous injuries because of Defendants' discriminatory practices, including:

> [1] out-of-pocket costs in providing governmental services (e.g., necessary building code inspections and repairs, police, and significant administrative, court and legal costs) related to various affected properties and neighborhoods; [2] reduced property values on foreclosed properties and surrounding properties; [3] lost property tax revenue on vacant or abandoned properties, and on foreclosed and surrounding properties as a result of lower home values; [4] lost other tax revenues; [5] lost recording fees as a result of the use of [the Mortgage Electronic Registration System] to avoid such fees; and [6] various other injuries resulting from the deterioration and blight to the hardest hit neighborhoods and communities.

*Id*. at ¶ 408. With respect to each foreclosure, the County allegedly incurred $19,000 in costs plus additional damages for declining property values and intangible harm to the community fabric. *Id*. at ¶ 431.

## II.

Defendants have moved to dismiss the County's claims under the Fair Housing Act on three grounds: (1) the County lacks standing; (2) the County's claims are time-barred; and (3) the

County has failed to state plausible disparate treatment or disparate impact claims.

These arguments come from a familiar and largely unsuccessful playbook utilized by financial institutions in similar FHA cases filed by counties and municipalities across the country.[1] Defendants' standing argument has achieved a measure of success on only three occasions.[2] Their statute of limitations argument has prevailed only once as an alternative holding. *See City of Miami*, 2014 WL 3362348, at *6. And Defendants have not cited a single reverse redlining case that

---

[1] *See City of Los Angeles v. JPMorgan Chase & Co.* No. 2:14-cv-4168-ODW (RZx), 2014 WL 6453808 (C.D. Cal. Nov. 14, 2014) (denying motion to dismiss that challenged standing, timeliness, and the plausibility of the city's allegations); *City of Los Angeles v. Bank of Am. Corp.*, No. CV 13-9046 PA (AGRx), 2014 WL 2770083 (C.D. Cal. June 12, 2014) (same); *City of Los Angeles v. Citigroup, Inc.*, 24 F. Supp. 3d 940 (C.D. Cal. 2014) (same); *City of Los Angeles v. Wells Fargo & Co.*, 22 F. Supp. 3d 1047 (C.D. Cal. 2014) (same); *DeKalb County v. HSBC N. Am. Holdings, Inc.*, No. 1:12-CV-3640-SCJ, 2013 WL 7874104 (N.D. Ga. Sept. 25, 2013) (same); *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-2857-STA, 2011 WL 1706756 (W.D. Tenn. May 4, 2011) (denying motion to dismiss that challenged standing and plausibility of city's allegations); *Mayor and City of Baltimore v. Wells Fargo Bank, N.A.* ("*Baltimore III*"), No. JFM-08-62, 2011 WL 1557759 (D. Md. Apr. 22, 2011) (denying motion to dismiss that challenged standing); *Mayor and City of Baltimore v. Wells Fargo Bank, N.A.* ("*Baltimore I*"), 631 F. Supp. 2d 702 (D. Md. 2009) (denying motion to dismiss that challenged standing and plausibility of city's allegations).

[2] *See City of Miami v. Bank of Am. Corp.*, No. 13-24506-CIV, 2014 WL 3362348 (S.D. Fla. July 9, 2014) (dismissing FHA claim for lack of standing); *Mayor and City of Baltimore v. Wells Fargo Bank, N.A.* ("*Baltimore II*"), 677 F. Supp. 2d 847 (D. Md. 2010) (same); *City of Birmingham v. Citigroup, Inc.*, No. CV-09-BE-467-S, 2009 WL 8652915 (N.D. Ala. Aug. 19, 2009) (same).

was dismissed for failure to state a plausible claim.  I review Defendants' arguments for dismissal against this backdrop of district court decisions.

A.

Defendants first argue that the County (1) lacks Article III standing to sue for the alleged FHA violations and (2) does not fall with the statute's zone of interests.

1.

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'"  *Susan B. Anthony List v. Dreihaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  *Defenders of Wildlife*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990)).

Defendants challenge only the first two elements of Article III standing; that is, they argue that the County has not alleged a "concrete and particularized injury in fact that is

6

fairly traceable to the challenged action of the [D]efendant[s]." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (internal quotation omitted).

The County responds that it has alleged several distinct injuries arising from Defendants' alleged discriminatory practices: (1) an eroding tax base; (2) declining property tax revenues; (3) the cost of providing government services associated with foreclosed and/or vacant properties; (4) lost recording fee income; and (5) intangible injuries to the fabric of its communities. *See* Compl. at ¶ 408. Only one of these theories needs to be plausible in order to support Article III standing. *See Defenders of Wildlife*, 504 U.S. at 563-67 (analyzing each of plaintiff's asserted injuries, none of which was sufficient to support standing).

