IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COUNTY OF COOK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO.: 1:14-cv-02280 |
| | ) |
| BANK OF AMERICA CORPORATION, | ) HONORABLE ELAINE E. BUCKLO |
| BANK OF AMERICA, N.A., COUNTRYWIDE | ) |
| FINANCIAL CORPORATION, | ) |
| COUNTRYWIDE HOME LOANS, INC., | ) |
| COUNTRYWIDE BANK, FSB, | ) |
| COUNTRYWIDE WAREHOUSE LENDING, | ) |
| LLC, BAC HOME LOANS SERVICING, LP, | ) |
| MERRILL LYNCH & CO., INC., MERRILL | ) |
| LYNCH MORTGAGE CAPITAL INC., AND | ) |
| MERRILL LYNCH MORTGAGE LENDING, | ) |
| INC., | ) |
| | ) |
| Defendants. | ) |

**Declaration of Dr. Gary Lacefield in Support of Plaintiff's Reply Brief in Support of Its Motion to Compel**

1. My name is Gary Lacefield. I am more than 21 years of age and I am legally competent to execute this sworn declaration. I have personal knowledge of the matters set forth herein and to which I offer my opinions in this matter as stated below and in support of Plaintiff's Motion to Compel defendants' discovery.

2. I am a Certified Fraud Examiner and the President and Senior Consultant of The Risk Mitigation Group, based in Arlington, TX. Among other professional endeavors, I provide expert testimony and forensic mortgage loan file audit and analysis services, as well as banking and mortgage lending industry consultation relating to fair lending, fair housing, and predatory lending practices. In a related capacity, I conduct fair housing and fair lending training to the mortgage lending industry, as well as training to investigators with the Department of Housing & Urban

Development ("HUD"). I also provide expert and consulting services to Law Enforcement regarding mortgage fraud and financial crimes related to real estate. Attached as Exhibit A is a true and correct copy of my updated Curriculum Vitae.

3. I have reviewed the Corrected Complaint in this matter, the Court's March 19, 2015 Order denying Defendants' motion to dismiss, the Court's April 16, 2015 Scheduling Order, the Court's May 29, 2015 Order denying Defendants' motion to certify an interlocutory appeal, Cook County's First Request for Production of Documents (the "Discovery"), Defendants' responses and objections thereto, Plaintiff's Motion to Compel, and Defendants' opposition thereto, including the Robert Daniel and Christine Costamagna supporting declarations as to the "burden" in collecting documents.

4. Plaintiff's Complaint alleges that, since the early 2000s, Defendants have engaged in a continuing nationwide equity-stripping scheme, conducted through a pattern and practice of predatory and discriminatory mortgage lending (including direct originations and the purchase of loans indirectly originated through Defendants' broker and wholesale lending channels), and the predatory servicing and foreclosures of those mortgage loans. The Complaint alleges that these practices, including reverse redlining, collectively constitute the discriminatory housing practice that forms the basis of Plaintiff's Fair Housing Act claim. The Complaint also alleges that the alleged practices have not stopped, but were continuing as of the date the Complaint was filed.

5. The discovery Plaintiff served requesting Defendants' mortgage loan-level and mortgage loan servicing data for Cook County for the ***entire period 2000 through the present*** is critical to the determination of the discriminatory nature of the alleged discriminatory housing practice of equity stripping, the scope of the practice and thus, Defendants' liability for them; identification of the number of loans involved; the identification of which loans and which properties were

involved; identification of when the practices began; proving the continuing nature of the practice today; refuting Defendants' defense that Plaintiff's claim is barred by the Fair Housing Act's statute of limitations; refuting Defendants' defenses that the loan terms themselves were not predatory and discriminatory or that Defendants' actions had a legitimate business reason and were not discriminatory; and proving that Defendants could have adopted other practices that were not discriminatory. This is precisely the type of information needed and necessary to conduct an investigation of any Fair Housing Act violations related to the solicitation and marketing of 1-4 family residential mortgage products, the financing process, the subsequent servicing, default servicing and foreclosure practices and the scope, timing and continuation of each of these practices.

6. As to the discovery Plaintiff served requesting loan-level mortgage data, this information is highly relevant to any determination of the full extent to which Defendants have engaged in the predatory and discriminatory lending aspect of the alleged equity stripping discriminatory housing practice, and whether or when those lending practices have ever stopped. Continued predatory or discriminatory refinancing of previously made predatory and discriminatory mortgage loans would clearly constitute a continuation of the lending aspects of Defendants' scheme as alleged in the Complaint.

7. Defendants' mortgage loan level data is required to be collected and maintained by the laws and regulations of the United States within Defendants' loan application register ("LAR"). Defendants maintain their LAR information in an electronic form that is actively utilized and accessed on a routine and daily basis in order for Defendants to conduct their ongoing day-to-day mortgage lending business operations and in order for Defendants' various banking regulators to inspect that information.

8. The federal laws requiring Defendants to maintain this information include the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §2801 *et seq, and implemented by 12 C.F.R. § 203, et seq.* Pursuant to those laws and regulations, Defendants' various entities are required to report a variety of the loan level information they collect and maintain to Defendants' various regulators including, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the Federal Reserve System, and the Department of Housing and Urban Development ("HUD").

