1    <u>TRANSCRIBED FROM DIGITAL RECORDING</u>

2         IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
3                 EASTERN DIVISION

4
     COUNTY OF COOK,                )  Docket No. 14 C 02280
5                                   )
                   Plaintiffs,      )  Chicago, Illinois
6                                   )  December 3, 2015
              v.                    )  1:15 p.m.
7                                   )
     BANK OF AMERICA CORPORATION, et )
8    al.,                           )
                                    )
9                  Defendants.      )

10
                  TRANSCRIPT OF PROCEEDINGS - Status
11           BEFORE THE HONORABLE MARY M. ROWLAND

12
     APPEARANCES:
13

14   For the Plaintiff:    JAMES D. MONTGOMERY and ASSOCIATES, LTD.,
                           by MR. DANIEL A. DAILEY
15                         One North LaSalle Street
                           Suite 2450
16                         Chicago, IL 60602

17
                           HARRIS PENN LOWRY, LLP, by
18                         MR. JAMES M. EVANGELISTA
                           (via conference call)
19                         400 Colony Square
                           Suite 900
20                         1201 Peachtree St. NE
                           Atlanta, GA 30361
21

22      ** Please notify of incorrect speaker identification **

23
          NOTE:  FAILING TO SPEAK DIRECTLY INTO A MICROPHONE
24          MAY RESULT IN INAUDIBLE PROCEEDINGS AS NOTED.

25

1    APPEARANCES (Continued):

2

3    For the Defendants:    GOODWIN PROCTER, LLP, by
                             MS. SABRINA M. ROSE-SMITH
                             901 New York Avenue, N.W.
4                            Washington, DC 20001

5
                             WINSTON & STRAWN, LLP, by
6                            MR. RYAN M. DUNIGAN
                             35 West Wacker Drive
7                            Chicago, IL 60601-9703

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcriber:           LISA H. BREITER, CSR, RMR, CRR
                            Official Court Reporter
21                          219 S. Dearborn Street, Room 1728
                            Chicago, Illinois 60604
22                          (312) 818-6683
                            lisa_breiter@ilnd.uscourts.gov
23

24

25

1           (In open court.)

2                THE COURT:  Thanks for taking the appointment.

3                MR. EVANGELISTA:  Pleasure speaking with you.

4                THE COURT:  Good.  I'm glad you did not fly in.

5      You're always welcome to attend by phone in my opinion, okay?

6                MR. EVANGELISTA:  It's good to save the County some

7      extra expense.

8                THE COURT:  Oh, there you go.  And you're from

9      Atlanta, right?

10               MR. EVANGELISTA:  That's right.

11               THE COURT:  I'm not kind to people who are from warmer

12     weather, but otherwise you're welcome to attend by phone.

13               Okay.  We have some people in the court, so I'll let

14     them put their appearance on.

15               MR. DAILEY:  Daniel Dailey on behalf of Cook County.

16               MS. ROSE-SMITH:  Sabrina Rose-Smith on behalf of Bank

17     of America and the other defendants.

18               MR. DUNIGAN:  Ryan Dunigan on behalf of the defendant.

19               THE COURT:  Okay.  All right.  So I've read the motion

20     to compel, which I understand is not pending.

21               MR. DAILEY:  Right.

22               THE COURT:  Okay.  But, you know, I thought it would

23     be helpful for me to read it.  And then I read Judge Bucklo's

24     order.  So I assume production is happening based upon the 2009

25     date.

 1          MS. ROSE-SMITH:  That's correct.

 2          THE COURT:  And what else -- what can I do?  Should I

 3  stay out of your way or can I be of help?

 4          MR. DAILEY:  Well, there's really one pressing, one

 5  very critical issue here.  That's the loan servicing data and

 6  what's known as the LAR data or loan application registration

 7  data.  The County absolutely --

 8          THE COURT:  Is this the MERS?

 9          MR. DAILEY:  No, ma'am.  That's a different issue.

10          THE COURT:  Okay.

11          MR. DAILEY:  But what we're talking about is loan

12  application registration data and the servicing platform data

13  going back to 2000.  The County's position is that it's

14  absolutely critical for the County to prove disparate impact

15  claim that they have all of the statistics necessary to compare

16  loans that were given to minorities in Cook County versus loans

17  that were given to similarly situated Caucasians that also had

18  discriminatory terms on it.

19          There's just no way by the legal sense that you can

20  compare completely and come up with a regression analysis

21  without full statistics going back to 2000.  And what Judge

22  Bucklo indicated and what we want to reiterate to the Court is

23  that the relevancy objection that the defendants are putting

24  forth says that they -- are based on their statute of

25  limitations defense, which is 2009, and they assume that we

1    don't need the other data.  But that's just inaccurate for the

2    purposes of a disparate impact claim.

3              So first, what we're asking today, in fact, is that

4    this Court agree with Judge Bucklo's decision and just order

5    the defendants to turn over the LAR data and servicing platform

6    data unrestricted in these fields from 2000 to now.

7              The burden is nominal, and that's not going to require

8    much briefing on that issue.  With regard to the remaining

9    issues that we've come to concessions on, there's still some

10   minutiae of those discovery disputes that should be worked out.

11             And we -- the plaintiff proposes that we do a joint

12   status report.  Both parties put in what we believe on that

13   specific issue we want, why we want it and let the Court look

14   at that, and we can come back and have a discussion about those

15   remaining issues.

16             THE COURT:  Okay.  So you're looking for LAR data,

17   which is loan application registration data?

18             MR. DAILEY:  Right.  And the servicing platform data.

19             THE COURT:  And the servicing platform data.

20             MR. DAILEY:  Yes, ma'am.

21             MS. ROSE-SMITH:  Your Honor, those are two very

22   different sets of data, kept on two very different systems.

23   And if I may explain the way that we are producing right now

24   because we have not limited our production to 2009 forward.

25             THE COURT:  Yeah, tell me this.  You're producing all

1   the loans that started --

2          MS. ROSE-SMITH:  All the loans originated on

3   January 1st, 2009, forward, everything.

4          THE COURT:  And everything serviced.

5          MS. ROSE-SMITH:  And everything that was still being

6   serviced as of January 1st, 2009.

7          THE COURT:  So if it would stop being serviced in

8   February 2009, you still would produce it?

9          MS. ROSE-SMITH:  Yes, because we have it.  And that's

10  the -- the issue isn't that it's just data or that we're trying

11  to stand on the statute of limitations defense.  The issue is

12  that these are six or seven different companies.

13         THE COURT:  Right.

14         MS. ROSE-SMITH:  That all came together as one company

15  with one set of systems on January 1st, 2009.  Loans that were

16  boarded at that time were loans that were active and still

17  being serviced.  There is probably somewhere data on loans, for

18  example, a loan that was made in 2000 and foreclosed in 2003.

19         But because we didn't have anything to do with it on

20  January 1st, 2009, the loan was done.  Foreclosure had already

21  happened.  We just don't have reliable data on it.  And so my

22  concern is that I can, for all the loans that were still being

23  serviced -- and this is not a limitations period issue because

24  2009 is still three years before --

25         THE COURT:  Right, I know that.

 1          MS. ROSE-SMITH:  -- the statute of limitations.

 2          THE COURT:  I get that, yeah.

 3          MS. ROSE-SMITH:  But the issue is I am sure that I can

 4    get you accurate and reliable data on loans that we can agree

 5    on that were still in the system.  It's -- the problem is the

 6    stuff that might not be in the system and has to get pulled

 7    from elsewhere.

 8          THE COURT:  So let me ask you this, though.  If you --

 9    if the loan, you're done servicing it in mid 2009, but you

10    still produce it, are you producing everything about that loan

11    or just what happened between January 1st, '09, and, you know,

12    May '09 when the loan was either foreclosed on or the person

13    paid it off or whatever happened?

14          MS. ROSE-SMITH:  No.  So we have offered to produce

15    all of the same origination data that we're producing on the

16    January 2009 forward loans.

17          THE COURT:  Because all that got loaded on.

18          MS. ROSE-SMITH:  Right, because all of it would be in

19    there, the LAR data.  All the data regarding that loan, the

20    servicing, all of that would be there.

