1    **TRANSCRIBED FROM DIGITAL RECORDING**

2                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
3                             EASTERN DIVISION

4    COUNTY OF COOK,                    )
                                        )
5                   Plaintiff,          )
                                        )
6                   vs.                 )  No. 14 C 2280
                                        )
7    BANK OF AMERICA CORPORATION, et al., )  Chicago, Illinois
                                        )  January 29, 2016
8                   Defendants.         )  9:39.

9                    TRANSCRIPT OF PROCEEDINGS - Status
        BEFORE THE HONORABLE MARY M. ROWLAND, Magistrate Judge
10
     APPEARANCES:
11
     For the Plaintiff:        HARRIS PENN LOWRY, LLP
12                             1201 Peachtree St., N.E., Suite 900
                               Atlanta, Georgia  30361
13                             BY:  MR. JAMES M. EVANGELISTA

14                             JAMES D. MONTGOMERY & ASSOCIATES, LTD
                               One North LaSalle Street, Suite 2450
15                             Chicago, Illinois  60602
                               BY:  MR. DANIEL A. DAILEY
16
     For the Defendants:       GOODWIN PROCTER, LLP
17                             901 New York Avenue, N.W.
                               Washington, DC  20001
18                             BY:  MS. SABRINA M. ROSE-SMITH

19                             WINSTON & STRAWN, LLP
                               35 West Wacker Drive
20                             Chicago, Illinois  60601
                               BY:  MR. RYAN M. DUNIGAN
21
                          PAMELA S. WARREN, CSR, RPR
22                          Official Court Reporter
                     219 South Dearborn Street, Room 2342
23                        Chicago, Illinois   60604
                               (312) 408-5100
24
     **NOTE:  Please notify of correct speaker identification.**
25   **FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE MAKES PORTIONS**
     **UNINTELLIGIBLE.**

1      (Proceedings held in open court:)

2            THE CLERK:  14 C 2280, County of Cook versus Bank of

3    America.

4            MR. DAILEY:  Good morning, your Honor.  Daniel Dailey

5    on behalf of Cook County.

6            MR. EVANGELISTA:  James Evangelista on behalf of Cook

7    County.  Nice to see you.

8            THE COURT:  Nice to see you.

9            MS. ROSE-SMITH:  Good morning.  Sabrina Rose-Smith on

10   behalf of the defendants.

11           THE COURT:  Good to see you.

12           MR. DUNIGAN:  Ryan Dunigan on behalf of the

13   defendants.

14           THE COURT:  Okay.  Good to have you all.

15           Here's the deal, you know if you order the transcript

16   -- and I think I saw that you ordered the transcript last

17   time -- if you are not near a microphone, because I don't have

18   a court reporter here, the court reporter who will be

19   transcribing it will have a difficult time picking you up.  And

20   I used to have that problem when I was practicing in magistrate

21   judges's courtrooms, so be careful.

22           If you want to sit, also the microphones at the tables

23   work, so you're welcome to do that.

24           How do you want to proceed?  You have some disputes.

25           MS. ROSE-SMITH:  Well, your Honor, I think we can

just -- I saw that we have 15 minutes on the -- on the calendar

out front, and so I was going to suggest that we just go

through them one by one.  But --

THE COURT:  Ummm --

MS. ROSE-SMITH:  -- in that short time, I'm not --

THE COURT:  I don't have anything until 10:30.

MS. ROSE-SMITH:  Okay.

MR. DAILEY:  Good.

MR. EVANGELISTA:  Okay, good.

All right.  Well, then I suggest that we just take

them one by one, if the Court still has questions about them.

And then, you know, there are a couple of additional

issues that we probably need to talk about, including the

schedule.  And so I don't know if you would prefer that we iron

that out first and then discuss the discovery disputes or --

THE COURT:  No, let's try to get through the discovery

disputes first.

Okay.  So I'm going to need help.  So I have read

them.  And, you know, I'm sure they are very articulately

spelled out, but they are a little bit Greek to me in some

ways.  So if you could help me through them.

So I'm looking at RFP 6.  That's our first problem.

MS. ROSE-SMITH:  Yes.

THE COURT:  That's -- I'm going to say plaintiff.  I

know it is County of Cook, but County of Cook is usually the

1    defendant in my courtroom, so it is --

2            MR. EVANGELISTA:  Okay.

3            THE COURT:  As I was reading here, I had to keep

4    correcting myself that the county was the plaintiff.

5            Okay.  So plaintiff is looking for -- what's the

6    relevant period again?  It is very long I remember.

7            MR. EVANGELISTA:  The complaint -- the complaint

8    relevant period is January 2000 and -- really 2000 up through

9    the current date.  That's when we allege the scheme.

10           But we've, over a period of time in meet and confer

11   discussions with defense counsel, have agreed to limit many of

12   our document requests back to January of 2004.  But the scheme

13   we allege is from January 2000 to current and continuing --

14           THE COURT:  To current?

15           MR. EVANGELISTA:  -- to current day.

16           And continuing to current day.

17           THE COURT:  I mean, that's -- you're producing like

18   all that data you produced to current?

19           MS. ROSE-SMITH:  Yes.  So we're -- as we said last

20   time that we're still -- we have said 2009 forward matters --

21           THE COURT:  Uh-huh.

22           MS. ROSE-SMITH:  -- because that's the easiest data to

23   pull.  But, yeah, we're producing it to -- at least right now

24   to January 31st, 2014.  And then we'll have to roll '15 if

25   that's what they -- if they want '15.

1          THE COURT:  Okay.  Oh, these are the bank's profits.

2     Their own profits.

3          And these are -- let's see.  I did some highlighting

4     here.  These are non-public financial data.

5          MS. ROSE-SMITH:  Yes, your Honor.  And that -- that's

6     really the concern because --

7          THE COURT:  Okay.  I'm not buying it.

8          So what do you want to tell me, county?

9          MR. EVANGELISTA:  Okay.  So the reason we want the

10    financial data is because we need to show that the profit

11    motive of the bank was intentional in making the equity

12    stripping loans that we have alleged have occurred -- have

13    occurred on a discriminatory basis.  So we want to show that

14    the particular loan products that were made in a discriminatory

15    way were more profitable to the bank than the non-predatory

16    loans that were not made in a discriminatory way.

17         MS. ROSE-SMITH:  So, your Honor, in response to that,

18    I have two points.  I took a look last night at Countrywide's

19    2007 10-K, and I really do think that what they are after is in

20    there.  And I don't think that a breakdown by -- a further

21    breakdown of cash flows and profits and losses will aid them

22    because what they are missing from the 10-K is really the

23    difference between what we made on discriminatory loans and

24    non-discriminatory loans, and none of the statements are going

25    to be broken out by the rates of the borrower or even -- even

1  broken out by all of the different loan features that they have

2  listed as ones that they consider potentially discriminatory

3  because their loan list is basically every loan.

4           What we do have, and what might be helpful, is the

5  gain on sale versus -- on non-prime loans versus prime loans

6  over the course of years, servicing fees income over the course

7  of years, late charges, prepayment penalty income over the

8  course of years.  All of those things are in the 10-K.

9           THE COURT:  And is the 10-K -- excuse me because I

10  don't know the jargon -- is that a publicly available document?

11          MS. ROSE-SMITH:  Yes, your Honor.  And the --

12          THE COURT:  And has that been produced already or

13  you're telling them to go get it themselves?

14          MS. ROSE-SMITH:  Well, we told them to go get it

15  because it is not like you have to go searching, it is on

16  EDGAR.  You just pull it -- pull down all the years for all the

17  companies.

18          The only thing --

19          THE COURT:  And can you do that for the companies that

20  you have -- that you have swallowed up so that the banks that

21  are no longer in business but they could still literally get

22  that for Countrywide --

23          MS. ROSE-SMITH:  Yes.

24          THE COURT:  -- if Countrywide (unintelligible).

25          MS. ROSE-SMITH:  Yes.

```
 1        THE COURT:  Okay.  I'm --
 2        MR. EVANGELISTA:  Do you --
 3        THE COURT:  Yeah, I'm done with --
 4        MR. EVANGELISTA:  Just --
 5        THE COURT:  I'm not going to give you the --
 6        MR. EVANGELISTA:  Sorry.
 7        THE COURT:  -- non-public financial data just because
 8   I don't see -- I mean, they're not going to have a listing of
 9   discriminatory loans.  They're just not going to have that data
10   for you.
11        I get your theory, I get your theory, and I know your
12   expert is going to mine your data for that and he or she is
13   going to opine that they made more money on the discriminatory
14   loans.  I know that's where the expert is going, but I don't
15   see how their non-public financial date is going to get you
16   there.
17        MR. EVANGELISTA:  So, your Honor, I think we can get
18   there another way, and that would be through the production of
19   the loan data that the bank tracks.  And we're -- we would be
20   able to accomplish that same goal because all of the profits on
21   the individual loans are tracked in the database and --
22        THE COURT:  But aren't I --
23        MR. EVANGELISTA:  -- we may get to that.
24        THE COURT:  -- giving you the whole database
25   basically?
```

1     MS. ROSE-SMITH:  No, your Honor, that's actually

2 something that came up after the hearing.  So when the county

3 says LAR data, they thought -- they were talking about all

4 origination data.

5     When I say LAR data, I mean the actual data that's

6 required in the LAR, the Loan Application Registry for

7 underreporting.

8     We are still negotiating on -- on -- we're giving them

9 more than LAR data, but we're not giving them everything under

10 the sun.  And we have given them multiple different pieces of

11 information that will help them suss out which data fields they

12 want.  Among them are the ones that he was just talking about,

13 which is various matrix on amounts made on loans.  So we

14 haven't yet agreed to do it, but we have agreed to discuss it.

15     THE COURT:  Uh-huh.

16     MR. EVANGELISTA:  And that's the issue, your Honor.

17 If we can get that data, the loan -- at the loan level profit

18 data with the -- that they already keep and maintain, I think

19 we'll be okay and won't need --

20     THE COURT:  Okay.  Well, I am --

21     MR. EVANGELISTA:  -- reports.

22     THE COURT:  -- glad you're discussing it.  I'm going

23 to deny the county's request as to RFP 6, but I hear you on the

24 bigger than (unintelligible) data.

25     MR. EVANGELISTA:  Your Honor, may I ask that while

we're -- as we're going to be trying to negotiate this -- this issue over the course of the next week or -- you know, next -- next two weeks, they can produce a list of a whole number of data fields to us that have many financial data points related to profits and losses in each of the loans at issue, that -- there -- we would have some sort of an expedited way to resolve any disagreement so we can get all of the data produced at one time efficiently and we're not going back and forth and this doesn't drag out because it is the loan data that is at the core of what we need to prove this case.

THE COURT:  Do they have a list of all the database -- all the data points?

MS. ROSE-SMITH:  Yes, your Honor.  They have a list of all the ones where we have a list for them.  And we have given them multiple other sources.  It is not just -- we don't just have a list of every single field that we have collected on every borrower over the period of ten years, we have the systems.  And if they have a question or a specific thing, we can pull it out of the system.  This is the ongoing problem.

I think that what -- I don't think that there is going to be any additional delay just as a result of asking for these.  I mean, certainly it is more data, and we're going to have to do a data request.  But I think that what Mr. Evangelista is asking for is just an expedited time frame for making a decision on whether or not we get those fields.

1    And I'm 100 percent for that, and so that's actually one of the

2    other things I was going to suggest is that we have an interim

3    point at which all of the existing discovery, if you have a

4    dispute about it, you bring that dispute to the Court and be

5    done because we want to move forward.

