**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| COUNTY OF COOK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BANK OF AMERICA CORPORATION, | )     Case No. 14-cv-2280 |
| BANK OF AMERICA, N.A., | ) |
| COUNTRYWIDE FINANCIAL | )     Honorable Elaine E. Bucklo |
| CORPORATION, | ) |
| COUNTRYWIDE HOME LOANS, INC., | )     Magistrate Judge Mary M. Rowland |
| COUNTRYWIDE BANK, FSB, | ) |
| COUNTRYWIDE WAREHOUSE LENDING, | ) |
| LLC, BAC HOME LOANS SERVICING, LP, | ) |
| MERRILL LYNCH & CO., INC., MERRILL | ) |
| LYNCH MORTGAGE CAPITAL INC., and | ) |
| MERRILL LYNCH MORTGAGE LENDING, | ) |
| INC., | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' REPORT REGARDING OUTSTANDING DISCOVERY**

Pursuant to the Court's January 29 and February 24, 2016 orders, Defendants Bank of

America Corporation, Bank of America, N.A., Countrywide Financial Corporation, Countrywide

Home Loans, Inc., Countrywide Bank, FSB, Countrywide Warehouse Lending, LLC,[1] BAC

Home Loans Servicing, LP, Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Capital Inc., and

Merrill Lynch Mortgage Lending, Inc. (collectively, "Defendants"), hereby submit their report

regarding outstanding discovery disputes.  Though the parties attempted to reach an agreement

on a joint report, individual reports are necessary in this instance because, at 11:08 pm EST on

the night the joint report was due, Plaintiff raised the following issues for the first time, without

---

[1] Countrywide Warehouse Lending, LLC ("CWL") merged into BofA Merrill Lynch Asset
Holdings, Inc. in March 2014 and CWL no longer exists.

the parties having discussed them at all, and materially changed so many portions of the draft report Defendants provided to Plaintiffs on the morning the filing was due that it was impossible to reach agreement on all issues before the filing was due to the Court:

- Verification Pages Missing

- Systems Letter Issues

- Material changes to the Relevant Time Period for its Data Requests

For this reason the parties had no time to mutually sign off on a joint report. This conduct is a very good example of the issues the parties have encountered on remaining issues, and it is unfortunate that the parties have to burden the Court with it. Defendants attempt to respond below to those issues raised in advance, and those Plaintiff raised at the eleventh hour, and state as follows:

## I.      STATUS OF DISCOVERY

The Parties have each served requests for production of documents, requests for admissions, and interrogatories. To date, Defendants have responded to the County's First Request for Admissions to Bank of America Defendants (21), the County's First Request for Admissions to Countrywide Defendants (21), the County's First Request for Admissions to Merrill Lynch Defendants (21), and the County's First Set of Interrogatories to Bank of America Defendants (14), the County's First Set of Interrogatories to Countrywide Defendants (14), and the County's First Set of Interrogatories to Merrill Lynch Defendants (14). In response to the County's First Request for Production, Defendants have produced 10,670 documents (totaling 140,206 pages), and up to 561 data points on 268,063 loans in Cook County.

### A.      Status of The County's Discovery Requests to Defendants

#### *(1) Verification Pages Missing*

2

Plaintiff asserts that Defendants have asserted "various objections to the County's precisely tailored Requests for Admissions" and "Interrogatories" and have not provided verifications for their responses.

Notwithstanding the representations Plaintiffs made regarding verifications, the parties each served interrogatories without verifications, and each side agreed that verifications could trail responses given the size of Cook County government and Defendants' organizations. During the many hours of meet and confer leading up to this report, Plaintiff did not take issue with verifications.

Plaintiff first notified Defendants that they intended to raise this issue with the Court notwithstanding that the Defendants agreed to provide verifications on March 11 at 11:14pm EST - the day the joint status report was due. Had Plaintiff given Defendants the courtesy of raising this issue at any time before the final hour, Defendants would have told them what it is telling the Court now – (1) given that Defendants already agreed to amend its interrogatory responses and requests for admission to address Plaintiff's revised definition of subject loan as used in the interrogatories and requests for admission, the only verification that will matter is for the amended responses is the verification of revised responses. This is particularly true where Defendants denied all of the requests to admit based on the objection to subject loan over a year ago, and Plaintiff only revised the definition on March 9, so Defendants'' amended requests will be the only ones that meaningfully can be verified; and (2) Defendants agree to provide the verification for those amended responses at the time they are served, and have no reservation about amending the responses in 30 days. Notwithstanding the accusations Plaintiffs make regarding these issues, this is something that the parties can and should have resolved rather than

submitting dueling reports, and it is unfortunate that there was no time to do so given when Plaintiff first notified plaintiff that it intended to bring this issue before the Court.

