**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| COUNTY OF COOK,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | CIVIL ACTION NO.: 1:14-cv-2280 |
| ) | |
| BANK OF AMERICA CORPORATION,  ) | **FIRST AMENDED COMPLAINT** |
| BANK OF AMERICA, N.A., COUNTRYWIDE  ) | |
| FINANCIAL CORPORATION,  ) | |
| COUNTRYWIDE HOME LOANS, INC.,  ) | |
| COUNTRYWIDE BANK, FSB,  ) | |
| COUNTRYWIDE WAREHOUSE LENDING,  ) | |
| LLC, BAC HOME LOANS SERVICING, LP,  ) | |
| MERRILL LYNCH & CO., INC., MERRILL  ) | |
| LYNCH MORTGAGE CAPITAL INC., AND  ) | |
| MERRILL LYNCH MORTGAGE LENDING,  ) | |
| INC.,  ) | |
| ) | |
| Defendants.  ) | |

Table of Contents

Introduction …………………………………………………………………………..4

Jurisdiction & Venue ..…………………………………………………………….....8

Parties …………………………………………………..…………………………....8

I. Background Facts ……………………………………………………….....… 13

    A. The Federal Government Has Found That Discrimination Was Pervasive In
    Subprime Mortgage Lending During 2000 through 2007...……………………….13

    B. Congress Has Found That Predatory and Discriminatory Lending Caused
    the Foreclosure Crisis…………………………….……………………..............18

    C. The Predatory, Subprime and Higher Cost, Mortgage Lending and
    Securitization Activities of Defendants and other Industry Participants Caused
    the U.S. Financial Crisis and the Subsequent Economic Collapse…………………..24

    D. The Foreclosure Crisis Has Disparately Impacted Minorities..…………….……..28

1

II.  Defendants' Discriminatory Actions And Other Wrongful Conduct…………………..…… 30

    A.  Defendants Knowingly & Intentionally Engaged In Predatory & Discriminatory Mortgage Lending & Servicing To Drive Revenue Growth & Fuel Their Profitable Securitization Operations …………………...…………….……….30

        1.  Defendant Countrywide Publicly Admitted Targeting Minorities For Subprime and High-cost Mortgage Lending to Drive Countrywide's Growth ……….………...…………………………………………………40

        2.  Defendants Bank of America Targeted Minorities For Predatory and Discriminatory Subprime and High-cost Lending to Drive Revenue and Earnings…………………………………………...………………...47

        3.  Defendant Merrill Lynch Funded Predatory and Discriminatory Subprime and Higher Cost Mortgage Lenders to Drive Growth, Revenue and Earnings In Its Own Residential Mortgage Backed Securities Activities ……………………………………………………........51

    B.  Defendants' Discriminated Against FHA Protected Minority Borrowers In Originating and Funding Predatory Subprime and Higher Cost Mortgage Loans.. ………………………………………………….……........56

        1.  The Countrywide and Bank of America Defendants Directly Targeted FHA Protected Minority Borrowers …………...…………….……. 62

        2.  Defendants' Discretionary Pricing Policies Resulted in Predatory Mortgage Lending on a Discriminatory Basis…………........………69

        3.  Defendants Lowered and Circumvented Their Underwriting Standards and Ignored or Fostered the Fraudulent Inflation of Property Appraisals… ………………………………………………………76

            a.  Countrywide Loosened Underwriting Standards and Abused Its Appraisal Process……………………………….........79

            b.  Merrill Lynch Abandoned its Underwriting Guidelines and Inflated Appraisals…………….……………………………........88

            c.  Bank of America Abandoned its Underwriting Guidelines and Encouraged Inflated Appraisals...………………………………........93

            d.  Defendants' Financial Incentives, Loosened Underwriting, and Inflated Appraisals Caused the Discriminatory and Predatory Lending that Harmed Plaintiff………….……………………………........99

2

C.  Empirical Data Evidences Defendants' Intentional Targeting Of, And The Discriminatory Impact On, Minority Borrowers in Plaintiff's Communities……………………………………………………………….…….……..103

D. Defendants' Predatory Mortgage Lending Disparately Impacted Minorites ………107

E.  Defendants' Predatory & Discriminatory Lending Schemes Were Concealed Through MERS and By Underreporting Minority Status In HMDA Data…………………….…………………………………………….…….110

F.  Defendants' Passed the Risk Of Their Predatory & Discriminatory Lending Scheme Onto Others…………….  …..…………….......….…….…...116

G. Defendants' Mortgage Servicing & Foreclosure Practices are Predatory & Discriminatory……………………………….......….…….…..117

H. Defendants' Predatory & Discriminatory Mortgage Lending, Servicing & Foreclosure Practices Have Injured Plaintiff…….……………......….…….…...133

III.  Cause of Action (Federal Fair Housing Act)   ……………………………….........142

IV.  The Bank of America Defendants are Successors in Interest to the Countrywide and Merrill Defendants……………….…......….…………….......….…….…...146

Demand for Jury Trial …………………………………………………………. 151

Prayer for Relief ……………………………………………………….……. 151

3

## INTRODUCTION

1.     Plaintiff, County of Cook, Illinois, brings this action pursuant to the civil enforcement provision of the Fair Housing Act, 42 U.S.C. §3601 et seq. and §3613 ("FHA"), which protects communities (and the individuals residing in them) from discriminatory acts, policies and/or practices that make housing unavailable or establish terms and conditions in real-estate related transactions, including real estate financing activities, that discriminate on the basis of race or ethnicity.

2.     Plaintiff asserts this litigation against the collective group of Defendants named here because the Bank of America Defendants are legally responsible, either directly, as a control person or as a successor, for each of the Defendant entities they acquired or merged with.

3.     Plaintiff seeks injunctive relief to remedy, and monetary damages for, Defendants' predatory and discriminatory residential mortgage lending and servicing activities that have resulted in - and will continue to cause - unprecedented numbers of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies in Plaintiff's communities and neighborhoods, particularly those communities with high percentages of FHA protected minority residents.

4.     The foreclosure crisis was the foreseeable and inevitable result of Defendants' (and other industry participants') intentional, predatory, equity stripping schemes that originated and/or funded higher cost first lien home mortgage loans (over 70% were for refinances, not purchases, and half of the refinances involved "cash out") and second lien home equity mortgage loans and lines of credit.  This lending activity enabled Defendants to capitalize on a relatively short-term opportunity to earn enormous fee income while home prices, and corresponding home equity levels, were at historical highs before the housing bubble burst.  It also enabled

4

Defendants to continue to generate fee income from servicing loans, and more fees from servicing defaulted loans and/or foreclosing on defaulted loans.

5.     Defendants' entire subprime and higher cost mortgage lending, securitization and servicing operations were geared to exploit borrowers, particularly FHA protected homeowner-borrowers, in order to maximize their corporate profits and their management's compensation.

6.     In particular, Defendants' targeted marketing practices, discretionary pricing policies, credit score override practices, underwriting policies, wholesale mortgage funding and mortgage securitization operations, compensation policies and mortgage servicing operations each individually, or in combination with each other, authorized, approved, or otherwise encouraged the origination and funding of first and second lien residential mortgage loans with different terms and conditions to similarly financially situated borrowers on the improper basis of race, color, ethnicity, sex and age.

7.     For example, after identifying and targeting FHA protected minority borrowers using advanced data mining techniques and predictive analysis methodologies, Defendants' various mortgage origination, securitization and servicing policies and practices allowed or encouraged: (a) unchecked or improper credit approval decisions for minority borrowers, resulting in borrowers being approved for and receiving refinance and home equity loans they could not afford and consequently were likely to become delinquent and/or default on; (b) subjective surcharges on minority borrowers of additional points, fees and other credit and servicing costs over and above an otherwise objective risk-based financing rate for such loan products, increasing the likelihood of delinquencies and/or defaults on such loans; (c) minority borrowers to be steered into higher cost loan products, also increasing the likelihood of delinquencies and/or defaults on such loans; and (d) undisclosed inflation of appraisal values of

minority residences in order to support inflated loan amounts to minority borrowers, further increasing the likelihood of delinquencies and/or defaults on such loans.

8. As a result of Defendants' equity stripping schemes, Plaintiff's communities and neighborhoods with relatively higher concentrations of FHA protected African America and Latino/Hispanic minority homeowners have disproportionately and disparately received more of such higher cost mortgage loans, and have been disproportionately and disparately impacted by the increased delinquencies, defaults, foreclosures and home vacancies resulting from such loans. Indeed, both the relative percentage share of such loans -- and the resulting increased levels of loan delinquencies and defaults, loan foreclosures, and home vacancies -- increase in direct relationship to increases in the percentage concentrations of FHA protected African America and Latino/Hispanic minorities in Plaintiff's communities and neighborhoods. Moreover, Defendants' foreclosure practices in of themselves are discriminatory, as reflected by the increasingly disproportionate number of foreclosures on African America and Latino/Hispanic minority homes and higher concentrated neighborhoods.

9. Defendants' intentional actions have caused tremendous tangible and intangible damage to Plaintiff including the erosion of Plaintiff's tax base; the loss of property tax revenue; out-of-pocket costs relating to abandoned or vacant properties; the loss of certain intangible property recording fee income; a reallocation of the County's limited resources; and many other injuries to the fabric of Plaintiff's communities and residents arising from the resulting urban blight. Plaintiff believes that it will continue to be injured by Defendants' discriminatory housing practices that are about to occur, particularly the continuing foreclosures occurring in higher concentrated minority areas.

10.     As further alleged herein, Defendants have been sued by and settled with federal regulators, including the Federal Reserve Board, the Office of the Controller of the Currency, the Federal Housing Finance Agency, various State Attorneys General, and FHA protected minority borrower class action plaintiffs, among others, for virtually all of Defendants' actions alleged in this complaint.  By virtue of Defendants' numerous cash settlements, and entry into consent orders to change their policies and business practices, Defendants have effectively conceded their liability for the matters alleged herein.

11.     Plaintiff, which is the embodiment of all the communities, neighborhoods and residents it collectively represents, seek to hold Defendants financially accountable under the FHA for that portion of Plaintiffs' injuries that Defendants' own actions *already have caused* to Plaintiff's communities and neighborhoods, which is distinct from the harm caused to individual borrowers and the fines and settlements Defendants have paid in connection with quasi-criminal and civil regulatory actions.

12.     As contemplated by the FHA Plaintiff also seeks to hold Defendants financially accountable for that portion of Plaintiff's injuries that Defendants' own actions *are about to cause* through additional mortgage delinquencies, defaults, home vacancies and/or foreclosures.

13.     Because of the deliberate, egregious and widespread nature of Defendants' predatory and discriminatory mortgage lending and servicing schemes, efforts to obfuscate their liability, and their callous disregard for the impact of such actions on Plaintiff's communities, neighborhoods and residents, Plaintiff also seeks imposition of punitive and/or exemplary damages.

**JURISDICTION & VENUE**

14.     This is an action for violation of 42 U.S.C. § 3601 et seq. (Fair Housing Act). This Court has original jurisdiction over this action pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331 and 1343 because the claims alleged herein arise under the laws of the United States.

15.     Venue is proper under 28 U.S.C. § 1391 because each Defendant is a corporation subject to personal jurisdiction in this County. Defendants have transacted business in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district.

**PARTIES**

16.     Plaintiff, County of Cook, Illinois, including its affiliated departments, is a governmental entity within the State of Illinois organized pursuant to the Illinois Constitution. Cook County is the nation's second most populous county and the largest county in Illinois, with more than 5.2 million residents constituting 41% of the entire Illinois population. Cook County consists of 129 municipalities and unincorporated areas encompassing various communities and neighborhoods, including the City of Chicago. Cook County is an aggrieved person within the meaning of 42 U.S.C. § 3602(i).

17.     Defendant Bank of America Corporation ("Bank of America") is a corporation organized under the laws of Delaware, with its principal place of business in Charlotte, North Carolina.  It is a diversified global financial services company and a bank holding company.  It has transacted business in this district.

18.     Defendant Bank of America, N.A. is a national banking association headquartered in Charlotte, North Carolina.  It has transacted business in this district.

8

19.     Defendant Bank of America, as the corporate parent of the various Bank of America subsidiaries involved in the wrongful activities alleged herein, including the named Bank of America entities, had the practical ability to direct and control the actions and operations of each of its subsidiaries and, in fact, did so through a variety of centralized functions, coordinated practices, and centralized policy and price setting mechanisms.

20.     Bank of America Corporation and Bank of America, N.A. (collectively the "Bank of America Defendants") operated as a common enterprise with each other while engaging in the unlawful acts and practices alleged below prior to Bank of America acquisitions of Countrywide and Merrill.  Because the Bank of America Defendants operated as a common enterprise, each one is jointly and severally liable for the acts and practices alleged against them.

21.     Defendant Countrywide Financial Corporation ("Countrywide") is a financial, federal savings and loan, holding company organized under the laws of Delaware with a principal place of business in Calabasas, California.  It has transacted business in this district. It created, authorized, and/or ratified the various policies and practices at issue in this complaint that its divisions and subsidiaries implemented, maintained and enforced. At its height, Countrywide had $200 billion in assets, 62,000 employees, and issued more than $400 billion in residential mortgages annually.  By March 31, 2008, Countrywide was the largest originator and servicer of residential mortgage loans in the country.  Subsequent to its acquisition by Defendant Bank of America on July 1, 2008, Countrywide (along with its own subsidiaries) remains a wholly owned subsidiary of Bank of America.

22.     Defendant Countrywide Home Loans, Inc. is a corporation organized under the laws of New York with a principal place of business in Calabasas, California.  It has transacted business in this County.  Prior to 2008, it funded the majority of Countrywide's nationwide

residential mortgage lending activity and was a wholly owned subsidiary of Countrywide. As a result of Defendant Bank of America's July 1, 2008, acquisition of Countrywide it is an indirect subsidiary of Bank of America.

23. Defendant Countrywide Bank, FSB was both a chartered national bank and a federal savings and loan association at various times during the relevant period, having changed its charter twice. Since 2008 it has funded Countrywide's nationwide residential mortgage lending activity. It also provided certain warehouse lending operations to Countrywide at issue herein. It has transacted business in this district. On April 27, 2009, it converted its charter back to that of a national bank and merged into Defendant Bank of America, N.A., which is the surviving institution. Thus, Bank of America, N.A. is the successor in interest to Countrywide Bank, FSB.

24. Defendant Countrywide Warehouse Lending, LLC is a limited liability company with a principal place of business in Calabasas, California. It has transacted business in this district. It also provided Countrywide's warehouse lending operations at issue herein. As a result of Defendant Bank of America's July 1, 2008, acquisition of Countrywide it is an indirect subsidiary of Bank of America.

25. Defendant BAC Home Loans Servicing, LP (f/k/a/ Countrywide Home Loans Servicing, LP) was a Texas limited partnership with a principal place of business in Plano, Texas. For a time, it was a wholly owned subsidiary of Bank of America, N.A. It has transacted business in this district, providing mortgage servicing on Bank of America's, Merrill Lynch's and Countrywide's mortgage loans. In July 2011, it was merged into Bank of America N.A.

26. Defendant Countrywide, as the corporate parent of the various Countrywide subsidiaries involved in the wrongful activities alleged herein, including the named Countrywide

10

entities, had the practical ability to direct and control the actions and operations of each of its subsidiaries and, in fact, did so through a variety of centralized functions, coordinated practices, and centralized policy and price setting mechanisms.

27. Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, FSB, Countrywide Warehouse Lending, LLC, and BAC Home Loans Servicing, LP (f/k/a Countrywide Home Loans Servicing, LP) (collectively the "Countrywide Defendants") operated as a common enterprise with each other while engaging in the unlawful acts and practices alleged below prior to Countrywide's acquisition by Bank of America. Because the Countrywide Defendants operated as a common enterprise, each one is jointly and severally liable for the acts and practices alleged against them.

28. Defendant Bank of America is the successor in interest to, and is otherwise liable for, all of the Countrywide Defendants as a result of Bank of America's acquisition of Countrywide in 2008. Upon its acquisition by Bank of America, Countrywide became part of Bank of America's common enterprise involving the unlawful acts and practices alleged below.

29. Defendant Merrill Lynch & Co., Inc. ("Merrill") is a corporation organized under the laws of Delaware, with its headquarters in the State of New York. On September 15, 2008, BOA agreed to acquire Merrill in a $50 billion all-stock transaction in which 0.8595 shares of BOA common stock were exchanged for each Merrill common share held as of October 10, 2008. On January 1, 2009, BOA announced that it completed its purchase of Merrill. Merrill is now wholly-owned by BOA. Prior to its acquisition, through its direct subsidiaries and affiliates, Merrill provided broker-dealer, investment banking, financing, wealth management, advisory, asset management, insurance, lending and related products and services on a global basis. Merrill has transacted business in this County.

11

30.     Defendant Merrill Lynch Mortgage Capital Inc. ("MLMCI") is a corporation organized under the laws of Delaware. With its headquarters in the State of New York, MLMCI served as a dealer in whole loan mortgages, mortgage loan participations, mortgage servicing and syndicated commercial loans. MLMCI, through its CMO Passport® service, provides dealers and investors with general indicative information and analytic capability with respect to collateralized mortgage obligations, mortgage pass-through certificates and asset-backed securities. As an integral part of its business, MLMCI enters into repurchase agreements whereby it obtains funds by pledging its own whole loans as collateral. The repurchase agreements provide financing for MLMCI's inventory and serve as short-term investments for MLMCI's customers. MLMCI also enters into reverse repurchase agreements through which it provides funds to customers collateralized by whole loan mortgages, thereby providing them with temporary liquidity.

31.     Defendant Merrill Lynch Mortgage Lending, Inc. ("MLML") served as a commercial mortgage conduit that makes, and purchases from lenders, both commercial and multi-family mortgage loans and then securitizes these loans for sale to investors. MLML purchases subprime residential mortgage loans from originators of these loans and aggregates these loans for sale in the securitization market. In January 2004, Merrill Lynch purchased Wilshire Credit Corporation, one of the leading companies in the subprime, nonperforming and reperforming residential mortgage special servicing markets, which operated as a subsidiary of MLMCI.

32.     Defendant Merrill, as the corporate parent of the various Merrill subsidiaries involved in the wrongful activities alleged herein, including the named Merrill entities, had the practical ability to direct and control the actions and operations of each of its subsidiaries and, in

fact, did so through a variety of centralized functions, coordinated practices, and centralized policy and price setting mechanisms.

33.     Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Capital Inc., and Merrill Lynch Mortgage Lending, Inc. (collectively the "Merrill Defendants") operated as a common enterprise with each other while engaging in the unlawful acts and practices alleged below prior to Merrill's acquisition by Bank of America.  Because the Merrill Defendants operated as a common enterprise, each of them also is jointly and severally liable for the acts and practices alleged against them.

34.     Defendant Bank of America is the successor in interest to all of the Merrill Lynch Defendants via its acquisition of Merrill Lynch in 2008.  Upon its acquisition by Bank of America, Merrill became part of Bank of America's common enterprise involving the unlawful acts and practices alleged below.

35.     Defendants BAC Corps. 1-50 are affiliates or subsidiaries of Defendants here that may be responsible for the conduct alleged herein.  Defendant established and/or maintained hundreds of subsidiary and affiliate entities throughout the United States, as well as foreign affiliates.  Such parties are named in "John Doe" capacity pending discovery in this case.

## I. BACKGROUND FACTS

### A.     The Federal Government Has Found That Discrimination Was Pervasive In Subprime Mortgage Lending During 2003 Through 2007

36.     In 1975 Congress passed the Home Mortgage Disclosure Act ("HMDA"), implemented under the Federal Reserve Board's Regulation C, requiring all mortgage lenders, including the Defendants here, to compile by census tract and report to the Federal Reserve their mortgage loan origination and purchase information, which includes borrower race, ethnicity and

gender. One of the primary purposes of HMDA reporting is to enable federal regulators to identify discriminatory lending patterns, such as those that violate the Fair Housing Act.

37. Concerned with potential discrimination in loan pricing, and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, in 2004 the Federal Reserve began requiring lenders to identify loans originated as "high cost" or "rate spread" loans where the annual percentage rate cost of borrowing on such loans, including up-front points and fees, exceeds 3 percentage points above reported yields for U.S Treasury securities of comparable maturities for first mortgage liens and 5 percentage points for subordinate mortgage liens.

38. At that time, mortgage lending industry groups successfully thwarted efforts by consumer lending groups to require lenders to include borrower credit score and other objective credit risk information in their HMDA reporting. Thus, HMDA data is the only readily available information, absent review of Defendants' actual mortgage lending data, from which to statistically demonstrate Defendants' discriminatory lending activity. Regardless, Defendants and other industry participants still collected and maintained borrower credit score and other objective credit risk information for each mortgage loan in connection with their internal and external operations, including for analytical and risk evaluation purposes, the sale and securitization of such mortgage loans, and loan servicing operations.

39. Based on its own review of all HMDA data the Federal Reserve Board confirmed that on a national basis African American and Latino borrowers were more likely to pay higher prices for mortgage loans than Caucasian borrowers during the excessive mortgage lending and refinance activity at issue here. For example, the Federal Reserve's analysis of 2004 and 2005 HMDA data revealed that "Blacks and Hispanics were more likely ... to have received higher-

14

priced loans than non-Hispanic whites .... [which has] increased concern about the fairness of the lending process." Robert B. Avery, Kenneth P. Brevoort and Glenn B. Canner, "Higher-Priced Home Lending and the 2005 HMDA Data," Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006). Such findings were echoed by the Federal Deposit Insurance Corporation. Martin J. Gruenberg, FDIC Vice Chairman, observed that "previous studies have suggested higher-priced, subprime lenders are more active in lower income, urban areas and that minority access to credit is dominated by higher cost lenders." Martin J. Gruenberg, *Address to the Conference on Hispanic Immigration to the United States: Banking the Unbanked Initiatives in the U.S.* (Oct. 18, 2006).

40. Even after accounting for the differences in borrowers' income, credit scores, property location, and loan amounts in the 2004 HMDA data, a Federal Reserve report found that on average African-American borrowers were 3.1 times more likely than Caucasian borrowers to receive a higher-rate home loan and Latino borrowers were 1.9 times more likely to receive a higher rate loan than Caucasian borrowers. *See* Congressional Testimony of Keith S. Ernst, Senior Policy Counsel, Center for Responsible Lending, before the Subcommittee on Financial Institutions and Consumer Credit (June 13, 2006) at 2. Reporting on the Center for Responsible Lending's study of the HMDA data (the Center is a non-profit research organization) Ernst testified:

> Our findings were striking. We found that race and ethnicity—two factors that should play no role in pricing—are significant predictors of whether a subprime loan falls into the higher-rate portion of the market. Race and ethnicity remained significant predictors even after we accounted for the major factors that lenders list on rate sheets to determine loan pricing.
>
> In other words, even after controlling for legitimate loan risk factors, including borrowers' credit score, loan-to-value ratio, and ability to document income, race and ethnicity matter. African American and Latino borrowers continue to face a

much greater likelihood of receiving the most expensive subprime loans—even with the same loan type and the same qualifications as their white counterparts. Across a variety of different loan types, African American and Latino borrowers were 30% more likely to receive a higher-rate loan than white borrowers.

*Id* at 3.

41.     Similarly, HMDA data for 2005 evidences that "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-Hispanic whites, a difference of 37.5 percentage points." Avery, Brevoort, and Canner, Federal Reserve Bulletin, at A159. Similar average discriminatory patterns exist on loan refinancing for the same period, where African Americans were 28.3 percent more likely than similarly situated Caucasians to receive higher priced loans. *See Id.* at A124, A159.  Indeed, a study commissioned by the Wall Street Journal found that in 2005 and 2006 55% and 61% respectively of borrowers who received subprime mortgages could have qualified for traditional mortgages at the lower rates offered to prime borrowers.  "*Subprime Debacle Traps Even Very Creditworthy*," *Wall Street Journal*, December 3, 2007.

42.     The U.S. Department of Housing and Urban Development (HUD) found that in neighborhoods where at least 80% of the population is African American, borrowers were 2.2 times as likely as borrowers in the nation as a whole to refinance with a subprime lender and even higher-income borrowers living in predominantly African American neighborhoods were twice as likely as lower-income Caucasian borrowers to have subprime loans. *See* U.S. Department of Housing and Urban Development, Office of Policy Development and Research, "All Other Things Being Equal: A Paired Testing Study of Mortgage Lending Institutions" (2002).

16

43.     In 2006 the Center for Responsible Lending uncovered "large and statistically significant" differences between the rates of mortgage loans offered to African Americans and Caucasians, even when income and credit risk were taken into consideration. Compared to their otherwise similarly-situated Caucasian counterparts, African Americans were 31-34% more likely to receive higher rate fixed-rate loans and 6-15% more likely to receive adjustable-rate loans." Gruenstein, Bocian, Ernst and Li, "Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages" (May 31, 2006).

44.     Similarly, HMDA Data for 2006 through 2007 evidences that African American and Hispanic borrowers continued to be much more likely to obtain higher-priced loans than Caucasian borrowers with the same qualifications.

45.     As further alleged below, and consistent with the generalized findings of the federal government and industry watch-dog groups, the HMDA data that Defendants here reported to the federal government reveals profound loan pricing disparities between FHA protected minority borrowers and similarly-situated Caucasian borrowers, even after controlling for borrowers' gender, income, credit scores, property location, and loan amount. Thus, Defendants' own reported HMDA data evidences their discrimination in their mortgage lending activity among minority borrowers who reside in Plaintiff's communities and neighborhoods, reflecting that minority borrowers have been preyed upon by the Defendants here and illegally steered into nonconforming subprime loans and/or higher cost conforming loans, as well as being improperly approved for loans or approved for inflated loan amounts, all of which increases the likelihood of loan delinquencies, defaults, home vacancies, and eventual foreclosures.

**B.**     **Congress Found That Predatory and Discriminatory Lending Caused The Foreclosure Crisis**

46.     According to Congressional findings, the foreclosure crisis throughout the United States, and within Plaintiff's neighborhoods and communities leading up to the current period, resulted from the predatory lending activities of the mortgage industry, particularly including the predatory and discriminatory lending activities of Defendants that are alleged here.  *Report to Congress on the Root Causes of the Foreclosure Crisis,* Report of Department of Housing and Urban Development (January 2010) (hereafter, the "*Root Causes Report*").

47.     As explained in the *Root Causes Report*, housing prices escalated after 2003 and "lenders began offering new mortgage products intended to stretch borrowers' ability to afford ever more expensive homes as a means of keeping loan origination volumes high." *Root Causes Report, Executive Summary* at ix.

48.     "The leading cause of the problem was the characteristics of the market and mortgage products sold, rather than the characteristics of the borrowers who received those products." Congressional Testimony of Keith S. Ernst, Center for Responsible Lending, "Current Trends in Foreclosure and What More Can be Done to Prevent Them" at 2 (July 28, 2009) ("*Ernst Testimony*") (Joint Congressional Economic Committee).[1]

49.     The foreclosure crisis was "driven by the very design of the loans at issue. The loan products at the heart of the crisis were structured in a way that made widespread failure virtually inevitable." E. Harnick, *The Crisis In Housing and Housing Finance: What Caused It? What Didn't? What's Next?,* 31 Western New England L. Rev. 625, 628 (2009).

---

[1] Available at http://www.jec.senate.gov/public/?a=Files.Serve&File_id= 36d7b93-a0a6-47b4-96ad-1475c70dc9ce).

50. Nationwide, between 2001 and 2006:

- Adjustable rate mortgages as a share of total subprime loans originated increased from about 73 percent to more than 91 percent;
- The share of loans originated for borrowers unable to verify information about employment, income or other credit-related information ("low-documentation" or "no- documentation" loans) jumped from more than 28 percent to more than 50 percent; and
- The share of ARM originations on which borrowers paid interest only, with nothing going to repay principal, increased from zero to more than 22 percent.

*See*, *Economic Impact on Wealth, Property Values and Tax Revenues, and How We Got Here*, Report & Recommendations by Majority Staff of Joint Economic Committee (October 25, 2007).

51. The Government Accountability Office ("GAO") has reported that "[m]ortgages originated from 2004 through 2007 accounted for the majority of troubled loans." Statement of William B. Shear, Director Financial Markets and Community Investment, Testimony Before the Joint Economic Committee U.S. Congress, "*HOME MORTGAGES Recent Performance of Nonprime Loans Highlights the Potential for Additional Foreclosures*" at 5, GAO-09-922T (July 28, 2009):

Of the active subprime loans originated from 2000 through 2007, 92 percent of those that were seriously delinquent as of March 31, 2009, were from those four cohorts [year-groups]. Furthermore, loans from those cohorts made up 71 percent of the subprime mortgages that had completed the foreclosure process. This pattern was even more pronounced in the Alt-A market. Among active Alt-A loans, almost all (98 percent) of the loans that were seriously delinquent as of March 31, 2009, were from the 2004 through 2007 cohorts. Likewise, 93 percent of the loans that had completed the foreclosure process as of that date were from those cohorts.

