```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    COUNTY OF COOK,                )  Docket No. 14 C 02280
                                     )
 4                  Plaintiff,       )  Chicago, Illinois
                                     )  March 24, 2016
 5             v.                    )  10:29 a.m.
                                     )
 6    BANK OF AMERICA CORPORATION, et)
      al.,                           )
 7                                   )
                    Defendants.      )
 8

 9                TRANSCRIPT OF PROCEEDINGS - STATUS
         BEFORE THE HONORABLE MARY M. ROWLAND, Magistrate Judge
10

11    APPEARANCES:

12    For the Plaintiff:      HARRIS PENN LOWRY LLP by
                              MR. JAMES M. EVANGELISTA
13                            1201 Peachtree St., N.E., Suite 900
                              Atlanta, Georgia  30361
14
                              JAMES D. MONTGOMERY & ASSOCIATES, LTD by
15                            MR. DANIEL A. DAILEY
                              One North LaSalle Street, Suite 2450
16                            Chicago, Illinois  60602

17    For the Defendants:     GOODWIN PROCTER LLP by
                              MS. SABRINA M. ROSE-SMITH
18                            901 New York Avenue, N.W.
                              Washington, DC  20001
19
                              WINSTON & STRAWN LLP by
20                            MR. RYAN M. DUNIGAN
                              35 West Wacker Drive
21                            Chicago, Illinois  60601

22    Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                              Federal Official Court Reporter
23                            219 South Dearborn, Room 2318-A
                              Chicago, Illinois 60604
24                            (312) 435-6047
                              Gayle_McGuigan@ilnd.uscourts.gov
25
```

 1          (Proceedings heard in open court:)

 2               THE CLERK:  14 C 2280, County of Cook v. Bank of

 3     America Corporation, et al.

 4               MR. DAILEY:  Good morning, your Honor.  Daniel Dailey

 5     on behalf of the County.

 6               MR. EVANGELISTA:  James Evangelista, also on behalf of

 7     the County.

 8               MS. ROSE-SMITH:  Sabrina Rose-Smith on behalf of the

 9     defendants.

10               MR. DUNIGAN:  Ryan Dunigan on behalf of the

11     defendants.

12               THE COURT:  Okay.  Everybody sit down.  Good morning.

13               ALL PRESENT:  Good morning.

14               THE COURT:  Good morning.  I am hoping that since you

15     filed these things on March 11th and 12th, you've worked

16     several things out.  Is that right?

17               MR. DAILEY:  We have.

18               MR. EVANGELISTA:  I think there are a few things --

19               MR. DAILEY:  With the verification pages.

20               THE COURT:  Oh, that's worked out.

21               MR. DAILEY:  Yeah.

22               THE COURT:  Yeah, I would hope so.  I can't believe we

23     spent any ink even talking about it.

24               Okay.  So on the verifications, I know that the

25     defendants are going to file supplemental responses and verify.

1    What date would you like to do those?

2              MS. ROSE-SMITH:  Your Honor, we originally said that

3    we were willing to do it within 30 days of the status report,

4    so if you just want to set it for either 30 days from today or

5    30 days from March 11th when we filed the status report, either

6    would be fine.

7              THE COURT:  How about April 22nd?

8              And you're going to be filing updated requests to

9    admit, am I correct?  And some updated rogs?

10             MS. ROSE-SMITH:  Yes.  So we had objections in both

11   based on the definition of subject loans, so we're going to

12   just do that.

13             We filed the verifications on the original -- or not

14   filed, but we served the verifications on the original

15   interrogatories yesterday.  We finally got them all, all done

16   with all three companies.  And then -- and we'll have the

17   verifications for the amended ones on April 22nd when the

18   answers are served.

19             THE COURT:  Okay.  All right.  So the supplemental

20   requests to admit, supplemental rog. responses based on working

21   out the definition of loan, was it?

22             MR. DAILEY:  Subject loans.

23             THE COURT:  Subject loans.  Yeah.  Okay.  Glad you

24   worked that out.

25             Okay.  So that will be April 22nd.  Maybe that will be

1    a good date for lots of things.

2          Okay.  Let's talk about this IT systems.  I mean, the

3    goal is to get a 30(b)(6) done here, okay?  That's all we're

4    trying to do.  It's a 2014 case.  Let's get the 30(b)(6) done.

5          Help me understand.  As I understand it, defendants

6    have produced a ton of data on this AS400 database.  And this

7    is going to be our driving database.  This is where most of the

8    data is.  And I understand if you want to take a 30(b)(6) on

9    this database.  Maybe you don't need to, maybe you do need to.

10   If you want to, you can have it.

11         I understand there's some other databases that you

12   might be interested in, so let's talk about that.  But I want

13   to say one thing as I'm reading these two reports.

14         When the plaintiffs tell me that there is like --

15   there's LandSafe Credit, Dynamic Docs, and AdvantEdge

16   databases, I just want to say, you know, I'm sure you know

17   this, you're very experienced lawyers, I trust everybody here,

18   not a game of gotcha, okay?  So you don't -- don't tell me, Oh,

19   defendants didn't put this in their letter, they're bad,

20   they're behaving badly.  Just pick up the phone, call them up,

21   and say, Hey, what about AdvantEdge, what do you know about it,

22   do you have it, did your guys use it, we think you used it.  I

23   mean, I know you're out there doing your own research and your

24   own -- and you should be.  I mean, I get it.  You're pounding

25   this case.  I don't want to hear, Look, they sent us a letter

1    and they didn't tell us about this and they're hiding the ball

2    and they're in gamesmanship.  We're above that in this case,

3    okay?  This is too high stakes of a case to be doing that.  So

4    stop doing that.

5           Now, tell me about these other databases and what do

6    you really need about them?  We're not going to have seven or

7    six or five major databases at stake here.  We can't.  It's too

8    much to handle.

9           Tell me about these other databases.

10          The thing that I understand about the Edge database is

11   that all of the data in the Edge database is stored in AS400.

12   So I feel like we have the Edge database covered because when

13   the big Bank of America took over Countrywide, they, like the

14   blob, the old blob movie, they took over the Edge database and

15   they sucked up all that data into their AS400, which would make

16   sense to me because they would want all that data because they

17   bought all that data when they took over Countrywide.

18          So I feel okay about what plaintiffs have with respect

19   to the Edge data.  Maybe I'm wrong.  So feel free to tell me

20   why I'm wrong.

21          So let's talk about Edge first.

22          MR. DAILEY:  Okay.  So, your Honor, what we were

23   looking for in the systems letter was some kind of

24   comprehensive database or systems for the entire equity

25   stripping scheme.

1    Our understanding regarding the AS400 is that that

2 database covers origination in terms of servicing and even

3 maybe foreclosure fields.

4    But the targeting aspect of the equity stripping

5 scheme, we determine -- and we were expecting a systems letter

6 that may or may not have captured what we believe was out

7 there.

8    And so when we received it on March 7th with the

9 filing date that Friday, there really was no time to go through

10 whether or not there were targeted data -- there were databases

11 that targeted minorities.

12    And when we're talking about these -- this Edge

13 system, I -- you know, it was put in there as an example, but

14 really we're looking for the AdvantEdge system, which was

15 integrated with the Edge system.

16    This was not necessarily for the purposes of tracking

17 the loan.  It was for the purposes of marketing and going --

18 and -- marketing products of loans with what-if scenarios.

19 That would have been relevant to our targeting claim of this

20 equity stripping scheme, and that's what we were expecting from

21 this -- from the systems letter that was promised to us over

22 the last six months.

23    So at this point, what we're asking for is --

24    THE COURT:  Okay.  Because they're not going to agree

25 that they were equity stripping, okay?  So you've got to be

 1   realistic about that.

 2          Okay.  So -- but you believe that there are databases

 3   or programs out there that have more to do with marketing and

 4   targeting, so pre-loan information, than the AS400, which has

 5   to do with, okay, we get a loan, this is how we follow the

 6   loan --

 7          MR. DAILEY:  Exactly.

 8          THE COURT:  -- and this is how we follow when it

 9   defaults and all of that business which we've already talked

10   about.

11          MR. DAILEY:  Yes, ma'am.

12          THE COURT:  So you're looking for data about how do

13   they call Mary Rowland -- which, by the way, they do,

14   incessantly, these banks, I don't know how they get my name --

15   to see if I want to take out a new loan.  Okay.

16          Is there data on that?  Is there a database -- I mean,

17   we're going back in time here because this would have to be

18   pre -- this would have to be pre some date, and it would have

19   to be Countrywide, I assume, doing these calls, right?  These

20   would be calls to people saying, Hey, Miss Rowland, we can get

21   you in on a good loan here because you're great and you've got

22   great credit, you've only declared bankruptcy seven times in

23   the last three years, let's get you a loan.

24          How do we -- how -- what would the bank have about

25   that?  What kind of database?

1    MS. ROSE-SMITH:  So the plaintiffs are right that

2  AdvantEdge had -- that it had that functionality and it was

3  used for portfolio, right?  So if they had -- if they wanted to

4  call people who already had a loan in exactly the example that

5  you gave.

6    The problem is that if -- AdvantEdge was an

7  origination system, so once the -- once the borrower said,

8  "Yes, I'm interested," all of the information that AdvantEdge

9  had then went to Edge, and then once it got to a certain point

10  in Edge, it went to AS400.

11    So it's my view that AdvantEdge has everything about a

12  specific borrower and whether a specific borrower on a loan was

13  targeted in -- in AS400.

14    The problem is that, as I understand it, the

15  plaintiffs also want who we might have marketed, who said no --

16    THE COURT:  Right.

17    MS. ROSE-SMITH:  -- what kinds of things we might have

18  said --

19    THE COURT:  Right.

20    MS. ROSE-SMITH:  -- and, you know, this is a company

21  that went out of business six years ago.  And even before it --

22  before that happened, AS -- or AdvantEdge stored data for 400

23  days.

24    THE COURT:  It what?  I'm sorry.

25    MS. ROSE-SMITH:  It stored data for 400 days.  And

1    after 400 days, data that wasn't transferred to Edge or

2    AdvantEdge was -- was deleted.  Right?

3            And the reason for that is because they were using it

4    to market their portfolio, so they only needed to have the

5    information that was already in AS400 about the loans that they

6    serviced.  Right?

7            So I can't definitively say right this minute that

8    there is nothing related to marketing out there.  I can look to

9    see if there's a system that relates to marketing, but

10   AdvantEdge isn't it.  And it's -- this is the difference

11   between what we promised them is databases, what they're asking

12   for is systems.

13           Microsoft -- like, for example, Microsoft Word, I can

14   type stuff in to Microsoft Word, but if I want to store that

15   document, it gets stored on the desk site system at work, so we

16   offered them desk site, the place where stuff is.  They want

17   information on the place where stuff was entered.

18           THE COURT:  Right.

19           MS. ROSE-SMITH:  And that's the -- and the problem is

20   that there's just not anything left that was stored there.

21           So what I can do is go back and check whether or not

22   there's some database repository that holds marketing-related

23   data, but it would be -- it would be helpful for them to

24   articulate what is it that they're looking for.  Are they

25   looking for call lists or scripts or --

1           THE COURT:  Right.

2           MS. ROSE-SMITH:  -- what is it that they're trying to

3    find --

4           THE COURT:  Right.

5           MS. ROSE-SMITH:  -- because those -- both of those

6    things that I just named would be in two different places, I

7    would suspect.

8           THE COURT:  Right, right.

9           So I understand that data would be kept -- would not

10   be kept for people who said no.  I can understand that.  Okay?

11          Let me ask you this about the AdvantEdge that then

12   morphed into Edge that then got, to the extent people accepted

13   the loans, got sucked into AS400.

14          Would that data include anything about how the person

15   was pitched the loan?  You know, so I say yes, I become a

16   borrower or I take out a second loan.  I'm already a borrower,

17   I take out a second loan.  I know you're keeping data on my

18   loan and all of that.  Is that data going to include any

19   information about how it was that I said yes or what you said

20   to me to get me to say yes or what promises you made me or what

21   you told me about my credit potential or any kind of

22   information that would be -- that would be of interest to the

23   plaintiffs?

24          Have you looked at the AS400 data enough to know

25   whether any of that is in there for the plaintiffs?

1      MS. ROSE-SMITH:  So, yes, I have, and the answer is

2   no.

3      The only place that I can think of that would have

4   anything like that is a system called StatusMart, which is one

5   of the systems that we disclosed because it stores things, and

6   it -- if the person when -- when an originator or when anybody

7   was calling the borrower about the loan, they would put

8   information into StatusMart about what -- the conversation,

9   right?  So it would not be -- it would not be a completely

10   unbiased report, but it would be at the time that the person

11   was on the phone they would have said what they said to the

12   borrower.  And that's -- and it's an unreliable source in that

13   way, but it is something.

14      And so we have in other litigations, for example,

15   produced StatusMarts on a sample of loans or produced the

16   StatusMart for a specific borrower who had -- who brought a

17   claim or something like that.

18      So that is a place where they might be able to see --

19   and it would also hold a lot of other things, right?

20      So it would say, you know, if they called the borrower

21   to check up pre-closing call or --

22      THE COURT:  But is StatusMart -- is StatusMart only

23   for people who already have borrowed money?

24      MS. ROSE-SMITH:  Yes.  So it would be for people who

25   either were getting a loan -- were getting a new loan or

1   refinanced.

2          THE COURT:  Okay.

3          MS. ROSE-SMITH:  I don't -- I don't know, but I could

4   check, on whether or not there would be StatusMart data on

5   loans that actually were never originated because the borrower

6   declined.  I am doubtful that they would have kept that.

7          THE COURT:  Yeah.  So, Plaintiffs, what do you have to

8   say?  Do you want to ask for call lists?  Do you want to ask

9   for scripts?  Do you want to ask for packages where the bank --

10  you know, join today, we'll give you a blender, I mean, that

11  kind of thing?

12         MR. EVANGELISTA:  Excuse me, your Honor.

13         So there are multiple things here with the data.

14  There are many, many data fields out there, including, from

15  what I understand is -- as defense counsel said, they're pulled

16  into components and they're put into AS400.

17         We were given a list of data fields about -- I think

18  it's about -- from their Turquoise system, which was the

19  original Countrywide system, that had a tremendous amount of

20  data points here.  Everything, from every single aspect of the

21  pricing, the marketing, who originated the loan, where it came

22  from, who the broker was, what the broker was paid.  All of

23  these data points come together.  This separate marketing

24  system is -- yeah, we would like to know of those loans what

25  was -- what were the marketing activities.

1        But what we have offered to do with respect to

2   Turquoise, the data fields we've asked for in Turquoise, the

3   additional data fields we've asked for regarding AS400, to the

4   extent they're -- they are not all in AS400, and I understand

5   that I think most of them -- some of them are, most of them

6   are, but we've not gotten clarity on that -- that we're willing

7   to give defendants a list of loans from -- that we believe are

8   discriminatory, and then they can go and pull the data that

9   we've asked for, the servicing data, marketing data, and other

10  data components.

11       So we've -- you know, to sort of try to capture

12  everything that happened with the loan, the information that

13  was tracked with the loan, and then -- but we -- but we would

14  first give them a list, as our expert has been going through

15  the data that they've already produced, to identify those loans

16  that are problematic.  We're not asking them to give us

17  everything on everything.  It's to give us everything on the

18  loans that we think are problematic.  I mean, that's kind of

19  the overarching view here.

20       And that covers marketing, pricing, broker --

21  broker -- brokers that are involved, where the loan was

22  originated, sort of all of that information that goes to how

23  the loan was priced, how the loan was marketed, what the

24  incentives were for the employees to make those loans, all of

25  those things are components alleged in our complaint --

1      THE COURT:  So let me ask this:  I have the number

2   230,000, but I might be thinking about a different case.  Is

3   that how many loans have been identified?

4      MR. EVANGELISTA:  So they've produced 2 -- I think

5   268,000 or 66,000 loans.  However, one of the problems is there

6   is a tremendously large number of loans for which no ethnicity

7   or race data was produced.  And for those, I think there's

8   about, I want to say 90,000 of those loans, that information

9   was not there, nor were -- nor were information like

10  institution ID, the one that made the loan, what the loan type

11  was, what the loan amount was, where it was made, what the race

12  is, what the ethnicity is, the sex of the borrowers, the income

13  of the borrower, all this information on loans that were

14  serviced after or as of January 1 forward.  And, you know, this

15  is a massive amount of missing information.  That's -- and that

16  is a separate stand-alone issue.

17      But we have, for the loans that they actually did

18  produce information, we want to capture -- of those loans we

19  think are problematic, we would like to give them a list of

20  those loans and say, Okay, now please go back and pull all this

21  other information for us, all the pricing information,

22  everything that they store and track in their system called

23  Turquoise, which is one of the big tracking components that

24  Countrywide used.  A lot of that data got moved into AS400,

25  along with AdvantEdge Edge data -- go ahead, you -- so we're --

1    we're trying to --

2         THE COURT:  So of the 268, although 98 of them are

3    incomplete, how many would you be identifying, roughly?

4         MR. EVANGELISTA:  How many have -- how many can we

5    identify that are, quote, unquote, discriminatory?

6         THE COURT:  Yes.

7         MR. EVANGELISTA:  Well, our expert is still going

8    through that data, and that's a very labor-intensive process.

9         We have identified and included in our amended

10   complaint that we filed last week --

11        THE COURT:  Right.

12        MR. EVANGELISTA:  -- many, many loans that actually

13   went into foreclosure on the foreclosure information the

14   defendants gave us, and that information supports our

15   additional allegations that we've made that the servicing

16   practices are discriminatory in themselves, of the loans that

17   are put into foreclosure are discriminatory, just looking at

18   the numbers of the loans.

