## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| COUNTY OF COOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BANK OF AMERICA CORPORATION, | ) | Case No. 14-cv-2280 |
| BANK OF AMERICA, N.A., | ) | |
| COUNTRYWIDE FINANCIAL | ) | Honorable Elaine E. Bucklo |
| CORPORATION, | ) | |
| COUNTRYWIDE HOME LOANS, INC., | ) | Magistrate Judge Mary M. Rowland |
| COUNTRYWIDE BANK, FSB, | ) | |
| COUNTRYWIDE WAREHOUSE LENDING, | ) | |
| LLC, BAC HOME LOANS SERVICING, LP, | ) | |
| MERRILL LYNCH & CO., INC., MERRILL | ) | |
| LYNCH MORTGAGE CAPITAL INC., and | ) | |
| MERRILL LYNCH MORTGAGE LENDING, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

## JOINT REPORT REGARDING OUTSTANDING DISCOVERY DISPUTES

Pursuant to the Court's March 24, and April 8, 2016 orders, Plaintiff County of Cook (the

"County") and Defendants Bank of America Corporation ("BAC") for itself and as successor by

*de jure* merger to Merrill Lynch & Co., Inc. ("Merrill"); Bank of America, N.A. ("BANA") for

itself and as successor by *de jure* mergers to Countrywide Bank, FSB ("CWB") and BAC Home

Loans Servicing, LP ("BACHLS") (BAC and BANA are collectively "the Bank of America

Defendants"); Countrywide Financial Corporation ("CFC"); Countrywide Home Loans, Inc.

("CHL"); Countrywide Warehouse Lending, LLC ("CWL")[1] (CFC, CHL and CWL are

---

[1] Countrywide Warehouse Lending, LLC ("CWL") merged into BofA Merrill Lynch Asset Holdings, Inc. in March 2014 and CWL no longer exists.

collectively the "Countrywide Defendants"); Merrill Lynch Mortgage Capital Inc. ("MLMCI"); and Merrill Lynch Mortgage Lending, Inc. ("MLML") (MLMCI and MLML are collectively the "Merrill Defendants") (collectively, "Defendants") hereby submit their joint report regarding outstanding discovery disputes and state as follows:

## I.     BACKGROUND

The Court directed the parties to address three issues in this joint status report in advance of the April 14, 2016 status conference: (1) the status of the custodian negotiations; (2) the status of the negotiations regarding the Turquoise database; and (3) the status of the search term negotiations. Based on the discussion with the Court at the April 7, 2016 hearing, the parties have also submitted competing proposed case schedules, and will be prepared to address Defendants' outstanding Motion to Compel 30(b)(6) witnesses. Finally, the parties also note below two issues still outstanding from the parties' last status report and hearing.

## II.    CURRENT OUTSTANDING DISCOVERY ISSUES

### A.     Email Search Custodians

The parties exchanged custodian lists and met and conferred about potential custodians on April 8 and April 11, but were unable to reach agreement regarding document custodians. Their positions are set forth below.

### The County's Position

Based on the parties' exchange of information, exchange of custodian lists, and meet and confer discussions held on April 8 and April 11, the number of proposed ESI custodians has been tremendously reduced. The chart below identifies each of the County's proposed ESI custodians, arranged by the general subject matter relevant to the Complaint (far left column). A number of the custodians appear multiple times as a result of their seniority, importance, and historical positions. Defendants indicated their agreement to search such custodians for all

pertinent information.

The individuals listed in the "BANA" (Bank of America), "CW" (Countrywide) and "ML" (Merrill Lynch) columns have been color coded. The parties appear to have agreed that, at least, the individuals who are not color coded shall be custodians. Incredibly, however, Defendants do not agree to also include three of the custodians they just recently proposed to the County which the County identifies in the far right column marked "Defendants' Proposed Custodians." In all there are a total of only 21 unique custodians that do not appear to be in dispute.

Defendants also do not agree to the:

- 21 unique individuals color coded in yellow, which Defendants claim are "irrelevant" to the issues in the case;

- the 2 individuals color coded in blue, which Defendants acknowledge are "relevant" to the issues in the case; or

- the 22 unique individuals color coded in purple, which Defendants claim they do not yet have enough information to determine their relevance but have stated that they will not obtain further information for them.

In short, there are 45 unique custodians in the chart below that are in dispute.

| | BANA | CW | ML | Defendants' Proposed Custodians |
|---|---|---|---|---|
| **General Equity Stripping Scheme** | Peggy Lawlor, Home Equity Sales Strategy Executive, SVP Home Loans Enterprise Sales & Mortgage Strategy Executive<br><br>Edward O'Donnell, Executive VP, Risk Management, Whistleblower | Angelo Mozilo, Chairmen & CEO<br><br>Andrew Gissinger, Executive Managing Director,<br><br>Greg Lumsden, President, Full Spectrum Lending<br><br>Barbara Desoer, | Vincent Mora, Managing Director, Mortgage Lending, Head of Mortgage Desk | |

|  |  |  |  |  |
|---|---|---|---|---|
|  | Eileen Foster, SVP Mortgage Fraud Investigations, Whistleblower | President, Home Loans & Insurance,<br><br>Edward O'Donnell, Executive VP, Risk Management<br><br>Michael Winston, Enterprise Chief Leadership Officer, Whistleblower |  |  |
| **Targeted Minority Marketing** | Leigh Teague, Senior Vice President, Customer Segment Strategy Manager,<br><br>Christina Morales, Vice President & Director of Multicultural Communications, North Carolina<br><br>Miguel Bassail, Vice President Multicultural Marketing Communications, Illinois<br><br>Claudia Portillo, Consumer Risk Officer – Multicultural Projects | Andrew Gissinger, Executive Managing Director<br><br>Andy Bielanski, Senior Managing Director, Marketing,<br><br>Lenny McNeill, Executive Vice President National Sales – Multicultural Diverse Segments,<br><br>Lilia Villasenor, Senior Vice President National Multicultural Manager |  |  |
| **Targeted Database Marketing** | Holly Breslin, Senior VP Database Marketing | Andrew Gissinger, Executive Managing Director,<br><br>Andy Bielanski, Senior Managing Director, Marketing,<br><br>Lenny McNeill, Executive Vice President National Sales – Multicultural Diverse Segments, |  |  |
| **Mortgage Product Pricing & Strategy** | Barbara Desoer, President, Home Loans & Insurance,<br><br>Mark Bruckner, Head, Home Loans Credit Products & Pricing,<br><br>Mike Witt, Credit Policy Executive for Mortgage | Andrew Gissinger, Executive Managing Director,<br><br>Andy Bielanski, Senior Managing Director, Marketing,<br><br>Stephen Smith, Countrywide Consumer | Vincent Mora, Managing Director, Mortgage Lending, Head of Mortgage Desk<br><br>John Young, VP Operations, NationPoint (subsidiary division of Merrill Lynch B&T) |  |

