# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| COUNTY OF COOK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| BANK OF AMERICA CORPORATION, ) | Case No. 14-cv-2280 |
| BANK OF AMERICA, N.A., ) | |
| COUNTRYWIDE FINANCIAL ) | Honorable Elaine E. Bucklo |
| CORPORATION, ) | |
| COUNTRYWIDE HOME LOANS, INC., ) | Magistrate Judge Mary M. Rowland |
| COUNTRYWIDE BANK, FSB, ) | |
| COUNTRYWIDE WAREHOUSE LENDING, ) | |
| LLC, BAC HOME LOANS SERVICING, LP, ) | |
| MERRILL LYNCH & CO., INC., MERRILL ) | |
| LYNCH MORTGAGE CAPITAL INC., and ) | |
| MERRILL LYNCH MORTGAGE LENDING, ) | |
| INC., ) | |
| ) | |
| Defendants. ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR A PROTECTIVE ORDER

The County of Cook (the "County") has filed an expansive lawsuit under the Fair Housing Act ("FHA") seeking millions of dollars in damages from Defendants, and yet it now asks this Court to deny Defendants depositions of the very people who should be the *most* knowledgeable about the County's claims and many of Defendants' defenses. The County has conceded in discovery that it effectively operates through its Commission Presidents. *See*, *e.g.*, Joint Status Report, at 11 (Jan. 22, 2016) [Dkt. 96] (explaining that the Board of Commissioners and Office of the President is "the policymaking body for the County") (hereinafter, "Joint Report"). Accordingly, Defendants noticed the depositions of current President Toni Preckwinkle and former Presidents Todd Stroger and Bobbie Steele (the "Presidents") so

Defendants can develop the evidence and testimony necessary to prove their defenses on both statute of limitations and merits issues. The County, perhaps fearing the Presidents' testimony will conflict with its claims and discovery responses, has filed a motion for a protective order to prevent these depositions from going forward. The motion argues that Defendants failed to articulate the specific relevant information they seek from the Presidents, and that the Presidents' personal knowledge of the conduct at issue in the First Amended Complaint is irrelevant because it is not the County's official knowledge (which consists only of information already in the County's official records). [Dkt. 109]. In addition to being incorrect, this position is immaterial because even if the Presidents' personal knowledge is not imputed to the County, it is still likely to be highly relevant to Defendants' defenses. As a result, the County's requested relief must be denied as inconsistent with both Rule 26 of the Federal Rules of Civil Procedure and Seventh Circuit precedent.

The County's various other arguments to prevent the depositions misstate the relevant standard articulated by the Seventh Circuit—whether there is "some reason to believe" that a government official's testimony will produce or lead to admissible evidence. *Olivieri v. Rodriguez*, 122 F.3d 406, 409-10 (7th Cir. 1997). As explained in more detail below, Defendants do not just meet, but amply exceed that standard.

First, in denying Defendants' motion to dismiss, Judge Bucklo rejected Defendants' statute of limitations argument "at the pleading stage" because she could not "determine on the basis of the complaint whether the County knew or should have known" of the facts giving rise to its FHA claim. Memorandum Opinion and Order, at 15 (Mar. 19, 2015) [Dkt. 52] (hereinafter, "MTD Order"). The Court explained that "the date on which the County discovered the basis of its FHA claims is an issue that should be decided after evidentiary submission (and

2

under a summary judgment analysis)." *Id*. Thus, Defendants are entitled to explore whether the County's prior knowledge bars the County's invocation of the continuing violation doctrine.

The County itself has directly put the Presidents' knowledge at the center of the notice issue, and provided "reason to believe" the testimony is relevant, because the County's own discovery responses assert that the Presidents and fellow Commission members are the *only* people whose relevant knowledge should be imputed to the County. Plaintiff's Amended Responses and Objections to Defendant Bank of America's 173 Requests to Admit, at 2 (Jan. 15, 2016) (hereinafter "Amended RFA Responses") (attached hereto as "Exhibit A"). Using this purported standard, the County has made facially preposterous denials of basic Requests for Admission posed by Defendants, including, for example, that it was not aware that Bank of America or Countrywide Home Loans made or serviced any mortgage loans in Cook County after 2004, or that subprime lending could cause foreclosures. *Id.* at 4-5, 19-20, 90. Defendants are entitled to explore these responses through depositions of the relevant fact witnesses, which the County itself identifies in its Responses as the Presidents.

