```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3    COUNTY OF COOK,                )  No.  14 C 2280
                                     )
 4                    Plaintiff,     )  Chicago, Illinois
                                     )  May 18 2016
 5                                   )  10:00 o'clock a.m.
      -vs-                           )
 6                                   )
                                     )
 7    BANK OF AMERICA CORPORATION,   )
      et al.,                        )
 8                                   )
                     Defendants.     )

 9
               TRANSCRIPT OF PROCEEDINGS - STATUS
10          BEFORE THE HONORABLE MARY M. ROWLAND

11    APPEARANCES:

12    For the Plaintiff:      JAMES D. MONTGOMERY & ASSOCIATES
                              BY:  MR. DANIEL A. DAILEY
13                            One North LaSalle
                              Suite 2450
14                            Chicago, Illinois 60601

15
      For the Defendants:     GOODWIN PROCTER LLP
16                            BY:  MS. SABRINA M. ROSE-SMITH
                              901 New York Avenue, N.W.
17                            Washington, DC  20001
                                       and
18                            WINSTON & STRAWN, LLP
                              BY:  MR. RYAN M. DUNIGAN
19                            35 West Wacker Drive
                              Chicago, Illinois 60601
20

21

22

23    Court Reporter:         ROSEMARY SCARPELLI
                              219 South Dearborn Street
24                            Room 2304A
                              Chicago, Illinois  60604
25                            (312) 435-5815
```

1           THE CLERK:   14 C 2280, Cook County v. Bank of

2   America Corporation.

3           THE COURT:   Good morning, everyone.

4           MR. DAILEY:   Good morning, your Honor.

5           MS. ROSE-SMITH: Good morning, your Honor.

6           MR. DUNIGAN:   Good morning, your Honor.

7           THE COURT:   Do you want to sit or stand?   It is

8   your choice.

9           Okay.   So I have read -- and I apologize.   You were

10  supposed to come in in April and I can't recall why I moved

11  it to May.   But I know you have got a lot to do.   So I am

12  sorry for pushing you back a month.

13          But I read your reports from April 11th, your joint

14  report.   And I also know that you submitted an expert's

15  report on the Turquoise data, which I read from the

16  plaintiff's perspective, and then a follow-up report from the

17  defendants' expert and a submission from the defendants, a

18  legal submission I guess, brief submission.   So I have read

19  all that.

20          So I am ready to rule.   And I am just going to go

21  through the things that I am ready to rule on, and then I

22  will probably have questions as we get towards the end.

23          So on the custodians here is what I think:   I think

24  that I am not going to allow custodian -- I am not going to

25  allow the -- what I would call the national whistle-blower,

1    the -- Mr. O'Donnell, Miss Foster and Miss Winston, to be

2    included in the custodians.  I am sure they are -- I am sure

3    they have very interesting e-mails that would be interesting

4    to read about, but I don't see the relevance to this case.

5            I am not going to allow the custodians to include

6    the major players at CW and Bank of America, Gissinger,

7    Bielanksi, Desoer and Lumsden.  These are all the yellow

8    people.

9            MR. DAILEY:  Okay.

10           THE COURT:  Okay?  I am talking about the yellow --

11   the people that are highlighted in yellow.

12           MS. ROSE-SMITH:  And, your Honor, I am sorry, I

13   didn't hear you.  Did you say you are going to allow those?

14           THE COURT:  I am not going to allow those.  But

15   right now I am talking about the yellow, the names that are

16   highlighted in yellow.

17           MR. DAILEY:  On the Countrywide, right, your Honor?

18           THE COURT:  On the Countrywide?

19           MR. DAILEY:  Right, you said --

20           THE COURT:  I am not sure which column they come

21   from because I just had them listed for me as yellow -- as

22   the people highlighted in yellow, but they may all come from

23   Countrywide.

24           MR. DAILEY:  No, they -- some come from Bana and

25   some come from Countrywide.

1    THE COURT:  Okay.  So I will say their names again.

2    Gissinger, G-I-S-S-I-N-G-E-R.  Bielanski, B-I-E-L-A-N-S-K-I.

3    Desoer, D-E-S-O-E-R.  And Lumsden, L-U-M-S-D-E-N.  So those

4    seven players are out in terms of custodians.

5    Now, there is another several yellow highlighted

6    people and who I am going to allow to be included as

7    custodians are the non-confidential people that are referred

8    to in the Complaint that I understand are highlighted in

9    yellow.  I don't know who those people are because in the

10   Complaint they are referred to as confidential people.  I

11   don't know their names, but I understand they are highlighted

12   in yellow.  I don't know who they are.  But I know you two --

13   you guys can work that out.

14   So of these remaining people highlighted in yellow,

15   the ones who are referred to in the Complaint as confidential

16   people, people who are providing information that I think is

17   obviously relevant to the allegations in the Complaint, they

18   shall be included as custodians.  I don't know if that is

19   Brian Jensen.  I don't know if that is Christina Morales.  I

20   don't know if that is Claudia Portillo.  I don't know if that

21   is John Cashner.

22   Do you understand what I am saying?

23   MS. ROSE-SMITH:  Yes.

24   MR. DAILEY:  Yes.

25   THE COURT:  But those nine individuals that are

1     identified in the Complaint as confidential sources are to be

2     included as custodians.  Okay?

3             (Discussion held off the record.)

4             MR. DAILEY:  Daniel Dailey, James D. Montgomery &

5     Associates, on behalf of Cook County, Special Assistant

6     States Attorneys.

7             MS. ROSE-SMITH:  Your Honor, I am gratified to hear

8     that you didn't ask us for our names because you forgot

9     rather than you didn't ask because you have seen us so often

10    that you just knew and wanted to get it over with.

11            So Sabrina Rose-Smith.  I am here on behalf of all

12    of the defendants, Countrywide, Bank of America, Merrill

13    Lynch, all three defendant families.

14            MR. DUNIGAN:  Ryan Dunigan on behalf of defendants.

15            THE COURT:  Okay.  If my daughter started one of

16    her gatherings without asking everyone their names, I would

17    kill her.  And now I just did that same thing.

18            Okay.  The people that are identified in blue that

19    the defendants agree are relevant, they are going to be

20    included as custodians.  They are Rebecca Mairone,

21    M-A-I-R-O-N-E, and Tony Meola, M-E-O-L-A.

22            There are 21 custodians that are not in dispute.  I

23    assume I don't need to identify those.  Correct?

24            MR. DAILEY:  Correct.

25            THE COURT:  Okay.  I will point out that Edward

1    O'Donnell is listed on that chart as not in dispute, meaning

2    he is not highlighted, and then he is highlighted.  Okay?  So

3    he is not a custodian that is going to be searched.  I think

4    that was probably just a typographical error that he didn't

5    get highlighted, but I just want to clarify because I was

6    counting and recounting and counting a third time to try to

7    get to the 21 and I kept getting to 22, when I figured out

8    Edward O'Donnell actually was not highlighted.  So the

9    glamorous life of a judge.

10            Okay.  There are three new people that were added

11   that I am going to include as custodians.  I am not sure if

12   they are disputed or not, but they are Brian Robinett, John

13   Berens and John Boland.  And I am not sure if the banks were

14   disputing them or not.  They have been recently identified.

