IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COUNTY OF COOK,                    )
                                   )
              Plaintiff,           )
                                   )
        v.                         )   No. 14 C 2280
                                   )
BANK OF AMERICA                    )
CORPORATION, *et al.*              )
                                   )
              Defendants.          )


MEMORANDUM OPINION AND ORDER

In this action, Cook County alleges that it suffered economic and non-economic injuries as a result of defendants' multitudinous violations of the Fair Housing Act of 1968 ("FHA") beginning in or around 2003. The County's 180-page complaint paints a detailed picture, illustrated with statistical analysis, evidence, and commentary drawn from academic, industry, governmental, and eyewitness sources, of defendants' discriminatory housing practices. I summarized the County's factual allegations in my decision of May 19, 2015, which denied defendants' motion to dismiss the County's complaint for lack of standing, untimeliness, and failure to state a cognizable FHA claim. *See Cty. of Cook v. Bank of Am. Corp.*, 181 F. Supp. 3d 513 (N.D. Ill. 2015). Following that decision, the parties embarked upon discovery but later agreed to stay the case

1

pending the Supreme Court's decision in *Bank of America Corp. v. City of Miami*, *Fla*. --- U.S. ---, 137 S. Ct. 1296 (2017). That decision prompted plaintiff to file a Second Amended complaint ("SAC"), which defendants have moved to dismiss under Rule 12(b)(6).[1]

Defendants' present motion reasserts certain arguments I previously rejected, insisting that "the judicial tide has turned" in the wake of *City of Miami* and *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015), another Supreme Court case that was decided after I denied their previous motion. Specifically, defendants claim that the injuries plaintiff alleges do not satisfy the proximate causation standard established in *City of Miami*, and that *Inclusive Communities* created "heightened pleading standards" for disparate impact claims under the FHA that the SAC also does not meet. Additionally, defendants argue that the County has pled no recoverable damages. For the reasons that follow, I grant their motion to dismiss in part.

I.

Assuming familiarity with my previous decision, I summarize the County's copious factual allegations—which I take as true

---

[1] Defendants explain that although they contemplated moving for judgment on the pleadings under Rule 12(c), they later determined that a motion under Rule 12(b)(6) was more appropriate since they had not yet answered the complaint. As defendants note, the standard is the same under both Rules.

for present purposes, *Swanson v. Citibank, N.A.*, 614 F.3d 400, 402 (7th Cir. 2010)—at a high level of generality. The County alleges that for the past approximately fifteen years, defendants have targeted African-American and Hispanic/Latino home buyers for a predatory, "equity stripping scheme" that involves, among other elements: disproportionately steering minority borrowers towards "subprime," higher cost loans, even when they qualified for prime loans; relaxing or departing from underwriting guidelines to approve loans to high-risk borrowers likely to default; including in the loan terms pre-payment penalties that inhibited the borrowers' ability to refinance; servicing predatory loans in a manner designed to maximize defendants' profit while increasing the likelihood of default, such as by securitizing high-risk loans, denying borrower requests for loan modification under the Home Affordable Modification Program ("HAMP") even when the borrowers qualified for HAMP modifications, and forcing them instead into more expensive, proprietary loan modifications or declining to modify the loans in a timely manner or at all; and foreclosing on loans to minority borrowers at a significantly higher rate than they foreclose on loans to non-minorities.

The County backs these allegations up with facially compelling evidence drawn from a variety of sources. For example, the County cites SEC reports that reflect defendants'

ballooning profits attributable to their mortgage lending and servicing operations (accompanied by spectacular increases in their highest executives' compensation), even as significant numbers of the predatory loans they originated, securities, and serviced entered delinquency. *See, e.g.*, SAC at ¶¶ 156-157, 162-163, 181-182, 364. The County also cites allegations of the relator in a *qui tam* action against defendants who claims to have observed fraud and other misconduct in defendants' processing of requests for HAMP modifications, e.g., *id*. at ¶ 365, as well as statements of confidential witnesses involved in defendants' lending process, which suggest, for example, that defendants intentionally targeted minority borrowers for predatory loans, e.g. *id*. at 461-463, 466; encouraged loan officers to approve loans even when borrowers did not meet underwriting criteria, e.g., *id*. at ¶ 249-250; and failed to take adequate steps to ensure compliance with fair housing and lending policies and practices, e.g., *id*. at 211-212.