The County's asserted injuries to its tax base and property tax revenues satisfy Article III's injury-in-fact requirement. The Supreme Court has held that "[a] significant reduction in property values directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 110-11 (1979); *see also City of Chicago v. Matchmaker Real Estate Sales Center, Inc.*, 982 F.2d 1086, 1095 (7th Cir. 1992) (same). Numerous district

7

courts, relying on *Gladstone*, have held that counties and municipalities have standing to sue for alleged FHA violations based on asserted injuries to their tax base and revenues. *See City of Los Angeles v. Bank of Am. Corp.*, 2014 WL 2770083, at *5; *City of Los Angeles v. Citigroup, Inc.*, 24 F. Supp. 3d at 947-48; *DeKalb County*, 2013 WL 7874104, at *4; *City of Birmingham*, 2009 WL 8652915, at *3. Defendants have not distinguished *Gladstone* or offered a persuasive reason to depart from the unbroken line of district court cases cited above.

On causation, the County must allege that its asserted injuries are "fairly traceable to the challenged action of the [D]efendant[s], and not the result of the independent action of some third party not before the court." *Defenders of Wildlife*, 504 U.S. at 560. Defendants challenge causation on two grounds: (1) minority borrowers in Cook County may have defaulted on their home loans for reasons having nothing to do with whether the loan had racially discriminatory terms and conditions and (2) the County's asserted loss in property tax revenue could have been caused by factors unrelated to discriminatory lending activities. *See City of Birmingham*, 2009 WL at *4 (dismissing reverse redlining case based on implausible causal allegations).

With regard to the alleged causal connection between discriminatory loans and the risk of default, Defendants allegedly steered minority borrowers into higher cost loans than

8

they would have received in the absence of discrimination. *See* Compl. at ¶¶ 222, 299. In other words, but for Defendants' discriminatory lending practices, minority borrowers in Cook County plausibly would have received appropriately priced home loans reflecting their ability to repay, thereby lowering the risk of default and foreclosure. *See Baltimore III*, 2011 WL 1557759, at *3 (holding that borrowers who were allegedly steered in high cost loans plausibly would have made payments on their mortgage and remained in possession of their homes absent discrimination). As for why Cook County's property tax revenues allegedly declined in recent years, *see* Compl. at ¶ 421, foreclosures stemming from discriminatory home loans plausibly contributed to this decline. *See Baltimore III*, 2011 WL 1557759, at *5 (rejecting argument that "external conditions affecting the value of real estate" broke the causal chain between alleged discriminatory lending and asserted injuries to city's finances). I stress, however, that the County's allegations pertaining to causation must be supported by competent evidence at the summary judgment and trial stages of this litigation. *See Defenders of Wildlife*, 504 U.S. at 561.

In sum, the County has asserted an adequate injury-in-fact that is plausibly connected to Defendants' alleged discriminatory lending activities.

9

2.

In addition to challenging Article III standing, Defendants argue that the County does not fall within the FHA's zone of interests.

"Whether a plaintiff comes within the zone of interests is an issue that requires [a court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark*, 134 S. Ct. at 1387 (internal quotation marks omitted). The ultimate question is whether the County "falls within the class of plaintiffs whom Congress has authorized to sue under [the FHA]." *Id*.

The FHA authorizes any "aggrieved person" to file suit. 42 U.S.C. § 3613. An "aggrieved person" includes anyone who "claims to have been injured by a discriminatory housing practice." *Id*. at § 3602(i)(1). In *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972), the Supreme Court held that by defining "aggrieved person" in such broad terms, Congress intended to confer standing to the full extent permitted under Article III of the Constitution. "Thus the sole requirement for standing to sue under [the FHA] is the Art[icle] III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered 'a distinct and palpable injury.'" *Havens Realty Corp. v. Coleman*, 455 U.S.

10

363, 372 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

I have already determined that the County's complaint satisfies Article III's standing requirements, so there is no need to undertake a separate zone of interests analysis. *See City of Los Angeles*, 2014 WL 6453808, at *6 (rejecting argument that city's reverse redlining suit fell outside the FHA's zone of interests); *City of Los Angeles v. Bank of Am. Corp.*, 2014 WL 2770083, at *8 (same); *City of Los Angeles v. Wells Fargo & Co.*, 22 F. Supp. 3d at 1056-57 (same). The only court to hold that a city's reverse redlining claims fell outside the FHA's zone of interests relied on an Eleventh Circuit case that is not binding on me and appears out of step with the Supreme Court's understanding of *Trafficante*. *See City of Miami*, 2014 WL 3362348, at *3-4 (relying on *Nasser v. City of Homewood*, 671 F.2d 432, 437 (11th Cir. 1982), which held that the Supreme Court did not intend to extend standing "to plaintiffs who show no more than an economic interest which is not somehow affected by a racial interest."). The Supreme Court has repeatedly declined to upset *Trafficante*'s holding that "the term 'aggrieved' in [the FHA] reaches as far as Article III permits." *Thompson v. North American Stainless, LP*, 562 U.S. 170, 176 (2011) (collecting cases).