9. As explained in 12 C.F.R. § 203.1, the purpose of reporting the HMDA information Defendants are required to collect and maintain is "to provide the public with loan data that can be used," among other things "[t]o assist in identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes."

10. Among other loan specific data used by Defendants in conducting their day-to-day business operations, Defendants are required by 12 C.F.R. §203.4 and Appendix A, to record and maintain in their LAR detailed loan level information including or relating to:

- A unique identifying number for the loan or loan application, and the date the application was received;

- The type of loan or application;

- The purpose of the loan or application;

- Whether the application is a request for preapproval and whether it resulted in a denial or in an origination;

- Loan pricing related data, including the interest rate "spread between the annual percentage rate (APR) and the average prime offer rate for a comparable transaction if the spread is equal to or greater than 1.5 percentage points for first-lien loans or 3.5 percentage points for subordinate-lien loans";

- The property type to which the loan or application relates;

- The owner-occupancy status of the property to which the loan or application relates;

- The amount of the loan or the amount applied for;

- The type of action taken, and the date;

- The location of the property to which the loan or application relates, by MSA or by Metropolitan Division, by state, by county, and by census tract, if the institution has a home or branch office in that MSA or Metropolitan Division;

- The ethnicity, race, and sex of the applicant or borrower, and the gross annual income relied on in processing the application; and

- The type of entity purchasing a loan that the institution originates or purchases and then sells within the same calendar year (this information need not be included in quarterly updates).

In addition to the above information, Defendants also collect and maintain other specific lending and loan underwriting data in their LAR including, but not limited to, borrower credit score information, borrower income information, type of documentation of borrower income provided (*e.g.*, Full Documentation, Low Documentation or No Documentation), borrower debt to income ratio, various financial terms of the mortgage loans made (*e.g.* adjustable rate, interest only payment, the original interest rate at loan origination, and the interest rate index used to reset rates on ARMs), the specific property addresses securing those loans, the value of that property and the loan to value ratios. This information is relevant to determine the predatory and discriminatory nature of any particular mortgage loan made to a minority borrower.

11. All of this key loan level data contained within Defendants' LAR is critical to Defendants' day to day business operations in recording, tracking, and monitoring each of the mortgage loans they made and the disposition of those loans, including for evaluation and financial analysis of Defendants' entire mortgage lending business operation.

12. More importantly, some of this same data feeds into Defendants' required HMDA reports that are used by Defendants' federal regulators to monitor and track Defendants' compliance with the Fair Housing Act, among other federal statutes and regulations. Specific loan identification

information, including property addresses, and borrower credit, underwriting and loan term information is not reported under HMDA and therefore is not publicly available. But all of this data is available to Defendants for the fulfilment of the oversight duties and obligations of Defendants' officers and directors in connection with their legally required risk assessment as to the safety and soundness of Defendants' banking operations.

13. The loan level information contained in Defendants' LAR is critical to proving whether Defendants in fact engaged in the alleged discriminatory housing practices of equity stripping, intentionally did so, and whether Defendants continue to do so, including through either ongoing predatory and discriminatory mortgage lending practices or mortgage servicing activities, including refinancing and foreclosure activities.

14. All of the Defendants' loan level LAR data for both minority and non-minority borrowers is required in order to demonstrate that minorities have received predatory mortgage loans on discriminatory basis; *i.e.* on terms more unfavorable than loans made to non-minorities or through predatory and discriminatory underwriting activities. It is through a comparison of the various financial terms and underwriting characteristics of the loans made to minorities with the terms and underwriting of loans made to non-minorities that the predatory and discriminatory nature of Defendants' lending would be proven at trial. All of the loan level LAR data also is needed to identify each of the loans that contain the predatory terms or were underwritten in a predatory manner as alleged in the Complaint. Moreover, the specific property addresses of each of those loans and the unique loan numbers in Defendants LAR will tie to the information contained in Defendants' mortgage loan servicing platform.

15. The discovery Plaintiff served requesting all of Defendants' mortgage loan servicing information on minority loans at issue in the Complaint relates directly to whether the alleged

nationwide equity stripping scheme constituting Defendants' discriminatory housing practice is still being carried out. Discovery of all of this loan servicing information for Cook County loans is critical to tie each particular discriminatory and predatory loan Defendants made in Plaintiff's communities (whether directly through originations or through purchases from its wholesale and broker channels) to Defendants' foreclosures in Plaintiff's communities, including the timing of those foreclosures.

16. The information contained in Defendants' mortgage loan servicing platform is used by and accessible to Defendants to conduct their day to day mortgage servicing operations. Defendants record, track and monitor many aspects of each of the mortgage loans they have serviced or continue to service. Defendants' mortgage loan servicing platform necessarily includes unique loan identifying numbers and property addresses that tie to Defendants' LAR data and any assigned Mortgage Electronic Registration Systems (MERS) registration number under which the loan was originated or which the underlying property is being foreclosed on due to a loan default.