21          THE COURT:  Okay.

22          MS. ROSE-SMITH:  And that means that I can again pull

23    that as reliably as I can pull something that was originated on

24    January 1st, 2009.

25          THE COURT:  So every loan that you're producing

1    information for already, you're giving LAR data?

2              MS. ROSE-SMITH:  Yes.

3              THE COURT:  Is LAR data just something you have to

4    keep for the government or something?

5              MS. ROSE-SMITH:  Yes.  So this is -- these are the

6    fields that are required for the loan application registry, and

7    that's the data for HMDA reporting.

8              And so we've already produced it for all of the

9    January 2009 forward loans, and we will produce it plus another

10   37 other fields, 37 or so fields in addition to LAR data that's

11   related to the origination of the loan.

12             THE COURT:  Okay.

13             MS. ROSE-SMITH:  And then some 30 fields, 30 to 40

14   fields related to servicing as well.

15             THE COURT:  And what's the servicing platform data?

16   It's just other data points?

17             MS. ROSE-SMITH:  Yes.  So this is information about

18   how the loan was serviced, delinquency status, foreclosure

19   status, loan modification status, those sorts of things.

20             THE COURT:  And race, somehow we can figure out --

21             MS. ROSE-SMITH:  Race goes with the LAR.

22             THE COURT:  Okay.  And when you say discriminatory

23   terms, you mean discriminatory terms of the loan itself?  So

24   are African-Americans getting a worse deal?

25             MR. DAILEY:  So -- and that's one -- yes, that is one

1    avenue and one allegation that the County has put in their

2    complaint, the actual term of the loan.

3            THE COURT:  And you're going to have somebody do an

4    analysis?

5            MR. DAILEY:  Exactly.

6            THE COURT:  But are you getting the terms of these

7    loans?  I mean, from 2009, 2010, 2011, from what the banks are

8    giving you, or the bank, is it clear from this data, okay, this

9    one has, you know, worst payoff plan or this one has an

10   accelerated -- you know, you get dinged if you don't -- you

11   know, it's a worse late fee or whatever the terms would be that

12   would be discriminatory.

13           MR. DAILEY:  See --

14           MR. EVANGELISTA:  Judge, may I speak to this for a

15   second?  Part of the issue here is that defendants are, A, not

16   giving us all of the loan data.  They're giving us some of it.

17           Some of the fields they've suggested they're not going

18   to be providing are fields that we need.  They're not giving us

19   all of the fields that we need in the servicing data.

20           They're not giving us data for all of the loan types

21   at issue here.  They've limited those down severely.  So this

22   is much more than just a date issue.  It is a scope issue in

23   what they're producing.

24           And as the Court's already commented on, we've got to

25   compare conforming loans to nonconforming loans, the reported

1    loans to loans that are not minority borrowers.  We have to do

2    it across loan types.  We have to do it across loan

3    characteristics, and we have to cover the entire time period.

4         So piecemealing out the data to us isn't really -- you

5    know, isn't really particularly helpful.  And counsel's

6    statement that, well, you know, they're not really sure of the

7    data, they're talking about Bank of America's data going

8    forward.

9         They're not giving us Countrywide legacy data.

10   They're not giving us Merrill Lynch legacy data which are --

11   you know, in this complaint, there are three defendant groups

12   in this complaint at issue.

13        THE COURT:  Yeah, I know.

14        MR. EVANGELISTA:  And by cutting all of that out, it's

15   very, very interesting and convenient because, of course, it's

16   very well widely reported that Countrywide was one of the major

17   problematic lenders of this time period.

18        THE COURT:  Yeah.

19        MR. EVANGELISTA:  And each of the defendants we've

20   alleged in the complaint have done something different.  We've

21   alleged that they violated the Fair Housing Act in a number of

22   different ways.

23        And unless we can get the loans for each of the

24   defendant groups over the time period, all of the loans made

25   originated in Cook County, not just first lien loans, but

1    second lien loans, whether it's a prime loan, whether it's a VA

2    loan, whether it's an FHA loan, whether it's any other

3    reportable loan or loan application.

4            THE COURT:  Well, let me ask this.  Let me ask this.

5    Why do you think -- I'm just thinking from sort of an

6    efficiency standpoint.  On what basis are you telling me --

7    because I -- put the date aside, okay?

8            From the stuff that the bank is telling you they're

9    producing, the 2009 going forward, okay, for service loans and

10   for loans that originate after 2009, I agree that you should

11   get every piece of information about those loans, okay?  No

12   doubt about it.

13           I assume all that stuff is electronic, and you should

14   have it in your hands.  I'm getting some nods from counsel

15   here, so it's not all electronic, and that's unfortunate.  But

16   regardless, you got to have it in your hands.

17           Why do you think -- because it would seem to me, if I

18   were the lawyer for the bank, it would be a bigger burden to

19   actually go in and delete fields and not produce certain fields

20   to you.  So what fields are not being produced to you?  I mean,

21   what's happening that you feel certain that you're not getting

22   something?

23           MR. EVANGELISTA:  Well, we're not getting the

24   Countrywide legacy data for loans -- for any of those prior

25   loans or the Merrill Lynch data.

1          THE COURT:  And you're talking to me about Countrywide

2     legacy data that where loans were still being serviced after

3     2009?

4          MR. EVANGELISTA:  Right.

5          THE COURT:  Okay.  So that legacy data, when Bank of

6     America swallowed up Countrywide, they should have somehow

7     imported the data into their motherboard of a computer.

8          And they would then be producing all of that historic

9     data at least for that particular loan because it was still

10    being serviced.  And you don't believe that you're getting that

11    data?  Because I got a lawyer here shaking her head up and down

12    that they're definitely intending to produce that to you.

13         MS. ROSE-SMITH:  Yes, your Honor.

14         MR. EVANGELISTA:  There's two issues, Judge, two

15    issues.  As we've alleged in the complaint, part of the scheme

16    here was about sales and securitization of these loans.

17         A lot of loans -- certainly some loans have gotten

18    sold off to other mortgage servicers.  So -- and are being

19    serviced by someone else.  We've alleged that, you know, to the

20    extent that the loan was made under discriminatory policy, if

21    it's still being serviced even by someone else, that's part of

22    the scheme.

23         Because the banks made the dollars on it, you know,

24    when they made the discriminatory loan and then they turned

25    around and sold it.  Maybe they kept mortgage servicing rights,

1    maybe they didn't.  But many of these loans have been moved

2    around and traded.  That's kind of one overarching issue.

3            THE COURT:  But that's a different problem.  That's a

4    different problem, though, right?

5            MR. EVANGELISTA:  That is a different problem that we

6    won't get those loans because they're not in Bank of America's

7    servicing system.

8            THE COURT:  Well, can't we subpoena -- can't we

9    subpoena those documents?

10           MS. ROSE-SMITH:  Your Honor --

11           MR. DAILEY:  We don't know where --

12           MR. EVANGELISTA:  We don't know who the lenders are or

13   the servicers because we don't know what the loans are.

14           MS. ROSE-SMITH:  Your Honor, if they kept the --

15           THE COURT:  Okay.  Hold on.  That seems a -- that

16   seems a very different problem to me.  But hold on, let me get

17   a response to that.

18           MS. ROSE-SMITH:  I don't think it is a problem because

19   if they kept the servicing but sold the loan, then they'd still

20   have the data from the loan.

21           THE COURT:  Right.  And what if they sold the

22   servicing?

23           MS. ROSE-SMITH:  If they sold the servicing, then they

24   would have all the servicing data up until the point that they

25   sold the servicing, and then they wouldn't have any more.

1    THE COURT:  And then would the documents that you're

2    producing to them with all that servicing up until, you know,

3    the day they sold the loan -- the servicing, the loan and the

4    servicing, would it say "sold to Wells Fargo"?

5    MS. ROSE-SMITH:  Yes, because we -- what we have is we

6    have a field that says servicer.

7    THE COURT:  Uh-huh.

8    MS. ROSE-SMITH:  And if the -- if that field says

9    service released, then we can go back and figure out who the

10   servicing was released to in the servicing data.

11   THE COURT:  Uh-huh.

12   MS. ROSE-SMITH:  And that's one of the fields that

13   we've already offered to give them is the servicing.