6          And so I don't see any problem with discussing it and

7    then saying in two weeks if we haven't decided, submit it to

8    the Court.  That's fine.

9          MR. EVANGELISTA:  Yeah.  And, your Honor, the

10   one -- you know, one of the issues is, you know, we were just

11   given this list last week at an in-person meet and confer.  And

12   there are literally -- approximately three, four hundred fields

13   on it.

14         Yeah, 350 fields on it.  And we have been asking for

15   it for quite a long period of time, since the outset of

16   discovery.  And, I mean, this really provides the core facts on

17   a per loan basis that would really help us evaluate the loans.

18   We look at the loans, we get the address, the property address

19   (unintelligible) --

20         THE COURT:  Yeah, I got it.

21         MR. EVANGELISTA:  -- as we take the addresses and run

22   them through our system.  Until we have that, we're hamstrung

23   in showing what we need to show.

24         THE COURT:  Okay.

25         MS. ROSE-SMITH:  And, your Honor, I don't -- I

1  disagree with the characterization, but I'm not going to

2  nitpick about it.

3          THE COURT:  You don't need to.

4          MS. ROSE-SMITH:  What I will say though is what they

5  were asking for at the -- we had -- there -- it wasn't a delay,

6  it was a fundamental misunderstanding in that they were asking

7  me for LAR data, and I was saying I gave it to you.  That's why

8  I looked so shocked last time when he said, you haven't

9  produced it all because we thought we had.  So it is -- we're

10  not opposed --

11          THE COURT:  Okay.

12          MS. ROSE-SMITH:  -- we're working on it --

13          THE COURT:  Everybody is working well.  I'm

14  all -- we're altogether.

15          Okay.  Let's -- we have only done one.

16      (Laughter.)

17          THE COURT:  And we were supposed to be done at 10:00,

18  so here we have -- thank goodness we have more time.

19          Okay.  RFP 46, each representation made by the banks,

20  all those banks, regarding any alleged or actual predatory or

21  discriminatory mortgage lending.

22          Okay.  Guys, come on.  What are you saying?  Every

23  time a Countrywide person talked to a county person and said we

24  don't discriminate --

25          MR. EVANGELISTA:  The --

1          THE COURT:  I mean, don't you think they were always

2     over there saying, we don't discriminate, we're equal

3     opportunity loaners?

4          MR. EVANGELISTA:  Here's --

5          THE COURT:  I mean, how are they going to comply with

6     that?  It seems like an impossibility.

7          Do you think they were over there saying, by the way,

8     we discriminate?  I mean, is she supposed to find evidence of

9     that?

10          MR. EVANGELISTA:  So --

11          THE COURT:  We like to discriminate against --

12          MR. EVANGELISTA:  -- that --

13          THE COURT:  -- people who live in Cook County.

14          MR. EVANGELISTA:  Yes, your Honor, and there -- and

15     there are two.  This one is actually statements to federal

16     regulatory agency.

17          THE COURT:  Oh, yeah, or state.

18          MR. EVANGELISTA:  Okay.  And the other one -- or state

19     agencies.

20          And then the other one is to the county.

21          THE COURT:  Yeah.

22          MR. EVANGELISTA:  And the reason --

23          THE COURT:  What are you looking for?

24          MR. EVANGELISTA:  Yeah.

25          THE COURT:  Tell me.  I don't understand this.

1    MR. EVANGELISTA:  We're looking for admissions where

2    they have -- where they have admitted -- I mean, they settled

3    mass- -- huge cases after very long federal regulatory

4    investigations on this exact issue and paid billions of dollars

5    to do it, including with --

6         THE COURT:  Okay.  BOA did --

7         MR. EVANGELISTA:  -- the OCC.

8         THE COURT:  -- or --

9         MR. EVANGELISTA:  Bank of American, Countrywide.  I

10   believe Merrill Lynch was part of it.  A number of the big

11   banks did.  There were lawsuits that were brought by the

12   Department of Justice.

13        THE COURT:  Okay.  But did they settle them all with

14   non-admissions of liability?

15        MR. EVANGELISTA:  Right.  Well, it -- but it is --

16        THE COURT:  I have settled 500 cases.  I have never

17   had anyone admit liability.

18        MR. EVANGELISTA:  The -- the -- well, one of the

19   issues are the OCC settlements, the consent decrees that they

20   entered into.

21        THE COURT:  What's OCC?

22        MR. EVANGELISTA:  The Control --

23        MS. ROSE-SMITH:  Office of Comptroller of the

24   Currency.

25        MR. EVANGELISTA:  Comptroller of the Currency.

1          Basically --

2          THE COURT:  God, pity that person.

3      (Laughter.)

4          MR. EVANGELISTA:  Well, they are --

5          THE COURT:  That's an awful job title.  Okay.

6          MR. EVANGELISTA:  -- regulated bank operations, and

7  that related to this whole -- the whole robo-signing scandal

8  where they were --

9          THE COURT:  Okay.

10          MR. EVANGELISTA:  Okay.

11          So there were -- there was a lot going on in these

12  activities.

13          THE COURT:  Did someone admit liability there?

14          MR. EVANGELISTA:  With the OCC I think they may have.

15  And it is hard -- but it is hard to tell because the statements

16  that come out are --

17          THE COURT:  Are so blank and neutral?

18          MR. EVANGELISTA:  They are bland -- they are very

19  bland and neutral.

20          THE COURT:  That's what people pay for.

21          MR. EVANGELISTA:  That's right.  That's why they are

22  paying a lot of money to get that.

23          THE COURT:  We have been in this game a while, you and

24  I.

25          MR. EVANGELISTA:  Yes, ma'am.

```
 1              THE COURT:  Okay.

 2              MR. EVANGELISTA:  And so, you know, obviously if they

 3    have made admissions or statements as part of -- not as part of

 4    the settlement process, but as part of the investigatory

 5    process, I think that's something we should be entitled to have

 6    access to, on the one hand, with the federal or state

 7    investigations.

 8              The second is --

 9              THE COURT:  Would any of those have anything to do

10    with Cook County?

11              MR. EVANGELISTA:  The second -- well, yeah, because

12    they were national practices.  The -- the settlements really

13    involved national practices for both servicing activities and

14    then there was a large lawsuit that was brought in California

15    against Bank of America and Country- -- well, and Countrywide

16    for actually its -- for violating the Fair Housing Act and

17    making discriminatory loans and pricing loans in a

18    discriminatory way that resulted in a very large settlement.

19              So that -- that information is very pertinent.  And

20    even the documents that they would have produced in that case

21    are very pertinent and could be a collective source of

22    information that would be very efficient for the defendants to

23    produce to us.

24              We have actually asked them for that.  That's one of

25    the things we're supposed to be talking about and negotiating
```

1    in our follow-up meet and confer after this that we have agreed

2    to discuss -- to discuss which of the cases they produced, and

3    we would ask that they would just give us a duplicate

4    production of what they produced in those cases.

5              MS. ROSE-SMITH:  I think, your Honor, you get the

6    difficulty.

7              THE COURT:  I feel like it is a little -- I feel like

8    what you are saying here -- I'm sorry to cut you off -- is a

9    little more narrow than what these questions are.  Like, I'm

10   seeing these RFPs as, you know, any time in the last 15 years

11   that any bank representative has spoken to any county employee

12   or any federal reg person and said anything, and I'm

13   not -- that's denied.

14             MR. EVANGELISTA:  Yeah, we're not looking for that.

15             THE COURT:  Now you seem to be narrowing it, which

16   seems a little more palatable to me.  Although I'm still

17   struggling with the relevance here.  But at least the

18   burdensomeness I'm feeling better about because you're talking

19   about the results of litigation, which seems more narrow

20   because at least we can pinpoint, okay, what are the five cases

21   we're taking, and we can -- we can get a handle on those.

22             And I assume you have talked to some plaintiffs's

23   lawyers around the country about what happened in those cases,

24   to the extent they can talk about it because I'm sure lots of

25   those settlements are subject to confidentiality and things

1  like that.

2      But -- so I -- but if they are talking about lawsuits,

3  if you have an agreement to talk about lawsuits separate from

4  these RFPs -- do you?

5      MS. ROSE-SMITH:  Well, your Honor, yes.  But what they

6  are -- I think this is two different things.

7      What they have requested in the lawsuits is whatever

8  you produce to the government, whatever documents and emails

9  and all of that that you produce to the government, please

10  produce to us.  That is a different inquiry than whatever

11  statements you may have made to the regulatory --

12      THE COURT:  Admissions, yeah.

13      MS. ROSE-SMITH:  -- about what your behavior was.

14  And --

15      THE COURT:  Okay.

16      MS. ROSE-SMITH:  -- I'm -- in my view the admissions,

17  I'm not saying that they would be admissible in this case, but

18  if there were any admissions, they are in the consent decrees

19  that we signed.  Those are public.

20      And if we made statements privately, they would either

21  be protected as part of the settlement or bank examiner

22  privilege or any other of the things that would be applicable

23  in, you know, self test.

24      And so -- and if there is a specific thing that they

25  can say we believe that you would have made an admission of

liability to this regulator and in this case, then that's an
entirely different ball game.  It is just responding to this as
a whole.

And part of the point here is this -- for the Cook
County one, at least, the second of the -- or the -- yeah, the
second of the two that are at issue here -- is they said, well,
if you made a statement that we relied on in not bringing
litigation and would that show that we didn't sit on our hands,
if -- if they think we did that and they can identify who we
did -- who we made that statement to, or if, conversely, we
think that would he made a statement that should have put them
on notice, we would produce that.  We have already -- we have
already agreed to do that.  We're not aware of any right now,
but if we became aware of any, we certainly would.

And so for the second one, I just don't think that
there is anything to do other than if the parties become aware
of statements, produce the statements.

And for the first one I just think, other than being
super specific -- I mean, I was thinking last night about the
number of representations I, on Bank of America's behalf, have
made to state and federal regulators over the last five or ten
years, a lot.  And even for me to try to find what I have said
on -- as a representative for Bank of America would be
incredibly difficult, even if it were something that we could
produce and was not privileged because it was part of

1   settlement or some other -- other privilege.

2        MR. EVANGELISTA:  So could I make the relevant

3   connection for you, your Honor?

4        THE COURT:  Yeah.

5        MR. EVANGELISTA:  Okay.  So aside from the fact it

6   would be an admission against interest or there might be some,

7   you know, admission factor to it, the other side of this issue

8   is that the defendants are making this entire statute of

9   limitations argument.  They have -- they have com- -- and I

10  apologize to get into this, but I need to explain it.

11       They have made the argument that the continuing

12  violation doctrine is how you looked at the Fair Housing Act

13  statute of limitations.  And they have -- they have tried to

14  pull into that a discovery rule, into the analysis of when the

15  statute of limitations begins under the Fair Housing Act.

16       Within the discovery rule and the continuing

17  violations doctrine, it is an equitable tolling doctrine.  And

18  basically it would say, well, if the -- if the limitations

19  period has already begun to run and --

20       THE COURT:  Is it two years?

21       MR. EVANGELISTA:  Right.  If the -- assuming the

22  two-year period has begun to run, all right, and it has

23  expired, then is there a basis to toll the limitations period?

24  If there is a basis to toll the limitations period, you have to

25  look at whether the plaintiffs's hands were unclean and that

they sat on their hands in asserting their rights. They didn't find out about it.

Here our theory of the case is that it is an equity stripping scheme. The limitations period has never begun to run under the plain language of the limitations period. The entire issue about what the county knew, when the county knew is irrelevant.