It also bears noting that Defendants' objection to the Interrogatories and Requests for Admissions were almost exclusively based on the use of a defined term "Subject Loan" which was convoluted, confusing, and, as it turns out when the parties discussed it during meet and confer, based on Plaintiff's misapprehension of terms such as "APR" and "non-conforming". Nonetheless, Defendants cooperated with Plaintiff to revise the definition and having done so, promptly agreed to revise their responses. Defendants are dismayed that this non-issue will consume Court time and resources when it should have been resolved by the parties.

### (2) Systems Letter Issue

Plaintiff complains that Defendants failed to provide sufficient information regarding its IT systems, presumably in response to Plaintiff's Request for Production nos. 10-13. Plaintiff's complaint about Defendants' identification of relevant IT system is without regard to: (1) the fact that the Court has already decided this issue in part; and (2) any rational method of trying to obtain the data relevant to Plaintiff's claim (as opposed to any data possibly available). During the meet and confer process in the fall, Defendants offered to work with Plaintiff to provide data once Plaintiff had identified the category or types of information it needed to make its claims. Plaintiff claimed it was unable to do so and this issue was brought before this Court during the December 2015 status hearing. Plaintiff made its arguments to the Court regarding its need for information on the Defendants' systems, and the court required that Defendants provide Plaintiff with AS400 sample servicing reports. Defendants, as discussed *supra,* provided the requested sample reports. Accordingly, given this Court's ruling, Plaintiffs have no need for any additional information regarding the databases that store other servicing data for loans potentially at issue.

In addition, Defendants, in an attempt to work with Plaintiffs, offered to provide Plaintiffs with a letter identifying certain databases that contained information identified in the complaint. Defendants did not agree to provide every system ever used by any Defendant, as that is neither practicable nor useful to help Plaintiffs identify the data it needs to make its case. Defendants, in the meet and confer, and its March 7 letter, provided Plaintiff information regarding the systems of record for the primary data at issue, origination and servicing, as well as some additional kind of databases that were implicated by Plaintiff's sweeping allegations.

Plaintiffs, are for the first time, arguing they are entitled to know, not just where and what kind of information Defendants kept, but every conceivable database used by Defendants (and any affiliate). For instance, Plaintiffs complain Defendants did not identify Edge, a system used by Countrywide in the initial interaction with the borrower when originating a loan. It was a system designed as an interface (an end user system into which data can be typed, like a website form), and was not a database repository – simply put, it does not store data, and as such, is not a place that would now store any of the data Plaintiff seeks. Information obtained by EDGE, for loans actually originated by Countrywide (as opposed to loans that were declined) would be stored in the AS400, the system of record for all origination data and the system about which Defendants have been fully transparent. Defendants have, since August, identified the AS400 as the relevant repository of data, particularly origination data. In the letter, Defendants have identified it and other repositories where relevant data regarding the origination and servicing of loans is stored, in order for the parties to discuss the systems and what else may be needed. Plaintiff is not entitled to more, and its demand for a list of any system, rather than its willingness to engage Defendants in a discussion about what systems there are and what use can

be made of them, is exactly the reason there are so many disputes now pending before the Court. As noted throughout, Plaintiffs seek volume, but disdain substance.

### (3) Initial Disclosures

Defendants timely provided their Initial Disclosures on May 8, 2015. On February 23, 2016, the County first informed Defendants that it believed Defendants "failed to identify all the individuals with knowledge relevant to Plaintiff's claims, including former Countrywide and Merrill Lynch employee/officers." The parties met and conferred about this issue on March 7, 2016, but were unable to resolve this alleged deficiency.