Cumulative foreclosure rates show that the percentage of mortgages completing the foreclosure process increased for each successive loan cohort (see fig. 3). Within 2 years of loan origination, 2 percent of the subprime loans originated in 2004 had completed the foreclosure process, compared with 3 percent of the 2005 cohort, 6 percent of the 2006 cohort, and 8 percent of the 2007 cohort. Within 3 years of loan origination, 5 percent of the 2004 cohort had completed the

19

foreclosure process, compared with 8 percent and 16 percent of the 2005 and 2006 cohorts, respectively. The trend was similar for Alt-A loans, although Alt-A loans foreclosed at a slower rate than subprime loans. For example, within 3 years of origination, 1 percent of Alt-A loans originated in 2004 had completed the foreclosure process, compared with 2 percent of the loans originated in 2005, and 8 percent of the loans originated in 2006.

52.     The Office of the Comptroller of the Currency ("OCC") reported that as of June 30, 2011, nationwide 28.1% of subprime and higher cost loans were seriously delinquent or in foreclosure as compared to only 5.5% of prime loans.  Thus, these loans were more than 5 times more likely to be seriously delinquent or in foreclosure than prime loans.  The OCC subsequently reported in June 2013 that while only 2.5% of prime mortgages were considered seriously delinquent, 8.9% and 15.4% of ALT-A and subprime mortgages loans, respectively, are considered seriously delinquent, reflecting a continuing, massive disparity in such delinquency rates.

53.     Defendants were the largest originators and/or purchasers, funders and securitizers of ARM loans and other predatory subprime and higher cost mortgage loan products in the United States.

54.     The foreclosure crisis was known (or at least foreseeable) to Defendants due to the increased risk of default inherent in the predatory, subprime and higher cost mortgage loan products they originated, funded and/or securitized.  *See Ernst Testimony*.  In particular, these products included the ALT-A and other non-prime, conforming, loan products with predatory features (such as prepayment penalties and adjustable interest rates) that Defendants discriminatorily sold to minority borrowers and that are issue here.

55.     Defendants further increased the likelihood of delinquencies, defaults, vacancies and eventual foreclosures on all their mortgage loan products sold to minority borrowers – higher

cost, subprime and conforming ALT-A GSE backed mortgage loans – by steering borrowers to "low-doc" or "no-doc" loans (no verification of employment, income or other credit-related information) and "interest only" ARM products, which eventually accounted for more than 50% and 22%, respectively, of all subprime ARM originations by 2006.

56.     The intentional predatory, equity stripping lending activity at issue -- targeting minority borrowers and/or steering them into higher cost loans, approving minority borrowers for loans that are not otherwise qualified, inflating the loan costs and amounts to minority borrowers, and willfully lax underwriting – in of itself dramatically increased the likelihood of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies because they undermined the ability of the borrower to repay the loan in the first place, creating a self-destructive lending cycle.

57.     As noted in one recent study issued by the Center for Responsible Lending of mortgage loan originations between 2004 and 2008, "*Lost Ground, 2011: Disparities in Mortgage Lending And Foreclosures*," D. Gruenstein, Bocian, W. Li, C. Reid & R. Quercia (November 2011) (hereafter the "*Lost Ground Report*"), "[l]oan characteristics and foreclosures are strongly linked. .   .   . Loans originated by brokers, hybrid adjustable-rate mortgages ("ARMs," such as 2/28s), option ARMs, loans with prepayment penalties, and loans with high interest rates (a proxy for subprime mortgages) all have much higher rates of completed foreclosures and are more likely to be seriously delinquent."

58.     Congress has determined that "the incidence of early payment defaults among these loans suggests that much of their poor performance may be related to lax underwriting that allowed borrowers to take on monthly payments that were unaffordable even before interest rate resets occurred." *Root Causes Report* at 9.

59.     Defendants and other industry participants knew full well of the likely outcome of their predatory lending activity, particularly as a result of the terms of their loan products combined with lax underwriting.   During the 2004-2006 period when more than 8 million adjustable rate mortgage loans ("ARMs") were originated, the subprime mortgage industry (including Defendants) knew that "[t]ypical subprime borrower had a housing-payment-to-gross-income ratio of 40 percent" and upon initial reset of the ARM, 39% of borrowers would face a payment increase of between 25 and 50 percent, 10% of borrowers would face a payment increase of 51 to 99 percent, and15% of borrowers would face a payment increase of 100 percent or more.  *See Root Causes Report* at 29.  Defendants also knew that upon the initial interest rate adjustment in the ARM products, many typical borrowers would face payment shock and be unable to make their mortgage payments.

60.     Congress also has found that the foreclosure crisis was "unusual in that general economic weakness did not play a significant role in producing delinquencies and foreclosures in most market areas—at least not initially." *Root Causes Report* at 29.  Instead, as further alleged below, it was the predatory lending practices of Defendants and other industry participants – combined with the related credit risk, deteriorating performance, and lack of transparency in these mortgage loan assets pooled in mortgage backed securities - that foreseeably de-stabilized U.S and global credit markets and, in turn, brought down the economy.  This in turn led to foreseeably higher unemployment and therefore more mortgage loan delinquencies, defaults, foreclosures and vacancies.

61.     Economists at the University of Michigan and elsewhere have found that the high rates of early delinquency and default, which led to the housing market crash, were caused by a deterioration in Defendants' and other lender's credit characteristics.

22

62.     Nor was foreclosure crisis caused by borrower behavior or CRA lending.   As explained in a study of mortgage loans originated between 2004 and 2008 issued by the Center for Responsible Lending, "*Lost Ground, 2011: Disparities in Mortgage Lending And Foreclosures*," D. Gruenstein, Bocian, W. Li, C. Reid & R. Quercia at 6 (November 2011) (hereafter the "*Lost Ground Report*"):

> Our study provides further support for the key role played by loan products in driving foreclosures. Specific populations that received higher-risk products— regardless of income and credit status—were more likely to lose their homes. While some blame the subprime disaster on policies designed to expand access to mortgage credit, such as the Community Reinvestment Act (CRA) and the affordable housing goals of Fannie Mae and Freddie Mac (the government-sponsored enterprises, or GSEs), the facts undercut these claims. Rather, dangerous products, aggressive marketing, and poor loan underwriting were major drivers of foreclosures in the subprime market.

63.     Simply put, mortgage *loans* made to minorities pursuant to the CRA and the affordable housing goals of Fannie Mae and Freddie Mac were not a cause of the foreclosure crisis.   *See Lost Ground Report*.   However, concentrations of the types of higher cost, higher leveraged, loans at issue in this litigation, which Defendants disproportionately made in minority communities, have been a foreseeable contributing factor to the foreclosure crisis, indeed factor with the highest correlation of foreclosures among other major contributing factors, *see* Jacob S. Rugh and Douglas S. Massey, *Racial Segregation and the America Foreclosure Crisis*, 75(5) AM. SOCIOL. REV. 629 (2010),[2] including the drop in real estate prices and economic collapse, both of which Plaintiff alleges Defendants' discriminatory and predatory equity stripping, loan making, loan servicing and foreclosure practices foreseeably caused in the first place.

---

[2] Available at http://www.asanet.org/images/journals/docs/pdf/asr/Oct10ASR Feature. pdf

### C.  The Predatory, Subprime and Higher Cost, Mortgage Lending and Securitization Activities of Defendants and other Industry Participants Caused the U.S. Financial Crisis and the Subsequent Economic Collapse

64.  The predatory nature of the terms of the higher cost and subprime mortgage loans themselves, the concealment of the associated and known risk of default on those loan products, and the passing of that risk through the securitization process, all as alleged herein against these Defendants for their own actions (as well as the actions of other industry participants), foreseeably caused the U.S. liquidity crisis, the U.S. financial crisis and the subsequent economic crisis that has further exacerbated the foreclosure crisis foreseeably caused by their predatory mortgage loan products in the first instance.

65.  Although previously known to or reasonably foreseen by Defendants (and other industry participants), the default risk inherent in the subprime, higher cost, mortgage loan products originated and/or funded by Defendants (and other industry participants) began to materialize in the first half of 2006 when delinquency rates on such products began increasing rapidly.  At this point in time, U.S. unemployment rates were low and home values were near their highest.

66.  Delinquency rates rapidly increased further as home prices fell and borrowers of adjustable rate products (the overwhelming majority of mortgage loan products at issue here that were originated during the relevant time period) began facing "payment shock" due to higher monthly payments as the interest rates adjusted upward.  These elements continued to combine to create a downward spiral in home prices and a rapid increase in loan delinquencies.

67.  As loan portfolio delinquencies escalated, third party RMBS investors began demanding that non-performing subprime and higher cost mortgage loans be repurchased by the financial institutions, such as Defendants here, that pooled, securitized and sold them.  Between

24

the first and third quarters of 2006, demands for loan repurchases tripled within the industry, including the demands that Defendants repurchase the non-performing loans they securitized. Rapidly increasing loan delinquency rates, repurchase demands and the associated risk at financial institutions, including Defendants, set in motion the financial crisis.

68.     To be sure, by the end of 2006 Defendant Countrywide clearly knew of the extreme and mounting risks resulting from its "supermarket" strategy that widened its underwriting guidelines to match any product offered by its competitors and which guidelines Countrywide increasingly granted exceptions to notwithstanding the higher rates of default Countrywide was experiencing on those loans.  Indeed, the risk was so great that in October through December 2006 Countrywide's top executives illegally sold hundreds of millions of dollars of their stock in the company, having concealed from stock market investors Countrywide's deteriorated financial condition and the rapidly escalating delinquency rates in its securitized RMBS loan portfolios.

69.     Defendant Merrill also was aware of the increasing risk and default rates as reflected in its late 2006 decision to cut off its wholesale mortgage lending operations that funded mortgage originations by their partners and joint ventures.  As a direct result of Defendant Merrill cutting off funding, Merrill's joint venture partner Ownit shuttered its doors in early December 2006, citing a lack of cash and Merrill's unwillingness to continue providing funding.  Ownit filed for bankruptcy later that month.

70.     By February 2007, industry-wide increases in subprime defaults had become widely known and the cost of insuring pools of mortgages – particularly home equity loans - began increasing.  Through the second quarter of 2007 delinquency rates were exploding beyond anything the mortgage lending industry had ever experienced in its history, causing the demand

for securitizations and related structured finance products to dry up. Simultaneously, unfavorable news of large losses, margin calls, and downgrades at financial institutions related to subprime and higher cost lending occurred.

71. By the summer of 2007, banking regulators and investors understand that the amount of risk in the RMBS and other structured finance products relating to subprime and higher cost loan products issued by Defendants (and other industry participants) was far greater than the market had previously been led to believe. This directly led to three distinct illiquidity waves – i.e. the underlying cause of the financial crisis and the resulting economic crisis.

72. The first illiquidity wave began on August 9, 2007 when LIBOR rates spiked, as liquidity and default risk of financial institutions rose because of concerns over large financial institutions' exposure to both counterparty credit risk and their own lending risk with respect to both their securitizations and the high risk mortgage loans underlying them.

73. In mid-August 2007 Defendant Countrywide had to tap an $11.5 billion loan facility from 40 banks, drawing down the entire loan facility to stave off a run on its bank assets. Around the same time, several other high profile mortgage lenders shuttered their doors, including Accredited Home Lenders and American Home Mortgage. Bank of America subsequently invested $2 billion in Countrywide on or about August 23, 2007.

74. Despite knowledge of the extreme risk in funding subprime and higher cost mortgage loan products and the foreseeable damage the practice was already causing, Defendant Bank of America nevertheless continued its wholesale funding operations until October 2007 when it ceased funding its wholesale lenders. Throughout this period mortgage delinquency rates continued to increase rapidly as funding for mortgage lending activity dried up and shut down, driving home prices lower. As home prices fell, much of the remaining equity borrowers had

was eliminated when loan amounts exceeded actual home values. These elements – which were the foreseeable *result* of Defendants' predatory and discriminatory activities in the first place -- continued to combine to create a downward spiral in home prices and a more rapid increase in loan delinquencies.

75. In January and February 2008 numerous asset write-downs were reported by large financial institutions relating to their subprime losses incurred during 2007. Throughout the spring and summer of 2008, the mounting losses at financial institutions led to a full blown liquidity crisis in which financial institutions would not lend funds to each other for fear of the unknown levels of loss exposure with any counterparties.

76. In the fall of 2008 the U.S. and global credit markets froze leading to a much greater financial crisis. Specifically, regulators, investors and other market participants realized the full extent of the credit losses, counterparty risk and default risk on subprime and higher cost mortgage loans underlying RMBS and other securitized debt instruments was unknown and that such unknown levels of risk had infected a wide swath of other investment market segments and U.S and global financial institutions.

77. It was not until June of 2008 that unemployment levels in the U.S. first began to rise even as foreclosure rates began to explode. Consequently, the foreclosure crisis was not caused by an increase in unemployment rates. Instead, increasing unemployment occurred as a foreseeable result of the financial and economic crisis, which was caused by the predatory and discriminatory lending and securitization activities of Defendants (and other industry participants). That economic crisis, and the increase in unemployment, further exacerbated the foreclosure crisis that was caused by the predatory and higher cost terms of the mortgage loan products themselves and the willfully shoddy manner in which they were underwritten.

27

78.     Moreover, the Senate Permanent Subcommittee on Investigations ("SPSI") found that financial institutions like Defendants "were not the victims of the financial crisis." *Wall Street And The Financial Crisis: Anatomy of a Financial Collapse*, Majority and Minority Staff Report (April 13, 2011) at 4.  Instead, the "billions of dollars in high risk, poor quality home loans" that they originated, sold, and securitized and their "unacceptable lending and securitization practices" were "the fuel that ignited the financial crisis." *Id.*

79.     In sum Defendants' predatory subprime mortgage lending (as well as the predatory lending of other industry participants), along with their attempt to conceal and shift the risk of their activities, ultimately caused the financial crisis, economic downturn and increased unemployment rates. All of these factors, which were the foreseeable result of Defendants' (and other industry participants') original predatory mortgage lending activities, further exacerbated both the foreclosure crisis and the resulting, foreseeable injuries to Plaintiffs.  Thus, Defendants cannot rely on general claims of economic downturn or borrower job losses as intervening causes of the defaults and foreclosures occurring in Plaintiffs' communities on predatory and discriminatory mortgage loans for which Defendants are responsible.

### D.     The Foreclosure Crisis Has Disparately Impacted Minorities

80.     As the direct result of the terms of the mortgage loan products disproportionately sold to them, minority borrowers nationwide (and those who reside in Plaintiff's communities and neighborhoods) paid materially higher monthly mortgage payments, on higher loan balances, than similarly situated Caucasian borrowers, and face higher rates of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies on loans for which Defendants are responsible.  For example, minority borrowers steered into or receiving a higher cost loan may

pay hundreds of dollars more each month in mortgage payments than a similarly situated borrower who has obtained a conforming loan at market interest rates.

81.     Numerous publicly available studies by reputable industry watchdog groups have found that the foreclosure crisis has hit African-American and Hispanic neighborhoods and home owners across the country disproportionately harder than non-minority Caucasian homeowners and that this is the result of predatory lending activity.

82.     The percentage share of delinquent loans, loans in the foreclosure process and loans already foreclosed on, increases in direct relationship to increased concentrations of minorities in neighborhoods within Plaintiff's communities.   According to the *Lost Ground Report*, although 57.5% of loan originations within the Chicago metropolitan statistical area ("MSA") between 2004 and 2008 were to Caucasian borrowers (12.1% were made to African Americans and 14.4% to Latinos), Caucasian borrowers faced only about 5.3% of the total number of completed foreclosures and 7.3% of the total number of seriously delinquent loans (i.e., *future* foreclosures at the time).   In stark comparison, African American and Latino borrowers in the Chicago MSA disproportionately incurred 12.1% and 14.4%, respectively, of all completed foreclosures and 15.3%, and 15.0%, respectively, of all seriously delinquent loans.

83.     Other conclusions and findings of the *Lost Ground Report*, which Plaintiff also specifically allege here, include that:

- "African-American and Latino borrowers are almost twice as likely to have been impacted by the crisis. Approximately one quarter of all Latino and African-American borrowers have lost their home to foreclosure or are seriously delinquent, compared to just under 12 percent for white borrowers."
- "Racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes. Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups. For example, approximately 10 percent of higher-income African-American borrowers and 15 percent of higher-income Latino borrowers have lost

their home to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers. Overall, low- and moderate-income African Americans and middle- and higher-income Latinos have experienced the highest foreclosure rates."

- "Loan type and race and ethnicity are strongly linked. African Americans and Latinos were much more likely to receive high interest rate (subprime) loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs. These disparities were evident even comparing borrowers within the same credit score ranges. In fact, the disparities were especially pronounced for borrowers with higher credit scores. For example, among borrowers with a FICO score of over 660 (indicating good credit), African Americans and Latinos received a high interest rate loan more than three times as often as white borrowers."

- "Impacts vary by neighborhood. Low- and moderate-income neighborhoods and neighborhoods with high concentrations of minority residents have been hit especially hard by the foreclosure crisis. Nearly 25 percent of loans in low-income neighborhoods and 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities."

- "Foreclosures have ramifications that extend beyond the families who lose their homes. Communities with high concentrations of foreclosures lose tax revenue and incur the financial and non-financial costs of abandoned properties and neighborhood blight. . . ."

- "[L]ow-income neighborhoods in other cities . . . have completed foreclosure rates of over 20 percent. Such high levels of concentrated foreclosures will place a significant burden on these neighborhoods and also the wider communities, which, without substantial interventions, will almost certainly suffer reduced revenues for vital city services, higher rates of crime, and myriad other adverse effects."

## II.  DEFENDANTS' DISCRIMINATORY ACTIONS AND OTHER WRONGFUL CONDUCT

### A.  Defendants Knowingly & Intentionally Engaged In Predatory & Discriminatory Mortgage Lending & Servicing To Drive Revenue Growth & Fuel Their Profitable Securitization Operations

84.    The "Interagency Guidance on Subprime Lending," issued on March 1, 1999 by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency and the Office of Thrift Supervision

("*Interagency Guidance*"), succinctly states the business rationale for lenders such as Defendants here to engage in subprime and higher cost lending:

> Due to their higher risk, subprime loans command higher interest rates and loan fees than those offered to standard risk borrowers. These loans can be profitable, provided the price charged by the lender is sufficient to cover higher loan loss rates and overhead costs related to underwriting, servicing, and collecting the loans. Moreover, the ability to securitize and sell subprime portfolios at a profit while retaining the servicing rights has made subprime lending attractive to a larger number of institutions, further increasing the number of subprime lenders and loans.

85.     The *Interagency Guidance* clearly warns against the predatory lending practices alleged against Defendants here: "Institutions that originate or purchase subprime loans must take special care to avoid violating fair lending and consumer protection laws and regulations. Higher fees and interest rates combined with compensation incentives can foster predatory pricing or discriminatory 'steering' of borrowers to subprime products for reasons other than the borrower's underlying creditworthiness."

86.     Because of the inherent risk to the safety and soundness of regulated banking institutions, the *Interagency Guidance* further explains that:

> Institutions that engage in subprime lending in any significant way should have board-approved policies and procedures, as well as internal controls that identify, measure, monitor, and control these additional risks. . . .   If the risks associated with this activity are not properly controlled, the agencies consider subprime lending a high-risk activity that is unsafe and unsound.

87.     Thus, Defendants' regulated bank entities were required to have "board-approved policies and procedures, as well as internal controls that identify, measure, monitor, and control" the risks associated with their subprime and higher cost lending activities, including compliance with fair lending laws and the Fair Housing Act.

31

88.     Defendants' holding companies, and their operating subsidiaries, were similarly required to maintain appropriate policies and procedures to ensure that they identified, measured and controlled such risks.

89.     Defendants knew at that time that their U.S. banking regulators, primarily concerned with bank safety and soundness issues, considered the avoidance of predatory and discriminatory lending practices (particularly including violations of the Fair Housing Act) to be an "essential component of a well-structured risk management program for subprime lenders," such as Defendants here, given the operating, compliance and legal risks involved.

90.     Defendants knew that an appropriate risk management program required them to "take special care to avoid violating fair lending and consumer protection laws and regulations" because "higher fees and interest rates combined with compensation incentives [could] foster predatory pricing or discriminatory 'steering' of borrowers to subprime products for reasons other than the borrower's underlying creditworthiness."

91.     Defendants also knew at that time that U.S. banking regulators were focused on the risks of abusive lending practices such as equity stripping, incorporating pricing terms that far exceeded the true risk of the loan, loan flipping, and one-way referral practices within a multi-subsidiary organization.

92.     At all times relevant the highest levels of Defendants' management were required to know through their own risk monitoring and control efforts, and either knew or were reckless in not knowing, of the nature of the risks, the relative amounts of risk, their ability to control such risks, and their exposure to the risks from their subprime and higher cost lending, securitization and servicing activities, including compliance with fair lending laws and the Fair Housing Act.

32

93.     All Defendants knew -- that the predatory loan products they originated or funded were targeted to and/or disproportionately impacted FHA protected minority borrowers based on the loan data they were legally required to report to HMDA. In fact, Defendants did collect and report to HMDA in connection with each mortgage loan application taken, each mortgage loan closed and each mortgage loan Defendants purchased thus showing their knowledge of its predatory loan products.

94.     Such data included borrower name, borrower race and ethnicity, borrower credit score, borrower debt to income ratio, loan to value ratio, loan terms and features (including interest rates, adjustment periods, index rates, and penalties), loan payment history, property address, and property values, among other things.

95.     Defendants also created, possessed and/or maintained this extensive electronic data in connection with each mortgage loan they maintained as their own asset, purchased, sold, and/or securitized into mortgage backed securities.

96.     Defendants received from loan sellers or created and made available to loan purchasers "loan tapes" in the form of Excel spread sheets containing such information.

97.     Each Defendant created, maintained and utilized such data in connection with their mortgage servicing operations.

98.     Each Defendant created, maintained and utilized such data in connection with their analytical decision making tools, applications and models regarding mortgage loan marketing (originations and wholesale), credit risk scoring, credit risk scoring overrides, override monitoring, mortgage loan pricing, mortgage loan underwriting, and related management compensation decisions.

33

99.     Each Defendant created, maintained and utilized such data in connection with their analytical decision making tools, applications and models regarding mortgage loan performance, prepayment rates, delinquency rates, loss severity rates, asset valuation, compliance with covenants in securitization transactions, and related management compensation decisions.

100.    Each Defendant created, maintained and utilized such data in connection with their legally required Management Information Systems, risk management and control functions, internal control and compliance functions, and related board level reporting activities.

101.    Finally, as a result of their required risk management and control functions, and internal control and compliance functions, all Defendants also knew, or were reckless in not knowing that the predatory loan products they originated or funded were targeted to and/or disproportionately impacted FHA protected minority borrowers.

102.    In light of such knowledge, Defendants' actions alleged here reflect a reckless disregard for their consequences, if not willful disregard for the harm they have caused.  Indeed, Defendants also knew at that time that if they appeared to be treating similar loan applicants differently on the basis of a prohibited factor (e.g., race, ethnicity or gender) they would have to provide a credible explanation for their disparate treatment or face an agency finding of intentional discrimination.

103.    Notwithstanding the inherent risks in, and the illegality of, predatory mortgage lending practices, Defendants engaged in them anyway, placing their financial interests above the best interests of their borrowers through:

- targeted marketing of mortgage loans on unfavorable terms to vulnerable borrowers who were unsophisticated or without access to traditional credit sources;

34

- steering credit worthy minority borrowers to more costly loans;

- incorporating into mortgage loans to minority borrowers unreasonable terms, excessive fees, pre-payment penalties, and/or yield spread premiums to the loan broker (i.e. kick-backs) that are not related to borrower creditworthiness or other objective lending criteria;

- Including prepayment penalties in minority borrower mortgage loans that inhibit the borrower's ability to refinance;

- basing loan values on inflated or fraudulent appraisals of minority borrowers' property;

- repeated refinancing of loans to minority borrowers that does not benefit the borrower and often jeopardizes the property (loan flipping);

- lending to minority borrowers based on the value of the real estate asset collateralizing the loan, not the borrowers' ability to repay ("equity-stripping");

- inclusion of other loan terms and conditions in loans to minority borrowers that make it difficult or impossible for a borrower to reduce their indebtedness (such as credit life or other forced insurance policies); and

- targeting minority borrowers to convert unsecured debt (for, example, revolving credit card debt) into secured debt through refinancing their mortgages – with predatory fees – with Defendants.

104.    Such predatory lending activities maximized the amount of origination fees and income Defendants received from their predatory subprime and higher cost mortgage lending operations -- by maximizing the volume of mortgage loans originated, maximizing the face amount of such loans, and maximizing the interest rates and other fees charged on such loans. Because such predatory and higher cost loans were inherently more risky, due to the loan terms themselves, RMBS that securitized such loans generated higher coupon interest rates than other comparably rated securities and therefore investors were willing to pay a higher price for them.

105.    Thus, the mortgage lending operations of Countrywide, Merrill, and Bank of America were designed to profit at every level of the securitization process, with Defendants

vertically-integrated to act as originators, underwriters, sponsors, sellers, depositors, and/or servicers of predatory mortgage products.

106.    This vertical integration allowed Defendants to control their respective securitization pipelines and further provided them with actual knowledge of the abuses at each level of the transaction, while also allowing them, through securitization, to cleanse their books of toxic loans they originated and purchased after collecting substantial fees all along the process.

107.    As further alleged herein, Defendants adopted multiple strategies to gain control of, and maximize profits from the securitization process, including:

- Acquisition of financial and ownership interests in loan originators to ensure a steady supply of predatory, higher cost, subprime loans to securitize;

- Development of investment banking arms to package and sell their own RMBS;

- Engagement in warehouse lending, whereby the Defendants would extend a line of credit to a third party loan originator to fund mortgage loans, which would then be pooled and securitized; and

- Entering into purchase agreements with third party originators to buy batches of mortgages to securitize.

108.    By controlling affiliated and correspondent lenders, Defendants each were able to dictate the underwriting standards at the origination level.  Because Defendants needed a high volume of loans to support their securitization operations, Defendants had every incentive, and as alleged below in fact did, lower or grant exceptions to their underwriting standards at the loan origination level.

109.    Indeed, the FCIC confirmed that "[s]ecuritization and subprime originations grew hand in hand" as "[t]he nonprime mortgage securitization process created a pipeline through which risky mortgages were conveyed and sold throughout the financial system. This pipeline

36

was essential to the origination of the burgeoning numbers of high-risk mortgages." (FCIC Report at 70, 125.). The FCIC concluded that: "[F]irms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. … These problems appear to have been significant. (FCIC Report, at 187.)

110.    Defendants' securitization activities were very substantial and grew rapidly. Thus, between 2003 and 2007 Defendants securitized more than **$777.5 billion** of first and second lien mortgages into securitizations as follows:

| (*in Billions*) | 2003 | 2004 | 2005 | 2006 | 2007 | Total |
|---|---|---|---|---|---|---|
| **Countrywide** | $58.5 | $116.2 | $163.6 | $141.2 | $80.4 | $560.0 |
| **Merrill** | $13.5 | $13.3 | $20.3 | $16.6 | $28.6 | $92.3 |
| **Bank of America** | $26.4 | $27.5 | $29.5 | $24.4 | $17.4 | $125.2 |

111.    As sponsors of securitizations, and in control of virtually the entire process, Defendants knew the predatory and discriminatory nature of the higher cost, subprime, ALT-A and/or other conforming loans underlying their securitizations because they had access to the loan files themselves and made representations and warranties in their securitizations with respect to such loans.

112.    Defendants' correspondent lenders provided Defendants with the data and information about the underlying mortgage loans, including loan terms, borrower ethnicity and loan performance characteristics.   Defendants also applied their own underwriting standards to the loans they purchased and conducted due diligence on those loans when purchasing them.

Moreover, as originators (or as the controlling entity of an originator), Defendants knew their own lending practices and the predatory and discriminatory nature of the loans those practices generated.