19        THE COURT:  Right.  I'm trying to figure out if this

20   is a good solution that you're proposing, but it depends on are

21   you telling me you're going to identify 25,000 loans, 2,000

22   loans, or 250,000 loans?

23        MR. EVANGELISTA:  And I cannot answer that question

24   because our expert is still trying to do the analysis on the

25   data.  And you -- so, first of all, they can only do the

1    analysis on the 266 minus the 90, okay?  So that's whatever it

2    is, 170,000 loans, because those are the only loans that have

3    the race and ethnicity data.

4         So -- and since we know that, you know, there were a

5    large number of those that were made to minorities, I don't

6    know -- I'm going to just guess, even if it's 50,000 loans --

7    or, excuse me, even if it was half of them that were made to

8    minorities over that entire time period, so now you're down to

9    at least, you know, maybe 80,000 loans, max.

10        But of those, we've got to go -- you know, you -- we

11   have to do a very detailed analysis that compares across loan

12   types, across FICO scores, across home values, across many,

13   many things and compare loans made to minorities with the loans

14   made to non-minorities and the different product types.  So

15   that is an extremely intensive process, and they've been

16   working on that since we got the data I guess in mid-February.

17        So, you know, our goal is to try to get that as soon

18   as possible and then cull that list down and say, okay,

19   defendants, here's this discreet set of loans we've identified,

20   please go pull all this other data we need that you maintain,

21   all the business data, all the information about pricing,

22   things like that.  And to us that seems the most efficient and

23   effective way.  But while we're doing that, defendants could go

24   back, and we've asked them to get additional information on the

25   loans that have no ethnicity data so we can at least try to

1    figure out where those loans were made and -- you know, and

2    what the loans were, who made them, and what the original

3    lending information was.

4         Now, they should have a lot of that information

5    somewhere because when they board their loans to service

6    them -- and counsel may correct me on this -- but they --

7    they're buying the loans or they're servicing them from

8    somewhere from somebody.

9         And, you know, we need to be able to go back and find

10   out how those loans as well, are they -- are they

11   discriminatory.  We have looked at and analyzed those loans;

12   and a very, very large percentage of them that have gone

13   actually into foreclosure, where there is no borrower ethnicity

14   data, we found a whole slew of them that have, for example,

15   common Latino names or Hispanic names where the data is not

16   there or it seems to indicate that they're not -- it's --

17   there's notations in there indicating that they're not a

18   minority or of Hispanic origin, so -- and that's a subset of

19   some of the foreclosed data.

20        So we've got -- we've got a whole slew of data issues

21   on those loans, and we're just trying to get through it so that

22   then we can have a complete simple set, give it to defendants

23   and say, Okay, now go back and get all the rest of the stuff

24   for us.

25        THE COURT:  Okay.  Miss Rose-Smith, what do you have

1    to say about the missing data?  Because I thought that the

2    AS400 was fairly complete in terms of a data set?

3          MS. ROSE-SMITH:  Your Honor, two points to make on

4    that.

5          First, borrowers -- whether or not a borrower reports

6    their race when -- we ask for HMDA requirements, it's optional.

7    So a borrower could decide on their own at the front end that

8    they will not identify race or ethnicity data; and in that

9    case, we wouldn't collect it because the borrower chose not to

10   give it to us.  So that's one portion of these loans that is at

11   issue.  And the HMDA rules say if the borrower won't tell you,

12   then -- then the borrower won't tell you.  You can't make them

13   just because you have a HMDA reporting requirement.  So that's

14   the first subset.

15         The second subset is in one of the first conferences

16   that we had before you, Mr. Evangelista insisted that they also

17   get data on HELOCs, and I said you don't -- there's no point in

18   getting data on HELOCs because we don't collect race and

19   ethnicity data on HELOCs, so you're not going to be able to

20   figure out whether or not a person who got a HELOC is a

21   minority.  And he said, Well, I'll do this combination

22   borrower/address/last name like thing where they figure out

23   somehow that I'm African-American because my last name is Rose.

24   So that's another subset.  Right?

25         And for those, HMDA made the HELOC reporting the

1    data -- the information on HELOC reporting optional.  So we

2    don't collect and report to HMDA on HELOCs, haven't ever.

3         And so, yes, there is a large subset of those loans

4    that don't have that data, but it's not because our records are

5    incomplete; it's because there was not data there.

6         I don't know what Mr. Evangelista means by something

7    else in the data records indicates to him that we put in that

8    the person was not a minority when they were.

9         I'm not aware of any field where we would have put

10   that in, and I've never heard that accusation before.

11        I'm not -- and I also don't -- I don't know of any

12   other fields, other than race, ethnicity, and institution ID

13   that are missing, because the very first time that I heard

14   plaintiff say that there were other fields missing was just

15   now.

16        So I don't -- if there are other fields missing, I'm

17   happy to talk about them.

18        But an institution ID, another one of the missing

19   fields, is something that when we -- if we bought loans that

20   were already -- had already been originated and were being

21   serviced elsewhere, that might not have been something that got

22   collected.

23        We have offered to go back and see if there are other

24   alternatives that would help identify the institution, and --

25   and we have given them some additional fields that would help

them.

So, for example, loan product type will tell you whether or not it was a product that was offered by Countrywide versus a product offered by Bank of America. It would not tell you if it was a product that was offered by Wells Fargo on a loan that we later bought, for example.

So we've identified some other fields that might help them understand that.

But there's -- short of that, there's not anything we really can do about race data, and there's not much more I can do about institution ID, and I don't know what else they claim is missing.

THE COURT: So here's -- here's -- I want to wrap this up.

Do the plaintiffs want to -- want to have their expert do his or her analysis, which I understand will take a little bit of time -- I can give you time to do that. I can then have you identify, which I think the bank wants anyways, they want a deadline by which you're going to identify the discriminatory loans. That seems like a good goal for everybody. We can set a date for that. And then we come back and talk again about other databases, which would be a narrowed inquiry for the bank to do.

Now, they're still going to have the same problems, whether they have marketing data, whether they have data from

1    Countrywide, whether they kept data on customers that they

2    called that declined to take a loan.  I mean, they're still

3    probably not going to have that data at that time; but at least

4    to the extent they were looking for it, they would be looking

5    for it on a smaller scale, to the extent that helps.  So do you

6    want to table this IT systems issue until you identify the

7    loan?  I'm happy to do that.  Or can we put -- can we close the

8    circle on this IT systems issue and figure out what exactly the

9    bank has on the IT systems and close it out that way?

10              Do you understand my question?

11              MR. EVANGELISTA:  I do.

12              I would like to try to get some clarity on the IT

13    systems because it is a bit of a chicken and the egg issue.

14    Because the data say, for example, from the Turquoise system

15    that we're asking for, many, many data fields that are there or

16    an AS400 that the defendants are not giving us -- and they are

17    not giving us the overwhelming vast majority of data points

18    that we've asked for that are on the list.  It's not that AS400

19    only has, you know, 30 or 40 data points or Turquoise only has

20    30 or 40.  There are 400-something data points --

21              THE COURT:  Right.

22              MR. EVANGELISTA:  -- that track everything about the

23    loan.

24              THE COURT:  Right.

25              MR. EVANGELISTA:  I mean, they tracked everything.

1          And so it is some of those key components about what
2     the pricing incentives were, that -- that goes to the issue of
3     how the loans were marketed.
4          THE COURT:  Right.
5          MR. EVANGELISTA:  It goes to the issue of whether
6     there was intent in making high cost loans --
7          THE COURT:  But can I interrupt?
8          MR. EVANGELISTA:  Yes.
9          THE COURT:  So we're really -- we're talking about
10    Turquoise then.  We're really not talking about LandSafe Credit
11    or Dynamic Docs or AdvantEdge or StatusMart or Edge.  I mean,
12    that -- because that was the big -- that was the big hoopla
13    here --
14         MR. EVANGELISTA:  Right.
15         THE COURT:  -- in the status report.
16         So are we done with that?  Because if we're done with
17    that, I can check it off my list.  If we're the really talking
18    about Turquoise --
19         MR. EVANGELISTA:  Right.
20         THE COURT:  -- that's a different subject.
21         MR. DAILEY:  We kind of got a little bit ahead of
22    ourselves.
23         That systems letter was strictly related to your
24    question, which was did the -- would the plaintiffs be willing
25    to accept, you know, script calls, things like that --

1           THE COURT:  Right.

2           MR. DAILEY:  -- and that's what the question was

3    relating to the systems letter.  The databases are a little

4    different.

5           THE COURT:  Right.

6           MR. DAILEY:  They have a lot more.

7           So to answer that original question, it was -- the

8    answer to it is if it captures the same information that we

9    were able to identify in AdvantEdge, yes.  The answer to your

10   question is yes.

11          The problem is we could not articulate that within the

12   time period because we didn't know.  And all we knew was, for

13   example, in AdvantEdge --

14          THE COURT:  Okay.  Well, you got the letter on the

15   7th.  It's the 24th.  What -- what do you need?

16          MR. DAILEY:  I would like -- if they have a system

17   that tracks the what-if scenarios, like AdvantEdge, and they

18   can produce documents or some kind of information that's

19   comparable, yes, the plaintiffs would absolutely want that

20   information.

21          THE COURT:  They don't have a system -- what they're

22   telling me, they're going to go back and check, but they don't

23   think they have any data that captures system -- that captures

24   data for people who turned down a loan.

25          Is that -- do you understand that?

1      MR. DAILEY:  I understand that.

2      THE COURT:  Okay.  But you're looking for people who

3  accepted the loans, and what data -- what data would you be

4  interested in?

5      MR. DAILEY:  So we would want -- we would actually

6  want to know how they came up with their what-if scenarios.  We

7  would want to know what information went into determining what

8  product that person received.  What were the relevant factors

9  that went into, for example, you know, Daniel Dailey receiving

10  a subprime loan.  How did you call and determine that?

11      And that's what the AdvantEdge system does.  It tells

12  you what product to market to that particular borrower.

13      MS. ROSE-SMITH:  No, it does not, your Honor.

14      THE COURT:  Okay.  I don't --

15      MR. DAILEY:  -- for 14K -

16      THE COURT:  -- understand that.  So Miss Rose-Smith, I

17  need you to -- are you Ms. Rose or Miss Smith?

18      MS. ROSE-SMITH:  Rose-Smith.

19      THE COURT:  Okay.  So what -- how would that work?

20      MS. ROSE-SMITH:  So if you --

21      THE COURT:  Data-wise.

22      MS. ROSE-SMITH:  Okay.  So if someone calls up and

23  they want a loan or we call them and they want a loan and they

24  are going to give us information about what they're looking

25  for, maybe they want to lower their interest rate, maybe they

1    want cash out, whatever it is is the goal for them in

2    refinancing, there are things that on the front end, the person

3    who has got the laptop and is doing the phone call can say, If

4    you want cash out, if you're looking for this, maybe this is

5    the loan type for this person.  If they want to lower their

6    monthly payment, maybe these are the types of loan scenarios.

7         I think that is what they mean when they say what-if

8    scenarios.  I don't know where those are stored.  I am willing

9    to go look.

10        On the other things that Mr. Dailey is talking about

11   when he says everything that went into the person's decision to

12   make the loan, one of the things that we're going to argue here

13   is that that's a lot of things that are -- that you can't

14   control for in trying to figure out whether or not the loan was

15   discriminatory, right?

16        So there is -- there are borrower issues, what the

17   borrower wanted, what the individual person was saying.

18        Data-wise, the only thing that I can think of that

19   would be helpful is something like StatusMart or -- or the

20   actual fields in the loan that talk about the borrower's

21   characteristics.

22        THE COURT:  You've already given them that.

23        MS. ROSE-SMITH:  Yeah.  And so that's really the only

24   thing that I can think of.  If they're talking about scripts or

25   something like that, like the actual words that are being

1    used --

2            THE COURT:  Right.

3            MS. ROSE-SMITH:  -- I don't know what's left over from

4    Countrywide, but that's another specific thing that I could go

5    and search for.

6            But I don't know -- I don't know what else to tell

7    them when they say we want everything that went into the

8    borrower -- the reason that the borrower was offered that loan

9    other than those two data points --

10           MR. DAILEY:  That's what --

11           THE COURT:  Have you seen this in other cases?

12   Because what I would imagine is the person would be saying, you

13   know, I make this amount, my spouse makes this amount, and we

14   have this much credit card debt.  So the person with the laptop

15   would be typing this in, and probably loan options would be

16   popping up for the bank employee, like, oh, they can get this

17   amount, they can get this rate.  Right?  Because the bank

18   employee is not figuring that out.  The bank is feeding that

19   person the information, like lock them in at this, lock them in

20   at that.  You think that happened in a discriminatory way --

21   maybe it did, maybe it didn't -- but I don't get how would that

22   be data that would then be stored, I guess, to get it for you

23   for this case seven years later.  That's what I'm trying to

24   figure out.

25           MR. DAILEY:  Your Honor, that's to us?

1          THE COURT:  Yeah.

2          MR. DAILEY:  Okay.  So if it's not stored, I --

3     obviously, if they don't have it anymore and it was 400 days

4     later, we'll have to accept that.

5          THE COURT:  Yeah.

6          MR. DAILEY:  But we want to make sure that there are

7     no other applications databases like that.  And I keep saying

8     database because I know from what their filings were, they

9     specifically said it was a, quote, management and loan

10    origination system.  And so it managed the context and managed

11    the input of these loan products for that -- that -- whatever

12    the borrower, quote, unquote, said.

13         So if they don't have it -- have to be fair, obviously

14    if you don't have it, you don't have it --

15         THE COURT:  Right.

16         MR. DAILEY:  -- but if you have a system similar to it

17    and --

18         THE COURT:  Okay.

19         MR. DAILEY:  That's what we were looking for so we can

20    go back and figure out whether repositories of those -- of

21    those fields are.

22         THE COURT:  Okay.  So what is my order going to say?

23    My order is going to say what?

24         Do you want her to check on the StatusMart or does

25    that not seem worth anybody's time?

1        That's only on people who accepted the loan.  And it's

2    very subjective because it's what -- it's what the person at

3    the bank typed in themselves, so it's very subjective.  I don't

4    know what use it's going to be.

5        MR. DAILEY:  That would be fine.  We would want the

6    data fields identified so -- all of them, if we can, get them

7    identified so we can go through and add that into our equation

8    when we're cross-checking the loans that we identify as

9    subject.

10        THE COURT:  That doesn't seem like that's a good idea.

11    What's your --

12        MS. ROSE-SMITH:  So StatusMart is literally a long

13    list of narrative fields.  So it will say -- it will have a

14    date on one side and then it will have whatever the person

15    typed in about the interaction with the borrower on that date.

16    It doesn't -- it's not like others that have fields that you

17    can pull from, which is why we don't offer it very often, even

18    though I did disclose it, because it's justified fields.  And

19    so we have to type in the loan number, and then it will pull --

20    and we can pull the StatusMart for that loan.  It's a

21    loan-by-loan thing and it comes up with a report, just like the

22    narrative reports for AS400 but --

23        THE COURT:  So let me suggest this.

24        MS. ROSE-SMITH:  -- no fields.

25        THE COURT:  StatusMart seems like it might be a good

1    thing to ask for for the loans that you identify.

2          MR. DAILEY:  That's -- yeah.

3          THE COURT:  Okay.  Let's put that on the --

4          MR. DAILEY:  Can we table that?

5          THE COURT:  -- thing to do.

6          Okay.  Other than StatusMart later, are we looking for

7    anything else?  You're not interested in scripts.  I've said it

8    seven times.  I've not heard a word from you about it.  And

9    they're going to be very old and hard to find.

10         There's no other database that we know of.

11         Am I ordering -- am I ordering the bank to check on --

12    just to do a double-check on any databases that would capture

13    what-if scenarios?

14         And does the bank understand what that means?

15         MR. EVANGELISTA:  Your Honor, and just so that we're

16    clear on what-if scenarios that we're specifically talking

17    about how borrowers -- potential borrowers are identified for

18    particular loan product types, because, again, this goes to the

19    issue of targeting here that we're trying to -- we're trying to

20    weed out.

21         THE COURT:  But when you mean potential borrowers are

22    identified, they're actually interacting with the borrower.

23         MR. EVANGELISTA:  So --

24         MR. DAILEY:  We don't -- that's not necessarily

25    true --

1          THE COURT:  They're not having some meeting where

2     they're saying let's target Mary Rowland.

3          MR. DAILEY:  They pre-qualify --

4          THE COURT:  They're actually interacting with me.

5          MR. EVANGELISTA:  Well, actually, your Honor,

6     Countrywide, one of the -- one of the heads, Gissinger, had

7     strategy documents specifically on the issue of targeting

8     minorities.

9          THE COURT:  But that's not a database.

10          MR. EVANGELISTA:  But they have to -- they tracked

11     everything there.

12          And the question is when they are reaching out and

13     identifying and searching through their data systems to market

14     certain loan types to people by -- with direct mail campaigns,

15     for example, Bank of America also had a department called the

16     Multi-Cultural Lending Department where -- and they went

17     through and used database technology to identify borrowers for

18     potential loan products.  So is that data included in this?  We

19     don't know the answer to that.  That's -- that's kind of the

20     problem.  We're trying to -- trying to get at is we don't know

21     what's in the databases, and all we've been trying to do is

22     just to get an understanding of what are the potentially

23     relevant databases that you have, because it doesn't really

24     matter what the system is --

25          THE COURT:  Okay.  Miss Rose-Smith?

1        I'm not considering that direct mails are in this --

2    this discussion.  I'm not saying you couldn't ask for direct

3    mail information.  I'm just saying I'm not seeing that here.