| | | | | |
|---|---|---|---|---|
| | Strategies,<br><br>Stephen Smith, BAC Centralized Mortgage Sales (2009 – 2010) | Markets Division, CFO (2001-2007)<br><br>Tomas Scrivener, CFO Secondary Marketing<br><br>David Doyle, Sales Origination Legacy Asset Servicing, Foreclosure Review<br><br>Todd Dal Porto, Western Div. Retail Sales Executive | Stephen J. Dunn, Senior Management, National Sales, First Franklin | |
| **Origination Policies & Practices** | Scott Houp, Senior VP, Sales Performance Exec., Illinois<br><br>Mary Watkins, Home Loans Credit, Products & Pricing (Policies & Procedures)<br><br>Scott Hamilton, SVP Process Redesign Leader (Home Equity execution strategies)<br><br>Brian Jensen, SVP Regional Manager, Illinois | Andrew Gissinger, Executive Managing Director, Countrywide<br><br>Barbara Desoer, President, Home Loans & Insurance<br><br>David Doyle, Sales Origination<br><br>Mike Schloessman, President, Home Loans, BAC Reps & Warranties Executive, Managing Director<br><br>Edward O'Donnell, Executive VP, Risk Management | John Young, VP Operations, NationPoint (subsidiary division of Merrill Lynch B&T)<br><br>Stephen J. Dunn, Senior Management, National Sales, First Franklin | |
| **Underwriting Policies & Practices** | Thomas Kevin Winston, Senior Vice President, Neighborhood Lending/Multicultural Products & Underwriting<br><br>Patrick Norton, 1st Vice President, Underwriting, Centralized Operations, Illinois<br><br>Edward O'Donnell, Executive VP, Risk Management | Rebecca Mairone, COO Head Mortgage Servicing, Legacy Asset Servicing, Default Servicing<br><br>Edward O'Donnell, Executive VP, Risk Management<br><br>Robert Price, Senior Vice President, National Underwriting Executive | Dean Brundage, Senior Loan Underwriting & Operations Manager, Merrill Lynch | John Boland (Countrywide)<br><br>Brian Robinett (Countrywide) |
| **Compensation Policies & Practices** | Stephen Smith, Centralized Mortgage Sales (2009 – 2010)<br><br>Leora Goren, Director of | Andrew Gissinger, Executive Managing Director, Countrywide<br><br>Barbara Desoer, | John Young, VP Operations, NationPoint (subsidiary division of Merrill Lynch B&T) | |

|  |  |  |  |  |
|---|---|---|---|---|
|  | Human Resources<br><br>John Cashner, Regional Sales Manager, Illinois | President, Home Loans & Insurance<br><br>Edward O'Donnell, Executive VP, Risk Management<br><br>Leora Goren, Director of Human Resources<br><br>David Doyle, Sales Origination | Stephen J. Dunn, Senior Management, National Sales, First Franklin |  |
| **General Servicing Policies & Practices** | Bill Senhauser, Legacy Asset Servicing, Compliance<br><br>Stephen Smith, National Servicing Executive (Nov. 2010 – July 2013)<br><br>Tim Huval, Head Home Loans Servicing<br><br>Ron Sturzenneggar, Head, Legacy Asset Servicing<br><br>Kim Lott, Mortgage Servicing, Compliance, Risk, Communications & Audit<br><br>Anne Resch, Servicing Initiatives, Fees Initiatives | Steve Bailey, Senior Managing Director, Servicing Manager<br><br>Bill Senhauser, Legacy Asset Servicing, Compliance |  |  |
| **Default Servicing/ Foreclosure Policies & Practices** | Rebecca Mairone, Head Mortgage Servicing, Legacy Asset Servicing, Default Servicing<br><br>Tony Meola, Head, Default Servicing<br><br>Mark Acosta, Mortgage Servicing, Foreclosure & Bankruptcy,<br><br>Jim Buchanan, Head FHA & Foreclosure Review<br><br>Sylvia Kawakami, Servicing Initiatives, Refer to Foreclosure | Rebecca Mairone, COO Head Mortgage Servicing, Legacy Asset Servicing, Default Servicing<br><br>David Doyle, Legacy Asset Servicing, Foreclosure Review, & Sales Origination |  |  |

| | | | | |
|---|---|---|---|---|
| | Patrick Carey, Legacy Asset Servicing/Default Servicing, Held for Investment & Specialty Segments<br><br>Paula Bradham, Quality Control, Legacy Asset Servicing, FTC & Fees, DOJ/AJ Metrics<br><br>Carol Cobble, Legacy Asset Servicing, Quality Control, Foreclosure, Bankruptcy & Fees | | | |
| **Strategic Servicing Initiatives/ Transfers** | George Ellison, Head Portfolio Management, Head, Legacy Asset Servicing, Portfolio Management<br><br>Larry Washington, Head, Legacy Asset Servicing, Servicing Portfolio Strategy<br><br>Jennifer Eisenberg, Servicing Portfolio Strategy, Strategy & Initiatives<br><br>Kelly Kent, Head Servicing Initiatives, Legacy Asset Servicing<br><br>Rene Giacalone, Servicing Initiatives, Strategic Servicing Transfers<br><br>Laura France, Default Servicing, Held For Investment Strategic Implementation | | | |
| **Servicing/ HAMP & HARP Modification & Refinance Policies & Practices** | John Murray, Default Servicing, Loan Modification<br><br>Anne Cardozo, Servicing Initiatives, Timely Modifications<br><br>Tammy Spriggs, Legacy Asset Servicing, | | | |

| | MHA/Modifications | | | |
|---|---|---|---|---|
| **Loss Mitigation/ Loss Forecasting** | Eric Telljohann, Head, Credit Loss Mitigation, Legacy Asset Servicing<br><br>Eric Wrobel, SVP Strategy, Loss Mitigation/Foreclosure<br><br>Steve Price, Credit Loss Mitigation, Foreclosure Alternatives<br><br>Ryan Vekeman, Credit Risk Segmentation & Risk Detection, Credit Loss Prevention Strategies<br><br>Stephen Riley, Credit Loss Mitigation, Intake & Program Procedures | Jack Schakett, Head Credit Loss Mitigation Strategies<br><br>Laura Bartolomea, Credit Loss Mitigation Strategies, Policy & Governance | Scott. A Turlington, Vice President, Loss Mitigation Manager, Merrill Lynch | John Berens (BANA/Countrywide) |

Defendants' primarily assert a burden argument in running ESI searches on the individual custodians which they do not agree to (i.e., the 45 color coded custodians). Thus, Defendants assert that the expense of searching for ESI for those individuals outweighs the County's need for, and relevance of, the information such custodians may have.

In determining the appropriate number of custodians, and the resulting burden on Defendants, the Court should consider the importance of this litigation, the broad scope and complexity of the nature of Defendants' alleged discriminatory housing practices, the number of Defendant parties, the extent of damages Defendants' actions have caused to the County and elsewhere as a result of their alleged discriminatory lending and servicing activity, and the tremendous financial resources at Bank of America's disposal.[2] The County belies that this

---

[2] In stark contrast, Defendants served discovery on Cook County seeking an enormous number of potential ESI custodians, including at least 59 separately named individuals, for one single and

heavily weighs in favor of requiring Defendants to run ESI searches, assuming such information even exists, on all of Plaintiff's proposed custodians.