Next, the Presidents, as the highest ranking individuals within the County, may (and should) have personal knowledge of the underlying discrimination alleged in the Complaint, which is asserted to be a blatant decades-long pattern of intentional discrimination by some of the largest mortgage lenders in the County. Defendants are entitled to know if the Presidents were ever aware of any complaints regarding Defendants or lending discrimination in general, ever investigated discrimination, what the Presidents knew and thought of Defendants' business activities, and if the Presidents themselves ever had any relevant interactions with Defendants (even if the President or her predecessors failed to act on that knowledge). These are all topics

3

that go the merits of the County's claims and that Defendants are entitled to explore through discovery.

Finally, the County cannot substitute a 30(b)(6) witness for these depositions because any such witness does not possess the relevant, personal knowledge of the Presidents, and the Federal Rules do not allow such a substitution.

For all of these reasons, the Court should deny the motion for a protective order.

## I. BACKGROUND

The County filed this lawsuit on March 31, 2014, generally alleging that it lost out on additional tax revenues and incurred expenses as a result of Defendants' targeting of minority borrowers for home loans with less favorable terms and conditions than loans made to similarly situated white borrowers in violation of the FHA. Complaint [Dkt. 1]. Defendants moved to dismiss, in part, because the County's claim is time-barred in light of the FHA's two-year statute of limitations period; the County was on notice of its claims and the facts on which it is based well before March 31, 2012 so the County cannot invoke the continuing violation doctrine. Motion to Dismiss, at 6-9 [Dkt. 29]. As noted above, Judge Bucklo rejected this argument "at the pleading stage" and explained that the notice issue "should be decided after evidentiary submission (and under a summary judgment analysis)." MTD Order, at 15.

Accordingly, on March 7, 2016, Defendants served the County with a Notice of Deposition of Toni Preckwinkle, who currently serves as President and has since December 2010. Then, on March 18, 2016, after conferring with the County's counsel on whether they would accept service, Defendants followed with Notices of Deposition of former Presidents Todd Stroger and Bobbie L. Steel. Mr. Stroger was President for the four years from December 2006 – December 2010. Before his tenure, Ms. Steele served as the interim President for a four-

4

month period in 2006 after her predecessor's untimely death. Before she became President, Ms. Steele was Commissioner of the 2nd District for two decades. Defendants noticed the depositions of the Presidents for March 29-31.[1]

On March 22, the parties met and conferred regarding Defendants' deposition notices, at which time the County sought Defendants' explanation as to why the Presidents' depositions are relevant and necessary to the litigation. Defendants explained the bases, as detailed in this Memorandum, including that Defendants intended to question the Presidents on subjects relevant to Defendants' statute of limitations defense, such as when the Presidents personally knew of the County's claim against Defendants and various facts underlying that claim. Defendants explained that this testimony is necessary because the Presidents' specific duties included, among other things, receiving information concerning possible litigation on behalf of the County, deciding whether to initiate such litigation, and because, as a general principle, the Presidents' knowledge is imputed to the Counties. Moreover, Defendants explained that, even outside of the litigation context, as heads of the Board of Commissioners the Presidents are in a unique position to have personal knowledge of matters raised in Commission meetings, including on the subjects of alleged housing discrimination, redlining, and other matters relevant to this litigation. The County raised relevance and burden objections and requested time to provide written objections.