15   They don't -- they are not color coded.

16            MS. ROSE-SMITH:  Your Honor, I think that they

17   were.  They were part of our original proposal to them and

18   then not included when they were proposed back but then

19   re-included, so they are fine.

20            THE COURT:  Okay.  I am -- we are not including any

21   of the purple people.  The purple people are done.

22            So I am done with custodians.  So let that work

23   begin.

24            Okay.  I will say this about the searches:  I am

25   concerned -- I know you haven't asked me to weigh in on the

1   terms.  I have glanced at the terms.  Yowza, a lot of them.

2   I see the chart that is on Page 9 of the joint filing.  And

3   when I look at that chart, I think there is going to be some

4   kind of limits on the ways the searches are going to be

5   conducted.  So certain individuals, depending on what their

6   job titles were, are going to have certain searches run

7   through them.

8            Are you hearing, Mr. Daily?

9            MR. DAILEY:  Yes, ma'am.

10           THE COURT:  But then when I read the defendants'

11  position to me, they are telling me, no, we are going to be

12  running, you know, 50 different searches through each e-mail

13  box.

14           MR. DAILEY:  Right.  That is -- that is incorrect.

15  We have this --

16           THE COURT:  Okay.  So I am not wading into that.  I

17  am not being asked to wade into that today, but I am

18  concerned that -- I am trying to give you a fair number of

19  custodians.  I think we are into the 40s -- or about 40

20  custodians.  I don't want this to become, you know, a monster

21  so that you get such a data dump that you can't swim out of

22  it.  Okay?

23           And I also don't want the banks having such a --

24  such a monster to review that we are in 2025 before we are

25  done with discovery in this case.  Okay?  That doesn't serve

1    anybody.

2    So you have your custodians.  Let's -- and you are

3    asking for a lot of terms here, which I don't know if you

4    guys have agreed on those terms or you are still talking

5    about those terms.  And some of those terms -- I mean I don't

6    know the point of some of the more overtly racist terms.  If

7    you really think that someone at Countrywide was sending

8    e-mails like that, okay, let's see.  I hope not, but okay

9    let's see.  But I am hoping that we can at least run the

10   searches in ways that we -- that becomes -- that that becomes

11   manageable.  Okay?

12   MR. DAILEY:  Okay, I understand.

13   THE COURT:  Now Turquoise.  Here is my thing about

14   Turquoise:  What I've got to keep in mind, okay, as the -- as

15   the referee or the police, it only applies to a subset of the

16   loans.  It only ever can.  Okay?  Now, I understand it comes

17   from Countrywide.  And I get that Countrywide is a real

18   target here.  Okay?  If it only applied to Merrill Lynch

19   loans, I don't know that we would care so much about it.

20   You understand what I am saying?

21   MR. DAILEY:  I do, yes.

22   THE COURT:  But it is only ever going to apply to a

23   subset of loans.  And what I hear defendants saying, and I

24   think you probably agree -- and I have not heard you contest

25   this -- you probably don't have any information to contest it

1    -- and I think this is probably true -- is that it is

2    ultimately -- they used it differently over time and so it is

3    ultimately, according to the defendants, unreliable data,

4    meaning we don't know what -- exactly how it was used at

5    different time -- points in time.  So it is -- it is data

6    that is of less valuable use than that other data that we

7    were using, which was like AS400, or something like that.

8    Okay?

9                   MR. DAILEY:  Yes, your Honor.

10                  THE COURT:  So I have -- I have that in my mind

11   when I am reading experts coming in to me telling me about

12   the data.  Right?  So you guys are going to great lengths to

13   talk to me about Turquoise.  So I get that it is important

14   because you guys are going to a lot of trouble to talk to me

15   about it, but I also know that it is only going to apply to a

16   subset of these loans and it is going to be for a limited

17   period of time.  And we are not -- it is not as accurate, it

18   is not certainly as up-to-date as the other data that we

19   have.  So I am -- all of that makes me a little squeamish

20   about the data.

21                  And then I have on top of that some -- and I am not

22   one to scold, but I have got to tell you for -- for a lawyer

23   to look at my order and -- for my order to say that you are

24   to identify certain things by April 1st, and for you to take

25   the position that that meant you were to identify them but

1 not communicate them to the other party, I think you think I

2 am an idiot.  It is the only way I can take that position

3 because I can't think of a judge in the world who would say,

4 "Do this by October 1st," and not -- and that the implication

5 of that would not be tell the other side.  So you have got to

6 think I am the stupidest person on the bench.

7     MR. DAILEY:  Not at all.

8     THE COURT:  Which I am sure was not your intent,

9 but that is the only way I can read that.

10     MR. DAILEY:  Okay.

11     THE COURT:  So let's not focus on that.

12     But I am troubled because I know the bank is doing

13 a lot of digging on this Turquoise stuff because it is a dead

14 field -- it is a dead animal to them because it is not

15 something that they are using currently.  And if you are not

16 giving them feedback on it, particularly if I give you a date

17 by which to give them some feedback on it, that is -- to me

18 it is just saying, well, how important is it really to them

19 because they don't seem to care so much about it?

20     So as I understand it you -- the bank has agreed to

21 produce certain fields.  And even in the April 11th filing

22 Miss Rose-Smith said she was going to continue to research

23 some fields and obviously, you know, that probably has been

24 ongoing.  And here we are in May.

25     So -- and I understand the argument and I actually

1   agree with it that this APR analysis is the best

2   understanding of really the price of the loan.  There is lots

3   of different ways we could try to get at this, but this is

4   going to be kind of the uniform way that we are going to

5   ultimately look at it when you are on trial in front of Judge

6   Bucklo, which, you know, I get discovery is like this

7   (indicating), but you know when you go to trial you are

8   really like this (indicating).

9               MR. DAILEY:  Yeah.

10              THE COURT: You are really trying to just give Judge

11   Bucklo or the jury, if there is a jury -- God bless them in

12   this case -- you know, you are really trying to simplify it,

13   not make it more confusing.

14              So I am not going to order any further -- how many

15   fields have you agreed on of the 42 that were in dispute?

16   Have you agreed on any more?

17              MS. ROSE-SMITH:  No.

18              THE COURT:  Because in April there were 42 in

19   dispute.

20              MS. ROSE-SMITH:  No, your Honor.  There were I

21   think 12 where we thought that the County had either that

22   field or an equivalent field.

23              MR. DAILEY:  Right.

24              MS. ROSE-SMITH:  Nine that we had -- we said, yes,

25   we will provide.

1          THE COURT:  Right.

2          MS. ROSE-SMITH:  And then I don't -- I don't think

3     that we have agreed to any others, although I don't -- the

4     only thing -- I might be thinking of -- one of the things

5     that we are trying to do is get them some additional data

6     because they said that some of our -- some of the loans were

7     missing data.  And we have gone back to Turquoise to see if

8     Turquoise can fill the gap.

9          THE COURT:  And that is a separate thing.

10         MS. ROSE-SMITH:  And so I am -- so I -- the only

11    reason I am hesitating is because I don't know if there are

12    additional ones that have offered to -- or that we have

13    offered to fill the gap, if that becomes necessary.