The County claims that defendants' treatment of African-American and Hispanic/Latino borrowers amounts to intentional discrimination and also claims that certain of its policies and practices, while facially neutral, had a disparate impact on these minorities. To illustrate the impact on the County, the SAC offers statistical evidence showing a drastic increase in foreclosure rates beginning in 2004 as compared with historical

averages as well as comparatively higher foreclosure rates in predominantly minority neighborhoods. SAC at ¶ 325. The County also alleges, and offers statistics to suggest, that minorities received a disproportionate percentage of the loans defendants originated within areas the U.S. Department of Housing and Urban Development had designated as "high foreclosure risk" areas. *See id.* at 319-331. Unsurprisingly, these areas have seen "tremendously higher foreclosure rates." *Id.* at 419.

The County alleges that it has been, and will continue to be, directly injured by defendants' practices in several ways. First, it claims to have incurred several categories of out-of-pocket costs, including costs associated with eviction and foreclosure proceedings, as well as costs arising out of the registration, inspection, maintenance, and/or demolition of vacant or abandoned properties. In addition, the County points to the cost of providing social services to evicted or foreclosed homeowners, as well as police patrol services. The County also claims to have lost "various income relating to abandoned or foreclosed properties," as well as "certain intangible property recording and transfer fee income." SAC at ¶ 9. In addition to these economic injuries, the County claims "injuries to the fabric of [its] communities and residents arising from the resulting urban blight." *Ibid.* In short, the County seeks to recover damages for tax losses and for the cost

of county services it has provided in the course, and in the wake, of the discriminatory foreclosures. The County also claims non-economic injuries to its neighborhoods and seeks an injunction prohibiting further discriminatory conduct and mandating affirmative steps to remedy the effects of its past discrimination.

Defendants argue that the County's claimed injuries are too remote from the alleged discrimination to satisfy the requirements of proximate cause under the framework the Court announced in *City of Miami*. They underscore that *City of Miami* requires "some direct relation between the injury asserted and the injurious conduct alleged" and limits recovery under the FHA to damages flowing from the "first step" of causation. 137 S. Ct. at 1306. In defendants' view, the injuries the County asserts do not fit this bill because they are "many years and many steps removed" from the alleged discrimination. Defendants argue that the County's claims rely on a chain of causation that is too lengthy, and whose individual links are too contingent upon external conditions and events, to satisfy *City of Miami*'s directness requirement. Defendants characterize the County's claims as derivative of the minority borrowers' claims and argue that as "secondary victims" of the alleged FHA violations, the County cannot show that its injuries were proximately caused by defendants' discrimination.

The County, for its part, insists that *City of Miami* does not disturb my previous conclusion that the County has alleged a plausible causal connection between its injuries and defendants' conduct. The County underscores that the Court expressly reserved ruling on whether the City of Miami's allegations of economic injury—which are, on the whole, materially indistinguishable from the County's claimed economic injury[2]—are sufficient to plead proximate cause. The County rejects defendants' view that *City of Miami* reduces the proximate cause analysis to a "single causal link," although it goes on to argue that even if that analysis were correct, its allegations would satisfy it. The County characterizes its complaint as asserting a "direct, single-link causal chain," described as follows: "1) Defendants' foreclosures were discriminatory in violation of the FHA...and 2) those foreclosures directly cost the County money in the form of foreclosure-related proceedings, maintenance of foreclosed properties, and services to foreclosed-upon homeowners, *inter alia*[.]" Resp. at 5-6.

The County's response to defendants' proximate cause argument thus shifts the focus away from its allegations

---

[2] The County asserts that its claim for "out-of-pocket costs related to foreclosure administration and oversight of foreclosed-upon properties" articulates injuries for which the City of Miami did not seek recovery. As explained below, I agree that the County is entitled to try and establish that a portion of its foreclosure administration expenses were directly caused by defendants' discrimination.

concerning defendants' predatory lending and inequitable servicing practices—though these make up the bulk of its complaint—and towards its discriminatory foreclosures, which the County characterizes alternatively as "stand-alone" causal events triggering the County's injuries, or as the culmination of an integrated, discriminatory equity-stripping scheme that began with predatory lending and ended in the foreclosures that directly caused its injuries. The County objects to defendants' analysis as "breaking down and disjoining the various components of the single equity stripping scheme, improperly treating each component as a distinct step in the causal chain of a foreclosure…and ignoring the core scheme allegation that loan defaults and foreclosures were the intended result" of the discriminatory scheme. Resp. at 7.