11

To the extent Defendants argue that the FHA contains a proximate causation requirement that is narrower than Article III's causation standard, *see Lexmark*, 134 S. Ct. at 1391 n.6 (distinguishing between these two concepts), I reiterate that the causal connection between Defendants' alleged conduct and the County's injuries is at least plausible.

In short, the County's claims falls within the FHA's zone of interests and do not fail for a lack of proximate causation.

B.

Defendants' next argument is that the County's claims are barred under the FHA's two-year statute of limitations.

The only way for Defendants to prevail on their statute of limitations argument at the motion to dismiss stage is if the County pleaded itself out of court:

> When a defendant charges noncompliance with the statute of limitations, "[d]ismissal under Rule 12(b)(6) [is] irregular, for the statute of limitations is an affirmative defense." *United States v. N. Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004). Because "complaints need not anticipate and attempt to plead around defenses," *id.*, a motion to dismiss based on failure to comply with the statute of limitations should be granted only where "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). In other words, the plaintiff must affirmatively plead himself out of court; the complaint must "plainly reveal [ ] that [the] action is untimely under the governing statute of limitations." *Id*. We review de novo a district court's decision to dismiss a complaint on statute-of-limitations grounds. *Indep. Trust Corp. v.*

*Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012).

*Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-14 (7th Cir. 2014).

The FHA provides that a civil enforcement action must be filed "not later than 2 years after the occurrence *or the termination* of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A) (emphasis added). The italicized language was added to the FHA in 1988 to codify the continuing violation doctrine recognized in *Havens*: "[W]here a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [two years] of the last asserted occurrence of that practice." 455 U.S. at 380-81.

Contrary to Defendants' assertion, the discriminatory conduct alleged in the County's complaint is not limited to discrete home loan decisions made between 2004 and 2008. The County alleges that Defendants *continue* to charge minority borrowers discriminatory fees and costs during the servicing of home loans. *See* Compl. at ¶¶ 213, 221-22, 368, 401. These allegations distinguish this case from *City of Miami*, the only reverse redlining case dismissed as untimely at the pleading stage. 2014 WL 3362348, at *6 (noting that complaint did not

13

allege discriminatory activities that occurred during the two-year limitations period). Instead, this case is similar to *DeKalb County*, where the court applied the continuing violations doctrine to allegations of (1) discriminatory lending that occurred outside the limitations period and (2) loan servicing that allegedly perpetuated the loan's discriminatory terms and conditions into the limitations period. 2013 WL 7874104, at *9-12.

Defendants counter that even if the County has alleged a pattern of discriminatory lending and servicing activities, the continuing violation doctrine does not apply because of *Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279 (7th Cir. 1993), and similar cases:

> [T]he fact that a series of discriminatory or otherwise unlawful acts is indeed a series, a continuum, rather than a concatenation of unrelated acts, will delay the deadline for suing with respect to the earliest acts in the series only if their character was not apparent when they were committed but became so when viewed in the light of the later acts. Only in such a case is it proper to describe the acts as adding up to a 'continuing violation' that allows the plaintiff to defer suing until the end of the statutory period...applicable to the last act.

*Id*. at 282 (paragraph break omitted); *see also Shanoff v. Ill. Dep't of Human Servs*, 258 F.3d 696, 703 (7th Cir. 2001) ("[I]f the [discriminatory] conduct that occurred before the limitations period was sufficient to notify the plaintiff that he had a substantial claim...the continuing violation doctrine

14

does not apply and he can only base his claim on conduct that occurred within the limitations period.").

Defendants' attempt to preclude application of the continuing violation doctrine at the pleading stage is misguided. I cannot determine on the basis of the complaint whether the County knew or should have known between 2004 and 2008 that 95,000 home loans signed by minority borrowers contained discriminatory terms and conditions. In support of their statute of limitations argument, Defendants ask me to consider documents that are beyond the scope of a motion to dismiss. *See Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014). It is plausible that the discriminatory nature of home loans signed by minority borrowers in Cook County became apparent only during the servicing period of each loan as high costs and fees started to add up. Here, as in *DeKalb County*, the date on which the County discovered the basis of its FHA claims is an issue that "should be decided after evidentiary submission (and under a summary judgment analysis)." 2013 WL 7874104, at *12.