17. Importantly, Defendants' mortgage loan servicing platform also necessarily includes information that would reflect the continuing nature of Defendants' discriminatory housing practice of equity stripping through Defendants' loan servicing operations, particularly including information regarding:

- borrower loan payment history;
- loan balance;
- zero balance code – (*i.e.*, the reasons the loan was paid off)
- months to maturity on the loan;
- loan default status;
- loan default date;

- loan default reason codes (i.e., the borrowers' state reasons why they defaulted);
- foreclosure status; and the
- foreclosure date.

All of this information is critical to proving the extent to which Defendants continue to engage in the alleged discriminatory housing practice of equity stripping through continued servicing of predatory and discriminatory loans, whether and precisely when such servicing terminated, and the reasons why such servicing terminated for each loan (for example, whether the loan was repaid and closed or whether it ended in default and foreclosure in further continuation of the alleged discriminatory housing practice).

18. Furthermore, and as the Complaint affirmatively alleges at paragraphs 84-101, the "Interagency Guidance on Subprime Lending" ("Interagency Guidance") issued on March 1, 1999 by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision clearly warned against the predatory lending practices alleged against Defendants because such practices pose an inherent risk to the safety and soundness of regulated banking entities. Thus, Defendants' federally-regulated banking entities, like Defendant Bank of America, N.A. ("BANA"), were required to have "board-approved policies and procedures, as well as internal controls that identify, measure, monitor, and control" the risks associated with their subprime and higher cost lending activities, including compliance with fair lending laws and the Fair Housing Act. Defendants' holding companies, and their operating subsidiaries were similarly required to maintain appropriate policies and procedures to ensure that they identified, measured and controlled such risks. At all times relevant, therefore, Defendants' management and their boards of directors were required to know through their own risk monitoring and control efforts of the

nature of the risks, the relative amounts of risk, their ability to control such risks, and their exposure to the risks from their subprime and high cost lending, securitization, and servicing activities, including compliance with fair lending laws and the Fair Housing Act.

19. In such a regulated environment, however, it is highly unlikely that Defendants would create or possess any documents reflecting an express written policy to discriminate in violation of the Fair Housing Act. Instead, as is typical in the investigation of mortgage lending discrimination activity, evidence of discrimination must be gleaned from internal emails, board level documents and compliance reports to the extent they indicate whether Defendants' met or did not meet their obligations to comply with fair lending laws and the FHA to maintain a safe and sound banking operation. Review of such records must include both those entities expressly subject to federal banking regulations, like BANA, as well as Defendants' affiliated non-regulated bank entities.

20. As practical matter, discovery of Defendants' pre-2009 discriminatory policies and practices, and records reflecting circumvention or non-compliance with facially neutral policies and practices, as well as Defendants' collected loan level data is absolutely critical to establish Defendants' liability for the discriminatory lending component of the alleged equity stripping scheme and the continuing nature of that scheme through Defendants' current servicing and foreclosure activity on the underlying loans. It was prior to 2009 in which the majority of the loans at issue resulted in foreclosures, which loans remain a focus of Defendants' current and future servicing and foreclosure activity.

21. In sum, the specific business record discovery that Plaintiff seeks is exactly the type of information that federal regulators, experts, auditors, and quality control specialists would review

to determine whether Defendants engaged in discriminatory housing practices like those alleged in the Complaint and whether those practices had terminated at some point or were continuing.

22. Matching Defendants' LAR and mortgage servicing data to certified copies of the HMDA data Defendants provided to the federal government (on which the allegations in the Complaint regarding Defendants' discriminatory lending practices are expressly based), along with a copy of the accompanying certified transmittal form FR HMDA-LAR, will further eliminate the possibility of errors or exclusions, enabling Plaintiff to identify any disparities between the data Defendants have produced to Plaintiff and the HMDA data Defendants have produced to the federal government. This also would minimize or eliminate chain of custody and authentication issues Defendants might raise with respect to publicly available HMDA data.

23. As a former HUD investigator in charge of reverse redlining bank examinations, a current HUD compliance advisor to several federally regulated banking entities engaged in home mortgage lending, and an advisor to law enforcement officials, I am confident that Defendants should quickly be able to produce the information Plaintiff has requested, and do so in the form Plaintiff has demanded it. Indeed, the electronic form in which Plaintiff has demanded the bulk mortgage loan level and servicing platform data files should not require any special programing to identify and copy onto an appropriate electronic media device such as a stand-alone hard drive. This information is legally required to be maintained by Defendants as part of their business records. It also should be readily accessible as Defendants use it and rely on it on a daily business as part of their core business operations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _16th_ day of October, 2015.

*[signature]*

Dr. Gary Lacefield
President, Risk Mitigation Group
Certified Fraud Examiner
CFE No. 626498

STATE OF Texas

COUNTY OF Tarrant

On this 16th day of October, in the year of 2015, before me Dr. Gary Lacefield personally appeared in person proved to me on the basis of satisfactory evidence to be the persons whose names are subscribed to within the instrument, and acknowledged that they executed the same.

My commission expires: December 2, 2017   Notary Public: *[signature]* Katie King



KATIE JANETTE KING
My Commission Expires
December 2, 2017