14   MR. EVANGELISTA:  The point is --

15   THE COURT:  So it seems like if I order them to tell

16   you who the servicer -- if servicers -- if the servicing was

17   sold, if I order them to tell you who the servicing was sold

18   to, then -- you know, now, whether you want to chase that down

19   or not, whether that's helpful to you or not, I don't know.

20   But that -- it seems like that's a problem.  I hear that that's

21   a problem, but that's a problem we can fix.

22   MR. DAILEY:  But it won't be included --

23   MR. EVANGELISTA:  We don't get that --

24   MR. DAILEY:  -- in the data.

25   MR. EVANGELISTA:  We don't get that information.

1          THE COURT:  Right.  I don't understand why you're not

2     getting that information.

3          MS. ROSE-SMITH:  It would be in that data if the -- so

4     here's when it wouldn't be in that data, your Honor.

5          THE COURT:  Okay.

6          MS. ROSE-SMITH:  If the loan was made in 2000, if the

7     servicing was sold in 2003, then we wouldn't -- then it

8     wouldn't be in this data.  Because it would be -- there would

9     be data from 2000 to 2003 somewhere in archived systems that

10    Countrywide or Merrill has.

11         But if Countrywide, Merrill or anyone was still

12    servicing it as of January 1st, 2009, everything we have until

13    the service release date will be there.  And even after the

14    service release date, the origination data will still be there.

15         So I -- and I just don't agree with what they're

16    saying is the problem because it just isn't.  Even though on

17    January 1st, 2009, they all came together, that doesn't mean

18    that I'm not giving them any information on Countrywide loans.

19         The loans that Bank of America serviced January 1st --

20    or were still servicing on January 1st, 2009, many of them --

21    the vast majority of them, in fact, I would venture to say --

22    are Countrywide loans or Merrill Lynch loans that now were

23    being serviced by Bank of America as the result of the series

24    of mergers.

25         So it isn't that you're not getting Countrywide data.

1    You're just getting it from a unified system.  And you're still

2    getting -- I heard at the beginning Mr. Evangelista say you're

3    not giving me specific fields.  Well, I have offered them all

4    the LAR data, 30 other origination fields, and I've said those

5    are -- those are the fields that tell you everything in the

6    world about the loan.

7         More than that, you're going to need something like

8    the loan file, the paper file.  Because the system is

9    queryable, right.  So I have to know what to tell it to give

10   me.  And I can't say give me everything because there are

11   thousands and thousands of things.

12        And so I can tell it to give everything that we use,

13   everything that we maybe gave an investor, that sort of thing.

14   They haven't proposed any alternative or they haven't said I

15   see your list of fields, and I think the following 10 are

16   missing.  That's not happened.

17        And so as a result, I'm giving them everything that my

18   expert is going to need because I asked that question first and

19   I said I don't want to -- I don't want to cut off my nose to

20   spite my face.  Tell me what you need in order to run your

21   regression analysis, and I will then collect that myself and

22   also offer that to the plaintiffs because I have to.

23             MR. DAILEY:  But --

24             MS. ROSE-SMITH:  And in addition to the origination

25   fields, which tell you everything about the details of the

1    loan, so, for example, if it had a prepayment penalty or an

2    interest rate that they thought was too high, that's all in the

3    list of data that I've agreed to give them.

4              And same with servicing.  If the loan was somebody

5    applied for a modification and they didn't get it, that's in

6    the servicing fields that I've offered.

7              So I'm not excluding data from other lenders.  I'm not

8    refusing to give them data for lenders for loans that aren't

9    being serviced anymore, and I'm not limiting it by loan type.

10   Because the other thing that they keep saying -- and I don't

11   really understand this -- is that we're limiting it to only

12   certain types of loans.

13             We're giving all first liens that are HMDA reportable.

14   And what that means is every loan that is a primary loan on a

15   borrower's residence or that was HMDA reportable, even if it's

16   not a primary loan --

17             THE COURT:  Did you say hunter reportable?

18             MS. ROSE-SMITH:  HMDA, the Home Mortgage Disclosure

19   Act.

20             THE COURT:  Okay.

21             MS. ROSE-SMITH:  And so that requires that I report

22   all -- I report data on refinancings and loans on residential

23   property.  The kinds of things that aren't HMDA reportable are

24   loans on vacant land.  A loan that is a small business loan

25   that's secured by the owner of the business' residence, that

1    kind of loan is really the only thing that's not HMDA

2    reportable.

3            So there's not a lot there.  And we report on certain

4    types of second liens and things like that, but we have a

5    dispute over second liens separate from the current dispute.

6    And it's not because -- it's because there's no race data

7    associated with those.

8            And so you may be able to say -- say, well, these 20

9    loans had higher interest rates, but you would not then be able

10   to say and they were only made to minorities.  Because we've

11   already gone through this in the City of LA case, which is a

12   very similar case, less broad, in California.

13           And in that case, we did produce HMDA data.  I'm not

14   trying to hide it.  The problem is that 95 percent of those

15   didn't have race data associated with them, and so they aren't

16   useful.

17           THE COURT:  Okay.  Okay.

18           MR. EVANGELISTA:  Your Honor, may I --

19           THE COURT:  I want to hear from plaintiffs.  I'm

20   not -- so the idea that it's sold to another servicer, I'm

21   not -- I'm going to order that they produce that information to

22   you so you're going to know if it was sold to another servicer,

23   but I'm not seeing that as a problem.  So tell me what the

24   problem is.

25           MR. DAILEY:  So I'm going to let Jim --

1          THE COURT:  Hold on.  Hold on.  Which of you are going

2     to talk?

3          MR. EVANGELISTA:  I will, your Honor.

4          THE COURT:  Okay.

5          MR. EVANGELISTA:  Because there are many, many points

6     that Counsel made there.  I need to go through them carefully.

7          The first issue on the servicing is we will not have

8     access to know the loans that were made prior to December 31st,

9     2009 -- 2008, that at any point in time, the vast bulk of those

10    loans made 2005 to 2007, any of them that have been sold prior

11    to December 31st, 2008, that date.

12         So there's an enormous amount of loans that could be

13    being cut off that we don't have the lending information, which

14    we're entitled to since we sued Countrywide for this issue.

15    And we certainly won't have the servicing information because

16    we won't know the loan and we won't know whether it's been sent

17    to another servicer.

18         We should be able to go get that, you know, that

19    information via subpoena if we need to, but we have to have the

20    underlying LAR data on that legacy information.

21         And what counsel is saying is they're only going to

22    give us the LAR data for loans that only Bank of America is

23    servicing after January 1, 2009.  We will be terribly

24    prejudiced without that, without that other loan and servicing

25    data.  That's the first point.

1          Okay.  Your Honor had asked about efficiency.  It is

2    extraordinarily inefficient for us to go -- because the way

3    this case has got to work is they're going to give us the loan,

4    the LAR data and the servicing data.  We're going to identify

5    the problematic loans.  We're going to take the property

6    addresses that we have -- which, by the way, is not in their

7    proposed and in their LAR data.

8          That's one of the main problems.  We're not getting

9    the borrowers' names and the addresses, so we can't pinpoint

10   the property.  But we got to take those property addresses, run

11   them back through all of the County systems so we can pull up

12   all of the relevant documents that show our damages that are

13   linked to specific properties.

14         And for us to do that twice, first with the post 2009

15   data and then later have to go back and do it all again with

16   pre 2009 data is extraordinarily inefficient and costly.  It

17   doubles the defendants' costs.  It doubles our costs, and it is

18   just unnecessary.

19         So the third thing is -- that's really critical is,

20   you know, we're not getting all of the fields.  Counsel gave us

21   a list of what fields they were going to give us about a day or

22   two ago in a letter.  We haven't had a chance to respond.

23   We're in the process of doing that.

24         But some of the key fields we need are borrower names.

25   Some of the key fields we need obviously are property

1    addresses.  The third thing is for the home equity loans, all

2    of the second lien loans -- because remember, they're not

3    giving us the second lien loans.  There again, vast majorities

4    of these problems were occurring on the home equity loans.

5        Our case is about equity stripping, and this is about

6    home equity loans.  They say, well, it's not relevant because

7    we didn't record -- we didn't have to record a borrower

8    ethnicity.  But that doesn't mean you can't determine

9    ethnicity, and it doesn't mean you can't -- we should not have

10   those mortgage loans to be able to review and analyze them.