But if -- if they are going to go down that path, and we have to make that argument, then we have to also show that we acted reasonably when we -- if -- you know, there has to be a ruling that the limitations period, yes, has begun to run and it has already expired. Now you have to rely on continuing violations doctrine or equitable tolling to extend an expired limitations period. You, county, did not the sit on your hands.

Well, one of the things, which is a jury question, and which one of the questions is, what did the -- what was the county looking at? What was the county doing or what was the county relying on?

Statements by Bank of America, public statements, are statements directly to county officials that we didn't do any discriminatory lending, we're not predatory lenders. Those are things that the county is entitled to rely on as -- as to the reasonableness of its behavior, okay, in whether or not to file suit or not.

1          So that -- this kind of gets down to a deep level to
2     respond to a statute of limitations argument --
3          THE COURT:  I understand.
4          MR. EVANGELISTA:  -- that we don't think applies.
5          THE COURT:  I understand the --
6          MR. EVANGELISTA:  Yeah.
7          THE COURT:  -- statute of limitation argument.
8          I -- I'm wondering from your client's perspective -- I
9     understand your client is its own big organization, as is the
10    bank, is there any -- can you narrow down where those
11    statements would have been made?  Did the --
12         MR. EVANGELISTA:  Uh-huh.
13         THE COURT:  I mean, it would have been preceded by
14    President Preckwinkle, right?  But Stroger -- okay, was there
15    a --
16         MR. EVANGELISTA:  Uh-huh.
17         THE COURT:  -- fair housing hearing?  Was there a
18    commission?  Was there an investigation?  Was there a --
19    something on, oh, my God, the foreclosure crisis, we're going
20    to have a meeting about this and we're going to call the banks
21    and -- I mean, if you posed questions about that, that would
22    be, I think, a much more reasonable request for her.
23         MR. EVANGELISTA:  So let me put the limitation in sort
24    of -- sort of in the mix here for you.  And it goes to, your
25    Honor, how -- and it is one of the defendants's issues that

1    they are about to get to here.

2          It is how Cook County defines what Cook County is for

3    purposes of imputing knowledge to it for whether or not it

4    acted timely in bringing its claims.  And we have limited it to

5    the Office of the President and the commissioners, the policy

6    makers of Cook County, who are the ones who can make the

7    decision about bringing the lawsuit and going forward on a

8    knowledgeable basis.

9          And so we would limit our request to statements made

10   to the county at that level, the Office of the President, the

11   commissioners, it -- assuming that that's also the definition

12   of what the county is for their purposes of trying to impute

13   knowledge to the county --

14         THE COURT:  Well --

15         MR. EVANGELISTA:  -- under the -- under the

16   limitations argument.

17         MS. ROSE-SMITH:  Well, but, your Honor, you can see

18   the problem with that, right?  The -- if Bank of America was

19   making such statements to anybody, they would have been making

20   it to various regulatory authorities and administrative

21   agencies of the county.  They would probably not have been

22   calling up the president and saying, hi, we don't discriminate,

23   right?

24         And so that -- to me that illustrates why the

25   knowledge for the county needs to be people who actually were

1   in a position to know.  And I have a list of those that I am

2   happy to give you.  It is not long actually.

3         But -- but so that's why, who Cook County is for

4   purposes of making these decisions.  It wouldn't just be people

5   who made policy, it would be people who actually were the

6   governing mechanism of the county.

7         THE COURT:  Right.

8         MS. ROSE-SMITH:  So I wouldn't limit, because, one, I

9   think if you do limit it, he's not going to get anything that

10  he wants because -- because I think that the number of times he

11  would have talked to the president is nil.  I don't know that

12  for certain, but I'm pretty sure.

13        And -- and, two, I just don't -- if the county relied

14  on something in order to make a decision about not bringing a

15  lawsuit, it must know what it is because if it didn't know what

16  it is it couldn't have relied on it.  And so you -- I can't say

17  I'm -- I'm -- I didn't rely on anything at all.  But, hey, I

18  just learned that Bank of America made this statement, and now

19  I'm going to say I will relied on it.  I had to have heard it

20  at the time and made a decision at the time based on that

21  statement.

22        And so what I have said is if we -- if we discover a

23  statement that we believe is one that shows you have knowledge,

24  we will produce it.  If you have a statement that you believe

25  is something that you relied on in making a decision not to

bring a lawsuit, let us know. We'll produce that if we have

it. You produce it if you have it. Either way both sides are

going to get what they want because I'm not going to be able to

make that argument in front of Judge Bucklo if I never produced

it and I show up at the last minute and say, a-ha, she's going

to absolutely not.

And so if -- this is not a situation where we're

trying to play gotcha. We're going to have to produce it to

them. Right now we don't know of any. But I also know that to

even start searching for that across any number of

representatives for Bank of America would be next to

impossible.

Now what you proposed a second ago where you said, if

you are aware of a specific hearing that the county held no

matter who held it, really if the -- if somebody -- one of the

county agencies held a hearing and a Bank of America

representative spoke there and they know that there was a

hearing, that's a target I can go and actually search for.

But searching for any statement made over ten years to

any state or federal regulatory agency or to Cook County itself

is just -- it is a needle in a haystack.

MR. EVANGELISTA: It --

THE COURT: So I'm -- I'm not going to foreclose you

from asking this in a more directed way. And if you want to

re-pose this because your client feels that representations

were made to it, I'm going to deny -- I don't know, are these motions to compel?  I mean, we didn't really do motions to compel, but, you know, you just brought these to me because I think I asked you to.

So I'm -- I'm going to -- I'm going to find that the bank need not respond to RFP 47 as it is worded.  And that is the one that -- that requests all statements made to the county.

But I'm -- I'm not -- you're free to drill down on that.  And if there is a -- if you want to say, look, any representations you made to the department of blah, Department of Development or what -- I don't know what it would be over there -- homeownership or department of, you know, whatever it would be that would interact most frequently with banking institutions to encourage homeownership or whatever that would be, I think that would be a more reasonable request to put on counsel to then go back to her client and say, okay, I want you to pull all the meetings that you had with the representatives from that department of the county for this time period, and tell me who met there and what kind of things you talked about.  Or pull me the agenda meeting minutes or whatever.  I mean, you're not going to have transcripts necessarily of those things, but they might be able that get you meeting minutes.  And your client might have meeting minutes too.  You know, that should be exchanged.

 1          MR. EVANGELISTA:  And perhaps it can be addressed also

 2     in a request to admit or an interrogatory might be a more

 3     direct way to get at it, your Honor, because I think we -- I

 4     think the point is is that they did not come and say, oh, we're

 5     discriminatory lenders.  I think they made public statements

 6     that their -- the problems that had occurred and the

 7     foreclosure crisis was the fault of the borrowers.  And that's

 8     kind of the issue that the county is dealing with.  And when

 9     you have public policy makers that are hearing in -- out in the

10     world, because that's what the news media is talking about,

11     that, you know, it is all the bad lenders and it is the economy

12     and it is not the fault of the original lending processes

13     itself, it puts them in a mindset.

14          And so that's, I think, an issue -- that's why we're

15     sort of asking these questions because if -- obviously if Bank

16     of America came and said either we are not discriminatory

17     lenders, that's something county officials might go, oh, okay,

18     well I don't have any reason to think the bank would be a

19     lender, why would I sue them?  Or, conversely, if they came and

20     said, by the way, we're really bad, we're -- we made all these

21     bad discriminatory loans, you should be doing something about

22     it, that would put the policy makers who were trying to decide

23     whether to bring a lawsuit or not on notice of actually

24     bringing a lawsuit.  That's why -- the entire purpose of this.

25          THE COURT:  Yeah.

1          MR. DAILEY:  And I -- you know, just to be clear, the

2     county did eventually put Bank of America, as well as any other

3     bank, on the predatory lender database and deemed them

4     predatory lenders after it conducted an investigation about

5     lawsuits and realize it was done and they predatory lenders.

6          So, you know, that -- clearly they didn't know

7     something led them to not know what the originating -- the

8     origination practices of the bank were.

9          THE COURT:  So it might be that whoever made that

10    decision to put them on the predatory lender list, that might

11    be the agency or the bureau that would be the most likely to

12    have interacted with the bank --

13         MR. DAILEY:  It was commissioners (unintelligible).

14         THE COURT:  -- in the year or two previous to that,

15    kind of demanding answers.

16         MR. DAILEY:  There was a commissioners --

17         THE COURT:  And that might be a way to ask --

18         MR. EVANGELISTA:  It was a commissioners.

19         THE COURT:  -- for the bank's interactions because

20    that may be the agency that's in charge of -- well, that

21    clearly is the agency that's in charge of developing the

22    predator lender list.

23         MR. EVANGELISTA:  It was the commissioners, I think,

24    your Honor.

25         MR. DAILEY:  (Unintelligible).  There you go.

1          MR. EVANGELISTA:  There you go.

2          THE COURT:  And that doesn't help.

3      (Laughter.)

4          THE COURT:  Okay.  So I -- I am not going -- I haven't

5      dealt with RFP 46, which is more the federal regulatory

6      agencies.  And I'm going to say this, there is no way I'm

7      making them give you all of the federal regulatory agency

8      statements they have ever made in their -- in the last ten

9      years or back to 2004, the last 12 years.

10          So I'm going to do the same thing.  But if you -- if

11     you want to reask this question as to specific -- I don't -- I

12     don't know about these robo stamp cases.  But if you want to

13     ask specific questions as to admissions made with respect to

14     settlements on predatory lending cases, you can ask about that,

15     and the bank can take whatever position it feels it needs to

16     take.

17          Okay?  But I'm going to -- this is too broad as asked.

18          MR. EVANGELISTA:  We can narrow that down.  And I know

19     counsel's certain going to object with --

20          THE COURT:  That's fine.

21          MR. EVANGELISTA:  -- a objection on --

22          THE COURT:  We'll revisit that another day.

23          MS. ROSE-SMITH:  Yes, your Honor.

24          And then speaking of visiting it another day, can we

25     just -- can I ask that they be required to just send us a new

1  RFP about it?

2          THE COURT:  Yeah.

3          MS. ROSE-SMITH:  I'm not going to complain --

4          THE COURT:  These are done.

5          MS. ROSE-SMITH:  -- about the number.

6          THE COURT:  These are done.  These are done.  These

7  are over.

8          MS. ROSE-SMITH:  Thank you, your Honor, that's --

9          MR. EVANGELISTA:  No problem.

10          THE COURT:  These are over.  We'll be at RFP 400 by

11  the time we're --

12          MR. EVANGELISTA:  I think so.

13      (Laughter.)

14          THE COURT:  Okay.  Now we get on to the bank's

15  requests, because we didn't -- we haven't given the bank any

16  attention.  Okay?

17          MS. ROSE-SMITH:  So, your Honor, the first of them is

18  one of the issues that we already previewed for you, which is

19  that the county has defined people who know for purposes of --

20          THE COURT:  Yeah.

21          MS. ROSE-SMITH:  -- of the statute of limitations

22  issue that we have just gone through.

23          As the president and the Board of Commissioners, we

24  would prefer that it be the president, the commissioners, and

25  the executives in any of the agency of the county that reported

up to the Office of the President.  For example, the Bureau of

Economic Development, the finance bureau, the county auditor,

and then other elected county officials.

So -- and that's actually only the Recorder of Deeds.

And we don't need all the -- all of the elected officials, but

some of them clearly would not have anything to do with --

THE COURT:  Like the State's Attorney.

MS. ROSE-SMITH:  -- these issues.

Right.  Or like -- yeah, the State's Attorney, for

example, or, you know, the judges or anybody who is elected

locally in the judicial system, things like that.

But the treasurer, the board of review commissioners,

the assessor, and then the office of the secretary to the board

of commissioners.