### Defendants' Position

Defendants' Initial Disclosures identified six employees with relevant knowledge of Defendants' fair lending policies and lending and servicing activities during the period 2012-2014 (the limitations period) a year ago, and despite plaintiff's claims above, nothing about the initial disclosures was raised at any point before February 24, 2016. The parties have discuss custodians, but only to the extent that Plaintiffs promised a list of custodians repeatedly in discovery, before finally delivering a list of 785, and on March 9, attempting to claim their failure to meaningfully narrow the number was the result of Defendants' failure to name more people in its initial disclosures. Defendants also identified three former Merrill Lynch employees with relevant knowledge.[2] Because Plaintiff's complaint alleges discriminatory conduct and other allegedly improper lending and servicing activity across each Defendant's entire business for a period of fifteen years, attempting to identify every current and former

---

[2] Defendants also disclosed that "representative(s) of First Franklin Mortgage Corporation, 2150 North First Street, Suite 100 San Jose, CA 95131, [were] likely to have information about underwriting and origination practices for loans purchased by Merrill Lynch; and [] brokers, appraisers, third-party property preservation vendors or personnel or others associated with all of the loans determined relevant to Plaintiff's claims in this matter, [were] likely to have relevant knowledge as to several subjects, including facts concerning, if applicable, loan origination, default servicing, foreclosure, and any vacancy at the properties." Defendant's Rule 26(a) Initial Disclosures, May 8, 2015 at 4.

employee who might have some knowledge about any challenged aspect of Defendants' business is a massive task. It is particularly difficult to do given that Plaintiff has not yet provided Defendants with the specific loans at issues or the specific policies challenged. Thus, to aid the effort, in addition to the nine people Defendants identified, Defendants produced organizational charts listing individual employees and departments, for all entities from 2004 forward. As proof of the problem with simply listing all employees with any knowledge in the Initial Disclosures, after Plaintiff reviewed the organizational charts, it provided Defendants with a list of 785+ employees *they claimed* may be knowledgeable about the business practices challenged in the complaint. Certainly all 785+ employees do not have relevant knowledge, but a year into discovery, the County has yet to put a finer point on any of their allegations. For this reason, Defendants maintain that, having identified nine individuals with relevant knowledge nearly a year ago, they fulfilled their discovery obligation.

Finally, it is also worth noting that, to date, Plaintiff (1) has yet to take, or even notice a single deposition, (2) only raised this issue last month, and (2) has done nothing else to test the knowledge of the individuals named. As a result, it is clear that Plaintiff claims the disclosures are insufficient *solely* on the basis of the number of individuals named (nine) rather than any actual lack of knowledge on the part of any person named or proof that Defendants failed to name individuals knowledgeable about all practices at issue. As the Court will see below, this preference for volume, rather than substance, appears to be an animating force behind each of Plaintiff's current objections. Accordingly, Defendants request that the Court decline to order that Defendants must amend their Initial Disclosures at this time (recognizing, of course, the parties' ongoing obligation to supplement discovery responses, including the Initial Disclosures, as a case progresses).

### (2)     *Interrogatories and Requests for Admission*

The Defendants have agreed to amend their interrogatory responses and requests for admission in order to address certain objections raised by the County.  The County reserves the right to raise any objection not cured by the amended responses with the Court.

### (3)     *Requests for Production*

Defendants served their responses and objections to the County's Requests for Production on July 9, 2015, and thereafter began rolling productions of data and documents that continues to this date.  The County raises the following objections regarding Defendants' responses:

**(a)     Relevant Period** – To manage production and reduce the burden and expense of discovery, Defendants initially sought to limit all document and data production to a Relevant Period of January 1, 2009-forward.  Plaintiff moved to compel production of data for a Relevant Period of January 1, 2000-forward.  Judge Bucklo denied the motion to compel without prejudice and referred discovery management to this Court, noting generally that the parties should consider a reasonable time period for production on a request-by-request basis.  Thereafter, Plaintiff offered to amend the Relevant Period applicable to all of its RFPs to January 1, 2004 (except as to loan origination and servicing data, which was still requested from 2000 forward).  Defendants maintained their objections to the Relevant Period even as revised.