113.    To be sure, on or about August 21, 2014, Bank of America agreed to pay an unprecedented $16.65 billion to settle claims brought by the DOJ relating to Bank of America's, Countrywide's, and Merrill Lynch's non-prime mortgage securitization and sales activities leading up to and during the Financial Crisis.  The settlement resolved several of the DOJ's then-ongoing civil investigations related to Defendants' packaging, marketing, sale, arrangement, structuring, and issuance of RMBS, collateralized debt obligations (CDOs), and their underwriting and origination of mortgage loans.  Importantly, the August 2014 settlement agreement incorporates a "Statement of Facts" regarding Defendants' actions, which Bank of America explicitly "acknowledges" are incorporated into the August 2014 Settlement.  A copy of the Statement of Facts is attached here as Exhibit C and Plaintiff alleges such facts as if fully set forth herein.  Among other things, it, Countrywide, Merrill Lynch, and their affiliates: (i) knowingly originated, purchased, or otherwise acquired from brokers, substantial numbers of risky and defective mortgage loans by ignoring or overriding their own underwriting criteria or failing to conduct adequate due diligence on purchased loans; and (ii) packaged and sold those loans in securitizations and made misrepresentations about the quality of those loans (including the ability of borrowers to repay them) to Fannie Mae, Freddie Mac, and the Federal Housing Administration (FHA), among others.  The Statement of Facts also evidences Bank of America's acknowledgements that Countrywide: (i) knew that certain borrowers had a high probability of defaulting on their loans; (ii) used "shadow guidelines" to approve loans to even riskier borrowers than Countrywide's relaxed underwriting guidelines would otherwise permit; (iii) was

motivated by the "saleability" of loans such that Countrywide was willing to originate "exception loans" so long as the loans, and the attendant risk, could be passed off to investors purchasing the loans; and (iv) subsequently expanded its loan offerings to include "Extreme Alt-A" loans, which one Countrywide executive described as a "hazardous product." The Statement of Facts further evidences Bank of America's acknowledgements that Merrill Lynch: (i) knew, based on due diligence it had performed on samples of the loans it purchased and resold to investors, that a significant number of those loans had material underwriting and compliance defects; (ii) disregarded its own due diligence and securitized loans that its due diligence vendors had identified as defective; and (iii) rarely reviewed unsampled loans to ensure that the defects observed in the samples were not present throughout the remainder of the pools, a practice leading one Merrill Lynch consultant to "wonder why we have due diligence performed" if Merrill Lynch was going to securitize the loans "regardless of issues." In short, the 2014 Settlement Agreement resolved the underlying basis for the DOJ's various complaints against Defendants -- that fraud pervaded every level of the residential mortgage backed securities industry and that Defendants had put their own profits ahead of their customers best interests.

114. In August 2014, Bank of America, N.A., Banc of America Mortgage Securities, Inc., and Merrill Lynch, Pierce, Fenner & Smith Inc. also entered into a consent agreement with the Securities and Exchange Commission arising out of the SEC's Cease-and-Desist Proceedings relating to certain material misrepresentations or material omissions regarding their RMBS that the Bank of America entities made in public filings in violation of Section 13(a) of the Exchange Act. As part of the agreement, Bank of America acknowledged that, as of the second quarter of 2009, it had forecast that the number of defaulted loans within its securitizations was continuing to increase and posed an "emerging risk." Bank of America was ordered to pay a civil penalty of

39

$20 million to the SEC and to cease and desist from committing or causing any violations and any future violations of Section 13(a).

115.    In connection with the securitization process, Defendants retained the loan servicing rights on virtually every predatory mortgage loan they originated or purchased and either kept on their own books or securitized and sold.  As further alleged below, Defendants engaged in predatory and discriminatory mortgage loan servicing activity, including discriminatory foreclosure activity, which also generated enormous fee income for Defendants.  This servicing and foreclosure activity, which continues to this day, not only furthered Defendants' initial predatory and discriminatory lending behavior but constitutes a stand-alone discriminatory housing practice.

116.    In short, Defendants engaged in the predatory and discriminatory mortgage lending, securitization, servicing and foreclosure activities alleged herein, despite regulatory guidance warning against that activity, as well as contrary to their own internal risk assessments, in order to maximize their revenue and income, fuel corporate growth, generate huge corporate profits and, for Defendants' top management to earn enormous compensation, including from profits from their sales of corporate stock.

**1.    Defendant Countrywide Publicly Admitted Targeting Minorities For Subprime and High-Cost Mortgage Lending To Drive Countrywide's Growth.**

117.    In a presentation to Harvard University on February 4, 2003, Countrywide's CEO, Angelo Mozilo publicly touted Countrywide's intention to exploit minority mortgage lending markets to drive Countrywide's growth.  Referring to the large gap in homeownership rates in the U.S. between white Americans (approximately 75%) and Hispanic and African Americans (less than 50%) at the time, Mozilo identified several causes for the gap and, thus, Countrywide's

opportunity to exploit those causes to further its own profit motive under the pretext of "how Countrywide is trying to address it." A copy is attached hereto as Exhibit A.

118.     Incredibly, Mozilo's patronizing comments simultaneously encapsulated the stereotypes of minority borrowers and the structural opportunities within the entire lending process that Countrywide was able to, and did, ultimately take advantage of:

> **The Money Gap** is the obvious barrier created by the fact that **there are those who have capital and access to credit, and those who don't**. On the capital side, the down payment and closing costs remain, perhaps, the greatest barriers to homeownership. And simply put, but not surprising, **minority and low-income families often lack the accumulated wealth and/or income to make these down payments and cover other closing fees**. . . .

> When it comes to credit, there is a double-edge, as well. On one side is the fact **that lenders are difficult to access because mainstream and reputable financial institutions are not always conveniently located near potential low-income and minority homebuyers. On the other side is the fact that many potential low-income and minority homeowners have questionable credit histories – at least as measured by the standard underwriting models available today – or no measurable credit history at all.** Thus, even if they can access a lender, that lender can't or won't help

> A report done for the Local Initiatives Support Corporation, otherwise known as LISC, found that over 40 percent of African American renters whose income was under $40,000 did not have banking relationships of any kind. **If these families want to become homeowners, they are often rejected by traditional lenders in the loan process; and if that is the case, they frequently become easy prey for predatory and unscrupulous lenders**.

> **One of the more obvious resolutions to the Money Gap is the elimination of down payment requirements for low-income and minority borrowers.** Current down payment requirements of 10 percent or less add absolutely no value to the quality of the loan. It is the willingness and the ability of a borrower to make monthly payments that are the determinants of loan quality. . . .

> Over the past 50 years, I have personally interviewed thousands of potential homebuyers and in the vast majority of cases, the barrier standing in between them and the house of their dreams was the down payment. **That barrier must be eliminated by offering customized programs to those borrowers who cannot meet the current down payment requirements.**

That brings me to the second issue that contributes to the overall homeownership gap – namely, *the Education Gap*.

*There is a truth in our industry that determining who gets a mortgage and at what interest rate is often more an art than it is a science. Put another way – understanding the home-buying process can be complicated and confusing, especially for low-income and minority families.* Not only are there dozens of documents to review and sign, but there are income ratios and a variety of loan options that a borrower must wade through. In addition, borrowers are faced with the complexity of understanding credit scores, commonly known as FICO, and the issue of how to improve these scores and ensure that the data contained by the credit repositories is accurate.

We must make the process not just easier, but easier to comprehend. *We must get information to potential homeowners in a manner and language that they can understand. We must educate the low-income and minority sector about their rights and the responsibilities of homeownership.* Equally important, we must reduce the documentation required to make any and all loans; *we should be able to approve loans in minutes, rather than days, and close loans in days, rather than weeks.* Furthermore, we should streamline the title insurance process and *we should replace the public recording of documents with book entry* as is done with stocks and bonds. This will substantially reduce costs and improve affordability.

If we fail to seek paradigms to simplify the process, accelerate the timing and reduce the cost of obtaining a mortgage, we will be left with two scenarios. One is that potential buyers will be too intimidated by the very process of buying a home to even attempt to move forward. The other is that for those who do have the fortitude to proceed, they can easily fall prey to the slick marketing schemes of predatory lenders promising an effortless process. *All of the technology is in place today to both simplify and accelerate the process* and the only issue standing in the way of change, unfortunately, is the "fear" of change.

119.    Touting Countrywide's already explosive success exploiting this lending sector between 2001 and 2003, Mozilo emphasized Countrywide's plan to multiply its efforts *six-fold* over the next few years:

Just over ten years ago, we launched our formal affordable lending program called *House America*. Our hope was that with flexible underwriting guidelines, we would enable more people to qualify for home loans, and by having fewer credit and employment constraints, more families would achieve their American Dream.

42

Back in 1992, we started with a $1.25 billion commitment to *House America*. In 2001, as part of our *House America* campaign to provide residential financing in under-served communities, we increased our commitment to $100 billion with a goal of obtaining that objective by 2005. I'm proud to say that in just 22 months, and not five years as originally planned, we have reached that goal. So I'd like to use this forum this evening to say that Countrywide is once again re-dedicating itself to expanding the dream of homeownership. Tonight, I am announcing the extension and expansion of our current 5-year, $100 billion challenge through the year 2010, with the commitment to fund a total of $600 billion in home loans for previously underserved Americans in this decade.

Countrywide is proud to make this commitment. We're excited about our new goal. We're eager to reach that goal. And, I can assure you that we will reach that goal.

120.    Mozilo then brazenly cloaked Countrywide's intentionally targeted, exploitative, discriminatory marketing and lending practices specifically identified in the body of the presentation itself, under a paternalistic veil of "educating" minorities and expanding minority homeownership:

As we had envisioned in 1992, *House America* offers **unique loan products that have been specifically designed to meet the needs of minority and low- to moderate- income borrowers**. But it also does more. It has become not just a lending program, but a more comprehensive effort that devotes considerable intellectual and financial resources to increasing homeownership among minority and low- to moderate-income individuals and families.

It is an effort that includes a counseling center which provides free services by phone in a comfortable, no obligation environment where people can obtain information about the home-buying process. *It is an effort that, in addition to providing loan products with flexible underwriting criteria such as home rehab loans, also specializes in being able to layer financing programs* through participation in hundreds of down payment and closing cost assistance programs. *House America* also offers other tools to ensure that we are doing everything in our power to expand the opportunities for home ownership. *It is an effort absolutely committed to education and outreach, both in English and Spanish, both online and in local communities, both at local home-buyer fairs and at lending workshops, and with our many partners, like Fannie Mae, Freddie Mac, FHA, the Congressional Black Caucus, the National Council of La Raza, AFL-CIO, and faith-based groups across the Country*, just to name a few.

In 1993, Countrywide opened four dedicated *House America* retail branches, and now we have 23 staffed with local and diverse professionals in major metropolitan areas all across the Country.

It is an effort that has enabled Countrywide to become the number one lender to Hispanics for the last 6 years and the number one lender to African Americans for the past 3 years. It is an effort that is helping create, if you will allow me to paraphrase, a Field of American Dreams. "If you build it, and build it right, they will come." Finally, *House America* is an effort that, as you can tell, makes all of us at Countrywide extremely proud. I could talk about it all night, but I won't.

But I want to make the point that this outreach effort is imperative. Fortunately Countrywide isn't alone – there are other mortgage lenders and financial institutions that are all making positive contributions. And the lesson we can take away from this is the following: for a long time, when it came to increasing low-income and minority home ownership, the message has always been "we should," or "we must." But the fact is, "we can," and "we are."

121.    According to Mozilo, implementing Countrywide's goals required resolution of "three structural obstacles: namely, the Underwriting Process, which I feel is driven by an antiquated credit scoring matrix; Predatory Mania; and, a Lack of Proper Perspective." As to the Underwriting Process structural obstacle, Mozilo explained:

I have two issues with our industry's current underwriting methodology. The first is that the automated underwriting systems kick far too many applicants down to the manual underwriting process, thereby implying these borrowers are not creditworthy; and the second issue is that once arriving in the hands of a manual underwriter, the applicant is subject to basic human judgment that can be influenced by the level of a borrower's credit score.

. . . .

Thus, the current protocol intentionally creates an environment where borrowers with lower FICO scores are subject to being disproportionately affected by the manual underwriting process. I say we need to amend these systems to do more than just approve the "cream of the crop," by creating a system that says "no" only to those deemed unwilling to make their mortgage payments.

122.    Mozilo's proposed fix to this Underwriting Process structural obstacle was explained in his presentation: "To resolve this *the credit score* bar dividing creditworthy from high-risk borrowers, *must be substantially lowered* by the GSEs, the secondary market in

44

general, and with bank regulators. The GSEs have made good progress over the last few years in expanding their credit criteria, but I encourage them to become **much more aggressive in this regard**." As further alleged below, Countrywide's implementation of this directive was the hallmark of its reduced underwriting standards.

123.    Mozilo revealed to the Harvard presentation attendees the true corporate tone he had set from the top of Countrywide as to predatory lending: "The next structural obstacle I would like to address is predatory mania, or to be more exact, the predatory lending legislation that is causing regulatory mania." After deriding "predatory lending laws . . . as a *cause celebre* with ambitious politicians at all levels," Mozilo offered that:

> a clear example of this counterproductive phenomenon is the State of Georgia. The anti-predatory lending measure that became law in Georgia last October is so complex, and the consequences of a violation – intended or otherwise – are so severe, that lenders and the secondary market have been forced to stop making or buying so-called high - cost loans. As a result, the availability of credit to many families has been curtailed out of the fear of possible lawsuits or other intended or unintended consequences.

What Mozilo did not explain, however, is that the true reason for the curtailment of higher cost mortgage loans was because credit agencies placed restrictions on their ratings for pools of mortgages originating from the states with predatory lending laws, making it more difficult for lenders like Countrywide to resell high-cost mortgage loans in the secondary market because such loans are more likely, by their nature, to violate predatory lending laws. Nor did Mozilo reveal the extensive ongoing lobbying efforts of Countrywide and other industry players that resulted in federal preemption of state anti-predatory lending laws by early 2004 and state lobbying efforts, including in Georgia, resulting in exceptions being granted to mortgage lenders.

124.    Addressing his "Proper Perspective" structural obstacle, Mozilo revealed Countrywide's misguided and cavalier attitude toward the causes of delinquencies and

foreclosures of higher cost loans, noting "that most families only go delinquent when faced with a devastating event – such as loss of health, loss of job or loss of marriage. The primary drivers of default are no different in the sub-prime market than they are in the prime sector." With respect to the predatory, higher cost, loan products at issue here that Defendants originated, sold, securitized, and serviced, and as further alleged below, nothing could be further from the truth.

125. Finally, Mozilo also revealed Countrywide's direct plan to grow based on its predatory and discriminatory mortgage lending practices:

> we must all lean on the side of looking for every reason to approve applicants rather than the reasons to reject them. We must focus on the majority that succeed, rather than be obsessed with the few that fail. If we maintain this perspective, we will be influenced to take greater risk in assuring that we create parity in homeownership. Clearly, for our industry, the minority and low-income sectors are the "emerging markets" that we can and must develop. The indications – whether they be an increase in immigration, education levels, income, or the fact that the sub-prime market is still in its infancy – all point to growth.

126. By focusing on its higher cost, predatory and discriminatory mortgage lending efforts from 2003 though 2007, Countrywide dramatically increased its origination of subprime mortgage loans to minorities and its overall market share, even as it faced fierce competition from other higher cost mortgage lenders. To do so, as Mozilo essentially admitted in his Harvard presentation, Countrywide systemically departed from its underwriting standards, resulting in a "culture change" that began in 2003.

127. To be sure, as of December 31, 2003, Countrywide had an 11.4% share of the U.S. mortgage origination market. Over the next four years, Countrywide's market share grew nearly 38%, to constitute approximately 15.5% of the U.S. market by year-end 2007.

128. Simultaneously, Countrywide's mortgage origination and securitization activities fueled the growth in its mortgage servicing business. As reported by Countrywide in its Form

10-K filed with the SEC for the year ending December 31, 2007, it was the largest residential mortgage servicer in the United States, servicing a portfolio of approximately $1.5 trillion in mortgages. Countrywide also disclosed that it valued its servicing rights, at a then current fair value, of over $18.9 billion. Countrywide further disclosed its growth in loan servicing fees, and other income from its mortgage servicing rights and retained interests, as reflected in the amounts of such fees of approximately $5.72 billion, $4.96 billion, and $4.28 billion, respectively in 2007, 2006 and 2005.

129. During 2003 through 2006 the price of Countrywide's common stock rose accordingly, from $25.28 on December 31, 2003 to $42.45 on December 29, 2006. Countrywide's top executives were tremendously rewarded for this growth, raking in $262,220,940 in compensation between 2004 and 2007, along with hundreds of millions of dollars in profits from their sale of Countrywide's stock. At $123,051,536, Mozilo's compensation alone accounted for nearly half of the compensation amount paid to Countrywide's executives during that same period.

**2. Defendant Bank of America Targeted Minorities For Predatory and Discriminatory Subprime and High-Cost Lending To Drive Revenue and Earnings**

130. As further alleged below, and like Countrywide, Defendant Bank of America deliberately engaged in predatory subprime and higher cost mortgage lending, directly targeting minority borrowers for home equity loans and purchase loans. A study published in 2000, by analysts with Bank of America's Community Development Banking division, titled "*Using Data Mining Technology to Identify and Prioritize Emerging Opportunities for Mortgage Lending to Homeownership-Deficient Communities*," revealed Bank of America's intent to exploit minority communities under cover of its Community Reinvestment Act programs, touting its high tech

47

data mining methodology "to identify communities where [it] could achieve the greatest success originating mortgage loans." A copy is attached hereto as Exhibit B.

131.    In April of 2002, Bank of America announced that it was quadrupling its "multicultural" marketing budget to more than $40 million annually. *See* http://adage/com/article/hispanic-marketing/bank-america-quadruples-ethnic-ad-budget/34216/ (April 15, 2002).  According to the article:

> Rather than taking a single multicultural approach . . . the country's No. 3 bank developed significantly different messages for the Hispanic, Asian and African-American markets, based on customer research and close attention to cultural nuances.

> Spanish-language print and five commercials focus on helping Hispanics fulfill their dreams, Mr. Villanueva [Bank of America's multicultural brand and communications manager] said. . . .

> For Asians, the brand platform is 'tangibly committed to the success and growth of all Americans' and ads end with 'Our bank.' Commercials shot in China, Korea and Vietnam, the beginning of an immigrant's journey, are steeped in metaphors and nostalgia.  One spot that flashes back to a boy teaching his younger brother to ride a bike in his homeland parallels with the helping hand today of Bank of America with a mortgage.  To convey authenticity, the bike is the exact kind an Asian child would learn to ride, not an American kids' bicycle.

> In contrast, one of the Hispanic spots opens on an exaggerated stack of mortgage-related paperwork the size of a house and details how Bank of America can reduce it by 80%.

> The ads will run in the appropriate Spanish, Chinese, Korean or Vietnamese to target consumers who prefer to communicate in their native language. . . .

> For the African-American market, the brand platform is 'helping African-Americans realize their financial destinies' and includes tips to simplify the financial process, such as 'Start today' and, for mortgages, 'Own it.'

> For each ethnic group, ads cover branding two products: mortgages and checking accounts.  Bank of America works with Hispanic agency Lopez Negrete Communications, Houston, and WPP Group-backed Kang & Lee Advertising, New York, and UniWorld, New York, for Asian And African-American ads, respectively.

Their work is very different from the general marketing campaign . . . .

In addition to advertising, the multicultural budget covers a 'soup-to-nuts' range of activities from in-language brochures to sales and fulfillment, with bilingual staff for offices and phone lines, Mr. Villanueva said.

132. Bank of America also exploited the subprime and higher cost mortgage lending market through its Correspondent and Warehouse lending channels – i.e., funding other mortgage loan originators -- and purchasing those loans. This ensured that Bank of America had access to a steady stream of mortgage loans to securitize and sell to investors, by pooling them into Bank of America's RMBS offerings.

133. To do so, Bank of America directly funded the top four predatory subprime and higher cost mortgage originators in the United States. By purchasing their loans and securitizing them and eventually selling the loans to investors. Particularly, these top lenders included: Defendant Countrywide (the country's then-number 1 subprime lender), Ameriquest (the number 2 subprime lender), New Century Financial Corporation (the number 3 subprime lender), and First Franklin (the number 4 subprime lender, which Defendant Merrill subsequently acquired). Not surprisingly, Bank of America became the leading participant in the wholesale/correspondent lending channel, holding approximately 26 percent of the entire U.S. subprime mortgage market.

134. Bank of America also expanded its share of the mortgage securities market by aggressively pursuing subprime mortgage originators, including OptionOne, Accredited Home Lenders, and GMAC Mortgage. Bank of America offered to pay more to purchase their mortgages than other competing Wall Street banks paid and by offering to perform less due diligence on the loans than Bank of America's competitors performed. Thus, Bank of America

paid more money for poorer quality subprime and higher cost mortgage loans and would not diligently review those loans when purchasing them.

135.    At the time, Bank of America knew that the originating banks were churning out risky loans with high likelihood of default. As Ken Lewis, then-CEO of Bank of America proclaimed on Bank of America's 2007 second quarter earnings call: "Broker [loans] tends to be toxic waste."

136.    Bank of America's efforts to maximize revenue and profits from its subprime and higher cost mortgage lending, securitization and mortgage servicing operations were clearly successful.  According to its annual financial reports filed with the SEC on Form 10-K, between year-end 2000 and year-end 2006, Bank of America's mortgage product revenue increased from $51.8 billion (over half was generated through its Correspondent and Wholesale Channels) to $76.7 billion and its mortgage servicing income increased from $560 million to $775 million. Bank of America's subprime and higher cost mortgage lending operations contributed substantially to this success, and to the threefold increase in its income over the same period from $7.5 billion in 2000 to $21.1 billion by 2006.[3] Likewise, the price of Bank of America's common stock rose tremendously over the same period, as reflected in the increase in its year-end 1999 closing price of $25.09 per share to $41.26 as of year-end 2007.

137.    Bank of America highly rewarded its top executives for this growth.  Executive compensation at Bank of America began to take off just as the company's subprime and higher cost lending operations ramped up.  In 2001, then-CEO Kenneth D. Lewis earned $2,623,804 in

---

[3] While Bank of America made a number of significant acquisitions during the relevant time period, a substantial portion of its growth related directly to the growth in its mortgage lending operations.

total compensation. In 2001 his compensation nearly tripled to $7,436,064 and just one year later it nearly doubled reaching $18,762,549 in 2002. From there, Mr. Lewis's compensation continued to climb: in 2003 he earned $20,217,981; in 2004, $22,724,058; in 2005, $22,027,984; in 2006, $27,873,348; and in 2007, $23,646,455. Thus, in just seven years' time, Bank of America's CEO saw a more than ten-fold increase in his annual compensation at the same time Bank of America was exploiting FHA protected borrowers. Mr. Lewis's compensation during this time even outstripped his well-paid banking executive contemporaries, whose median annual compensation was $5 million. Moreover, Mr. Lewis also cashed out $180,188,642 in Bank of America stock in 2006 alone, just as the impending subprime crisis began to appear.

138. Mr. Lewis was not the only Bank of America executive to benefit from Bank of America's predatory subprime and higher cost mortgage lending, funding, securitization and servicing operations. From 2003 through 2011, Bank of America's top few executives raked in a over *one half of a billion dollars* in compensation.

### 3. Defendant Merrill Lynch Funded Predatory and Discriminatory Subprime and Higher Cost Mortgage Lenders to Drive Growth, Revenue and Earnings in Its Own Residential Mortgage Backed Securities Activities

139. Through acting primarily as an investment bank, and not a retail mortgage lender, Defendant Merrill Lynch also fostered predatory lending to minority borrowers to increase the volume of residential mortgage loans Merrill could securitize and sell. Merrill Lynch ensured a steady stream of such loans by: (i) engaging in warehouse lending; (ii) departing from its own underwriting standards in its securitizations; (iii) tacitly and/or explicitly encouraging retail mortgage loan underwriters with whom it had warehouse funding relationships to depart from their own underwriting standards; and (iv) acquiring predatory retail mortgage lenders.

140.     When the mortgage securitization business began to take off in the early 2000's, Merrill Lynch was not initially a dominant market player.   Through its two subsidiary defendants, Merrill Lynch Mortgage Capital Inc. ("MLMCI") and Merrill Lynch Mortgage Lending, Inc. ("MLML"), Merrill entered and operated within the mortgage market.

141.     In 2003 Merrill began taking aggressive action through its Global Markets and Investment Banking Group to increase its market share in generating and selling asset-backed securities, particularly residential mortgage backed securities ("RMBS").   Led by its then-CEO, E. Stanley O'Neal, Merrill revamped its operations by hiring new people, including George Davies, a trader tasked with increasing the volume of mortgage loans coming into Merrill's trading desks.

142.     In January 2004, Merrill agreed to purchase Wilshire Credit Corporation, one of the then-leading companies in the subprime, nonperforming and underperforming residential mortgage special servicing markets.   Merrill then began purchasing immense volumes of subprime mortgage loans, paying more for such loans than every other firm on Wall Street, and using its other operations to entice subprime lenders to sell their loans to Merrill. Merrill also ramped up its warehouse financing operations to other subprime lenders, offering financing at very little or no cost so long as the lender continued to sell Merrill the subprime loans it originated.   Thus, Merrill operated its warehouse lending business in a manner designed to increase its share of the securitization business.

143.     At the same time, Merrill adopted liberal standards as to what mortgage loans it was prepared to acquire and routinely purchased loans that did not comply with the underwriting standards it was disclosing to investors. And, responding to fierce competition from an

increasing number of market players, Merrill continued to loosen its underwriting guidelines and ignored the results of its due diligence on purchased loans.

144. According to a recent report from the Financial Crisis Inquiry Commission ("FCIC"), Merrill knew from its third party loan reviewers such as Clayton Holdings LLC ("Clayton"), that approximately 23% of the loans that Merrill was looking to acquire were improperly underwritten, but Merrill nevertheless proceeded to include such loans in securitization pools to increase its RMBS production volume and market share.

145. To further its strategy, in September 2005, Merrill purchased a 20 percent stake in subprime wholesale mortgage lender Ownit Mortgage Solutions, Inc. ("Ownit"). This was to ensure that Merrill had a steady supply of residential mortgage loans that could be packaged, pooled, securitized, and sold. Between September 2005 and December 2005, Ownit originated approximately $6 billion dollars of loans that were sold to Merrill — 2/3 of Ownit's total originations for 2005.

146. For its part, Ownit, began operations in 2003 and became one of the 15 largest subprime lenders in the United States thanks to funding by Defendant Merrill. Until it ceased operations in December 2006 and filed for bankruptcy protection, Ownit focused its lending on "mass nonaffluents," a term used by Ownit's founder (who previously founded First Franklin) to refer to his target market of mortgage borrowers – those who earned less than $100,000 per year and had less than $100,000 in assets.

147. A former corporate underwriter at Ownit from 2004 to 2006, who was previously identified in American International Group's complaint against Bank of America in the action styled *American Int'l Group, et. al, v. Bank of America Corp., et. al*., Index No. 652199/2011, Supreme Court of the State of New York, County of New York ("AIG Complaint") and who sat

in on product development meetings with Ownit's top executives, explained that Ownit's goal was to be "a non-mainstream" lender that would do "loans no one else would do."

148. On December 30, 2006, Merrill acquired the First Franklin Mortgage Corporation ("First Franklin") and related servicing platform from National City Corporation for $1.3 billion. First Franklin originated residential mortgage loans through a wholesale network and retail channel. As former Merrill CEO O'Neal explained in a recently-disclosed September 2010 interview with the FCIC, Merrill purchased First Franklin "to control our [own] source of origination," echoing the interviewer's comment that Merrill made the purchase "to vertically integrate." (O'Neal Tr. 87:5-21, Sept. 16, 2010).

149. As Merrill sought to expand its market share in its securitization operations, it also encouraged its subprime lenders—including First Franklin and Ownit—to originate more low- and no-documentation loans. Incredibly, to increase loan volumes, Merrill paid more money to First Franklin, Ownit, and other subprime lenders to generate no- income-verification loans than for originating full-documentation loans from qualified borrowers – as much as 105 cents on the dollar.

150. Merrill knew, should have known, or was reckless in not knowing from its experience with loan securitization that such loans had high default rates. Merrill, however, was not sufficiently concerned that the loans were risky and non-conforming because it transferred the risk of loss onto its RMBS investors.

151. Merrill also enticed non-depository originators to sell their subprime mortgages to Merrill by offering low-cost warehouse lines of credit, which allowed those originators to generate even more product to sell to Merrill. For example, Merrill obtained a substantial portion of the residential mortgages that it securitized by purchasing billons of dollars worth of

these loans from non-depository originators such as ResMAE, Option One, and Mortgage Lenders Network USA, Inc., to which Merrill advanced warehouse lines of credit at low rates.

152. Merrill's subprime and higher cost mortgage lending and servicing strategy was very successful. Based upon its focus on courting subprime originators, by 2005 — a year in which Merrill purchased and securitized approximately $30 billion in subprime mortgages — Merrill grew to become the seventh largest issuer of subprime RMBS.

153. As Merrill reported in its Forms 10-K filed with the SEC, Merrill's net earnings more than doubled from $1.7 billion in 2002 to $3.8 billion in 2003. By year-end 2004, Merrill's net income increased to over $4.4 billion, reflecting a $600 million (15.6%) increase over its 2003 net income. By year-end 2005, Merrill's net income increased to over $5.1 billion, reflecting nearly a $700 million increase over its 2004 net income. And, in 2006, Merrill reported nearly $7.5 billion as net income.

154. Merrill's cash inflows from securitization of residential mortgage loans played a substantial part in these financial results. Merrill reported in its 2004 and 2007 Forms 10-K filed with the SEC, respectively, its cash inflows from securitizations increased from $43.7 billion for the year ending 2003 to $100.2 billion for the year ending in 2007.