4        But what -- what's your thought on that?

5        MS. ROSE-SMITH:  I am nearly 100 percent positive that

6    the marketing department didn't use AdvantEdge in -- in that

7    way.  Right?  AdvantEdge is for loan originators.  So these are

8    people who are actually interacting with borrowers, making

9    calls to borrowers.  It's not the strategy decisions about what

10   goes into a direct mail campaign or even -- even whether or not

11   you would, for example -- and I know this didn't happen, and so

12   I don't want to represent that it happened at all -- but even

13   if somebody were to make a decision that they would redesign

14   the AdvantEdge system so that if the person said that they were

15   African-American, suddenly different types of loans would pop

16   up then for other people, right?  That did not happen.  But if

17   that did, that wouldn't be information in AdvantEdge.  It would

18   have been a decision that was made by the people who were

19   directing strategy for the company.

20       So all of the stuff that Mr. Evangelista just talked

21   about has nothing to do with AdvantEdge, in my view.  It's --

22   and it's -- and I don't know where they're getting the idea

23   that it would other than just having decided that that's what

24   they would say.

25       MR. EVANGELISTA:  So, your Honor, we're not just

1    making stuff up.  We're talking about what the company

2    disclosed in its 10K, how it described this particular database

3    in their form 10K -- which, of course, your Honor knows is

4    under penalty of perjury and, you know, people go to jail if

5    you -- they file false 10Ks -- and they've identified that

6    AdvantEdge Edge is used in, quote, unquote, generating more

7    sales.  It is used to, quote, unquote, pre-qualify a

8    prospective applicant.  It is used to provide what-if scenarios

9    to help find the appropriate loan product, to obtain online

10   price quotes.  And it's integrated with a whole slew of other

11   systems.

12        And I respect Counsel's explanation that this

13   particular system is a front-end desktop system that's

14   essentially used by call-takers; but the concern here is less

15   about this system and more about what systems are there that

16   were used to market and how were those market -- how was that

17   marketing data either incorporated into AS400, if the loan was

18   maintained, or incorporated into Turquoise, or any other of

19   the, we'll call it the databases, for the purposes of

20   marketing.  As oppose -- we're not worried about, you know,

21   people putting in the data sitting at the desktop front end.

22   We're worried about how people are reached out, marketed to,

23   and contacted from a call center.

24        So if they are identifying prospective borrowers to

25   prospective loan products and they're receiving phone calls, is

1  this system or is there another system or other systems used by

2  either Bank of America or Countrywide or Merrill Lynch --

3          THE COURT:  Okay.

4          MR. EVANGELISTA:  -- to identify these products.

5          THE COURT:  Okay.  So I'm going to order that the

6  defendants will verify whether there are any -- whether there's

7  any data stored on what-if scenarios and/or how potential

8  borrowers were identified who did not ultimately sign up for a

9  loan.  Okay?  Take out a loan.  No, I'm not limiting it?

10          MR. EVANGELISTA:  Well, let me make one different

11  point --

12          THE COURT:  Because I don't think this data is going

13  to exist, so I want to move on.

14          MR. EVANGELISTA:  So there's -- and I don't want to

15  belabor the point, but there are call-out centers and there are

16  call-in centers, and the call-in centers come from marketing

17  directly to people, however, that marketing is done, whatever

18  way they do it.  And so we're not concerned with the loans that

19  weren't made.  We're concerned with the data points on the

20  loans that were made.  What data points are out there currently

21  kept, where are they kept, and are they accessible for the

22  loans, your Honor, that we will identify.  And we would --

23  that's what we would like to know.

24          THE COURT:  So the defendants are going to verify

25  whether there's data available on what-if scenarios and data

1    points available on how potential borrowers -- how actual

2    borrowers were identified.

3              Do you understand what you're being asked to do?

4              MS. ROSE-SMITH:  Yes -- I'm sorry, your Honor.  I

5    just -- I -- I think so.  I -- yes.

6              THE COURT:  Okay.

7              MS. ROSE-SMITH:  I think so.

8              THE COURT:  And you're going to verify that by

9    April 22nd.  Okay?

10             MS. ROSE-SMITH:  Okay.

11             THE COURT:  And we're going to table StatusMart.

12             Okay.  That's only our second item.  Let's move it a

13   little more quickly, okay?

14             All right.  Should we go to time periods and the

15   databases or should we really try to talk about the witnesses,

16   the 785 versus the 9?

17             MS. ROSE-SMITH:  I mean, their -- it's their case,

18   your Honor, but I would say that things like relevant time

19   period and data are really important, and they're stopping us

20   from being able to go forward.

21             THE COURT:  Yeah, let's do that.

22             MR. EVANGELISTA:  And also, your Honor, we are still

23   discussing those issues, and we can each --

24             THE COURT:  Let's try to work that out.

25             MR. EVANGELISTA:  Okay.  Yeah.

1        THE COURT:  Let's say there's not going to be 785

2   deps, okay?  I can give you that guidance.

3        MR. EVANGELISTA:  Yeah, we don't want to do that

4   either.

5        THE COURT:  Okay.  Here's what I understood about the

6   time period since last we -- even last time we spoke.  We're

7   going back to January 2009, and it's going to include data for

8   all loans that were being processed after January 2009, so that

9   takes into account any loan that had originated, whether it

10  originated in January 2000, '01, '02, '03, '04, '05, as long as

11  it was continuing into '09.  I feel good about that.  I thought

12  we were done with that discussion.  So what's the problem?

13       MR. EVANGELISTA:  Okay.  Two points on that.

14       One is -- so with respect to what they've given us

15  already for that period, that's great, but there are a couple

16  of points.

17       One, as we've already talked about, there are 90,000

18  loans that are missing any kind of useful data to determine

19  what the loan product is, who originated it, what the

20  borrower's race and ethnicity is, and the like.  And it's not

21  just, oh, ethnicity is missing.  It's for almost all of those

22  loans, it is many, many data fields that is -- that are not

23  there.  And many, many of those loans went into foreclosure.

24  There was a particular data field that we --

25       THE COURT:  Are they HELOCs?

1          MR. EVANGELISTA:  I'm sorry?

2          THE COURT:  Are they HELOCs?

3          MR. EVANGELISTA:  They may very well be.

4          And one of the issues here is we've asked counsel for

5   a particular data field where the borrower requested a

6   piggyback HELOC, and the defendants are refusing to give it to

7   us.  So we can't even -- we don't know whether the loans are

8   HELOCs, we don't know who they were made to --

9          THE COURT:  Are we talking about date here or are

10  you -- is there a -- does this tie back into the date or are we

11  talking about the --

12         MR. EVANGELISTA:  It does.  So that's -- that's the

13  issue for the data that we have -- that's been given to us so

14  far, plus the data that we're asking for additional fields.

15         The other date issue for the data is we would like to

16  go back -- we think that the data that's produced makes a very

17  reasonable showing that the -- they're engaging in the activity

18  that we've complained about in the complaint.  We would like to

19  get the data for loans that servicing was stopped by January 1,

20  2009.  And I think it's probably -- counsel can probably answer

21  the question.  It may not be that big of an additional

22  production, but we would like to have the full dataset from

23  when things were being serviced because a lot of the

24  foreclosures, your Honor, started -- really started kicking off

25  and happening in mid-2005 right up through 2009.  So we're

1   missing -- you know, we'd like to know are there additional

2   loans that were made early on that foreclosed early on because

3   those are probably some of the worst loans out there because

4   they foreclosed right away.  They were made and they almost

5   immediately went into foreclosure within a year or two as

6   opposed to the ones that have trickled out and dragged out, you

7   know, over the time period and continuing into the future,

8   so --

9          THE COURT:  Right, but isn't the problem that you

10  filed the case in 2014 and the statute of limitations goes back

11  to 2012 and we're doing data back to 2009 and now you want to

12  go back to, what, 2006?

13         MR. EVANGELISTA:  Right.  So -- and -- so your Honor's

14  answer -- or question to me is assume -- I know he does not

15  want me to get into the statute of limitations issue, but the

16  statute of limitations in this case begins to run when the

17  scheme terminates.  We alleged in our complaint at the time the

18  complaint was filed that the scheme has not terminated.  In

19  fact, it's continuing into the future.  So the limitations

20  period has never begun to run.

21         We've been willing to go back and say let's, just for

22  argument's sake, let's make sure there's bad behavior going on

23  within the two years before the complaint was filed,

24  foreclosures, foreclosures in a discriminatory way.  We've --

25  we've shown that from the data they've given us.  We've amended

1    the complaint to show that.  So there is no statute of

2    limitations issue here, your Honor.

3              And that's the key -- that is the key issue in this

4    case and to -- we want to capture the rest of the loans that

5    were made during the time period.

6              So I appreciate that --

7              THE COURT:  In your ideal world, what's the time

8    period?

9              MR. EVANGELISTA:  If -- the bulk of this bad lending

10   activity really started in 2003 and ramped up until 20 -- I

11   would say till the end of 2008, and then the financial crisis

12   hit as a result of this stuff.

13             So what we've done in our proposal here is we've --

14   you know, we've -- originally, we've said all along, look, we

15   really need them back from early 2000, the beginning of 2000,

16   but we're willing to just focus on the core group of loans that

17   were made during that time period.

18             So we're asking for whatever additional loans that

19   they have not produced yet that were originated and the

20   servicing was stopped before January 1, 2009, however many

21   loans there are.

22             THE COURT:  Were originated when?

23             MR. EVANGELISTA:  That were originated from 2000

24   forward or from -- we'll even take 2003 forward.  We'd be fine

25   with just the 2003 forward, because that's really when the bulk

1    of the subprime lending occurred and, you know, as you go back

2    and look at our complaint, how we've laid out all the

3    motivations related to this.

4            MR. DAILEY:  Your Honor --

5            THE COURT:  Miss Rose-Smith -- oh, yeah, go ahead.

6            MR. DAILEY:  It's fair to say that we did offer 2004.

7    I know in our joint report we stated 2003, but we did offer

8    2004 as a middle ground because they originally were saying --

9            MR. EVANGELISTA:  Those and some other issues.

10           MR. DAILEY:  Right.  So I don't want -- I don't want

11   to represent that we did not offer 2004.

12           THE COURT:  Okay.  Miss Rose-Smith?

13           MS. ROSE-SMITH:  Okay.  So I want to just answer that

14   with a focus on what data there is.  There's -- there are lots

15   of other things to be said about that, but I just want to

16   answer that, and I hope that that will be useful for the Court.

17           So post January 1st, 2009 -- which, again, three years

18   before the statute of limitations begins to run, in our view --

19   there are three companies at issue.  Right?  After January 1st,

20   2009, we were talking about data from three companies on the

21   same system.  Pre-2009, we're talking about three different

22   companies.  So I need to tell you about what data there is for

23   all three companies.  Okay?

24           The first is legacy Bank of America data, so loans

25   that Bank of America made 2003 in this early time period.

1    　　　　If that loan was not being serviced on January 1st,

2    2009, they didn't board it onto the system.  Instead what they

3    did is they took what they call a snapshot of the data for that

4    loan and then they archived it.  Okay?  And the rest of the

5    data for that loan was not kept because the loan was no longer

6    active, the borrower had paid off, the loan had foreclosed,

7    whatever the circumstance may have been.  The loan was

8    serviced, released to another servicer, and so it still exists

9    today, but we don't know anything about it, that sort of thing.

10   So all we have is snapshot data.

11   　　　　And I -- I have worked very hard to find someone who

12   still remembers what the snapshot looked like; but I can tell

13   you that the data fields that we have promised and produced to

14   them so far may or may not be all of the data in those snapshot

15   fields.  I don't know where the snapshot data is; but wherever

16   it is, it's archived and we have to pull it out of archive to

17   then figure out what it is to then search it for loans from

18   Cook County.  So that's legacy BANA.

19   　　　　Legacy Countrywide data for loans -- for a loan that,

20   for example, was originated in 2003 and paid off in 2004, or

21   refinanced in 2004, exists; but the concern with it is that it

22   is so old that the field -- like the -- the information that we

23   have on it is going to be even less reliable than the

24   information that we've already provided.  Right?  So -- because

25   fields change, field names change, what we -- what we now know

1   to search for and call it is something different because it was

2   used differently before.  So right now the plaintiff is saying,

3   Listen, for 90,000 loans, I don't have any information on them

4   at all, which while news to me is, you know, if that is a

5   concern, we want to address it, that's going to be -- you're

6   going to multiply that problem times however many loans there

7   are out there.

8          THE COURT:  When you say it's available, you mean it's

9   not archived.

10         MS. ROSE-SMITH:  Well, it is archived, but it is --

11  it's not -- it's not like this snapshot thing that was put into

12  permanent storage.  It's on the same system where we got the

13  data from originally.  So AS400 will have the -- whatever data

14  there is, but it's not going to be --

15         THE COURT:  But it's not up to date.

16         MS. ROSE-SMITH:  Right.  And it's not going to look

17  like the same data as this because these fields are different.

18         And then we have the same problem with legacy Merrill

19  data, and legacy Merrill didn't --

20         THE COURT:  What it's called?  Nerrill?

21         MS. ROSE-SMITH:  Merrill Lynch.

22         THE COURT:  Oh, Merrill Lynch.  Sorry.

23         MS. ROSE-SMITH:  Yes.  Sorry.  I call it Merrill, and

24  now that sounds like I'm talking about some lady, but it's

25  Merrill Lynch.

1        (Laughter.)

2            MS. ROSE-SMITH:  And Merrill Lynch didn't originate

3    loans.  They didn't -- that's not what they did.  And so

4    whatever data the plaintiffs want on the loans from Merrill

5    Lynch is going to be -- we're going to have the same problem

6    with Merrill as we do with legacy BANA, Bank of America.  So it

7    just is -- I think -- my view of it is this, that if you can --

8    they have loans that originated pre-2009.  If they -- if they

9    can demonstrate -- it's a substantial burden for us to go back

10   and find this data and what we produce would be unreliable and

11   make everybody's statistical analysis unnecessarily

12   problematic, but if they -- if they make a showing that there

13   was discrimination in the -- in the statute of limitations

14   period -- and what they put in their complaint, your Honor, not

15   a showing of discrimination in the period, just a showing of

16   foreclosures in minority neighborhoods.  But if they -- if they

17   make that showing -- and they will have an opportunity to do it

18   because we are going to file a motion for summary judgment

19   saying that that didn't happen -- so then, you know, we will go

20   back and give them whatever unreliable stuff they want, but --

21   but before that -- and at this point, when they already have

22   enough information to prove discrimination in the pre-statute

23   of limitations period, what they have either is good enough or

24   it's not.  If there's nothing there, then there's no point in

25   going back and getting the old data.  And it's not as if it

1    will unnecessarily delay things because Judge Bucklo said that

2    we didn't have to wait until the -- until the dispositive

3    motions period, and we're going to file that motion as soon as

4    possible, which is why we're trying to get everybody -- get

5    them to identify the loans and the policies and all of that

6    stuff.  So we're not trying to hide the ball here.  It's just

7    that this is old data from old companies that don't exist.

8           I don't know -- I don't know what else to do other

9    than to say what you have, either there's discrimination there

10   or not.

11          THE COURT:  Can you tell me of the loans that

12   you've -- you know, of what you've produced -- and I know that

13   many of them originated pre-2009 because they were still being

14   serviced in '09 -- what's that percentage breakdown?

15          MS. ROSE-SMITH:  I don't know the percentage

16   breakdown.

17          THE COURT:  I mean 50/50 or --

18          MS. ROSE-SMITH:  No, it's lower.  I know the number,

19   but I don't know what that is as a percentage.  So of the

20   260,000, there are 5,000 that Countrywide -- that I believe

21   Countrywide originated pre-2009.  I don't know the number for

22   BANA, unfortunately.

23          So -- and I don't know -- and some of them would not

24   have been originated by either of those parties.  They would

25   have been bought later.  And I don't know what number of the

1    ones that were purchased because we have the servicing rights

2    to them but were -- but were originated by someone else are in

3    that pool.

4              THE COURT:  So when Countrywide -- when it -- if it

5    was still servicing the loan after 2009 and you put its data

6    onto the AS400, you then got its data fields to be in

7    compliance with the AS400 fields.

8              MS. ROSE-SMITH:  Right.  So whenever they would have

9    upgraded the system or when they boarded new loans -- and to be

10   clear, Countrywide loans were always on AS400.  The others were

11   boarded onto it.

12             THE COURT:  Oh, okay.

13             MS. ROSE-SMITH:  So they -- in the process of

14   boarding, which took quite some time, they matched data to the

15   existing fields, which is why we have a more uniform subset.

16             And at the same time as AS400 gets upgraded, though,

17   all the time fields that -- there are -- there are concerns

18   with the way that fields are described because the loan isn't

19   in use anymore --

20             THE COURT:  Okay.  Let me ask this --

21             MS. ROSE-SMITH:  -- so it's not getting upgraded --

22             THE COURT:  Let ask about this about the timing issue.

23             Are you guys in agreement as to timing -- forget the

24   data fields, this data -- but, you know, we have e-mail

25   searches, I mean, we have other things I assume we're doing --

1    do we have a timing issue there or are we in agreement?

2             MR. EVANGELISTA:  We've offered 2004 -- January 1,

3    2004 forward based on defendants' representation that that's

4    where they have the data, from that point forward.

5             THE COURT:  She has e-mails from Countrywide?

6             MR. EVANGELISTA:  Right, but --

7             MS. ROSE-SMITH:  No.

8             MR. DAILEY:  We've agreed on some areas, your Honor,

9    and some of them we have not.