First, Cook County is not requiring Defendants to run each of its four proposed searches [3] on all of the custodians. Instead, the County is only requesting that Defendants to run the County's four searches against the custodians in each of the general custodian groups follows:

| General Custodian Subject Matter Group | Requested Searches |
|---|---|
| Equity Stripping Scheme<br><br>Compensation Policies & Practices | 1.Target Marketing Practices Search<br><br>2. Origination & Wholesale/Broker Lending Practices Search<br><br>3. Compensation Practices Search<br><br>4. Servicing /Foreclosure Practices Search |
| Targeted Minority Marketing<br><br>Targeted Database Marketing<br><br>Mortgage Product Pricing & Strategy<br><br>Origination Policies & Practices<br><br>Underwriting Policies & Practices | 1.Target Marketing Practices Search<br><br>2. Origination & Wholesale/Broker Lending Practices Search<br><br>3. Compensation Practices Search |
| General Servicing Policies & Practices<br><br>Default Servicing/ Foreclosure Policies & Practices<br><br>Strategic Servicing Initiatives/ Transfers<br><br>Servicing/ HAMP & HARP Modification & | 1. Servicing /Foreclosure Practices Search<br><br>2. Compensation Practices Search |

narrow issue – the timing of the County's knowledge of its claims.
[3] The County's four searches, incorporating multiple search terms, are identified in an April 4, 2016 letter. Based on the parties' meet and confer on April 11 there do not appear to be any disputes other than the "burden" on Defendants resulting from the number of potential hits that Defendants must review before production.

| | |
|---|---|
| Refinance Policies & Practices | |
| Loss Mitigation/ Loss Forecasting | |

Second, three of Cook County's requested custodians are former high level employee-whistleblowers previously involved in direct litigation against Countrywide and/or Bank of America, particularly including mortgage lending and servicing issues that the County believes are directly relevant to this case: Edward O'Donnell, Executive VP, Risk Management, Eileen Foster, SVP Mortgage Fraud Investigations, and Michael Winston, Enterprise Chief Leadership Officer. In addition, the following requested custodians holding high level positions at Countrywide and Bank of America also are highly critical as they are primarily responsible for much of the discriminatory equity stripping scheme at the heart of the Complaint: Andrew Gissinger, Executive Managing Director, Andy Bielanski, Senior Managing Director, Marketing, Greg Lumsden, President, Full Spectrum Lending and Barbara Desoer, President, Home Loans & Insurance, Rebecca Mairone, Head Mortgage Servicing, Legacy Asset Servicing, Default Servicing and Tony Meola, Head, Default Servicing.

With respect to the remaining requested custodians, Cook County focused on custodians with overlapping employment to make the ESI search and hardcopy document production effort most efficient, and focused on those employees Defendants identified in their March 29, 2016 letter (ordered by the Court) as having documents subject to various prior litigation holds. The County also has identified and selected custodians based on their corresponding job title – i.e. level of seniority and apparent responsibilities -- during the relevant time period. Finally, the County has included the nine Confidential Witnesses identified in the Complaint.

The County has made tremendous efforts to cull down the number of custodians to cover the substantive issues in the Complaint, particularly regarding the servicing/foreclosure component of the alleged equity stripping scheme and the stand-alone discriminatory servicing and

foreclosure practices. The County respectfully submits that the number of proposed custodians are necessary, reasonable and do not impose a substantial burden on Defendants that outweighs the County's need for the information under the circumstances of this case.

## Defendants' Position

### Background

As directed by the Court, Defendants reviewed the County's list of 782 individuals that it proposed as custodians for the Defendants, and, on March 29, informed the County that 103 of those individuals had some data that was housed in Defendants' large litigation repositories. On April 1, the County responded to the Court's March 24 order by identifying 121 individuals – 33 as custodians from the list of 103 for which Defendants had confirmed data held pursuant to existing data holds, plus an additional 88 individuals for whom the County requested that Defendants confirm whether any data existed given the County's assertion that each individual was either currently employed or recently separated from BANA.

On April 8, after researching the 88 individuals the County identified, Defendants emailed the County to (1) provide preliminary information about the employment status of the 88 individuals the County specifically identified (including 10 about whom Defendants have no records at all) and (2) propose its own list of 24 potentially relevant custodians based on the methodology defense counsel previously offered to the Court at the last hearing (i.e., that the parties should seek to agree on 2-3 people from each of 6 relevant categories, including marketing, sales and origination, underwriting, servicing, loss mitigation and foreclosure).

The parties' met and conferred on April 8. During the meet and confer, Defendants explained their reasoning for selecting the specific individuals on their list, and the County

agreed to provide Defendants with a true custodian list, identifying the subset of the 121 individuals it believed were relevant and sought as custodians.

On April 10, the County sent Defendants a "narrowed" list of 97 custodians in 12 categories. Only three of the County's categories overlapped with Defendants' six categories. The April 10 list also had just two custodians in common with Defendants' proposed list. Defendants viewed the April 10 list as a rejection of their custodian proposal. Thus, in an attempt to reach a compromise, Defendants selected 32 custodians *directly from the County's April 10 list of 97* – still following its proposed method by choosing 2-3 people but now choosing from the 12 categories the County claims are at issue. The parties met and conferred on April 11, 2016 to determine which custodians were agreed upon and which were still in dispute. On the call, the County proposed a final list of 79 custodians.

*Argument*

In its response above, the County starts its discussion here – claiming that the "number of proposed ESI custodians has been tremendously reduced" without acknowledging (1) that the effort in reducing the custodians has been predominantly the work of the Defendants and not due to any effort at compromise on the County's part, and (2) ignoring that even after the Court's warning that there would not be an 80 person custodian list, the County is still seeking 79 custodians.

First, Defendants believe the Court should adopt a version of the proposal they made during the March 24, 2016 status conference, which this Court indicated sounded reasonable. The Defendants' original proposal: (1) identified the key areas of relevant information the County needs in order to pursue its allegations and creates six categories that the custodians be drawn from; and (2) offered between two and five individuals per category (some categories

require more than two individuals be listed, in order to cover areas where one of more Defendants had multiple lending channels). Defendants' proposal is sound. The County alleges that Defendants: (1) targeted minority borrowers; (2) originated/sold minority borrowers discriminatory mortgage loans; and (3) serviced those same discriminatory loans, either by overcharging minority borrowers fees, failing to offer loss mitigation options, and/ or foreclosing in a discriminatory way.

The custodians originally proposed by Defendants were sufficient to address all the relevant topics the County might need to prove the existence of this alleged "equity stripping scheme." In Defendants' view, if the pervasive scheme alleged by the County occurred and resulted in disparate treatment (and to be clear, Defendants assert that it did not), the scheme would be evidenced by information from the electronic files of mid-management executives in charge of lending operations, and by information from individuals in a supervisory position that directly involved the marketing, underwriting, and servicing of loans in the Cook County area. Yet the County rejected this proposal.

Instead, the County seeks a hodge-podge of custodians including three whistleblowers, and multiple former Countrywide executives with perhaps recognizable names, but nothing to do with Cook County. These custodians are certainly not those who would have implemented the "equity stripping scheme" Plaintiff alleges. None of the individuals Plaintiff identifies – O'Donnell, Foster, Winston, Gissinger, Bielanski, Lumsden, Desoer, Mairone, or Meola – have ever been accused of implementing or perpetuating any intentionally discriminatory policy or practice, and any disparate impact must be proven through statistical analysis, not email.