On March 28, 2016, the County served Defendants with its written objections and refused to allow the Presidents to be deposed. *See* Letter from Daniel Dailey to Sabrina Rose-Smith (Mar. 28, 2016) [Dkt. 109-2]. As a purported "concession," the County stated that it was

---

[1] Separately, on February 22, 2016, Defendants served the County with a notice seeking testimony on 36 topics pursuant to Rule 30(b)(6). The notice requested testimony falling into three categories: (1) the County's prior notice of its suit and its diligence in filing its claims (topics 1-14); (2) the County's damages theories and supporting evidence (topics 15-31); and (3) the County's basis for its allegations of discriminatory conduct (topics 32-36). That deposition was initially noticed for March 23, 2016, but has not taken place to date. *Id*.

5

"willing to provide a most knowledgeable individual(s), pursuant to Defendants' 30 (b) 6 Notice and deposition notices from the County Presidents, from the Office of the President." *Id.* Defendants rejected the County's stated concession, and the parties agreed that they were at an impasse. On March 29, 2016, the County moved for a protective order seeking to enjoin Defendants from deposing the Presidents. [Dkt. 109].

**II.     ARGUMENT**

      A.     <u>Defendants seek relevant information.</u>

Defendants seek to depose the Presidents on highly specific topics that are directly relevant to Defendants' merits and statute of limitations defense, the latter of which partly hinges on when the County knew or should have known of the facts giving rise to its FHA claim.

First, Defendants intend to ask the Presidents about their personal knowledge of the discrimination claims in the Complaint. No matter what the Presidents testify on this subject, it will be highly relevant to Defendants' defenses. If the Presidents deny any knowledge of lending discrimination within the County or bad acts by Defendants, it directly supports Defendants' position that the County has no actual evidence to support its claims. If, on the other hand, the Presidents have personal knowledge of lending discrimination within the County or Defendants' business practices specifically, it will further substantiate that the County and its presidents had knowledge outside the statute of limitations period that largely bars the County's temporally expansive FHA claim. In either event, the testimony will lead to admissible evidence regarding Defendants' defenses.

Second, Defendants intend to ask the Presidents specific questions directly tied to the notice issue. According to the County itself, it "has an elected Office of the President and a Board of Commissioners and can initiate litigation through the informed decision of its President and/or Board, based on information properly provided to the President and/or Board." Amended

6

RFA Responses, at 2.[2]  Defendants, therefore, seek to depose the Presidents and inquire into exactly these topics—*i.e.*, when the Presidents first discussed with anyone the possibility of "initiat[ing] litigation" against Defendants, when they made the "informed decision" to sue Defendants; what "information" that decision was "based on"; and how and when any such information was "provided" to them.  This necessarily includes questions on various resolutions, studies, programs, initiatives, and other matters arising during their tenures that appear to track some of allegations in the County's complaint and that the Presidents are in a unique position to know (and should have known) about.[3]

As Defendants argued in their motion to dismiss, numerous County records indicate that the County believed that lenders, at least in general, were violating the FHA within County boundaries since at least the 2000s.  Judge Bucklo herself identified this as necessary subject of discovery and an evidentiary submission.  MTD Order, at 15.  Defendants are entitled to explore the Presidents' knowledge of such documents and the circumstances surrounding the creation, as well as related information and documents that may be available elsewhere.  Documents identified already that demonstrate the Presidents' relevant personal knowledge include:

1. County Resolution 10-R-02, which was adopted by President Stroger on December 1, 2009 and noted the "disproportionate number of foreclosures in poor areas resulting in a high rate of board-ups and squatters who often engage in illegal activity." [Dkt. 29-3].

---

[2] *See also* Joint Report, at 11 (noting that the Board and Office of the President are responsible for making "the decision to initiate litigation against Defendants"); Hr'g Tr., 31:7-32:4 (Jan. 29, 2016) (Mr. Evangelista explained that "policy makers … at the commission level … are the ones who really are making the call as to whether or not to proceed with litigation") (attached hereto as "Exhibit B").

[3] The County may contend that the decision to initiate this action came about only after a solicitation from counsel that prompted privileged discussions with the State's Attorney's office and a subsequent privileged investigation.  That may be so, but there is evidence that the Presidents knew or should have known about the alleged conduct set forth in the First Amended Complaint independent of any such solicitation or discussions.  Testimony regarding those issues and why they did not did not prompt a decision to initiate litigation would not be privileged and would be highly relevant to Defendants' defenses.