14         THE COURT:  Right.  And you are still going to and

15    you are obligated to use Turquoise to fill the gap.  You have

16    promised to do that and you are going to do that because of

17    -- the data that you produced has gaps.  We know that.  I

18    think you told me the first day I met you that HELOC loans

19    were going to have the gaps because you don't keep certain

20    data on HELOC loans, for instance, you don't keep race data

21    on it, which is a challenge in a case about race.

22         So these loans are necessarily going to have a big

23    gap in there for the plaintiffs.  If HELOC loans are part of

24    this case, which I assume they are, I don't know if you can

25    fill that in with Turquoise because I don't know how HELOC

1    would tie in with the Turquoise data.  But any gaps that you

2    have you are going to go back to Turquoise.

3             Other than that -- other than filling in gaps and

4    the Turquoise data points that you have agreed to produce,

5    that the parties have negotiated and agreed to, I am not

6    going to order any further production from Turquoise.  I am

7    done with Turquoise.

8             Okay.  Now, the next thing that you guys report on,

9    but I don't think you need me on it, is the County brings to

10   my attention that there is loan data -- 35 percent of the

11   loan data doesn't have ethnicity and there is missing loan

12   data, and that you were going to maybe -- do you want me to

13   set a date by which you have to identify the loans that have

14   missing data?  Would that be helpful?  There is nothing for

15   me to rule on, but --

16            MS. ROSE-SMITH:  So they did send a spreadsheet

17   that had the loans that were missing.  So we have been, since

18   the date of this report, trying to figure out whether or not

19   there is anything that would be a suitable substitute for the

20   same information or would be that information kept in a

21   different field somewhere else.

22            THE COURT:  Right.

23            MS. ROSE-SMITH:  So we are in the process of doing

24   that and I think we are close to sending out, you know, what

25   we -- what we have to the plaintiffs.  So I don't think that

1   there is anything to do unless -- unless the plaintiff wants

2   a date by that, although I think it is going to be in the

3   next two weeks or so.

4           THE COURT:  Okay.  So the loans that are missing --

5   so I am putting in the minute order then the loans that have

6   missing data have been identified and the defendants are in

7   the process of attempting to either fill those gaps or find

8   that data from some other location.  And would you like to

9   set -- could you give a date by which that might be

10  accomplished?

11          MR. DAILEY:  Your Honor, may I say something about

12  this missing -- these missing fields?  That is -- we can get

13  a date for that, but in addition -- because this is a good

14  place to insert it -- we discovered that we also cannot merge

15  that data with the foreclosure data.  So we cannot identify

16  the loans to the corresponding foreclosed properties.  We

17  discovered that a couple weeks ago.  We alerted the

18  defendants to that same thing.

19          At this point identifying those properties is

20  absolutely essential.  So whatever date is set for including

21  and fixing some of these missing data fields, can we also say

22  that that date includes reproduction of the data so that it

23  is in a format where it is mergeable to another set of data

24  which we can identify foreclosed properties?

25          And at this point we are not raising as a point of

1    saying that the data was manipulated, although we did have an

2    expert say there is no way this would have been happened

3    because defendants have come forth and said, "Hey, we can get

4    this fixed." We just don't have a date. So we are looking

5    for reproduction. And I -- it would be very wise to include

6    it altogether, a reproduction of that data, so that we can

7    identify the subject properties.

8                THE COURT:  Okay.

9                MS. ROSE-SMITH:  Your Honor --

10               THE COURT:  The loan data and the foreclosure data

11   is separate, produced separately?

12               MR. DAILEY:  Right.  We already had foreclosure

13   data.

14               THE COURT:  Where did you get that?

15               MR. DAILEY:  We bought that when we filed our

16   Complaint.  That was from the State.

17               THE COURT:  You bought that?

18               MR. DAILEY:  And we were able to map the

19   foreclosures throughout --

20               THE COURT:  I see.

21               MR. DAILEY:  Right.

22               THE COURT:  Okay.

23               MR. DAILEY:  But what -- go ahead.

24               MS. ROSE-SMITH:  Your Honor, the concern is we had

25   our client go back, when you ordered that we produce the

1   property address -- it was -- remember the big kerfuffle

2   about whether that was actually loan data?  And they know --

3   so we knew -- and when I say "we," I mean the lawyers at

4   Goodwin Procter -- knew that there was a field called

5   property address that had the address in it.  So we said,

6   "The Court wants you to pull property address, pull property

7   address."  Property address is one field.  So -- it does have

8   the address.  So the plaintiffs have that.

9           What property address doesn't do is split the

10  actual address itself into the different components of an

11  address.  So we didn't produce five fields that have the

12  street number, the street name, the city, the state, and the

13  zip in certain fields.  And the reason that becomes a problem

14  for the plaintiffs is that they want to be able to sort the

15  data by, for example, just the zip code.  And you can't do

16  that with a property address field because it turns out that

17  that is all one field.

18          So if you look at it in a giant spreadsheet and you

19  click, it is going to sort it by the numbers of the beginning

20  of the property address as opposed to the numbers by the zip

21  code.

22          THE COURT:  Right.

23          MS. ROSE-SMITH:  So we didn't realize that that was

24  what they wanted to do with the data.  And this is not at all

25  under any circumstance a manipulation issue.  It is -- and we

1    have offered a solution which they decided not to take.  So

2    it turns out that there are two options.  We pull the data,

3    all the five different components, or we could -- our expert,

4    actually in order for them to run their analysis, which is

5    already done -- they ran some sort of program that split the

6    components of the address.

7              Although the -- they didn't split the street number

8    from the street address.  So those two are still together.

9    But the zip code is separate.  So if that is the -- I think

10   that is the operative field that they want to be able to

11   sort.

12             And we offered that to them, and they said, no, we

13   don't want the -- the fix that your expert did, which I could

14   have gotten to them weeks ago -- we want you to re-pull all

15   the data.  And we said this is -- you have no reason to

16   believe we manipulated this data.  If I go back to the client

17   with another request, it goes into the why don't we just take

18   the simple solution.  You don't have any reason to believe we

19   are going to mess that up or any of that.  And if we did,

20   then our expert was just as wrong as yours, and we didn't

21   want that to happen.  So just take it that way.

22             They won't.  And so, you know, this is one of those

23   things, if the Court orders it, we will certainly do it.

24   But this is makework for us over something that we just did

25   -- one, we didn't know that they wanted and, two, is just as

1    easily fixed by running whatever program -- whatever thing

2    our expert did with their -- they used the program that they

3    used to -- to conduct their analysis, to load all the

4    information in.  And all they did was split that field.

5         And I think their expert could do it too.  But if

6    he can't, we offered to do it for them.  I just -- this is

7    just one of those things where I am not even sure why we are

8    fighting.

9         THE COURT:  And then if you do that, counsel, can

10   it then be merged with the foreclosure data?

11        MS. ROSE-SMITH:  Yeah, because I think that the

12   only reason that there is a merger problem is because however

13   -- I understand from -- from the information that they have

14   given us that their -- that they need to be able to sort by

15   the zip code component of the address or -- or potentially

16   like the street.  And I think that they can do that based on

17   what we had.

18        And I -- you know, they have not at any point --

19   they flat rejected it and said, no, we want you to re-pull

20   it," but they didn't say that there was anything wrong with

21   it.  So if there is, you know, that is an entirely different

22   story, of course.  But it is --

23        THE COURT:  So do you know -- Mr. Dailey, do you

24   know the problem with the merging?