Viewed in this light, the County insists, there are "no intervening forces creating an untenable 'discontinuity' between the injury and [defendants'] conduct." *Id*. at 15. In the County's view, defendants' argument wrongly conflates two questions: who is the *direct target* of the discrimination, and who suffers *direct injuries* as a result. The County insists that I need only consider the latter question and that its allegations sufficiently plead its direct injuries resulting from defendants' discrimination.

I begin with the relevant principles from *City of Miami*. Like the County, the City of Miami alleged that Bank of America (and Wells Fargo) "imposed more onerous, and indeed 'predatory,' conditions on loans made to minority borrowers than to similarly situated borrowers" and serviced those loans in a discriminatory manner, leading to "default and foreclosure rates among minority borrowers [that] were higher than among otherwise similar white borrowers and were concentrated in minority neighborhoods." *City of Miami,* 137 S. Ct. at 1301. These practices allegedly visited a constellation of economic harms on the City, including "diminished property-tax revenue," and "increased demand for municipal services...needed 'to remedy blight and unsafe and dangerous conditions' that the foreclosures and vacancies generate." *Id*. at 1302. The district court dismissed the case, concluding that the city's injuries were outside the FHA's zone of interests and that it had not alleged a sufficient causal connection between those injuries and the banks' discrimination. *Ibid*. The Eleventh Circuit reversed, holding that the "zone of interests" test was satisfied, and that the city's claimed injuries were foreseeable results of the defendant's alleged FHA violations.

The Supreme Court granted certiorari to examine both of these holdings. It began by affirming the Eleventh Circuit's

conclusion that the city's alleged economic injuries fell within the FHA's zone of interests. The Court reiterated its previous observation that the text of the FHA "reflects a congressional intent to confer standing broadly," citing several cases in which it had held that that individuals and entities not themselves the targets of discrimination were nevertheless "aggrieved persons" entitled to assert violations of the statute. *Id*. at 1303-04 (*citing Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) (non-profit working to oppose housing discrimination can assert FHA claims); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979) (village can assert FHA claim for lost tax revenue caused by racial steering); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211 (1972) (white tenants deprived benefits of interracial associations can assert FHA claim for discrimination against minorities). Noting that Congress's intervening amendments to the FHA "retained without significant change the definition of 'person aggrieved,'" the Court concluded that principles of *stare decisis* and statutory interpretation compelled it to adhere to these decisions. *Id*. at 1305. It thus held that the City of Miami's alleged injuries fell within the FHA's "zone of interests." *Id*. at 1301.

The Court went on, however, to reject the Eleventh Circuit's conclusion that because the city's claimed injuries

were foreseeable results of the alleged discrimination, the City had adequately pled proximate causation. *Id*. at 1306. It held:

> In the context of the FHA, foreseeability alone does not ensure the close connection that proximate cause requires. The housing market is interconnected with economic and social life. A violation of the FHA may, therefore, 'be expected to cause ripples of harm to flow' far beyond the defendant's misconduct. *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 524, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983). Nothing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel. And entertaining suits to recover damages for any foreseeable result of an FHA violation would risk 'massive and complex damages litigation.'" *Id*. at 545, 103 S. Ct. 897.

*Ibid*. The Court held that proximate cause instead requires "some direct relation" between the injury claimed and the wrongful conduct alleged, and that a claim for damages under the FHA—which it likened to a tort claim—is generally limited to the "first step" of the directness inquiry. *Id*. at 1305-06 (citing *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992); *Curtis v. Loether*, 415 U.S. 189 (1974); *Anza v. Ideal Steel Supply Corp*., 547 U.S. 451 (2006); and *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010)).

I conclude that the bulk of the injuries the County asserts—tax losses and increased costs for county services such as police patrol and support services to evicted borrowers—do not flow directly from the discrimination it alleges. In an effort to rebut defendants' argument that its injuries are the

result of a "convoluted, years-long chain of causation" that began with defendants' discriminatory lending practices, the County homes in on its allegations of discriminatory foreclosures, arguing that these foreclosures directly triggered the damages it claims. But even the foreclosures remain several steps removed—both temporally and causally—from the tax losses and most of the increased county service costs the County claims as monetary injuries, and they are equally remote from the property vacancies and neighborhood blight it asserts as non-monetary injuries. The County's allegations confirm as much. For example, the County quotes a Woodstock Institute Study that allegedly states:

> [F]oreclosures, particularly in lower-income neighborhoods, *can lead to* vacant, boarded-up, or abandoned properties. These properties, *in turn*, *contribute to* the stock of 'physical disorder' in a community that *can create* a haven for criminal activity, discourage social capital formation, and lead to further disinvestment...and lower property values for existing residential homeowners.