## C.

Defendants' final argument is that the County has failed to state plausible disparate treatment and disparate impact claims.

A complaint must contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*

15

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In a recent FHA case, the Seventh Circuit reiterated that "[it] does not take much to allege discrimination." *Wigginton v. Bank of Am. Corp.*, 770 F.3d 521, 522 (7th Cir. 2014) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (holding that a plaintiff alleging disparate treatment need not plead a prima facie case); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010) (holding that plaintiff who alleged "the type of discrimination that she thinks occur[ed]...by whom...and when" had stated a plausible FHA claim)). One "essential allegation" in an FHA complaint is "that someone else has been treated differently." *Id.*; *but see Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 714 (7th Cir. 1998) (questioning "wholesale transposition of the *McDonnell Douglas* standard to the credit discrimination context").

1.

"The Fair Housing Act makes it 'unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race[.]'" *Swanson*, 614 F.3d at 406 (quoting 42 U.S.C. § 3605(a)).

The County's central allegation is that Defendants targeted minority borrowers and steered them into more expensive home loans with a higher risk of default than loans made to similarly

situated white borrowers. In other words, the County has identified the type of discrimination that allegedly occurred (so-called "reverse redlining); by whom (Defendants); and when (from 2004, when the earliest discriminatory loans in Cook County were originated, into the loan's servicing period). These allegations are sufficient to state a plausible disparate treatment claim under 42 U.S.C. § 3605(a).

The County also alleges that Defendants' conduct violated 42 U.S.C. §§ 3604(a)-(c), which prohibit discrimination in the sale or rental of housing. I take no position on whether Defendants' alleged conduct violates these additional FHA provisions because neither party has addressed this issue. Defendants' two sentence reference to 42 U.S.C. § 3604(c) in a footnote on the last page of its motion is not a well-developed legal argument. *See* Dkt. No. 29 at n.27.

2.

With regard to the County's disparate impact claim, Defendants first argue that such claims are not even cognizable under the Fair Housing Act.

This issue is currently pending before the Supreme Court. *See Texas Dep't of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 46 (2014) (granting certiorari). The *Texas Dep't of Housing* case was argued on January 21, 2015 and will likely be decided by the end the

17

current term. I note, however, that two previous cases presenting the same question were voluntarily dismissed after the Supreme Court had granted review and set the cases for argument. *See Twp. of Mt. Holly, N.J. v. Mt. Holly Gardens Citizens in Action, Inc.*, 134 S. Ct. 636 (2013); *Magner v. Gallagher*, 132 S. Ct. 1306 (2012).

Unless or until the Supreme Court holds that the FHA does not permit disparate impact claims, I must apply binding Seventh Circuit precedent holding that such claims are cognizable. *See Bloch v. Frischholz*, 587 F.3d 771, 784 (7th Cir. 2009) (en banc) ("[W]e have held that, in certain circumstances, plaintiffs can sustain a § 3604 claim on a modified disparate impact theory." (citing *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977)); *see also Hoffman v. Option One Mortg. Corp.*, 589 F. Supp. 2d 1009, 1010-11 (N.D. Ill. 2008) (rejecting argument that *Alexander v. Sandoval*, 532 U.S. 275 (2001), and *Smith v. City of Jackson*, 544 U.S. 228 (2005), compel the conclusion that disparate impact claims are not cognizable under the Fair Housing Act). Therefore, Defendants' motion for a stay pending resolution of the *Texas Department of Housing* case currently before the Supreme Court is denied.

Assuming that the County's disparate impact claim is cognizable, Defendants argue that it must be dismissed because the complaint does not identify a specific practice that

allegedly had a disparate impact on minority borrowers and relies on "deficient" statistics. Dkt. No. 26 at 37. The County has, in fact, alleged a variety of practices that allegedly had a disparate impact on minority borrowers. *See* Compl. at ¶ 7-8 (alleging that Defendants' discretionary pricing policies, credit approval decisions, and appraisal practices resulted in minority borrowers receiving a disproportionate share of high cost home loans). Whether the County's statistics establish a prima facie case of disparate impact is not something I can or must decide at the pleading stage. *See Swierkiewicz*, 534 U.S. at 515.

In sum, the County's disparate impact claim is cognizable (at least for now) and identifies specific practices that allegedly caused minority borrowers to receive a disproportionate share of high cost home loans. Whether the County can prove this claim on the merits is a question for another day.

### III.

Defendants' motion to dismiss is DENIED for the reasons stated above.

**ENTER ORDER:**

*[signature: Elaine E. Bucklo]*
_____

19

                                              **Elaine E. Bucklo**
                                          United States District Judge

Dated: March 19, 2015