11       You most certainly can determine ethnicity or

12   certainly a very, very high degree of it, if not actual sending

13   somebody door-to-door where the problematic loans were made

14   by -- with borrower names, addresses, pinpointing where they

15   are, you know, on specific streets.

16       I mean, the issue here is that many, many of these

17   higher cost loans occurred because minority borrowers were

18   steered into higher cost loans and -- in addition to other

19   people, but minority borrowers were steered into them to a much

20   greater extent than non-minority borrowers.

21       And you can identify from the collective HMDA data

22   whether it's a loan that's originated by the bank or whether

23   it's a loan that's purchased by the bank.  Because when they

24   purchased those loans, they also purchased the data strips that

25   come with them and that information.

1          And you can identify right down to, you know, the

2    borrower name, address, census track.  I can tell you, you

3    know, within 99-degree reasonableness without walking and

4    meeting, you know, the particular person and asking them if

5    they're a minority, if it's a minority-made loan.

6    Unfortunately, that's the issue here.

7          And so by not giving us the second lien loans is also

8    another way of trying to dramatically limit down our case and

9    prevent us from proving our case.  So that's why we've said,

10   look, you know, there's no reason to go through all these

11   machinations of giving us limited bits of data.  Just give us

12   the data.  Produce it one time.  It wouldn't cost you any more.

13         You know, it's the same, you know, click of the mouse

14   to produce the data -- you know, all of the data on all of the

15   loans so we can compare and contrast all of the loans that were

16   made from each of the three lenders.

17         I mean, we've alleged the complaint.  We're past the

18   motion to dismiss.  We ought to have our ability to do that at

19   this point in time.

20         THE COURT:  Okay.  I don't see any reason why you

21   wouldn't -- why the bank wouldn't produce the borrower names,

22   the property address and the second tier loans, the loans --

23   the equity loans, home equity loans, whatever they are, home

24   equity lines.  That seems easy.

25         MS. ROSE-SMITH:  We don't have any problem with doing

1    any of those things.

2         THE COURT:  Yeah.

3         MS. ROSE-SMITH:  So HMDA data requires that you record

4    the census track, the state, the zip and all of that.  They

5    asked for that specifically, so we gave them that, and we gave

6    them the loan numbers which -- and information about servicing.

7         All of this can tell you who they are, but the only

8    reason that we didn't do borrower names is because we have to

9    then -- there's all sorts of levels of security that the bank

10   has to do with that.  But I don't have a problem with borrower

11   name, and I don't have a problem with borrower address.

12        But the reason that we haven't ever had a discussion

13   about that is because I told them what I was going to produce

14   to them in September, and plaintiffs e-mailed me on Saturday

15   night after Thanksgiving and said no, we disagree with what

16   you've told me in September that you were going to do.

17        And so yes, I've just sent them another letter, but it

18   isn't because I wanted to sort of sabotage them before this

19   hearing.  It was just because I got a letter on Saturday and I

20   responded to it by Tuesday.

21        MR. EVANGELISTA:  They didn't identify the issues,

22   your Honor.

23        MS. ROSE-SMITH:  We didn't identify the fields because

24   we gave you the ones that you asked for.  So that's -- so you

25   asked for LAR data.  LAR data doesn't include some of the

1    fields that they're asking for.

2          On second liens, I agree 100 percent, your Honor.  It

3    is an entirely different thing and something that Judge Bucklo

4    is going to have to address about whether or not they can use

5    the speculative method of last name plus census track to

6    determine minority.

7          That's not for you.  And so I am fine with it.  I just

8    thought that it's kind of pointless.  We're far down the line.

9    Because they waited three months to send me anything, I never

10   requested it.

11         The bank's at year-end reporting.  It's going to take

12   them a long time to go back and get stuff that we didn't ask

13   for in the first place.  It's that simple.  If they want

14   information on HELOCs, they can have information on HELOCs and

15   we can have that fight on another day.  My issue --

16         THE COURT:  They want information on HELOCs.

17         MS. ROSE-SMITH:  And my issue doesn't have anything to

18   do with that.  And if at any point we had had a discussion

19   about that in the last three months --

20         THE COURT:  Okay.  So the only thing that I think

21   is -- and I also want you to produce a field that indicates if

22   it was sold to another servicer and who that servicer was.

23   Whether they've asked for that or not, I want you to do that.

24         MS. ROSE-SMITH:  We already are.

25         THE COURT:  Okay.  So the only thing that I think is

1    an issue is when Countrywide started a loan in 2003 and they

2    sold it in 2005, and so there's no way that it's going to be

3    produced here.

4            And, you know, I understand the plaintiffs are telling

5    me they need that produced and I hear -- I haven't even heard

6    yet, but I know you're going to tell me what a burden that is

7    because that was never uploaded into your system.

8            I don't know where those documents would be.  And if

9    you want to talk more about that, I'm happy to hear more about

10   that.  If you want to meet and confer about it, I don't know.

11   I don't know.  How many loans would that even be?

12           MR. DAILEY:  A lot.

13           MS. ROSE-SMITH:  Not nearly as many as the plaintiffs

14   seem to think.  I -- I -- so let me just say this about that in

15   the first instance.  If the loan was sold, that's not the end

16   of the story.

17           If the loan was sold -- and, in fact, most loans

18   probably were sold shortly after -- the bank, whether it be

19   Countrywide Bank or Bank of America or Merrill or any of the

20   subsidiaries, probably kept the servicing.

21           And you can look at any pooling and servicing

22   agreement, they're publicly available, and it will tell you

23   they kept the servicing by and large.  And if they did and they

24   were still servicing it, then the servicing data would be

25   available.

1          Now, if they serviced it for two more years and the

2     person refinanced with another lender and they didn't -- and

3     the loan was over, then yes.  So that's -- and that's the stuff

4     that I'm saying that we have a lot of difficulty with.

5          So I can get the plaintiffs 80 percent there, which my

6     experts tell me is 100 percent of what you actually need to run

7     the regression analysis.  But what they're saying is I won't

8     even look at your 80 percent and see if it's enough until I get

9     all 100 percent.

10          And I'm saying that the last 20 percent of that is --

11     is a hoop that is going to take a long time, be really

12     expensive.  And in the big scheme of things, this is where my

13     relevance burden comes in -- or my relevance objection comes

14     in.

15          Because you're going to have me go off and try to dig

16     up legacy systems, and they don't want paper files, which will

17     have all the information in them.  Instead, they want queryable

18     data in specific formats.  So I'm going to have to go find the

19     system, reconstitute the system, query the system and then

20     produce the data on it for loans that they've already said for

21     Bank of America, they don't care about origination that was

22     happening in the limitations period.

23          They only care about old origination and servicing

24     that happened in the limitations period.  And so what I've said

25     is why are you going to send me off on this expensive and

1    difficult burden for not nearly enough loans when all you have

2    to do is take what I'm willing to give you, which I'm sure that

3    they cannot tell you that their experts need more than that.

4            And then if you find some discrimination in the

5    servicing period or in your limitations period, then I will --

6    then I think that it would be fair for the judge to say yes.

7    So now those loans, because there was discrimination in the

8    servicing period, those loans 100 percent matter.  And it

9    doesn't matter what it costs to go find them.  You go find

10   them.  That's all I'm saying.

11           And I don't think that Judge Bucklo thought that was

12   an unreasonable thing.  When we were before her, she seemed to

13   understand that.  And I think that she said so in her order

14   when she said the plaintiffs have already offered some pre 2009

15   stuff.  There must be a way to come to a happy medium.

16           And that's what we're -- that's what we're really

17   trying to do here.  It's not -- I don't want to hide the ball.

18   I don't think that they're going to find what they're looking

19   for.

20           But in the meantime, I have to protect my client's

21   resources, and they want a population of loans that is much

22   harder to get, not nearly as relevant as the population that

23   I'm offering -- unless, of course, they prove discrimination in

24   the servicing period -- and really difficult for me to find and

25   certify that it's accurate in any way at this point.

1    And it doesn't -- that's for all of them, all of the

2  companies.  So I'm not saying that that means that by cutting

3  it off the way that we have, we're not giving them anything

4  about Countrywide.  We are.  Because after January 1st, 2009,

5  if Countrywide was servicing a loan, it's on Bank of America's

6  system now.