So it is a -- it is a relatively small list of people,

and we're willing to -- we're willing to not say any -- any low

level secretary whose in the office of the treasurer.  I'm not

saying those people --

THE COURT:  Right.

MS. ROSE-SMITH:  -- but heads of each of these

agencies and --

THE COURT:  So --

MS. ROSE-SMITH:  -- (unintelligible).

THE COURT:  -- isn't there -- isn't there a legal

answer to this?  I mean, you're asking me to make a discovery

ruling which is, you know, I have a lot of discretion, Rule 26, big discretion here.

But isn't there a legal answer to this that I should look at?

MR. EVANGELISTA:  And --

THE COURT:  Or what are you asking me to do?

MR. EVANGELISTA:  I was actually going to suggest on this issue, your Honor, that maybe we put in a short -- some sort of short brief so -- to give the Court some legal information.  Because the way we have been looking at it, in order to impute liability to the county or a city, the law in the context of civil rights cases is that you have to show whatever practice was going on, was known to the policy makers. It was a widespread practice.  It was known to the policy makers, and the policy makers are the ones -- usually the -- it is usually at that commission level.

And that's how we have approached it because they are the ones who really are making the call as to whether or not to proceed with litigation that could impact the county's business relationships with its banks, for example.  And so in order to -- they are the ones that you have to show -- you knew something or had a reason to, you know, initiate litigation against the banks in order to -- to proceed.

So the housing agency, you know, they may complain, oh, you know, this is terrible we have got all these things

going on, but unless it gets to the proper channels through

agenda that's given to the board --

THE COURT: Right, but if she can prove --

MR. EVANGELISTA: -- or the president's office --

THE COURT: -- that the people in the housing agency

weren't doing their job, for instance, so they knew that there

was this crisis, or we were awash in foreclosures and the -- in

the way that the housing agency was looking at it, they seemed

to be disproportionately resting -- is this a race case or a --

MR. EVANGELISTA: Well, it --

THE COURT: -- case class or --

MR. EVANGELISTA: It is a -- yeah, it is a single race

case --

THE COURT: Okay.

MR. EVANGELISTA: -- on behalf of the county, yeah.

THE COURT: Okay. So the housing agency can see that

there is clearly a race element here to the way these proposals

are shaking out. And they don't do their job.

MR. EVANGELISTA: Okay.

THE COURT: And they don't bring it to the policy

maker's decision or policy maker's attention, does that mean

that the bank doesn't get the protection of the statute of

limitations?

MR. EVANGELISTA: Well -- well, I mean, I think the

issue is -- that's -- I think the answer is no. I mean, I

think the law is in order to get to that decision maker, you
have to show that this was sort of a -- something that was
widespread that they knew about that was widespread.  And --

THE COURT:  But if the housing division knew about it,
and that's their job, they're -- they're a county whatever, a
division or bureau or whatever they are called, and that's
their job to monitor housing -- I don't know what their charter
would be -- but, I mean, the commissioners, they are
not -- they can't be in every little business.  You know, they
have got their constituents, and they are running for office.
And they have got a million issues, violence, the jail,
the -- you know, they have got a a million things going on.

So if the housing people know about it and she can
prove that the housing people know about it and she can show
that they sat on their hands, you think she doesn't get
protected by the statute of limitations because they didn't do
anything about it?

MR. EVANGELISTA:  Yeah, I -- your Honor, and I
don't -- and again that's why I suggested maybe some legal
briefing on this because I'm not sure that -- that the -- the
housing authority or the housing division, if -- unless it is
a -- it is directly under the Office of the President --

THE COURT:  Yeah, I don't know.

MR. EVANGELISTA:  -- would get to -- right -- would
get to that level.  And I don't know -- I mean, I have done a

1    lot of research on whether you can impute liability --

2            THE COURT:  Yeah.

3            MR. EVANGELISTA:  -- for this particular issue, and

4    there is nothing out there.  This is a novel issue.

5            THE COURT:  So here's my other concern.  I appreciate

6    that.

7            MR. EVANGELISTA:  Yeah.

8            THE COURT:  And you're going to have that fight in

9    front of Bucklo.

10           MR. EVANGELISTA:  Yeah.

11           THE COURT:  So my other issue is I'm in discovery.  So

12   I have to make sure she gets what she needs to make her

13   argument.  And you -- you get what you need to make your

14   argument.

15           And so part of her argument is going to be these

16   housing people, they didn't do what they were supposed to do.

17   Like they knew what was happening and, you know -- and you're

18   going to be saying, it doesn't matter what they knew and have

19   to go to Preckwinkle and, you know, there is only this body.

20   But you know --

21           MR. EVANGELISTA:  Uh-huh.

22           THE COURT:  But for purposes -- and you can make that

23   argument --

24           MR. EVANGELISTA:  Right.

25           THE COURT:  -- and you'll cite your law and all that.

1       But I got to make sure that she has the data so that

2   if Judge Bucklo rules in her favor, then she's not saying,

3   okay, well, now we got to go back and reopen discovery

4   because --

5           MR. EVANGELISTA:  Uh-huh.

6           THE COURT:  -- you know, Rowland, she kept it so

7   limited, we didn't do any discovery on anybody but the board.

8   And now you have ruled that other people matter under the law,

9   and now we have got to reopen discovery.

10          I mean, that's --

11          MR. EVANGELISTA:  Uh-huh.

12          THE COURT:  So we're a little bit -- you know,

13  we're -- I think for me to get legal briefing from you is not

14  particularly useful because I don't think that I am ruling --

15  that I should be ruling on the ultimate issue.

16          MR. EVANGELISTA:  Right.

17          THE COURT:  I mean, your ultimate issue is who has to

18  have knowledge for purposes of this statute of limitations

19  argument.  And you're going to have a knock down drag out about

20  that, and that's great.

21          MR. EVANGELISTA:  Uh-huh.

22          THE COURT:  But all I have to do right now is to make

23  sure that if she wins that argument, legally, that then she has

24  the ammo as to what did the housing bureau or whatever we're

25  calling this thing, what did they know.  And I don't want to

1   overly burden you, and I am not going to make you produce from

2   the Health and Human Services Bureau and the prison bureau and

3   the -- you know, we're not going to go to irrelevant agencies

4   just to bury you.

5           MR. EVANGELISTA:  Right.

6           THE COURT:  But I think we can come up with reasonable

7   agencies so that if the bank wins that argument, the bank can

8   then say, okay, we won that argument fair and square.  Now we

9   want to tell you what did those bureaus know?  Because they sat

10  on their hands.

11          MS. ROSE-SMITH:  And I have a list, your Honor,

12  so -- and it is -- it's not outrageous.  And it doesn't have

13  any of the ones that you said, for example, that you are not

14  going to order.

15          THE COURT:  Right.

16          MS. ROSE-SMITH:  So I think it is reasonable.  And we

17  can either discuss or I can give it to you right now, whatever

18  you prefer.

19          THE COURT:  So I think at this stage, I have got to

20  allow the production.  And I think she may not be able to use

21  it.  I mean, if you win your legal argument, then it is all

22  wasted time, you know.

23          But if -- but we are in discovery, and it might be

24  relevant because she might win that argument.  But I don't feel

25  comfortable ruling that you win that argument, and then Judge

Bucklo disagrees with me, and then you haven't done the
discovery.

MR. EVANGELISTA: Right.

THE COURT: And then she literally -- she's like,
okay, great, now I won the argument. Now I have to go back and
figure out what did the housing bureau people know because
Rowland shut me down, and I don't have that.

MR. EVANGELISTA: So, your Honor, she had -- I think
had identified -- maybe she could reidentify which of the ones
are on her list, and then -- basically I think you said
no -- you're not looking for every employee, but the -- you
know, the head of the division, right?

MR. DAILEY: (Unintelligible).

MR. EVANGELISTA: I mean, how do you --

MR. DAILEY: I would --

MR. EVANGELISTA: How do you --

MR. DAILEY: -- cut it down and limit it down first
because those divisions she just let -- she just listed off,
they still have multiple different areas. And I -- right now
to say, oh, you get discovery in this particular division, we
need to sit down and agree on where that information might be
most likely contained, and --

THE COURT: Yeah. I'm happy for to you meet and
confer. I'm in no position to say who is relevant and who is
not.

1          Okay.  Interrogatory 2 is about the banking

2    relationships that the county has had with any of the

3    defendants.

4          MR. DAILEY:  And any other banks.

5          MS. ROSE-SMITH:  And your -- your Honor, we --

6          THE COURT:  Any of the defendant banks, right?

7          MR. DAILEY:  No, and any other banks as well.  All

8    bank relationships with the defendants and (unintelligible)

9    they ask for all banking relationships with any other banks as

10   well.

11         THE COURT:  Okay.

12         MS. ROSE-SMITH:  I thought we asked for --

13         THE COURT:  I thought it was just the bank.  Any other

14   defendants including all bank accounts, loans, lines of

15   credits, financing.

16         MS. ROSE-SMITH:  Yeah, we have limited it to the bank

17   defendants.

18         THE COURT:  Yeah.

19         MS. ROSE-SMITH:  And, your Honor, I will be candid and

20   say that is a very broad request.  And the reason it is done

21   that way is because it is a back-door attempt to get at

22   something that they have -- that we have just not been able to

23   get.  And that is they have -- they have in their requests for

24   admissions disclaimed knowledge of even the most basic thing.

25   For example, the county did not know that Countrywide made

mortgage loans in the county in 2005, right?  And so as a

result of that, we're trying to figure out ways we can prove

that they did know or that they should have known certain basic

facts, like what -- what kind of business this entity that they

were banking with did in the county.

And so I'm not -- I'm not here to say we must have

this because every single piece of that is relevant.  My main

issue is trying to understand who did business with my client

and what diligence they would have done before doing business

with my client so that I can then show that they should have

known some basic facts that we might get if they would just

admit them and move on, like that the -- that Countrywide made

mortgages in Cook County or that Countrywide or that Bank of

America made mortgages in Cook County.

So that's really the issue.  It is not the -- I don't

care about every single loan that they made.  And I'm not

asking for account numbers or, you know, details on whether --

THE COURT:  Yeah, I'm not giving you --

MS. ROSE-SMITH:  -- they made a payment on time.

THE COURT:  -- that.  Right, right, right, right.

MS. ROSE-SMITH:  It is the --

THE COURT:  So what's the problem?

MR. EVANGELISTA:  Well --

THE COURT:  What about admitting that they, you know,

made loans and all that kind of stuff?

1          MR. EVANGELISTA:  Well --

2          THE COURT:  That they made mortgages.

3          MR. EVANGELISTA:  Okay.  Your Honor, so, again, this

4     goes to the -- this is a statute of limitations ploy --

5          THE COURT:  Yeah.

6          MR. EVANGELISTA:  -- argument, okay, so to be clear

7     about what it is.  And they're asking -- they're asking to

8     know -- how -- they're asking on what basis does the county

9     government have, and the decision makers of the county, know

10    whether or not Countrywide or any other bank is making subprime

11    loans?  To call them subprime, that they are servicing

12    subprime.  I mean, you're asking --

13         THE COURT:  To homeowners.

14         MR. EVANGELISTA:  You're asking commissioners to know

15    what the business of a bank is, and you're trying to get at it

16    through what your bank records are.

17         It is really -- it is really designed to say, okay,

18    here's how much -- you know, go look and see all the business

19    you have with Bank of America.  And Bank of America had also

20    asked, and I think even in their response they indicate they're

21    looking for information about other banking relationships as

22    well with other banks --

23         THE COURT:  Okay.  Well, they're not getting that.

24         MR. EVANGELISTA:  -- which is irrelevant.

25         And I don't see how -- what bank accounts we have with

Bank of America shows any relevance to whether or not the

decision makers of the county knew that Countrywide in

particular or the Bank of America in particular was making or

servicing any kind of particular loan at a -- during a certain

time period.