**Defendants' Position**

Judge Bucklo ordered the parties to consider the Relevant Period on a request by request basis in order to reach a compromise that balanced the burden and expense of discovery (which Defendants had illustrated in opposition to the motion to compel) with the Plaintiff's need for discovery, and in keeping with Judge Bucklo's ruling that discovery would not be phased.  In

response to those concerns, Defendants did, in fact, offer documents and data for some or all of the Plaintiff's revised Relevant Period depending on the request and the availability of documents and data.  As a result, Defendants have produced ample pre-2009 discovery, including data on all first lien and HELOC loans made since January 1, 2009, ***and any such loan originated pre-2009 that was being serviced as of January 1, 2009.  Defendants also have produced (or are in the process of producing) pre-2009 documents in response to RFPs 1-5, 7-9, 10-15, 16, 18, 35, 40[3], 48-50, 52-54, and 60***.  In each instance, Defendants produced documents or information using the revised Relevant Period (2004-forward) demanded by Plaintiff.  Nonetheless, Plaintiff still demands that the 2004-forward Relevant Period be applied to every RFP uniformly, notwithstanding any burden or relevance objection Defendants have made.

Aside from the concern that Plaintiff has made no other effort to narrow its requests further (again, preferring volume over substance), the burden imposed by the Plaintiff's across the board 11-year Relevant Period is not only oppressive, it is unnecessary.  Because Judge Bucklo has not yet had occasion to rule on the applicability of the Fair Housing Act's two-year statute of limitations, Defendants have offered documents and data for a period beginning ***three years before*** the limitations period.

The County will be able to determine everything it needs to know about whether any uniform mortgage lending or servicing "policy" continued into the limitations period (*i.e.* into 2012) using the discovery already produced or promised, and/or by receiving additional discovery from 2009 forward.  Moreover, pre-2009 origination based discovery is irrelevant

---

[3] Plaintiff agreed no response was required in response to RFPs 41-42, and withdrew RFP 44.  This Court previously sustained Defendants' objections to RFPs 43, 45-47.  After Defendants conducted an investigation regarding the availability of documents in response to RFPs 51 and 56, the parties previously agreed that no further response was required.  Plaintiff previously "tabled" and have not re-raised, RFP 59.  As a result, the Relevant Time Period is not an issue for these RFPs.

because Plaintiff already conceded that it does not allege discriminatory loan origination practices continued after January 1, 2009. *See e.g.* Compl. ¶¶ 126, 318; Mot. to Comp., docket no. 78 at 4. Instead, it alleges that loans originated before 2009 are relevant because those loans were serviced in a discriminatory way into the limitations period. *See* Compl. ¶ 401. By receiving data on all loans still being serviced by any Defendant as of January 1, 2009, the County will be receiving everything it needs to prove its claim that some form of discriminatory servicing continued into the limitations period.

By contrast, if discovery extended before 2009, the Defendants would have to search not only Bank of America, N.A.'s ("BANA") current databases and relevant custodians, but also at least three different legacy entities which originated, sold or securitized mortgage loans and multiple legacy data systems for each of those entities. *See* Declaration of Robert Daniels ¶¶ 8-9, attached to Def's Opp. to Mot. to Comp. as Exhibit 2. Much of the legacy data is now difficult to locate, offline or archived. *Id.* ¶ 11. A search for this data will substantially increase the cost to Defendants, as it will require an additional one hundred or more man hours to just collect the additional data. *See Id.* ¶ 12.

Plaintiff has not articulated any basis for why Defendants' existing production is insufficient, aside from a generalized demand for all data and all documents. Defendants request that the Court sustain their objections and decline to order further production.

**(b)** <u>**Additional Data Fields**</u> (RFPs 12, 14-15, 48-50 and 52-54) – Plaintiff is seeking additional loan origination and servicing data fields beyond the 560+ fields Defendants have provided in response to these nine RFPs. The parties are not in agreement regarding, and Defendants have indicated that they will not produce: (i) additional data contained in the loan servicing history reports from Defendants' AS400 system – specifically 11 more servicing data

fields (which, like other loan data already produced, can be pulled and produced collectively for all loans) and an additional 8 subsections within each loan servicing history report that contains narrative entries specific to the individual loan (and which, unlike other loan data already produced, cannot be pulled and produced collectively for each loan, which means Defendants will have to produce the full individual loan servicing history report for each loan at issue), and (ii) 274 additional loan origination fields from Turquoise.