155. Merrill's mortgage servicing rights also played an important role it its financial results. For example, as of year-end 2007, Merrill reported in its Form 10-K filed with the SEC that the fair value of its mortgage servicing rights was approximately $476 million. Merrill also disclosed that it received revenue of $341 million in servicing fees and another $63 million from ancillary and late fees relating to its servicing rights.

156. In short, between 2003 and 2006, Merrill's operating profit averaged $5.2 billion per year, more than double the $2.1 billion it averaged in the preceding five year period.

Consequently, Merrill's executives took home an astounding $676,300,702 in compensation over the four years from 2003 to 2007. And, as the price of Merrill's common stock rose during the period, its executives cashed in by selling their stock. For example, Merrill CEO, O'Neal, pocketed $30,044,749 selling his Merrill Lynch stock in 2006 and 2007.

### B. Defendants' Discriminated Against FHA Protected Minority Borrowers In Originating and Funding Predatory Subprime and Higher Cost Mortgage Loans

157.    Defendants' predatory and discriminatory subprime and higher cost mortgage lending was not the result of random or non-discriminatory factors. Rather, it was the direct and intended result of Defendants' business models, respectively, and their intent was to maximize corporate profits pursuant to those business models. Indeed, Defendants' executed corporate policies and practices to make its business models achieve maximum profits.

158.    Through vertically integrated corporate policies, practices, processes, and/or procedures each of the Defendants originated (or provided funding for) first lien and second lien (i.e., home equity) residential home mortgage loans to FHA protected African America and Hispanic/Latino minority borrowers on terms more unfavorable than those offered and made to similarly situated Caucasian borrowers. This resulted in FHA protected minority borrowers paying higher interest rates and fees, and/or receiving loans on other more unfavorable terms, such as prepayment penalties.

159.    The primary financial incentive for the Defendants' predatory and discriminatory subprime and higher cost mortgage lending and funding activities are: (1) the loan origination fees paid up front, typically from, and therefore immediately reducing, borrowers' equity in their homes; (2) fees earned from securitizing loans, including the financial gains booked on the sales

56

of securitized assets; and (3) fees earned from servicing the loans they made and/or acquired over the life of the loans.

160.     Defendants' respective business models at issue here were unlike the business model of traditional mortgage lenders, such as savings and loan institutions or community banks, which typically **hold the mortgage loans they originate,** earn income from the interest paid by the borrower over the life of the loan, and have their capital remain tied up in the loan, and at risk, until it is repaid over time.  Consequently, traditional mortgage lenders are concerned with proper loan underwriting, supported asset value and the borrower's ability to repay the loan over time.

161.     Defendants' subprime and higher cost mortgage lending and funding business models at issue here developed and originated, or funded, riskier subprime and higher cost mortgage loan products, with predatory features that generated more income, enabled continuous re-allocation and use of capital, and passed the risk of loss to others by pooling, securitizing, and selling to investors the predatory loans they had made.

162.     To generate as much income as possible, Defendants' subprime and higher cost mortgage lending and funding operations were primarily concerned with making as many purchase money and home equity loans as possible, at the highest interest rates possible (i.e., yield spread), with the most up front origination fees possible, and at the maximum loan values possible.    On many loans, the Defendants also incorporated loan prepayment and early repayment penalties, making it prohibitively costly for borrowers to refinance their loans with another lender. Thus, the mortgage loan products Defendants directly originated or funded at issue here were either predatory themselves or, as further alleged below, were underwritten or approved in a predatory way.

57

163.     Defendants developed, sold, and/or funded exotic loan products, including, among others, hybrid adjustable rate mortgages, interest only mortgage loans, and pay option mortgage loans that were targeted to, or disparately impacted, FHA-protected minority borrowers.  For example, a tremendous majority of Defendants' loan product offerings were adjustable rate mortgage loans ("ARMs"), which have a low initial fixed interest rate for a short-term period (a "teaser rate"), followed by substantial interest rate increases in subsequent years, e.g., two-year fixed rate/twenty-eight year adjustable loans that were referred to as "2/28 loans," or three-year fixed rate/twenty-seven year adjustable loans that were referred to as "3/27 loans."

164.     One of the most egregious examples of predatory mortgage loan products was the Pay Option Arm offered by Defendant Countrywide. A Pay Option ARM's interest rate adjusts every month based on the fluctuations of the corresponding index used to calculate the interest rate.  Although a Pay Option ARM's introductory interest rate ended after a very short period of time, the borrower's payments did not immediately change to reflect the new interest rate. Rather, the borrower was given four payment options each month: (1) a minimum payment that covers none of the principal and only a part of the interest due that month; (2) an interest-only payment; (3) a payment that is amortized to pay off the loan in 30 years; and (4) a payment that is amortized to pay off the loan in 15 years.  Each time a borrower made only the minimum monthly payment, which, consistent with Defendants' sales strategy, borrowers routinely did, the principal loan balance increased, as did the interest payments next due.  This further increased the amount of the fully-amortizing payments the loan eventually required for repayment.

165.     According to a former branch manager who was employed with Countrywide from 1995 through 2005  ("CW3"), Countrywide management made a "big push" to sell ARMs so that Countrywide could get in with a low interest rate, knowing that those borrowers would

soon return for new loans when the rates adjusted and the borrower experienced payment shock. CW3 stated that borrowers qualified on ARMS when "they were tight on qualifying" because the borrower's income could support the initial lower payments, even though they could not have qualified for the same dollar amount loan with a fixed interest rate. CW3 often heard loan officers advising borrowers that they could refinance when their loan adjusted and their interest rate increased. According to CW3, Countrywide management was well aware of these tactics. Management, however, assumed the buyer would refinance or sell before the rate reset, or simply did not care what happened to the borrower because, by the time the rates did reset, Countrywide would have passed the risk of default on to investors either by selling or securitizing the loan.

166.     Defendants also offered a plethora of other predatory mortgage loan products to FHA protected borrowers, including high loan-to-value (LTV) (up to 100%) financing and low-documentation and no-documentation loans, which they knew posed serious risks.

167.     At the time they originated such loan products, funded others to make them, and/or purchased such loans to be pooled and resold into securitizations, Defendants all knew or were reckless in not knowing that borrower "payment shock" -- a large increase in borrowers' monthly mortgage payments – would result from the scheduled increases to the interest rate and, in the case of Pay Option ARMS, were further magnified by negative amortization.

168.     The loan products, themselves, were not the only problem. As also alleged below, at the same time, Defendants also all knew or were reckless in not knowing that their (and their correspondent lenders') compensation and underwriting practices, policies, and procedures, allowed and even encouraged predatory and discriminatory mortgage loans to be routinely made at maximum loan to value ratios, minimum income to debt ratios, unverified income levels,

and/or by qualifying borrowers based on their ability to make payments based only on the initial teaser interest rates, all in complete disregard for borrowers' ability to repay the loan.

169. This type of predatory mortgage lending engaged in by Defendants is known as "equity stripping." In essence, Defendants willfully disregarded borrower ability to repay the loans made to them. Instead, Defendants relied on the ability of the mortgage lienholder to recoup the value of the loan and various fees charged to it – if not also further profit –from foreclosure on the underlying real estate asset securing the loan in the likely and anticipated event of borrower default. According to CW1, "[t]he subprime market as a whole was about equity stripping."

170. The results of such reckless, if not willful, predatory lending behavior is reflected in the unprecedented, but nonetheless foreseeable, default rates on all of Defendants' ARM products. For example, by October of 2009 *74% of borrowers* in Countrywide's active two-year hybrid ARMS were in delinquency or default, and approximately **51% of *borrowers*** in Countrywide's active three-year hybrid ARMs were in delinquency or default. These exorbitant default rates contrast sharply with the delinquency or default rate of only 13% for borrowers with fixed rate mortgage loans during the same time period.

171. Once these predatory subprime and higher cost mortgage loan products were originated – regardless of whether originated in-house or through Defendants' correspondent and wholesale lending channels - Defendants then repackaged, securitized, and sold most of those loans as quickly as possible. This allowed Defendants to reallocate their capital immediately to make more loans and earn more fees in the process while knowing, or recklessly not knowing, that such loans likely would fail.

172.    As further alleged below, Defendants' respective subprime and higher cost mortgage lending activities, and their efforts to maximize profits through them, fostered, encouraged, and relied upon a variety of predatory and discriminatory behavior by Defendants' employees that violated the Fair Housing Act.

173.    As also further alleged below, Defendants were well aware of the predatory and discriminatory nature of the subprime and higher cost loans they purchased through their correspondent and wholesale lending channels.  In addition to requiring correspondent lenders to meet Defendants' underwriting guidelines, Defendants underwrote and/or reviewed the loans generated by correspondent lenders and brokers before purchasing them.  Further, Defendants performed due diligence on their brokers and correspondent lenders, which included reviewing marketing materials.  For example, according to CW8, other First Franklin employees reviewed the marketing materials of brokers who originated loans on behalf of First Franklin.  First Franklin employees were not allowed to generate and use their own marketing materials without approval from First Franklin attorneys. And, according to CW8, loan products were offered to brokers based on investor guidelines, including guidelines promulgated by Defendant Merrill Lynch.  These guidelines permitted stated income loans, no money down loans, and loans to borrowers with FICO scores as low as 580. In fact, First Franklin offered a 100% stated income loan, but there was a requirement to document assets, although the assets did not have to be verified for seasoning or source. True no documentation loans with no asset information had a 95% loan-to value limit. Thus, Defendants also are liable for the loans they purchased or funded because they were made pursuant to Defendants' own underwriting guidelines and Defendants had the opportunity to review those loans and the practices of their brokers and correspondent lenders.

1.    **The Countrywide and Bank of America Defendants Directly Targeted FHA Protected Minority Borrowers**

174.    As alleged in detail in paragraphs 117-126 and 130-131 above (and as reflected in Exhibits A & B attached hereto), Defendants Countrywide and Bank of America made clear both their intention and their methodology to focus their subprime and higher cost mortgage lending efforts on prospective minority borrowers – admittedly targeting borrowers who were typically living in urban areas, who have less access to traditional credit, limited credit histories, lower incomes, lower credit scores and homes with lower values but, relatively untapped home equity.

175.    FHA protected mortgage loan borrowers were susceptible to the intentional targeted marketing efforts of the Countrywide and Bank of America Defendants, as well as predatory subprime and higher cost mortgage lenders in each of the Defendants' correspondent and wholesale lending channels.  This is because, as generally known to Defendants, such FHA protected minority borrowers traditionally: (a) lacked access to low cost credit; (b) lacked strong relationships with traditional depository institutions; and/or (c) lacked adequate comparative financial information, access to such information and/or financial sophistication (particularly in the case of minorities whose first language is not English or have not achieved a high level of education), such that they could not adequately evaluate the terms, conditions and risks of the mortgage loan agreements they were entering into.

176.    Because historical housing patterns and segregation had created communities and neighborhoods of high minority population concentrations, those communities and neighborhoods provided an efficient means for Defendants to target potential borrowers seeking to refinance their home loans, consolidate consumer loans, or obtain credit for consumer spending by utilizing their existing home equity.

177.    Well aware of the California "housing bubble" as early as 2003, Defendants –

particularly Countrywide – increased their marketing and lending penetration into high minority

communities across the United States, including in Plaintiff's communities, where home values

were relatively lower, home prices had not appreciated as rapidly as in other market segments,

and such homes had available untapped equity.

178.    Countrywide and Bank of America directly targeted minorities with written

solicitations, including home loan pre-approval letters, internet advertising, and localized

community-based marketing techniques, including hiring minority employees to market products

in minority neighborhoods, and launching bilingual marketing campaigns, including providing

Spanish-language websites and publications, after identifying minority communities and

individual prospective borrowers.  This kind of direct targeting provided the quickest and easiest

path – i.e., the path of least resistance – to obtain as rapidly as possible the most borrowers who

were most likely to accept the terms of Defendants' predatory mortgage loan products.  Bank of

America even had a devoted "Fair Lending Group" that targeted African American and Hispanic

borrowers with loan products, including mortgages, according to CW7.  Interestingly, CW11 and

another former Sales Manager with First Franklin ("CW12") related that marketing materials,

loan applications, and good faith estimates were produced in borrowers' native languages, but

the final loan documentation was not produced in the native language for these same borrowers.

179.    From January to December 2008, Bank of America was ranked 17 among the top

25 Hispanic advertisers. *See* http;//www.media-economics.com/news/ HWM/HWMNews2009-

02-09.html. In addition, a Hispanic advertising market circular describes Bank of America as the

leader among banks for the first quarter 2008 in Hispanic magazines and newspapers advertising.

180.    As described in the publication "*Using Data Mining Technology to Identify and Prioritize Emerging Opportunities for Mortgage Lending to Homeownership-Deficient Communities*" ("Using Data Mining"), Bank of America utilized a variety of data sources, including prospective borrower credit information, data mining techniques (with the assistance of SAS Enterprise Miner software), and other sophisticated predictive behavior modeling and regression analysis techniques to identify potential minority borrowers and communities where Bank of America could maximize its loan originations. Bank of America also partnered with Epsilon, which aggregated consumer credit score data and other data for use by Bank of America in its targeted marketing strategies.  Bank of America eventually became Epsilon's largest database and marketing services client.

181.    *Using Data Mining* even pitches that "Bank of America has a staff of specialists and mortgage loan programs especially geared towards assisting applicants who are often times constrained by a variety of circumstances.  Bank of America remains committed to finding solutions to make the dream of homeownership become a reality for residents in all of the communities that it serves."

182.    Adding insult to injury, Bank of America directly originated many predatory and discriminatory subprime or higher cost mortgage loans under the purported cover of its Community Reinvestment Act lending program.

183.    To help overcome the historical reluctance of traditional lenders to make loans in minority communities (whether because of prejudice or lack of profit incentive given lower average real estate values and higher credit risk borrowers) - – i.e., "redlining" -- the Community Reinvestment Act ("CRA") was enacted by Congress in 1977, 12 U.S.C. § 2901, to incentivize

federally-regulated banks and savings and loan institutions to make residential mortgage loans, consumer loans, and commercial loans into predominantly minority communities.

184.    Historically, the relatively small number of CRA loans made were kept on a lender's books and were properly underwritten (i.e., were not predatory) to comply with CRA regulations, avoid regulatory supervisory actions, and prevent financial loss to the lender due to default.  Thus, *CRA loans typically have much lower default rates than subprime or higher cost loans and certainly loans that are predatory*.  While CRA lending helped make safe credit available to minority communities, mortgage lending deregulation in the 1980's set the stage for a boom in predatory, subprime mortgage lending in minority communities, which, historically, were in need of credit.

185.    Publicly stated CRA lending commitments were particularly important to lenders like Defendant Bank of America during the relevant time period at issue here because Bank of America was in the process of tremendous growth and expansion through acquisition of existing bank charters, opening new charters, and/or expanding their charter through new branch openings. Bank of America's regulators were required, as part of the approval process for such expansion, to review and consider Bank of America's compliance with the CRA and to consider public commentary regarding such compliance.  Thus, to satisfy consumer lending and minority advocacy groups in connection with Bank of America's planned acquisition of Fleet Boston in January 2005, Bank of America touted its commitment to make *$750 billion* in CRA loans.

186.    In its January 2005 press release announcing the $750 billion CRA commitment, Bank of America proclaimed: "We are determined to be the number one community development lender and the bank of choice in our growing ethnically and culturally diverse markets."  This statement reflected Bank of America's intent to target minorities for sale of its

mortgage loan products, with its CRA commitment serving as a smoke screen cover for any improper loan origination activities.

187.    But many of the mortgage loan products Bank of America originated or funded and improperly credited to its CRA lending commitment under "community development" and pro home ownership rhetoric were not CRA compliant. In fact, the loans were predatory in nature and consequently defaulted at high rates, and were not retained by Bank of America, which had profiteered from them through its securitization activities.  As disclosed to the FCIC in June 2010, almost 17 percent of the low- and moderate-income loans Bank of America originated between 2004 and 2007 were delinquent at some point for 90 days or more, and it had retained only about fifty percent of those loans on its balance sheet, having either sold or securitized the rest.

188.    Incredibly, in the third quarter of 2008 Bank of America then apparently tried to pin blame for the higher losses it had sustained in its residential mortgage portfolio on its CRA borrowers, stating that while its CRA loans constituted only 7 percent of its owned residential-mortgage portfolio, they represented 29 percent of that portfolio's net losses.  This apparent blame-shifting tactic is disingenuous considering that Bank of America's compliant CRA loans were typically made at low, unprofitable, interest rates and properly underwritten from the outset so that Bank of America could obtain favorable CRA review ratings from its regulators.

189.    According to the then-Comptroller of the Currency in 2008, John C. Dugan, CRA loans were "not the culprit behind the subprime mortgage lending abuses, or the broader credit quality issues in the marketplace." Indeed, an extensive study of the CRA conducted for the Federal Reserve showed that CRA did not exacerbate the foreclosure crisis in any meaningful way.

66

190.    Countrywide also directly targeted FHA protected borrowers. According to a former employee of Countrywide who later joined Bank of America when Bank of America acquired Countrywide ("CW7"), Countrywide's marketing to the Hispanic community was "sophisticated."   He stated that Countrywide had a stated goal of making home ownership possible for Hispanic borrowers and marketed to the Hispanic community in at least four different ways: (1) Countrywide board member Henry Cisneros was on the board of directors at Univision, and the two companies had a co-branding agreement, which included Countrywide advertising on the Univision website; (2) Countrywide partnered with community-based real estate agents because one of the most effective ways of reaching Hispanic borrowers was by forging relationships with the real estate agents Hispanic borrowers trusted; (3) Countrywide used its call centers and Acxiom to profile Hispanic borrowers based on surnames; and (4) Countrywide targeted the Hispanic community through a regularly-updated and fully-functional Spanish language website.

191.    According to CW3, Countrywide also hired African American and Latino account executives with the intent that these account executives would market and sell Countrywide loans to African American and Latino borrowers in their communities.

192.    Another former Countrywide loan officer who was employed with Countrywide from 2006 and later employed by Bank of America following its acquisition of Countrywide ("CW5") has stated that Countrywide targeted Hispanic borrowers by creating a Spanish-speaking department that Spanish-speaking borrowers could contact directly for mortgage loans.

193.    Furthermore, according to a former employee at a division of Countrywide known as Full Spectrum Lending who was employed from 2004-2005 ("CW1"), Countrywide targeted for refinances current Countrywide mortgage holders who had missed payments.  Countrywide,

67

through Full Spectrum, would contact these borrowers to inquire as to why they had missed payments and to ask about the challenges they were facing, particularly whether they were having trouble making their m mortgage payments because of their credit card payments. Full Spectrum would then offer these borrowers a new mortgage with cash back to pay off their credit cards. Another former Countrywide employee who was employed with Countrywide from 2005-2006 ("CW2") confirmed that Countrywide targeted borrowers to convert their unsecured credit card debt into debt secured by their homes. According to CW2, Countrywide sent targeted advertisements for home equity lines of credit (HELOC") to CapitalOne credit card holders. CW2 was told to inform these potential borrowers that they could convert their high interest credit card debt into secured debt at a lower interest rate with a Countrywide HELOC. These new HELOC loans were offered to borrowers with a low introductory rate for just six months that automatically escalated at the end of the introductory period. In cases where Countrywide refinanced the unsecured debt into secured debt, the costs associated with the refinancing, which were higher with Countrywide than with many other lenders, were added to the borrower's loan. This targeted marketing of higher cost loans effectively stripped the equity that the borrowers had in their homes.

194. Merrill Lynch affiliate First Franklin also targeted FHA protected borrowers. According to a former First Franklin Account Executive ("CW8"), First Franklin brokers targeted FHA protected borrowers for non-prime mortgage loans. As a general matter, First Franklin brokers pursued members of their own communities. For example, Spanish-speaking brokers targeted Hispanic borrowers, Polish brokers sold to Polish borrowers, and Russian Jewish brokers sold to Russian Jewish borrowers.

68

2.      **Defendants' Discretionary Pricing Policies Resulted in Predatory Mortgage Lending on a Discriminatory Basis**

195.    The Countrywide Defendants, Bank of America Defendants (directly and through its correspondent lenders Countrywide, Ameriquest, New Century and First Franklin), and the Merrill Defendants (through its correspondent lenders First Franklin and Ownit) at their respective corporate levels each set rates, fees, and terms on higher cost, subprime, and ALT-A loans, which were distributed on rate sheets provided to Defendants' employees, branch managers and network of brokers and correspondent lenders.

196.    Through a two-step process, Defendants' discretionary pricing policies expressly authorized and encouraged discretionary finance charges, including higher fees at closing, additional or add-on fees, higher interest rates, and/or other discretionary charges in order to maximize their profits, placing their interests ahead of their borrowers.  For instance, CW1 recounted that Countrywide charged as much as $10,000 in title fees, an amount that greatly exceeded what typical title fees would be.

197.    According to CW1, one borrower with Countrywide who refinanced her mortgage three times with Countrywide and who never took an equity cash-out payment for herself, ultimately owed $50,000 more after the refinancings strictly because of the exorbitant fees Countrywide tacked on for the refinancings.

198.    These additional discretionary charges were collected at the time the loans were originated, and continue to be collected during the servicing of both nonconforming mortgage loans and mortgage loans underwritten using GSE underwriting guidelines, which Defendants directly originated and/or funded through their correspondent and wholesale lending channels disproportionately with minority borrowers both nationwide and in Plaintiff's communities.

199.    Once a loan applicant provided credit information through a loan officer, mortgage broker, or correspondent lender, Defendants performed an initial objective credit analysis.  At this point, Defendants evaluated various traditional, objective, risk-related credit variables relating to the prospective borrower, including the borrower's debt-to-income ratios, the borrower's home's loan-to-value ratios, the borrower's credit bureau histories, FICO scores, debt ratios, bankruptcies, automobile repossessions, prior foreclosures, and payment histories, among other things.  From these objective factors Defendants derived a risk-based financing rate referred to in the mortgage industry as the "par rate," which they regularly communicated to their loan officers, branch managers and correspondent lenders.

200.    However, via "rate sheets" and other written communications made in conjunction with the par rates, Defendants regularly communicated, simultaneously encouraged, and automatically authorized their loan officers, branch managers and correspondent lenders to mark up the par rate and impose additional subjective charges, yield spread premiums and other discretionary fees and costs on mortgage loans offered to FHA protected minority borrowers that were not based on any particular or appropriate credit risk factor – i.e., "overages." Many such loans, but necessarily all of them, were classified by Defendants as subprime or "high cost" loans and are tracked in the HMDA data Defendants are required to collect, maintain and report to HMDA.

201.    As numerous former employees of Defendants have related, employee and broker compensation was tied to the profitability of the loans issued.  The more expensive the loan was for the borrower and the less documentation the loan had, the more profitable it was for the originator.  Likewise, according to CW2, institutions, including Countrywide, were offering zero-doc, pay option loans with four points on the back-end.  Thus, a broker would earn a

commission equal to four percent of the loan just for getting a borrower to accept one of these dangerous, predatory loans. Further, according to CW2 and CW11 if the broker enticed a borrower to accept a loan with origination points or a rate higher than the par rate or a loan with pre-payment penalties, the broker's compensation increased.

202. Furthermore, according to CW11, brokers also earned additional fees by regularly refinancing customers. Countrywide did not require that there be a net tangible benefit to refinancing borrowers in the form of a reduction in interest rate or payment. As such, brokers were able to reap a substantial benefit in terms of fees by refinancing borrowers without any benefit whatsoever to the borrower.

203. Bank of America also rewarded brokers with yield spread premiums for placing borrowers in higher interest rate loans, according to CW9.

204. According to CW8, Merrill Lynch, through First Franklin, followed a similar model whereby First Franklin provided tiered rate sheets to its brokers and encouraged them to sell higher interest rate loans to borrowers by awarding yield spread premiums to brokers who did so. This practice encouraged brokers at First Franklin to lead borrowers into accepting loans with higher interest rates. One of these incentives was designed to generate loans earlier in the month in order to keep the pipeline full. Additional incentives were paid through the yield spread premium to brokers who brought First Franklin more expensive, or higher cost, loans. CW12 has related that brokers who submitted loans to First Franklin would ask the underwriters to ensure the loans would be structured with the "maximum points RESPA [Real Estate Settlement Procedures Act] would allow" to increase the broker's own compensation. A former loan account manager with First Franklin ("CW10") added that brokers were not eligible for yield spread premiums if they allowed borrowers to buy-out of the pre-payment penalties that were

built into the loan programs that First Franklin offered to brokers. Employees and brokers were therefore encouraged to sell higher-priced loans in conflict with the borrowers' best interests.

205. According to CW12, many of the minority borrowers who received loans from brokers who originated loans on behalf of First Franklin were nudged into stated income loans, even when the borrower could have qualified for less expensive full documentation loans, because brokers typically made more money on stated income loans. Some brokers, according to CW12, never even learned how to do full documentation loans.

206. CW12 stated that First Franklin account executives' compensation structure motivated them to seek the business of larger brokers or brokers with high loan volume, and many of these brokers were engaging in predatory lending. According to CW12, there were no policies in place at First Franklin to prohibit account executives from working with brokers who were engaging in predatory lending nor were account executives trained to identify and avoid predatory lending.

207. CW11 also recalled instances in which brokers increased the borrower's loan amount and fees immediately prior to the scheduled closing. In such instances, borrowers did not have sufficient time to review the fees assessed in conjunction with their loans.

208. When mortgage loans made to FHA protected borrowers contained such marked up interest rates that resulted in a yield spread premium payment to Defendants, Defendants received additional income because the yield spread premium-affected borrower is locked into a higher interest rate going forward on their mortgage loan than they would otherwise pay if they had been placed in a par rate loan without an additional rate mark up.

209. Thus, Defendants' discretionary pricing and related compensation policies monitored, authorized, and provided financial incentives to Defendants' loan officers, branch

managers, and correspondent lenders to make subjective price adjustments to the loans they generated. For example, Countrywide regularly calculated a "Net Price Exception" ("NPE") for each retail loan that it funded, subsequent to origination, which approximates the amount by which the total cost of the actual loan differs from the total cost of the loan on the par rate sheet.

210.    As alleged in a recently settled (for $335 million) complaint filed by the Department of Justice against Countrywide, Countrywide had engaged in a pattern or practice of discrimination (through its own origination activity and through its correspondent lenders) in violation of the FHA for discriminatorily originating higher cost and subprime mortgage loans to minorities.   According to the complaint, the DOJ's analysis of Countrywide's HMDA data demonstrated statistically significant discriminatory pricing disparities in Countrywide's retail mortgage loans generated between 2004 and 2008 on both a national and local level in numerous geographic markets across the United States.

211.    The DOJ complaint alleged that Countrywide charged Hispanic and African America borrowers significantly more in pricing adjustments not based on credit risk factors than it charged to White borrowers.   Based on the loans examined, for Hispanic borrowers the statistically significant annual NPE difference ranged between 15 and 28 basis points and for African American borrowers the difference ranged between 13 and 24 basis points.   The DOJ complaint also alleged that for loans sourced through Countrywide's mortgage brokers, African-American and Hispanic borrowers were more than "twice as likely to be placed in subprime loans than non-Hispanic White borrowers who had similar credit qualifications."

212.    In addition, Defendants included pre-payment penalties in many of their subprime mortgage loan products either to control the borrowers' refinance of the loan or to generate additional fee income when borrowers refinanced their loans with other lenders.

213.     FHA protected minority borrowers in Plaintiff's communities and neighborhoods have paid and continue to pay discretionary fees and costs from loans originated by Defendants that have inflated those borrowers' ongoing finance charges payable throughout the servicing period of the loan. Thus, each payment by a borrower over the life on such a mortgage loan made by Defendants continues to perpetuate the predatory terms of the underlying loan as it was originated, perpetuates Defendants' scheme in making such loans, and further financially benefits Defendants as they continue to earn fees servicing the loan.

214.     Such predatory, subjective loan pricing - which by design imposes differing finance charges on persons with the same or similar credit profiles - disparately impacts FHA protected minority borrowers in Plaintiff's communities and neighborhoods.  As the HMDA data reflecting Defendants' lending patterns further alleged herein (and HMDA data analyzed by the Federal Reserve) indicates, minorities – even after controlling for credit risk – have been substantially more likely than similarly situated non-minorities to pay such charges that are built into Defendants' subprime or "high cost" loans.

215.     Because of Defendants' increased fees and costs built into such loans, along with Defendants high loan to value lending practices (particularly in cash out refinance transactions and home equity loans), FHA protected minority borrowers often had no equity or negative equity in their home upon the closing of Defendants' mortgage loans to them.  As a result, FHA protected borrowers were dependent upon an appreciation in the home prices to pay for such loans or refinance them at a later time, while Defendants also knew that such appreciation would not continue because of the housing bubble and eventual housing price collapse that began to appear in California as early as 2005 and elsewhere in 2006.

74

216.     Defendants took no precautions to avoid this result and instead acted at all times with reckless disregard of it and of FHA protected borrowers' ability to repay their loans. Indeed, despite their knowledge of the housing bubble, Defendants willfully continued to make equity stripping subprime and higher cost loans to FHA protected minority borrowers in Plaintiff's communities and neighborhoods in total disregard for the consequences.