10            THE COURT:  Okay.

11            MR. DAILEY:  With regard to, for example, some of the

12   policies, they've produced pre-2009 --

13            THE COURT:  I see.

14            MR. DAILEY:  -- and some things they haven't --

15            THE COURT:  I see.

16            MR. DAILEY:  -- so it's gone on by specific --

17            THE COURT:  Okay.  I'm worried about e-mails.

18            MR. DAILEY:  Okay.  Right.

19            THE COURT:  Okay.

20            MR. EVANGELISTA:  May I just --

21            THE COURT:  No.

22            MR. EVANGELISTA:  -- make one follow-up?

23            THE COURT:  So this is how I feel.  I hear you about

24   whether they can show what they need to show with the data that

25   they have, and I think you've really done an excellent job at

1    producing stuff, even though they have this problem with the

2    90,000 loans.  And I don't know anything about that.  I don't

3    think that that was mentioned in the documents you guys filed.

4          I am inclined, because of the timing of this and the

5    crash happening in 2008, 2009, and the bulk of these loans, I'm

6    inclined -- I'm not going to give any kind of Bank of America

7    legacy snapshots.  I can't even imagine how costly that would

8    be.  And I'm not interested in giving any Merrill Lynch legacy.

9    But I am inclined, since I know a little bit about Countrywide,

10   and since they're on the AS400, to give that data because I

11   think they're really the most problematic loans.

12         But I am telling this to the plaintiffs:  I don't want

13   to hear one gripe about that data.  She is telling you now it's

14   going to be a mess.  That is your problem.  Okay?  She cannot

15   clean it up.  I'm not going to make her clean it up.  Okay?

16   It's going to be -- it's not going to be pretty the way the

17   current AS400 is.  So you're going to have to take the

18   burden -- I'm not -- I mean, I have to do this proportionality

19   thing.

20         My other option is to do what defendants are

21   suggesting, which is to say you hold off and you get this

22   Countrywide data after summary judgment rulings.

23         I'm not sure how Judge Bucklo would feel about that

24   because then she would be -- you would be -- if she denied

25   summary judgment, then you would be saying, Okay, well, now

1    we've got to go back to Rowland, and she would be calling me

2    and saying, Well, Rowland, why didn't you do your job the first

3    time around?  So I'm taking that into account, too.  She wants

4    me to get discovery done.  That's my job.  So I'm balancing

5    that, which is not your problem, but it's partly what's in my

6    mind.

7           But I don't want you in here every week complaining to

8    me that the legacy Countrywide data is giving you an ulcer,

9    okay?  She's telling you right now her client doesn't keep it

10   up to date, it's legacy data, those loans were not live when B

11   of A bought Countrywide, so they didn't care about them, they

12   didn't do anything with that data, they kept it -- thankfully

13   for you -- they kept it and they didn't dump it, so they have

14   it.  I'm ordering her to incur the expense of producing it to

15   you, which is a gift, but I'm not going to be on her ordering

16   her -- compelling her to track down because, you know, it

17   doesn't have this data field or it doesn't have that data

18   field.  I don't know what kind of shape it's going to be in.

19   It sounds like it's not -- she's making faces like it's --

20           MS. ROSE-SMITH:  Sorry, your Honor.  I don't have a

21   poker face about that.

22        (Laughter.)

23           THE COURT:  No, I understand.  It's going to be not

24   pretty.  But I'm not convinced, hear me, I'm not convinced that

25   you've met your burden for me to order the Bank of America to

1   incur however many hundreds of thousands it would cost to clean

2   up that data.

3           Now, if you want to tell me, Look, Judge, we'd rather

4   wait, let us duke it out in summary judgment and come back to

5   you after we win summary judgment and go after the legacy data,

6   then I might be in a position to say to Bank of America, Okay,

7   they get the legacy data from Countrywide and you've got to

8   clean it up and you've got to incur whatever expenses that is

9   to clean it up.  You want to wait, I'll wait.  But if you want

10  it and you want your expert to get to dig into it -- and I know

11  how experts are and I know they want to dig into data because

12  they're nerds that way.  So if you want it, you can have it,

13  and it's going to cost her money to get it to you, but I'm not

14  having -- I'm not having you then in here griping at me about

15  it.

16          MR. EVANGELISTA:  And, your Honor, I think it's fair

17  to say that if the Countrywide data was already on the

18  Countrywide data system, it should be perfectly fine.

19          THE COURT:  I feel kind of comfortable about that, but

20  she is being very clear in her representation that as they've

21  done updates, I feel like my dying iPhone updates every 15

22  seconds, as far as -- I mean, so as these things update,

23  they're not going back and updating that, right?

24          So whatever has happened in the past seven years or

25  five years or whatever we're talking about, that has not been

1    part of the updating process.  Okay?

2         MR. EVANGELISTA:  Yes.  And so -- but if your Honor

3    could just be clear about what data we're getting.  I -- the

4    Countrywide data, we will accept that.  We would like to have

5    it, and we would appreciate the -- and we do appreciate the

6    Court's ordering it --

7         THE COURT:  Okay.  So you're going back to 2004.

8    You're getting the same data, to the extent that it's

9    available, and I don't know that all the same data points would

10   have been available on that data, that's available on the

11   AS400, I guess it's on the same platform, for loans originated

12   or serviced after 2004, although there's no reason to go --

13   right, if a loan was -- if a loan was -- go ahead,

14   Miss Rose-Smith, because you want to say something.

15        MS. ROSE-SMITH:  I was just going to say, I think what

16   they're asking for is loans that were originated from 2004

17   forward, regardless of how long we serviced it, because if you

18   say originated or serviced --

19        THE COURT:  Okay.

20        MS. ROSE-SMITH:  -- then that could mean a loan that

21   was made 30 years prior to 2004 --

22        THE COURT:  Right.  We don't want that --

23        MS. ROSE-SMITH:  And they made the last payment in

24   January of 2004 --

25        THE COURT:  So loan originated after January 1, 2004.

1          MR. EVANGELISTA:  Right.  And servicing -- and

2    servicing would have been ended before January 1, 2009.  So it

3    just captures the missing component of what we're -- what we're

4    looking for.

5          MS. ROSE-SMITH:  And, your Honor, just to be clear,

6    you're ordering the fields that we have already produced, the

7    ones that --

8          THE COURT:  Yes, to the extent they're available,

9    knowing that some of those fields may not still be available.

10          MR. EVANGELISTA:  But, your Honor, may I make one

11    question here, because the first -- what your Honor said is

12    that same data, to the extent it's available, I don't want

13    counsel -- I want to make sure we are clear that counsel is not

14    interpreting it that if there's a field called ethnicity and

15    the date and -- or -- or race or loan product or rate and

16    the -- and the name of the field has slightly changed, when

17    they know that data is sitting there that they don't give it to

18    us because it doesn't match the exact field --

19          THE COURT:  I mean, I'm saying the same data.  The

20    same data.

21          MR. EVANGELISTA:  The same data.  Thank you.

22          THE COURT:  I don't -- I don't --

23          MS. ROSE-SMITH:  I wouldn't do that, your Honor.

24          THE COURT:  I don't see any hint of her playing games

25    like that.  I've not gotten a whiff of that.  Okay.

```
 1              MR. DAILEY:  Thank you, your Honor.

 2              MR. EVANGELISTA:  Thank you.

 3              THE COURT:  Are we done with time periods?

 4              MR. DAILEY:  We're done with the data portion of that

 5    time period.  You asked had that been across the board, and it

 6    had not.

 7              THE COURT:  Can I just say one thing?  Is April 22nd

 8    an unreasonable date on that?  I think it is.

 9              MS. ROSE-SMITH:  For the -- to produce the data?  It

10    is.

11              THE COURT:  Yeah.

12              MS. ROSE-SMITH:  I actually think my client would kill

13    me if I tried to give you an estimate --

14              THE COURT:  Okay.

15              MS. ROSE-SMITH:  -- but -- because I don't know --

16              THE COURT:  How about April 22nd you provide a

17    deadline?

18              MS. ROSE-SMITH:  Okay.

19              THE COURT:  You can submit something really short to

20    me and just -- and then I'll enter an order that it will be

21    produced by June 15th or whatever you tell me.  Okay?

22              MS. ROSE-SMITH:  Okay.  Thank you, your Honor.

23              THE COURT:  I'm not going to quibble with your dates.

24              Okay.  Witness information, you guys are going to

25    continue to discuss.
```

1          MR. DAILEY:  Right.

2          THE COURT:  Deadlines.  What else do we need to talk

3     about?  I mean time period.  I'm sorry.

4          MR. DAILEY:  AS400 loan servicing fields, specific

5     fields.  It looks like that's still outstanding, your Honor.

6          THE COURT:  On time?  On timelines?

7          MR. DAILEY:  Oh, I'm sorry.  No.  I'm sorry.  Right.

8          MR. EVANGELISTA:  The big time issue I think that has

9     the largest impact in the case is for the e-mail searches of --

10    and that sort of wraps in the --

11         THE COURT:  People.

12         MR. EVANGELISTA:  -- search fields and it wraps in the

13    custodians, because obviously there's more custodians if we're

14    covering the time period, but since the bulk of these loans

15    were made during the 2004 to 2008 time period --

16         THE COURT:  Well, I feel like we have -- we have, just

17    generally, we have a problem with e-mail, custodians, search

18    terms, timeline.  I mean, where are we with that, in general?

19         MR. EVANGELISTA:  So -- okay, your Honor --

20         THE COURT:  I mean, is this where we're talking about

21    785 potential people?  So how are we going to get to the bottom

22    of that?

23         MR. EVANGELISTA:  All right.  What we would propose is

24    we have -- we were asked to give a list of custodians, and we

25    did that, of -- based on the little information that we had

1    available that we could pull from whatever sources we could,

2    including their word charts.  We gave them a list.  We asked

3    for them to come back and give us a counterproposal, show us

4    who do you think is important, so we can have a

5    meet-and-confer, negotiate and discuss those custodians.  We

6    didn't get that information from defendants.  Nevertheless,

7    we've been working on trying to cull down our big list, to cull

8    it down, take unnecessary people out, divide the witnesses or

9    the custodians between the three corporate entities, the legacy

10   corporate entities and then the merged entity --

11             THE COURT:  Yeah.

12             MR. EVANGELISTA:  -- going forward, and try to put

13   those witness individuals into different pots of this is a

14   marketing person, so they're going to be relevant to the

15   marketing searches --

16             THE COURT:  Well, can I interrupt for a minute?

17             I thought, Miss Rose-Smith, that you had a list of 90

18   that you thought was good.

19             MS. ROSE-SMITH:  No, your Honor.  That's not true.

20             THE COURT:  Okay.

21             MS. ROSE-SMITH:  So what -- what happened here is --

22   this is just a timing thing.  They sent us a list of 785 on

23   February 18th, I believe it was, and we met and conferred on it

24   on the custodians for the first time on March 7th, okay?  Just

25   a timing issue.

1        At the time I said to them this list is absurd.  I

2   look at this list and I can identify maybe 90 people who if

3   Judge Rowland is looking at this cold and only looking at

4   titles might say these are relevant.  That's all I said to

5   them.  Okay?  And so I said -- and I have a list of -- a subset

6   of the list of the 90 that I think I would produce because I

7   don't want to have to go to Judge Rowland and have her order

8   just 90 based on titles.  Right?  Because 90 -- and I quoted to

9   them the cost, even assuming that there were 80 custodians,

10  right?

11       So I have a list of people that are -- that I think

12  are relevant in all of their different categories of

13  information, right?  And -- but they're all 2009 forward,

14  because we still have this issue with relevant time period.

15       If you -- what I would propose that the parties do to

16  resolve this is, depending on whether or not you order us to

17  search e-mail for pre-2004 -- from pre-2009 -- and to be clear,

18  what we have there is only things that were being held for

19  random people who were custodians in other litigation, not

20  because we have massive amounts of e-mail.

21            THE COURT:  Right.

22            MS. ROSE-SMITH:  BANA's roll-off policy is 90 days,

23  so -- and Countrywide kept a lot of things, but it's all since

24  been gone past the merger unless it was being -- it's on --

25  subject to a different litigation hold --

1          THE COURT:  Right.

2          MS. ROSE-SMITH:  -- for another matter.

3          So -- but if we go and search that, then what I

4    propose is -- I divided up in sort of my head they want

5    marketing, they want sales and origination, they want

6    underwriting, and then they want servicing and default

7    servicing, which servicing is just general how the loan was

8    serviced and how payments were applied, default servicing is

9    all of the stuff that they've alleged in their complaint about

10   loss mitigation, HAMP modifications, foreclosure.  And I would

11   propose that for -- I originally was thinking that 2009 we

12   would provide two custodians for this, two for that, two for

13   that, for each of those different things, and then five on the

14   whole -- the collective servicing, so there would be like 11 or

15   12 custodians from each -- like total from these entities.  But

16   if you go back further, I would propose that you do the same

17   thing and keep that list to something manageable like 20 or 30

18   as opposed to -- because I can tell you what it will cost us to

19   review 80, and I can tell you that we estimate that it would

20   take 40 reviewers 7 1/2 weeks based on what we have.  And

21   that's based on -- that's based on actual evidence -- I mean

22   actual estimates that we did in order to respond to the 80

23   custodians issue.

24          So I guess that's how I think we should manage this is

25   if assuming those fields that I just identified are right --

1    marketing, sales origination, underwriting, servicing, loss

2    mitigation, foreclosure, HAMP, identify custodians --

3         THE COURT:  So that's six fields -- I mean six

4    areas --

5         MS. ROSE-SMITH:  One, two, three, four, five, really

6    five -- five areas, because HAMP and loss mitigation are the

7    same.

8         THE COURT:  Okay.

9         MS. ROSE-SMITH:  But --

10        THE COURT:  You think ten people from each of those?

11        MS. ROSE-SMITH:  No.  Well, what I would propose to do

12   is break it up so that I'm giving you, on the pre-2009, give

13   you -- because that's all going to be Bank of America -- give

14   you ten people for all of the pre-2009 period, because that's

15   all one entity then.

16        On the pre-2009, I think what we'd have to do is

17   identify one to two people in each of those sections for each

18   of those companies, and that would -- that would net you

19   another 20 people or so.

20        And so that's why I'm saying that that seems like a

21   more reasonable thing.  And I tried to do that --

22        THE COURT:  On the pre-2009, we're going to -- it's

23   going to be very spotty whose e-mails we even have.

24        MS. ROSE-SMITH:  Right.  And so that's another thing

25   is I -- I -- I do have -- I have here what our -- what our

1    holds are, so we went back and said, Oh, you're holding that

2    for litigation, keep holding it.  Right?  So I have a list of

3    that, but I don't think it is, for that, is custodian by

4    custodian, I think it's case by case.

5              So I'm not trying to identify people who we don't have

6    anything to search, but I also don't know that the people that

7    we have are going to be especially relevant, and so we're going

8    to have to figure that out.  But a framework for doing that

9    that isn't let's start negotiating at 10 and 785 and meet

10   somewhere in the middle, that's not going --

11             THE COURT:  No, that's not what's happening.  So we

12   want to get the most -- we want to get the most effective

13   people.  I mean, it doesn't -- that's what we need to do.

14             MS. ROSE-SMITH:  So I, as I said, I've spent the last

15   few days since March -- well, since -- since March 7th, so the

16   last couple of weeks trying to identify the people who would be

17   helpful for that, and I have a list -- I only had before 2009,

18   which is the list that I always had, and I've tried to identify

19   the people who are pre-2009 so that we can -- so we can have a

20   discussion about that.

21             THE COURT:  Would the pre-2009 for Bank of America,

22   would they be the same people --

23             MS. ROSE-SMITH:  No.  So --

24             THE COURT:  -- or would they not necessarily --

25             MS. ROSE-SMITH:  No.  There's only actually I -- I

1    happen to know this.  There's only one person who is on this

2    list that is a -- is a legacy BANA person, who would then maybe

3    know something about legacy BANA loans.  And there's one person

4    on the list who is a legacy Countrywide employee that would

5    then know something about legacy Countrywide marketing,

6    actually, so that's --

7              THE COURT:  Yeah.

8              MS. ROSE-SMITH:  -- because a lot of people have just

9    left.

10             THE COURT:  Yeah.  Yeah, of course.  Well,

11   especially --

12             MS. ROSE-SMITH:  So I --

13             THE COURT:  -- Countrywide, I assume.

14             Okay.  So what -- that seems very sane.  What's the

15   problem with that proposal?

16             MR. EVANGELISTA:  Well, for one thing, we've been

17   asking for their proposal/counterproposal back time and time

18   again, and we're --

19             THE COURT:  Okay.  Well, now you have it.

20             MR. EVANGELISTA:  Okay.  Now we have it.  So I think

21   that is a -- I think that's a good proposal, but we do need to

22   be able to have an opportunity to see who they're identifying

23   and sit down and meet and confer, talk with them about it and

24   see if there's anybody else that we feel if they have the data

25   to go and go back and get it.  You know, our list was generated

1     from their work charts and from public database searches where

2     we could try to find former employees.

3              THE COURT:  Yeah, I know, but we're not --

4              MR. EVANGELISTA:  And we're not asking --

5              THE COURT:  We're not searching the president of the

6     bank's e-mails, I mean, for this.  What's -- what's the point?

7              MR. EVANGELISTA:  Well -- well, actually, no, not the

8     president of the Bank of America, but certainly the people that

9     were running Countrywide that -- at the very top.  And so the

10    way that system was set up over there, it's the people at the

11    top that knew what was going on and intended it and planned it.