Nonetheless, after receiving the April 10 list of custodians the County proposed, Defendants again tried to reach resolution – agreeing to search ESI for a full 1/3 of the County's

13

long list - 31 of the original 97. Though Defendants do not agree that these custodians are the most relevant or reasonable ones to search, they compromised by choosing the custodians Plaintiff preferred, but staying within a manageable framework of choosing 2-3 individuals for each of Plaintiff's topics. As is the case with every compromise Defendants make, however, the County now demands those 31, plus 48 more, and they added three custodians Defendants suggested in their original offer but which were not on any of Plaintiff's previous lists. Above, they represent that Defendants "agreed" to these 34 custodians, though Defendants' current offer does not include the three custodians Plaintiff added from Defendants' list.[4] The Court should order that only those 31 custodians on which Defendants already agreed be searched.

The County claims that it needs the 31 agreed upon custodians, plus 48 others, but this position ignores the substantial burden searching 79 custodians would impose on Defendants. The County claims its search terms are simple and would reduce the burden on Defendants, but Defendants attach the most recent letter and terms here. As the Court can see, the County's search terms list is extensive, the terms to be included are broad, and the formula for applying the terms to each custodian is unnecessarily complex. *See* Ex. 1, Modified Search Terms List and Letter. The search terms proposal includes 308 individual terms that the County proposes Defendants combine in 4 different ways, and then run each set of searches across various custodian categories. The result is that all 308 terms – in 4 different combinations – will be run on most of the custodians. As one example, although the Plaintiff claims the "Default Servicing/Foreclosure Policies & Practices" custodians above will only be subject to the "Compensation Practices Search" in their letter, they fail to mention that the "Default

---

[4] Defendants also have not agreed to conduct further research on the Plaintiff's list of proposed individuals.

Servicing/Foreclosure Policies & Practices" custodian list includes individuals who appear in multiple categories, like David Doyle and Rebecca Mairone – both of whom are also listed for "Origination Policies & Practices" and "Underwriting Policies & Practices".  Of course, the "Origination" and "Underwriting" categories also are subject to the three other search categories, not just the "Compensation Practices Search."  This means that for those custodians (and many others who overlap in the same way) – Defendants must run all four searches on them even though the chart above makes it look line only one such search is required.  Likewise, the "Compensation Practices Search" is itself not a limiting factor, because to run it, Defendants must combine "(i) any Compensation Terms within 15 of (ii) any Loan Product Terms, or Lending Policy Terms, or Predatory Conduct Terms, or Target Marketing/Discriminatory Marketing Terms, or Discriminatory Racial Terms" according to the County's letter.  So that one "Compensation Practices Search" itself encompasses every single one of the 286 terms on the County's list.  In sum, the fact that some searches only apply to some categories does not alleviate Defendants' burden at all.  Indeed, all the combination of categories and search terms does is make the entire process more complicated.  So, reducing the burden on Defendants can only meaningfully be accomplished by limiting the number of proposed custodians.  Defendants have now made two viable proposals to identify relevant custodians.  The Court should adopt one or the other, rather than letting the County run hundreds of terms across all data held for any employee with an interesting title – and all just because the County claims one defendant[5] has "tremendous financial resources at [its] disposal."[6]

---

[5] This claim ignores the fact that most of the other Defendants have few, if any resources, having ceased making loans, and in many instances ceased to exist, eight years ago.

[6] The County also alleges that Defendants served Cook County with requests seeking ESI

Finally, the County may claim it cannot narrow its list any further because Defendants have refused to provide information on whether Defendants have data on all 79 individuals. The Court should not credit this basis for refusing to narrow the list. Defendants have explained that they were able to check the list of 782 custodians against existing large litigation hold lists to quickly identify those individuals with legacy data only because there are actual lists that can be consulted. Defendants cannot do the same for individuals not on one of those legacy litigation hold lists because there is no central repository or tracking mechanism which identifies which individuals currently have ESI available for collection. The Defendants' general data retention policy is that, for individuals who are not under regulatory or litigation holds, data is maintained for 90 days. Thus, for Defendants to determine if an individual has more recent ESI available, it has two options (1) actually take on the time and expense of collecting any data available, or (2) conduct a manual search for each individual's employee number (in the case of former employees)[7], then send the employee number/name to the team that handles Defendants' collection process so that the team can determine, by looking up each name/number individually, whether any other collection has ever been made in the past for each individual. The team member then creates a report identifying the date of the collection for each individual, and the type of data collected. While this process provides fairly good information for whether data is

allegedly for "59 separately named individuals, for one single narrow issue" – this is incorrect. Defendants' proposed list of custodians to Plaintiff covered all of Defendants' issues – notice, liability and damages. Plaintiff has not objected to any specific custodian, but if it does, Defendants will narrow the list in good faith. The only "stark contrast" to draw here is this: Defendants identified its relevant custodians in detail specifically months ago, began and ended with one list of 59 people that it has not changed, and indicated willingness to compromise if the County were to raise an objection. The County certainly has not done that for its search terms.

[7] In many cases additional research is required to confirm that the employee number is for the correct person, for instance, if there are multiple employees with the same name (which occurs often given the number of current/past employees).

likely available for any individual, it is not definitive. The only definitive way to determine if ESI is available is to attempt to collect the ESI, which will force Defendants to incur additional work and costs for people the County may not actually intend to include as custodians.

For all these reasons, Defendants request that the Court order only that Defendants produce data for those 31 custodians from the County's list that Defendants already identified.

### B. Turquoise Data Fields

The parties met and conferred about Turquoise data fields on April 8 and April 11, but have not reached agreement. Their positions are set forth below.

### The County's Position

The Turquoise data fields listed below are absolutely essential to identifying the specific subject loans at issue and demonstrating the extent of Defendants' discriminatory and predatory lending and servicing conduct with respect to those loans. The County's expert, Dr. Gary Lacefield, will provide an affidavit explaining this. However, Defendants will not produce these data fields without taking every opportunity for a fight to try and avoid it. For example, Defendants are asserting that the County was required to provide a letter identifying the new fields by April 1, 2016, when the Court has consistently been clear when ordering a party to provide a document to the opposing party. The County addresses this red herring defense in more detail further below.

Per the Court's order, the County dramatically culled down the list of fields by April 1, 2016 in preparation for meet and confer discussions with Defendants about them., in advance of meet and confer, which occurred on April 8, the County provided Defendants with a must-have-list of just 58 culled fields after confirming the absolute necessity for each of them with their expert. During the April 8 meet and confer Defendants reviewed the entire list of culled fields and the parties discussed all of the fields in which Defendants claimed to have provided other

17

forms of similar information. As a result, the County was able to agree to cut a few more of those fields based on Defendants' representation that they were duplicative of other data that Defendants had produced, or would agree to produce.

However, Defendants have generally rejected all of the County's other requested fields, particularly those fields which seek critical mortgage pricing, interest rate spread, lender identification data, and property location data necessary for the County's expert to run the various statistical analyses relevant to the various lending and servicing discrimination activities alleged in the Complaint. Moreover, those fields, in addition to another race field ("group race code") would fill in some of the numerous gaps in Defendants' existing production of **94,256 loans** (35.4% of the total) that **do not contain any borrower ethnicity data**, particularly **17,891 such loans** that Defendants foreclosed on between April 2012 and April 2014 (38.4% of all foreclosures). This is separately discussed in the section further below.