2. County Resolution 08-R-37, which was adopted by the Commissioners on January 9, 2008 and found that "foreclosure rates of homes in Cook County … is rapidly increasing" and noted the "larger issue of fraudulent loans[] and loans issued to people who cannot repay loans 'reset' at dramatically higher rates…." [Dkt. 29-4].

3. A 2010 study by the Office of Budget and Management, which reports directly to the President, which reported on fair lending practices within the City of Chicago and found that the "geographic lending patterns of now defunct subprime lenders whose loans fueled the foreclosures currently devastating communities across the country" were concentrated in black, Latino, and lower-income communities. Richard M. Daley, Analysis of Impediments to Fair Hous. Choice & Fair Hous. Plan, Chi. 2010 at 21-22 [Dkt. 29-5]; *see also id.* at 32.

4. Minutes from a September 17, 2008 meeting of the Board of Commissioners, showing that President Stroger submitted a Proposed Resolution noting a "decline in property values, loss of home equity for both a foreclosed homeowner and neighboring homeowners[, and] an increase in crime…." [Dkt. 29-6].

5. A December 14, 2011 ordinance adopted by President Preckwinkle, devised to hold lenders and servicers accountable for the same harms alleged in the County's Complaint. *See*, *e.g.*, Cook Cnty. Land Dev. Ord. §§ 102-19, 102-20 (ordinance passed Dec. 14, 2011) [Dkt. 29-9] (requiring mortgagee to inspect properties for vacancy and, in certain circumstances, to perform certain property maintenance actions).

Perhaps most importantly, these are just some examples of the documents and information Defendants have been able to identify *on their own*. *See also* Memo. In Support of Defendants' Mot. to Dismiss, at 7-9 n.8-14 [Dkt. 29] (citing other documents involving the County and/or the City of Chicago that concern the same allegations and injuries in the Complaint). Defendants are entitled to discovery and testimony from the Presidents concerning what knowledge they have of other documentary evidence that demonstrate the County's prior notice of its claims.

In light of the above, the County's suggestion that Defendants seek only "non-specific" information is absurd. *See* Mot. at 3-5, 8-10. The fact that Defendants do not know exactly what the Presidents will say before questioning them does not make this a fishing expedition. *See Nw. Univ. v. City of Evanston*, 2001 WL 743756, at *2 (N.D. Ill. June 29, 2001) (noting that plaintiff "really has no way of knowing what information the [witnesses] possesses until it asks [them]"). This is the County's own lawsuit; County policymakers should not be permitted to initiate a

multi-million dollar legal action but disclaim any responsibility to provide deposition testimony about when, how, and why they chose to do so. Moreover, it is the County—over Defendants' objection—that claims the applicable time period for this lawsuit implicates the years long before President Preckwinkle's tenure, stretching back to the years even before the Stroger and Steele administrations. Defendants are entitled to deposition testimony that will bolster their defenses as to this entire time period.

        B.     <u>Defendants are entitled to discovery concerning the Presidents' personal knowledge.</u>

In support of its motion, the County offers the gravely misguided notion that only knowledge or information that can be imputed to the County is discoverable, and that the Presidents' "personal knowledge" cannot be imputed to it, so the Presidents' personal knowledge is not discoverable. Mot. at 6-7, 10. Initially, it is noteworthy that this argument is in direct conflict with the County's own affirmative discovery position. The County has indicated to Defendants and the Court that it will need to take numerous personal depositions of Defendants' employees, and the County will undoubtedly cry foul if Defendants attempt to bar all such depositions on the grounds that the County is entitled only to the "official knowledge" of a 30(b)(6) witness of Defendants' choosing. Yet, that is exactly what the County proposes here. Regardless, the County is incorrect in arguing that only knowledge imputable to the County is discoverable, and that the Presidents' personal knowledge cannot be imputed.