25        MR. DAILEY:  Yes, your Honor.

1        THE COURT:  Why is there a problem?

2        MR. DAILEY:  So I just actually talked again to

3  some of our consultants.  What -- what we told them -- when

4  we rejected the defendants' proposal to take their expert's

5  sorted data, the reason was because it is not going to be as

6  detailed enough for our purposes.  And our experts cannot

7  merge this data -- from two sides of the country all say the

8  same thing.  They cannot take this data and merge it into the

9  foreclosed property because everyone knows -- when I say

10  "everyone," defendants would absolutely know that having

11  addresses in one field make it impossible to merge with

12  another document -- another format.

13        THE COURT:  Right?  But what if you separate out

14  the zip code?

15        MR. DAILEY:  That wouldn't do all of what needs to

16  be done.  We also need to separate it by the address.  So

17  some of this data is not -- just because it is in one zip

18  code doesn't mean it is going to be mergeable to that one

19  foreclosed actual address.  You still have to go back there

20  and do that.

21        THE COURT:  But what if their expert can separate

22  -- so can give you a column for zip code, a column for street

23  address, and then a column for street name; is that what you

24  need?

25        MR. DAILEY:  Right.  Everything needs to be

1    separated.  That is normally how this data is produced, and

2    that is how it is maintained.

3            THE COURT:  Does it have to -- but it doesn't have

4    to say Cook County, right, because we are all Cook County,

5    and it doesn't have to say Chicago --- well, I guess it --

6            MR. DAILEY:  Well, that is not necessarily correct

7    because I was actually looking through the data just the

8    other day and some of this is outside of Cook County.  I

9    actually learned -- I actually saw some numbers made

10   somewhere in Kane -- in Lake County.  So --

11           THE COURT:  Well, those are not relevant, though.

12           MR. DAILEY:  Right.  But if you are asking --

13           THE COURT:  And you can delete those.

14           MR. DAILEY:  Right.  But you are asking -- your

15   question, my understanding of your question, was that if all

16   of them are Cook County, then you don't need certain fields

17   to be separated out.

18           THE COURT:  Yeah.

19           MR. DAILEY:  But that is not accurate.  There are

20   some fields that are not Cook County in there, and we did

21   find that.

22           THE COURT:  So you -- do you already -- in the data

23   that you have do you have a County field and it says Cook,

24   Cook, Cook, Cook, Cook, Cook, Cook, Lake, Lake, Lake, Lake,

25   Cook, Cook Cook, Lake, Lake, Lake, Cook, Cook, Cook, Cook?

1          MR. DAILEY:  No, ma'am.  No, it doesn't.  It says

2     just the address and where the property is in the City.  But

3     we know from looking at -- we pulled some of the addresses

4     and we know that some of them are not in Cook County.

5          And again it is -- we are not accusing the

6     defendants of anything.  I want to make that clear.

7          THE COURT:  No, I am not either.

8          MR. DAILEY:  Okay.

9          THE COURT:  Can your expert do this -- have you

10    talked to your expert about doing this -- what I would call

11    cleaning it up, cleaning up the address, you know, by

12    separating them into separate fields?

13         MR. DAILEY:  Are you saying did I ask them, my

14    experts?

15         THE COURT:  Yes.

16         MR. DAILEY:  Yes.  They explained to us it would be

17    extremely expensive for them to do that.  They would have to

18    buy more data for them to go and try to have that separated.

19    And that is what -- I was verbatim -- I told to defendants in

20    the letter, which is why they didn't do it.

21         THE COURT:  Right.

22         MS. ROSE-SMITH:  No, we didn't do it, your Honor,

23    just because we thought -- because if I put it back in the

24    queue, then this is going to take much longer time and

25    because our expert could do it.  And maybe it was expensive,

1    but it was expensive -- we have already paid for them to do

2    it.

3                 THE COURT:  Yeah.

4                 MS. ROSE-SMITH:  And so I am not opposed to the

5    idea of going back and getting each component in a different

6    field.

7                 THE COURT:  Right.  That is what we are going to

8    do.  So --

9                 MS. ROSE-SMITH:  If I can get it easier and quicker

10   from my expert --

11                THE COURT:  Right.  So the defendants' expert is

12   going to take care of this problem.  And she is going to

13   truncate, if that is the right word, the address field into

14   mini fields.  It sounds like you want a separate thing for

15   Illinois and you want a separate thing for Cook County and

16   you want a separate thing for the City.  The City would be

17   different because you could be Chicago, you could be -- there

18   is lots of cities in Cook County, of course.

19                I don't know why you would have a separate one for

20   the street as compared with the number.  That makes no sense

21   to me.

22                MR. DAILEY:  Candidly, your Honor, we don't know

23   what form the data was originally.  That is why we said no

24   from the expert because now, after we have it now, we don't

25   know how the fields were separated, which is why we said just

1    us  the raw data.  Because the experts --

2            THE COURT:  Well, the field, the way it was kept,

3    was the address was one field.

4            MR. DAILEY:  No.  And my understanding that is not

5    correct.

6            MS. ROSE-SMITH:  Yeah.

7            MR. DAILEY:  When I talked to defense counsel, she

8    said when they queried it, that is how it came up.  But

9    ordinarily --

10           THE COURT:  So that is how it was kept --

11           MS. ROSE-SMITH:  Well, if --

12           THE COURT:  -- by the bank.

13           MS. ROSE-SMITH:  To be clear, your Honor, I am sure

14   that multiple different systems deep that address in multiple

15   different ways.  We have been through this same production in

16   a case out in Los Angeles.  So were aware of a field.  And so

17   what we did was go back and say, "Hey, they want the property

18   address.  Give us the property address field."  I am sure

19   that if I go back and say to my client, "Please pull all of

20   these individually," they will do it.

21           My concern isn't about the being able to do that.

22   It is the time that it will take to do that because we have

23   been running custodian searches right now, so the 30 we had

24   originally agreed on and I wanted them to run.  So we didn't

25   wait.  And there is just a cycle of things and a priority of

1    things, and I am not the only case they have got going.

2           And so I just thought if there is an easy way to

3    get it, let's just get it.  And it is not that raw data was

4    any different.  I gave my expert the same thing as we gave to

5    Cook County.  And so all they did was take that field, the

6    property address, and split it up.  And all we are doing is

7    is saying, "Here is the results of that" because that is how

8    they ran their analysis.

9           And so if I -- if I can do that, I don't think that

10    there is any prejudice to the plaintiffs that way.

11    Otherwise, they just have to wait for it.  And that -- and I

12    don't want them to wait for it, candidly, your Honor, because

13    I want them to identify the properties that they think are at

14    issue because I need that in order to go forward with our

15    case.

16           THE COURT:  I am just struggling -- Mr. Dailey, I

17    am struggling to understand what is the negative of this

18    solution.  They are paying for it.  They are going to get you

19    back the same data set, but it is going to have your

20    addresses chopped up the way you want them.  They are going

21    to have it.  Their expert is going to have to account for it

22    the same way.  Their expert is going to have recreated it.