SAC at ¶ 372. (emphasis added). The emphasized portions of this excerpt reveal both the contingent nature of the County's injuries (with "*can lead,*" "*contribute to,*" and "*can create*" all suggesting that other conditions also bear upon the asserted causal chain) as well as their temporal and causal remoteness (with "*in turn*" indicative of both). Similarly, where the County enumerates its injuries in a non-exhaustive list of out-of-

12

pocket costs and lost revenues, it concludes with a catch-all claim for "various other injuries *resulting from the deterioration and blight* to the hardest hit neighborhoods and communities." *Id*. at 376. The County insists that at least some of its injuries arise "*from the effect of the foreclosure process itself*." *Id*. at 377 (emphasis added). But even this allegation implies at least one intermediary step between the foreclosure and the County's losses, which as stated arise not out of the foreclosure process, but out some unspecified *effects* of that process.

Moreover, the County acknowledges that multiple factors, including falling home prices, rising unemployment, and a freeze in the U.S. and global credit markets, contributed to the global financial crisis of 2008 and subsequent recession, all of which impacted the County's losses. The County insists that defendants' lending and securitization practices were "the fuel that ignited the financial crisis." SAC at ¶ 114. That may be true. But to hold defendants liable on the theory that its discriminatory conduct was the prime mover, or the root cause, of the County's injuries would rely on a causation theory of precisely the sort *City of Miami* cautioned against in the FHA context. 137 S. Ct. at 1306. Indeed, it is difficult to perceive any limiting principle—and the County suggests none—to distinguish the County's economic losses from those that could

be asserted by any number of similarly remote parties: local merchants whose revenue has decreased as a result of neighborhood foreclosures and vacancies, home service providers whose customer base has been depleted by foreclosures, and the like. There can be no question that allowing damages suits by such parties under the FHA "would risk 'massive and complex damages litigation.'" *Ibid*. (quoting *Associated Gen. Contractors* 459 U.S. at 545).

The County dedicates much of its response to defendants' proximate cause argument to distinguishing defendants' cases on the ground that they arose in the context of statutes other than the FHA. In the County's view, the Court's consistently broad interpretation of the FHA counsels in favor of a "more liberal" or "relaxed" proximate cause standard. Resp. at 9, n. 10. But that argument has an obvious problem: the Court's discussion of proximate cause in *City of Miami* explicitly relied on the very cases defendants cite, without any suggestion that the principles they articulate should be "relaxed" in the FHA context. 137 S. Ct. at 1306 (citing, *inter alia*, *Associated Gen. Contractors,* 459 U.S. at 534 (injuries claimed by labor unions as a result of the defendants' coercion of third parties not proximately caused by alleged antitrust violation); *Holmes*, 503 U.S. at 268 (RICO injuries claimed by nonprofit corporation legally required to reimburse customers of securities broker-

dealers unable to meet their customer obligations were not proximately caused by stock-manipulation scheme that caused broker-dealers to fail); and *Hemi Group*, 559 U.S. at 10 (City of New York's tax losses resulting from cigarette manufacturer's failure to file report identifying its online purchasers located in New York did not satisfy RICO's "direct relationship" requirement)). Meanwhile, none of the FHA authorities the County offers in support of its liberal construction—*Havens*, *Gladstone*, and *Trafficante*—addressed the issue of proximate causation. Each of these cases instead examined the FHA's zone of interest, which all agree encompasses the County's claimed injury.