7    THE COURT:  I understand.

8    MR. EVANGELISTA:  May I speak?

9    THE COURT:  Hold on a minute.

10    MR. DAILEY:  Judge, I just have to make a point.

11  Based on counsel's, what she just said, if we can prove that

12  there's some discrimination within 80 percent of your loans,

13  then okay, then we'll go back and get it.  That's not how you

14  conduct discovery.

15    We have a claim, a statistical analysis that we must

16  prove.  We don't have to prove it.  We don't put together

17  statistical analysis based on 80 percent of the data.  You need

18  100 percent of the information you're going to bring to a jury

19  and say you sold more loans with discriminatory terms to blacks

20  than whites.  You can't do that with 80.

21    So my question then becomes, based on what counsel

22  just said, at what point do we come back to this Court, who

23  makes the determination to say, okay, well, these 80 percent

24  were discriminatory.  Let me have these additional.

25    Are they going to agree that 80 percent or whatever we

1    come out was discriminatory?  That doesn't make any sense.  So

2    then how can -- you're asking us to prove a discrimination

3    claim that you're disagreeing with.  Oh, but when you prove it,

4    we'll give you more.  That can't be allowed to happen.

5              MS. ROSE-SMITH:  And that's not --

6              MR. DAILEY:  -- move forward with the regressive

7    analysis, and they will agree and our expert will clear

8    counsel's misstatement has said, if he filed a declaration,

9    needs loan data from 2000 to 4.  That will crush these issues

10   that we're going to run into.

11             A regression analysis is about controlling for

12   variables.  If you don't give us all the data fields, our

13   expert's going to sit up on the stand and be cross-examined

14   from another -- from defendants' counsel saying did you think

15   about this variable, did you think about this or did you know

16   this?  No.

17             Just give it to him.  Let him come up with his

18   regression analysis and then we'll come back at a summary

19   judgment level and determine what was discriminatory or not.

20             MS. ROSE-SMITH:  Your Honor, that's a different

21   analysis, though.  I'm not saying I'm only going to give you 80

22   percent of the data about all of the loans.

23             I'm saying for the 80 percent of the loans that I can

24   access -- and 80 and 20 is not -- this is not -- I'm not saying

25   that we have 80 percent and we're only missing 20.  I'm just

1   saying that we can get the vast majority of the way there and

2   there's the last bit that's hard.

3          But I'm saying for all of the loans that I have data

4   on, you can have -- we can have a discussion about fields and

5   you can have any fields you want.  I'm not saying that there's

6   a limit on that.

7          THE COURT:  I don't understand.  It doesn't seem like

8   there's any dispute about the fields that exist that she's

9   willing to produce any of the fields that she has.  I don't

10  understand what the dispute is.

11         MR. DAILEY:  She's not producing all the fields.

12         MR. EVANGELISTA:  There are field issues, your Honor.

13         MS. ROSE-SMITH:  No, no, we are not -- we have not

14  said I will produce everything.  I said there are thousands of

15  fields.  Here are our -- here are the 60 most common ones that

16  we use that our expert intends to use in their regression

17  analysis that get used when loans are bought and sold.

18         They describe all the characteristics of the loan.

19  They include all the LAR data, all the stuff that was

20  reportable under HMDA.

21         THE COURT:  So you've started off by telling me you

22  need the LAR data.  I'm ordering her to produce it.  She says

23  she's already produced it.  You tell me you mean --

24         MR. DAILEY:  From 2000.

25         THE COURT:  No.  I'm only on 2009 going forward.

 1          You tell me you need the property addresses and the

 2   names.  I'm ordering her to produce it.  You tell me you're

 3   interested on when it's sold to a new servicer.  I've ordered

 4   her to produce it.  You need the servicing platform data.  Are

 5   you producing all of that?  I don't know what those fields are.

 6          MS. ROSE-SMITH:  Yes.  So the servicing platform data,

 7   we've offered another 40 or so fields on that that include all

 8   of the characteristics about the loan that our expert is going

 9   to use.  And I'm as open about the servicing platform data as I

10   am about the origination data.

11          The problem is they won't tell me what it is.  I said

12   to them in a meet and confer why don't you go to your expert.

13   Tell me what fields your expert, who presumably has done this

14   before, needs, and I will produce those fields.  They didn't do

15   that.  So I went to my expert and said which ones do you need,

16   and I offered all of those fields.  And I don't --

17          THE COURT:  Are the plaintiffs telling me they really

18   want a thousand fields?

19          MR. EVANGELISTA:  Your Honor?

20          THE COURT:  Yeah.

21          MR. EVANGELISTA:  May I speak to this issue?  Again,

22   we just got their list of data fields the other day.

23          THE COURT:  Okay.

24          MR. EVANGELISTA:  They did not offer that and provide

25   it before back in September, nor did they provide the LAR data

1    to tell us what fields they're going to produce in LAR data.

2            MS. ROSE-SMITH:  Yes, we did.

3            MR. EVANGELISTA:  When they did produce -- no, they

4    offered to produce the HMDA data.  That is not the LAR data.

5    And the proof is that in the LAR data she said she just

6    produced to us, she didn't produce the borrower names and the

7    borrower addresses.

8            We want all of the LAR data, everything that's

9    required and maintained in the loan application registry.  What

10   makes up the HMDA data and gets reported to the federal

11   government by HMDA comes from the loan application registry,

12   but it's not the same thing.

13           So on all of the loans, we want all of the LAR data.

14   On the servicing platform data, we just got her list the other

15   day.  And the issue here is we have asked them to give us the

16   fields -- the rundown of the fields of the data that they

17   maintain in their servicing -- on the servicing platforms.

18   They would not give us those field lists.  So what it then

19   requires us to do --

20           THE COURT:  Did you give them the field lists?

21           MS. ROSE-SMITH:  Well, no, your Honor, and here's why.

22   Because the system that we use, AS/400, is a customizable one,

23   and so it gets built over time.  And so field names change and

24   field -- like the fields that were in use in 2009 are not all

25   the same fields that are in use right now.

1          The fields that were in use in 2005 are different than

2     the ones that are produced -- or in use now.  That's the

3     problem.  So -- and I don't have and the client doesn't have a

4     universal list of every field that was ever used.

5          What I do have is a -- like a printout of what the

6     servicing history looks like for a loan.  And if they were to

7     look at that and say, "I want the field that captures this

8     piece of information," then I could -- then I could go back and

9     say, okay, what field captures this information, add that to

10    the query, and then we would get it.

11         And they -- I said that, and we just haven't done it.

12    And the other thing that I do want to make clear --

13         THE COURT:  Did you give them this printout?

14         MS. ROSE-SMITH:  Uh-huh, I think we did, your Honor.

15    So it's part of the production that we made.

16         MR. EVANGELISTA:  I don't recall seeing that.

17         THE COURT:  I want you to reproduce it.  Okay.  So

18    we're going to do this.  So by next week, I want you to tell

19    her what fields you want out of this servicing platform data.

20         By tomorrow, I want you to reproduce this printout of

21    what the servicing platform data is.  And by next -- what do

22    you need? -- till next Thursday to tell her what do you need to

23    capture from this servicing platform data.

24         I mean, if you're going to tell her you want 500

25    fields, you can tell her that.  But I don't know that that's

1    going to be helpful to your expert.  I mean, it sounds --

2              MR. EVANGELISTA:  Your Honor --

3              THE COURT:  You'll just get killed with kindness.

4    Yes?

5              MR. EVANGELISTA:  Your Honor, let me -- can I make

6    just a clarification on this?

7              THE COURT:  Yes.

8              MR. EVANGELISTA:  When we get a servicing history for

9    a particular loan, okay, that -- if the loan is given to us,

10   did not go all the way through the foreclosure and REO process,

11   we're missing a lot of fields.

12             THE COURT:  Is it going to be a loan -- is it going to

13   be an example of a loan, or is it going to be something more

14   general?

15             MS. ROSE-SMITH:  No.  It's going to be -- and I don't

16   have a problem choosing a loan that went all the way to

17   foreclosure or went all the way -- whatever they want.

18             But what I have is the AS/400 servicing history.  It's

19   an Excel spreadsheet that is -- you know, it has different

20   things in it, everything that happened on that loan.  And there

21   are sections and titles and categories and columns.