        MS. ROSE-SMITH:  Well, your Honor, that's --

        MR. DAILEY:  The (unintelligible) loan.

        MS. ROSE-SMITH:  -- if you -- if you --

        MR. EVANGELISTA:  Residential loans, right.

        MS. ROSE-SMITH:  -- think the county -- sorry.  I

don't mean to talk other to you.

        MR. EVANGELISTA:  That's okay.

        MS. ROSE-SMITH:  If you only think of the county as

this tiny sliver of the county administration right up here,

then that makes less sense.

        But when you think of the county as the Department of

Finance and others who would have made key decisions about

where to invest that county's money, those are people who if I

know what relationships we're talking about and who was in

charge of those relationships and I have a basic understanding

of those, then I understand where to go next.  Okay.  Those

people would have done diligence into the kind of business that

Bank of America was doing.  Those -- these people would have

been watching where their investments went.

        And I am not -- I don't want details on the

investments, I want details on the relationships or I want them
to fully answer with a broader definition of Cook County the
RFAs that we have already propounded and that they have
disclaimed any knowledge of.

    THE COURT:  Okay.  Well, that -- I don't have those
before me, do I?

    MS. ROSE-SMITH:  No, your Honor, because
we're -- because the way that the RFA rules work, I need to go
and prove that they were lying, and then I can come back and
ask for costs and ask for sanction.  That's part of what's
going on here.

    THE COURT:  Yeah.  Okay.  So I would like to -- you're
going to go back and you're going to work out a broader
definition of county.  Okay?  And you're not going to give any
information about other banks.  That's just -- she doesn't want
it, she doesn't need it, that's silly.

    I would like you to, with the broader definition of
the bank -- of county, of what the county is, I really think
the easiest thing to do is to narrow this into what all -- as
you define the county, broadly define county, to tell her what
the county, as it is broadly defined, knew about the defendant
bank's making mortgage loans.  So what did the various entities
of the county because of that your various dealings with the
banks, what did they know about -- I mean, that's a different
interrogatory.  And I don't want to be drafting your

interrogatories for you because you're much better at it than I

am.

But do you care if I just order that?

MS. ROSE-SMITH:  No, that's -- that's wonderful

because that's what we're looking for.

MR. EVANGELISTA:  They have asked -- there are some

interrogatories I think that fairly would cover that.

THE COURT:  Okay.

MR. EVANGELISTA:  And there are RFAs, yeah.

THE COURT:  So I don't want to be -- you know, so I'm

just going to say that for Interrogatory 2 that's what you're

going to do.  You don't need to -- so you don't need to go into

all the other banking relationships.  The fact that you

borrowed money to build the hospital or you borrowed money to

do this or -- you know, whatever you were borrowing money for

from the bank, they don't really care and they don't really

need all that, and I don't want you to have to pull all that

together because that would be a headache.

But -- but you do need to go and talk to the various

areas and the people who worked and ran those departments in

those -- for that time period and say what did you know about

the bank during that time period in terms of their making

mortgages.  And given that they're residential mortgages, they

may or may not have known a lot about that or they may not have

known that much about it because they are residential

mortgages.  And so it may not have been that germane to what
the county employees were doing.  Okay?

Now unfortunately I do have a 10:30.  It is not going
to be long, so I can go back and do it, and I could spend about
another 20 minutes with you guys.

Do you want and wait and do that or do you need to go?

MS. ROSE-SMITH:  Your Honor, I think that would be
useful with everybody present.

MR. EVANGELISTA:  Yes.

THE COURT:  Okay.  I'm going to go do that in my
office.  I'll be right back.

(Brief recess.)

THE COURT:  Okay.  All right.  What's next?  Where are
we?

MR. EVANGELISTA:  Your Honor --

THE COURT:  Oh, here we are.

MS. ROSE-SMITH:  Yes, we're on Interrogatory Number
12.  And, your Honor, I think this is a pretty straightforward
issue.  So we know from the discovery that we have that the
county claims to have learned based on a communication that it
received on June 15th, 2012, information that it might have a
claim.  And that it then spent a year doing something that the
plaintiffs characterize as investigating whether or not they
had the tools to investigate their claim.  And then they
retained counsel on August 27th.  And thereafter counsel

1   undertook an investigation into -- into the nature of the

2   claims and brought this lawsuit on -- in 2014.  Okay?

3           And, again, this is a request to try and understand

4   background decision makers, all of those sorts of things.

5   Because all we're trying to do is -- we wanted them to give us

6   in a narrative -- narrative answer in the response to the

7   interrogatory, tell us what steps you took once you learned

8   that you might have a claim, tell us what you did next.

9   Because what they did next will tell me whether or not those

10  are things that were done, could have been done, should have

11  been done at any point, and also to understand and how the

12  county makes decisions.  Right?  So this, again, is part of the

13  broader issue of who is the county.

14          If they went to certain -- if they went to specific

15  bodies and said, can you investigate this?  And that body says,

16  no, we don't have the funding, that's fine, but I would like to

17  know that that body is the body that they would have gone to to

18  investigate it.

19          So I didn't want documents about this, I just want a

20  narrative of this is the group that received the information.

21  This is the group that they consulted.  If they consulted

22  legal, I don't want to know what they said to their legal

23  department, I just want to know step by step what did you do

24  until the point that you retained counsel.  And after

25  you -- they retained counsel, I'm not asking them to log or to

1    produce any information about what they did.  I'm just

2    asking -- because I don't want to have to do the same thing on

3    my side for when Bank of America retained counsel.

4            THE COURT:  Right, of course.

5            MS. ROSE-SMITH:  But just in that interim period, if

6    they had -- they apparently some meetings and they had some

7    discussions, I just want to know what they did --

8            THE COURT:  Well, you know --

9            MS. ROSE-SMITH:  -- not --

10           THE COURT:  -- that they retained counsel on August

11   27th, 2013, right?

12           MS. ROSE-SMITH:  Right.  But there was a year between

13   --

14           THE COURT:  You seem to know that.

15           MS. ROSE-SMITH:  -- the two.

16           THE COURT:  Okay.

17           MS. ROSE-SMITH:  Yeah.

18           THE COURT:  Now when you say -- because I don't

19   have -- you say that in Interrogatory Number 11 they tell you

20   they got a complaint on June 15th, 2012.  I don't happen to

21   have Rog 11 in front of me because it is not included here.

22           What was the complaint?  Was that from a person or

23   a --

24           MS. ROSE-SMITH:  No, I -- I -- why don't you tell them

25   because I -- I think I know what it is, but -- I think they got

a letter from Mr. Evangelista telling the county they might
have a claim on June 15th.  And that thereafter they looked
into whether or not, hey, we might have a claim.  And then
after determining, apparently based on the response that they
had given to the interrogatory, that they didn't have the
capacity to make an investigation, they hired Mr. Evangelista
or Mr. Dailey, I don't know which, and thereafter they made the
investigation.

THE COURT:  Okay.  So what's your -- what's your
position county plaintiff?

MR. EVANGELISTA:  Well, your Honor, that -- it is real
simple.  They have the dates here.  They are trying to make a
statute of limitations argument that the county did not bring
suit within a two-year period.  I mean, they are using
a -- trying to use a two-year period.  In here they have
information that at the -- at best, okay, the county had some
sort of idea that there was some kind of a Fair Housing Act
claim, right, as of April -- I'm sorry.

MS. ROSE-SMITH:  June.

MR. EVANGELISTA:  Excuse me.  -- as of June 15th,
2102.  But the complaint was filed within two years of that
date.

So why do they need to pry into and poke around into
what would clearly be work product of the State's Attorney's
Office, attorney-client communications between maybe the

State's Attorney's Office and the Office of the President, who is represented by counsel? I mean, I just don't see what that gets them. They have got -- you know, from the plain document at best, it is I think about 18 months between the time that under the -- under the -- that particular document they could say, hey, the county, you had some idea that maybe there is some kind of a Fair Housing Act claim. But that -- that does not help their statute of limitations argument one way or another.

THE COURT: Wait. And the 18 months is the June 15th, 2012, complaint and the date that you filed the complaint?

MR. DAILEY: Right.

MR. EVANGELISTA: That's right. Which is April 9, 2014.

So it is within the two years. So what difference does it make?

MS. ROSE-SMITH: But --

MR. EVANGELISTA: How is it even --

MS. ROSE-SMITH: Your Honor, the reason that it is relevant is think of it from a discovery perspective, right? I -- I understand that their position is that they did not know anything about what was happening in foreclosures in Cook County until June 15th, 2012, when they got a letter. I understand that.

I don't believe that's true. We're doing lots of

other things to discover what they would have known.  But think about me in a deposition, right?  I am going to ask a county official, when did you learn this, right?  And they say, we learned this in June 2015.  What did you do after that?

And then if I discover that that official or that department learned information that they could have taken through those same set of steps, I will ask, could you have done that?  Did you -- were you in contact with this group?

And more to the point of the thing that we were just talking about where the -- where we're talking about who makes decisions in the county, if I find out that -- that the person that they talked to in August of 2012 was in the assessor's office or was in the Bureau of Economic Development's office, obviously then that means that those are people who were involved in making this decision, so they are people who I should get discovery from.

I'm -- all I'm trying to do is understand what happened and who was involved.  And this is just one of these places.  And I'm not trying to go into privileged information, but I'm just trying to understand, okay, what did you do?  Who was involved in the decision?  How did that come into being?

THE COURT:  So you mean you want to then say to the county official, okay, you heard about this in June 2012.  What did you do?  And she says, well, I went to the county assessor or whatever.  And you want to say, okay, well then why the heck

didn't you do that in 2009?

MS. ROSE-SMITH:  Right.  When you had this piece of information or that piece of information, could you have done that?  Maybe the answer is no.  But likely I think the answer is going to be yes.

MR. EVANGELISTA:  Your Honor, she doesn't need that information to ask those questions.  She could ask, when did you first come to the conclusion that you had -- that Cook County had a Fair Housing Act claim against Bank of America and what was that based on?

Then she could go back and say, well, what did you do after that point in time?  Who did you talk to?  Could you have -- did you know any information, have a basis for that prior to the time you learned that Cook County had a claim?  Who did you then talk to?  Could you have talked to somebody at that point?

You can get to the same line of inquiry and questions without prying into the county's attorney-client privilege and attorney work product privileges relating to their investigation.

I mean, it is just -- it is ridiculous.  If I asked her the same information about what did, you know, their law department do to investigate their claims, you know, they would be jumping up and down saying no way.

MS. ROSE-SMITH:  That's why I am not asking about the

1    period after --

2         THE COURT:  No, I'm going to -- she's not going to get

3    into the lawyer thing, and I'm not going to let her.

4         MS. ROSE-SMITH:  Yeah.

5         THE COURT:  But you just said that she could ask, you

6    know, the bureaucratic who she is deposing these questions.

7    So, I mean, if she can ask the bureaucrat, why can't she ask it

8    in an interrogatory?  Because the bureaucrat is going to be

9    answering the interrogatory.

10        MR. EVANGELISTA:  It --

11        THE COURT:  I mean, I know you're going to be drafting

12   it, but the bureaucrat is going to be giving you the

13   information.

14        MR. EVANGELISTA:  That's right.  And they have asked

15   us some -- and it comes down to how -- ultimately it goes back

16   to this issue about defining county is one of the problems we

17   have had because where does -- where does the -- you draw the

18   -- I mean, where do you draw the line on any of this stuff.