**Defendants' Position**

### *AS400 Loan Servicing Data*

At the December 7 hearing, the parties discussed with the Court the data contained in the loan servicing history reports in AS400.  Defendants sought to have Plaintiff identify specific data it needed, and Plaintiff protested that it lacked sufficient information about the data contained in AS400 to identify specific loan servicing fields.  As a result, this Court ordered that Defendants provide Plaintiff with 10 sample loan servicing history reports to assist Plaintiff in identifying the types of data potentially available in AS400 regarding loan servicing. Dec. 7, 2015 Order (Dkt. # 91).  The Court further ordered that Plaintiff had one week to review the reports, confer with Defendants regarding any questions or issues raised by the reports, and then to identify any additional fields sought.  Defendants completed production of the reports on December 14, 2015.  Plaintiff asked no questions, and made no attempt to meet and confer until December 21, 2015, when Plaintiff sent Defendants a letter asserting that Plaintiff was unable to eliminate ***any*** data field in the loan servicing history reports because all fields were potentially relevant, and so demanded that Defendants produce all fields for every loan.  *See* Dec. 21, 2015 Ltr. to S. Rose-Smith from J. Evangelista at 1.

On January 19, 2016, the parties met in person to discuss outstanding discovery issues, including the loan servicing data. At that meeting, Defendants expressed dismay that Plaintiff had asked no questions about the loan servicing history reports and had made seemingly no effort to eliminate obviously irrelevant fields. Plaintiff offered to review the reports again, and highlight the fields it sought (though Plaintiff's "offer" was essentially what this Court had originally ordered that Plaintiff do). On February 3, 2016, Plaintiff provided Defendants with the highlighted loan servicing history reports, but again had simply highlighted all of the approximately 84 data fields in the report (as well as the narrative subsections of the report). Among the fields that Plaintiff highlighted were 33 fields Defendants already had agreed to produce to Plaintiff in December 2015.

In one last effort to get Plaintiff to focus on only those fields specific to the needs of its case, on March 8, 2016, Defendant created a lengthy chart for Plaintiff, setting forth each field Plaintiff had demanded, noting which of the demanded fields had already been produced to Plaintiff or promised, and giving an explanation of the field itself (though Plaintiff had yet to inquire), and why Defendants believed the field was not relevant to Plaintiff's claims. Only after Defendant did so did Plaintiff finally make a good faith effort to reduce the number of fields sought – *from 51 new fields (plus the 33 it requested that it already has) to 11*.

Unfortunately, however, Plaintiff continues to insist that 8 of the narrative subsections of the reports be produced. As Defendants explained to the Court when the AS400 reports originally were produced, the narrative subsections cannot be produced as data fields because they are not uniform entries (*e.g.*, a dollar amount or date entered in the same format for every loan that has the field) – they are typed or automatically generated narrative fields for various actions on the loan or notes regarding calls to or from borrowers. In order to give Plaintiff the

narrative subsections, Defendants must produce each individual loan servicing history report for each loan. Thus, despite narrowing the data fields requested to 11, Plaintiff still effectively is demanding the full report for individual each loan because that is the only way the 8 narrative subsections can be produced. Plaintiff has stated that it will limit production of individual loan servicing history reports to only some of the 268,000 loans for which Defendants have produced other data, but Plaintiff has not identified those loans to Defendants yet, nor given Defendants any indication of the number of loans at issue or when to expect the list.

In addition to this uncertainty, producing individual loan servicing history reports for even a subset of 268,000 loans will impose a tremendous burden on Defendants' resources. Each report averages 20-30 pages, and must be pulled, reviewed and redacted for privilege (since the narrative fields may contain privileged information), and produced. Even if Plaintiff only requests the individual loan servicing history reports for 10% of the 268,000 loans whose data Defendants have produced thus far, that results in 670,000 pages to be reviewed and redacted for privilege (assuming each report is 25 pages long, though some are significantly longer than 25 pages). The proposed review is even more problematic since it could not even begin until Plaintiff provides Defendants with the list of loans it considers at issue. And, as noted below in Section C regarding the parties' dispute over the discovery schedule, Plaintiff will not commit to identify the loans by a date certain (and soon) so the parties can focus on only those loans that are at issue.