217.     Defendants' discretionary pricing policies ultimately caused FHA protected minority borrowers in Plaintiff's communities and neighborhoods to pay higher costs for obtaining mortgage loans than similarly situated Caucasian borrowers with identical or similar credit scores credit upon the issuance of the mortgage loans and on an ongoing basis throughout the servicing period of the loan.

218.     According to CW1, Countrywide had no real policy in place to prevent FHA protected borrowers from paying higher prices for mortgage loans.  Thus, "people in minority neighborhoods [paid] higher prices" for Countrywide mortgage loans than in non-minority neighborhoods.  Similarly, neither Bank of America, Merrill Lynch nor their correspondent lenders and brokers at issue here, had policies specifically designed to prevent FHA protected borrowers from paying higher prices for mortgage loans, of if they had such policies, they were either not enforced or intentionally avoided.

219.     As a result of the predatory discretionary loan terms, higher loan costs, and reduced home equity related to such discretionary pricing policies, Plaintiff's communities and neighborhoods with higher percentages of FHA protected minority borrowers have experienced a greater rate of mortgage delinquencies, defaults and home foreclosures on the loans Defendants were responsible for.  This, in turn, has caused a downward spiral of additional mortgage delinquencies, defaults and home foreclosures in Plaintiff's communities and neighborhoods

both with higher percentages of FHA protected minority borrowers as well surrounding areas that have lower percentages of FHA protected minority borrowers.

220.    The discretionary pricing policies described herein constitute patterns or practices of discrimination because, as an integral part of the Defendants' business models, it was the standard operating procedure of Defendants that had a disparate impact on minority borrowers.

221.    Application of the Defendants' discretionary pricing policies, and the accompanying impact on minority borrowers, was not a sporadic, isolated practice, rather it occurred every day that loans were extended, renewed or continued during the relevant period.

222.    Defendants' employment of their discretionary pricing policies means that minority borrowers are subjected to increased mortgage-related costs, in the form of higher interest rates and ongoing payments than would be the case in the absence of discrimination.

223.    But for the effects of Defendants' discretionary pricing policies, i.e., the ongoing higher interest rates and payments, the foreclosure rate among the Defendants' minority borrowers would have been lower.

**3.    Defendants Lowered and Circumvented Their Underwriting Standards and Ignored or Fostered the Fraudulent Inflation of Property Appraisals**

224.    Long before the relevant period, Defendants had established at the corporate level, and had maintained, uniform underwriting standards (generally in line with the standards established by GSEs, Fannie Mae and Freddie Mac) that were distributed to and utilized by their employees, managers, brokers and correspondent lenders.

225.    However, in order to increase their production of equity stripping subprime and higher cost loans to maximize profits (both in origination, securitization and servicing activities) while home prices remained at historical highs, beginning no later than 2004 and escalating

through 2006, Defendants reduced their underwriting standards or engaged in various practices to circumvent or override them.

226.    Defendants' changes to their underwriting policies were designed to, and did, authorize and encourage Defendants' loan officers and branch managers (and brokers and correspondent lenders) to approve mortgage loans or improperly increase loan amounts to under-qualified or unqualified FHA protected minority borrowers in order to make as many loans as possible and at the highest possible loan amounts.

227.    Critical to the underwriting process is the establishment of the value of the underlying real estate asset through property appraisals.  Like their underwriting policies, Defendants' standards for property appraisals became increasingly laxed, if not willfully fraudulent, during the relevant period in order to maximize loan amounts and/or establish adequate loan to value ratios (LTV) to meet even more relaxed underwriting guidelines.

228.    Thus, Defendants utilized appraisers who often asked the lending staff "what they were looking for" in terms of appraisal value in order to complete the transaction and then did what they could to derive an appraisal value that met the expectations of Defendants' lending staff.  Thus, in the 2005 and 2006 timeframe Defendants were well aware that the appraisals were "coming in high."

229.    As described by Patricia Lindsay, a former wholesale lender who testified before the FCIC in April 2010, appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value." *See* Written Testimony of Patricia Lindsay to the FCIC, April 7, 2010, at 5.

77

230.    Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his testimony to the FCIC, "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again …. [T]oo often state licensed and certified appraisers are forced into making a Hobson's Choice.'" *See* Testimony of Jim Amorin to the FCIC, available at www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRANAIFATestimonyonMortgageReform042309final. pdf.

231.    In fact, a 2007 survey of 1,200 appraisers conducted by October Research Corp.—a firm in Richfield, Ohio that published *Valuation Review*—found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. The same study found that 75% of appraisers reported "negative ramifications" if they did not cooperate, alter their appraisal, and provide a higher valuation. This pressure succeeded in generating artificially inflated appraisals.

232.    Faced with this choice, appraisers systematically abandoned applicable guidelines and over-valued properties in order to facilitate the issuance of mortgages that could then be collateralized into mortgage-backed securitizations.

233.    Defendants knew that appraisers often "pushed the value" of the properties they appraised, effectively becoming advocates for higher loan values for the brokers that had referred them the business instead of objective appraisers of the true fair market value of the properties.

234.    Defendants have been sued by American International Group, as well as GSEs Fannie Mae and Freddie Mac, as well as other third parties that have purchased or insured pools of mortgage loans originated, funded, purchased, and/or securitized by Defendants.   Those

complaints allege that Defendants either knew of, or were complicit in, inflated appraisals underlying the individual mortgage loans in the loan pools they purchased or insured.

235. Defendants' employees frequently also made "business decisions" to override Defendants' underwriters to approve the loans particularly when such loans originated from brokers that were responsible for a significant amount of business.

236. To the extent Defendants would rely on any compliance training for its loan officers, loan processors, underwriters, managers and correspondent lenders, to demonstrate that Defendants' corporate policies discouraged the discriminatory and predatory lending at issue here, Defendants' corporate culture, actual operating practices, and compensation structure all ran counter to any such compliance training that Defendants may have conducted rendering such training irrelevant.

### a. Countrywide Loosened Underwriting Standards and Abused Its Appraisal Process

237. Countrywide used an automated underwriting system known as "CLUES" to underwrite loans. The CLUES system applied the principles and variables set forth in the Countrywide underwriting manuals and its loan program guide. CLUES applied an "underwriting scorecard," which assessed borrower credit quality by analyzing several variables, such as FICO scores, loan to value ratios, documentation type (*e.g.*, full, reduced, stated) and debt-to-income ratios. These variables were weighted differently within the scorecard, depending upon their perceived strength in predicting credit performance. In underwriting a loan, Countrywide loan officers entered an applicant's information into CLUES, which would (1) approve the loan; (2) approve the loan with caveats; or (3) "refer" the loan to a loan officer for further consideration and/or manual underwriting.

238.     Instead of rejecting a loan if a requirement of Countrywide's guidelines had not been met or if CLUES calculated that the loan presented an excessive layering of risk, CLUES "referred" the loan to a loan officer for manual approval. The loan officer would request an "exception" from the guidelines from more senior underwriters at Countrywide's structured lending desk ("SLD"). Countrywide's level of exceptions was higher than that of other mortgage lenders. The elevated number of exceptions resulted largely from Countrywide's use of exceptions as part of its matching strategy to introduce new guidelines and product changes.

239.     In practice, this meant that Countrywide virtually abandoned underwriting in any meaningful way.   Contrary to its public assurances otherwise, Countrywide CEO Mozilo's mandate of a 30% market share required Countrywide to depart systemically from its underwriting standards and this resulted in a "culture change" starting in 2003. A former senior regional vice president was quoted in a January 17, 2008 *Business Week* article stating, "Programs like 'Fast and Easy' where the income and assets were stated, not verified, were open to abuse and misuse. The fiduciary responsibility of making sure whether the loan should be done was not as important as getting the deal done."

240.     Countrywide's "supermarket" or "matching" strategy -- whereby it would offer any product offered by a competitor -- was a key driver of the company's aggressive expansion of underwriting guidelines. For example, if Countrywide's minimum FICO score for a product was 600, but a competitor's minimum score was 560, the production division invoked the matching strategy to reduce the minimum required FICO score at Countrywide to 560.

241.     Countrywide's matching policy did not, however, end with the particular mortgage products offered on the market. Instead, Countrywide mixed and matched the individual *terms* offered by multiple lenders, taking the worst of each. The resulting composite

80

offering was thus *even more* aggressive than that of any one competitor who had a particular feature matched. Countrywide's aggressive mortgage products resulted in "layered" risks created by its undisclosed "matching" philosophy.

242.     Countrywide deployed its matching strategy by expanding the number of employees who could grant exceptions throughout the underwriting process.  A wide range of employees received authority to grant exceptions and to change the terms of a loan, including underwriters, their superiors, branch managers, and regional vice presidents. In this way, even if Countrywide's computer system recommended denying a loan, an underwriter could override that denial by obtaining permission from his or her supervisor.

243.     Countrywide routinely approved "exception" loans that did not satisfy even Countrywide's weakened "theoretical" underwriting criteria through a high-volume computer system called the Exception Processing System—but only after Countrywide charged these high risk borrowers extra points and fees. Countrywide made enormous profits from these higher fees. The Exception Processing System was known to approve virtually every borrower and loan profile with a pricing add-on when necessary, and was known within Countrywide as the "Price Any Loan" system.

244.     According to the SEC, in mid 2006 attendees at an internal Countrywide credit meeting were informed that one-third of the loans referred out of Countrywide's automated underwriting system violated "major" underwriting guidelines, 23% of the subprime first-lien loans were generated as "exceptions," and that "exception" loans were performing 2.8 times worse than loans written within guidelines. That the loans approved by exceptions were performing so much worse than other similar loans is itself strong evidence that the "exceptions"

were not being granted based on any purported countervailing circumstances in the borrowers' credit profile.

245. Ultimately, Countrywide's exception policy was designed to ensure that all loans were approved even if the borrower could never hope to repay the loan. For example, in an April 14, 2005 e-mail chain, various directors were discussing what FICO scores Countrywide would accept. One Managing Director wrote that the "spirit" of the exception policy was to "provide flexibility and authority to attempt to approve all loans submitted." Thus, according to one former Underwriter with Countrywide from 2005 to 2006 ("CW11"), Countrywide approved many borrowers with low credit scores.

246. An internal Countrywide document described the objectives of Countrywide's Exception Processing System to include "[a]pprov[ing] virtually every borrower and loan profile," with "pricing add on" (*i.e.*, additional fees) if necessary to offset the risk. The objectives also included providing "[p]rocess and price exceptions on standard products for high risk borrowers." In his testimony to the SEC, former Countrywide President David Sambol identified a February 13, 2005 e-mail he wrote that similarly said that the "purpose of the [Structured Loan Desk] and our pricing philosophy" should be expanded to so that "we should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal."

247. According to CW7, Countrywide also referred targeted borrowers who did not meet Countrywide's already laxed credit profile to its Full Spectrum Lending unit so that Full Spectrum Lending could issue the loan.

248. Another way Countrywide found to get around its "theoretical" underwriting policies was through the systematic abuse of no- and low-documentation loan processes. With

these types of loan products, the borrower is not required to provide the normal confirmations and details for credit criteria such as annual income or current assets. Low-documentation mortgages were originally designed for professionals and business owners with high credit scores, who preferred not to disclose their confidential financial information. Traditionally, these loans also required low loan-to-value ratios. According to CW11, however, there were many loans submitted by brokers and closed at Countrywide "that did not make sense," i.e. there was "no way the borrower made the amount of money" stated in the loan file.

249. When a Countrywide loan officer knew an application would not be approved on the basis of the applicant's actual financial condition, the officer often steered applicants into low-documentation products or "liar loans." Once in those programs, Countrywide coached borrowers on how to falsify the application to ensure it would be approved, and in some instances would even fill out the required misrepresentations without the borrower's knowledge. One Countrywide employee cited in the AIG Complaint estimated that approximately 90% of all reduced- documentation loans sold out of his office had inflated incomes. Furthermore, the AIG Complaint alleges that one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications. In addition to outright fabrication of information, Countrywide also failed to confirm that the information being provided to it by loan applicants was accurate. For full-documentation loans, Countrywide failed to verify that asset and income information being provided to it by borrowers was accurate, as required under those programs.

250. Perhaps even worse, according to CW11, there were times when a borrower's employment information was traced back to a company owned by the broker that submitted the loan to Countrywide. It was obvious according to CW11 that the borrower's stated place of

employment was "fake" or a shell company of some sort. These loans were nonetheless closed and funded. In fact, CW11 stated that sales personnel had instructed him and others to "go easy" on the review of loans submitted by certain brokers who generated a substantial amount of business for Countrywide.

251. CW5 confirmed that fraud occurred in mortgage applications Countrywide underwrote. CW5 recalled an incident in approximately July of 2007 in which a borrower originally indicated that he earned $60,000 annually. During the course of conversations with the borrower, CW5 learned that the borrower only earned half that amount and was therefore unable to afford the loan the borrower was seeking. CW5 declined to underwrite the loan, even after being instructed by his superior to complete the loan. When CW5 refused to do so, the loan was assigned to another loan officer to be completed with the inflated stated income of $60,000. In another instance, CW5 related that a borrower seeking to refinance a loan experienced his loan being converted from an FHA loan to a conventional loan despite the borrower having never signed any documentation to support the change. CW11 witnessed similar perpetrations of fraud in stated income loans. For example, CW11 recalled seeing the same income amount for multiple borrowers from the same broker because that amount would allow the borrowers to qualify for the loans they wanted, even though their actual incomes were much lower.

252. CW2 has similarly related that, while working as a mortgage broker who sold mortgages to Countrywide, his Countrywide account representative expressly told him that if borrowers could not qualify for the desired loan amount based on their actual income, CW2 should "take them no doc" because Countrywide did not want to see "low income" on applications.

253.    According to the complaint against Countrywide and Mozilo filed by the California Attorney General, a former supervising underwriter at Countrywide explained that the company declined to check bank balances for applicants applying for stated-income, stated-asset loans that provided account information. Countrywide also had the right to verify the income stated on a loan application by use of Internal Revenue Service data, but only 3% to 5% of the loans that Countrywide issued by 2006 were ever checked.

254.    For stated-income loans, where Countrywide promised that it would exercise discretion, during the 2005-2006 period the company directed loan officers to support their assessments by referring to the website www.salary.com. The website did not provide specific salary information for any particular borrower, but provided a range of salaries for particular job titles based upon the borrower's zip code. And even when the stated salaries were outside the ranges, Countrywide did not require its employees to follow-up with the borrower. This practice was reported by former employees cited in a complaint against Countrywide brought by the Illinois Attorney General.

255.    Countrywide's senior management imposed intense pressure on underwriters to approve mortgage loans, in some instances requiring underwriters to process 60 to 70 mortgage loan applications in a single day and to justify any rejections they made. This created an incentive not to review loans thoroughly but instead simply to rubber-stamp them "approved." That pressure even came from the most senior levels of management. According to the *Wall Street Journal*, a former executive reported that Sambol was "livid" at a 2005 meeting because call-center employees were not selling enough adjustable-rate mortgages, which were highly profitable for Countrywide.

256.    Countrywide also abused its appraisal process to approve as many higher cost and subprime loans as possible, particularly to FHA protected minority borrowers.

257.    In September 2006, Mark Zachary (former Regional Vice President of Countrywide), informed Countrywide executives that there was a problem with appraisals performed on KB Home properties being purchased with mortgage loans originated by Countrywide. According to Zachary, Countrywide executives knew that appraisers were strongly encouraged to inflate appraisal values by as much as 6% to allow homeowners to "roll up" all closing costs.  According to Zachary, this practice resulted in borrowers being "duped" as to the true values of their homes. This also made loans more risky because when values were falsely increased, loan-to-value ratios calculated with these phony numbers were necessarily incorrect.

258.    According to Capitol West Appraisals, LLC, a company that has provided real estate appraisals to mortgage brokers and lenders since 2005, and is a "review appraiser" for Wells Fargo, Washington Mutual, and other lenders, Countrywide engaged in a pattern and practice of pressuring even non-affiliated real estate appraisers to increase appraisal values artificially for properties subject to Countrywide's loans.  From at least 2004 through at least 2007 Countrywide maintained a database titled the "Field Review List" containing the names of appraisers whose reports Countrywide would not accept unless the mortgage broker also submitted a report from a second appraiser. No mortgage broker would hire an appraiser appearing on the Field Review List to appraise real estate for which Countrywide would be the lender because neither the broker nor the borrower wanted to pay to have two appraisals done. Instead, the broker would simply retain another appraiser who was not on the Field Review List.

259.    Because Countrywide was one of the nation's largest mortgage lenders, a substantial portion of any mortgage broker's loans was submitted to Countrywide. A broker

86

therefore could not rule out that Countrywide would be the ultimate lender, and because mortgage brokers knew from the blacklist that a field review would be required if a blacklisted appraiser were chosen, with the likely result that a mortgage would not be issued with that appraisal, and that its mortgage applicant would have to incur the cost of retaining another appraiser, such a broker had a strong incentive to refrain from using a blacklisted appraiser. By these means, Countrywide systematically and deliberately enlisted appraisers in its scheme to inflate appraisals and issue low quality, extremely risky loans.

260. Capitol West stated that Countrywide officers sought to pressure Capitol West to increase appraisal values for three separate loan transactions. When Capitol West refused to vary the appraisal values from what it independently determined was appropriate, Countrywide retaliated by placing it on the Field Review List after refusing to buckle under the pressure to inflate the value of the properties

261. According to Capitol West, Countrywide also created certain procedures to further enforce its blacklisting of uncooperative appraisers like Capitol West. Specifically, if a mortgage broker were to hire an appraiser that happened to be on the Field Review List, Countrywide's computer systems automatically flagged the underlying property for a "field review" of the appraisal by LandSafe, Inc., (LandSafe) a wholly owned subsidiary of Countrywide Financial.

262. LandSafe would then issue another appraisal for the subject property that, without exception, would be designed to "shoot holes" in the appraisal performed by the blacklisted appraiser such that the mortgage transaction could not close based on that appraisal. Indeed, according to Capital West, in every instance, LandSafe would find defects in the appraisal from the blacklisted appraiser, even if another, non-blacklisted appraiser had arrived at the same value

87

for the underlying property and the non-blacklisted appraiser's appraisal was accepted. According to Capitol West, this exact set of facts happened with respect to an appraisal it submitted after it was placed on the Field Review List.

263.    Several claims have been filed against Countrywide and related entities which describe individual homeowners' experiences with inflated property appraisals in obtaining mortgages from Countrywide. Such lawsuits include two class actions brought by homebuyers against KB Home, a building company that used Countrywide as its exclusive lender. Countrywide and its appraisal subsidiary, LandSafe, have also been sued by Fannie Mae and Freddie Mac investors for damages arising from inflated appraisals for property underlying mortgage packages sold to both Fannie Mae and Freddie Mac.

### b.    Merrill Lynch Abandoned its Underwriting Guidelines and Inflated Appraisals

264.    Merrill inflated its appraisals and caused lenders in its correspondent and wholesale channels to abandon their underwriting guidelines. Merrill's purpose was to increase loan volumes available for securitizations, therefore its profits.

265.    Former employees of Merrill's origination arms Ownit and First Franklin have confirmed that both Ownit and First Franklin abandoned their stated underwriting guidelines. For example, a former director at Ownit, whom is cited in the AIG Complaint, stated that during the relevant timeframe, there was such a strong demand for mortgage loans from Merrill that "there was more a quest for volume than for quality." Similarly, a former regional vice president at Ownit also cited in the AIG Complaint indicated that the pressure to deliver volumes of loans was so great that Merrill was essentially "screaming at [Ownit] to deliver product."

266. Former employees also confirmed that banks like Merrill were fully involved with and informed about the nature and quality of the loans being acquired from Ownit. Indeed, a former Ownit director identified in the AIG Complaint stated, "Someone from the [bank] buying [the loan pool] was always sitting in on the closing of the pools." Typically, the bank representative came from "credit risk side of the firm" and was involved "all the way through" the evaluation and purchase of Ownit's loans.

267. According to a May 8, 2007 article appearing in The New York Times, to further increase its production of subprime loans, Merrill instructed Ownit to increase its loan volume by weakening its underwriting guidelines to originate more "liar" loans for which no documentation was requested or required to substantiate the borrowers' oral representations of their annual earnings. Prior to Merrill's investment in Ownit in 2005, approximately 90% of Ownit's loans were fully documented. After Merrill asked for more stated income loans, the number of stated income loans climbed from almost zero to over 30%.

268. Based upon Merrill's request, Ownit also lowered the credit scores it required of its subprime borrowers. Thus, Ownit's average new borrower FICO score dropped from 690 to approximately 630. In comparison, the Federal Deposit Insurance Corporation defines a "subprime" loan as one for which the borrower has a FICO score of 660 or below. Merrill's instructions for Ownit to intentionally weaken its underwriting standards had an immediate and direct impact upon the performance of Ownit's loans. From December 2005 through May 2006, Ownit began to experience first payment default rates and early payment default rates (missing one of the first 3 payments) of 1% to 3%.

269. Another former employee of Ownit, a senior underwriter responsible for originating loans between September 2004 and July 2006 who is cited in the AIG Complaint,

89

revealed that Ownit loan officers were falsely inflating incomes on stated income loans and "fudging the numbers" to get the loans approved. A former loan funder with Ownit from December 2004 to December 2006, who was responsible for actually disbursing the funds to borrowers once a loan was approved, was also cited in the AIG Complaint as having personally observed stated income loan applications with questionable claimed incomes. For example, this former employee observed one loan application where a self-employed gardener claimed to be making $20,000 a month. When she brought this and other related issues to her supervisors, she was told to "mind her own business" and to just fund the loans that had already been approved.

270.    Merrill Lynch correspondent lender First Franklin offered loan products based on investor guidelines, including guidelines Merrill Lynch set, according to CW8.  These guidelines permitted stated income loans, no money down loans, and loans to borrowers with FICO scores as low as 580.  In fact, First Franklin offered 100 percent stated programs, meaning that income and asset claims in the loan files were not supported by any documentation.

271.    The AIG Complaint also cites a former senior underwriter with First Franklin until 2005 who disclosed that her branch manager would often override her decisions not to fund loans because First Franklin audited only about 5% of its closed loans, and the branch manager felt the odds that problematic loans he approved would be identified were low.  For example, this former employee recalled one instance where a borrower who worked as a cocktail waitress at a restaurant called Blueberry Hill (which she likened to the International House of Pancakes) claimed on the loan on her application to earn $5,000 a month. This former employee rejected the loan because she did not believe the claimed income was accurate. Another time, this former employee recalled a borrower who had an auto-detailing business who claimed to make $7,500 a

month. These loans were ultimately approved when her branch manager overrode her initial rejection of these loans.

272. A former mortgage funder with First Franklin from 2005 to 2007 ("CW4") stated that First Franklin specialized in no income, no asset loans and applied very lax underwriting standards. For example, CW4 witnessed loans go through without required signatures or needed follow-up on inspection reports. According to CW4, account executives with First Franklin pressured mortgage funders to overlook common requirements so that a loan could proceed as quickly and with as few questions as possible.

273. The former senior underwriter of Ownit, identified in the AIG Complaint, also disclosed that at Ownit the appraisal process was "owned by the loan officers" who enjoyed "a cozy relationship" with the appraisers. She stated that "excessive adjustments" were made to inflate appraisals and these adjustments were never challenged. As a result, Merrill could not and did not genuinely believe the appraisal values used to calculate LTV and CLTV statistics because it knew that property values were being purposefully and baselessly inflated to increase the amount of money that could be given to a borrower.

274. The AIG Complaint also details a former employee at First Franklin revealing that if an underwriter rejected a loan because it did not meet underwriting criteria, her manager would re-direct the loan application to a certain loan processor who would "sign behind your back." This former employee also recalled an instance where she was "one thousand percent convinced" that the income verifications submitted along with a loan were fraudulent, as the borrower's payroll deductions for Social Security and Medicare fell below the acceptable ranges for such deductions, resulting in an inflated net "take-home" pay for the borrower. She presented this

evidence to her manager, who rejected her concerns. The loan was approved even though this former employee believed the deductions were illegitimate and the paystub was fraudulent.

275.    A former underwriter with First Franklin from 2005 to 2007 cited in the AIG Complaint noted that similar problems plagued First Franklin's lending operation. Indeed, this former employee said that some of the lending practices at First Franklin were "basically criminal" and that First Franklin required its underwriters to depart from stated underwriting guidelines in a way "that we did not agree with, but had to do" in order to keep their jobs. With respect to the appraisal process, this former employee divulged that her managers would call appraisers directly if "they didn't get exactly what they wanted" and request a re-appraisal until a satisfactory number was returned. When she and another former underwriter "spoke out" about the problematic lending practices taking place at First Franklin, they were both fired for attempting to "blow the whistle" on the First Franklin's problematic lending practices.

276.    CW10 also revealed that, although comparable properties in an appraisal were supposed to be within one mile of the property at issue, appraisers would inflate values by using comparable properties further than a mile away from the subject property, even when homes within a one mile radius had recently sold for a more reasonable price and should have been used as comparables. Yet another former employee with First Franklin cited in the AIG Complaint also stated that her branch instructed appraisers to change their appraisals and omit certain key details. This former employee also revealed that her branch manager would pick certain appraisers because he knew they would return with favorable (and overstated) appraisals Finally, this former employee revealed that First Franklin's bonus structure motivated underwriters to close and fund as many loans as possible. For her part, this former employee received $50 for

every loan she closed and funded, ultimately making over $150,000 a year while at First Franklin, although her base salary was $55,000.

### c. Bank of America Abandoned its Underwriting Guidelines and Encouraged Inflated Appraisals

277. Like Countrywide and Merrill Lynch, Bank of America schemed to increase the volume of its higher cost and subprime loans it originated between 2004 and 2007. To keep pace with the market and to provide mortgage loans for its own securitizations, Bank of America departed from its own underwriting standards and encouraged inflated appraisals.

278. The FCIC reports that, in 2005, examiners from the Federal Reserve and other agencies conducted a confidential "peer group" study of mortgage practices at six companies, including Bank of America. According to Sabeth Siddique, then head of credit risk at the Federal Reserve Board's Division of Banking Supervision and Regulation, the study "showed a very rapid increase in the volume of these irresponsible loans, very risky loans. A large percentage of their loans issued were subprime and Alt-A mortgages, and the underwriting standards for these products had deteriorated." (FCIC Report, at 172, emphasis added.)

279. At the same time, Bank of America was providing mortgage loans to a risky class of borrowers that demonstrated a credit profile with an increased likelihood of default. As disclosed to the FCIC in June 2010, almost 17% of the low to moderate income ("LMI") loans originated by Bank of America between 2004 and 2007 were delinquent at some point for 90 days or more. (6/16/10 BoA letter to FCIC, Schedule 2.5.) Bank of America, however, retained only about 50% of those LMI loans on its balance sheet and either sold or securitized the rest. (*Id*.)

280. According to confidential witnesses interviewed in another lawsuit against Bank of America, Bank of America failed to adhere to sound underwriting practices and guidelines during the relevant time period. Like Countrywide, Bank of America employed a multiple step process for loan approval to increase the chances that a loan would be approved. In the first instance, borrower information was entered into Bank of America's "Desktop Underwriting" system. If a loan was rejected by this automated system, the loan would then be referred to a junior underwriter for manual underwriting. If a junior underwriter was unable to approve the loan, the application would be escalated to a more senior underwriter with greater "exception" authority.

281. Bank of America granted "exceptions" to stated underwriting criteria without evaluating a borrower's repayment capabilities or considering countervailing compensating factors. Indeed, one former Loan Processor/Junior Underwriter, who worked for Bank of America from early 2006 to 2008 and who is cited in the AIG Complaint, revealed that Bank of America used exceptions to stated underwriting guidelines to approve loans "quite a bit." That same former employee noted that the fact that an exception was used to approve a loan was not always noted in the loan file.

282. Another former Loan Processor/Junior Underwriter, who worked for Bank of America from 2003 to 2008 and who was also cited in the AIG Complaint, disclosed that loans were approved even when it was clear that the borrower lacked the ability to repay. For example, she recalled that many times loans were approved where the borrower was left with only $500 in monthly income after the borrower paid his or her monthly mortgage expenses.

283. Another former Loan Processor/Junior Underwriter, who worked for Bank of America in 2005 and who is also cited in the AIG Complaint, revealed that loan officers would

submit a loan application for one type of loan product and, if the application was rejected, the loan officer would submit the same application for a different product, which might also be rejected, only to be re- submitted yet again for another product until the loan was ultimately approved.

284.     In the words of a former Mortgage Underwriter with Bank of America from 2005 to 2006 who is cited in the AIG Complaint, Bank of America and its employees would do "whatever they could do to make loans"—loans that Bank of America would then securitize and sell to investors.

285.     Similar to Countrywide, Bank of America maintained an entire division dedicated to approving problem loans that were unable to be funded through the more routine—but already permissive—underwriting procedures described above.