12    So people like Gissinger, who was at the very top of that

13    chart, those are very important people and people that were in

14    his particular senior level group, management group.  But --

15    that's for legacy Countrywide.

16              So -- but I did want to make one other point.  It's

17    not just those -- it's not just the areas that defense counsel

18    has identified, because what she's left off the list are the

19    product development strategy people -- issue, who is doing

20    product development strategy, and then market -- marketing is

21    implemented to fit within that product development strategy.

22    And who are the people that were designing and what was the

23    compensation strategy, right?  Because the whole issue here is

24    that they designed and created a compensation system and

25    designed and created products that were specifically targeted,

1    marketed to minorities, in order to willfully take advantage of

2    minorities, not just in the loan origination, but when the

3    loans went into default.  This is in public statements.  It is

4    alleged in our complaint.  It is public statements made

5    particularly by the Countrywide defendants.  So -- and then the

6    third component --

7         MS. ROSE-SMITH:  That's not true, your Honor.

8         MR. EVANGELISTA:  The third component is servicing.

9    And in the servicing aspect, there is a strategic aspect to the

10   servicing here because the servicing isn't just, oh, we'll just

11   sort of collect money and see what happens, but they're

12   managing huge amounts of assets, the mortgage servicing rights

13   assets.  They're managing whether or not -- what properties

14   they're going to put into foreclosure if they think they can

15   make money on it.  So there was a strategic component to

16   servicing, not just the physical act of servicing the loan, but

17   how that happens?  Where do we decide to foreclose?  What loans

18   are we going to foreclose on?

19        THE COURT:  So it seems like maybe some of the areas

20   that defendants are suggesting you're not that interested in.

21        MR. EVANGELISTA:  No.  I think all -- I think the

22   areas that the defendants have identified are all relevant, but

23   they've left off these additional areas that are highly

24   relevant to the allegations in the complaint that this was not

25   an accident, this wasn't, oh, you know, after the fact that

1   we -- we made some bad loans.  This was a planned, intended
2   activity.
3           MS. ROSE-SMITH:  Your Honor, if I might respond just
4   on the -- on this point about which additional things.
5           We've already produced -- so the plaintiff keeps
6   saying over and over I want to be able to prove their motive, I
7   want to be able to prove their motive, but this is a
8   discrimination case, right?  So they have two types of claims:
9   disparate impact and disparate treatment.
10          For disparate impact, they don't need any motive
11  information at all, really.  I mean, what they need is a
12  facially neutral policy that had a disparate impact on
13  minorities.
14          Now, their -- they don't need -- that's not a case
15  that generally gets proved by e-mails.  That's a case that
16  generally gets proved by policies and procedures and numbers.
17          We have given them the compensation policies pre and
18  post 2009, so they have 2004 to 2009 and they have 2009 to
19  present.  They already have that.  And they have the data,
20  right?
21          So if there was some compensation policy that by
22  paying people in a specific way it had a disparate impact on
23  minorities, that -- they don't need e-mails for that.
24          On product development and strategy, again, this is
25  back to this same idea that what -- what the plaintiffs care

1    about is what product the person got, what features of that

2    product were discriminatory, or what parts of that product were

3    discretionary such that the local people in Cook County could

4    then manipulate that -- manipulate that product such that it

5    would be discriminatory here even though it might not otherwise

6    be discriminatory.  So maybe they routinely -- maybe this loan

7    has an interest rate range and majority borrowers got an

8    interest rate on the lower end of the range routinely and

9    majority borrowers were given interest rates on the higher end

10   of the range, right?

11        So we have tried to offer them the people who were,

12   you know, management-level people in these sections, right?

13   So, you know, the person in charge of underwriting and then

14   also people who are regionally in charge of underwriting.

15        But this idea that product development strategy

16   matters in comparison to, you know, actual use of the product

17   in the field, I don't see how that's relevant.  I just don't --

18   I don't see why.

19        And then I don't understand what they mean by

20   strategic servicing, right?  So if they mean the head of the

21   department that came up with the servicing policies, that's one

22   thing.  But, again, I really just need specifics.  Right?

23   Don't be nebulous about this idea that there was this strategic

24   servicing scheme.  Tell me what you think who -- who you think

25   would have been the architect of that scheme or what title that

1    person has, and then I will -- I will see whether or not we

2    have data on that person.  But they have not been that

3    specific.

4              MR. EVANGELISTA:  Your Honor, may we respond on that

5    or no?

6              THE COURT:  Well, I mean --

7              MR. EVANGELISTA:  Briefly.

8              THE COURT:  -- you're in the weeds pretty deep here

9    for me to be -- are you asking me to rule on whether we're

10   going to have e-mail search terms regarding compensation

11   strategy?

12             MR. EVANGELISTA:  Well, your Honor --

13             THE COURT:  Because -- or are you willing to sit

14   down -- it seems like what's happening now is you're for the

15   first time having -- for the first time describing -- the bank

16   is describing the five areas that it believes should be subject

17   to e-mail searches, and you're adding these four or five other

18   areas, which it seems like there's room for debate here.  If

19   you want me to rule on that, I can.

20             MR. DAILEY:  I think we should talk --

21             MR. EVANGELISTA:  Just one second.

22             Your Honor, we've alleged a 200-page complaint that

23   has this, and this -- we've alleged a discriminatory

24   intentional housing fraud scheme.  And we've asked for punitive

25   damages at trial.  And we have laid out every single one of

1    these components.

2          What I am saying today to defense counsel is not a

3    surprise.  We've been talking about this all along.  It goes to

4    the document requests we've asked for.  It goes to all of these

5    things that are alleged in the complaint very clearly.

6          I don't think defense counsel and defendant get to

7    define our case for us.  Our case is defined by our complaint

8    and our pleadings, which make it very clear that we have

9    alleged an intentional discriminatory housing practice.  And it

10   involves not just looking at, oh, yeah, there were some of

11   these different policies here that caused a discriminatory

12   impact, but we're talking about policies that were put together

13   by very smart people who don't want to get caught for a problem

14   like this, and everything is carefully designed to not look

15   like a bad thing, but it's actually an intentional -- an

16   intentional problem.  And we went to great pains to lay that

17   out thoroughly and carefully in the complaint that all of this,

18   how the product is designed, who it's targeted to and how it's

19   marketed, all of those things come together for the entire --

20   the entire allegation that supports the discriminatory housing

21   practice that we've alleged.

22          So defendants may not agree with it, but I don't think

23   they get to define our case and what discovery, now that this

24   case has passed the motion to dismiss, what discovery we should

25   be entitled to to prove our claims in the complaint.

1          MS. ROSE-SMITH:  Your Honor, the only point that I

2    would make about that is that their version of specificity has

3    resulted in a list of 785 --

4          THE COURT:  Right.

5          MS. ROSE-SMITH:  -- custodians.

6          THE COURT:  Right.

7          MS. ROSE-SMITH:  And that's all I have to say about

8    that.

9          THE COURT:  So how are we going to get to the

10   bottom -- I have one question with respect to the Countrywide

11   legacy, because I do think that we're kind of having a debate

12   here and we don't really know what's available.

13          So, you know, you talk about you want to get the

14   president of Countrywide's e-mail.  I don't know if we even

15   have that in his inner circle, because you think they are

16   sending e-mails back and forth about how they are going to rip

17   off certain communities.  So I would like to get a handle on

18   what do we have, okay?  Because I think there's -- I'm going to

19   do some balancing here, and it might be that there's going to

20   be more discovery done on Countrywide e-mails than there are on

21   older Bank of America e-mails, so I'm going to -- you know,

22   those are more costly depending on how they're stored, so it's

23   going to be important for me to know what's out there.  And I

24   understand if they only saved stuff because of litigation that

25   was pending -- now, there was a lot of litigation pending

1    against Countrywide for a while, so it might be that it is --

2    has all been preserved.  I don't know.  I don't expect counsel

3    to know that today.  But I think we are -- I need a little more

4    information before I can -- before I can figure that out.  I

5    don't know if we can go ahead with some e-mail searches while

6    we're figuring that piece of it out.

7            I honestly believe that you guys can work some of this

8    out.  You know?  Of course, plaintiffs want a broader swatch of

9    discovery than defendants think is appropriate.  You're not the

10   first case where this has happened, believe it or not.

11           So, you know, what I hear from defendants is they

12   clearly are going back before the magic 2009 date, which I

13   thought was an issue, but it seems --

14           MS. ROSE-SMITH:  We don't want to, your Honor, but I'm

15   trying to be practical.

16           THE COURT:  Okay.  So, you know, it seems like that

17   part is in the works.

18           Defendant, if you want to say to me, Look, we don't

19   want to do any e-mail searches, you know, we don't want to get

20   involved in the search terms until we figure out exactly what

21   it is we're going to be searching, I respect that, so we can

22   table this whole thing and come back in 30 days, or you can

23   say, Look, we can figure this out as to everything but the

24   Countrywide legacy stuff and let's get kind of the easier stuff

25   done first, if you feel -- if you want to do that.  I don't

1    know how your IT department likes to work.  I know this kind of

2    stuff is a pain and is costly.

3         So if you can come to some agreement on the five areas

4    that -- I mean, I think the bank's proposal as to their

5    original proposal is a good place to start.  I don't -- I think

6    that the plaintiffs have a right to stretch that.  I think

7    there's ways to include some search terms in there that, you

8    know, will cover some other areas that you're concerned with.

9    You're not searching 80 e-mail boxes.  You're just not.

10        MR. EVANGELISTA:  Okay, your Honor.  So the -- this is

11   actually what the parties had agreed to was we were going to

12   sit down and try to work through the custodian list and the

13   search terms and pull together -- because I don't think it

14   would be a good use of anybody's time to run preliminary

15   searches.  I think it's better that we get a core set of

16   custodians, a core set of search terms.  We've proposed those.

17   We proposed search terms and a search methodology, and that --

18   those terms and methodology cover the points that we're talking

19   about, compensation issues and things like that, strategic --

20        THE COURT:  Do you agree with that, Miss Rose-Smith?

21        MS. ROSE-SMITH:  Your Honor, I brought the search

22   terms letter because it is such a problematic thing.  I haven't

23   objected.

24        So let me start with this.  I'm not going to get

25   worked up with the search terms list.

1          But we went through their search terms list, which is

2     really three different lists of words that they want us to

3     connect by "and," depending on the kind of custodian they claim

4     the person is.  It is the most convoluted thing I have ever

5     seen in my entire career.  But we did not object to the words

6     or the fact that it took one of my associates an hour to put

7     them together into actual search strings.  We didn't object to

8     that.

9          What I said to Mr. Dailey is of your lists of words,

10    here are ones that I know when you use a connector like "and,"

11    you're going to get a lot of hits.  Like "100 percent and FHA,"

12    right?  If you search that over any number of fields, you're

13    going to get a lot of hits on that, right?  But if you come

14    back with some additional connectors, I'm willing to not fuss

15    about their fields as a general matter until I run them and

16    they come back with --

17              THE COURT:  Right.

18              MS. ROSE-SMITH:  -- 300,000 hits.

19              THE COURT:  Yeah, of course.

20              MS. ROSE-SMITH:  Right?  So that's why I haven't

21    raised any objection to those and am trying to work with them

22    to narrow them and add additional realistic connectors, like

23    within five or something like that --

24              THE COURT:  Right, right.

25              MS. ROSE-SMITH:  -- that makes sense other than "and."

1          THE COURT:  Right.

2          MS. ROSE-SMITH:  And so I'm willing to continue to do

3     that.

4          I am -- if we -- if we are talking about a universe

5     where we identify categories and we end up with 20 to 30

6     custodians, I don't mind searching a broader group of terms,

7     because even if it comes up with a lot of hits, it's still

8     going to be manageable for staffing purposes to review.  But it

9     is all of a piece because as long as there's a possibility that

10    there might be 80 custodians or 700 custodians --

11         THE COURT:  Right.

12         MS. ROSE-SMITH:  -- then I want to be very, very

13    specific about the search terms.  Does that make sense?

14         THE COURT:  Yeah, of course.

15         So I think I can't help you more right now except to

16    say you need to work on it and we're going to meet again.

17    There are not going to be 700 custodians, and there are not

18    going to be 80 custodians, so you're going to need to pick your

19    fights, okay?

20         MS. ROSE-SMITH:  Your Honor --

21         THE COURT:  And I want a report from you of what you

22    have in terms of e-mail storage from Countrywide so they can

23    make decisions about who are they going after.

24         MS. ROSE-SMITH:  May I just suggest --

25         THE COURT:  Yeah.

 1          MS. ROSE-SMITH:  -- for our timing purposes that that

 2     be on a very short timeline?  I can go back and do that in a

 3     relatively quick period.

 4          THE COURT:  Fine.

 5          MS. ROSE-SMITH:  And I would like us not to have a lot

 6     of time to meet and confer about this, not because I don't want

 7     to talk to them about it, but because I don't want to talk to

 8     them endlessly about it --

 9          THE COURT:  Okay.

10          MS. ROSE-SMITH:  -- before you make a ruling

11     because --

12          THE COURT:  What date would you like?

13          MS. ROSE-SMITH:  I would like you to just order that

14     it happen in two weeks.

15          THE COURT:  We come back in two weeks?

16          MS. ROSE-SMITH:  Yeah.

17          THE COURT:  Okay.

18          MR. DAILEY:  You said come back in two weeks or we

19     meet and confer in two weeks?  I'm not following.

20          THE COURT:  Let's come back.

21          MS. ROSE-SMITH:  Yeah, let's come back, because

22     either -- and the reason that I say that is because I have

23     already looked into how long and how much staffing and all of

24     that we're going to need to do the e-mail search, and that's

25     going to take a while.

1      THE COURT:  Yeah.

2      MS. ROSE-SMITH:  And so I want to make sure --

3      THE COURT:  It's going to take months.  It's going to

4 take you two months.

5      MS. ROSE-SMITH:  Yeah, and so the maximum --

6      THE COURT:  So tell me, can you find out about what

7 you have in terms of Countrywide in that time?

8      MS. ROSE-SMITH:  Yes.

9      THE COURT:  Okay.  So I could see you on the 7th.  We

10 will only talk about e-mail.  We will only be allowed to talk

11 about e-mail, though.  I have a 12:00 o'clock that I have to be

12 at.  So 10:00 o'clock.  Maybe you'll tell me we don't need to

13 talk because you've worked it all out.

14      Do I need to set another date in between or you guys

15 will work those dates out?

16      MR. EVANGELISTA:  Can you set a date by which they

17 will give us the information on the Countrywide individuals

18 that they have?

19      THE COURT:  Okay.  Give them the information on

20 Countrywide by the 29th.  Is that okay with you?  That's three

21 days.  Is that too tight?  Do you need a week?

22      MS. ROSE-SMITH:  Well, I mean, I -- I know I can give

23 them what custodians we have.

24      THE COURT:  Yeah.

25      MS. ROSE-SMITH:  I don't know that I will be able to

1   give them the date ranges for which we have the data, because

2   the date ranges are specific to whatever litigation they were

3   held for.

4           THE COURT:  Okay.

5           MS. ROSE-SMITH:  I -- but, you know what, let's

6   just -- I will just make everybody work and we'll get it done

7   on the 29th.

8           THE COURT:  Okay.

9           MS. ROSE-SMITH:  I want to just get it done.

10          THE COURT:  Okay.  And then are you going to have time

11  to meet and confer about search terms?

12          MR. EVANGELISTA:  So we should have -- I mean, that's

13  going to be kind of tight to try to -- I think to get that

14  done, only because defense counsel has pointed out a couple of

15  issues with a few of the terms as creating potentially large

16  hits, and we've agreed to go back and limit those down.  But we

17  need -- you know, I don't want to be in a position where we

18  have again identified for purposes of our meet-and-confer

19  discussions here's what we would like, and then defense counsel

20  not coming back with any kind of a substantive response, and we

21  talk about it and talk about it, and then they just end up

22  saying, No, we're not going to give it to you, and they dictate

23  to us what they're going to give to us.  I'd like the process

24  to actually work so that we can kind of get all these issues

25  cleared up with the Court as soon as possible.

1              MS. ROSE-SMITH:  Your Honor, I raised the issue about

2      the scope of their search terms when we first got them and

3      then -- so that was a few months ago.  And then the second

4      iteration, I said the same thing, and that was a month or so

5      ago.  And so they have had a significant amount of time to look

6      at their terms and add in different connectors.

7              What he is saying in a very nice way is I want you to

8      go back and tell me what connectors should be added.  Right?

9              We're not objecting to any of their terms until I see

10     how many hits they have because to me the only objection that's

11     relevant is burden.  Right?

12             Relevance is one of those murky things that you're

13     probably going to say I'm going to err on the side of letting

14     them look into this given their complaint.

15             So my only concern is for -- and I can't tell them,

16     other than a generalized here's my sense from working with this

17     bank for years, these are going to generate a lot of hits, I

18     can't tell them until we actually have the search strings.

19             Unfortunately, the way that their letter works is not

20     only do you have to combine different words from three lists in

21     order to do that, then you only apply them to specific

22     custodians.

23             So until those custodians get identified, I don't know

24     what the objection is.

25             So my suggestion is that -- I'm not making an

1    objection to search terms.  Let us come back to you if there is

2    an issue with the custodians, right?

3         They are going to -- they've already agreed that they

4    will narrow down their search terms further.

5         And then I will raise any objection that I have to the

6    term once we have a ruling on the custodians.

7         And I will do that quickly because I will run what we

8    have -- you know, I'll have somebody work on that, running what

9    we have.

10        And so that is to me the better solution, right?  To

11   say, okay, once custodians are nailed down, we've talked about

12   what we have, nail down what custodians we're going to search,

13   run all of their terms, are there terms that we can't work out.