The County notes that, despite Defendants' interpretation, the Court's order did not specifically require the County to serve another written culled list of Turquoise data fields on Defendants by April 1. Nor did the County interpret the order as such, particularly since the County previously had provided Defendants with a written and substantially culled list of fields. If the County had interpreted the order in such a manner it would have provided another written list to Defendants on April 1, along with the culled custodian list which the Court actually did order the County to serve. Instead, the order required the County to cull its list by April 1 so that the parties could engage in meaningful meet and confer discussions and narrow the remaining fields in which there was disagreement. In any event, the parties did discuss the County's narrowed data fields at the April 8 meet and confer. Moreover, the County did provide a written list of those culled fields a full day in advance of the meet and confer discussions after the

County confirmed with its expert that each of the culled fields were absolutely necessary to the expert's statistical analyses of Defendants' discriminatory lending and servicing practices.

During the April 8 meet and confer, Defendants offered to provide (and the County agreed to accept) some additional data fields that were requested by Defendants' own expert to conduct his expert analysis. As described by Defendants, these are the "Duration Rate Lock," "Loan Program ID," "Mortgage Insurance Type," "Lender Premium Pricing Credit Amount" and "Lender Premium Pricing Credit Points" fields. In addition, based on the parties' April 11 three hour meet and confer Defendants stated, subject to the Court overruling its objections, that it would agree to produce the following fields:

SecondMtg_HELOCLoanNum
SecondMtg_HELOCPiggyBackFlag
LineOfCredit
MarketId
MarketName
ClosingCostPts
HE Piggyback
RefiCashOutFlag
CLUES Final Decision Type

However, Defendants would not agree to produce the following fields, stating for many of them that they did not have enough information to know what the filed covered:

Source Id
Source Name
Base Price
Total PriceAdj
Base SRPPts
RiskGradeType
FinalExceptPts
ARM Margin
PricedNoteRate
HELOCNoCostFLag
ReqdPriceMarginPts
BaseSrvValPts
ExcessSrvValPts
BuyDnPts

InitCommitPeriod
SecondMtg_HELOCTotalRevenue
SecondMtg_HELOCARMStartRate
SecondMtg_HELOCARMMargin
ARMMarginRangeId
PricingRiskGradeType
DeskMktPrice
BrokerIncFeesAmt
BrokerPtsAmt
YSPNetAmt
ProductionExtremeAltAFlagBit
DeskStartRatePts
DeskMarginPts
SettlementDtTm
SecondMtg_HELOCNECPts
NoPayFlag
ReqdARMMarginRate
GraceCdType
RiskTierType
ReferralType
SourceofBusiness
ProductionROE
SoftMarketCategory
DecliningPropValFlag
SecondaryMktgRelockFeePts
ProductionsRelockFeePts
ClosCostsCrMLOPts
ClosCostsCrNoMLOPts

The County's expert will provide an affidavit supporting the critical nature of the County's must-have Turquoise data fields set forth above (which the County further culled as a result of the April 8 meet and confer discussion). In short, there are now only 42 fields over which the parties are in dispute (putting aside Defendants' other arguments).

### Defendants' Position

Although the Court's March 24 order required that the Plaintiff identify any additional Turquoise fields it needed to conduct its analysis by April 1, 2016, Plaintiff did not identify *any needed fields to the Defendants until April 7*. On April 7, when Defendants noted it had not received a list of fields, the County first falsely claimed it was unable to identify the fields on

April 1 as contemplated in the March 24 order because its expert had been unavailable (though the County did not inform either Defendants or the Court of this issue or ask for more time). Apr. 7, 2016 Email from J. Evangelista to S. Rose-Smith at 10:49am EST. Later the same day, the County next claimed, incredibly, that it had identified the Turquoise fields it needed by April 1 as required by the Court, ***but that the Court's order required the County to identify the fields, but did not require the County to tell Defendants what those fields were***. Apr. 7, 2016 Email from D. Dailey to S. Rose-Smith at 12:15pm EST. Nonetheless, the County claimed that, as a "courtesy", it would identify the fields to Defendants by letter later the same day. *Id.* The County's April 7 letter eventually did so - identifying 56 Turquoise fields, and repeating the self-serving claim that the County identified the fields it needed by April 1 (though the County did not deign to send Defendants the list until 6 days later).

Because the County wholly disregarded this Court's March 24 order, Defendants request that the Court find that the County waived the right to obtain any additional Turquoise fields at issue. This Court already admonished the parties at the last hearing that discovery was not "a game of gotcha" and that the Court intended for the parties to meaningfully meet and confer about the Turquoise fields. For the County to now claim, contrary to the discussion on the record, *see e.g.*, Mar. 24, 2016 Hearing Tr. at 110:13-17, and a fair reading of this Court's March 24 order, that the Court intended for the County to identify needed fields, but keep that information to itself until the Thursday before this status report was due is ridiculous.

As Defendants have repeatedly argued, Turquoise data is not relevant here, because it (1) only exists for a subset of legacy loans (and does not exist for legacy BANA loans, loans made by Merrill or any of its current or former subsidiaries, or any loan that Defendants did not originate, but may hold servicing rights to – these limitations apply to approximately a third of

21

the loan population for which Defendants have already produced other data), and (2) is unreliable because both Turquoise itself, and the underlying data sources from which it pulls, changed and evolved over time. For this reason, data in specific fields may not reflect the same information over time, various fields may or may not be used at different points in time, and the data may not be consistent with other data in Defendants systems of record (i.e. the AS400 systems). Any data that the County obtains is information it intends to represent as definitive proof of Defendants' conduct. Defendants have repeatedly stated that, given the uses to which the County intends to put the data, it should come from Defendants' systems of record, not from Turquoise.

Despite the unreliability of the Turquoise data, the County claims it is "absolutely essential."[8] But twice now, the County has disregarded its obligations to negotiate in good faith regarding the data – last time, by having failed to get back to Defendants at all after Defendants provided information regarding 60 fields about which the County noted it had questions,[9] and

---

[8] The County claims its expert will submit an affidavit explaining how the data is necessary. Defendants have not seen such an affidavit, but reserve the right to refute it with one from its own experts. In addition, Defendants note that federal regulators routinely make investigation into, and findings regarding, discriminatory lending without the need for the greater than 120 data fields Plaintiff is seeking. The sole reason the County's expert wants more data is because the County has no idea what discriminatory policies and practices are at issue, or what facially neutral policy caused a discriminatory impact. Instead, the County's expert wants to test as many different variables as possible for disparate impact in order to identify anything that might be plausible. This is precisely the issue Defendants flagged for the Court regarding the County's request for the "Grace Days" field in AS400, and the County's insistence that the field was required because Defendants may have discriminated against borrowers by manipulating the number of grace days to which minority borrowers were entitled. With that field, as with all the others above, the County has absolutely no good faith basis for believing the field will show disparate impact, it just wants to test the fields out and see whether its expert can find ***anything*** that would support its claims.

[9] The Court previously ordered that Defendants did not need to provide any of these 60 fields given that the County had failed to respond.

now, by having wholly failed to identify fields at issue now in defiance of this Court's clear intent.  Given that the data is unreliable and limited to only a subset of the loans at issue, and in view of the County's malfeasance, Defendants request that the Court decline to order any additional production from Turquoise.