On the first issue, Defendants are entitled to discovery on more than just the "official knowledge" of the County as relayed by a County 30(b)(6) witness. First, the plain language of Rule 26 simply does not support the County's proffered distinction between "personal" and "official" knowledge at the discovery phase. Simply put, whether an individual's personal

9

knowledge is properly imputed to an entity presents an *evidentiary* question, not a *discoverability* question. As one Court aptly explained:

> Defendants are not entitled to a protective order limiting the scope of the deposition and prohibiting questions regarding knowledge or information obtained … outside the scope of [the witness'] employment with Defendants. Although the information [the witness] gained … may or may not be imputed to Defendants, this is an evidentiary question for the District Court. Plaintiffs should be allowed an opportunity to depose [the witness] and determine what, if anything, he knew…. If Defendants believe that this information may not be imputed to Defendants, they may file the appropriate motion in limine prior to trial. Plaintiffs, however, shall have the opportunity to question [the witness] as to the scope of his personal knowledge, irrespective of where or how he obtained his knowledge.

*Durkee v. Jett*, 2011 WL 5127646, at *1 (W.D.N.C. Oct. 28, 2011). Based on statements made at a hearing earlier this year, this Court would seem to agree. Hr'g Tr., 35:13-15 (Jan. 29, 2016) (Court: "I think for me to get legal briefing from you [on which departments' or employees' knowledge is properly imputed to the County] is not particularly useful because I don't think that…I should be ruling on the ultimate issue.").

Second, it is implausible, at best, for the County to argue that the direct personal knowledge of its *highest-ranking official*, cannot be imputed to the County. The County offers this Court no basis for making such a ruling, which would be contrary to binding Seventh Circuit precedent. It has always been the case that entities "'know' what their employees know" or "at least, what employees know about subjects that are within the scope of their duties." *See Prime Eagle Grp. Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375, 378 (7th Cir. 2010) (corporate president's knowledge was properly imputed to corporation). In this case in particular, the broad scope of a president's duties is such that her knowledge is more likely to be imputed to the entity over which she presides than would be the knowledge of a lower-level employee. *Cf.* 3 Fletcher Cyc. Corp. § 811 ("It is the general rule that notice to and knowledge of the president of a corporation relating to its affairs and business is notice to and knowledge of the corporation…."). In fact, the

10

County's *own* position has consistently been that the "County" is personified in the Office of the President and the Board of Commissioners. *See*, *e.g.*, Joint Report, at 11 (the Board of Commissioners and Office of the President is "the policymaking body for the County – including the decision to initiate litigation against Defendants"). If this Court decides to rule now on what knowledge is imputed to the County (and Defendants are not encouraging it to rule on this issue), it should rule that at least the knowledge of County Presidents while they are serving is imputable, and order the depositions to proceed.

      C.      <u>The Court should overrule the County's other objections.</u>

           *1.      The Presidents' status as current or former government officials should not prevent their depositions.*

The County is plainly wrong when it suggests that each Presidents' mere position as a government official exempts them from depositions. Mot. at 4-7, 9. Instead, the Seventh Circuit has held only that high-ranking officials "should not have to spend their time giving depositions in cases arising out of the performance of their official duties *unless there is some reason to believe that the deposition will produce or lead to admissible evidence*." *Olivieri*, 122 F.3d at 409-10 (emphasis added).[4] As a result, "[a] party seeking the deposition of a high ranking official should first demonstrate that there is some reason to believe that the deposition will produce or lead to admissible evidence." *Bagley v. Blagojevich*, 486 F. Supp. 2d 786, 789 (C.D. Ill. 2007) (quoting *Hobley v. Burge,* 2007 WL 551569, at *2 (N.D.Ill. Feb. 22, 2007); *Nw. Univ.*, 2001 WL 743756, at *1-3; *accord Cannon v. Burge*, 2007 WL 2410392, at *5 (N.D. Ill. Aug. 20,