23    So it is not like when you are deposing their expert and

24    you immediately say, "Well, we don't know anything about that

25    data.  Well, you have got different data."  You are going to

1    have the same data.  It is going to be broken up the way you

2    want it.

3              I don't know if that is going to be mergeable.  I

4    mean you are telling me that is going to be mergeable.  I

5    don't know the mergability of it.

6              MR. DAILEY:  And, your Honor, it is interesting

7    because opposing counsel just made a point.  She said, you

8    know, we want to identify those foreclosed properties, the

9    subject properties.  If she is saying right now that their

10   expert already divided that, they can actually identify those

11   foreclosed properties.  The fact that they haven't shows that

12   whatever -- however it is that he divided it, will -- has not

13   been able to -- hasn't proved the ability to locate those

14   properties.  And that is what we are saying.  We are going to

15   have to locate those properties.

16             MS. ROSE-SMITH:  Your Honor --

17             MR. DAILEY:  So it is a little inconsistent to say,

18   oh, his data will give us the ability to merge and locate

19   these properties, and that is what we really want, when you

20   could actually do that yourself, if that is the case.

21             MS. ROSE-SMITH:  No, actually that is logically

22   inconsistent, your Honor.  Yes, it is true that I can

23   identify the foreclosures.  I am not asking them to identify

24   the foreclosures.  I am asking them to identify those

25   foreclosures that they believe caused them some damage.  It

1   may be that their argument ultimately is every single

2   foreclosure during this time period caused the County damage.

3   But if that is the case, what I am after is that the County

4   say that or to identify some subset of the entire -- the

5   foreclosures over the entire period in the County.  So I am

6   not saying I want him to identify foreclosures to me because

7   I can't and, therefore, that illustrates that I haven't done

8   with this data what I said.

9           THE COURT:  Right.  She wants you to identify the

10  discrimination.

11          MS. ROSE-SMITH:  Yeah.

12          MR. DAILEY:  That is something that we are looking

13  at.  As a compromise, so we don't belabor this issue, the

14  County will agree to do this:  If we can have the ability to

15  talk with an expert and have them divide the fields we want

16  but reserve the right if they are not mergeable, if we are

17  having other issues, to come back before the Court and have

18  that produced within a short amount of time to fix whatever

19  issue there is.

20          Would that be acceptable to the Court?

21          THE COURT:  Well, I think that -- you know, I mean

22  I will say this:  They -- we have to be the mergability.

23  They have to be mergeable ultimately.  I mean I think

24  everybody agrees with that.  Right?  The two databases

25  hopefully can talk to each other.

1    Now, I am a little bit nervous that you got the one

2    database from the State because we all love our governmental

3    entities, but they are not the most advanced technologically.

4    So I don't know what you -- you know, what you are getting

5    from the Secretary of State.  Maybe they keep the foreclosure

6    data.

7    MR. DAILEY:  I want to say we got the HMDA data,

8    was a part of that, your Honor.  I don't want to be

9    inaccurate.

10    THE COURT:  Okay.  But it could be an older

11    platform that we are talking about that could be challenging.

12    Okay?  So --

13    MR. DAILEY:  Your Honor, we are talking about an

14    Excel sheet.  We are talking about merging two documents from

15    the fields into an Excel sheet.

16    THE COURT:  Oh, beautiful.

17    MR. DAILEY:  And it is clear that there is no way

18    you can merge one field into multiple fields for an Excel

19    sheet.  And that is why our experts were so adamant about

20    saying there is something wrong here.  Nobody in the world

21    that has a lot of data would put addresses in one field

22    because they could never do a mail merge.

23    THE COURT:  Okay, okay.  Well, if we are only in

24    Excel sheets, even I can handle that.  Okay.

25    So I will tell you this:  I agree with you that I

1  want to get you to the point where you can merge these two

2  databases.  Okay?  I understand your expert's need for that.

3          MR. DAILEY:  Yeah.

4          THE COURT:  I think this is a reasonable and the

5  quickest and most efficient fix.  You said you want to talk

6  to her expert.

7          MR. DAILEY:  Well, talk through counsel,

8  obviously --

9          THE COURT:  Okay.

10         MR. DAILEY:  -- and reserve the right, if there is

11 any issues, to bring it back before the Court.  I just don't

12 want to foreclose if I can --

13         THE COURT:  Fine.  You can always bring issues.

14         MR. DAILEY:  Okay.

15         THE COURT:  But let's -- so let's try to -- should

16 we set a date to try to get this resolved or --

17         MR. DAILEY:  Please.

18         THE COURT:  -- do you just want to get this done?

19         MR. DAILEY:  I would like to get this resolved as

20 soon as possible because we have got -- this goes to the

21 heart and -- and matter of this litigation.

22         THE COURT:  Okay.  So --

23         MS. ROSE-SMITH:  Your Honor, it can be short.  I

24 already have the spreadsheet with them split up this way.  So

25 the only thing is I am going to have to go back to the expert

1    and get them to divide the street number from the street

2    name.

3           THE COURT:  And that doesn't take very long?

4           MS. ROSE-SMITH:  Yeah.

5           THE COURT:  Okay.

6           MS. ROSE-SMITH:  That is it.

7           THE COURT:  Do you want to say by May 27th?

8           MS. ROSE-SMITH:  That is fine.

9           THE COURT:  Okay.  So by May 27th the parties will

10   resolve this issue of separating out the street addresses.

11          And then I also want to set a date by which the

12   defendants will fill in the missing identification -- the

13   missing data.  I think you are going to need a little longer

14   than May 27th.

15          MS. ROSE-SMITH:  Yeah, I -- I tried to get a final

16   ETA on that in preparation for the hearing, and the best I

17   got was, "We expect it to be ready in the next two weeks."

18   So if the Court could set something at the beginning of the

19   third week from now, then I am sure we can -- we can make

20   sure it happens by then.

21          THE COURT:  Okay.  I am going to say June 6th.

22   Okay.

23          Okay.  Now, I know there were requests for

24   production issues, which I am not as prepared on because it

25   turned out you sent me to earlier filings; and when I went to

1    the earlier filing, then you sent me really to a motion to

2    compel, which was quite a long time ago and I didn't get to

3    read all of that.  And I feel like I need to to understand

4    what is happening.

5          But I want to hear -- and that was 97 pages or

6    something, by the way.  So it had a lot of pages in it.  And

7    I know it is not all about these requests, but I -- but I am

8    not prepared to rule, but I am happy to hear what you are

9    talking about.

10         But first of all let's talk about these dates

11   because I think we are -- we are making progress.  Are you

12   going to have your Countrywide data -- and I appreciate that

13   on the 22nd of April you filed a document with me telling me

14   that you are going to be able to produce that Countrywide

15   data that I told you to produce by July 8th.  So that seems

16   significant.  I don't know.  I know it is old.  I know it is

17   archived.  It might be -- I am sure it will be full of holes.

18   But, you know, that seems like a significant date to keep in

19   mind when we are setting these other days.  So they are going

20   to get those -- they are going to get that information on

21   July 8th.

22         I am going to set a close of discovery for December

23   15th, 2016 because we have to be optimistic.  And I would

24   like to say that we are going to serve all additional written

25   discovery -- you know, I would like to say that we are going

1    to do that -- well, you guys are going to do that.  I don't

2    know why I say "we" -- that you will do that by August 29th,

3    2016.  But, you know, I do think it is reasonable that

4    plaintiffs would be able to do that after they get the

5    production of the e-mails.