Moreover, the Court's discussion in *Havens* supports the inference that most of the County's injuries, while cognizable under the FHA, are indirect vis-à-vis the alleged discrimination. In *Havens*, the Court determined that residents of a neighborhood affected by racial steering, but who had not themselves been individually targeted by the practice, had standing to assert FHA claims based on the "adverse impact" of the practice on the neighborhood. The Court observed that "the injury asserted" in these "neighborhood" claims (akin to the County's claim for injury to the fabric of its neighborhoods) "is an indirect one." 455 U.S. at 375. The Court then contrasted the indirect, "neighborhood" injuries with the direct injuries some of the plaintiffs suffered in their capacity as "testers,"

characterizing the latter as "the denial of the tester's own statutory right to truthful housing information caused by misrepresentations to the tester." *Ibid*. Plainly, none of the County's alleged injuries is comparable to the direct injuries in *Havens*.

Nor does *Trafficante* support the County's directness theory as to the totality of its alleged injuries. In *Trafficante*, two tenants of an apartment complex—one white and the other African-American—complained that the owner of the complex discriminated against non-whites in the rental of apartments, thus depriving both plaintiffs of the social and economic benefits of living in an integrated community and causing them reputational harm. 409 U.S. at 206-208. The Court held that these injuries brought the plaintiffs within the scope of the FHA's broad definition of "aggrieved persons." *Id*. at 208. The Court did not address the directness of the plaintiffs' injuries, presumably because it was obvious, or at a minimum undisputed: the moment the complex owner refused to rent to a non-white person, tenants of all races were denied, as a direct result of the owner's conduct, the associational and reputational benefits of that person's proximity. Again, none of the County's alleged injuries is comparable.

Where the County's proximate causation theory does find some traction is in *Gladstone*. There, the Village of Bellwood

alleged that a real estate firm's racial steering violated the FHA by "manipulat[ing] the housing market" in a segregative manner, "rob[bing] the village of its racial balance and stability." 441 U.S. at 109-10, 111. The Court allowed the Village's claim to proceed, reasoning:

> The adverse consequences attendant upon a "changing" neighborhood can be profound. If petitioners' steering practices significantly reduce the total number of buyers in the Bellwood housing market, prices may be deflected downward. This phenomenon would be exacerbated if perceptible increases in the minority population directly attributable to racial steering precipitate an exodus of white residents.... A significant reduction in property values directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services.

441 U.S. at 110-11 (citations omitted). Thus, while *Gladstone* did not address the question of proximate causation, it clearly contemplated recovery under the FHA for downstream tax injuries such as the ones the County asserts here.

Were *Gladstone* the Supreme Court's last word on the claims a municipality may pursue under the FHA, I would be inclined to hold, as I did in my previous decision, that the County is entitled to develop evidence to try and show that the totality of its alleged injuries were proximately caused by defendants' discrimination.[3] But *City of Miami*'s discussion of proximate

---

[3] Like the diminution in the municipal tax base considered in *Gladstone*, the County claims a reduction in its "tax digest — representing the value of all real property subject to tax." SAC

causation effectively curtails the ability of municipalities to recover for many of the downstream losses they undoubtedly suffer as a result of far-reaching FHA violations of the kind alleged here. *See City of Miami*, 137 S. Ct. at 1311 (Thomas, J. *concurring in part*) ("the majority opinion leaves little doubt that neither Miami nor any similarly situated plaintiff can satisfy the rigorous standard for proximate cause that the Court adopts and leaves to the Court of Appeals to apply.") For the reasons explained above, I conclude that the County's claimed tax losses, as well as their increased costs arising out of the provision of downstream social services such as policing and home-loss counseling, are too remote in time, and too contingent on later events, to satisfy the "first step" directness requirement that the Court now applies in this context.

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), a Lanham Act case, does not persuade me otherwise. The *Lexmark* plaintiff—a commercial entity—claimed it was injured as a result of the defendants' false advertisements to consumers. The Supreme Court held that the harm the plaintiff alleged had a "sufficiently close connection to the conduct the

at ¶ 387. Defendants argue that documents produced in discovery prove that any reduction in the tax digest had no adverse effect on the County's coffers, since the County assesses and collects taxes in a manner independent of the tax digest. Because I conclude that the County's alleged tax injuries do not satisfy the proximate cause standard established in *City of Miami* in any event, I need not reach this argument.

statute prohibits" to suggest proximate causation. *Id*. at 1390-91. Citing *Holmes* and *Hemi Group*, the Court explained that the proximate cause requirement ordinarily bars claims that are "purely derivative of 'misfortunes visited upon a third parson by the defendants' acts.'" *Id*. at 1390. The Court acknowledged that "[i]n a sense...all commercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising," but held that because the Lanham Act does not authorize consumer suits for false advertising, "the intervening step of consumer deception" was not fatal to the commercial plaintiff's claim. *Ibid*. The same reasoning does not support proximate causation in the FHA context, where individual targets of housing discrimination are not only authorized to bring claims, but are indeed the core class of persons the statute protects. *See Trafficante*, 409 U.S. at 210 (noting that "members of minority groups were damaged the most from discrimination in housing practices"). So while I agree with the County that its injuries are not "derivative" of the targeted individuals' injuries, it cannot overcome *City of Miami*'s directness requirement on the authority of *Lexmark*.