22             And if they want any of the data that would be in any

23   of those sections and categories and columns, say so and we

24   will add it.  Although on this particular thing, the

25   foreclosure data and the REO data is already in what I have

1    offered them.

2         MR. EVANGELISTA:  Well --

3         THE COURT:  Would it be sensible then to give them 10

4    sample loans, and then they can look at all the fields for all

5    10 of those and that would be a better sample of what happens

6    when they go in foreclosure, when they get paid off?

7         I don't know enough about banking to know what your

8    practices are, but I don't want you to send them one loan.

9         MS. ROSE-SMITH:  Well, your Honor, I don't have a

10   problem sending them, you know, 10.  The question -- I would

11   prefer that we decide on the criteria for the 10 here.  Because

12   if you send us back, if you've gotten any -- any flavor of the

13   discussions, you know that we should probably not be left to

14   our own devices to figure that out.

15        THE COURT:  Yeah.

16        MS. ROSE-SMITH:  And so if we can agree today on what

17   kinds of things they want to know about the servicing, then I

18   will send them 10.

19        THE COURT:  Yeah.  I'm just -- it seems like if you

20   can articulate for her what the fields are.  Now, if in the end

21   the bank says we don't want to give these two fields, I'm happy

22   to hear an argument on that and I'm happy to rule on that.

23        But I feel like I'm not going to be much help talking

24   to you about -- I mean, you want the names of the people.  I'm

25   ordering her to produce those.  But I can't -- I don't think I

1    want to say she needs to produce all 1,000 fields.  That

2    doesn't seem like that's helpful.

3              MR. EVANGELISTA:  No, you're right, your Honor.  But

4    again, here's the problem.  This is a company that makes lots

5    of money servicing loans.

6              They obviously have manuals and teach people how to

7    operate within the system and obviously can tell you what the

8    fields are that they're tracking.

9              THE COURT:  Well, what about if you get the -- what if

10   you -- do you have an AS/400 for idiots, like the worker manual

11   for AS/400?

12             MS. ROSE-SMITH:  No, but we do have policy and

13   procedure manuals, and we've produced 2,447 of them so far.  So

14   if you look at those, that might be useful.  But I know that

15   they haven't because they asked me to reproduce it on

16   November 18th and said that they were never able to download it

17   in the first place, even though we produced that to them in

18   September.

19             MR. EVANGELISTA:  Well, that's actually not what we

20   said but...

21             THE COURT:  So I don't find those manuals very

22   helpful, having had to look through them myself when I was

23   doing discovery.  So, you know, I mean --

24             MS. ROSE-SMITH:  They're system by system.  So they're

25   like page by page, this is what -- this is what you enter.

1      THE COURT:  Yeah.

2      MS. ROSE-SMITH:  The problem is that the people who do

3  servicing probably interact with 10 fields.  If you're in

4  customer service, for example, you might only interact with the

5  field that allows you to manually type in what the person said

6  on the phone.

7      THE COURT:  Right, of course.

8      MS. ROSE-SMITH:  And so there isn't -- that's why I

9  produced just a whole bunch of different ones from different

10  areas so that they could say, okay, I want all the fields this

11  group uses or that group.

12      They just haven't.  I'm not trying to hide the ball,

13  your Honor.  I just need some specificity.  Otherwise, they're

14  just sending me out, and every time I make an offer, they say

15  "yes and."

16      MR. EVANGELISTA:  May I make a suggestion?

17      THE COURT:  What about would you mind -- would you

18  mind indicating in a letter exactly the fields that you have

19  provided to your expert?  I mean, it's very early for you to be

20  doing that, I understand.  But would you feel comfortable doing

21  that?

22      MS. ROSE-SMITH:  I have sent them a letter with all

23  the fields, and I can represent today that those are the fields

24  that we're giving our experts.

25      MR. EVANGELISTA:  Your Honor, let me make a point.

1     And this is what I was going to get -- I was getting back to

2     about that we had just gotten this information.  That with the

3     information they gave us, we are prepared to be able to add

4     some additional fields to that.

5          I mean, but again, the question is we don't know what

6     we don't know that they're tracking.  And because there are a

7     couple of issues here that we don't know how it's being tracked

8     within -- within the company now or within any of the legacy

9     companies and one of -- certainly really for Bank of America

10    now, this is a very critical issue where we've talked about how

11    the loans have been made.  And additional discriminatory

12    conduct has occurred where loans have not been refinanced under

13    HARP or some other program that the banks are sitting on those

14    and delaying them and putting people into foreclosure

15    because --

16          THE COURT:  Is that part of this case, the failure to

17    refinance?

18          MS. ROSE-SMITH:  Yeah.

19          MR. EVANGELISTA:  That's the allegations in the

20    complaint, yes.

21          THE COURT:  Okay.

22          MR. EVANGELISTA:  And so we don't know, for example,

23    so a loan is being serviced, it goes into default, the bank

24    makes a bunch of money.  There are fields maybe about how much

25    fees generating or charging.  Countrywide charged all sorts of

1    excessive fees when a loan went into default.

2         THE COURT:  But you're getting every field.  You're

3    getting every field about fees, I assume?

4         MR. EVANGELISTA:  Well, that's the problem, and no,

5    we're not.  And we're not getting fields about whether or not a

6    borrower asked for modification, how long did that modification

7    go for.

8         MS. ROSE-SMITH:  Yes, they are.

9         THE COURT:  But I'm telling you to do that.  I mean,

10   you just say to her, I want all the fields that concern fees

11   that the bank collected.  I want all the fields that any

12   comment by the customer, every field that reflects a comment by

13   the customer.

14        I mean, you're not going to know what the bank calls

15   that.  And she's telling us that AS450 or 400 changes the name

16   what the bank calls that.  So she doesn't even know what the

17   bank calls that.

18        But if you tell her however AS/400 calls it, I want to

19   know every time the customer called and you're going to see,

20   okay, the African-Americans are calling asking for loan

21   modifications and the white people are calling asking for loan

22   modifications and how does that shake out?

23        Are you able to -- if they say that to you in that

24   plain of language, every time a customer calls to ask for a

25   loan modification, can your people through the AS/400 capture

1    what might be five different fields, right, because there's

2    going to be different people taking information in from

3    customers and typing that into the computer.  But can your

4    people access all those fields?

5              MS. ROSE-SMITH:  Yes.  And the only -- what I would

6    say to them if they said that, I would say we're already giving

7    you every time anybody enters that someone -- that someone

8    requested a modification, the action that was taken.  Was it

9    completed, concluded, closed?  What status is it in by month,

10   whether a permanent modification was mailed or not mailed, the

11   date on which it was mailed, when it was received back, what

12   ultimately happened to it.

13             That's all in the stuff that we've offered.  The only

14   thing out of that list of things that wasn't in there is every

15   time a borrower called, there might be some note about what the

16   borrower said.  Now, that note is supposed to -- if they call

17   for a modification, they get transferred to the modification

18   department.  The modification department's supposed to put it

19   in.

20             There are separate notes from the customer service

21   people.  Those are harder to query in the same way because it's

22   not -- that's not a field.  That's sort of open comments.

23             THE COURT:  Right.

24             MS. ROSE-SMITH:  And for that, what they would need is

25   probably the AS/400 for every loan that is at issue, and I

1    don't think they want that.  And so because it's -- the

2    AS/400's probably about 40 pages, and the number of loans at

3    issue 100,000 to 200,000, maybe more.

4            Every AS/400 for that is probably going to be a lot

5    for them to go through those comments.  But the -- but I think

6    that the fields that I know that we can pull cover everything

7    that they just said without the off chance that there might be

8    someone who called about a loan mod and didn't get transferred

9    to the modification department.

10           That's really the only thing that's left.  And if they

11   really want to go after that, your Honor, then they can read,

12   you know, 150,000 AS/400s.  I'm fine with that.

13           THE COURT:  Well, they may come back to you and say,

14   look, on these 100 loans, we want to look at the whole AS/400.

15           MS. ROSE-SMITH:  And we would agree to that.

16           THE COURT:  Because we see here that this woman did

17   not get a loan modification and these 10 white people did, and

18   we want to dig here a little bit.

19           MS. ROSE-SMITH:  We wouldn't have any problem with

20   that.