19        THE COURT:  Yeah.

20        MR. EVANGELISTA:  So --

21        MR. DAILEY:  And I think it is important to make sure

22   we understand that we answered this and said, what they did,

23   the steps they did, were all put into the complaint.  We have a

24   400-plus paragraph complaint.  That was the result of the

25   investigation.

1    So when you're asking what you -- when you ask whoever

2 is going to be deposed, what did you do?  We have -- they are

3 going to go through 400 paragraphs of the complaint.

4        MR. EVANGELISTA:  The --

5        MR. DAILEY:  They are not going to have privy or any

6 kind of information in regards to what counsel did in its

7 investigation.

8        THE COURT:  Right.

9        MS. ROSE-SMITH:  But I --

10        MR. DAILEY:  So there is no point.  We have answered

11 the question that that's -- I think that's what the essence of

12 your question was, your Honor.

13        MR. EVANGELISTA:  Yeah, the interrogatory asked, and

14 then we basically said in the interrogatory, you know, the

15 county got a letter in June 2012, and that was at the earliest

16 point there was any possible argument that they had any -- for

17 -- you know, any sort of somebody said something to them about,

18 hey, you might have a Fair Housing Act claim in general, okay,

19 not related to anybody.  But, hey, let's look at this issue

20 because it is out there, it is floating around.  All right?

21 And then they hired counsel.  And then counsel --

22        THE COURT:  They had counsel a year later.

23        MR. EVANGELISTA:  That was us.

24        THE COURT:  Fourteen months later.

25        MR. EVANGELISTA:  A year later.  We did the

investigation.  And the investigation was delivered to them in

the form of a draft complaint.  And within two, two whatever it

was, a month of the draft complaint, they filed it.  They

agreed and filed it.

There is no -- everything else in between the bookends

there is -- is work product.

At a deposition ask whatever questions you want.

THE COURT:  Well, everything after August 27 is work

product.  But is everything between June 15th, 2012, and August

27, 2013, work product?

MR. EVANGELISTA:  Well, if it --

THE COURT:  Or is that the bureaucrats doing their

thing?

MR. EVANGELISTA:  Yeah, no, if -- to the extent the

bureaucrats were involved and there is something in the

official records, which there is not that I am aware of, but

the question is the state's attorney's communications with the

Office of the President, whatever their communications were,

those would be privileged because there is an attorney-

client --

THE COURT:  Well, are you saying --

MR. EVANGELISTA:  -- relationship there.

THE COURT:  -- that after the -- after the county was

notified on June 15th, 2012, they went right to the state's

attorney?  I mean, is that the answer?  Because then they got

1    counsel involved right away.

2           MR. EVANGELISTA:  I --

3           MR. DAILEY:  (Unintelligible) State's Attorney

4    actually was -- we're state's attorneys.

5           MR. EVANGELISTA:  We -- I'm sorry.

6           MR. DAILEY:  And so the state's attorneys knew and

7    brought --

8           THE COURT:  You're state's attorneys?

9           MR. EVANGELISTA:  We were appointed as state's

10   attorney's --

11          MR. DAILEY:  Right.

12          MR. EVANGELISTA:  -- that's right, your Honor.

13          MR. DAILEY:  So there are multiple --

14          THE COURT:  Not until August 27th.

15          MR. EVANGELISTA:  That's right.

16          MR. DAILEY:  Right.

17          MR. EVANGELISTA:  But there are multiple privileges

18   here at issue.  You have --

19          THE COURT:  Yeah, but I want to know between June

20   15th, 2012, and August 27th, 2013, were they deal- -- were the

21   county officials dealing with the regular old state's

22   attorneys?  Is that how they were dealing with this?

23          MR. EVANGELISTA:  That -- whatever dealings would have

24   been, would have been between the state's attorneys before we

25   were appointed, and the attorney for the Office of the

President.  That's what would have been there.

And then whatever the attorney for the Office of the President and the office of present presented to the board and discussed if they felt it was appropriate, that's it.  That's the world of information that would be there.  And all of that is, I believe, subsumed within the attorney work product and attorney-client communications privileges.  So there is nothing there.

I mean, to the extent they are looking into whether or not they have a claim and they are trying to figure out, well, what do we need to do to bring it?  Can we do it?  That's work product.  Why should counsel have that?

THE COURT:  Right.  I don't -- I mean, have you given that answer?  Did you give that answer --

MS. ROSE-SMITH:  No, your Honor.

THE COURT:  -- to the interrogatory?

MS. ROSE-SMITH:  And if they had --

MR. EVANGELISTA:  We did.

MS. ROSE-SMITH:  -- put that answer in the interrogatory because that is not what the interrogatory, says. I have it, I can read to you their response.  If that's what they had said, then we would have said, okay, so those -- so you got the communication or State's Attorney's Office got the communication, whoever got it, and the Office of the President and the State's Attorney then started talking --

1          MR. DAILEY:  But --

2          MS. ROSE-SMITH:  -- it wouldn't be on the paper.

3          MR. DAILEY:  And I think that it is just that

4     sometimes it becomes convoluted.  We are state's attorneys, so

5     we are always representing --

6          THE COURT:  Yeah, but you're not in the case between

7     June 15th, 2012, and August 27th.

8          MS. ROSE-SMITH:  That's right.

9          MR. DAILEY:  Our boss is.

10         THE COURT:  She's just trying to look at that window.

11         MR. DAILEY:  Right.

12         THE COURT:  That 14-month window.

13         MR. EVANGELISTA:  The 12 month, your Honor.

14         THE COURT:  So what you are telling me -- I just want

15    you to go back and verify this.  So that's going to be my

16    ruling.

17         I want you to verify that between June 15th, 2012, and

18    August 27th, 2013, I want you to clean up your answer.  I don't

19    know what you put in the interrogatory, but apparently what the

20    answer is is that the county immediately turned toward counsel,

21    which would be the State's Attorney under normal circumstances

22    until they get a special State's Attorney involved, and that

23    the investigation, the internal investigation, was done through

24    counsel.

25         I mean, I'm not -- I don't want to answer your

question for you.  But if that's your answer, you need to
articulate that for the bank.  If they had some other agency at
the county do some investigation, you need to articulate that
for the bank.

MS. ROSE-SMITH:  And, your Honor, with that ruling, I
think we -- we will withdraw our objection to their response to
Interrogatory Number 14 because if they answer Interrogatory
Number 12 in the manner that it seems that they're going to
answer it based on what they have made the -- the
representations that they have made here, then what we would be
asking for in the Interrogatory Number 14 is, it would appear
to be, privileged information, and that's not my intent.  So I
don't think we even need to discuss that one.

I'll withdraw my objections to that one, and then just
wait for what they -- what their amended response is.

THE COURT:  Okay.  Fine.

Okay.  Interrogatory 8.

MS. ROSE-SMITH:  So Interrogatory Number 8 is another
that is actually the thing that we were bickering about when
your Honor came back into the room.

THE COURT:  Okay.

MS. ROSE-SMITH:  We just said, please identify for us
the minority populations.  They use the word minority multiple
times in their complaint.

And from reading it it appears that the minority

1  populations are African Americans and Hispanic or Latino

2  individuals.

3       Right?

4       Fine.  We asked that interrogatory to confirm it,

5  close it off, let that be the population of people and loan

6  types that we're talking about.  And in response, they -- in

7  meet and confer said, oh, there is -- we're talking about women

8  they say.  And now in their status report to the Court they

9  said, women, particularly African American women, were

10 disproportionately affected.

11      And my question is, are we saying now African

12 Americans, male and female; Hispanic and Latinos, male and

13 female, plus some other population of women, perhaps white

14 women or other ethnic and racial minority women, are also

15 included outside of the Hispanic and Latino or African

16 American?

17      THE COURT:  Okay.  I don't want to hear any argument.

18 I want -- I'm granting this.  I want you to answer this in very

19 few words.  Tell her what you're talking about.  She has a

20 right to know.  She's going to crunch her data.  You're going

21 to crunch her data.  She wants her expert to be establishing

22 that she didn't do anything discriminatory.  She's got a right

23 to know, what are you talking about?  It just got to be dink,

24 dink, dink, dink, dink.

25      MR. DAILEY:  Okay.

1          THE COURT:  You don't need to argue it.

2          Okay.  14.

3          MS. ROSE-SMITH:  And the last one, your Honor, I think

4     is another one that can be answered pretty simply.  They made a

5     specific allegation in their complaint about robo-signing and

6     bankruptcy cases.  And we asked them, please identify the

7     bankruptcy cases that you are talking about that are -- that

8     form the basis of your having said that.

9          And they came back and said, well, among other things,

10    these two just consent decrees.  And we have said to them,

11    first of all, tell me which ones, like the full list of ones

12    that you relied on.  And if those are the only two, say that

13    those are the only two, right, so that I can then say, okay,

14    that's their basis and I like or don't like their basis and

15    I'll argue that with Judge Bucklo.

16         But they don't do that.  Instead they prefer to let it

17    remain open and won't identify the specific cases.  And I will

18    tell, your Honor, that this one, Interrogatory Number 14, is

19    symptomatic of the responses to a lot of others that we're

20    still negotiating.  And so that's one of the reasons why I

21    brought it.  It seems silly, and it seems as if it is something

22    that could be answered thoroughly and completely and be done,

23    but this is the -- this is the frustration that we're having in

24    getting them to respond is at some point what their case is and

25    what proof they have is what they have.  And I'm not even

1    asking about proof right now.

2        I'm just asking you to tell me -- give me information

3    about the nature of your allegation.  And in this case they

4    just won't definitively say that either of the cases that they

5    cite are all they have or give me the list of the cases that

6    they cite.  That's all I'm asking for.

7        MR. EVANGELISTA:  Okay.  Your Honor, in the complaint

8    we have alleged that they engaged in these bankruptcy -- unfair

9    practices in bankruptcy based on the consent decree they

10   entered into with the OCC.  Now it does not list every single

11   -- the OCC consent decree does not list every, you know,

12   thousands of bankruptcy cases where they filed false statements

13   with the Court in order to try to, you know, either -- to

14   either try to get foreclosures done or through the robo-signing

15   process.  But they are not going to enter into a consent decree

16   unless they have done it.

17       We have identified that you -- you entered into the

18   consent decree.  You have entered -- you -- the consent decree

19   changed your business practice.  You have agreed to change your

20   business practice.  You have agreed not to engage in this

21   behavior.  It affected a number of banks.  And that gives us a

22   reasonable basis to make the factual allegation.

23       They're asking us to now go back and try and identify

24   every bankruptcy case that this may have happened in when we

25   don't have the discovery.  We have asked them for that very

1   specific discovery.  Give us the information you provided in

2   connection with the consent decree which alleged that and found

3   that you engaged in these bankruptcy practices.

4           So we have asked for it.  We had a reasonable basis to

5   allege it, and we don't have the discovery.  They're trying to

6   force us to answer an interrogatory before giving us the

7   discovery to answer the interrogatory.

8           THE COURT:  Uh-huh.

9           MR. EVANGELISTA:  That goes back to the same issue

10  with -- with identifying the minorities that are involved in

11  the litigation.

12          And, you know, just to touch back what your Honor said

13  before --

14          THE COURT:  Even though I didn't let you speak.

15      (Laughter.)