***Turquoise Origination Data***

Following the Court's direction that Defendants make an effort to identify sources for Plaintiff to aid it in determining what, if any, additional origination fields might be available should Plaintiff need them for its loan analysis, Defendants offered Plaintiff a list of

approximately 389 loan data fields potentially available in a database called Turquoise. Defendants cautioned that not all fields on the list were currently or even previously had been in use, and it did not agree that any new fields were relevant. Defendants also cautioned that any data available would likely only be available for a subset of the 268,000 loans on which Defendants provided other, relevant loan data, and that, because the system and the Defendants' use of it had evolved over time, Defendants would not have information on what every field was or how it was used across the entire 11 year Relevant Period. Nonetheless, Defendants invited Plaintiff to ask questions and use the list to identify any specific fields beyond those already being provided, that Plaintiff would like Defendants to investigate or consider producing. Defendants provided the list on January 19, 2016. On February 3, 2016, Plaintiff identified 274 fields of the 389 that it demanded Defendants produce for all loans. Plaintiff also asked that Defendants explain what data was contained in an additional 60 fields to allow Plaintiff to decide whether or not to request them. As with the AS400 data, of the total fields sought, Plaintiff failed to acknowledge that Defendants already had promised to produce or had produced 60 of the 274 fields. Defendants declined to provide the data, but they did collect and provide what information they had on the 60 fields Plaintiff identified as ones about which it had questions.

Plaintiff continues to demand the 274 fields, and to date has not identified which, if any, of the 60 other questioned fields it seeks. Plaintiff's refusal to narrow its requests again raises the same concern that Defendants have expressed throughout. Defendants provided the Turquoise field list, not as an offer of production, but instead to heed the Court's request that Defendants give Plaintiff a sense of what kind of data was stored, with the hope that it would help Plaintiff articulate what data (either specifically by field or broadly by category) it needed for its experts' fair lending analysis. Rather than do that, and engage with Defendants on a few

14

specific fields that might be relevant, Plaintiff demanded that Defendants produce everything the parties already agreed to produce, plus more than 80% of the Turquoise fields, without articulating any relevance basis for the request.

The Turquoise data is not relevant given that Turquoise contains loan origination data for loans the Countrywide Defendants' made outside of the limitations period. As noted in Section (c) below, pre-2009 loan origination data is not relevant to Plaintiff's claims unless they can show that the loans were serviced in a discriminatory manner during the limitations period. For this reason, demanding Defendants essentially start over with its origination data production to include 274 new fields at this late date is unduly burdensome on Defendants' resources to pull and perform quality control review of the new data – particularly at this late stage, and when the data sought is of limited relevance.

For all the reasons above, Defendants request that the Court decline to order them to produce any additional data from AS400 or Turquoise.

(c)     **RFPs 16-23; 24-39, and 55** - The parties are not yet in agreement as to the scope of production regarding these RFPs. The parties have agreed in principle that Defendants will search emails for documents responsive to these requests, but disagree on the number of custodians and breadth of search terms. The parties continue to discuss ways to narrow the custodian list and search terms offered by Plaintiff, and hope to reach resolution on this issue before the March 22, 2016 hearing. The parties list the custodian/search terms disagreement so that any issues left to be resolved on this issue may be presented to the Court for resolution on March 22.

The parties also disagree on additional production of policies and procedures (RFPs 16-23), compliance reports, other compliance related document requests (RFPs 24-39), and board minutes and meeting handouts (RFP 55).

### Defendants' Position

As Defendants detailed in their opposition (Dkt. #84) to Plaintiff's initial motion to compel (Dkt. #78), Plaintiff's requests are expensive and burdensome, and only made more so by Plaintiff's refusal to meaningfully limit what it is seeking, or to identify specific practices or policies about which it seeks discovery. For example, Plaintiff has requested all board minutes, handouts, and board packages for each Defendant's board of directors since 2004, and communications by or with board members about any violations of fair lending policy and procedures and other compliance policies. (RFPs 19, 20-25, and 55) Because of the large amount of potentially privileged information such minutes and communications contain, review of board materials is particularly costly due to the increased number of attorney work hours required to review, tag, and redact or log privileged documents.

Defendants previously estimated that to comply with this board of directors document request, 1,000-1,500 Countrywide related documents for the 2004-2008 time period would need to be reviewed. *See* Christine Costamagna Decl. ¶¶ 9-10, attached to Def's Opp. to Mot. to Comp. as Exhibit 3. Pre-2009 Bank of America Defendants and Merrill Lynch Defendants board meeting minutes pose similar concerns. *Id.* For the Bank of America Defendants, the vast majority of pre-2009 board material is in offsite storage, so it would have to be collected and scanned. *Id.* For the Merrill Lynch entities, board materials are all in hard copy and would have to be taken out of storage and scanned before review. *Id.* This process may add hundreds of person-hours just to collect such documents, not including review and production time. *Id.* All

of this would be, of course, in addition to the cost of review and production of documents and data already produced, and the cost necessitated by the email searches about which the parties are still negotiating.