286.     Severely credit-blemished loans were diverted to Bank of America's so-called "Plan C" group, which employed alternative underwriting criteria to approve and fund loans. Similar to Countrywide's exception-based Structured Loan Desk, Bank of America's "Plan C" group had even greater exception authority than senior underwriters, and the group's mandate was to find ways to fund loans that were rejected under Bank of America's stated underwriting guidelines— loans that one former Bank of America employee cited in the AIG Complaint believed, "should not have been funded under any circumstances."

287.     According to another former employee responsible for originating loans between 2005 and 2006 who is cited in the AIG Complaint, Bank of America's rationale for approving such loans was simply "if we didn't do it, someone else would," demonstrating that Bank of America also competed in the race to the bottom, abandoning its stated underwriting guidelines along the way.

288.     Numerous former employees have also revealed that Bank of America knew that borrowers were lying about their income to procure loans through the stated income loan programs. In fact, several former employees recounted instances in which they had actual knowledge that the income recorded by borrowers on their loan applications was false, but were told by their superiors to approve the loans anyway. In addition, former employees revealed that Bank of America loan officers themselves often inflated borrower income and "doctored the numbers" to get loans approved.

289.     Even worse, brokers who originated loans for Bank of America were not held to the same loose underwriting standards as Bank of America's retail loan officers, according to a former Bank of America Mortgage Loan Officer ("CW9").  Whereas retail loan officers were required at least to attend compliance training (while simultaneously encouraged by others to ignore such training), brokers were not even required to attend training.  Brokers and their sales personnel were able to target borrowers in any manner that they saw fit resulting in substantial risk in Bank of America's wholesale operations.

290.     Former employees with Bank of America have revealed that Bank of America pressured appraisers to inflate appraisals on mortgaged properties, which allowed borrowers to take out the loans for which they applied.

291.     According to a former employee with Bank of America from 2003 to 2008 who is cited in the AIG Complaint, it was common knowledge and widely understood that some Bank of America loan officers had "close relationships" with appraisers that allowed them to obtain inflated valuations. Bank of America loan officers would often call appraisers and tell them "I need you to come in at this amount."  The appraisers would then return with the requested valuation, allowing the loans to be approved. As a result, Bank of America knew that property

values were being purposefully and baselessly inflated in order to increase the amount of money that could be given to a borrower.

292.    Bank of America also enforced a 30-day rule, under which loan officers were required to collect all necessary documentation to close and fund a loan within thirty days.  If required documentation was not collected within the thirty days, loan officers were often directed to approve the loan anyway. Indeed, a former Loan Processor/Junior Underwriter with Bank of America from early 2006 to 2008 who is cited in the AIG Complaint noted several occasions where managers directed her to close and fund a loan after thirty days despite the fact that the loan was missing key supporting documentation.

293.    Bank of America also clearly knew that many of the subprime and higher cost loans it funded or purchased through its correspondent and wholesale lending channels did not meet its underwriting guidelines, but Bank of America purchased them nevertheless.

294.    According to an internal report prepared by Clayton (a third-party due diligence firm Bank of America used to review loan-level data on pools of mortgages it was considering purchasing) titled "Trending Report," 30% of the loans it reviewed "failed to meet guidelines." The report included a finding that these loans had been granted despite the lack of any purported compensating factors justifying an exception to the underwriting standards.  To create the report, Clayton analyzed about 10,200 loans originated for Bank of America between the second quarter of 2006 and the first quarter of 2007.

295.    A former senior project lead at Clayton from 2004 to 2009 who is cited in the AIG Complaint revealed that Bank of America was not actually interested in the fundamental credit quality of the loans reviewed during Bank of America's due diligence process. Indeed, this former Clayton employee revealed that a Vice President of Structured Products at Bank of

America specifically told him that he "didn't give a flying f*** about DTI" and other credit characteristics of the loans being reviewed. The Bank of America VP told this former Clayton employee that he did not care about elements of the loans like appraisals, DTI, or credit because, "we [Bank of America] can sell them [the loans] to whoever" and "we [Bank of America] can sell it [the loans] down the line."

296.   A review of just 100 sample loan files from Bank of America conducted by a plaintiff in a separate securities fraud action against Bank of America revealed violations of underwriting guidelines in 82% of the loans, including blatant misrepresentations of income, employment, and owner-occupancy. Representative examples included:

- *Misrepresentation of Employment*.  The borrower stated on the loan application that she was self-employed as a builder for 25 years, earning $35,000 per month, and the co-borrower stated that he was also self- employed as a builder earning $30,000 per month. The borrower also listed on the application that she had been the owner of her building/construction business for 25 years; however, her year of birth was 1971, which would have made the borrower *10 years old* when she became the owner of the business. Additionally, the loan file contained letters of incorporation for both the borrower and co-borrower's businesses with inception dates of 9/28/1993 and 2/26/2002, respectively. A reasonably prudent underwriter should have noticed that the age discrepancy was a red flag and questioned the validity of the information contained on the loan application. The loan defaulted.

- *Misrepresentation of Income*.  The borrower stated on the application that she was self-employed as a personal chef with a monthly income of $10,166.67, or $122,000.00 annually. The borrower's tax returns, *contained in the loan file*, showed a gross income for the entire year of 2007 of $3,126.00 for services as a personal chef, and $27,225 as a self- employed personal assistant. The borrower earned monthly income that was $675 less than the amount of the subject loan mortgage payment in the year following the mortgage closing. The borrower made only one payment on the mortgage, and defaulted.

- *Misrepresentation of Debt Obligations*.  The application failed to disclose that the borrower simultaneously closed on a second mortgage, originated by the *same lender*, in the *same condominium* complex. Public records showed that the Borrower acquired a mortgage on the same day as the subject loan for $414,000 with a monthly payment of $4,995 for a property located in Dallas, TX.  The origination underwriter failed to include the monthly payment in the borrower's

debt-to-income ratio ("DTI") for the subject loan, resulting in an imprudent underwriting decision. A recalculation of DTI based on the borrower's undisclosed debt, and recalculated income of $1,200 per month, yields a DTI of *1,129.08%*, which exceeds the guideline maximum allowable DTI of 55%. In the same file, the borrower stated on her loan application that she was an owner of a liquor store for 13 years, and stated her monthly income as $23,000 a month. $23,000 a month for an owner of a liquor store is unreasonable and should have put the underwriter on notice for potential misrepresentation. The borrower filed a Chapter 13 bankruptcy with the Central District of California Bankruptcy Court in October 2008.  Per the Statement of Financial Affairs, the borrower reported that she was retired and earned income of $14,400 annual or $1,200 per month for the year of 2006.  The loan defaulted.

- ***Excessive DTI***.  The lender's guidelines permitted a maximum allowable DTI of 55% for a stated income loan when the subject property was an investment property. The DTI was not accurate because the borrower's income for the year of the subject loan closing of 2006 was a ***loss*** of $200,684, or a monthly loss of $16,724 per month, and the borrower's total monthly debt was $7,878, meaning that the DTI could not be calculated because the income was ***negative***.  The loan defaulted.

- ***Underwriting Guidelines Breach***.  The lender's guidelines prohibited a loan amount greater than $400,000 for loans approved with a C or CC risk grade. The subject loan was approved as a C risk grade with a 5 x 30 rating due to unsatisfactory mortgage payments in the last 12 months on the borrower's secondary mortgage. Despite this requirement, the subject loan closed in the amount of $740,000, which exceeds the guideline maximum of $400,000.  The loan defaulted.

### d.    Defendants' Financial Incentives, Loosened Underwriting, and Inflated Appraisals Caused the Discriminatory and Predatory Lending that Harmed Plaintiff

297.    Defendants' predatory and discriminatory equity stripping scheme was carried out through the combination of Defendants' discretionary pricing policies, lowered underwriting standards, inflated appraisal practices and override policies.  All of these policies and practices were communicated throughout Defendants' operations and were enabled through the loan-related forms and agreements, including loan contracts, loan applications, and instructions on

completing loan applications and contracts, that Defendants disseminated to their employees, managers and correspondent lenders.

298.  Importantly, however, Defendants financially incentivized and encouraged their employees, branch managers and correspondent lenders to approve as many higher cost and subprime mortgage loans as possible, particularly including to FHA protected borrowers, through compensation schemes rewarding fee generation, loan volumes, and overages, while ignoring risk.

299.  Thus, in order to drive the volume growth of their higher cost, subprime and ALT-A mortgage loan business – and thus make more money - Defendants financially incentivized their employees, management and correspondent lenders to override and/or circumvent prudent underwriting practices, and place their own financial interests ahead of Defendants' borrowers.  The direct consequence of this is that Defendants and their correspondent lenders:

- intentionally steered FHA protected minority borrowers into higher cost, subprime, ALT-A or other mortgage loan products through various practices including failing to advise such borrowers of lower cost alternatives or advising such borrowers not to submit proof of income;

- intentionally originated to FHA protected minority borrowers higher cost, subprime, ALT-A or other mortgage loan products while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;

- intentionally originated to FHA protected minority borrowers loans on terms more unfavorable than loans made to non-minority borrowers who were similarly situated under traditional lending criteria;

- intentionally underwrote and originated to FHA protected minority borrowers higher cost, subprime, ALT-A or other mortgage loan products at borrowers' maximum income/debt ratios while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;

- intentionally underwrote and originated to FHA protected minority borrowers higher cost, subprime, ALT-A or other mortgage loan products for which they would not otherwise qualify for, and were unable to pay for, while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;

- intentionally underwrote and originated to FHA protected minority borrowers ARM loan products at borrowers' maximum income/debt ratios but at the teaser interest rates rather than the minimum anticipated adjusted rate after the initial teaser rate period expires while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products;

- intentionally underwrote and originated to FHA protected minority borrowers higher cost, subprime, ALT-A and even loans backed by Government sponsored enterprises (i.e., the Federal National Mortgage Association ("FNMA"), the Federal Home Loan Mortgage Corporation ("FHLMC"), and the Government National Mortgage Association ("GNMA") collectively, the "GSEs") at inflated amounts beyond the fair value of their homes and based on inflated appraisals while knowing the increased likelihood of delinquencies, default, foreclosures and home vacancies on such loan products; and

- included pre-payment penalties in the loan products issued to FHA protected minority borrowers.

300. Because of the higher origination fees charged with respect to such nontraditional loans, and the demand for such products in Defendants' securitization operations, employees and independent mortgage brokers were paid more when originating such nontraditional, predatory, subprime and higher cost loan products than when they originated standard loans.

301. For example, Countrywide paid its employees who originated loans in part based on the volume and dollar value of the loans they approved. A substantial portion of the salary of Countrywide's sales employees was based on commissions, which gave the employees a strong incentive to maximize sales volume and close the maximum number of mortgage loans regardless of quality. Countrywide's wholesale account executives, the employees who dealt with brokers, were paid only on commission—they had no base salary.

302. Adding a three-year prepayment penalty to a mortgage loan would generate an extra commission for the Countrywide employee of 1% of the loan's value.

303. Persuading someone to add a home equity line of credit to a loan carried an extra commission of 0.25%.

304. Countrywide also incentivized its brokers to systematically sell riskier products. A former Countrywide employee provided documents to the *New York Times* indicating that Countrywide's profit margins ranged from three to five percent on regular subprime loans, but on loans that included heavy burdens on borrowers, such as high prepayment penalties that persisted for three years, Countrywide's profit margins could reach as high as fifteen percent of the loan.

305. Former Countrywide mortgage brokers reported that brokers received commissions of 0.50% of the loan's value for originating subprime loans, while their commission was only 0.20% for less-risky loans.

306. Former Merrill executives have publicly acknowledged that Merrill's willful compensation and underwriting practices relating to its subprime lending and securitization business – that rewarded originators solely on volume, while disregarding borrower ability to repay – were flawed.

307. As former Merrill CEO John Thain commented in a September 2010 interview with the FCIC: "[W]hen you have a system where you pay someone for originating mortgages simply on volume and nothing happens to them if the credit quality is bad, and nothing happens to them if the borrower is fraudulent on his loan application, and nothing happens to him if the appraisal's fraudulent, then that's probably not a very smart system." (Thain Tr. 98:7-14, Sept. 17, 2010.)

308. A former First Franklin underwriter cited in the AIG Complaint revealed, for example, that certain fellow underwriters "would approve anything" because First Franklin's

102

compensation structure "created an incentive" to close risky loans and depart from stated underwriting practices. This former employee emphasized that the bonus structure was not based on the total number of loans reviewed within a month, which would include loans that were approved as well as loans that were rejected, but only on the number of loans that the underwriter actually funded and closed. She stated that the monthly bonuses for meeting volume targets were as much as $2,000 - $3,000 per underwriter, in addition to base salary.

309. The combination of such financial incentives with Defendants' discretionary pricing policies, lax underwriting and inflated appraisal practices created a *fait accompli* of predatory and discriminatory lending.

310. This caused FHA protected minority borrowers in Plaintiff's communities and neighborhoods to disproportionately receive higher cost and subprime mortgage loans they could not repay and which exceeded the values of their homes, ultimately stripping away their home equity.

311. As a result, Plaintiff's communities and neighborhoods with higher percentages of FHA protected minority borrowers have experienced a greater rate of mortgage delinquencies, defaults and home foreclosures on mortgage loans for which Defendants were responsible. This, in turn, has further driven the downward spiral of additional mortgage delinquencies, defaults and home foreclosures in Plaintiff's communities and neighborhoods.

**C. Empirical Data Evidences Defendants' Intentional Targeting Of, And The Discriminatory Impact On, Minority Borrowers in Plaintiff's Communities**

312. Defendants' intentional targeting of FHA protected minority borrowers in Plaintiff's communities, and the discriminatory impact on those borrowers from such lending, is

evidenced by the publicly available data Defendants themselves collected and reported pursuant to HMDA.

313.   However, because many loans with predatory loan terms many not be designated as "high cost" or "higher cost" by Defendants, and Defendants do not voluntarily report the number of their loans that contain predatory terms. In the HMDA data that Defendants did report, it underestimated the extent of the number of predatory loans Defendants actually made that are at issue here. Thus, discovery of all the electronic loan data Defendants maintain on each loan will provide the most accurate information.

314.   In its simplest form, however, the raw HMDA data reported by Defendants and their correspondent lenders clearly demonstrate that Defendants' higher cost, subprime, and ALT-A mortgage loan origination activity targeted FHA protected minorities within Plaintiff's neighborhoods and communities.

315.   Each of the Defendants' made far more of their total mortgage loans to FHA protected minority homeowners in Plaintiff's communities and neighborhoods than to non-minorities in light of the key comparative demographic -- single family, owner-occupied housing units -- in Plaintiff's communities and neighborhoods.

316.   Each of the Defendants' also made far more of their "high cost," higher cost, subprime and ALT A mortgage loans to FHA protected minority homeowners in Plaintiff's communities and neighborhoods than to non-minorities in light of the same comparative demographic in Plaintiff's communities and neighborhoods.

317.   And, as further alleged below relating to disparate impact, the overwhelming majority of the loans Defendants made to FHA protected minorities were in the highest

foreclosure rate census tracks in Plaintiff's communities and neighborhoods, which census tracks also generally contained the highest percentages of minority homeowners.

318.    Between 2004 and 2007 Defendant Countrywide originated at least 70,185 mortgage loans in Cook County and reported the minority status of the borrowers.  At least 47% of those loans (33,291 loans) were identified in HMDA data by Defendants as being made to minority borrowers.  However, the total percentage of Cook County housing units owned and occupied by minorities during that time was only approximately 22.6%.  Of the 70,185 loans that Countrywide made in Cook County and reported minority status on, Countrywide reported that 17,227 of them were high cost/subprime.  However, 11,180 of those loans (65%) were made to FHA protected minority borrowers.

319.    Similarly, during the same period, Countrywide reported the minority status on 61,381 loans that it purchased in Cook County.  21,753 of those loans, i.e., 35%, were originated to minorities.

320.    Defendant Bank of America itself originated at least 27,347 mortgage loans in Cook County during the same period for which it reported the minority status of the borrowers. 32% of those loans (8,823 loans) were identified in HMDA data submitted by Defendants as being made to minority borrowers, notwithstanding that only approximately 22.6% of Cook County's housing units were owned and occupied by minorities.

321.    Of the total loans Bank of America's primary correspondent and wholesale lenders originated in Cook County during this period, and minority status of the borrower was reported, Ameriquest made 52% (2,256 of 4,332 loans) of its loans to minority borrowers, New Century made 68% (9,106 of 13,422 loans) of its loans to minority borrowers, Accredited made

105

74% (7,887 of 10,620 loans) of its loans to minority borrowers, and Option One made 67% (4,408 of 6,568) of its loans to minority borrowers.

322. Bank of America's correspondent lender New Century reported the minority status on 1,836 loans that it purchased in Cook County during the same prior. 1,017 of those loans, i.e., 55%, were originated to minorities.

323. Of the total loans Merrill's primary correspondent and wholesale lender, First Franklin, originated in Cook County during the period, and also reported the minority status of the borrowers, First Franklin made 70% (1,533 of 2,199 loans) of its loans to minority borrowers. Of these total 2,199 loans, 2,169 (99%) were reported as high cost and, of those, 1,515 (70%) were made to FHA protected minority borrowers.

324. This empirical data demonstrates that Defendants made a substantially greater percentage of their total mortgage loans and of their higher cost, subprime, and ALT-A mortgage loans to minority borrowers beyond what the racial makeup of Plaintiff's communities and neighborhoods would otherwise indicate was appropriate on a non-discriminatory basis. These differences cannot be explained by differences in borrower credit score or other objective criteria.

325. On its face, this data reflects Defendants' discriminatory targeting and discriminatory treatment of FHA protected minority borrowers relating to Defendants' predatory mortgage lending activities, including the discriminatory housing practice of "reverse redlining" i.e., the intentional targeting of FHA protected minorities for the extension of credit on unfavorable terms. This data, in addition to the data below, also demonstrates, on its face, disparate impact.

**D.**     **Defendants' Predatory Mortgage Lending Disparately Impacted Minorities**

326.     Prior to the predatory and discriminatory lending practices of Defendants alleged herein, Plaintiff had few, if any, "high foreclosure risk" (HFR) census track areas as defined and designated by the U.S. Department of Housing & Urban Development ("HUD") and the historical annual foreclosure rates were averaging between approximately 1% to 2%.

327.     HUD designated HFR areas reflect neighborhood characteristics that are estimated by HUD to have a high level of risk for foreclosure – e.g., those neighborhoods with a relatively high concentration of higher cost loans, subprime or highly leveraged loans (high LTV and DTI ratios), among other factors.

328.     Subsequent to and during the predatory and discriminatory lending and servicing practices of Defendants (and other industry participants) alleged herein, Plaintiff experienced a massive increase in the number of higher cost, subprime and highly leveraged loans made within Plaintiff's neighborhoods and communities with high populations of FHA protected minority borrowers leading to numerous HUD designated HFR areas.

329.     Indeed, the level and severity of the risk of foreclosures across the nation and in Plaintiff's communities and neighborhoods became so great that HUD changed its HFR ranking system from a scale of 1-10 (10 being the highest foreclosure risk areas) to a scale of 1-20 (doubling the prior risk designation and designating 20 as the highest foreclosure risk areas).

330.     The HUD designated HFR areas coincide directly with high minority percentage rate population census tracks in Plaintiff's communities and neighborhoods.  And, the HUD designated HFR areas coincide directly with high foreclosure rates in Plaintiff's communities and neighborhoods. Indeed, Plaintiff's neighborhoods and communities with the highest HFR

areas, have proportionately the highest percentages of FHA protected minority homeowners; and have experienced tremendously higher foreclosure rates.

331.    HMDA reported foreclosure data reflects that the average foreclosure rates increase among census tracks in Plaintiff's neighborhoods as the percentage of minority population increases.  Reflective of Defendants' targeting and redlining of minority borrowers for higher risk non-prime mortgage loans – *i.e.*, higher cost and/or higher leveraged mortgage loans -- immediately following the beginning of the boom years in Defendants' (and other industry participants) discriminatory non-prime mortgage lending, Plaintiffs' communities with the highest percentages of minority borrowers experienced higher initial foreclosure rates on such newly originated mortgage loans.  At that time, unemployment levels were low and the economy was growing.

332.    In Cook County, the initial foreclosure rates from 2004 through 2006 in census tracks with demographics of less than 40% FHA protected minority homeowners increased from an historical average of about 1% to approximately 8.65%.  However, the initial foreclosure rates in census tracks with demographics of 40%-59%, 60%-79% and 80%-100% protected minority homeowners over the same period was over 11.6%, 13.23% and 20.46%, respectively, reflecting nearly a 236% increase in foreclosure rates between census tracks with demographics of less than 40% FHA protected minority homeowners and 80%-100% FHA protected minority homeowners.

333.    Clearly, the mortgage loans Defendants originated in Plaintiff's communities to FHA protected minority borrowers were more likely to result in delinquency, default and foreclosure than the loans Defendants made to Caucasian borrowers, with many of the loans

made within the highest HUD designated HFR foreclosure rate areas. This data also reflects targeting, disparate treatment and disparate impact.

334.    For example, of the 70,185 loans Countrywide originated between 2004 and 2007 in Cook County, and reported HMDA data on the minority status of the borrowers, 48,766 (69%) of those loans were originated within the highest HUD designated HFR foreclosure risk areas. Of those highest HFR foreclosure rate area loans, 27,224 (56%) were originated to minorities, representing 82% of the 33,291 loans Countrywide reported that it originated to minorities in Cook County.

335.    Similarly, during the same time period, of the 21,753 loans Countrywide purchased and reported were originated for minorities. In fact, 17,467 of these loans or 80% were originated in Cook County's highest HFR areas.

336.    Of the 62,421 loans reported between 2004 and 2007 to HMDA involving minority borrowers, Bank of America and its correspondent lenders originated 45,338 (73%) of those loans within the highest HUD designated HFR foreclosure risk areas of Cook County. Of those highest HFR foreclosure rate area loans, 28,124 (62%) were made to minorities, representing 86% of the 32,533 loans Bank of America and its correspondent lenders reported they originated to minorities in Cook County. Of the 8,823 loans to minorities in Cook County that Bank of America itself reported it originated, 6,722 (76%) were made in the highest foreclosure rate areas. In stark contrast, only 8,959 (48%) of the 18,524 loans Bank of America made to non-minorities were located in the highest HFR census tracks.

337.    Similarly, during the same period, Bank of America purchased 1,021 loans originated by its correspondent lenders in Cook County that were reported as made to minorities. Of those 927 (91%) were originated in Cook's highest HFR areas.

109

338.    The statistics concerning the loans originated by Merrill and its primary correspondent lenders, Ownit and First Franklin, in Cook County for which they reported minority status, reflect similar targeting, disparate impact and disparate treatment.  For example, of the 3,617 loans they originated and reported minority status on, 2,363 (65%) of those loans were made within the highest HFR areas, 1,507 of which (64%) were made to minority borrowers.  Of the 2,199 loans made by First Franklin, 1,392 (63%) were to minorities and in the highest HFR areas.

339.    This statistical information provides direct and prima facie evidence of the disparate impact, as well additional evidence of the targeting and disparate treatment, of Defendants' predatory mortgage lending activities in Plaintiff's communities and neighborhoods. If Defendants had not targeted minority borrowers for non-prime mortgages, minorities in Plaintiffs' communities (and Plaintiffs' higher minority neighborhoods) would not have suffered significantly greater numbers and percentages of loan defaults and foreclosures on Defendants' mortgage loan products than the percentages of minority homeownership reflected in Plaintiffs' demographic data. But for Defendants' predatory and discriminatory actions alleged herein, the number and concentration of predatory non-prime mortgage loans and the number and concentration of corresponding defaults, vacancies, and foreclosures experienced by FHA protected minority borrowers in Plaintiffs' communities and neighborhoods would have been far lower and Plaintiffs' alleged injuries would not have occurred to the extent they did occur.  And, as further alleged below in section II G., Defendants' actual foreclosure filings over the period reflect a stand-alone continuing discriminatory housing practice.

E.    **Defendants' Predatory & Discriminatory Lending Schemes Were Concealed Through MERS and By Underreporting Minority Status In HMDA Data**

110

340.    Defendant Bank of America was one of the founding members and shareholders of MERSCORP Holdings, Inc., the parent company of Mortgage Electronic Registration Systems, Inc. which operates the MERS System.

341.    As such, Defendant Bank of America helped fund the development and initial start-up of MERS to act as a nominee for mortgage lenders and lenders' successors and assigns (e.g., securitization trusts) to privately originate, track, assign and/or trade mortgage loans through a confidential computer registry (containing over 70 million mortgage loan records) enabling mortgage lenders to circumvent public lien assignment recording processes.

342.    Defendant Bank of America, N.A. is a current member of MERS.  Bank of America, N.A.'s Managing Director and Servicing Portfolio Strategy Executive, Lawrence P. Washington, serves as a board member of MERSCORP Holdings, Inc.  In addition, Countrywide Bank, FSB, and several Merrill Lynch entities were members of MERS, prior to their merger into Bank of America, N.A.

343.    MERS previously publicly described itself on its website as "an innovative process that simplifies the way mortgage ownership and servicing rights are originated, sold and tracked. Created by the real estate finance industry, MERS eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans."

344.    According to MERS' prior public website disclosures, it also provides money savings to lenders by eliminating assignment costs, document correction costs and tracking fees - "Once the loan is assigned to MERS . . . tracking servicing and beneficial rights can occur electronically for all future transfers. The need for any additional assignments after this point will be eliminated unless the servicing rights are sold to a non-MERS member."

345.    MERS has thus saved industry participants – and denied public recording systems operated by County governments such as Plaintiff here – a total of over $2 billion in public recording fees.

346.    Thus, MERS obscured Defendants' and other industry participants' mortgage loan origination, ownership, assignment, securitization and servicing activities.

347.    MERS' admittedly deliberate circumvention of the public recording process has damaged, and continues to damage, Plaintiff by making it extremely difficult for Plaintiff to determine ownership interests in vacant or abandoned properties that have not yet been foreclosed upon to cure building code deficiencies, ensure compliance with building codes, obtain unpaid taxes and/or utility bills, and/or determine the ownership or lien holders to enable in rem or tax foreclosure sales.

348.    Because Plaintiff did not have access to MERS there was virtually no way for Plaintiff to identify parties – e.g., mortgage note holders or securitization trustees – legally and financially obligated to pay the costs of maintaining abandoned or vacant properties within its jurisdiction.

349.    These practices, also by design, denied Plaintiff of the revenue from recording fees and taxes that Plaintiff otherwise would have received had the various assignments and other changes in title been properly recorded.

350.    More importantly, however, by circumventing public lien holder recording processes by design, MERS obscured Defendants' and other industry participants' mortgage foreclosure practices, severely impeding Plaintiff's ability to determine the primary parties who made predatory and discriminatory mortgage loans in Plaintiff's communities and neighborhoods that have resulted in home vacancies and foreclosures.

112

351.    This served to conceal Defendants' and other industry participants' predatory mortgage lending and servicing practices, and improper mortgage foreclosure processes, making it extremely difficult for Plaintiff – and other interested parties - to identify the predatory lenders "whose practices led to the high foreclosure rates that have blighted some neighborhoods." Mike McIntire, *Tracking Loans Through a Firm That Holds Millions, N.Y. Times* (April 24, 2009). It effectively "removes transparency over what's happening to these mortgage obligations and sows confusion, which can only benefit the banks." *Id*.

352.    Nationwide, a majority of foreclosures (estimated at 60%) have been conducted in the name of MERS as designee, assignee or title holder of Defendants as originator or securitization trustee making it virtually impossible to determine from publicly available data which Defendants hold the mortgages to, are in possession of, and/or are or may be foreclosing on properties in Plaintiff's communities and neighborhoods, further obfuscating the predatory and discriminatory lending practices of Defendants and other industry participants.

353.    Thus, the only realistically feasible way to determine precisely all the minority owned properties possessed by, or in control of, or foreclosed upon at the direction, or for the benefit, of Defendants, is through electronic discovery of Defendants' LAR, loan origination, mortgage servicing and foreclosure data that Defendants specifically collect, track, and utilize for their HMDA reporting obligations and their operational activities.  This discovery is necessary to determine the full extent of the Defendants' discriminatory conduct Plaintiffs allege, including through Defendants' continuing servicing of, and foreclosures on, each such higher cost or non-prime mortgage loan made on a discriminatory basis.

354.    Complicating this issue, it has been widely reported, investigated, litigated, and publicly acknowledged that Defendants' and MERS' electronic mortgage lien and assignment

records contain errors. It also has been widely reported, investigated, litigated, and publicly acknowledged that this has been exacerbated by and/or lead to Defendants' "robo signing" practices.

355. MERS' current website admits that its operations are "a national electronic registry system that tracks the changes in servicing rights and beneficial ownership interests in mortgage loans that are registered on the registry."

356. Thus, identification of the full extent of the predatory and discriminatory loans made by Defendants here, and their complicity in continuing their predatory equity stripping scheme through the continued servicing of each such predatory and discriminatory loan, also will require discovery through MERS.