14        THE COURT:  Right.

15        MR. DAILEY:  Your Honor, I think it's important to

16   make sure we're clear when we say "limit," limit the search

17   terms, we're talking about -- counsel did go through and say,

18   Hey, we're going to get a lot of hits on these particular ones.

19        THE COURT:  Right.

20        MR. DAILEY:  There were more search terms.

21        THE COURT:  Right.

22        MR. DAILEY:  And we agreed to go in and add a couple

23   more connectors --

24        THE COURT:  Right.

25        MR. DAILEY:  So that wouldn't happen.  And if it did

 1    happen, we would still sit down and talk.

 2            MS. ROSE-SMITH:  Right.  That's all I mean.

 3            MR. DAILEY:  Right.  And I just wanted to make sure

 4    that that was clear.

 5            THE COURT:  So by the 7th, are we going to be able

 6    to -- and I'm thinking about moving it to the 14th, actually.

 7    Are we going to be able to say here's the custodians, we've

 8    agreed on these five, we've agreed on these ten, we're having

 9    an argument over these others?

10            That's what we're going to do next time we're in

11    court, and we're going to --

12            MS. ROSE-SMITH:  Yes.

13            MR. DAILEY:  I would like --

14            THE COURT:  -- decide on a final -- decide finally the

15    number of the custodians and who they are.

16            MR. DAILEY:  Yes.

17            THE COURT:  And I'm not going to be addressing search

18    terms at that time.

19            MR. DAILEY:  All right.

20            THE COURT:  All right?

21            MR. DAILEY:  Right.

22            MR. EVANGELISTA:  It sounds like you're not.

23            THE COURT:  Okay.

24            MR. EVANGELISTA:  It sounds like we're in agreement on

25    that, but --

1           THE COURT:  Okay.

2           MR. EVANGELISTA:  -- I would ask if we can do it on

3     the 14th, if your Honor could make it at 10:30 --

4           THE COURT:  I'm going to move to it to the 14th

5     because that's going to be better for me at 10:00 o'clock.  And

6     I'm going to ask that by the 11th, you guys submit something to

7     me that says here's -- here's our dispute, because otherwise

8     you're going to be talking to me and I'm not going to know what

9     you're saying.

10          Okay.  All right.  So that's the witness information

11    really.  Custodians.

12          MR. EVANGELISTA:  Uh-huh.

13          THE COURT:  Okay.  All right.  And the time period.

14    We're kind of skirting around that, but it's going to wrap

15    around this whole issue about e-mail searches.

16          MS. ROSE-SMITH:  Well, there's two -- yes and no.

17          So -- so I just said I really don't want to, but I'm

18    being practical, we will search -- we will search 2004 forward

19    for e-mails, if that's what the Court wants us to do.  I don't

20    want to be on record as saying that I agree with that, because

21    I don't, but I will do it if that's what the Court orders, but

22    I don't want my client to think I just offered that up.

23          THE COURT:  Okay.

24          MS. ROSE-SMITH:  So we will do that for e-mails.  But

25    there is still the left-over issue of specific requests that we

1   have issues with where this isn't, in my view, this is not

2   covered by e-mails, and so we need to make decisions on the

3   timing for those.

4         Plaintiff has said in multiple instances, Well, we

5   think e-mail will cover it.  And if that's the case, then we're

6   resolved with that.

7         But I don't -- I don't want them to come back at some

8   later point and say you didn't give me enough policies and

9   procedures that were pre-2004 and now I want to raise that as

10   an issue.

11         THE COURT:  Okay.  So e-mails -- I'm going to order

12   that e-mails begin in January 2004 and no other -- that that

13   date will not apply to any other requests.  Okay?

14         MR. DAILEY:  Okay.  Thank you, your Honor.

15         THE COURT:  So I don't know what that would be, hard

16   documents, whatever they are, they're going to go to 2009,

17   although you've already agreed on some.  I know they've given

18   you policies pre-2009.  I'm not commenting on that.

19         So we're done with time frame.

20         MR. DAILEY:  Right.

21         THE COURT:  Okay.  So we're working on witnesses.

22   We're coming back on that as to e-mail searches or electronic

23   searches.

24         Are there other things we need to talk about?  Because

25   I'm a little bit running out of steam.  I know you said you

1     wanted two hours.  I'm trying to stay with you.

2              MR. DAILEY:  I think -- honestly, I think we can come

3     to terms with the definition --

4              THE COURT:  I know you want to talk about Turquoise.

5              MR. DAILEY:  No.  No, ma'am.  I was talking about the

6     definition of Cook County.

7              THE COURT:  That's -- defendant gets that secretary of

8     whatever.  She or he is in.

9              MR. DAILEY:  We just wanted to make clear that the

10    County was agreeing to go ahead and do that reluctantly, of

11    course --

12             THE COURT:  Okay, good.

13             MR. DAILEY:  -- if the secretary to the board was

14    speaking --

15             THE COURT:  Thank you.

16             MR. DAILEY:  -- in their official capacity --

17             THE COURT:  What else?

18             MR. DAILEY:  -- for the commissioners.

19             THE COURT:  What else?  How about the four lawsuits?

20             MS. ROSE-SMITH:  RFP 61.

21             THE COURT:  Yeah.

22             MS. ROSE-SMITH:  So, your Honor, I -- I didn't learn

23    that they had agreed to narrow it down to four until I saw it

24    in their version of the status report.

25             THE COURT:  Yeah.  And they didn't just narrow it

1   down -- they didn't just narrow it down to four, but it seems

2   like they narrowed down the documents from the four.  Am I

3   correct about that?

4           MS. ROSE-SMITH:  I only understood them to be

5   narrowing it down to all documents in those four cases.

6           THE COURT:  I thought that they -- and I'm a little

7   bleary-eyed, but I thought that they -- the settlement

8   agreements, factual statements, and consent orders -- am I

9   not -- I'm on page 16 of plaintiff's submission.

10          MR. EVANGELISTA:  So, your Honor, I can clarify that.

11          THE COURT:  Oh, I see.  You're limiting it to just the

12  following cases.

13          Well, what do you want all these documents for?  I

14  mean, what are you looking for?

15          MR. EVANGELISTA:  Well, this case has, in essence,

16  been litigated by the federal government, and Bank of America

17  has already produced documents, extremely similar case, on the

18  allegations that we've made in this complaint, and so the

19  documents that they've produced in that litigation --

20          THE COURT:  So you want all their discovery in those

21  cases.

22          MR. EVANGELISTA:  Not all discovery, just the

23  documents they produced.  Not the privileged ones, just -- just

24  whatever documents they produced and that they have I'm sure in

25  a culled set somewhere because they had given it over.  We

1    would like a copy of what they've produced in those -- in those

2    four cases.

3            THE COURT:  So the discovery they've produced.

4            MS. ROSE-SMITH:  And the privilege log.  That's what

5    their request called for --

6            MR. EVANGELISTA:  And, actually, we would withdraw the

7    privilege log issue if we can have the core -- just the core

8    documents that they -- that they turned over.

9            MS. ROSE-SMITH:  So, your Honor, I went back and I

10    looked into these -- into these ones.  And I have some specific

11    objections about them.

12            First of all, in the In Re. Bank of America, the U.S.

13    Department of Treasury case, it was an OCC enforcement action,

14    my client -- this came out of an OCC exam.  My client has

15    significant, loud objections about bank examination privilege

16    to production of the documents that were in that case.  This

17    doesn't have anything to do with minorities, by the way.  This

18    is a specific case that has to do with foreclosure practices.

19    Right?  They're -- they're already having these search e-mails

20    for stuff about foreclosure practices, so I don't know why they

21    need it -- they need it twice, especially given that there are

22    bank examination privileges.  And my client has such strenuous

23    objections to that, that if you are inclined to order anything

24    on that, they have asked me to request that you allow us to

25    brief that issue as to that one specific case, because that is

1    something that they feel very significantly opposed to.

2         The other case -- the next one is -- I'm going from

3    the bottom.  The next one is this Gregory Mackler case.  We

4    don't -- there were no documents there.  That case was filed --

5    it has to do with a relator.  It's a False Claims Act case.

6    Doesn't have anything to do with discrimination.  But there was

7    no separate production made.  That was wrapped into a global

8    settlement that Bank of America and others did with the

9    Department of Justice, so there's nothing really there.

10        On the *U.S. versus Countrywide Financial*, this was an

11   FHA case, and what was produced there is what you normally get

12   in an FHA case.  In other words, loan data and policies and

13   procedures.  We are already giving loan data and policies and

14   procedures.  This case was broader.  It didn't cover just Cook

15   County or just Chicago.  It covered a much broader area.  And

16   so what I would -- my argument there is we were already

17   producing the same types of stuff that was produced in that

18   case specific to Cook County, and it doesn't make sense to then

19   say, Please produce all that loan data that you produced on all

20   of these other markets that don't have anything to do with Cook

21   County just because you produced them in that case.  Instead --

22   it's data and policy.  It's exactly what you need in an FHA

23   case.  And so we -- we're doing that here, so I don't think we

24   need anything there.

25        And then the last one is the In re. Bank of America,

1    the HAMP case.  Again, not a case that was specific to minority

2    borrowers or any allegation of discrimination.  It was just a

3    case where they alleged that Bank of America generally didn't

4    give HAMP modifications when they were supposed to.  And that

5    case, we produced 106,279 documents.  I don't know how many

6    pages that is.  And so I've previously raised issues with

7    producing them or pages, and my client is opposed to

8    re-producing all of these because they won't just reproduce

9    them, right?  They want to -- they will want to review them,

10   and that's extensive and expensive.  So we would have a burden

11   objection to that one.

12          And that's all of them.

13          THE COURT:  I'm not going to order that.  That's

14   denied.

15          Okay.  What else do I have to talk about?

16          I mean, I think we still need to talk about data,

17   right?

18          MS. ROSE-SMITH:  The specific ones, yes, your Honor,

19   Turquoise and AS400.

20          THE COURT:  Yeah.  So where am I in the document?  I

21   think that I'm on like page 11, 12, 13 of the County's

22   position, the same pages for the plaintiff's position -- I

23   mean, the defendants' position.  So --

24          MS. ROSE-SMITH:  AS400 is probably easiest because

25   it's a smaller number of fields.

1          THE COURT:  Right.  There's just like 11 fields,

2     right?

3          MS. ROSE-SMITH:  Well, there are 11 fields, and then

4     there are 8 sub-reports that come out of those fields.

5          The plaintiffs did not mention the -- or did not

6     specifically raise the eight sub-reports, but I asked them

7     ahead of the hearing and they still want them.  And given that

8     we talked about it, even though they didn't put it in the

9     report, I'm trying to be fair and say that's clearly --

10          THE COURT:  Okay.  Let's talk about the 11 fields.

11          MS. ROSE-SMITH:  Okay.  So the first one is SEC MKT.

12     This is a field that's just --

13          THE COURT:  Yep.

14          MS. ROSE-SMITH:  We said we would go back and look.

15     We found it.  I don't mind giving it.  I don't think it has

16     anything to do with anything, and I'm not by agreeing to do it

17     conceding that it is relevant at all for any purpose, but I

18     am -- I'm trying to be reasonable, so that one is fine.

19          The telephone number --

20          THE COURT:  So are you saying you are giving it?

21          MS. ROSE-SMITH:  Yeah.

22          THE COURT:  Okay.

23          MS. ROSE-SMITH:  I'm saying that I'm willing to give

24     it.  We have it.  I checked.  It's something that --

25          THE COURT:  Okay.  I didn't hear you.  Okay.

 1              MS. ROSE-SMITH:  Yeah.  So that one is fine.

 2              For telephone and mailing address -- so this is the

 3     last number that we have for the borrower for their phone

 4     number.  And then the mailing address is not the property

 5     address.  This Court has already ordered that we provide the

 6     property address.  Some people, if the house was a rental or if

 7     they've moved --

 8              THE COURT:  Right.

 9              MS. ROSE-SMITH:  -- have a different mailing address.

10     So this is a borrower's mailing address from whenever --

11     whatever we last had for them.

12              We made an objection because that is -- that is MPI

13     under Gram-Leach-Bliley, and we just don't feel like we can

14     turn it over.  We did not say that we didn't want you to

15     contact borrowers.  In fact, our initial disclosure said

16     borrowers would have relevant information.  But these guys

17     aren't those borrowers' lawyers.  This is not a class action or

18     even a putative class action.  And so for me to just say, Sure,

19     I will give you all of these people -- I will give Cook County

20     essentially your phone number, I don't think borrowers would

21     like that as a general principle, given that it's a government,

22     and I also think that we can't do it under the

23     Gram-Leach-Bliley.  And so absent some showing that having

24     every borrower's phone number and mailing address as opposed to

25     some subset of borrowers of loans that they identify as

1    particularly problematic I think is an overreach and with

2    significant privacy concerns.

3           THE COURT:  How about -- I would like to treat this as

4    the StatusMart -- as our StatusMart data.  So when you identify

5    your loans, we'll supplement with the borrower phone and

6    borrower mailing address, okay?

7           MR. EVANGELISTA:  All right.

8           THE COURT:  Okay.  Principal interest rate.  I can't

9    believe that's not already in there.

10           MS. ROSE-SMITH:  It is, your Honor.  And then.  So

11    what they've said in their report is wrong.  It's not the --

12    it's not the principal interest rate.  It's -- this is the

13    principal and interest payment.  So at the time that the report

14    is pulled, whatever the total amount of their payment is is

15    there.

16           Now, we've given them the interest rate month by month

17    for the entire history of the loan.  And that's what they say

18    in their report because they called this the principal interest

19    rate.  That's what they say is relevant.  But what the field

20    really is is the principal interest payment.  And I'm not sure

21    I understand why -- I don't know what their relevance basis is

22    for the principal and interest payment, which is not the

23    principal and interest payment that was -- that was available

24    at the beginning of the loan.  It's -- it's under current

25    payment information, which means at whatever time we pulled it,

1    that's what their payment was.  And I'm not sure I understand

2    why that's relevant, but I'm happy to hear it.

3              MR. EVANGELISTA:  Yeah, so we did discuss that with

4    them in our meet-and-confer.  We went through each of these and

5    explained the relevance.  And the relevance is that if -- what

6    the borrower is paying now, it is different, particularly with

7    respect to adjustable rate mortgages, where there was one

8    payment and interest rate early on, and then now they're paying

9    either a much higher or inflated rate, and combine that with

10   the servicing data and that loan goes into foreclosure, and you

11   can see -- you can see how the increased rate goes right

12   into -- you know, would lead the loan into foreclosure.  And

13   that really relates to a large number of loans that were made.

14   So, you know, we just think that's a simple term.  There's

15   not -- a simple term that has relevant information.  There's no

16   reason to withhold it.  And it gives us a framework to see what

17   are they paying at this point in time relative to what they

18   were -- would have been paying initially when the loan was

19   made.

20             There's another term -- there are a couple of other

21   terms like that that help juxtapose when the loan was made

22   versus what they're paying now.

23             MS. ROSE-SMITH:  Well, but the problem is that this

24   isn't what the borrower is paying when the loan was made.  This

25   is what the borrower is paying -- or the last piece of

1    information that we have on file about what the borrower's

2    payment was before the loan was service released.  It

3    doesn't -- it's just whatever that payment is right that

4    minute.  And if they want to see how the interest rate impacted

5    the payment over time, as I've said, we've given them both

6    interest rate over time -- and I can show you what that looks

7    like, your Honor -- it's a month-by-month -- so if there is a

8    change in the interest rate because it's an ARM, you will see

9    the month that it changed, you will see how long it was

10   charged, and then you will see when it changed again in the

11   fields that we've already provided.

12           THE COURT:  And do you see when the foreclosure took

13   place --

14           MS. ROSE-SMITH:  Yes.

15           THE COURT:  -- relative to when the ARM went up?

16           MS. ROSE-SMITH:  Yes.  So you -- so the information

17   here that we've provided will provide that because it has the

18   date, the date of the foreclosure, the dates that a mod. was

19   first requested, so they could even see if --

20           THE COURT:  Right.

21           MS. ROSE-SMITH:  -- the rate change --

22           THE COURT:  So your expert is going to do all that

23   analysis, isn't -- isn't he or she?

24           MR. EVANGELISTA:  I'm sorry?

25           THE COURT:  Your expert is going to do all that

1    analysis.

2            MR. EVANGELISTA:  Right.  But what we were told was,

3    Well, you can go calculate that information.  That's what

4    defendants' position is, that, Oh, okay, well, if you know the

5    interest rate, and then you can go back and sort of calculate

6    it, but yet they have a field that shows what the payment is

7    right now when -- at the time the data was produced, if the

8    loan is still being serviced, or when the loan was -- at the

9    time it went into default.  I just don't see why that is a

10   problem to give that.

11           MS. ROSE-SMITH:  Well, because that's not the -- that

12   may not be the payment that they're actually paying now or the

13   payment that they paid three months earlier or the payment that

14   they paid six months before that.

15           THE COURT:  So this is what they are owe -- this is

16   what they owe, but they might pay less than that.

17           MS. ROSE-SMITH:  No -- yeah, and they may make a

18   payment that is less than that.  Right?  So --

19           THE COURT:  And is that reflected in the database,

20   what they actually pay?

21           MS. ROSE-SMITH:  There is -- one of the reports that

22   they've asked for is a narrative report, and it will show

23   payment application over time.