If the Court is inclined to order any Turquoise fields, it should only order those Defendants have already offered to provide.  Despite the County's conduct, Defendants did attempt between April 7 and April 11 to determine whether they could agree that any of the fields in Turquoise might contain potentially relevant information for some loans.  While they could not get information on all fields in the short time between when the County finally provided the fields and the date this report was due, Defendants were able to determine the following:  (1) there are 12 fields of the 58 for which the County either already has an equivalent data field, or has other data fields that would allow it to calculate the information in the field at issue[10], and (2) there are 9 fields that Defendants' experts agreed might provide something relevant and which Defendants agreed to produce.[11]  While they will continue to research the remaining fields until the April 14 hearing, Defendants request that the Court find they have done more than enough, and, if it is inclined to order any more unreliable data from Turquoise at all, it order only those new fields Defendants already have offered.

---

[10] The County has taken seven fields off of its list based on Defendants informing the County that it already had the information from those fields.  The County is also subtracting the 9 fields for which Defendants have agreed to produce Turquoise data.  This math is the basis for the County's claim that only 42 fields remain at issue.

[11] In addition, after reviewing those fields the County sought, Defendants' experts  have identified 5 other data fields (not exclusive to Turquoise, but likely duplicative of the Turquoise data Plaintiff claims to need contains for some loans) that Defendants agreed to provide Plaintiff at the April 8 meet and confer.  Those fields are:  (DurationRateLock, LoanProgramID, MIType, LenderPremPricingCreditAmt, and LenderPremPricingCreditPts).

## C. Concerns Regarding Defendants' Existing Data Production

The County has raised some concerns with Defendants' existing data production (fields with no data), and agreed on March 11 to list the loan numbers and missing data fields for Defendants to investigate.

## The County's Position

As the County noted in the last status report, and as briefly discussed at the last status conference, Defendants' production of ***94,256 loans*** (35.4% of the total loans for which it has produced data) do not contain any borrower ethnicity or other important data necessary to identify the loan product, the lender, and the property location of the loan at issue, particularly 17,891 such loans that Defendants foreclosed on between April 2012 and April 2014 (38.4% of all foreclosures). Defendants have represented that these are primarily their "home equity" loans. For virtually all of these loans where borrower race or ethnicity data is missing, the following data also is missing in almost every case:

institutionid
agency_cd
applicationdate
loantype
propertytype
purpose
occupancy
loanamount
preapproval
action
actiondate
purchaser
msa
censustract
county
statecode
race_1
race_2
race_3
race_4
race_5

      coarace_1
      coarace_2
      coarace_3
      coarace_4
      coarace_5
      sex
      coasex
      ethnicity
      coa_ethnicity
      income
      denial1
      denial2
      denial3
      ratespread
      hoepastatus
      lienstatus

Without this data, the County's expert cannot properly perform his statistical analysis. The parties have discussed this issue during the April 11 meet and confer and have agreed to attempt to resolve the situation themselves. To that end, the County agreed to provide a list of loan numbers for the loans with the missing data and Defendants agreed to look into the matter. The County requests the Court to set April 22, 2016 as the date by which the parties will either resolve the issue or thereafter raise the issue with the Court in a follow up status conference.

### Defendants' Position

The County presents this as a disputed issue, and implies throughout its sections that Defendants have intentionally withheld the data on these loans, but this is untrue. Data may in fact be missing from these loans, but Defendants believe that any missing data will be the result of some combination of four issues: (1) HELOCs are not generally HMDA reportable, and therefore will be missing many HMDA fields, while some first liens will not have race data because borrowers have the option to report their race, and if they do not, it would not be in the Defendants' records (2) some data, particularly on old loans, may just not be available, (3) Defendants provided HMDA data for more loans than it provided servicing data, and so some

25

loans will be missing servicing data (for example, if the loan was originated by a Defendant company, but not serviced by a Defendant company; and (4) some loans for which Defendants provided servicing data, it might not have corresponding HMDA data, if the loan was not HMDA reportable when acquired.

While Defendants cannot determine what the issue is at this time, they note they first heard of this issue in court at the March 14 hearing.  Thereafter, on March 25, Defendants specifically asked Plaintiff to identify what data it claimed was missing.  On April 1, Plaintiff responded, but did not identify loans for which data was missing.  On April 8 during the parties' meet and confer, the County agreed to identify loans with missing data, and Defendants agreed to look into it and respond promptly after the County identifies the loans at issue.

### D.    Search Terms

The County provided the Defendants with modified search terms on April 7, 2016.  The parties agreed to defer further discussion until after the custodian negotiations were complete. Defendants believe that the only way to efficiently negotiate search terms is to test them on agreed upon custodians to determine whether the terms produce a prohibitive number of hits.  As a result, Defendants reserve all rights to object to or request modification of the County's proposed terms until after the custodians have been identified and the terms are tested. Defendants will raise any objections to terms first with the County before bringing any dispute about specific terms to this Court.

## III.    DISCOVERY ISSUES UNRESOLVED FROM LAST HEARING

### A.    RFPs 16-23, 24-39, and 55

The parties disagree on additional production of policies and procedures (RFPs 16-23), compliance reports, other compliance related document requests (RFPs 24-39), and board minutes and meeting handouts (RFP 55).  At the last hearing, the Court noted that these RFPs

were still outstanding.  The parties refer the Court to their March 11 status reports for each side's position on these RFPs, but ask that the Court rule on these RFPs as well.

### The County's Position

The parties still disagree on the scope of Defendants' responses to RFPs 16-23 (Defendants' alleged discriminatory policies and procedures), RFPs 24-39 (Defendants' relevant compliance reports and related documents), and RFP 55 (Defendants relevant board minutes and meeting handouts).  As the Court is aware, the County has alleged a discriminatory equity stripping scheme and stand-alone discriminatory servicing and foreclosure practices that involve several operational activities of Defendants' mortgage lending business, and which are not limited merely to Defendants' origination of discriminatory or predatory loans.  Defendants' policies, practices and procedures identified in RFP 16, as well as communications encouraging or reflecting noncompliance or circumvention of those policies, are undeniably relevant to this litigation.  Moreover, discovery of Defendants' relevant compliance reports, and related board minutes and other materials, are relevant given that the County has alleged that Defendants' actions were conducted at the direction or knowledge of senior level executives.

Defendants have objected to these requests largely on the purported basis that they would be "expensive and burdensome" for Defendants to comply with.  This objection is without any merit.  The materials are directly relevant and Defendants already have likely collected and produced such materials in connection with other litigations involving the same conduct at issue here.  Defendants' assertion that the County has sought discovery regarding "the entirety of the mortgage lending business" is not accurate.  Moreover, the County is willing to limit these requests to the critical time period during which the vast majority of the mortgage loans at issue

were originated 2003 to 2008. The County further refers the Court to its discussion of this topic in the County's March 12, 2016 status report (Dkt. # 104).