---

[4] In contrast to this binding Seventh Circuit law, the County invents an assortment of standards for preventing depositions of government officials, none of which actually applies. The standard is not, for example, whether the Presidents possess "some unique or special information." Mot. at 3-5. Nor is it whether the deposition will "disrupt the [Presidents'] productivity" or interfere with their "business days." *Id.* at 4. It is also not whether "alternative discovery options are available" or whether the Presidents' depositions "will yield repetitive answers." *Id.* at 7-8. Nor is it whether the Presidents' "personal knowledge" can "be imputed to the *entire* County." *Id.* at 10. And it has nothing to do with whether purportedly "good faith concessions" were offered, accepted, or rejected. *Ibid.*

11

2007). It is ultimately the movant's burden, however, to justify a protective order. *Johnson v. Jung*, 242 F.R.D. 481, 483 (N.D. Ill. 2007).

As shown above, Defendants have much more than just "some reason to believe" that the Presidents' depositions will produce or lead to admissible evidence; indeed they are *certain* to produce admissible evidence. *See supra*, at 6-7 (the Presidents are responsible for deciding when and how the County initiates litigation); *id.* at 7-8 (various official documents show the Presidents regularly receive information from the Commissioners and other sources regarding matters such as discriminatory lending and foreclosures in Cook County that track the allegations in the County's First Amended Complaint). For all of these reasons, the Presidents' actions, motivations, and knowledge bear directly on this litigation and, specifically, on Defendants' statute of limitations defense.

Indeed, courts in the Seventh Circuit frequently allow depositions of high-ranking government officials over more substantive objections than offered here. In *Bagley*, plaintiffs brought an unlawful termination claim and the State Defendants objected to the deposition of the Governor, but the Court allowed it because "the Governor had a role in the decision to eliminate the correctional captain position" and so deposing the Governor was proper because the captains had "sufficiently demonstrated some reason to believe that [his] deposition … will produce or lead to admissible evidence." 486 F. Supp. 2d at 788-90.[5] Similarly, here, the Presidents' depositions should be allowed where they did not just have "a role in the decision" to initiate litigation and setting the agenda before the Board, but the *primary* role.

---

[5] The Court later granted the Governor a protective order on the basis of sovereign immunity, but reaffirmed its prior ruling. *Bagley v. Blagojevich*, 2008 WL 4724310, at *3 (C.D. Ill. Oct. 22, 2008). The Seventh Circuit affirmed on appeal, noting the standard articulated by the district court concerning depositions of high-ranking government officials. *Bagley v. Blagojevich*, 646 F.3d 378, 390, 401 (7th Cir. 2011).

*Hobley* is another good example. There, the Court rejected the City's argument that the Mayor's deposition should not go forward because he was not "a final policymaker," explaining that, in his former role as the State Attorney, the Mayor "possibly" was "put on notice of allegations of physical abuse of suspects by Chicago police through a letter to [the State Attorney] from the then-Superintendent of Police…." 2007 WL 551569, at *2. The Court allowed the Mayor's deposition because he "may have information about the activities of Burge and other police officers…and about whether any action was taken on the basis of such knowledge." *Id.* at *3. Here, the Presidents were undeniably put on notice of at least some facts that informed their decision to initiate litigation against Defendants—the only remaining unknowns are precisely which facts those were and when they first learned of them—so the case for their depositions is even stronger.

And finally, in *Northwestern University*, over the Magistrate Judge's contrary recommendation, the Court found that the depositions of the Mayor and City Manager should go forward. 2001 WL 743756, at *1-2. As to the Mayor, the Court found that the University was entitled to "understand her reasons for vetoing the Designation Ordinance" and to inquire "as to the motivations of the other members of the city council for passing the Designation Ordinance." *Id.* at *2. As to the City Manager, the Court ruled that he too could be deposed because, "as the one who implements all directions from the city council, [he] could have information regarding motives of the city council members relating to the passage of the Designation Ordinance." *Id.* at *3. Likewise, here, the Presidents will be able to speak not just to their own knowledge and motivations concerning this lawsuit, but, given their role in County government, to those of the Commissioners as well.