6            So is -- is that realistic?  Do you know what I am

7    saying?

8            MR. DAILEY:  Right.  And it --

9            THE COURT:  They are going to want some time after

10   they get the e-mails, which means you pulling them, you

11   reviewing them for privilege, you turning them over, them

12   getting to review them, and them then saying, "Okay, here is

13   a final set of interrogatories or a final set of document

14   requests."  So is that a smart date to set?

15           MS. ROSE-SMITH:  Sorry, I am just trying to go --

16           THE COURT:  I mean I am looking at your chart and

17   you are setting -- you know, the defendants want to set these

18   dates, and I see that.  And I like dates.  But plaintiffs

19   want to tag everything to, you know, 40 days or 30 days after

20   we get certain stuff.  And I am trying to balance both of

21   those interests.  And I would like to have some hard dates

22   myself, not that I want to get rid of you, but I want to have

23   some dates for all of us to keep our eyes on the prize.

24           But, you know, they have to have certain

25   information before they can serve their final requests.  And

32

1   I know you want them to identify the loans that are the

2   issue, but I -- I sort of think they need the July 8th

3   production to do that.  Again it may be full of holes, it may

4   not be that helpful to them, but I think they are entitled to

5   have that.

6          Or we could have an earlier date and then -- and

7   know that they are going to supplement it after they get

8   their July 8th production.

9          MS. ROSE-SMITH:  Well, so it would be fine with me.

10  So, your Honor, the reason that we are pressing for this date

11  is because Judge Bucklo said to us that if you want to file

12  an interim motion for summary judgment that addresses the

13  statute of limitations period, you can.  And so what we want

14  to do,  given that they already have the data for the

15  two-year period prior to filing the Complaint, we would like

16  to be able to say in response that here is our -- here are

17  all of our statute of limitations arguments.  There was no

18  discrimination in the limitations period and, you know, the

19  notice issues and all of that.

20         And so if -- so the other stuff that we are

21  producing doesn't matter for that, although it does

22  ultimately matter for the entire case because if Judge Bucklo

23  rules against us, we are supposed to do that.

24         THE COURT:  Of course.

25         MS. ROSE-SMITH:  So I don't mind having a date -- I

1    would just like a date by which they will tell us which of

2    the properties that they -- that they are -- that we have

3    identified on the loans made during the limitations period

4    they believe are discriminatory so that I can get to that

5    interim point.

6            If they then separate by saying, "Now I want to add

7    all these other ones that I think happened outside of the

8    limitations period," that is fine with me.  So that is the

9    reason I am after that date.

10           THE COURT:  So this July 8th production, which is

11   all Countrywide, which is all historic, would be all outside

12   this limitations period?

13           MS. ROSE-SMITH:  Yes, because --

14           THE COURT:  So my concern with this date is not --

15   you are not as concerned with it for your purposes as I am.

16           MS. ROSE-SMITH:  Yeah, I mean it is certainly

17   important for the -- for the full case.

18           THE COURT:  Yeah.

19           MS. ROSE-SMITH:  But it isn't -- you know, all the

20   loans were either made or serviced during the limitations

21   period.  We have already produced the data on those.

22           MR. DAILEY:  Your Honor, I believe Judge Bucklo --

23   and I am almost 100 percent certain did not set an interim

24   date for filing a motion for summary judgment.  What she said

25   was --

```
 1              MS. ROSE-SMITH:  No.

 2              THE COURT:  She didn't say that.  She said --

 3              MR. DAILEY:  -- there is only one dispositive

 4    motion.  So if they are saying they can file that at any time

 5    but not -- with regards to when you file it, just know there

 6    is only one that is going to be filed.  And --

 7              MS. ROSE-SMITH:  That is --

 8              MR. DAILEY:  To my understanding from what she just

 9    said was, oh, we can file the motion for summary judgment on

10    statute of limitations and if you want -- which makes the

11    production for July seem not so important -- you can file

12    that motion any time, but it is going to be one.  And we are

13    going to probably file a 56(d) motion until we get the rest

14    of the production to see if they are still servicing any of

15    those loans in Cook County.  So it does matter what that

16    production is on July 8th.

17              MS. ROSE-SMITH:  No, that was actually -- your

18    Honor, that is the one specific thing.  At the first status

19    conference Judge Bucklo had no interest in our proposal for

20    phased discovery.

21              MR. DAILEY:  Right.

22              MS. ROSE-SMITH:  The one thing that she said

23    instead, however, because when we were arguing about the

24    reason why all this other stuff won't matter, and she

25    disagreed with us and said it will lead to more discovery
```

1  disputes.  So we --

2           THE COURT:  More?

3           MS. ROSE-SMITH:  Maybe there would have been more.

4  You know, she has been doing this longer than me and knows

5  what she is doing, so maybe there would have been twice as

6  many.  And so she was concerned that would just start us

7  fighting.  And so instead she said, you know, I am not going

8  to phase discovery at all; you are not allowed to prioritize

9  this, but if you want to file a motion that is directed

10  specifically at that, I will let you do that without

11  prejudice to filing a motion at the end.  So --

12           THE COURT:  Okay.

13           MR. DAILEY:  Can we just --

14           THE COURT:  Well, you can order that transcript I

15  am sure.

16           MR. DAILEY:  Because I am certain that is not what

17  was said.

18           MR. ROSE-SMITH:  Okay.

19           THE COURT:  Well, I am not going to get involved in

20  that weed.  But I am just trying to see if there is some

21  dates that would make sense -- mostly, Mr. Dailey, I am

22  trying to figure out if there is a date by which you could

23  identify the loans that are at issue because I think that is

24  a good thing to do, but I want you to have what you need to

25  do it.

1        MR. DAILEY:  Candidly, your Honor, if it is 30 --

2   between 30 and 45 days after the production, I believe we can

3   identify those loans, those properties at issue, and merge

4   them, and then provide those to the defendant.

5        THE COURT:  Okay.  So you know what I am going to

6   say, I am going to say that you are going to do that by

7   August 15th.

8        MR. DAILEY:  That is fine.

9        MS. ROSE-SMITH:  Your Honor, they have had the data

10  on the limitations period discovery for quite some time.

11  Could they identify those at any time before August 15th?

12       THE COURT:  Well -- from the data they have?

13       MS. ROSE-SMITH:  Yeah, because those aren't -- the

14  stuff that you have ordered that we have promised for July

15  8th is all the different -- all new loans.  So it is all the

16  same data but on all -- an all new set of loans.

17       THE COURT:  Right.  But their response to that is

18  going to be you have all these holes to fill.  And I just

19  gave you until, you know, June-something to fill all those

20  holes.

21       MS. ROSE-SMITH:  My -- I just -- I am silent

22  because I would rather have less time to fill them -- I mean

23  it is just --

24       MR. DAILEY:  Your Honor --

25       THE COURT:  You just really want to press -- you

37

1    really want to push forward.  But --

2            MS. ROSE-SMITH:  Well, it is -- at this point, your

3    Honor, I think it is just -- it is fine to leave it at August

4    15th because with all of the deposition stuff that we have,

5    the likelihood we are going to get through that all is

6    diminishing by the day.  So it is okay, August 15.