Nevertheless, a narrow category of the County's alleged injuries do have a sufficient temporal and practical connection to the challenged foreclosures to bring them plausibly within the "first step" of causation: the out-of-pocket costs it claims

to have incurred in processing the discriminatory foreclosures, such as additional funding for the Cook County Sheriff to serve foreclosure notices and for the Circuit Court of Cook County to process the deluge of foreclosures. *See* SAC at ¶¶ 9, 376, 378. Although the SAC does not quantify this discrete subset of losses, they presumably represent only a small portion of the damages the County seeks. Indeed, I am skeptical that this narrow category of foreclosure processing costs is worth fighting over in a suit of this magnitude. Still, these costs bear a sufficiently close connection to the alleged discrimination that the County is entitled to offer evidence to establish defendants' liability for its losses.

There is no merit to defendants' argument that Illinois common law bars the County from recovering for these losses. Defendants anchor their argument in principles of state sovereignty, insisting that a federal statute such as the FHA cannot empower a state-created political entity to exceed the scope of its state-granted authority. But this argument has it backwards. Where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," it is state law that cedes. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (explaining conflict preemption) (internal quotation marks and citation omitted).

Defendants' central authorities acknowledge as much. In *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 324 (9th Cir. 1983), the Ninth Circuit applied the municipal cost recovery rule to bar the city from recovering the cost of public services it incurred as a result of an accident caused by the defendant's negligence. The court explained, however, that the general rule bears exception, and that "[r]ecovery is permitted where it is authorized by statute or regulation...or required to effect the intent of federal legislation," among other circumstances. *Id; see also City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E. 2d 1099, 1143-44 (acknowledging exceptions). Indeed, the upshot of *City of Miami* is that is that the FHA authorizes a municipality to pursue claims for economic injuries, including for additional "municipal services" occasioned by the alleged violations, provided they can plausibly allege that their damages were proximately caused by the defendant's discrimination. None of defendants' cited authorities compels a contrary result based on common law municipal cost recovery restrictions.[4]

---

[4] For example, cites *Alden v. Maine*, 527 U.S. 706 (1999). That case is entirely inapposite, as it concerns the constitutional basis for and scope of states' sovereign immunity from suits by private citizens in their own courts. It does not address the authority of state-created political entities to initiate suits against private entities in federal courts pursuant to a federal statute. *Champaign County v. Anthony*, 337 N.E. 2d 87 (Ill. App. Ct. 1975), another case defendants cite, concerned a county's

Having determined that the County pleads at least some recoverable injuries that were plausibly proximately caused by the alleged discrimination,[5] I turn briefly to defendants' argument that the County's disparate impact claim—which I previously held adequate on the pleadings—does not survive *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). The argument does not require extensive analysis.

The straightforward question on which the Court granted certiorari in *Inclusive Communities* was "whether disparate-impact claims are cognizable under the Fair Housing Act." *Id*. at 2513. It answered the question affirmatively, concluding that "[r]ecognition of disparate-impact claim is consistent with the FHA's central purpose," as well as with its text and with the Court's interpretation of similar language in other federal anti-discrimination statutes. *Id*. at 2521, 2518. Defendants strain to turn the Court's decision to their advantage, insisting that although it affirmed that such claims are

---

assertion of common law tort claims, not statutory claim authorized by Congress. Defendants' remaining authorities are no more persuasive.

[5] This conclusion alone dispenses with defendants' argument that the County lacks Article III standing for want of an injury-in-fact, *see* Mot. at 20 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); Reply at 12-14, though the argument is meritless in any event.

cognizable, it established "rigorous, pleading-stage requirements" that the County has not met. Mot. at 15. But the SAC easily clears the relevant pleading hurdles.