21           THE COURT:  Yeah, and I'm going to let them do that.

22   So -- but I think -- but it seems to me that with some talking

23   back and forth, you could articulate what you want, maybe not

24   in AS/400 language, but you could tell her what you want to

25   capture and she could say I'm either already giving it to you

1    or, okay, I'll add that to the list.

2           And I think we still have this problem with the

3    legacy, and I'm not going to be able to rule on that today.

4    Because I hear that that's a big problem, and I don't know what

5    to do about that.

6           But I want to get you started on this because I think

7    you can get this.  I mean, how long is it going to take to give

8    them all this?  Because this is a nice piece of stuff for them

9    to look at.

10          MS. ROSE-SMITH:  Well, for everything that we've

11   already offered, which I think includes nearly everything that

12   we've talked about with the exception of borrower name.

13          THE COURT:  And address.

14          MS. ROSE-SMITH:  Yeah.  So those aren't LAR data

15   fields.  They just aren't.  So that's why they're not in the

16   list, but we can pull them.

17          The only -- my only hangup about time is it's probably

18   going to take about four weeks longer than it normally would

19   because now we're in December.  And the bank has -- their data

20   department has a lot of data reporting that they have to do

21   just as a financial institution.  So it will take a little bit

22   longer, but it's not --

23          THE COURT:  But they're going to have it in January

24   sometime?

25          MS. ROSE-SMITH:  Yeah.  Because we've already started

1    to pull it for all of the loans that we've offered.  So it

2    should be in progress.

3              MR. EVANGELISTA:  Your Honor?

4              THE COURT:  Yes.

5              MR. EVANGELISTA:  If I can just add to that.

6              THE COURT:  Yeah.

7              MR. EVANGELISTA:  Right.  So it sounds like we're

8    getting -- making some headway with the LAR data and the

9    servicing data except with respect to the legacy stuff.

10             But there was sort of another point.  Your Honor

11   started out saying, you know, assume that the discovery was

12   proceeding on the information requested post January 2009.  It

13   is not with respect to a number of our discovery requests.

14             We have agreements on many things.  And, you know, I'm

15   actually preparing a letter back to counsel sort of clarifying

16   where we're in agreement, where we're disagreeing, where we're

17   still in disagreement.

18             But one of the key other areas that we're in

19   disagreement on is the policies, communications relating to

20   those policies, documentations of circumvention of the

21   policies, internal reporting relating to circumvention of the

22   policies.

23             All of this really substantive data that would go to

24   the issue of, you know, the discriminatory conduct.  And

25   defendants again want to put a January 1, 2009, forward date on

1    all of that when we all know full well that a lot of these

2    policies at issue that generated many, many, many of these

3    loans, the vast bulk of the loans, or lots of them certainly,

4    were in the time periods done by the legacy entities prior to

5    January 2009.  So that's sort of one issue.

6            Counsel, in the letter that we just got, has basically

7    said, well, we're not going to give -- we're not even going to

8    agree to anything right now on this.  So that discovery from

9    what I understand is not going forward, and that is the

10   critical liability-related discovery in addition to the loan

11   data that we're looking for.  That's one issue.

12           THE COURT:  Okay.  So I thought when we started, you

13   said we're going to talk about the LAR data and then you're

14   going to submit something to me about the other stuff.

15           Is this part of the other stuff?

16           MR. DAILEY:  Well, yeah, the plaintiff -- yes, ma'am,

17   we wanted to propose that the parties submit a joint report.

18      (Noise interruption.)

19           MS. ROSE-SMITH:  I apologize, your Honor.

20           THE COURT:  I didn't even know it did that.  Okay.

21           MR. DAILEY:  Yes.  We wanted to present a joint report

22   to propose what those remaining discovery issues are in writing

23   and let the Court look at it.

24           THE COURT:  That would be great.  Because I was a

25   little bit -- I read what happened before Judge Bucklo, but I

1    didn't know if any of that was still pending or I couldn't tell

2    from her order if I was supposed to be --

3          MR. DAILEY:  We made a lot of concessions since.  And

4    even in our response to their reply, some of those issues kind

5    of dissipated.  And even now we're kind of coming to terms with

6    some of them and then new issues have --

7          THE COURT:  Of course.  Of course.  I see that we're

8    going to be meeting regularly.  I did not realize that when I

9    got the referral.  And then I read -- I looked more closely at

10   it yesterday, and I saw, oh, I'm going to get to know them, so

11   that's nice.

12         So I would like to do that mostly because I have a

13   settlement conference this afternoon, and I can see the people

14   out of my window and they're pacing.  And they're looking angry

15   at me.

16         So I appreciate what you're saying about these

17   policies, and I'm not giving up on them.  Let me ask this about

18   the legacies.  These Countrywide people, are they -- I mean, do

19   we have Countrywide people?  Are we going to be deposing

20   Countrywide people or are they all gone?

21         MR. DAILEY:  No.

22         MS. ROSE-SMITH:  They're not employed by Bank of

23   America anymore --

24         THE COURT:  Right.

25         MS. ROSE-SMITH:  -- but we know where they are, your

Honor.

THE COURT:  Okay.  So there are going to be people?

MR. DAILEY:  Oh, yeah.

MS. ROSE-SMITH:  Yeah.

MR. EVANGELISTA:  May I make one point, your Honor, on this quick legacy thing?

THE COURT:  Yeah.

MR. EVANGELISTA:  So there are going to be depositions of them, and they're perfectly capable of certifying the accuracy of the information contained in whatever legacy servicing and loan application registry.

THE COURT:  So they haven't disappeared?

MR. EVANGELISTA:  Right.  But one final point on this. Counsel's statement a few minutes ago that -- or a little while ago that they had a big cost burden associated with this is new.  They had previously said that they don't think that there's a cost issue, but they don't want to produce it because they don't think it's relevant.

That's the issue.  They don't want to give it to us because it's not relevant.  The cost of going and getting from the legacy system from Countrywide, one company, all of that stuff would have been on a similar system, you know, where they serviced the data, and the loan application registry should have been kept in one place.

And it's not like they have to go through many, many

1    different systems to find that information.  So there really

2    shouldn't be a cost burden on it.  So I think from what

3    representations were made to us before, that there was no

4    cost -- there really was no significant cost burden.  But they

5    just didn't want to give it to us because they didn't think

6    loans prior to January 1, 2009, were relevant, quote-unquote.

7            THE COURT:  So let me ask plaintiffs if you had to

8    pick between Merrill and Bank of America and Countrywide, one

9    bank that you were going to get to dig as a treasure --

10            MS. ROSE-SMITH:  Oh, it's Countrywide, your Honor.

11            THE COURT:  That's what I think.  Okay.

12            MS. ROSE-SMITH:  Everybody --

13            THE COURT:  I just wanted to know.

14            MR. DAILEY:  We already know this.  They know, too.

15            THE COURT:  Okay.  All right.  Shall I set another

16    status or what would you like to do?

17            MR. DAILEY:  Yes.

18            THE COURT:  We had talked about the bank giving you

19    some sample files.  Do you think you need that?  Because

20    counsel was saying, I think very wisely, that we would hammer

21    that out right now.  Or do you think you can work through

22    this -- these servicing platform data fields without seeing

23    samples of the data fields?

24            I mean, what I would anticipate is you would give them

25    10 loans.  But they wouldn't be files.  They would be -- it

1    would be AS/500 (sic) files, right?

2         MS. ROSE-SMITH:  Right.  So the AS/400, it's an Excel

3    spreadsheet.

4         THE COURT:  Right, right.  So you'd give them the

5    Excel spreadsheet on 10 files?

6         MS. ROSE-SMITH:  Yeah, the AS/400 on 10 files and

7    then --

8         THE COURT:  And each of them are going to be 40 pages.

9         MS. ROSE-SMITH:  Yeah.

10        THE COURT:  And then you would say, oh, this is what

11   an AS/400 looks like, an AS/500 looks like on a file.  And then

12   you would have a sense of, okay, we want this for this file.

13   Oh, this is stupid.  We don't need this.

14        MR. EVANGELISTA:  Right.

15        THE COURT:  And are you -- what I would like to do is

16   to trust her to randomly select some, but I don't know if the

17   relationship is such that -- I'm getting a nod of the head

18   "no," the relationship is not.