16          MR. EVANGELISTA:  I mean, I don't want to open it up.

17  I know you closed me off.  But --

18          THE COURT:  Okay.

19          MR. EVANGELISTA:  -- it the same issue.

20          THE COURT:  So tell me -- I mean, here's my -- I never

21  understood those robo-call cases, although I read about them in

22  the paper.  I mean, robo call -- robo --

23          MR. EVANGELISTA:  That's fine.

24          THE COURT:  -- stamp, you know.

25          I know robo-stamping -- you know, I know it is

1 not -- I know it had its problems.  You know, I know it is not

2 proper for a variety of reason.

3    But where the cases with the OCC, were they

4 discriminatory or were they just a violation of a various

5 banking regulations?  So --

6    MS. ROSE-SMITH:  They were unsafe and unsound

7 practices.

8    THE COURT:  Right.

9    MS. ROSE-SMITH:  So it wasn't even that it violated a

10 specific regulation, just that the OCC, whose chart was

11 regulating the banks said, we don't think this is a good

12 practice.  We want you to do this differently so that there are

13 no mistakes.  Right?

14    And so --

15    THE COURT:  So when they went in and signed a consent

16 decree and said, mea culpa or non-admission of liability but

17 we'll pay you $400 million, whatever they paid, did they -- how

18 does that go to discrimination?  Because you have a much higher

19 burden because you're -- you know, you're picking a

20 discrimination fight.  So what is -- how does that get

21 to -- how are you hooking that up?

22    MR. EVANGELISTA:  Your Honor, it goes -- and it goes,

23 again, to the theory of the case or this -- the theory of this

24 case is equity stripping.  Okay?  It is not a discriminatory

25 lending case, it is a discriminatory lending and servicing

case. And it is about the entire conduct from the loan-making activity through the -- until the last loan that was made, is closed, or closed, repaid, and what was done during the course of that servicing. And if the banks are servicing them in a way that it -- that are designed to continue to basically strip equity out of them in improper and illegal ways, predatory ways, discriminatory ways, that we are entitled to that.

And, you know, the issue in the robo-signing was they are basically filing false documents with the Court saying that they -- that title has been assigned to them so they can turn around and foreclose on these properties. All these bad practices, right, on the loans, but we have to show that -- we can't -- we're not bringing a claim that you, Bank of America, engaged in this across the nation, and we should get it for everybody because we don't have that claim under the Fair Housing Act. But you did it in a discriminatory way through disparate impact. So if we can show --

THE COURT: Uh-huh.

MR. EVANGELISTA: -- with the loan data, the loan servicing data, that the loans were discriminatory and predatory in the first place --

THE COURT: Okay.

MR. EVANGELISTA: -- then --

THE COURT: So you're --

MR. EVANGELISTA: -- carries right through.

1  THE COURT:  Here's what I am going to do.  I'm going

2  to -- I'm going to let you off the hook on this one.  Okay?  So

3  I'm going to ultimately -- I hear what you are saying.  I mean,

4  ultimately -- are you producing the bankruptcy filing to him?

5  MS. ROSE-SMITH:  So he's not asking for the bankruptcy

6  consent decree, he's asking for every document that we produced

7  to the OCC in the course of --

8  THE COURT:  And you guys --

9  MS. ROSE-SMITH:  -- (unintelligible) --

10  THE COURT:  -- are negotiating that.

11  MS. ROSE-SMITH:  Right.  Because if they want all of

12  that, it is millions and millions of documents.  And I think

13  they ought to be (unintelligible) because I don't think it is

14  relevant.  But we'll get to that.

15  THE COURT:  Yeah.

16  MS. ROSE-SMITH:  All I'm saying is if -- it is fine.

17  And I think that he the answered the question a minute ago when

18  he said we, on the basis of those consent decrees, have a

19  legitimate basis to --

20  THE COURT:  Right.

21  MS. ROSE-SMITH:  -- have alleged that --

22  THE COURT:  I agree.

23  MS. ROSE-SMITH:  -- and so -- and in that case all I

24  wanted was the interrogatory to say, the basis for this

25  allegation is the existence of these two consent decrees.

1    Right?

2             THE COURT:  But he wants --

3             MS. ROSE-SMITH:  But they won't --

4             THE COURT:  -- to dig in -- I mean, I think ultimately

5    his expert wants to look at those filings, the bankruptcy

6    filings potentially on a case-by-case basis and say, look at

7    how they shook out based on race or gender or whatever our

8    basis of discrimination here is, which we do need to nail down.

9             MR. DAILEY:  Disparate impact.

10            MR. EVANGELISTA:  It is -- so, your Honor, it

11   is -- again, you have a lending scheme and an activity that

12   continues into the future.  And it is the -- where the

13   borrowers and that lending scheme has disparately impacted

14   minorities through foreclosures --

15            THE COURT:  Yeah.

16            MR. EVANGELISTA:  -- okay.  But the activities that

17   go -- it is the -- it is the improper servicing activities that

18   continue the bad lending practices to begin with, okay, as it

19   goes to the whole (unintelligible).

20            THE COURT:  I understand.

21            MR. EVANGELISTA:  Yeah.

22            THE COURT:  I understand.

23            MR. EVANGELISTA:  So this is part of that.

24            THE COURT:  So I think -- so do you need him to amend

25   his answer?

1          MS. ROSE-SMITH:  All I wanted was for him to say at

2    this point, this allegation is based on these two cases.

3    Because that -- I'm just -- I'm thinking further down the line

4    about witnesses I need to bring to bear.  I understand that

5    they are going to get data and they're going to argue from that

6    data --

7          THE COURT:  Right.

8          MS. ROSE-SMITH:  -- additional information.  This was

9    --

10          THE COURT:  So he doesn't have a whole list of

11    bankruptcy cases.  He can't hand you a list of 4000 bankruptcy

12    cases that he --

13          MS. ROSE-SMITH:  Right.

14          THE COURT:  -- thinks are at issue.

15          MS. ROSE-SMITH:  Right.  And so --

16          THE COURT:  He may ultimately.  His expert may have

17    four million bankruptcy cases that he says, I analyzed these or

18    I ran these through a logarithm and this is of how they shake

19    out in terms of African Americans or in terms of African

20    American women or in terms of Latino women, head of household

21    or whatever -- however we're going to nail this down.

22          But he's not going to answer that, and I'm not going

23    to order him to answer that now.

24          MS. ROSE-SMITH:  I'm just asking the basis for the

25    allegation in the complaint.  And if --

THE COURT:  So the basis for the allegation in the complaint is the consent decrees.

What I am asking you is do you need him -- are you happy with the record as we have it now or do you need him to file a supplemental response?

MS. ROSE-SMITH:  I'm happy with the record a long as long we understand that when he does have more information, he will supplement.  I just want --

THE COURT:  He's always under a duty --

MS. ROSE-SMITH:  Yeah.

THE COURT:  -- to supplement.

MS. ROSE-SMITH:  It was just a loosey-goosey[] answer, your Honor.  And I just wanted to be --

MR. EVANGELISTA:  Your Honor, what I -- what we just covered in court is exactly what we will put down on paper.  I mean, that --

THE COURT:  Okay.

MR. EVANGELISTA:  -- it is based on the consent decree.  This is what we have now.  We reserve the right to amend.

THE COURT:  Okay.  I feel I have not heard the end of that consent decree.

(Laughter.)

THE COURT:  Okay.  I better read up on it.

Okay.  What else do we need to talk about because I

1  need to get rid of you because I have got a busy afternoon.

2      MR. EVANGELISTA:  I think the first with thing, your

3  Honor, is the -- at the last status conference, we need to talk

4  a little bit about the schedule.  It is the date plaintiffs can

5  amend their complaint.

6      (Laughter.)

7      MR. EVANGELISTA:  That expires tomorrow.  And so the

8  problem is when we originally entered into the scheduling

9  order, we thought we would have all of the loan and servicing

10  information at this point.  Right?  So we don't.

11      And the -- I think that the fact discovery and other

12  issues related to the scheduling order need to flow off of when

13  we're going to get the final set of loan data and servicing

14  data and that our expert has time to analyze it.  We can take

15  that, drill it down, find the property addresses and the loans

16  that are discriminatory, and take that data and go back to the

17  county, run it through the county servers and get all of the

18  damages information that they need.

19      THE COURT:  And you need all that --

20      MR. EVANGELISTA:  It has to go in that order.

21      THE COURT:  -- for the complaint?

22      MR. EVANGELISTA:  I'm sorry?

23      THE COURT:  I mean, we're not -- you need all that for

24  the complaint?

25      MR. EVANGELISTA:  Well --

1          THE COURT:  You're not listing damages in the

2   complaint, are you?

3          MR. DAILEY:  No, your Honor, not the latter part, but

4   the former part is important so that we can directly identify

5   what need -- what, if anything, needs to be amended in the

6   complaint.

7          MR. EVANGELISTA:  Right.

8          MR. DAILEY:  We have not received --

9          THE COURT:  You have got 140-page complaint here.

10         MS. ROSE-SMITH:  I -- your Honor, they have alleged

11   discrimination in every aspect of our business.  So if they

12   find discrimination at some point, they have already made an

13   allegation that would cover that.  That's what we're trying

14   to -- I don't understand what else they would add.

15         We were talking -- if we were talking about entities

16   or something like that, then I would have expected to get some

17   discovery by now that asks me about specific entities and their

18   level of involvement --

19         THE COURT:  Okay.

20         MS. ROSE-SMITH:  -- but I haven't.

21         THE COURT:  Let me rain on your parade here a little

22   bit.  I am looking at the referral order from Judge Bucklo, and

23   it says I have this case for discovery supervision.  I don't

24   see anything in here to tell me -- does anybody have any reason

25   to think that I should be setting dates?

1          MR. DAILEY:  At the bottom at the last page she did

2     say that.

3          THE COURT:  I did -- she did?

4          MS. ROSE-SMITH:  With authority to amend the deadlines

5     in the case as necessary to deal with the discovery fights.

6          THE COURT:  She did.

7          MS. ROSE-SMITH:  Yes.

8          THE COURT:  Oh, that little sneaker.

9        (Laughter.)

10         THE COURT:  She got the last sentence on the last

11    page, did she.  Okay.

12         Okay.  So when are we going to be done with discovery?

13    Let me ask that.  I mean, when are we going to be done with the

14    database?  Data.

15         MS. ROSE-SMITH:  We -- well, it is hard to say, your

16    Honor.  All of the stuff that we have agreed to provide, we are

17    in a position -- we're going to be in a position to provide it

18    by the middle of February.  They want a lot more than the stuff

19    that we have agreed to provide, and they have not yet

20    identified what all of those things are.  And so we haven't had

21    a discussion about them yet.  Those things are going to trail

22    obviously.  And so it could be -- it could be longer.

23         And, frankly, if we're talking about -- we're just

24    talking about data, then that's it.  But if we're talking about

25    everything else, that's -- you know, we're still a long -- we

1    have a long way to go with that.  So I think --

2              THE COURT:  I'm just talking about data right now.

3              MS. ROSE-SMITH:  -- it could be four or five months

4    before --

5              MR. EVANGELISTA:  Your Honor, the -- one of the key

6    issues on the everything -- I mean, yeah, the data, both the

7    lending origination data that we're talking about and the

8    servicing data, is one big discrete chunk of information.

9              But the other discrete chunk of information that we

10   haven't even raised today because we have agreed to go back and

11   try to work it out, all the corporate emails based on

12   our -- and electronic documents based on documents searches

13   that, you know, at this point, you know, we're still trying to

14   figure a way to identify the custodians to search and come to

15   terms with search terms.