The County also has requested legacy policies and procedures for each of the Defendants, and email communications about those policies. (RFPs 16-23) The County seeks policies regarding the entirety of the mortgage lending business: marketing, underwriting, origination, sales, appraisals, compensation, servicing, REO, and fair lending. Just considering the email portion of this demand shows how daunting and expensive the collection effort would be. If one estimates there are only two people whose emails will need to be searched as to each topic for each of the three Defendant groups, covering eight extra years (2000-08 in the motion to compel example) to the search could add 54 custodians, and over 25 million total documents (not pages) to be searched. Defendants estimate that this type of additional email custodian discovery alone, including the review of the documents and the preparation of a privilege log, likely would cost over $12 million. *See* Daniel Decl. ¶¶ 18-20, attached to Def's Opp. to Mot. to Comp. as Exhibit 2.

But the burden is almost certainly going to be multiples – maybe many multiples – of that figure if Plaintiff has its way. This is true for at least two reasons. First, it is unrealistic to think that only two employees will need to have their emails searched for only nine topics (Daniel Decl. ¶ 10); the County requests policy and procedures for over forty topics relating to the mortgage origination business in Request 16, and then requests all board and management level communications regarding all of the topics' implementation, enforcement, violations or discontinuation of such policy. (RFPs 16, 20-22) The Court will not be surprised to learn that Plaintiff's initial list of such custodians was substantially in excess of the 54 used in the estimate

17

herein. Second, the figures above cover partial responses to just 16 of the County's RFPs, but they are seeking production for 25 RFPs above. The attendant cost will be similarly multiplied for other requests at issue herein.

Defendants have consistently expressed these concerns and have been transparent about the burden and cost. Further, in the face of Plaintiff's refusal to narrow these requests further, Defendants have repeatedly offered potentially relevant categories of documents, and made production of promised documents. In each instance, Plaintiff's response has been to accept the offered production, but maintain that more was required.

**(d)** **RFP 61** - The parties have not reach any agreement as to production of documents in response to this RFP, which seeks "each unique, non-redundant, hard copy and electronic document, including any associated privilege log" that any Defendant "produced to the opposing party in" 15 actions.

**<u>Defendants' Position</u>**

Defendants maintain their relevance and burden objections to this RFP. First, Defendants determined, and informed Plaintiff, that more than 100 million pages of documents were produced in the 15 actions (in some cases, as long as 10 years ago). In order to have a vendor simply load the productions, convert the pages to .tif files where needed, and bates label them, Defendants' vendor would charge approximately $0.01 per page. As a result, it would cost approximately $1,000,000.00 to re-produce the documents without any relevance review or redaction for applicable privileges (such as for the bank examination privilege, which may not have applied for certain of the actions, but would apply here, or for borrower privacy). Plaintiff remains undeterred. As with other requests, Plaintiff continues to demand production ***because it***

*is aware that the information exists*, and has not stated any actual need for these productions in order to prove its claims.

Second, of the 15 actions for which Plaintiff demands reproduction of documents, only one involved any allegation of discrimination. That action (1) concerned only the Countrywide Defendants, (2) involved only subprime loans, (3) did not result in any finding of liability, and (4) did not allege "equity stripping" or challenge the Countrywide Defendants' servicing, foreclosure, or securitization policies or practices as this case does. As a result, reproductions of the documents produced in that one action would only address 1/3 of the Defendants, and viewed charitably, would not address 3/4 of Plaintiff's claims. Further, production of any or all of the 15 actions would be prohibitively expensive, and would not yield relevant information, particularly given that Plaintiff has already requested and continues to require production of its own extensive discovery. Accordingly, Defendants request that the Court sustain their objections.