357. In addition to Defendants' use of MERS to conceal the originators, record lien holders (through assignment) and loan servicers of the predatory loans they originated, purchased, owned or securitized, and now service, Defendants also underreported race and ethnicity HMDA data on the mortgage loans they originated or purchased.

358. By not reporting to the federal government higher cost mortgage loan designations and race and ethnicity data on all the mortgage loans they originated or purchased, Defendants have been able to further conceal the full extent of their predatory and discriminatory mortgage lending and servicing activities.

359. For example, while Countrywide reported borrower race and ethnicity data on 131,566 loans it originated or purchased in Cook County during 2003 through 2007, it originated or purchased at least another 37,177 loans that it did not report such data on. 14,630 (39%) of those loans were made in the highest HFR census tracks in Cook County.

114

360.    Bank of America, originated directly, and indirectly through its primary correspondent lenders, or purchased a total of 15,414 mortgage loans during the relevant period in Cook County in which it did not report race and ethnicity data on. 10,400 (67%) of those loans were made in the highest HFR census tracks in Cook County.

361.    Similarly, Merrill originated directly, and indirectly through its primary correspondent lenders, or purchased a total of 9,257 mortgage loans during the relevant period in Cook County in which it did not report race and ethnicity data on.  7,615 (82%) of those loans were made in the highest HFR census tracks.

362.    Not surprisingly, the vast majority of the loans Defendants originated and purchased for which no race or ethnicity data was reported were originated within the highest foreclosure rate census tracks in Plaintiff's communities and neighborhoods, which correspond with the census tracks with the highest percentages of minority homeowners.

363.    This practice further concealed the extent of Defendants' predatory and discriminatory behavior, further necessitating discovery of all of Defendants' mortgage loan data they created or maintain in connection with their mortgage lending, securitization and servicing activities at issue here.    Indeed, of the loan origination and servicing data that Defendants produced on February 16, 2016, regarding the 266,224 mortgage loans in Cook County that Defendants were continuing to service after January 1, 2009, ***94,256 such loans (35.4%) had no race or ethnicity data***.    Worse, that same data reflects that 17,891 loans, 38.4% of the 46,568 total mortgage loans Defendants conducted foreclose related activity on in Cook County, had no ethnicity or race information. ***Even worse,*** Defendants own data evidences foreclosures on at least 3,530 loans where the surname is a 'common' Hispanic name but is missing race or ethnicity data.  And, there are at least an additional 423 foreclosures in which the minority status may be

115

misidentified.  In total, Defendants' data reflects that there are at least 3,953 mortgage loans that were foreclosed upon that were mislabeled as non-minority or where the race and ethnicity data was not reported. Plaintiff anticipates that further analysis will reveal that many more loans where race and ethnicity was not reported will turn out to have been made to an African American or Hispanic borrower.  As further alleged herein, Defendants' foreclosure activity has been disproportionately concentrated in the highest minority areas and disproportionately concentrated on minority borrowers.

**F.    Defendants' Passed the Risk Of Their Predatory & Discriminatory Lending Scheme Onto Others**

364.    Defendant's securitization model required that after a subprime mortgage loan was originated either directly, through a broker or correspondent lender, or purchased from other third party subprime originators, it often was closed directly in the name of MERS. A MERS tracking number was then assigned and the loan was then pooled with other loans across geographical regions, packaged, securitized, and sold.  Defendants then retained all of the lucrative servicing rights as additional revenue streams.

365.    Defendants' typical securitization transactions involved the establishment of a special purpose vehicle (SPV) such as a trust. When mortgage loans are made by Defendants or their brokers or correspondent lenders, the loans become negotiable instruments and when assigned to a trust or other SPV, the trust becomes a holder in due course under the Uniform Commercial Code.

366.    This enables the assignee of the loan (e.g. the trust and trustee) to hold the note and enforce it without many of the defenses the borrower would have had against the original lender, effectively cleansing the loan note of direct predatory lending claims and obfuscating

116

who owns the loan.  At the same time, the risk of loss on the underlying mortgage loans pass to the trust -- and ultimately onto its private or public investors.

367.    Because mortgage borrowers effectively lose their rights to raise the initial act of predatory or discriminatory lending by the loan originator as a defense to foreclosure, Defendants and other industry participants were able to lend with deliberate indifference as to legality or propriety of the underlying loan origination and in fact were incentivized to engage in such misconduct.

### G.    Defendants' Mortgage Servicing & Foreclosure Practices Are Predatory & Discriminatory

368.    While most of Defendants' predatory, higher cost and subprime mortgage origination practices at issue subsided after the Financial Crisis, Defendants continue to service such loans and continue to receive periodic payments on outstanding predatory and discriminatory loans at issue here.  Defendants' loan servicing also includes the evaluation and processing of borrower requests for loan modifications and refinances, servicing loans that enter into default and charging fees and increased interest, default work outs and foreclosure proceedings, activities that Defendants have undertaken in an improper or bad faith manner. While these activities serve to continue and perpetuate Defendants' prior predatory and discriminatory lending conduct, more importantly they reflect stand-alone discriminatory housing practices that also are continuing.  Thus, Defendants' discriminatory housing practices in Plaintiff's neighborhoods and communities is further evidenced by, and explicitly includes, the increased foreclosure rates, numbers of foreclosures, and clustering of foreclosures on mortgage loans made to minority borrowers for which Defendants are responsible.  As Plaintiffs allege below, publicly reported foreclosure data – and Defendants own servicing and foreclosure

117

data they already have produced in this case – plainly evidences the discriminatory treatment of minorities through Defendants' foreclosure activity in Cook County, evidences that such activity is disproportionately increased for minorities and is concentrated in Plaintiff's minority communities, and evidences disparate impact of both Defendants' discriminatory mortgage lending activity and its current mortgage servicing/foreclosure practices. In short, Defendants' foreclosure activities are integral to Defendants' equity stripping scheme, but also are stand-alone discriminatory.

369. Because many of the largest lenders, such as Defendants here, retained the servicing rights on the mortgage loans underlying their loan originations and purchased loans transferred into securitizations, they obtained yet another source of revenue from the loans after they securitized them and passed along the risk of loss to investors.

370. Loan servicers, such as Defendants, are paid a percentage of each mortgage payment made by a borrower as compensation for handling the various administrative aspects of the mortgage loan payment process including, but not limited to, collecting mortgage payments, crediting those payments to the borrowers' loan balance, assessing late charges, establishing escrow accounts for the payment of taxes and insurance, making such payments when due, collecting and making the payments to private mortgage insurance, and making distributions of principal and interest to the SPVs or other investors that have purchased such loans.

371. Although the servicing fees paid on an individual loan are relatively small - typically 0.25% (on prime loans) and 0.5% (on subprime loans) of the outstanding principal balance of each mortgage loan each month - when added across the millions of mortgage loans typically serviced by a servicer, the fee revenue is enormous. Mortgage servicers like Defendants

also typically earn interest income on the float of borrower mortgage payments to be remitted to the SPVs, as well as late payment fees and other fees.

372.     Mortgage loan servicers such as Defendants are responsible for managing loss mitigation when a borrower becomes delinquent (collection and work out activities) or defaults on the loan (evictions, foreclosures and management of vacant or foreclosed properties, including property maintenance and repairs).

373.     Importantly, loan servicers are paid significant additional fees to provide such loss mitigation services (as well as late fees on overdue mortgage payments) and, because they typically do not bear the risk of loss on the underlying asset where they have sold it into a securitization, they are further incentivized to maximize their servicing fees, including through the foreclosure process itself, where Defendants have actually added upcharges to borrowers.

374.     For loans they do not hold, loan servicers such as Defendants are either indifferent to borrower delinquencies, defaults, home vacancies or foreclosures, or are actually incentivized to cause borrower delinquencies, defaults, home vacancies or foreclosures because they make more net income in those circumstances (i.e., fees charged to both borrowers and the owners of the loans -- such as a securitized trust that issued mortgage backed securities -- less the cost to provide the service), and receive that income during default servicing and foreclosure activities. This is because servicers, like Defendants, are reimbursed for their servicing fees before any money passes to investors in securitizations as a result of a foreclosure.

375.     For home mortgage loans where Defendants have a financial interest in addition to the servicing rights (e.g. they hold the underlying first lien loan or a secondary loan), Defendants might be incentivized not to foreclose in order to avoid a write down of the asset.  In such circumstances, the borrower may be in default and simply vacate the property, leaving it

119

uncared for, unprotected, and vulnerable to vandalism and/or criminal activity, all of which increase the harm to Plaintiff.

376.    At the same time, Defendants and other industry participants have become increasingly willing to delay foreclosure – refusing to take ownership and possession – where the costs associated with the foreclosure and repair of the property outweigh the financial recovery Defendants can obtain from the foreclosure.    All of this has led to the growing "shadow inventory" of vacant home that have not yet been foreclosed upon and which will increase Plaintiff's damages over time as such properties are foreclosed on in the future.

377.    Defendants have engaged in predatory and discriminatory mortgage loan servicing that was part and parcel of their predatory and discriminatory mortgage lending scheme and which further increased the number of FHA protected minority borrowers' mortgage delinquencies, defaults and ultimately home vacancies and foreclosures on loans for which Defendants are responsible.

378.    Pursuant to their servicing rights, Defendants typically maintain control over the foreclosure process involving the loans originations and purchases at issue here.

379.    Indeed, as stated by Countrywide's President, David Sambol, in an October 2007 Earnings Call, the ***company's mortgage servicing business strategy was to profit from default-related services in down times such as the current mortgage crisis***:

> Now, we are frequently asked what the impact of our servicing costs and earnings will be from increased delinquencies and [loss] mitigation efforts, and what happens to costs. And what we point out is, as I will now, is that increased operating expenses in times like this tend to be fully offset by ***increases in ancillary income in our servicing operation, greater fee income from items like late charges, and importantly from in-sourced vendor functions that represent part of our diversification strategy, a counter-cyclical diversification strategy such as our businesses involved in foreclosure trustee and default title services and property inspection services***.

[Emphasis added]. In many instances these mortgage servicing fees were inflated or improper and Defendants charged them to both the borrowers and any secured parties – e.g., a securitization trust or GSE – for which Defendants provided loan servicing. Defendants track all of these charges, including any write-offs, on their mortgage servicing data platforms, including AS400.

380. As a result of various mergers, acquisitions and business line consolidations, Defendant Bank of America, N.A., is now responsible for servicing the active residential mortgage loans that Bank of America, Countrywide and Merrill Lynch have retained servicing rights to. In addition to maintaining servicing rights on many of the first lien mortgages Defendants originated or purchased, Defendants also serviced all second lien (e.g., home equity) loans they originated and/or purchased. Thus, Defendant Bank of America remains one of the industry's largest servicer of prime mortgage loans.

381. As has been alleged in various federal litigations and regulatory actions against Defendants, which litigations and regulatory actions have been settled or resolved by consent decrees entered into by the Defendants, the Defendants' predatory and discriminatory mortgage servicing and foreclosure activities included policies and practices, including, but not limited to:

- failing to respond in a sufficient and timely manner to the increased level of home delinquencies, defaults and/or foreclosures by increasing financial, staffing, and managerial resources to ensure that their mortgage servicing companies adequately handled the foreclosure process;

- failing to respond in a sufficient and timely manner to the increased level of loss mitigation activities by increasing management and staffing levels to ensure timely, effective and efficient communication with borrowers with respect to loss mitigation activities and foreclosure activities and full exploration of loss mitigation options or programs prior to completion of foreclosure activities;

- failing to have adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and board oversight of the foreclosure process, including sufficient oversight of outside counsel and other third-party providers handling foreclosure-related services with respect to the loans serviced for others;

- filing or causing to be filed in connection with minority borrower bankruptcy proceedings in federal courts numerous affidavits, executed by employees of Defendants' mortgage servicing companies or employees of third-party providers, falsely or recklessly making various assertions such as the ownership of the mortgage note and mortgage, the amount of principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review;

- filing or causing to be filed in courts in various states and in connection with minority borrower bankruptcy proceedings in federal courts or in the local land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary; and

-  Litigating foreclosure proceedings and bankruptcy proceedings, and initiating non-judicial foreclosure proceedings, against minority borrowers without consistently ensuring that mortgage loan documentation of Defendants' ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party.

382.    Defendants also routinely charged marked-up fees to minority borrowers through various means, including in connection with repayment plans, reinstatements, payoffs, bankruptcy plans, and foreclosures.

383.    For example, Countrywide Field Services Corporation ("CFSC"), now doing business as BAC Field Services Corporation, was one of the subsidiaries used by Defendants in servicing minority borrowers' mortgage loans.  As an intermediary to services obtained from third-party vendors, CFSC routinely marked up vendor service charges, in numerous instances by 100% or more, before "charging" them to Defendants.  Defendants then up-charged minority borrowers for those same services.  Similarly, Defendants obtained and upcharged borrowers for services through other subsidiaries, including LandSafe Default, Inc., also known as LandSafe

National Default, ("LandSafe") and ReconTrust Company, N.A. ("ReconTrust"). Similarly, Defendants have assessed and collected default-related fees that they were not legally authorized to assess and collect pursuant to the mortgage agreements with their borrowers, or have made misrepresentations about those fees and borrower obligations to pay them.

384. These actions individually and/or collectively with Defendants' other practices alleged herein have further led to disproportionate rates of delinquencies, defaults, home vacancies and/or foreclosures on loans originated, purchased, and/or serviced by Defendants that were made to FHA protected minority borrowers. Indeed, the predatory and discriminatory loans at issue here continue to become delinquent and defaulted on, leading to property vacancies and foreclosures.

385. In 2010, Bank of America segmented its residential mortgage loan portfolio into legacy asset servicing and home loan servicing. It now has prime mortgage loan servicer operations in 33 U.S. sites, including major service platforms in Simi Valley, Calif., the Dallas area (including Plano, Fort Worth, and Richardson, Texas), Charlotte, N.C., and Buffalo, N.Y., employing approximately 36,000 staff members responsible for call center and non-default servicing functions, loan resolution, default management, foreclosure and bankruptcy administration, and REO management. It also utilizes the outside services of four domestic vendors and five offshore owned sites. Its primary system of record for home loan servicing is IBM's iSeries LS, which is supported by Bank of America's other enterprise applications and systems.

386. In addition, Bank of America also services its segmented portfolio of legacy assets - subprime mortgage loans and special loan servicing administration – that consists primarily of delinquent and distressed mortgage loans. Bank of America has approximately

5,700 employees in its early stage mitigation efforts and employs another 13,000 staff in its late stage collection efforts.

387.    In June 2010, the FTC filed suit against Countrywide Home Loans, Inc. and BAC Home Loans Servicing, LP in connection with their predatory mortgage loan servicing activities, including those described above.  Bank of America almost immediately entered into a consent judgment and order with the FTC, whereby Bank of America agreed to pay $108,000,000 in settlement and make various changes to its mortgage servicing operations.

388.    In a supplemental consent judgment and order filed on March 22, 2012, the FTC alleged that from June 17, 2010 through June 30, 2011, BAC had violated the June 2010 consent order.  Among other things, the supplemental consent judgment found that BAC Home Loans had, among other things: (1) misrepresented amounts borrowers owed on loans, including for improper fees; (2) improperly assessed and/or collected fees not permitted in loan instruments or in excess of fee schedules; and (3) failed to timely provide all necessary information to the FTC to determine the identities of consumers entitled to redress and the amounts necessary to compensate those consumers.

389.    On April 13, 2011 Defendant Bank of America, N.A. entered into a Consent Judgment with the Office of the Comptroller of the Currency, concerning Bank of America's "unsafe or unsound practices with respect to manner in which the Bank handled various foreclosure and related activities" – i.e., Defendants' "robo-signing" foreclosure activities.  As an example of such unsafe and unsound practices, the Consent Order listed that Bank of America and its subsidiaries had:

> (a) filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of

124

the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records; (b) filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary; (c) litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time; (d) failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes; (e) failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and (f) failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

390.    The OCC Consent Order required BAC "to submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable compliance program to ensure that the mortgage servicing and foreclosure operations, including Loss Mitigation and loan modification, comply with all applicable Legal Requirements, OCC supervisory guidance, and the requirements of this Order and are conducted in a safe and sound manner ("Compliance Program")"

391.    A report of an investigation conducted by the Inspector General of Housing and Urban Development, published on March 12, 2012, regarding Bank of America's foreclosure processes and FHA claims submitted to HUD between October 1, 2008, and September 30, 2010.  Among other things, the report expressly emphasized Bank of America's refusal to provide HUD with copies of its "written foreclosure policies and procedures in effect during the review period" or adequate access to "employees and information," necessitating HUD's assistance from the U.S. Department of Justice to issue civil investigative demands.  The HUD report stated that because it had "identified potential False Claims Act violations, in February

125

2011, we provided DOJ with our analyses and preliminary conclusions as to whether BAC engaged in the alleged foreclosure practices." The HUD report continued: "DOJ used our review and analysis in negotiating a settlement agreement with BAC. On February 9, 2012, DOJ and 49 State attorneys general announced a proposed settlement of $25 billion with BAC and four other mortgage servicers for their reported violations of foreclosure requirements."

392. The HUD report also found that:

> Bank of America did not establish an effective control environment to ensure the integrity of its foreclosure process. Because it failed to establish proper policies and procedures that fostered compliance with laws and regulations, its affiants robosigned foreclosure documents, its notaries failed to authenticate signatures, and it used law firms that may have falsified legal foreclosure documents. As a result of its flawed control environment, Bank of America engaged in improper practices by not fully complying with applicable foreclosure procedures when processing foreclosures on FHA-insured loans, thereby misrepresenting its claims to HUD.

393. Further demonstrating the lack of "an effective control environment," CW7 has detailed severe problems in the execution of servicing defaulted loans at Bank of America. For instance, a borrower in foreclosure might receive a call from one division of Bank of America indicating that the borrower was approved for a loan modification only to be the recipient of efforts to evict the borrower on the very same day. According to CW7, Bank of America is "incompetent" in servicing loans in default and foreclosure.

394. As part of Defendants' predatory, equity stripping, mortgage lending and servicing scheme, Bank of America (which had acquired the Countrywide and Merrill Defendants by this time) also failed to modify the predatory, higher cost and subprime mortgage loans it was responsible for under the Home Affordable Modification Program ("HAMP"),

which was implemented in March of 2009 to assist the millions of American homeowners facing foreclosure.

395.    Instead of abiding by the spirit (and the letter) of HAMP, however, Defendant Bank of America largely ignored or exploited HAMP to further its own financial interests.

396.    Though mindful it needed to permit some number of HAMP modifications to avoid government action against it, Bank of America developed an elaborate scheme to force down the number of successful HAMP modifications. It has done so by deliberately and unlawfully denying scores of otherwise qualified homeowners, including minority borrowers in Plaintiff's communities and neighborhoods, the ability to successfully qualify for HAMP modifications, while lying to those homeowners persistent enough to escalate complaints and to the regulatory bodies inquiring on behalf of homeowners.

397.    Bank of America concluded that it was far more lucrative to deliberately force otherwise qualified homeowners *outside* of HAMP so that it could either profit from foreclosure proceedings, force the homeowner into a more costly proprietary mortgage "modification" than HAMP would permit, or otherwise profit from continuing to service the defaulting and defaulted mortgages.

398.    A July 29, 2009, *New York Times* article, "*Lucrative Fees May Deter Efforts to Alter Loans*," by Peter S. Goodman, J. Emilio Flores, reported the rationale for  Bank of America's failure to modify loans:

> Even when borrowers stop paying, mortgage companies that service the loans collect fees out of the proceeds when homes are ultimately sold in foreclosure. So the longer borrowers remain delinquent, the greater the opportunities for these mortgage companies to extract revenue — fees for insurance, appraisals, title searches and legal services.

Mortgage companies, some of which are affiliated with the nation's largest banks, are paid to manage pools of loans owned by investors. The companies typically collect a percentage of the value of the loans they service. They extract their share regardless of whether borrowers are current on their payments. Indeed, their percentage often increases on delinquent loans.

Legal experts say the opportunities for additional revenue in delinquency are considerable, confronting mortgage companies with a conflict between their own financial interest in collecting fees and their responsibility to recoup money for investors who own most mortgages.

399. Thus, in a *qui tam* action brought against Defendants Bank of America and BAC Home Loans Servicing, LP, Relator Gregory Mackler directly and independently observed Bank of America accomplish this fraud since the inception of HAMP, in knowing violation of the express terms of the HAMP "Program Documentation" through a variety of mechanisms, including the following: (a) developing and maintaining a fraudulently concealed document image repository of homeowner HAMP documentation so that Bank of America or its agents could falsely deny receiving homeowner documents or claim incompleteness even after satisfactory receipt of them; (b) deliberately deceiving homeowners who complain about Bank of America 's handling of their HAMP inquiries and submissions, with efforts to keep them from HAMP eligibility; (c) intentionally forcing homeowners to wait months before a response to HAMP eligibility determinations (such delay resulting in HAMP "ineligibility") and failing, by design, to communicate HAMP concerns to homeowners, including deadlines, purportedly incomplete records, modification status, risk of losing eligible status, or other eligibility concerns; (d) unlawfully proceeding with foreclosure actions (under "dual track" protocols) while homeowners are reviewed for HAMP eligibility or during a payment period; (e) failing to properly credit homeowner HAMP payments during the Trial Period, resulting in improper denials of permanent HAMP modifications and other improper costs to homeowners; (f) failing

to properly "waterfall" homeowners under HAMP requirements, including by pushing proprietary modifications on homeowners as a predatory foist; (g) failing to properly convert eligible HAMP homeowners from Trial Period status to permanent modification status; (h) failing to properly and in good faith evaluate homeowners for HAMP, including failing, by design, to develop and maintain a proper quality control operation; and (i) failing to give actual authority to Bank of America employees and contractors to properly resolve escalated complaints. *See Complaint, United States of America, ex. rel. Gregory Mackler v. Bank of America, NA and BAC Home Loans Servicing, LP*, Civ. No. 11-cv-03270 (E.D.N.Y.).

400. As a result of its activities in violation of the terms of its participation in HAMP, in June 2011 the federal government cut off Bank of America's ability to receive payments from the federal government under HAMP until it had made "substantial improvements" in its program.

401. Regardless of whether its mortgage servicing processes may have improved as a result of any consent order it has entered into, Bank of America is still servicing the predatory and discriminatory higher cost mortgage loans at issue here by accepting and processing each loan payment on such loans or engaging in loss mitigation activities, including foreclosures, on such loans. As such, Bank of America's loan servicing, modification and refinance, and foreclosure activities continue the equity stripping scheme engaged in by each of the Defendants in this litigation. More importantly, however, Bank of America's servicing and foreclosure practices and activities themselves reflect ***stand-alone discriminatory housing practices***, resulting in disproportionate numbers of foreclosures on minority homes, and disproportionately increasing foreclosure activity in minority areas in Plaintiff's communities and neighborhoods. Empirical publicly available foreclosure data – and Defendants' own mortgage servicing and

foreclosure data on loans they have continued to service since January 1, 2009, which they already have produced in this litigation – evidences that the mortgage loans Defendants originated to African American and Hispanic borrowers in Cook County or those loans that they serviced have experienced disproportionately increased foreclosures than the loans Defendants made or serviced for white borrowers, as well as disproportionately larger numbers of foreclosures in higher minority neighborhoods/census tracts. This empirical information provides additional direct and *prima facie* evidence of targeting and disparate treatment, as well as the disparate impact, on African American and Hispanic borrowers in Cook County, reflecting that Defendants' mortgage servicing and foreclosures policies and practices are stand-alone discriminatory and constitute stand-alone discriminatory housing practices.

A.     Defendants' collective foreclosure activities are numerically, geographically and demographically depicted in the attached Exhibits D ("Foreclosure Filings In Minority Areas within Cook County, IL From January 1, 2005 to April 9, 2014"), E ("Foreclosure Filings In Minority Areas within Cook County, IL From April 9, 2012 to April 9, 2014"), and F ("Foreclosure Filings In Minority Areas within Cook County, IL From April 10, 2014 to February 19, 2016"), each of which is incorporated herein. Each of the foreclosure data points identified and mapped in Exhibits D, E and F correlate to a specific property location and address, which shall be provided by Cook County in discovery.

B.     Since January 2005 to date (depicted in Exhibits D and F), Defendants have initiated foreclosure proceedings on at least 18,916 mortgage borrowers in Cook County. Notwithstanding that the total percentage of Cook County housing units owned and occupied by African American and Latino/Hispanic minorities during the relevant period was only approximately 23%, Cook County's neighborhood census tracks with the highest concentrations

of African American and Latino/Hispanic homeowners, 71% or more and 91% or more, experienced the brunt of Defendants foreclosure activity over the period, with 6,823, and 4,075 foreclosures, respectively.

      C.     More importantly, however, the relative percentage of Defendants' foreclosure activity in the highest minority homeowner concentrated census tracts (71% or more and 91% or more) has ***increased*** over time compared to the percentage of foreclosures in low minority census tracks (30% or less), which has ***decreased*** over time, disparately impacting higher minority neighborhoods. This is plainly reflected by comparing the relative numbers of foreclosures in higher and lower minority areas over time. *Compare* Exhibits D, E and F, which reflect these trends as follows:

| Time Period Reflected In Foreclosure Map | Number of foreclosures in 71% or more minority areas | Percentage of foreclosures in 71% or more minority areas relative to total foreclosures | Ratio of foreclosures in 71% or more minority areas compared to 30% or less minority areas | Percentage of foreclosures in 30% or less minority areas relative to total foreclosures | Number of foreclosures in 91% or more minority areas | Percentage of foreclosures in 91% or more minority areas relative to total foreclosures | Ratio of foreclosures in 91% or more minority areas compared to 30% or less minority areas |
|---|---|---|---|---|---|---|---|
| **Jan '05 to Apr '14** (Ex D) | 6352 | 36% | 1.02 | 35% | 3804 | 21% | .61 |
| **Apr '12 to Apr '14** (Ex E) | 2020 | 37% | 1.14 | 33% | 1168 | 22% | .66 |
| **Apr '14 to Feb '16** (Ex F) | 471 | 43% | 1.54 | 28% | 271 | 25% | .88 |

      D.     Moreover, while the total numbers of Defendants' foreclosures have declined over the period, Exhibits E and F plainly demonstrate that Defendants' foreclosure activities in the higher (50% and above) and the highest (71% and above) minority census tracts continue to this very day. However, these Exhibits do not, and cannot, map the foreclosures that have not yet occurred as a result of Defendants' "shadow inventory" of defaulted borrower loans.

      E.     On February 16, 2016, Defendants produced in this case certain loan origination and servicing/foreclosure data regarding the 266,224 mortgage loans in Cook County that

Defendants were continuing to service after January 1, 2009. That data unequivocally evidences that of the total 28,677 loans in the data set that Defendants flagged for foreclosure activity and reported borrower race or ethnicity data, 14,004 such loans (nearly 49% of the total) were loans that had been made to African American and Hispanic minority borrowers. Worse, the same data set reflects that between April 2012 and April 2014 Defendants engaged in ***increased*** foreclosure activity on African American and Hispanic borrowers (on a relative percentage basis), foreclosing on at least 3,060 loans made to African American and Hispanic borrowers in Cook County. This represented 57% of the total 5,364 loans Defendants had engaged in foreclosure activity and reported race and ethnicity data over the period. Conversely, the relatively percentage of Defendants' foreclosure activity on white borrower homes decreased over the period. Thus, the publicly available data alleged and discussed above, including as depicted in the GIS MAPs in Exhibits D, E & F, is supported Defendants' own produced data on the loans that Defendants actually provided ethnicity data.

F.      Defendants' February 16, 2016 data set also included information on Defendants' foreclosure patterns as they related to borrower FICO scores, further reflecting the discriminatory nature of Defendants' foreclosure activities. For example, Defendants foreclosed on much higher percentages of African American and Hispanic minority borrowers in Cook County with Poor FICO credit scores (579 and below) (nearly 74% of foreclosures of Poor credit score borrowers) compared to non-minority white borrowers (about 24% of Poor credit score borrowers). Similarly, Defendants foreclosed on much higher percentages of African American and Hispanic minority borrowers in Cook County with Fair FICO (580-669) credit scores (over 61% of foreclosures of Fair credit score borrowers) compared to non-minority white borrowers (about 35% of Fair credit score borrowers).

132

G.      Defendants' February 16, 2016 data set further included certain information on Defendants' transfers of mortgage loan servicing to third party servicers.  Of the 49,779 Cook County loans in the data set in which borrower ethnicity data was provided and Defendants transferred the servicing to third parties, 21,234 loans transferred were originated to African American and Hispanic minority borrowers, reflecting nearly 43% of such transferred loans. Worse, the same data set reflects that between April 2012 and April 2014 Defendants transferred servicing on 6,059 loans in which race and ethnicity data was provided, 3,228 of which (approximately 53%) were originated to African American and Hispanic minority borrowers.