24           What we have in our data -- I'm just looking through

25   it really quickly -- we have -- we have what we call loan

1  status over time and delinquency status over time, so you can
2  see at any given month whether or not it was current, meaning
3  that they've made the full payment --
4            THE COURT:  Uh-huh.
5            MS. ROSE-SMITH:  -- or whether or not it had dropped
6  to 30 days past due --
7            THE COURT:  Okay.  I'm not going to -- I'm not going
8  to order this.
9            I am inclined to order the credit life insurance.
10  Tell me what this is.
11            MS. ROSE-SMITH:  It's borrowers who have paid or are
12  paying a particular insurance in case they died so that their
13  mortgage --
14            THE COURT:  Right.  And you want to argue that they
15  sold this in a way that was discriminatory.
16            MR. DAILEY:  Yeah.
17            MR. EVANGELISTA:  Yes.
18            THE COURT:  Yeah, okay.  I'll order them to produce
19  that.
20            Year-to-date taxes.
21            MS. ROSE-SMITH:  So this is the amount that the --
22  that in the year that the data was pulled, this is the amount
23  that the -- of taxes paid by the lender for the year at the
24  time we pulled the data.
25            So I actually had them run a sample of 63,000 of our

1    loans to see what each of these fields comes up with.  And on

2    year -- on the year-to-date taxes, in a lot of them it's zero,

3    and in some of them it's whatever -- it's whatever if they've

4    made their first quarter tax payments or --

5              THE COURT:  Why do you need this for your damages?

6    Doesn't the County know its tax -- I mean, are your damages the

7    fact that taxes were not paid on these properties?

8              MR. EVANGELISTA:  Well, that's one component of

9    damages, yes, your Honor.

10             THE COURT:  So why do you need this?

11             MR. EVANGELISTA:  Why do we need it from defendants?

12             THE COURT:  Yeah.

13             MR. EVANGELISTA:  Well, the concern is for -- to the

14   extent that the taxes have been unpaid and have accrued or also

15   at the time that the property went into foreclosure -- because

16   one of the issues is who -- who -- whether the taxes had been

17   paid, who has paid it, who is responsible to pay it.

18             MS. ROSE-SMITH:  But, again, the year-to-date taxes

19   field wouldn't tell you that because if a loan is already in

20   foreclosure, it wouldn't show you all the years, the time that

21   it's been in foreclosure, taxes that weren't paid.  It would

22   only show you whatever from January 1st the lender paid on the

23   borrower's behalf.  And so in some cases, that would be zero if

24   they didn't hold escrows --

25             THE COURT:  Right.

1          MS. ROSE-SMITH:  -- and in some cases it will be

2     whatever the first quarter taxes are.

3          THE COURT:  Yeah.

4          MS. ROSE-SMITH:  I would just submit that the County's

5     records on what was paid and unpaid are a much more complete

6     record of that than this one field.

7          THE COURT:  Yeah.

8          MR. EVANGELISTA:  Your Honor, based on that, we'll go

9     ahead and withdraw that one --

10         THE COURT:  Yeah.

11         MR. EVANGELISTA:  And we'll stick with --

12         THE COURT:  I'm not --

13         MR. EVANGELISTA:  -- our records, if counsel --

14         THE COURT:  Okay.

15         MR. EVANGELISTA:  In other words, if counsel is saying

16    that those records are fine, they'll accept them, then we don't

17    need --

18         MS. ROSE-SMITH:  I'm not saying that, your Honor.

19         THE COURT:  No, she's not saying that.

20         MS. ROSE-SMITH:  They have a more complete record than

21    what we have in this field.

22         MR. EVANGELISTA:  Okay.  So there's your answer of one

23    of the reasons of why we needed it because, you know --

24         THE COURT:  Well, she's saying it's not -- it doesn't

25    show you much in terms of the day that she pulls it.  I mean, I

1    myself don't escrow, so it wouldn't show you much if you pulled

2    mine.  Okay.  But I'm not going to order it.

3            Discount held.  This appears to be relevant for

4    numerous claims.  It would show what the rate charged to the

5    borrower actually is.

6            MS. ROSE-SMITH:  So that's actually not true.  The

7    discount held field is a field that shows -- it's in the

8    original information section, which means it's an origination

9    field.  And what it is is if the borrower -- it's a discount

10   that they would have gotten on the interest rate.  So I

11   looked --

12           THE COURT:  When they sign up for the loan?

13           MS. ROSE-SMITH:  Yeah, when they -- when the loan --

14           THE COURT:  I'm ordering that.  That sounds helpful.

15   I'm ordering that.

16           Maturity date and term of loan remaining term.

17           MS. ROSE-SMITH:  So the maturity date, they're --

18   you're getting --

19           THE COURT:  I know what that is.

20           MS. ROSE-SMITH:  Well, that's maturity.  So what

21   they're not getting is the -- we're giving them the maturity

22   term, which is like 360 or --

23           THE COURT:  Right.

24           MS. ROSE-SMITH:  And so they -- what they want is the

25   date, the maturity date, and I just didn't -- I -- the only

1    thing that we had a discussion about with this is for me to say

2    I think you already have what you need and then to say no.

3              MR. EVANGELISTA:  So, your Honor, the difference here

4    is this is a hard date when the loan terminates.  It's a simple

5    data point that they capture.  Otherwise, we have to go back

6    and look at when the loan was originally made --

7              THE COURT:  Okay.  I'll give you that.  I'll give you

8    the maturity date.  But you're already giving them the term of

9    the loan, right?

10             MS. ROSE-SMITH:  Yes.  And we -- I looked -- so we're

11   already giving them the amortization term.  The --

12             THE COURT:  You're not going to give them the

13   remaining term.  I mean, you're not calculating that for them.

14             MS. ROSE-SMITH:  Well, the problem is that we haven't

15   found a way to get it out of -- to produce it anyway, so

16   it's -- to me, it's just -- if that is relevant to any claim,

17   it seems like you would -- their expert would be able to

18   calculate it.

19             MR. EVANGELISTA:  As long as we have -- as long as we

20   have the maturity date, we can --

21             THE COURT:  Right.  You'll calculate that.

22             MR. EVANGELISTA:  Right.

23             THE COURT:  Okay.  Sale price, appraisal date, and

24   appraisal amount.

25             MS. ROSE-SMITH:  So sales price is not -- is not --

1    and I told them this -- is not the sale price when we sold the

2    loan in foreclosure.  It's the price that -- so if a borrower

3    buys a new house and they have a contract on the house, it's

4    the sale price of the contract.  And so for refi's, that number

5    is zero, right?  Because that -- because it's not a sale price.

6    And I explained that to them, and they still seemed to want it,

7    but I'm not sure why.  It doesn't seem like -- it seems to me

8    if what you're trying -- if the only reason that you would need

9    that is if you were trying to say that we made high LTV loans.

10   We're giving them the LTV.  So if they -- if they want to say

11   that we only made 100 percent LTV loans to minority borrowers,

12   they don't need the sale price, they just need the -- they need

13   the LTV and the loan amount, which we're giving them.

14          MR. DAILEY:  And, your Honor, it's all captured here

15   purposely, the sale price and appraisal date and appraisal

16   amount, which were refused as well.  We're going to compare

17   whether or not you inflated those appraisal amounts versus what

18   the actual sale price on that contract was.

19          Our complaint specifically alleges that Bank of

20   America, defendants, fraudulently appraised property.  And

21   because they were able to do that, that was one of the major

22   portions and major ways of stripping equity that likely didn't

23   even exist in the property at the time the loan was made and

24   when it went into foreclosure.

25          THE COURT:  And is all that in AS400, so there's a --

1   there's a column that says this is what the property was

2   appraised at and this is what, you know, and this is what it

3   actually sold for?

4           MR. DAILEY:  Based on our understanding, that's what

5   this is, yes, ma'am.

6           MS. ROSE-SMITH:  Yes.

7           THE COURT:  I'll order that.

8           MS. ROSE-SMITH:  So all three of those?

9           THE COURT:  Yes.

10          MS. ROSE-SMITH:  Okay.

11          THE COURT:  Okay.  And grace days.

12          MS. ROSE-SMITH:  Your Honor, this one is -- it is

13  literally the number of days in a borrower's grace period.  And

14  I -- this field to me is illustrative of everything that's

15  happened here.

16          So when I asked them what their relevance basis was

17  for this, they said for the first time ever we think that maybe

18  what you did is say to an African-American borrower, "And we

19  usually have a 15-day grace period on this, and we're only

20  going to give you 8 days."

21          That's not anywhere in their complaint.  It's not

22  anything that I have ever heard anybody accuse anybody of.  And

23  it makes sense that nobody has ever been accused of that

24  because the grace days are set by like Fannie- and

25  Freddie-formed documents, so there's not ever really a change,

1    but that's what they told me is the reason that they had that.

2         And that's -- to me, that's one of the problems here

3    is we can go field by field and talk about what's relevant and

4    what's not relevant, but the problem is that a lot of times

5    they were saying it's relevant based on nothing other than this

6    is something that we have -- we thought might be interesting.

7    And that's -- you're going to see a lot of that in Turquoise.

8    And what I want to know is how does that tie to a specific

9    allegation that you've made and how -- and how is that

10   relevant.  And grace days just doesn't seem to be relevant.

11        MR. DAILEY:  Well, of course, we definitely disagree

12   with Counsel's characterization of this field.

13        It's highly relevant because it goes to the product

14   term.  Grace days go with different product terms.  And if you

15   gave minority borrowers products with less grace days, that's

16   going to go into how you were able to strip the equity in terms

17   of foreclosing on that property earlier.  That's --

18        MS. ROSE-SMITH:  Your Honor --

19        MR. DAILEY:  -- one way to look at it.

20        And the other way that we also had already determined

21   was -- and when I say determined, we are looking into -- is

22   that your servicing procedures and your foreclosing procedures

23   and practices violated half of federal statutes, and we allege

24   that clearly.

25        So there's no indication here and no belief on our

1    part that you actually followed the grace day rule just because

2    it was mandated by Freddie -- Freddie Mac and Fannie Mae.

3              MS. ROSE-SMITH:  So that is a perfect example of when

4    they say, Oh, your Honor, we've been incredibly specific in our

5    complaint about what our allegation is.  We said that they

6    violated the federal laws on servicing.  Now that means that it

7    has something to do with grace days.  Right?

8              So I have been for a year assuming I understood what

9    that meant, and now it also means that maybe we didn't comply

10   with grace days.

11             And that's part of the problem that you're going --

12             THE COURT:  Yeah.

13             MS. ROSE-SMITH:  -- to see with Turquoise, and I just

14   don't -- grace days are not dependent on loan product.  Grace

15   days are determined by whether or not the loan is conforming or

16   not conforming.  And the only reason that they're determined by

17   that is because if it is a Fannie Mae loan, it's going to have

18   the same number of grace days; and if it is not, it's going to

19   have whatever the -- whatever the company's policy was on grace

20   days, which, based on the 60,000 or so loans that I reviewed to

21   prepare for this, is 15 days.  Same as Fannie.  There's not --

22   and, frankly, this is the difference between where that

23   allegation would come from.  Right?  That would just be like me

24   saying, "Your Honor, I think you're a serial killer, so please

25   let me search your house."

1          THE COURT:  Yeah.

2          MS. ROSE-SMITH:  I don't have any basis to make that

3   allegation, but I'm going to say that, and then you're going to

4   have to provide information.

5          Nothing in the complaint talks about grace days.

6   Nothing.

7          MR. EVANGELISTA:  Your Honor, actually the complaint

8   goes into great lengths about how the loans that were made

9   included a whole variety of predatory terms.  Prepayment

10  penalties.  Higher inflated interest rates.  Higher yield

11  spread premiums.  And the grace days go to the particular

12  products.

13         So if there are -- the issue here isn't as much about

14  conforming loan product, Fannie Mae or Freddie Mac loans,

15  because presumably if they followed that form, everyone would

16  have had the same grace day.  It's a question of shorter grace

17  days in a loan that we've alleged was intended or designed with

18  the intent that it likely would go into foreclosure.

19         THE COURT:  Okay.

20         MR. EVANGELISTA:  Made to go into foreclosure.

21         THE COURT:  Here's what I'm going to do.  I understand

22  your argument about grace days, and I'm going to order it, but

23  I want to say this:  I think the bank is being extremely

24  forthcoming in terms of producing this data.  Okay?

25         You guys, you've got to pick up the phone and talk to

1      her about what you're looking for and why you need it.  Okay?

2              I mean, she shouldn't be hearing about this the first

3      time in court.  It's not helpful.

4              MR. EVANGELISTA:  Your Honor --

5              MS. ROSE-SMITH:  We talked about this when --

6              MR. DAILEY:  She just disagreed --

7              MR. EVANGELISTA:  Just one second --

8              MS. ROSE-SMITH:  March 8 I believe it was -- yeah,

9      March --

10             MR. EVANGELISTA:  Your Honor, the issue here is that

11     we only just get information at the last minute, and then we

12     try to meet and confer and understand it and see what's in

13     there, and then we try to respond to them as soon as possible.

14     We didn't know about grace days before.

15             MS. ROSE-SMITH:  Untrue, your Honor.  Untrue.

16             MR. EVANGELISTA:  We didn't know that it was there.

17             MS. ROSE-SMITH:  They have known about the field for

18     grace days since you ordered us to produce the AS400, which was

19     at the last hearing.  So the idea that we gave this to them at

20     the last minute, untrue.

21             MR. DAILEY:  We had a meeting on March 7th in which we

22     discussed the final data fields.  What -- and I -- that's the

23     date we had the conversation.  That's the day we told you, yes,

24     we wanted it.  That's the date you said no.

25             MS. ROSE-SMITH:  Right, because that's the first time

1    that I learned that you had this reasoning for grace days as

2    suddenly we're going to say that you gave minority borrowers a

3    shorter grace period.  But you have known about the field for

4    grace days since we produced the --

5            MR. DAILEY:  We've known about lots of fields that we

6    had a discussion on March 7th about --

7            THE COURT:  All right.

8            MR. DAILEY:  Told you --

9            MS. ROSE-SMITH:  The idea that --

10           THE COURT:  Okay.

11           MS. ROSE-SMITH:  -- we're trying --

12           THE COURT:  Okay.

13           MS. ROSE-SMITH:  -- to hide the ball is --

14           THE COURT:  All right.  So you have some disputes over

15    some RFPs.  I'm not going to rule on those today.  And I'm

16    reluctant to say I'll take those up in April, but I may try.  I

17    doubt it.

18           I'm -- I've done what I've done in terms of the

19    schedule.

20           At the next time we talk, we're going to set a date by

21    which, I hope, a date by which they will identify their loans,

22    although given that I'm giving them the legacy Countrywide

23    data, that may be pushed back, but we probably -- what I would

24    like to do is have you identify the loans for the data you've

25    already received, knowing that the legacy Countrywide loans

1    will be identified thereafter, so we'll do that in two stages.

2         MS. ROSE-SMITH:  That would be really helpful for us

3    to get started on it.

4         THE COURT:  I think that's a good way to do it.

5         I understand we have not talked about Turquoise

6    origination data.

7         MS. ROSE-SMITH:  Turquoise data is only -- only

8    Countrywide data.

9         THE COURT:  Yes?

10        MS. ROSE-SMITH:  And I will say this:  They -- they,

11   in their report, identified some categories.

12        THE COURT:  Yep.

13        MS. ROSE-SMITH:  If -- we can talk about categories.

14   The problem is that you're not going to get this data on all

15   the loans.  And, you know, we went through -- they gave me 60,

16   so I went back and tried to figure out what the 60 were, and I

17   gave them a list of what information I had about the 60.

18        There were some where I had to say nobody knows what

19   this field is, nobody uses it currently, and nobody here was

20   able to tell us what it is or what it was, and when they looked

21   at what the sample fields were, they got -- they got things

22   like null or no recent history back in, like, what the field

23   contained.  And so I -- the reason that I gave them the

24   Turquoise data fields, all of which are fields that are -- the

25   data is stored in AS400, it's not in Turquoise -- but the -- I

1    gave them that because one of the previous hearings you said

2    you've got to give them enough information so that they can

3    identify the kinds of information that they need --

4           THE COURT:  Right.

5           MS. ROSE-SMITH:  -- what is it that they're looking

6    for.

7           And so I said here are some types of things that can

8    be -- that will be available, at least on Countrywide loans,

9    and maybe we can find a comparable field for Bank of America

10   loans.

11         And instead of saying, Okay, Sabrina, which of these

12   fields have to do with pricing, because I want something that

13   identifies pricing, or which of these fields have to do with

14   "X" because I want something that has to do with "X," they came

15   back and said, We want 274 and we have questions about 60.

16         And then I went back through and I looked at the ones

17   like -- so I don't know if you can see this, your Honor, but

18   this page, all of the fields that are highlighted in yellow

19   (indicating) are ones that we had already agreed to give them

20   but which they nonetheless said, We want this field, even

21   though we already are giving them that data.  They did no work

22   to even cull down their ask based on what they were already

23   getting.  And that is the kind of thing that we're dealing

24   with.  And that's why we're deadlocked at Turquoise.  It's not

25   because I'm saying, "I will give you nothing."  I am saying,

1  "The only person who I can think of that can make you be

2  rational about what you're asking for is Judge Rowland, and so

3  I'm going to refuse until she tells you that you have to be

4  rational about it, because this is not something that I can

5  deal with."

6  　　　　MR. EVANGELISTA:  Okay.  So actually, your Honor, what

7  happened is we were asked to identify -- we were given this

8  in -- what was the -- we had a meet-and-confer and we were

9  handed this document.  We were asked to go back and identify

10  the fields we want.  We were not given a date -- a field

11  description of any of this.  We had our expert look -- our

12  expert look at it, who is a former HUD investigator, on this

13  exact issue.  He looked at this stuff and said, "This is a

14  treasure trove goldmine in this case."