### Defendants' Position

Defendants refer the Court to its March 11 Status report (Dkt. #103) for the more details regarding the concerns it has with these RFPs. Defendants note further that, although the Court already determined that the 2004-forward relevant period for data did not apply to other discovery requests, *see* March 24 Order at 1-2, each of these Requests is still overbroad and unduly burdensome. Defendants note that they have produced 140,206 pages of materials, including underwriting, compensation, and foreclosure and default servicing policies and procedures. Defendants made the first production of such policies on September 4, 2015, and have made rolling productions that included additional policies and procedures since then, with the last such production on February 16, 2016. Though the County has all of this information for at least two months, and some of it for as long as seven months, it has yet to identify a single policy or procedure document it needs, but does not have, and is instead asking repeating a generic demand for more. Likewise, Defendants have offered to search for specific compliance documents, and asked the Country to be specific about what board information, if any, it was truly seeking. As previously noted, this is consistent with the County's preference for volume over substance, and refusal to put any finer point on its requests. Defendants request that the Court determine their existing production is sufficient and sustain their burden and relevance objections.

## IV.    REVISED DISCOVERY SCHEDULE

The parties are in agreement that the Court should extend the discovery period, and further agree that the Court should impose interim deadlines for specific discovery events (*e.g.*,

deadlines for additional written discovery to be served, and all production to be completed), but they are not in agreement regarding the dates.  The following are the parties' proposals:

| DEADLINE | PLAINTIFF'S PROPOSAL | DEFENDANTS' PROPOSAL |
|---|---|---|
| Plaintiff to identify specific loans it asserts are at issue in this action | Within 30 days after Defendants complete production of additional loan origination and servicing data fields, and additional loans originated since January 1, 2003 and serviced until January 1, 2009 | **May 16, 2016** |
| **All** additional written discovery served | Within 45 days after Defendants complete production of email and other electronic documents collected from searches of  custodian records | **May 16, 2016** |
| Hearing on all any disputes arising from objections to new written discovery | Within 60 days after the conclusion of written discovery. | **July 11, 2016** (date of hearing intended to be one month after responses to any additional written discovery is due, subject to the Court's availability and at the Court's discretion) |
| Deadline for parties to complete production of all documents/data ordered at March 22 and April 14, 2016 status conferences | **July 1, 2016** | **August 29, 2016** |

| Status Conference (and opportunity for parties to raise any concerns about sufficiency of productions resulting from March 22, 2016 status conference) | **August 1, 2016** | **October 3, 2016** (date of hearing intended to be one month after productions are completed, subject to the Court's availability and at the Court's discretion) |
|---|---|---|
| Deadline for parties to complete production of all documents/data in response to **<u>all</u>** outstanding written discovery. | Within 60 days after the conclusion of written discovery | **November 1, 2016** |
| Status Conference (and opportunity for parties to raise any concerns about sufficiency of productions) | **November 1, 2016** | **December 1, 2016** (date of hearing intended to be one month after productions are completed, subject to the Court's availability and at the Court's discretion) |
| Fact Discovery Cut-Off | **January 31, 2017** | **December 15, 2016** |
| Expert Discovery Cut-Off | **April 1, 2017** | **March 27, 2017** |
| Dispositive Motions with Supporting Memoranda Due | **May 5, 2017** | **May 5, 2017** |

## <u>The County's Position</u>

The County proposes a discovery schedule that ends the exact same date, May 5, 2017, that Defendants' proposed schedule ends. The substantive differences between the parties' two proposals involve the timing of when written discovery must be completed, the date of when fact

discovery ends, and the resulting relative lengths of time for fact and expert discovery following the completion of document production.  The County's position is set forth in the chart below.

The County's proposed schedule sets the deadline for service of all written discovery 45 days after Defendants complete their production of all loan level and servicing data, and the hardcopy and ESI discovery responsive to the County's First Set of RFPs, as ordered by the Court at the upcoming April 14 status conference (along with the data already ordered at the March 22 status conference).  The County's proposed schedule then sets a January 31, 2017 fact discovery cut-off date.  This would provide about 12 weeks after the agreed November 1, 2016, document production completion deadline for the parties to complete their review of all produced information and then complete all substantive fact depositions.  Under the County's proposed schedule, there would then be eight weeks of expert discovery that would run from February 1, 2017 to March 31, 2017.

 Defendants' proposed May 16, 2016 hard deadline to serve all written discovery is not reasonable.  It would unfairly eliminate the County's ability to serve additional or follow-up discovery after an adequate time for the County to review the vast amount of ESI and other information that Defendants have not yet produced in response to the County's first set of discovery (which was served nearly a year ago in June 2015).  This is because Defendants simultaneously propose that they: (1) do not have to complete their loan level data discovery (ordered at the March 22 status conference) until *August 29*; and (2) would have until *November 1, 2016* to complete their production of all remaining discovery, including the discovery ordered at the upcoming April 14 status conference (e.g., critical additional loan level and servicing data from the Turquoise database and the first round of substantive hardcopy and ESI discovery resulting from searches run on the document custodians determined by the Court.   Under

Defendants' proposed schedule, the County would have to serve follow up written discovery by May 16, long before it could possible know what it needed to ask for. In addition, Defendants' proposed December 15 fact discovery cut-off date would leave just six weeks for the County to: (1) complete its review the substantive information Defendants produce by the agreed November 1, 2016 document production completion date; and (2) take the necessary fact depositions before fact discovery period ends. This is not adequate given the breadth and complexity of the issues, and number of Defendant parties involved, in this extremely important litigation.

Unfortunately, given the long history of the discovery process thus far, the County has every reason to anticipate that information will slowly trickle out and important information will be provided at the last minute. Thus, the County also anticipates the resulting need for adequate time after the November 1 document production cut-off to review and analyze the produced information, and then prepare for and take necessary substantive fact depositions. Defendants themselves have stated that they likely will need substantial time to collect and review the materials obtained through ESI searches of custodians.

Based on the length of time it has taken to resolve the complex data field, search term and custodian identification issues, the County believes that its proposal is the more reasonable and appropriate discovery schedule. In addition, the schedule should include a provision for extensions for good cause, specifically including any delays in the completion of Defendants' loan level and servicing data, ESI and hard copy document productions.

**Defendants' Position**

Defendants want this case to move forward. The original complaint in this case was filed two years ago, and discovery has been ongoing for nearly a year. While Defendants recognize that the schedule does need to be extended, it has proposed a schedule that cuts off fact discovery

32

in mid-December, rather than extending it into 2017. Defendants believe their schedule is

workable, and will serve to move the case along. The County argues Defendants' proposed

schedule (1) does not leave the County with adequate time to review any production made by

Defendants, (2) does not leave time for review of any document production before taking

depositions, and (3) should not include a hard deadline for service of all written discovery

because it cannot determine what additional discovery to request until it has received and

reviewed all current discovery.

First, Defendants have never represented that it intends to produce millions of documents

leaving no time to review what is produced. It has represented that it may have to search and

review such a large quantity, but actual production will be only a subset of what is reviewed.

Regardless of the number of documents produced, Defendants have and will continue to produce

documents on a rolling basis, such that the County need not be concerned that Defendants will

dump a massive number of documents on the County right at the deadline. Defendants further

note that its schedule calls for two production cut-off dates (in August and in November), which

further eliminates the County's concern because all document responsive to the current requests

would be produced in August, well before discovery closes.