13

Thus while courts in this Circuit recognize that depositions of apex witnesses do implicate some unique concerns, where those witnesses have potentially relevant information, their status as elected officials[6] does not trump Defendants' right to a fair trial and the opportunity to discover relevant information and testimony.

### 2. A 30(b)(6) witness chosen by the County is not an adequate substitute for the Presidents' personal knowledge.

Finally, the County argues that the Presidents' depositions are unnecessary because the information sought is duplicative of information that the County's 30(b)(6) witness could provide. Mot. at 3-4, 7-8, 10. As noted above, this is not the applicable standard and therefore, even if true, is irrelevant. *See supra*, at 11; *see also Martinez-Hernandez v. Butterball, LLC*, 2010 WL 2089251, at *10 (E.D.N.C. May 21, 2010) (rejecting argument that depositions of "corporate decision makers" would be "duplicative, cumulative and unnecessary" where "corporate designees have already been extensively deposed" because "the Rule 30(b)(6) process" is not "a shield to prevent legitimate depositions of other corporate decision makers or key players").

But here, the County's claim is not true. The County says that it "initiate[s] litigation through the informed decision of its President…." Amended RFA Responses, at 2. Only the Presidents can adequately speak to what they knew about *their own* decisions related to this litigation. It is disingenuous for the County to argue that someone other than the Presidents is a

---

[6] Even if there was not "some reason to believe" that the Presidents' depositions would produce or lead to admissible evidence, the County still has not carried its burden to justify a protective order as to the two former Presidents. This is true because the heightened concerns regarding depositions of high-level government officials do not apply once they leave office. *Toussie v. Cty. of Suffolk*, 2006 WL 1982687, at *2 (E.D.N.Y. July 13, 2006); *Sanstrom v. Rosa*, 1996 WL 469589, at *5 (S.D.N.Y. Aug. 16, 1996); *Gibson v. Carmody*, 1991 WL 161087 at *1 (S.D.N.Y. Aug. 14, 1991). While some courts have reached a contrary conclusion because of concerns that former officials would be inundated with requests for testimony after they leave office, this action is no a nuisance lawsuit, and presumably the County considered that decisions made, or not made, by former Presidents would be relevant when weighing the benefits and burdens of initiating this action.

14

better source of information as to the Presidents' own thought processes, including what information was considered and when such information was learned.

Relatedly, the County argues that good cause for a protective order exists because it has "made several good faith concessions" to produce a 30(b)(6) deponent of its choosing to testify on similar topics. Mot. at 8-10. Again, this has nothing to do with whether government officials known to have relevant, personal knowledge may be deposed. *See supra*, at 11; *see also* WRIGHT & MILLER, 8A Fed. Prac. & Proc. Civ. § 2103 (3d ed.) ("[A] party who wishes the deposition of a specific officer or agent of a corporation may still obtain it and is not required to allow the corporation to decide for itself whose testimony the other party may have."). The County's stated "concession" merely to produce a 30(b)(6) witness that it is already required to produce pursuant to a different notice, is not actually a concession and has no relevance to the Presidents' personal depositions.

### III. CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny the County's Motion for a Protective Order [Dkt. 109] and order that the Presidents be deposed at a date and time convenient to both parties within the next thirty (30) days.

Dated: April 13, 2016 Respectfully Submitted,

By: */s/Sabrina Rose-Smith*

J. Erik Connolly
*EConnolly@winston.com*
Ryan M. Dunigan
*rdunigan@winston.com*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Tel.: (312) 558-5600
Fax: (312) 558-5700

Thomas M. Hefferon
*THefferon@goodwinprocter.com*
Sabrina Rose-Smith
*SRoseSmith@goodwinprocter.com*
Matthew S. Sheldon
*MSheldon@goodwinprocter.com*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
Tel.: (202) 346-4000
Fax: (202) 346-4444

James W. McGarry
*JMcGarry@goodwinprocter.com*
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
Tel.: (617) 570-1000
Fax: (617) 523-1231

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2016, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

Dated: April 13, 2016  */s/ Sabrina Rose-Smith*
*One of the attorneys for Defendants*