7            THE COURT:  Sorry, it is going to be a long, hot

8    summer.

9            Okay.  So those are the dates I am going to set.

10   Okay?  I am sure there will be other dates along the way.

11           Okay.  Talk to me about these requests for

12   production.  My main question is, do you remember what they

13   are?

14           MS. ROSE-SMITH:  I do.

15           THE COURT:  Okay.  There are a lot of policies and

16   then reports that the banks had to make, compliance reports

17   and related documents.  They are Nos. 16 through 23, 24

18   through 39, and then an odd one, I think 51 is the number.

19           MS. ROSE-SMITH:  55, your Honor.

20           THE COURT:  55, okay.

21           But then my question is this:  You're doing all

22   this electronic discovery, which I know is mostly e-mail

23   searches.  Does any of that electronic discovery address

24   these requests to produce?

25           MS. ROSE-SMITH:  Only -- only tangentially.  So I

1    will just start with 16 through 23, which is every policy

2    that either of the defendants had about every aspect of the

3    mortgage lending business.  And the e-mails may pick up,

4    based on the search terms, stray copies of those policies if

5    they were e-mailed.

6                  THE COURT:  So like an attachment or something?

7                  MS. ROSE-SMITH:  Yeah, but it is also there -- and,

8    you know, this is something that Mr. Evangelista repeats

9    often and I think it is fair, that if there is some sort of

10   unspoken disregard of that policy, then the e-mail is more

11   likely to pick that up because, of course, Countrywide is not

12   going to have a policy that says that please ignore the

13   policy that we have on fair lending.  Right?  They are not

14   going to have a second policy that says that.

15                 THE COURT:  Yeah.

16                 MS. ROSE-SMITH:  So if there is some sort of, you

17   know, systemic but unspoken disregard, then the e-mail is the

18   likeliest place to find that.  But it won't get to the

19   policies.  And so we need -- and so we know that, and so we

20   produced underwriting policy, complaints, fair lending

21   policies and procedures, appraisal policies, referral

22   policies and servicing policies.  And we produced them from

23   2004 forward.  And we said to the plaintiff, we produced that

24   stuff to you.  We have been producing since the very

25   beginning of production in November of last year, but we

39

1       produced all of it by February of this year.  Look at it and

2       tell us specifically what is missing, and we will go get it.

3              And they have said, well, we want everything that

4       is listed.  And I -- and the issue with that is I am sure

5       that we can go searching and dig up, you know, more policies,

6       but it is diminishing returns given that we have given them

7       the enterprise fair lending policies and, you know, all of

8       these other things.  And I just thought, tell me what -- why

9       you think our production is deficient.

10              THE COURT:  Yeah, Mr. Dailey.

11              MR. DAILEY:  So I am just speaking quickly about 16

12      through 23.

13              THE COURT:  Yeah.

14              MR. DAILEY:  While we have had policies -- and we

15      are not going to deny that defendants have produced

16      policies -- what this is also going towards are policies that

17      defendants say are either, A, irrelevant or, B, not specific

18      enough.  And what I am talking about is, for example,

19      servicing policies or we were looking for -- for example,

20      there were -- there were -- we were looking for things closer

21      to the compliance reports and the procedures for the

22      compliance reports.  Those weren't produced, and their

23      argument is that they are not relevant.

24              So we included these, not saying that they weren't

25      producing, but saying that the compliance report, things like

1   that, need to be -- need to be produced as well.  Now I know

2   that is in 24 to 39 as well.  So that goes into more detail.

3   But their whole argument is it is just overly broad.

4          Now, I will say this:  After we have -- because we

5   have already identified some of the predatory features in a

6   lot of these loans and we just needed to merge them, we will

7   be pro -- we will be -- we will be sending another round of

8   RFP's for specific policies relating to those features of

9   those loans.  That will be happening.  So I don't want to

10  foreclose that opportunity.  But we do need to -- I don't

11  want to say that we are not going to specifically identify

12  more properties -- policies.  But I will say that the

13  policies that I have identified, all of them have been

14  produced.

15         THE COURT:  All of them haven't been?

16         MR. DAILEY:  Based on what we -- based on our

17  assessment.  And I say that because when we were looking at

18  the Turquoise data field, one of the reasons we asked for

19  some of those fields is because we didn't find them on --

20  necessarily in the policies.  For example, the broker,

21  points, and the way the brokers were compensated.  Those are

22  all fields that were in the Turquoise database.  And so we

23  assumed they weren't in the policies.

24         But if they are, now that we are going to have to

25  get some of those fields, we are going to have to go back and

1    make sure there is a way to get that information.

2    MS. ROSE-SMITH:  Your Honor, we produced broker

3    comp plans.  They agreed to -- very early in the case they

4    agreed for a rep to -- we can produce a representative

5    sampling of broker comp plans.  So that -- and we did that.

6    I mean I don't know -- I don't know where Mr. Dailey is

7    looking or whether maybe what he is looking for is not indeed

8    in there, but we did give them broker compensation plans.

9    And whatever is in them is what is in them.

10    MR. DAILEY:  Your Honor, I was just using that as

11    an example, your Honor.  But my point was that some of the

12    terms and information that we were looking for, we were

13    trying to find in Turquoise.

14    THE COURT:  Okay.

15    MR. DAILEY:  So that was not included inside -- in

16    a majority of the broken comp plans.  But we are not

17    foreclosing the defendants' request to identify additional --

18    additional policies specifically because now we don't have

19    the Turquoise fields anymore.

20    THE COURT:  Okay.

21    Okay.  Anything on 24 through 39?

22    MS. ROSE-SMITH:  Those --

23    THE COURT:  Those are the --

24    MR. DAILEY:  Compliance reports.

25    THE COURT:  -- compliance reports.

42

1          MR. DAILEY:  Right.  And we -- I mean that is

2     obviously highly relevant as well as board minutes.  And what

3     you don't see here for board minutes is bulletins, which is

4     what country -- excuse me, Full Spectrum Lending, which was

5     part of Countrywide used a lot, but we included in that title

6     of board minutes.  We believe that is all absolutely

7     relevant.  That is how you all sent out messages for new

8     products that you were marketing for ways that Countrywide

9     and its -- and its proteges were able to implement new

10    policies and market their products towards other borrowers.

11    So the compliance report actually mimicked or some of them

12    reflect what those bulletins were about.

13          And I gave you an example.  In one of the trials

14    that the U.S. had against Countrywide they actually point to

15    specific bulletins and articles that were released telling

16    its employees how to push what was called at that time the

17    hustle or hustle loan loans.  We are asking for compliance.

18    And they actually talked about compliance reports.

19    Defendants keep asserting that that is burdensome and it is

20    irrelevant, but it is not.

21          MS. ROSE-SMITH:  Okay.  So Request 55 specifically

22    says all of your board packages and all of the -- all of the

23    handouts that were given to the board.  Nothing about that

24    request at any point before this very minute ever led me to

25    believe that they wanted bulletins that were sent out to

1    individual employees.  We have never really talked about

2    compliance bulletins.