As the Court observed in *Inclusive Communities*, disparate-impact liability "has always been properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA…if such liability were imposed based solely on a showing of a statistical disparity." 135 S. Ct. at 2522. The Court went on to explain that because disparate-impact claims are not meant to displace "valid government policies," but rather to remove "artificial, arbitrary, and unnecessary barriers" to equality, plaintiffs must plead and ultimately prove not only a statistical imbalance, but also an "artificial, arbitrary, and unnecessary" and a "robust" causal connection between the two. *Id*. at 2523.

No one disputes that the SAC is replete with statistics reflecting racial disparities in mortgage default and foreclosure rates within Cook County, or that the County attributes these disparities to defendants' lending, servicing, and foreclosure policies and practices. Defendants' primary objection is twofold: first, that the County attributes the alleged racial disparities to defendants' *intentional* discrimination against African-American and Hispanic borrowers, rather than to facially-neutral policies or practices; and

second, that the County's allegations of a broad, "equity stripping scheme" fail to identify any single, facially-neutral policy with a robust causal connection to the alleged disparities. Not only are these arguments premised on a mistaken view of the law, they ignore vast swaths of the County's factually detailed complaint.

First, while it is true that a disparate-impact claim does not require proof of intentional discrimination, allegations of intentional discrimination do not defeat a disparate-impact claim. *Adams v. City of Indianapolis*, 742 F.3d 720, 732 (7th Cir. 2014) (reversing lower court's dismissal of disparate-impact claim on the ground that allegations of intentional discrimination defeated the claim, stating that "[t]he legal premise of the court's ruling was wrong."). Anyway, the SAC contains ample allegations of facially-neutral practices by defendants alleged to have a disparate impact on minority borrowers. For example, the County's description of defendants' fraudulent, dilatory, or otherwise wrongful processing of distressed borrowers' requests for loan modifications under HAMP do not suggest that defendants used race-based criteria in handling these requests. *See* SAC at ¶¶ 365, 367.

Second, although the County undeniably articulates a multifaceted "equity-stripping scheme," defendants offer no authority to suggest that the "specific" practice challenged in

24

a disparate-impact claim must be limited to a single component. Certainly that is not the thrust of the plurality view in *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 944 (1988). There, after observing that statistical disparities are insufficient to establish a prima facie disparate impact claim, the *Watson* plurality merely explained that the plaintiff is "responsible for isolating and identifying the specific…practices that are allegedly responsible for any observed statistical disparities." *Ibid*. Nothing about this statement limits the complexity of the challenged practice.

Moreover, defendants' characterization of the County's allegations as "challenging everything Defendants have ever done in originating or servicing loans, without identifying any single policy" is inaccurate. Over the course of more than five hundred painstakingly detailed paragraphs, the County describes the various components of the challenged equity stripping scheme and explains how those components, and the scheme as a whole, has had a disproportionately negative impact on minority borrowers and has injured the County as a result.

Defendants lean heavily on the Ninth Circuit's unpublished decisions in *City of Los Angeles v. Bank of Am. Corp.*, 2017 WL 2323441 (9th Cir. May 26, 2017), and *City of Los Angeles v. Wells Fargo & Co.*, 2017 WL 2304375 (May 26, 2017), which affirmed summary judgment in the defendants' favor on FHA

disparate-impact claims. These decisions focused on three of the putative policies that Los Angeles claimed caused the alleged racial disparity and concluded that the evidence failed to suggest a "robust" causal link to two of them while the third was not a policy at all. As one of my colleagues recently noted in a well-reasoned decision denying dismissal of the County's disparate-impact claims in a closely analogous case, however, "[a]t the pleading stage of a lawsuit, '[i]t is enough to plead a plausible claim, after which a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.'" *County of Cook v. Wells Fargo & Co.*, No. 14-C-9548, 2018 WL 1469003, at *11 (N.D. Ill. Mar. 26, 2018) (Feinerman, J.) (quoting *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017)). Having closely reviewed the operative complaint, I am satisfied that the County's allegations articulate both a statistical race-based disparity and a specific, multifaceted policy with a robust causal connection to that disparity. Defendants have not shown that *Inclusive Communities* requires more.

### III.

For the foregoing reasons, defendants' motion is granted in part. The County is entitled to proceed on both its disparate treatment and its disparate impact claims under the FHA. The

County's potential recovery is limited, however, to its claims for foreclosure-processing related expenses.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: March 30, 2018