19        MR. DAILEY:  I would ask for the sake of just

20   neutrality that either the Court decides, say, look, get some

21   from this date, some that's been serviced or have been

22   continued service, not originated on 2009, originated before

23   2009.

24        THE COURT:  Yeah.

25        MR. DAILEY:  And I would rather the Court say, you

1    know, give five and five and let counsel look at those.

2         MR. EVANGELISTA:  And if I could provide some of the

3    parameters, your Honor, on that.  We would like to know, you

4    know, follow it through where there had been a complete

5    foreclosure and the property is REO.  It's owned.

6         THE COURT:  The property is already owned?

7         MR. DAILEY:  REO.  It's a real estate --

8         MR. EVANGELISTA:  REO, real estate, yeah, it's REO.

9         MS. ROSE-SMITH:  It just means a foreclosure has

10   completed and the property has been either sold to another --

11   someone else after the foreclosure.  Or if it's REO, then it

12   wasn't sold at auction and the bank now owns the property.

13        MR. EVANGELISTA:  That's right.

14        MS. ROSE-SMITH:  Or the -- or the investor, if it were

15   Fannie Mae or something.

16        MR. EVANGELISTA:  Right.  We'd sort of like to get

17   a -- I would say a cross-section rather than a random sampling

18   of loans that were issued in the 2005 to 2007 time period to

19   minority borrowers and loans that were issued later.  If they

20   want to give us some that were issued after January 1, 2009,

21   that's fine.

22        But so that we can sort of follow through and look at

23   some of the different parameters and fields that are in there.

24   And then I think we can very quickly get back to them with a

25   reasonable amount of time to look through the paper that they

1   send us and nail down the fields that we need and we should put

2   that issue to bed.

3        THE COURT:  Okay.  All right.  I am going to be tied

4   up.  So I probably won't get this order out till tomorrow.  So

5   I'm going to give them till next Friday to get you these loans,

6   okay.

7        And then I'll give you probably until the middle of

8   next week to get to her what you want.  And so -- and then I'm

9   going to give you till mid January to produce that stuff.

10  Because that's going to be the 18th of December by the time you

11  get their request, their wish list.

12       And so that takes us in -- then it's the holidays.  So

13  then I'll give you like four weeks after that or five weeks

14  after that to actually produce the stuff, okay?

15       MS. ROSE-SMITH:  Okay.

16       THE COURT:  And then I'll have you back in mid

17  January.  And by then I'll also put a date in there for you to

18  submit to me kind of a he said/she said, what are your other

19  disputes, okay?  And then I'll have you back in January and we

20  can talk about them.

21       MR. DAILEY:  Okay.

22       MS. ROSE-SMITH:  That sounds fine with me, your Honor.

23  The only thing I have a question about is when we get the new

24  data fields, we come to some agreement on that, that we've

25  already got orders in for the other stuff, and that is the

1    stuff that I think we'll have by mid January.  I don't know

2    that if we put a new order in now --

3            THE COURT:  That's fine.

4            MS. ROSE-SMITH:  -- that that's going to happen.  But

5    it will be produced in the ordinary course of making

6    productions.  And we've been making rolling productions.  So

7    that's my only concern is that I don't want to commit to --

8            THE COURT:  That's fine.

9            MS. ROSE-SMITH:  -- all new fields.

10           THE COURT:  You have a long time to do discovery.  I

11   just put in dates so I remember to ask you about them.  If you

12   say to me, look, it will be done in the next three weeks, I'm

13   not holding anyone in contempt, okay.

14           MR. DAILEY:  Judge, there was also a discovery -- we

15   have a discovery deadline for I think an amendment to amend the

16   complaints.

17           THE COURT:  Okay.

18           MR. DAILEY:  To amend the pleadings.  I think that's

19   the 31st of December, excuse me.  And so I would -- I think

20   that at this point, it would be wise to go ahead and terminate

21   those deadlines because we're still really enthralled in the

22   middle of discovery.

23           THE COURT:  Are we amending?

24           MR. DAILEY:  We don't know yet.  We wouldn't want to

25   limit that until we get some type of -- you know, till we get

1    to some kind of consensus on these issues here.

2         MS. ROSE-SMITH:  Your Honor, my only concern with that

3    is the complaint is already 400 pages long.  I don't know what

4    else they could possibly say.  And I understand they have a

5    right to say it, but they've already sued all of the entities.

6         They've already made allegations about every aspect of

7    a loan from the second it comes in the door to the second it's

8    gone forever.  And so while I'm not trying to limit them, I

9    just don't understand why that particular deadline has anything

10   to do with the discovery that's going forward.  Because there's

11   not anything that they don't already allege we did wrong such

12   that there's not anything new.

13        THE COURT:  Yeah.  So my concern is even more mundane,

14   which is that Judge Bucklo sent this to me for discovery.  So I

15   don't know that she would care, but I don't know that she would

16   want me changing dates about dealing with the pleadings.

17        MS. ROSE-SMITH:  As much as I hate to say this, your

18   Honor, I think she actually did say in her order that she had

19   that she was authorizing you to make every change that you

20   wanted.  I wish I didn't have to tell you that, but I do.  And

21   so I think you can make any changes that you want.

22        MR. DAILEY:  She said you can amend.  She said I am

23   referring discovery supervision, authority to reset.

24        THE COURT:  Okay.  So I am willing to give you a

25   little more time.  You said vacate those dates.  Not happening.

1     We're not just having like no date.

2              MR. DAILEY:  Right.

3              THE COURT:  Because that scares me.  So is it due the

4     end of December, you're saying?

5              MR. DAILEY:  Yes, ma'am.

6              THE COURT:  I don't set anything for the end of

7     December, okay.  So why don't -- can I kick that to the end of

8     January?

9              MR. DAILEY:  Yes, ma'am.

10             MR. EVANGELISTA:  May I make a suggestion, your Honor,

11    that we revisit a date at the next status conference where

12    we'll all be before you, we can talk about it.

13             You know, one of the things that it's a little hard to

14    do is, you know, we still don't have the bulk of the discovery

15    that I was mentioning about the policy, practice and

16    circumvention of those policies and practices that are going to

17    be borne out in e-mail and in the documents.

18             Obviously we're not going to see in a written policy

19    it's okay to, you know, steer minority borrowers to a higher

20    cost loan.  But we're going to see that in the e-mail.  And

21    that's really the kind of stuff that we need before we can --

22    we can amend the complaint.

23             Just having the loan data, you know, that's going to

24    help confirm our allegations and help us identify damages, but

25    not the liability issue.

1        THE COURT:  So here's what I'm willing to do because I

2    don't want to lose track of it.  I'm going to move it to the

3    end of January so that we don't lose track of it, and then we

4    can take it up.  I'll make a note in the order that we can take

5    it up at the next when we get further along in discovery, okay?

6        So I'm not a big date stickler.  I mean, I like to

7    have them so I don't lose them.  But if we talk in January and

8    you say, look, I need till the end of March, that's fine.  I'm

9    not a big date person.

10        Okay.  I need to go, though, so we need to move on.

11    But I want to remind you that they're also going to get HELOC

12    information.  Do you remember that?  Because I said that a

13    while ago.

14        MS. ROSE-SMITH:  Okay.  That's fine.

15        THE COURT:  So I understand that's going to take some

16    more time and they're not going to have that by mid January,

17    but I want you to know that's in the order.

18        MS. ROSE-SMITH:  Okay.  And that's still -- I just

19    want to make sure that we're still talking about, at least

20    until we discuss it further, the -- all the loans that were

21    originating --

22        THE COURT:  You're doing your production pursuant to

23    your dates.  They want me to order you to go back into a

24    warehouse and dig up the Countrywide computers.  I have not

25    ordered that yet.

1          MS. ROSE-SMITH:  Okay.

2          THE COURT:  Okay?  Have a good holiday.  See you soon.

3          MR. DAILEY:  Thank you.

4          MR. EVANGELISTA:  Thank you, your Honor.

5        (Concluded at 2:17 p.m.)

6                    C E R T I F I C A T E

7      I certify that the foregoing is a correct transcript of the

8    digital recording of proceedings in the above-entitled matter

9    to the best of my ability, given the limitations of using a

10   digital recording system.

11

12   */s/LISA H. BREITER*_____      *January 5, 2016*
     LISA H. BREITER, CSR, RMR, CRR
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25