16             And we have identified, you know, several hundred

17   possible searches terms to defense counsel.  They have asked us

18   to go back and try to formulate some searches for them.  We

19   have agreed to do that.  And it is really -- that's the

20   core -- it is the stuff that's in t he email --

21             THE COURT:  I know.

22             MR. EVANGELISTA:  -- as your Honor knows --

23             THE COURT:  I know.

24             MR. EVANGELISTA:  -- that's really going to make the

25   difference about how we can, you know, amend the complaint

1    and -- because that's the core information there.  Now --

2    MS. ROSE-SMITH:  Your Honor, you always have the

3    option before trial to amend the complaint to conform to what

4    the evidence is at that point.  Right?  They're -- what they're

5    saying to you is I need to know every -- all of the evidence in

6    order to amend what my allegations are.

7    And what we're saying is your allegation is what you

8    believe happened, and that's supposed to then shape the course

9    of discovery based on what you believe happened.

10   They're saying I don't want to tell you what I believe

11   happened.  I believe lots of bad things happened.  And I want

12   all the evidence, and then I'll tell you which specific bad

13   things I think happened.  And that's not the way that this

14   usually goes.

15   I you understand that if they wanted amend to add

16   people or to add allegations or something like that, that would

17   be one thing.  But what they're telling you is, please give me

18   all the emails, all the documents.  And I just don't

19   understand an example of what that might turn up, right?  Or

20   are they saying that they may determine that there was LGBT

21   discrimination or discrimination against, you know, Native

22   Alaskans or some other group that's not included in the

23   complaint?

24   If they have basis for believing that that kind of

25   discrimination happened, they don't have to have the proof of

it, they just have to have some basis for believing it and they
can amend their compliant right now.

I am -- I just don't understand what it is that they
think waiting eight or ten months and holding the complaint
open indefinitely until they get all of this will accomplish.

THE COURT:  When are you seeing from Bucklo?  I'm not
seeing --

(Discussion off the record.)

MS. ROSE-SMITH:  You don't see --

MR. EVANGELISTA:  I don't see it in here.

MS. ROSE-SMITH:  I think we have a copy of it.

MR. EVANGELISTA:  Do you have a copy of it
(unintelligible).

MR. DAILEY:  An order, Judge's order, Judge Bucklo's
order.

(Discussion off the record.)

MS. ROSE-SMITH:  It was in her order denying the
motion to compel.

THE COURT:  I see.

(Discussion off the record.)

MR. DAILEY:  At the bottom of the page 3.

MR. EVANGELISTA:  Page 3, carry over to page 4.

MS. ROSE-SMITH:  Where she says I am referring.  It
says, I am referring this case to her for discovery supervision
with authority to reset the current deadlines, discovery

1  deadlines as needed.

2       And then she asks that you keep in mind that she

3  denied our request for bifurcated discovery.

4     (Discussion off the record.)

5       THE COURT:  Yeah, I --

6       MR. EVANGELISTA:  We can get a pre- -- an amendment in

7  if we need to amend to something very -- you know, probably

8  within a month or two.

9     (Discussion off the record.)

10       THE COURT:  Yeah.

11     (Discussion off the record.)

12       THE COURT:  Yeah.  And that's the problem is I think I

13  only have it for discovery.  So I think if -- did she set

14  tomorrow as your deadline?

15       MS. ROSE-SMITH:  No, your Honor, you reset it last

16  time --

17       MR. EVANGELISTA:  Yeah.

18       MS. ROSE-SMITH:  -- because it wasn't at the end of

19  December.  And we told -- and you did that based on our

20  representation to you that you have authority to do it --

21       THE COURT:  Yeah.

22       MS. ROSE-SMITH:  -- so based on that, what you --

23       THE COURT:  So --

24       MS. ROSE-SMITH:  -- just read --

25       THE COURT:  -- if I get fired, I'll -- you're hire me

1  or something?

2          MR. EVANGELISTA:  So we thought --

3          THE COURT:  That sounds good.

4          MS. ROSE-SMITH:  I'm sure we all would, your Honor.

5  No worries.

6      (Laughter.)

7          THE COURT:  Yeah.  Okay.  So I think what I would be

8  willing to do is set a date that is reasonable.  I will send

9  her an email saying, you know, falling on my sword and saying,

10  I maybe goofed up here.  And she's not seeing you go again I

11  see until April, so I -- I'm guessing this is not the top of

12  her list right now, so I don't think she'll have any stress

13  about this.

14          But I think from here on out you need to go to her on

15  this.  Okay?

16          MR. DAILEY:  Okay.

17          THE COURT:  So what I would say is if you are going to

18  have your data by the end of -- by mid February -- can I put

19  that in an order that the data is to be produced by February

20  15th?

21          MS. ROSE-SMITH:  Yes.  The data that we have already

22  promised to produce --

23          THE COURT:  Yes.

24          MS. ROSE-SMITH:  -- will be produced by February 15th.

25          THE COURT:  Okay.  So data that's -- that we have

1    already ordered and that you have worked out.

2              MS. ROSE-SMITH:  Yes, there is --

3              THE COURT:  February 15th.  I understand I ordered

4    some.  I understand you have come to some --

5              MS. ROSE-SMITH:  Yes, the stuff that -- yes, your

6    Honor.  Both the stuff that you have ordered and the stuff that

7    we have already agreed to provide.

8              THE COURT:  Okay.  And I'm going to then say -- and

9    you're not going to like this, but it will give you time

10   between tomorrow and the end of February to go to Judge Bucklo

11   and say, hey, we need more time.  And if in the meantime she

12   sends me back an email that says, hey, I don't care if you deal

13   with the amendments to the complaint, you know, I'll let you

14   know that, and I'll just take that on.

15             But this way I'll kind of cover myself, and then you

16   can -- you have time between now and -- tomorrow obviously you

17   can't go see her.

18             So I'm going to say that you have to amend the

19   complaint by February 26th, which doesn't give you much time,

20   but it gives you time to make up -- see your data, make a

21   motion a her.

22             At this point you don't see her until April, so you

23   can figure out what you want to do about that.

24             MR. EVANGELISTA:  Okay.

25             THE COURT:  I'm probably going to see you again

1  between now and February 26th anyway.

2          MR. DAILEY:  Okay.

3          MR. EVANGELISTA:  Your Honor?

4          THE COURT:  Yeah.

5          MR. EVANGELISTA:  On the -- I'd like to ask this

6  request though and get some direction from the Court on it.

7  They're going to be producing a lot of data to us.  And if they

8  are reproducing it in this initial set in February and then

9  another expanded set at some later date based on these

10  additional terms, we'd like to get it all produced -- you know,

11  not produced piecemeal.

12          In other words, what we need is sort of the full data

13  set on the loans and to try to put everything back to together

14  again.  So whatever they are giving us this February 15th, we'd

15  ask that that same information be included in the set that

16  we're agreeing to --

17          THE COURT:  Reproduce.

18          MR. EVANGELISTA:  -- that as part of the reproduction.

19  It -- as opposed to getting separate, basically separate access

20  documents and we have no -- not necessarily any way to link

21  them together.

22          THE COURT:  I think you can work that out.

23          MS. ROSE-SMITH:  I have no idea technologically how

24  that works, your Honor.  But if we can do that and maybe -- if

25  there is a feasible way for us to do that, then we'll do it.

```
 1   I -- we're not trying to --

 2           THE COURT:  If not, then you have to give him the

 3   second set with some kind of identifier that's comparable to

 4   the first set so that his expert can merge them together.

 5           MS. ROSE-SMITH:  Well --

 6           THE COURT:  And I'm sure your IT person --

 7           MS. ROSE-SMITH:  -- that will happen --

 8           THE COURT:  Yeah.  And your --

 9           MS. ROSE-SMITH:  -- because the loan number.

10           THE COURT:  And your expert and their IT person should

11   be talking regularly.  I mean, you know, a couple of times.

12           Okay.  What -- you had an idea counsel that I liked,

13   which was you have to decide some things within two weeks or

14   you have to bring them to the Court.

15           MS. ROSE-SMITH:  Yes.

16           THE COURT:  So what's that deadline?

17           MS. ROSE-SMITH:  So I -- I was saying that -- you

18   know, I said two weeks at the time for that specific issue.

19   But, you know, I think that the parties should say in 30 days

20   every dispute that you have for the discovery that's been

21   served on both sides --

22           THE COURT:  Okay.

23           MS. ROSE-SMITH:  -- which should be brought to the

24   Court.

25           THE COURT:  Let's say February 26th.
```

1      Are we going to say any motion that needs to be filed

2 by February 26th?

3           MS. ROSE-SMITH:  That's fine with us, your Honor.

4           THE COURT:  Okay.

5           MR. EVANGELISTA:  On existing discovery.

6           THE COURT:  Okay.  Have you done any oral discovery?

7           MS. ROSE-SMITH:  No, your Honor.  We -- we want to,

8 but we're trying to wait until we --

9           THE COURT:  Yes.

10          MS. ROSE-SMITH:  -- get a little bit more in the

11 interrogatories.

12          THE COURT:  I don't think that's unreasonable.  This

13 is a document heavy case.

14      Okay.  Do you want to then just have a status set for

15 early March?  And I'll know that there may or may not be any

16 motions.  And if there aren't, that will be happy.  And if

17 there are, then we'll just check in.

18          MR. EVANGELISTA:  Okay.

19          MS. ROSE-SMITH:  I think that's good.

20          THE COURT:  And if it is just a few things like this,

21 I mean, this was completely fine for me.

22          MR. EVANGELISTA:  Okay.

23          THE COURT:  And it didn't -- I do not need anybody to

24 tell me Rule 26 says or cite me cases.  Do not waste your time,

25 please.  You're busy.  You're working well together.  I

1    appreciate that.  I don't need motions to compel.

2            If you want to do something like this and if you found

3    it useful, I'm happy to work with this.

4            MR. DAILEY:  Okay.

5            MR. EVANGELISTA:  Yeah.

6            THE COURT:  It was very pleasant.

7            MS. ROSE-SMITH:  Okay.

8            THE COURT:  But please doesn't the cite me what Rule

9    26 says.

10       (Laughter.)

11           THE COURT:  I have read it.

12           Okay.  So what do you say about the first week of

13   March or the second week of March?  I am your -- I'm at your

14   disposal.

15           MR. DAILEY:  Just pick one.

16           MR. EVANGELISTA:  If you pick one, your Honor.  But if

17   you could just maybe schedule it for 10:00 or --

18           THE COURT:  Okay.

19           MR. EVANGELISTA:  -- a little kind of -- 10:00 or

20   10:30 then, I can --

21           THE COURT:  Because you fly in?

22           MR. EVANGELISTA:  I fly in from Atlanta.

23           THE COURT:  Okay.  So --

24           MR. EVANGELISTA:  I appreciate.

25           THE COURT:  I would say Tuesday, March 8th, at 10:30.

1          Is that good for you?

2          MR. EVANGELISTA:  Perfect.  Thank you.

3          THE COURT:  Okay.  You guys took up way too much time.

4    Have a wonderful week.

5          MS. ROSE-SMITH:  I'm sorry, your Honor, I wish I could

6    promise that it won't always be this way, but I'm a little

7    nervous.

8          THE COURT:  No, it's -- you know, you're fine.  You're

9    working -- I appreciate how you're working together, I really

10   do.

11         Have a great weekend.

12         MR. DAILEY:  Thank you.

13      (Which concluded the proceedings.)

14                              CERTIFICATE

15         I certify that the foregoing is a correct transcript

16   from the digital recording of proceedings in the above-entitled

17   matter to the best of my ability, given the limitation of using

18   a digital-recording system.

19

20

21   */s/Pamela S. Warren*                     February 2, 2016
     Official Court Reporter                        Date
22   United States District Court
     Northern District of Illinois
23   Eastern Division

24

25