### B.       Status of Defendants' Discovery Requests to the County

#### (1)       Definition of Cook County

Pursuant to this Court's January 29 Order, Defendants proposed a list of officials and departments to be included in the definition of Cook County for purposes of Defendants' discovery. Defendants did so on February 8, 2016. The parties met and conferred about the definition on February 26, 2016. The parties are in agreement regarding the definition, except for the following entities and officials:

- **The Office of the Secretary to the Board**

### Defendants' Position

The parties are in agreement regarding the definition of Cook County for purposes of Defendants' discovery requests except the Office of the Secretary of the Board. Defendants

understand that the Secretary's knowledge would be based on official records, but that is the very reason they want the office, which is an official record keeper, to be included in the definition of Cook County for purposes of Defendants' discovery regarding knowledge. Other than Plaintiff's reluctance, it is unclear why an office that Plaintiff admits has knowledge based on official County records would not be considered part of Cook County for these purposes. Accordingly, Defendants request that the Court order that the Office of the Secretary to the Board be included.

### (2) Interrogatories

The County has agreed to amend its interrogatory responses in order to address certain objections raised by Defendants. Defendants reserve the right to raise any objection not cured by the amended responses with the Court.

### (3) Requests for Production

The County has informed Defendants that additional document production is forthcoming in response to Defendants' requests for production. Defendants reserve the right to raise any objection not cured by the additional production with the Court.

### C. Revised Discovery Schedule

The parties are in agreement that the Court should extend the discovery period, and further agree that the Court should impose interim deadlines for specific discovery events (*e.g.*, deadlines for additional written discovery to be served, and all production to be completed), but they are not in agreement regarding the dates. The following is Defendant's proposal:

| DEADLINE | DEFENDANTS' PROPOSAL |
|:---:|:---:|
| Plaintiff to identify specific loans it asserts are at issue in this action | **April 11, 2016** |
| **All** additional written discovery served | **April 11, 2016** |

| | |
|---|---|
| Hearing on all any disputes arising from objections to new written discovery | **June 13, 2016** (date of hearing intended to be one month after responses to any additional written discovery is due, subject to the Court's availability and at the Court's discretion) |
| Deadline for parties to complete production of all documents/data ordered at March 22, 2016 status conference | **August 1, 2016** |
| Status Conference (and opportunity for parties to raise any concerns about sufficiency of productions resulting from March 22, 2016 status conference) | **September 1, 2016** (date of hearing intended to be one month after productions are completed, subject to the Court's availability and at the Court's discretion) |
| Deadline for parties to complete production of all documents/data in response to **all** outstanding written discovery. | **October 1, 2016** |
| Status Conference (and opportunity for parties to raise any concerns about sufficiency of productions) | **November 1, 2016** (date of hearing intended to be one month after productions are completed, subject to the Court's availability and at the Court's discretion) |
| Fact Discovery Cut-Off | **December 15, 2016** |
| Expert Discovery Cut-Off | **March 27, 2017** |
| Dispositive Motions with Supporting Memoranda Due | **May 5, 2017** |

March 11, 2016                                   Respectfully submitted,


                                                */s/ Sabrina Rose-Smith*

                                                J. Erik Connolly
                                                *EConnolly@winston.com*
                                                Ryan Dunigan
                                                *RDunigan@winston.com*
                                                WINSTON & STRAWN LLP
                                                35 West Wacker Drive
                                                Chicago, Illinois 60601
                                                Tel.:  (312) 558-5600
                                                Fax:  (312) 558-5700


                                                Thomas M. Hefferon
                                                *THefferon@goodwinprocter.com*
                                                James W. McGarry
                                                *JMcGarry@goodwinprocter.com*
                                                Sabrina Rose-Smith
                                                *SRoseSmith@goodwinprocter.com*
                                                Matthew S. Sheldon
                                                *MSheldon@goodwinprocter.com*
                                                GOODWIN PROCTER LLP
                                                901 New York Avenue, N.W.
                                                Washington, D.C. 20001
                                                Tel.:  (202) 346-4000
                                                Fax:  (202) 346-4444


                                                *Attorneys for Defendants Bank of America*
                                                *Corporation, Bank of America, N.A.,*
                                                *Countrywide Financial Corporation,*
                                                *Countrywide Home Loans, Inc., Countrywide*
                                                *Bank, FSB, Countrywide Warehouse Lending,*
                                                *LLC, BAC Home Loans Servicing, LP, Merrill*
                                                *Lynch & Co., Inc., Merrill Lynch Mortgage*
                                                *Capital Inc., and Merrill Lynch Mortgage*
                                                *Lending, Inc.*

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2016, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

Dated:  March 11, 2016                    */s/ Sabrina Rose-Smith*

                                                  *One of the attorneys for Defendants*