H.      Discovery of Defendants' entire mortgage loan origination data and mortgage loan servicing information since January 2000, but at least since January 2003, will enable Plaintiffs to prove the linkage between the vast majority of each of Defendants' discriminatory mortgage loans, the terms of each loan, and Defendants' servicing and foreclosure activities related to each such loan through the entire relevant period to the extent that Defendants did not service such loans after January 1, 2009, since Defendants have not yet produced such data.

**H.      Defendants' Predatory & Discriminatory Mortgage Lending, Servicing & Foreclosure Practices Have Injured Plaintiff**

402.    The predatory and discriminatory mortgage lending and servicing practices by Defendants and other industry participants seriously harmed Plaintiff's communities and neighborhoods by effectively diluting -- or completely eliminating -- the equity of minority borrowers' homes, placing those borrowers in far greater jeopardy of loan payment delinquencies or defaults, dramatically increasing the numbers and rates of home vacancies and foreclosures Plaintiff's communities and neighborhoods are currently experiencing (and will

continue to experience into the future) and, ultimately, causing extensive monetary and non-monetary damages to Plaintiff.

403.    Home foreclosures disproportionately occur in predominantly minority neighborhoods. *See, e.g.,* Juliana Barbassa, Report: Minorities Hit By Foreclosures, USA Today, March 6, 2008; National Training & Information Center, Preying on Neighborhoods, 2007 Foreclosure Update, March 3, 2008 available at http://www.ntic-us.org/images/fullyear2007.pdf (last viewed March 19, 2009).

404.    Minority neighborhoods suffer severe deleterious effects from increased foreclosures. A Woodstock Institute Study has demonstrated that "foreclosures, particularly in lower-income neighborhoods, can lead to vacant, boarded-up, or abandoned properties. These properties, in turn, contribute to the stock of 'physical disorder' in a community that can create a haven for criminal activity, discourage social capital formation, and lead to further disinvestment…and lower property values for existing residential homeowners." Dan Immergluck & Geoff Smith, There Goes the Neighborhood: The Effect of Single-Family Mortgage Foreclosures on Property Values, Woodstock Institute Study (June 2005) available at http://www.nw.org/foreclosuresolutions/ reports/documents/TGTN_Report.pdf.

405.    All residents of these neighborhoods suffer from these effects, including the Plaintiff. As such, Plaintiff has suffered injury from the Defendants' use of the Discretionary Pricing Policy within the limitations period.

406.    Brian Moynihan, BAC CEO, admitted in his testimony to the FCIC: "Over the course of the crisis, we, as an industry, caused a lot of damage. Never has it been clearer how poor business judgments we have made have affected Main Street."

134

407.    As a result, the injury to Plaintiff will continue long after the last wrongful act in the Defendants' scheme – the inevitable, if not intended, vacancy and/or foreclosure on the predatory and discriminatory mortgage loan products Defendants sold to homeowners in Plaintiff's neighborhoods and communities and/or refused to modify or refinance.

408.    Defendants' illegal discriminatory conduct has caused substantial, measurable damages to Plaintiff's communities and neighborhoods including, but not limited to:

- out-of pocket costs in providing governmental services (e.g. necessary building code inspections and repairs, police, and significant administrative, court and legal costs) related to various affected properties and neighborhoods;

- reduced property values on foreclosed properties and surrounding properties;

- lost property tax revenue on vacant or abandoned properties, and on foreclosed and surrounding properties as a result of lower home values;

- lost other tax revenues;

- lost recording fees as a result of the use of MERS to avoid such fees; and

- various other injuries resulting from the deterioration and blight to the hardest hit neighborhoods and communities.

409.    Such injuries arise from both the effect of the foreclosure process itself (lower home values and tax revenues) and from vacant or abandoned properties that either already have been foreclosed upon or are facing foreclosure (i.e., the shadow inventory of foreclosures) as a result of borrower defaults.  Not surprisingly, the brunt of this injury is disproportionately suffered in Plaintiff's communities and neighborhoods with relatively higher FHA protected minority borrowers, however the harm has spread throughout Plaintiff's communities.

410.    Relying on data supplied by the Mortgage Bankers Association – a mortgage industry business association - the GAO found in November 2011 that high foreclosure rates correlate to increased numbers of home vacancies.  *"Vacant Properties, Growing Number*

135

*Increases Communities' Costs and Challenges,*" Report to the Ranking Member, Subcommittee on Regulatory Affairs, Stimulus Oversight, and Government Spending, Committee on Oversight and Government Reform, House of Representatives, GAO-12-34 (November 2011).  For example, the GAO found that Chicago's overall nonseasonal vacancy rate dramatically increased from 7.50% in 2000 to 11.60% in 2010.  In comparison, on a nationwide basis, non-season vacancies over the same period increased only 51% and other vacancies increased only 59%.

411.  As reported by the GAO at page 20 of its report, "[a] nongovernmental organization in Chicago conducted additional surveys and research on the 18,000 properties in the Chicago Department of Buildings' list of vacant buildings and found that about 13,000 were associated with a foreclosure between 2006 and the first half of 2010." The GAO continued at page 36 "that abandoned foreclosures were particularly prevalent on low-value properties and in distressed urban areas," including Chicago, and discussed in note 45 that "the vast majority of abandoned foreclosures were loans that involved . . . private label mortgage backed securities" – the type of mortgage backed securities packaged and sold by Defendants here.  Another study of vacant properties in Chicago cited by the GAO "found that 69 percent of the over 18,000 vacant properties registered with the city were associated with a foreclosure filed between 2006 and the first half of 2010."  GAO 12-34, at 37.

412.  The GAO also found in November 2011 that vacant and/or foreclosed properties have reduced prices of nearby homes between $8,600 to $17,000 per property, specifically citing a study estimating that "on a single block in a Chicago neighborhood, one foreclosed, demolished property may have reduced the values of 13 surrounding properties by $17,000 per property compared with the median house price in Chicago."  GAO 12-34, at 45

413.    Plaintiff has incurred out-of-pocket costs with respect to specific vacant foreclosure and pre-foreclosure properties secured by the predatory, subprime loans, originated and/or acquired and repackaged by Defendants because Plaintiff has been required to provide a multitude of services relating to such properties that would not have been necessary if such properties were occupied and shift dwindling resources to address problems created by such vacancies and foreclosures.

414.    For example Plaintiff has sustained financial injuries for providing services to such vacant homes that have not been cared for, have been vandalized and/or have provided a location for illegal activities, all leading to violations of Plaintiff's building code, including the creation of physically unsafe structures that threaten public safety.  This, in turn, has led to substantial personnel time and out-of-pocket costs incurred by Plaintiff's building code enforcement and legal functions having to inspect, investigate and respond to violations at such vacant properties that threaten public safety or address public health concerns; and taking legal action to investigate and prosecute building code violations at the vacant properties.

415.    The task of Plaintiff's legal function in identifying responsible parties in order to take legal action have been made all the more difficult, causing greater financial injury to Plaintiff, as a direct result of the difficulty in determining the identity of the correct owner of such subprime loans.  This is because transfers and assignments of the loans were not properly recorded by Defendants, including its transferees, assignees, agents and/or trustees of the pools of loans that issued MBS secured by such subprime loans.

416.    As another example, Plaintiff's police department has had to send personnel and equipment to such vacant properties to respond to public health and safety threats that arise at these properties because the properties are vacant.

137

417.    Using property address and mortgage lien and foreclosure data obtained from Defendants in discovery, Plaintiff can isolate out-of-pocket and lost revenue damages attributable to each individual property secured by a predatory subprime loan issued by Defendants as a direct result of Defendants' discriminatory and predatory lending practices and resulting foreclosures.

418.    Routinely maintained property tax and other financial data allow precise calculation of the property tax revenues Plaintiff has lost as a direct result of Defendants' discriminatory and predatory lending practices and the resulting property vacancies and foreclosures.

419.    Using well-established GPS mapping techniques that locate specific properties within census tracks, property addresses and mortgage lien and foreclosure data, and well-established statistical regression techniques, Plaintiff's damages attributable to lost property tax revenue (as a result of the drop in home value) on properties surrounding foreclosed properties attributable to as Defendants' discriminatory and predatory lending practices also can be calculated.

420.    A major source of Plaintiff's revenue is taxes on real property, particularly residential real estate. Such tax revenue depends on the valuation of the residential real estate in Plaintiff's jurisdiction.   The fair market value of the residential real estate in Plaintiff's jurisdiction has been adversely impacted by home vacancies and foreclosures on predatory and discriminatory mortgage loans, particularly including those loans originated, funded, and/or purchased by Defendants at issue here.

421.    As a primary result of Defendants' (and other industry participants') predatory lending activities, Plaintiff's real estate tax digest has declined by a total of approximately $42

138

billion from its high point in 2009. Cook County's equalized assessed valuation of all real estate subject to tax was approximately $177.8 billion in 2009 and was last reported, as of 2012, at approximately $135.9 billion.

422. Much of this decline is due to the decline in the value of the residential real estate located in Plaintiff's communities as a result of the foreclosure crisis caused by Defendants' (and other industry participants') predatory lending activities. The decline in Plaintiff's tax digest reflects a corresponding reduction in Plaintiff's tax receipts, budgets and related reductions in Plaintiff's ability to provide critical services within Plaintiff's communities.

423. Defendants are responsible for the percentage of Plaintiff's damages that equates to Defendants' percentage share of predatory mortgage lending activity in both its retail and wholesale operations in Plaintiff's communities. That share equates to the number of loans Defendants originated directly or through correspondent lenders, and the loans Defendants funded and/or purchased for securitizations.

424. Plaintiff also have been injured as a result of the frustration of the various purposes and missions of its various departments and authorities that foster equality and opportunity for affordable housing, revitalize neighborhoods, foster economic development and prosperity in the community, and provide support services for its residents at large. In addition, Plaintiff's authorities and departments also have been injured as a result of having to reallocate their human and financial resources away from its missions and purposes in order to address the foreclosure and home vacancy crisis caused in part by the discriminatory and predatory subprime mortgage lending practices, including those of Defendants.

425.    Plaintiff will continue to incur all of the above types of damages on properties that will become vacant and/or will be foreclosed upon that are secured by a predatory subprime loan issued by Defendants.

426.    Although nationally there have been over 5 million foreclosures since 2007, it has been estimated by industry stakeholders that the foreclosure cycle relating to the predatory lending activity between 2004 through 2007 is only half way complete; and another 5 million foreclosures likely to come.  In March 2010, CRL estimated that "5.7 million borrowers were at imminent risk of foreclosure. . . . African American and Latino borrowers continue to be disproportionately at risk relative to non-Hispanic white borrowers."  D. Gruenstein, Bocian, W. Li and K. Ernst, "*Foreclosures by Race and Ethnicity: The Demographics of a Crisis*" (June 18, 2010) at 10.  CRL's data reflects such disparate impact across all income ranges for African American and Latino borrowers.  *See id*.

427.    Many of these homes are in the "shadow inventory," i.e., are vacant or are occupied with the homeowner seriously delinquent or in default of their mortgage, but foreclosure proceedings have not yet begun.  As reported in a November 2011 *Wall Street Journal* article, "*How Many Homes Are In Trouble?,*" industry estimates of housing units in the shadow inventory range up to 10.3 million (Laurie Goldman, Amherst Securities) with the low end of the range of 1.6 million housing units by CoreLogic (which relies on a lagging indicator of credit score to estimate loan performance and the probability of default).

428.    Nationally, home prices hit a near-decade low in February 2012, declining approximately 23% since 2007.  In mid-2012 Chicago home prices hit their lowest level in nearly 11 years and, despite some recent upward trend, continue to remain far below their high point in 2006.  As of January 2014, however, Standard & Poor's Rating Service estimated that,

140

nationally, the level of shadow inventory had increased slightly with approximately 51 months of shadow inventory housing supply. In November 2013, CoreLogic's shadow inventory analysis revealed that at that time, although levels were the lowest since 2008, there remained 1.7 million properties in the shadow inventory, almost half of which were delinquent but had not yet begun foreclosure proceedings. While the trend is declining, additional predatory mortgage loans continue to go into default, and will continue to do so, particularly with respect to the adjustable rate mortgage loans.

429. Consequently, numerous additional delinquencies, defaults, and foreclosures on Defendants' predatory and discriminatory loans likely will occur and Plaintiff is entitled to injunctive relief and the recovery of damages that are about to occur from Defendants actions.

430. Academic studies -- prepared prior to the collapse in U.S. housing prices -- of the financial impact of foreclosures on communities such as Chicago reflect up to $34,000 in community wide damages resulting from *each foreclosure*. This includes actual governmental expenditures in the form of additional costs of services (police, fire, code enforcement, trash removal, property boarding up, inspections, etc.), losses of revenue (foregone property taxes and utility taxes) and losses in property value.

431. Based on recent, related academic studies, the average cost to Plaintiff for each foreclosure on a loan made by Defendants is approximately $19,000, with additional damages accruing as a result of deteriorated property values and harm to Plaintiff's communities and neighborhoods. As such, compensatory damages alone in this case may exceed $1 billion given that Defendants are responsible – through direct originations or their wholesale channel of correspondent lenders – for approximately 95,000 predatory and discriminatory mortgage loans made within Plaintiff's communities and neighborhoods to minorities and approximately 60% of

those loans already have or can be expected to become delinquent, default and eventually be foreclosed upon.

432.    Because the total number of predatory and discriminatory mortgages originated by Defendants, or for which Defendants are otherwise responsible for, as well as the number of foreclosures related to such mortgages have been obfuscated and concealed through the securitization process and the use of MERS, discovery of all of Defendants' loan files for loans made or purchased in Plaintiff's neighborhoods and communities may be necessary before a precise damages calculation can be made.

433.    Plaintiff's damages, resulting from their out-of pocket costs in providing additional governmental services and their lost tax and utility revenue, relating to properties secured by the predatory, subprime loans, originated and/or acquired and repackaged by Defendants can be established from Plaintiff's records once the locations of the homes upon which such loans were made can be identified from discovery of Defendants.

434.    Plaintiff's damages, resulting from lower home values and other injuries resulting from the deterioration and blight to the hardest hit neighborhoods and communities, can be established with statistical evidence and expert testimony.

### III. CAUSE OF ACTION
### (Federal Fair Housing Act)

435.    Plaintiff repeats and incorporates by reference all allegations contained in paragraphs 1 through 434 as if fully set forth herein.

436.    Defendants' mortgage lending and securitization acts, policies, and practices, as furthered and continued by Defendants' loan servicing and foreclosure activities, constitute intentional discrimination (including through reverse redlining and steering) on the basis of

ethnicity and/or race by intentionally targeting FHA protected African-American and Latino/Hispanic minority borrowers (including women) in Plaintiff's communities and neighborhoods for predatory, higher cost, subprime, ALT-A and/or other mortgage loans (including primary, secondary and home equity loans) made on terms less favorable than loans made to similarly situated non-African American or Latino/Hispanic borrowers, and/or without regard to such minority borrowers' ability to repay such loans.

437.    Defendants' mortgage lending and securitization acts, policies, and practices, as furthered and continued by Defendants' loan servicing and foreclosure activities, have had an adverse, disproportionate and disparate impact on FHA protected African-American and Latino/Hispanic minority borrowers (including women) in Plaintiffs' communities and neighborhoods as a result of the greater percentage of predatory, higher cost, subprime, ALT-A and/or other mortgage loans (including primary, secondary and home equity loans) they have received, and on terms less favorable to such borrowers, than loans made to similarly situated non-African American or Latino/Hispanic borrowers.

438.    Defendants' mortgage servicing and foreclosure acts, policies, and practices constitute intentional discrimination and/or disparate treatment on the basis of ethnicity and/or race by foreclosing on African-American and Latino/Hispanic (including women's) homes to a greater extent than foreclosures on non-African American or Latino/Hispanic homeowners in Plaintiffs' communities and neighborhoods.

439.    Defendants' mortgage servicing and foreclosure acts, policies, and practices themselves have had an adverse, disproportionate and/or disparate impact on FHA protected African-American and Latino/Hispanic minority borrowers (including women) in terms of the relative percentages of foreclosures in higher concentrated African-American and

143

Latino/Hispanic neighborhoods, as compared to the percentages of foreclosures on Caucasian homeowners and in neighborhoods with low concentrations of African American or Latino/Hispanic homeowners. Defendants' acts, policies, and practices also have had an adverse, disproportionate and/or disparate impact on FHA protected minority borrowers in Plaintiff's communities and neighborhoods in terms of the percentage of mortgage loan delinquencies, defaults, home vacancies and foreclosures, suffered by FHA protected minority borrowers relative to the relative percentages of mortgage loan delinquencies, defaults, home vacancies and foreclosures suffered by similarly situated Caucasian borrowers.

440.    These adverse and disproportionate impacts are the direct result of Defendants' policies of making loans destined to fail and giving substantial discretion and incentivizing loan officers, brokers and others responsible for mortgage lending to make and steer people into subprime loans without regard for whether they could repay the loan or might qualify for better loans.

441.    Defendants' pattern and practices of predatory and discriminatory lending cannot be justified by business necessity, and could have been avoided through the use of alternative business policies and procedures that had less discriminatory impact.

442.    The predatory and discriminatory discretionary pricing policies, underwriting practices, and foreclosure activities described herein individually and collectively constitute patterns or practices of housing discrimination because, as an integral part of the Defendants' equity stripping activities and mortgage banking business models, it was the standard operating procedure of Defendants that constituted the discriminatory treatment of, and/or had a disparate impact on, minority borrowers.

443. Defendants' predatory and discriminatory actions have caused African Americans, Latino/Hispanic Americans, and residents of predominantly African-American and Hispanic neighborhoods in Plaintiff's communities to receive mortgage loans that were destined or expected to fail, and in fact failed, on levels higher than failed loans made to similarly situated Caucasian borrowers; because loans made to minorities were more unfavorable terms than Caucasian borrowers. Specifically, these levels were greater in Plaintiff's minority communities and led to substantially higher rates of foreclosure than in non-minority areas.

444. Defendants' discriminatory acts, policies, and practices as alleged above are continuing and will continue until the last discriminatory, equity stripping, non-prime mortgage loan that Defendants originate, fund, purchase, and/or service is repaid and closed and/or is foreclosed upon. Defendants' unlawful actions described above were, and are, intentional and willful, and/or have been, and are, implemented with callous and reckless disregard for Plaintiff's federally protected rights.

445. Individually, and/or collectively, Defendants' acts, policies, and practices violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3601 et seq., in so far as:

(a) Defendants' acts, policies, and practices have made and continue to make housing unavailable on the basis of race and/or color, in violation of 42 U.S.C. § 3604(a);

(b) Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race and/or color, in violation of 42 U.S.C. § 3604(b);

(c) Defendants' published policies and statements have expressed and continue to express a preference on the basis of race and/or color, in violation of 42 U.S.C. § 3604(c); and

(d) Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions and privileges on the basis of race and/or color in

connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

446. Plaintiff is an "aggrieved persons" as defined by 42 U.S.C. §3602(i) because Plaintiff, as an organization itself subject to the provisions of the FHA, has been injured by Defendants' discriminatory housing practices alleged above and also because Plaintiff believes that it will continue to be injured by Defendants' discriminatory housing practices that are about to occur through the continuation of Defendants' discriminatory housing practices, also as alleged above. Thus, Plaintiff expressly brings this Count as an aggrieved person in its own right pursuant to the private persons civil enforcement provisions of 42 U.S.C. §3613(a) for its own organizational harms and other damages arising from Defendants' discriminatory housing practices that violate the FHA. Plaintiff has been, and continues to be, adversely affected by the acts, policies, and practices of Defendants, their employees, and/or their agents. Plaintiff's organizational harm and other injuries are continuing and will increase unless and until Defendants cease their equity stripping activities, including through their continuing discriminatory and predatory mortgage servicing and foreclosure activities. Injunctive relief is therefore necessary to prevent further financial and non-financial harm to Plaintiff.

## IV. THE BANK OF AMERICA DEFENDANTS ARE SUCCESSORS IN INTEREST TO THE COUNTRYWIDE AND MERRILL DEFENDANTS

447. Based upon the steps taken by Bank of America to consummate its acquisition of Countrywide, Bank of America became the successor-in-interest to Countrywide.

448. There was continuity of ownership between Bank of America and Countrywide. Bank of America's Form 8-K, dated January 11, 2008, states that under the terms of the merger "shareholders of Countrywide receive[d] .1822 of a share of Bank of America Corporation's

stock in exchange for each share of Countrywide." In other words, former Countrywide shareholders became Bank of America shareholders.

449. Countrywide ceased ordinary business soon after the transaction was consummated.

450. There was continuity of management, personnel, physical location, assets and general business operations between Bank of America and Countrywide.

451. Bank of America assumed the liabilities ordinarily necessary for the uninterrupted continuation of Countrywide's business.

452. Bank of America assumed Countrywide's mortgage repurchase and tort liabilities.

453. Bank of America also became the successor in interest to Countrywide because Bank of America entered into a series of transactions between July 1, 2008 and November 7, 2008, with Countrywide and its various subsidiaries, which Bank of America then controlled. The transactions were not at arm's length, and gave inadequate consideration to Countrywide. Moreover the transactions were structured in such a way, as to leave Countrywide unable to satisfy its massive contingent liabilities arising from Countrywide's mortgage origination, securitization, and servicing practices.

454. For example, by transferring to itself Countrywide Bank, FSB, along with substantially all of the assets of Countrywide Home Loans, Bank of America left the remaining Countrywide entities with only illiquid assets, no ongoing business, no ability to generate revenue, and insufficient assets to satisfy their contingent liabilities.

455. As a result of numerous mergers between various Countrywide and Bank of America subsidiaries, Bank of America, N.A. also assumed all of the liabilities of Countrywide

147

Bank, NA and BAC Home Loans Servicing, L.P. (f/k/a Countrywide Home Loans Servicing, L.P.).

456. There is no question that Bank of America, in fact, merged with Countrywide while at the same time ending Countrywide's ongoing operations. On April 27, 2009, Bank of America rebranded Countrywide Home Loans as "Bank of America Home Loans." Many former Countrywide locations, employees, assets, and business operations now continue under the Bank of America Home Loans brand. On the Form 10-K submitted by Bank of America on February 26, 2010, both Countrywide Capital Markets, LLC and Countrywide Securities Corporation were listed as Bank of America subsidiaries.

457. Countrywide's former website now redirects to the Bank of America website. Bank of America has assumed Countrywide's liabilities, having paid to resolve other litigation arising from misconduct such as predatory lending allegedly committed by Countrywide.

458. As is customary in large corporate mergers, at least some of the Countrywide Defendants retained their pre-merger corporate names following their merger with Bank of America. However, Countrywide's operations are fully consolidated into Bank of America's and the Countrywide entities have lost any independent identity they have maintained following the merger.

459. On April 27, 2009, Bank of America announced in a press release that "[t]he Countrywide brand has been retired." Bank of America announced that it would operate its home loan and mortgage business through a new division named Bank of America Home Loans, which "represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans." The press release made clear that Bank of America planned to complete its integration of Countrywide Financial into Bank of America "later this

year." The press release explained that Bank of America was in the process of rebranding former Countrywide "locations, account statements, marketing materials and advertising" as Bank of America Home Loans, and stated that "the full systems conversion" to Bank of America Home Loans would occur later in 2009. "Bank of America Home Loans" is thus a direct continuation of Countrywide's operations, although the Bank of America Defendants have represented that Bank of America Home Loans is a "trade name" rather than a separate legal entity. It is a Bank of America trade name or brand and thus a part of Bank of America.

460.    Mortgage contracts and legal documents state that BAC Home Loans Servicing, LP is the entity "formerly known as" Countrywide Home Loans Servicing, LP, a Countrywide subsidiary, which clearly shows that BAC Home Loans Servicing, LP is the direct successor to Countrywide Home Loans, since it is a mere continuation of Countrywide's business.

461.    Countrywide ceased filing its own financial statements with the SEC in November 2008, and its assets and liabilities have been included in Bank of America's publicly filed financial statements. Bank of America has paid to restructure certain of Countrywide's loans on its behalf.

462.    Former Bank of America CEO Ken Lewis was quoted in a January 23, 2008 New York Times article reporting on the acquisition of Countrywide Financial and its subsidiaries, in which he acknowledged that Bank of America knew of the legal liabilities of Countrywide and its subsidiaries and impliedly accepted them as part of the cost of the acquisition

463.    Bank of America has also reached various settlement agreements in which it has directly taken responsibility for Countrywide's liabilities. For example, as part of a settlement agreement with certain state attorneys general, Bank of America agreed to forgive up to 30 percent of the outstanding mortgage balances owed by former Countrywide customers. The

loans were made before Bank of America acquired Countrywide. Moreover, Bank of America permitted Countrywide Financial and Countrywide Home Loans to settle another predatory-lending lawsuit brought by state attorneys general and agree to modify up to 390,000 Countrywide loans, an agreement valued at up to $8.4 billion.

464.    Indeed, during its acquisition of Countrywide, Bank of America performed due diligence on Countrywide, which informed Bank of America as to Countrywide's conduct alleged herein.

465.    Bank of America continues to service the predatory and discriminatory mortgage loans that Countrywide made, thereby further continuing Countrywide's misconduct alleged herein.

466.    Moreover, addressing investor demands for refunds on faulty loans sold by Countrywide, Moynihan stated: "There's a lot of people out there with a lot of thoughts about how we should solve this, but at the end of the day, we'll pay for the things that Countrywide did." And, in a *New York Times* article published in December 2010, Moynihan, speaking about Countrywide, again confirmed: "Our company bought it and we'll stand up; we'll clean it up."

467.    Based on these facts, the Supreme Court of the State of New York in *MBIA Ins. Corp. v. Countrywide Home Loans, et al.*, Index No. 602825/08, held that MBIA sufficiently alleged a *de facto* merger "in which Bank of America intended to absorb and continue the operation of Countrywide." *Id.*, Order on Motion to Dismiss, at 15 (Apr. 29, 2010).

468.    Similarly, based upon the steps taken by Bank of America to consummate its acquisition and merger of Merrill Lynch in early January 2009, Bank of America became the successor-in-interest to Merrill Lynch, with Bank of America remaining the surviving entity when the deal closed.

150

469. There was continuity of ownership between Bank of America and Merrill Lynch.

470. Merrill Lynch ceased ordinary business soon after the transaction was consummated.

471. There was continuity of management, personnel, physical location, assets and general business operations between Bank of America and Merrill Lynch.

472. Bank of America assumed the liabilities ordinarily necessary for the uninterrupted continuation of Merrill Lynch's business.

473. Bank of America assumed Merrill Lynch's mortgage repurchase and tort liabilities.

474. By virtue of its merger with Merrill Lynch, Bank of America also became the successor-in-interest to First Franklin Financial, which Merrill Lynch had previously acquired.

475. Thus, the Countrywide and Merrill Defendants, and their subsidiaries, were in fact merged into Bank of America Corporation and/or Bank of America, N.A. which remain liable for the any and all damages resulting from the wrongful actions alleged herein.

## DEMAND FOR JURY TRIAL

476. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant it the following relief:

(1) enter a declaratory judgment that the foregoing acts, policies, and practices of Defendants violate 42 U.S.C. §§ 3604 and 3605;

(2) enter a permanent injunction enjoining Defendants and their directors, officers, agents and employees from continuing to publish, implement, and enforce their illegal, discriminatory

conduct described herein through the foreclosure process and directing Defendants and their directors, officers, agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(3) award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for its injuries caused by the conduct of Defendants alleged herein;

(4) award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendants for the willful, wanton and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5) award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

(6) order such other relief as this Court deems just and equitable.

Dated:  March 18, 2016

ANITA ALVAREZ,
STATE'S ATTORNEY FOR COOK COUNTY

By:  /s/ Daniel A. Dailey
James D. Montgomery Jr.
John K. Kennedy
Daniel A. Dailey
Michelle M. Montgomery
JAMES D. MONTGOMERY & ASSOCIATES LTD.
One North LaSalle Street, Suite 2450
Chicago, Illinois 60602
Phone: (312)977-0200
Fax: (312)977-0209
jamesjr@jdmlaw.com
ddailey@jdmlaw.com
mmm@jdmlaw.com
jkennedy@jdmlaw.com

James M. Evangelista (*Admitted Pro Hac Vice*)
Jeffrey R. Harris (*Admitted Pro Hac Vice*)
Darren W. Penn (*Admitted Pro Hac Vice*)
David J. Worley (*Admitted Pro Hac Vice*)
HARRIS PENN LOWRY LLP
400 Colony Square, Suite 900
1201 Peachtree Street, NE Atlanta, GA  30361
Phone: (404)961-7650
Fax: (404)961-7651
jim@hpllegal.com
jeff@hpllegal.com
darren@hpllegal.com
david@hpllegal.com

**Special Assistant State's Attorneys**

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I served the above and foregoing FIRST AMENDED COMPLAINT on all parties by causing a true and correct copy to be filed with the court's electronic filing system, which should automatically send a copy to all counsel of record.

Dated:  March 18, 2016                      /s/ Daniel A. Dailey
                                            Daniel A. Dailey