15  　　　　The data that Countrywide has kept on these loans is

16  everything we have alleged in the complaint.  All of it.  It is

17  pricing information.  It is compensation information.  It is

18  how money is divided up on these loans.  It is what the

19  incentives are.  It's got marketing information.  It goes on

20  and on.  And you can just -- I mean, the -- you know, you can

21  just look at the name of the field, and it is plainly obvious

22  what should be in that data based on the field name.

23  　　　　So based on the field name and our review of the field

24  names, we said, Yeah, we would like these -- we would like the

25  fields you've already agreed to produce, we would like the

1    additional fields, to the extent they're additional in

2    Turquoise, that you haven't already agreed to give us, and we

3    went through to the best that we could and said, Look, we don't

4    have the descriptions, but based on what it appears to us to

5    be, this stuff looks highly relevant to our -- to the

6    allegations in our case.

7            Again, not just simply about, Oh, this was a loan and

8    we're looking at just simply the FICO score and the

9    loan-to-value ratio and what the interest rate was, but on all

10   the -- the components of how the different, we'll call them the

11   different facially neutral policies come to play on each loan.

12   So when you have, we'll call it a facially neutral policy of

13   compensating people to make a more costly, more expensive loan,

14   or to bake into it a higher origination cost --

15           THE COURT:  I understand the theory.

16           MR. EVANGELISTA:  Yeah.  So it's -- it is -- it is

17   a -- it is a treasure trove of data points.

18           THE COURT:  So is the Turquoise data on the AS400?

19           MR. DAILEY:  No.  Our understanding it was only the

20   GEMS --

21           MR. EVANGELISTA:  Wait.  Wait.  Let defense --

22           MS. ROSE-SMITH:  It is part of the GEMS module.  I

23   think that legacy data might be stored on their different --

24   there are like four different AS400 types.  Might be stored in

25   one of the others.

1    Wherever it is, it's -- it's -- we have what we have for

2    Countrywide loans.  We have nothing on these for Merrill.  We

3    have nothing on these for Bank of America.

4    And the problem isn't -- the problem isn't that all --

5    they've just identified this massive number of fields and

6    they've said, Yes, I know it's taking you six months to get us

7    data on the 60 or 90 fields that you've already given us, but

8    now please go back and get us 274 more.

9    And the basis that they have alleged for that is:  See

10   my big complaint.  Right?

11   And it's exactly the grace days problem.  I am trying.

12   But with that many fields, I -- I have no idea what the theory

13   of the case is going to be other than you did everything wrong

14   and only to minorities.

15   And so I look at this the way that they look at

16   this -- the federal government looks at this, right?  When

17   they're trying to figure it out.  They want information about

18   the underwriting and pricing decision, and the information that

19   they ask for that is denial and acceptance, points and fees,

20   and interest rates.

21   This is all in -- this is all the not -- the old HMDA,

22   the new HMDA.  They look at borrower demographic information.

23   They want race, ethnicity, sex, and age.  Given them that.

24   Given them all the underwriting and pricing decision.  Borrower

25   financial and credit information.  Income, lien status, credit

106

1    score, DTI, all of that, we're giving it.  Loan

2    characteristics, right?  Prepayment penalty.  Introductory

3    rate --

4            THE COURT:  What about this compensation, this

5    baked-in compensation theory?

6            MS. ROSE-SMITH:  Well, but there's this idea that

7    there's -- so, first of all, I don't know what they mean by

8    "baked-in compensation."  There is -- because -- because

9    there's -- it's pretty clear that there are multiple different

10   types of compensation on a loan.  There's what we are going to

11   give the originator.  Right?  And depending on whether that

12   originator is a broker or a -- or someone who works in-house,

13   there's a compensation plan, so they have the compensation plan

14   to see what -- and you can look at that and you can see what --

15           THE COURT:  But is there any data in there that --

16           MS. ROSE-SMITH:  No, what it will tell you is for loan

17   types that are pay option ARMS, this is what we pay.  For loan

18   types that are these kinds of ARMS, this is what we pay.  So to

19   that theory, they can then say, Look, your compensation plan

20   incentivized these loans that I now, based on this data --

21           THE COURT:  No, I understand that, but is there

22   anything in the Turquoise data that indicates, oh, yeah, this

23   person was getting a better compensation than this other -- on

24   this other loan?

25           MS. ROSE-SMITH:  No.  What it will do -- the only way

that you could do that is if you pulled -- I don't know which field, looking at it right now, but there are fields that will tell you loan -- like what the -- it doesn't give you -- it doesn't give you the individual originator's credit.  It will give you broker information by loan, I think.  But I don't know about the -- I only saw fields for crediting the branch with the -- with the fact that the loan was made.  I didn't see fields for that.  But there -- I don't want to misrepresent. There might be in this long list of things.  And I don't have any better descriptions than what I've already given the plaintiffs.

But the problem is if we could have a conversation where they would bracket it off and say, You know what, the thing that I need most is this compensation thing, I would say, Here are ten fields that have to do with compensation, at least as I understand it, based on my -- what I know and what I can find out about this, because this is -- the people who know these systems are gone --

THE COURT:  Right.

MS. ROSE-SMITH:  -- let's talk about that.  But that's not what they've done.  And that's why I have an objection to it, because if they can -- and, you know, they've said that the reason that they can't do that is because they don't know what the fields are, but I have said I have -- you have the same information that I have.  And Mr. Evangelista just represented

1    to you --

2              THE COURT:  Right, his expert loves these fields,

3    right.

4              MS. ROSE-SMITH:  Yes.  Exactly.

5              THE COURT:  Let me ask this, Counsel:  The Turquoise

6    origination data, how -- what era is this?  Because is this

7    going to cover what I just ordered you to produce in terms of

8    the Countrywide loans pre-2009?

9              MS. ROSE-SMITH:  No, because the fields -- well, yes,

10   so -- yes and no.

11             So the data that we put in here would have been data

12   that at some point was in Turquoise and then -- and that

13   came -- that then is in AS400, so we're pulling from multiple

14   systems to get the data --

15             THE COURT:  I see.

16             MS. ROSE-SMITH:  -- that we promised --

17             THE COURT:  I see.

18             MS. ROSE-SMITH:  -- so yes and no.

19             THE COURT:  So to the extent you're doing this, you're

20   already doing what I ordered you to do anyway because these are

21   older loans and they're only Countrywide.

22             MS. ROSE-SMITH:  Yes.  So if there's data for those

23   fields in here, we get it.

24             THE COURT:  Do you want to hand me the list of data

25   fields and have me rule?  I mean, I don't know what to say.

1    You want 274, she wants to produce 62.  You can't -- you cannot

2    have her give you a list of 274 and call her up three weeks

3    later, whatever the timeline was, and say, We want all 274.

4    You've got to negotiate with her.

5            MR. EVANGELISTA:  Your Honor, the negotiation issue

6    here is not a problem from our side, but it is not -- it is not

7    possible to negotiate with somebody who doesn't respond other

8    than to say, No, I'm not giving them.  That's -- that's the

9    problem we've had in the meet-and-confer --

10           THE COURT:  Well, you're both having challenges

11   communicating, and whoever is being more reasonable or not,

12   you know, I don't know, but what do you want me to -- do you

13   want me to rule?  Because I will.  But, you know, you guys know

14   your case better.  So if you want me to come in and say, That's

15   a good field, that's not a good field, that's a good field,

16   that's not a good field, I will do that.

17           MR. EVANGELISTA:  Your Honor --

18           THE COURT:  That seems insane.  And if I were

19   litigating the case on either side, I would want to control

20   that more than having some dodo in a -- in a robe do that, but

21   I will do it.

22           MR. EVANGELISTA:  Your Honor, we would just like to

23   sit down with the defendants and go through these fields.

24   We've already identified the areas that we think are important.

25           THE COURT:  But you identified every field.

1          MR. EVANGELISTA:  I'm sorry?

2          THE COURT:  You identified every field.

3          MR. EVANGELISTA:  Well, we didn't identify every

4  field.  We've identified a lot of fields because they all

5  involve very similar areas that are relevant to the case.  The

6  marketing issues where -- you know, what -- where's the

7  marketing lead coming from, the compensation issues, and how

8  compensation changes when you add different predatory features

9  or factors or yield spreads into the loan, who -- whose -- is

10  the loan a broker loan?  Was it generated in-house?  Was it a

11  purchased loan?  All of these things go to -- go to the

12  complaint.

13          And so I am very happy to sit down and try to cull

14  down as much as we can, but I need the defense counsel to sit

15  down with us and go through and say, Look, you know, we've been

16  asking, tell us why what we're asking for isn't relevant.

17  We'll take it off the list.  We've done that over and over

18  again if we -- if we -- where we've had meet-and-confer

19  discussions and counsel says, You know, that's not really

20  relevant.  And with very few exceptions, we're okay.  You know,

21  where we're disagreeing, we bring that issue to the Court.  But

22  unless we can have -- unless that process can work as it's

23  supposed to work in meet-and-confer, which is we ask for

24  something, you say, Well, look, this is why we think what

25  you're asking for is too much, and let's go through them and

1    spend the time to do that.

2          That's -- that's all we're asking to do.  Whether it's

3    the data fields, whether it's the custodians, whether it's the

4    search terms, that's what we're asking for.  And we've been

5    asking for this for months.

6          MS. ROSE-SMITH:  Your Honor, I'm going to try and take

7    all of the accusation out of this and say this:  For the

8    Turquoise fields, they did send me a letter at one point and

9    said, We want 274, but there's 60 that we have questions about.

10   They didn't say I have questions about all these other fields

11   that I'm asking for.  They said there's 60 that we have

12   questions about.

13         I went through and found -- and it took weeks to do

14   because these company -- this company doesn't exist anymore, it

15   took weeks to do -- but I went through them and I figured out

16   what information I had for each one of those fields, and I gave

17   them that information.  And I said, Let us sit down and talk

18   about that information, right?  And then you can tell me which

19   of these you want or don't want.

20         I can't do that functionally for all 274,

21   resource-wise, without it taking a long time because I go to

22   multiple different departments, anybody --

23         THE COURT:  Right.

24         MS. ROSE-SMITH:  -- use this?  Anybody seen this?  And

25   that's because we don't have a dictionary.  Okay?

1    So all I'm saying is identify these groups.  Now, he

2    says, Oh, we've identified groups.  In their -- in the thing

3    that they filed March 11, that is the first time that they said

4    we're interested in the pricing information that's in

5    Turquoise.  Okay?

6    So if that's what you're going to order us to go back

7    and do, I think that's fine; but I don't want it to seem as if

8    anything that I've done in this case has prevented us from

9    having that conversation.  I have tried --

10    THE COURT:  I am not worried about your conduct in the

11    least.

12    MS. ROSE-SMITH:  It just is I can -- I cannot create a

13    data dictionary for 274 fields.

14    THE COURT:  Are the 60 fields in the 274?

15    MS. ROSE-SMITH:  No.  So there were 389 on the list.

16    They asked for 274, and they asked -- they said we can't

17    determine whether to take these 60 off the list or keep them

18    on, please tell us about those.

19    So it's 274 plus 60 that are in play.

20    THE COURT:  Can we agree that the 60 are now off the

21    list?  I mean, you never got back to --

22    MR. EVANGELISTA:  I don't think we've had a chance

23    to -- I mean, because this process is so time-consuming, and

24    what we've said to counsel on this is let's work through the

25    process and get it down to agreed list.  We are fine with doing

1    that.  We're fine with giving them some time to do it.  And

2    I --

3           THE COURT:  Well, she took a lot of time and she got

4    you a letter on the 60, and you never got back to her.  So in

5    my mind, the 60 are dead.  And that would be -- that would help

6    pare this list down.

7           MR. DAILEY:  Your Honor, I think it would be very

8    prudent if the parties had a hard day to either have the number

9    to opposing counsel or not to take this issue off the table.

10          THE COURT:  I can't hear you.

11          MR. DAILEY:  It would be prudent of the parties to --

12   for the court to order a date to have this completed, and

13   whatever dates -- whatever fields we want, whatever fields they

14   say yes to, either have it settled or not, and I'm saying

15   before the next status hearing --

16          THE COURT:  Well, what I want to make sure of is that

17   the bank -- the bank takes into account how this interfaces

18   with the other pre-2009 Country Club [sic.] because, frankly,

19   if this Turquoise takes care of the pre-2009 Country Club

20   production, then you don't have to do that production and/or if

21   the 2004 to 2009 production replaces this production, then you

22   don't need to be spending time on this production.  So I'm

23   worried about the double production here.

24          MR. DAILEY:  Just so I'm understanding correctly, are

25   you talking about the loan data that we -- that you ordered

1    earlier --

2                THE COURT:  Yeah.

3                MR. DAILEY:  -- in contrast with the Turquoise data?

4    I think those are two different.

5                MS. ROSE-SMITH:  They are.

6                MR. DAILEY:  Much different.

7                MS. ROSE-SMITH:  Well, that's not true, they're not

8    much different.

9                But of the 274 that they asked for, they identified 33

10   that we were already giving them.  So it's 274 minus 33,

11   because we're giving them 33.  So on the pre-2009 production,

12   they will get those same 33 that they're already getting out of

13   Turquoise.  So there's not going to be a double production.

14   It's just going to be -- we're going to not produce them --

15   we're only going to produce them once.

16               THE COURT:  Okay.

17               MS. ROSE-SMITH:  But the issue is discussing all of

18   the 60 that they have questions about and then of the 274 that

19   we haven't already given them which of them are ones that they

20   want.

21               And on the 60, your Honor, I think that you should

22   make a ruling today because I identified for them a description

23   of those fields on May -- I just pulled up the e-mail -- it was

24   March 8th that I sent that.  I sent it at midnight.  I stayed

25   up.  March 8th.  And I said field, description of the

1    information that I have.  We did not get to talk about it

2    because AS400 took up so much of our conversation, but I did

3    send them the description.

4         So between March 8th and now, you would expect that

5    they would say here are the ones we want or don't want.

6         And then on the 274, I think we should go back and

7    they can give me groups, and we can try to have a discussion.

8         THE COURT:  Yeah, let's set some deadlines.  So --

9         MR. EVANGELISTA:  Your Honor, just on this Turquoise

10   data field, yes, the issue was that we -- we -- as counsel

11   represented, we did not have a chance to sit down and go

12   through that with them.  I mean, we can respond to them very

13   quickly on those additional fields and on the questions.  And,

14   again, when we had an opportunity and we had this information

15   that counsel presented, we went through -- we eliminated many

16   items that -- you know, when counsel explained what they are,

17   we've eliminated them.  We haven't, you know, asked for stuff

18   that we don't think is relevant.

19        THE COURT:  Good.  Good.

20        Okay.  So here's what I'm going to do:

21        By April 1st, of the 274, minus the 33 that she's

22   already producing, so whatever that number is, of that number,

23   by April 1st you need to identify which of those 274 you really

24   want.  I mean, I know you've said you wanted 274, but I want

25   you to pare that down.

1          I am taking the 60 off the list that you never got

2  back to her about, so that will help you pare that down.

3          And then I know you're filing something with me on, is

4  it April 11th you're filing something with me?

5          MR. DAILEY:  Yes, ma'am.

6          MS. ROSE-SMITH:  Yes.

7          THE COURT:  So on that date, I want you to tell me as

8  to Turquoise how many fields are you still having a dispute

9  about, and we will talk about that the next time you come in.

10 And maybe the answer will be zero.

11         And I also -- that will give the bank a couple of days

12 to figure out how this interacts with the other legacy stuff.

13 It doesn't sound like it does; but to the extent it does, that

14 might take care of some of the plaintiff's concerns.

15         MS. ROSE-SMITH:  That's true, your Honor, because it

16 might be that these fields are -- we're providing more of these

17 fields than we think, they just have different names.  So we'll

18 figure it out.

19         THE COURT:  I mean, it seems like Turquoise -- it's

20 cheaper to get it from Turquoise because it's a more active

21 database.

22         Okay.  That's all.  I'm done.

23         I owe you a ruling on a couple of -- on a couple of

24 requests for production, right?

25         MS. ROSE-SMITH:  Yes, your Honor.

1    MR. DAILEY:  Yes.

2    THE COURT:  Do I?  That are in here?  I'll try to do

3 that before I leave tomorrow.  And I'll see you in early April.

4 Okay?

5    Have a good day, everybody.  Thanks for your patience.

6    MR. EVANGELISTA:  Your Honor --

7    THE COURT:  Yes.

8    MR. EVANGELISTA:  Could we set the hearing the next

9 time at 10:30 a.m. instead of 10:00 a.m.?  Is that --

10    THE COURT:  Sure.  What date -- what date did I say?

11    MR. EVANGELISTA:  14th.

12    THE COURT:  April 14th.  Sure.  10:30.  No problem.

13 Does that work for everybody?

14    MR. EVANGELISTA:  Thank you.

15    MR. DAILEY:  Yes.

16    MS. ROSE-SMITH:  Yes, your Honor.

17    THE COURT:  Thank you.  Have a good day.

18    MS. ROSE-SMITH:  Thank you, your Honor.

19    (Proceedings concluded at 12:52 p.m.)

20

21

22

23

24

25

1                     C E R T I F I C A T E

2         I certify that the foregoing is a correct transcript of the

3     record of proceedings in the above-entitled matter.

4

5
      /s/ GAYLE A. McGUIGAN_____        April 1, 2016
6     Gayle A. McGuigan, CSR, RMR, CRR                    Date
      Official Court Reporter
7                                                  April 1, 2016
      _____          Date
8     Gayle A. McGuigan, CSR, RMR, CRR
      Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25