Second, the County objects to Defendants' proposed schedule because there are only 45

days between the deadline for the parties to complete all production in response to new requests,

and the close of fact discovery. The County contends that this is not enough time for

depositions. Defendants disagree. As evidenced by the recent discovery motions, Defendants

have already noticed depositions, and will take those depositions despite the County informing

Defendants it has not completed all document production in response to Defendants' requests.

The County is free to notice depositions at any point, and need not wait. Indeed, if the County

takes some early depositions, it might help the County better articulate any additional documents it may need. Defendants are also happy to prioritize review of information from specific custodians so that depositions can begin before all document production is complete.

Third, refusing to set a hard deadline for service of written discovery until after Defendants complete all current email searches and production may well preserve the County's option to keep requesting documents, but the Court should decline to do so. Even by the County's own schedule, it would mean the parties could still be serving additional document requests as late as August 15 (45 days after completion of production ordered for first requests for production), and that Defendants would need to produce all documents on October 15 (within 60 days of August 15) – a completely impractical timeframe given that any new requests may require production of additional ESI, the parties inevitably will have some disputes, and the parties are required to meet and confer before raising issues to the Court. Defendants' schedule, in contrast, moves the case forward by recognizing that discovery has been ongoing since last summer, and the parties are going to each have to impose some limits on what they seek. It also recognizes the reality of litigation – written discovery usually must end well before each side feels it has had adequate time to review every single document produced by the other side and been given the opportunity for unlimited follow up requests.

## V. DEFENDANTS' PENDING MOTION TO COMPEL

Defendants have filed a motion to compel the County to identify witnesses to testify regarding Defendants' 30(b)(6) topics. Since the motion was filed, the County has agreed to provide a witness as to Topic 26. Below are the parties' positions as to the remaining topics (28-29 and 32-35).

### The County's Position

**Defendants agreed to defer certain 30(b) 6 topics per the County's objection;**

34

**Defendants' nevertheless moved to compel those same issues.**

On March 22, 2016, Defendants specifically agreed, in writing stating, "[] given that [the County] verbally have raised specific concerns about the damages topics, [Defendants] are willing to defer deposition on those topics until a later date to be discussed." [See S. Rose-Smith Email March 22, 2016]. Defendants then turned around and moved this Court to compel the County to provide dates for Defendants' 30 (b) 6 Notice of Depositions on the very topics they agreed to defer. The Defendants contend the County has waived any objection or right to dispute the topics because it did not file for a protective order. This is absurd, the parties had an agreement. The County raised the objection that it was unable to provide a reliable witness because all of the subject loans had not been identified. The Court had not made a final ruling on the critical data fields necessary to identify the subject loans for the County. The County explained to Defendants, after the subject loans are identified, a deponent would be able to accurately and completely speak to the 30 (b) 6 topics under Damages with real examples. The Defendants' agreed with the County to defer the topic, there was no need for a protective order (or so the County thought).

The County wants to identify the predatory loans at issue more than the Defendants, but the County recognizes it must have all of the fields necessary to link the loans to the policies and to the foreclosures. The County has, and will continue to assist Defendants in discovery but responds to the Defendants' motion to compel as follows:

**Topic 26**

Despite the Parties' previous agreement, the County will provide a deponent on May 23, 2016.

**Topic 32**

Despite the Parties' previous agreement, the County already agreed to provide a witness for topic 32. The County only stated the deponent would speak to allegations specifically in the complaint. This was not a limitation conjured up by the County, the topic actually states, "For this topic, the witness(es) must be able to testify to details regarding the exact nature of each form of **_alleged_** discrimination…" Why Defendants decided to compel this topic remains a mystery to the County, but it demonstrates the Defendants relentless pursuit to mischaracterize the County in discovery negotiations.   The County will produce a witness on April 21, 2016 to discuss topic 34 and 35, subject to discussing the allegations in the complaint, as requested in the Topics 34 and 35.

**Topic 28-29**

These topics go to the heart of the County's position, and parties' agreement to defer the Damages topic and, most importantly, the topics require the County's expert's report. These topics specifically speak to damages and calculation but without identifying the subject loans any deposition would be inaccurate and with no specificity. Most importantly, the County's expert, who is conducting research and providing a report, is the most knowledgeable to speak after analyzing the loan data. Therefore, an expert must speak to these topics.

**Topic 35**

The County must identify the loans first or any answer(s) will not be complete. The County notes, Defendants have presented a contradiction when they agreed to defer topics until the predatory loans are identified, but request the County to identify the policies, specific loan types and products at issue in this case. The loan products will be identified by the fields (also at issue in this report) connected to those loans. The County actually **_wants_** to identify the predatory loans terms and loan types and link them to the resulting foreclosures. The predatory terms will

have policies so the County will identify and discuss those particular policies connected to the predatory terms that resulted in foreclosed homes. ***This is not complicated*** and the County still cannot understand why Defendants have contradicting positions.

**<u>Defendants' Position</u>**

Defendants have already articulated their bases for the motion in their supporting memorandum, and incorporate those arguments by reference.

In response to the County's claim that Defendants agreed to defer the topics now at issue, and then moved to compel anyway, Defendants note that they made it clear to the Court that they intended only to defer those damages topics that required Plaintiff to identify all the loans at issue, not every single damages topic. The parties met and conferred about this very issue on March 30, and counsel for Defendants followed up in an email on March 31. Mar. 31, 2016 Email from S. Rose-Smith to D. Daily at 4:02pm EST. Defendants did not move to compel until April 6, and only after Plaintiff expressly declined to produce a witness for Topics 28-29 and 32-35 in an April 1 email to Defendants. Apr. 1, 2016 Email from D. Dailey to S. Rose-Smith at 6:25pm EST. Further, Defendants motion shows they did in fact defer as to those topics that ask about specific loans. Indeed, that is precisely the reason that Defendants are not seeking a witness on ten other topics for which the County has not identified a witness.

Dated:  April 11, 2016

/s/ *Dan A. Dailey*

Daniel A. Dailey
*ddailey@jdmlaw.com*
James D. Montgomery and Associates, Ltd.
One North LaSalle Street
Suite 2450
Chicago, IL 60602
(312) 977-0200

James M. Evangelista
*jim@hpllegal.com*
Harris Penn Lowry LLP
400 Colony Square, Suite 900
1201 Peachtree St., NE
Atlanta, GA 30361
(404) 961-7650

*Attorneys for Plaintiff, County of Cook, Illinois*

Respectfully submitted,

/s/ *Sabrina Rose-Smith*

J. Erik Connolly
*EConnolly@winston.com*
Ryan Dunigan
*RDunigan@winston.com*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Tel.:  (312) 558-5600
Fax:  (312) 558-5700

Thomas M. Hefferon
*THefferon@goodwinprocter.com*
Sabrina Rose-Smith
*SRoseSmith@goodwinprocter.com*
Matthew S. Sheldon
*MSheldon@goodwinprocter.com*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
Tel.:  (202) 346-4000
Fax:  (202) 346-4444

James W. McGarry
*JMcGarry@goodwinprocter.com*
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02019
Tel.:  (617) 570-1000
Fax:  (617) 523-1231

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2016, I caused a true and correct copy of the foregoing

to be served upon counsel of record as of this date by electronic filing.


Dated:  April 11, 2016                       */s/ Sabrina Rose-Smith*_____

                                                      *One of the attorneys for Defendants*