3         What we said to them on 24 through 39 is that we

4    are willing to look for all of the -- so -- so the bank has

5    an enterprise fair lending division.  Countrywide had a

6    similar -- an entity with a similar function, but I don't

7    remember dealing with it.  And we have said we will look for

8    policy that -- the enterprise fair lending policy.  So think

9    about borrower credit characteristics that -- you know, all

10   of the ways in which you can use those things to lend and any

11   analysis that they -- you know, or any concerns that were

12   articulated in these compliance reports about that -- that

13   impact, that sort of thing.

14        So we -- and we gave them a very straightforward

15   position on this.  And they said, "No, we want everything."

16   And so now they are raising these bulletins which did go out,

17   although hustle wasn't a set of loans.  Hustle was a process

18   and so it wasn't about pushing loans.  And what you are

19   seeing is getting bits and pieces of information and then

20   asserting that that must be definitively the way things

21   worked and absolute refusal to trust me when I say, no,

22   actually it doesn't.  And -- but then coupled with a complete

23   inability to be more specific about what it is that you want

24   to search.

25        So I in the motion to compel -- we articulated with

1    affidavit support all of the burden that was associated with

2    the searches that we would have to run for compliance data

3    and for board meetings and for all of that stuff.  None of

4    that is alleviated by anything that has happened since then.

5    And so to me this is just a balancing act, right?  We have

6    given them 140,000 documents.  Look at them.  And if there

7    are specifics, right, I welcome specific RFP follow-up.

8              But to keep these broad ones open indefinitely as a

9    means of making me go and search for things when -- when it

10   is every time I talk to them they articulate something new

11   that maybe is something I should be looking for, it just gets

12   to a point where we don't know what to do.  I mean I can -- I

13   thought we had done a good job with policies and procedures.

14   And I think that our policy on -- that our fair lending

15   policy was fair.  It is an objective without an alternative.

16   The alternative is to go back to the words.  And if I read

17   you the words of the request, you would see why I have

18   that -- I have that initial reaction.

19             THE COURT:  I read the request.  I mean I know it

20   is lengthy.  It is lengthy.

21             Okay.  So I owe you a ruling on the RFPs.  I owe

22   you a ruling on the 30(b)(6), and I owe you a ruling on the

23   presidents.

24             MR. DAILEY:  Say the last part again.

25             THE COURT:  The deposition of the president.

1          MR. DAILEY:  Oh, right, yes.

2          THE COURT:  And you will get those shortly because

3    I want -- I appreciate your patience with me, and I want to

4    get you moving along.

5          Okay.  But you have a lot of work to do in between,

6    right, without my rulings?

7          MS. ROSE-SMITH:  Yes, your Honor.

8          MR. DAILEY:  Yes, your Honor, yes.

9          THE COURT:  But you are waiting for me?

10         MR. DAILEY:  Yes.

11         MS. ROSE-SMITH:  Well, I mean we are not -- I mean

12   we haven't stopped.  Nothing has gone -- nothing is at a

13   standstill.  We are conducting depositions.

14         THE COURT:  Are you deposing other people aside

15   from the 30(b)(6)?

16         MR. DAILEY:  We have depositions set -- scheduled

17   for next week.

18         MS. ROSE-SMITH:  They are all 30(b)(6) related.  So

19   we have 30(b)(6) witnesses scheduled for next week and then I

20   think the beginning of June.  So, no, we have not -- other

21   than the presidents and I -- and I think that we are going to

22   -- I think we are going to send out one subpoena -- we have

23   not -- we have not noticed any depositions other than the

24   ones that are either part of the 30(b)(6) or at issue.  And

25   then they haven't sent any deposition notices at all.

1          THE COURT:  Okay.  So -- and when I set the close

2     of discovery for mid-December, I am not anticipating that you

3     going to have your experts done by then.  Do you think you

4     could have your experts done by then?

5          MS. ROSE-SMITH:  No, your Honor.  The way we

6     originally set up the schedule -- and I think we agreed on it

7     -- is that there would be -- there is a period of I think 30

8     or 45 days.

9          THE COURT:  Right.

10         MS. ROSE-SMITH:  And there is all that other stuff

11    that follows.

12         THE COURT:  Yeah, okay.

13         When do you see Judge Bucklo again, any idea?

14         MR. DAILEY:  I want to say January 31st.

15         THE COURT:  Oh.

16         MS. ROSE-SMITH:  She saw the fact discovery had

17    been vacated and -- she looked at both of our proposals and

18    said, "Well, it appears by January fact discovery will close

19    no matter which way Judge Rowland rules, so I will see you in

20    January."

21         THE COURT:  Well, good for her.

22         THE CLERK:  January 4th actually.

23         THE COURT:  So what would you propose -- I don't

24    want to get in your way, I don't want to waste your time, but

25    I don't want to let you be out on your own either because you

1  I know you have a lot of, you know, disputes which are in

2  good faith.  But you want to come back in 60 days, you want

3  to come back in 90 days?  I mean you have got a lot of work

4  to do, but I don't want you out there getting in trouble

5  where you can't resolve something.  But you can always call

6  and say, "Hey, we need to come in."

7          MS. ROSE-SMITH:  So I think 60 days.  I mean if we

8  are accounting for the fact that they are probably going to

9  issue more discovery and there might be some disputes or

10  something like that, 60 days seems reasonable to come back.

11          MR. DAILEY:  Yeah.

12          MS. ROSE-SMITH:  And there might be issues to

13  resolve.

14          THE COURT:  So that gets us to mid-July.  I could

15  do something -- how about we say July 28?  Would that be okay

16  if we kick it to the end of July?

17          MR. DAILEY:  That is fine, your Honor.

18          THE COURT:  Okay.  Because I am out the week of the

19  18th.  We will say 9:30.  Does that work for you traveling

20  people?

21          MR. DUNIGAN:  10:00.

22          MS. ROSE-SMITH:  I come in the night before, but I

23  think if Mr. Evangelista comes in, he likes to come in the

24  morning and so he prefers 10:00.

25          MR. DAILEY:  Yeah.

1          THE COURT:  10:00 is fine.  Okay.  And call me if

2    you have a problem in between now and then.  Okay?

3          And I will get these other orders out so the deps

4    you are taking you will take and whatnot.  I know you just

5    filed some response on the 30(b)(6), right?

6          MS. ROSE-SMITH:  It was just they filed a response.

7    We submitted the transcript.  That was all.

8          THE COURT:  All right.  I am going to get those out

9    this week.

10         MR. DAILEY:  All right.

11         THE COURT:  What day is it?

12         MR. DAILEY:  Today is Wednesday.

13         THE COURT:  Wednesday?

14         MS. ROSE-SMITH:  Wednesday.

15         THE COURT:  Okay.  Am I losing gray matter or

16   gaining it -- is it more gray matter or less gray up here

17   when I get older?  I can't remember.  But whatever it is, it

18   is taking over.

19         MS. ROSE-SMITH:  Well, whatever it is, it is

20   happening to everybody.

21         THE COURT:  We are all in the same boat sinking.

22   Sinking.

23         Thank you all very much.

24         MR. DAILEY:  Thank you, your Honor.

25         MS. ROSE-SMITH:  Thank you, your Honor.

1        THE COURT:  Have a great day.

2        (Which were all the proceedings heard.)

3                      CERTIFICATE

4        I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   s/Rosemary Scarpelli/          Date:  May 19, 2016