**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| COUNTY OF COOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:14-cv-02280 |
| | ) | |
| BANK OF AMERICA CORPORATION, et al | ) | HONORABLE ELAINE E. BUCKLO |
| | ) | |
| Defendants. | ) | MAG. JUDGE SUNIL R. HARJANI |

## PLAINTIFF'S MOTION TO DISQUALIFY COUNSEL AND MEMORANDUM OF LAW IN SUPPORT THEREOF

## TABLE OF CONTENTS

BACKGROUND ............................................................................................................... 1

LEGAL STANDARDS .................................................................................................... 4

ARGUMENT .................................................................................................................... 5

    A.    The Analysis of Legal Ethics Expert Professor Roy Simon Suggests Goodwin's Conflicts Require Disqualification .......................................................... 5

        1.    Goodwin has Serious, Concurrent Conflicts of Interest ............................ 5

        2.    Goodwin's Serious Conflicts Are Not Waivable, and Even if They Could Be Waived, Goodwin Did Not Obtain Valid Waivers ............................... 8

    B.    The Contradictory Or Recanting Sworn Testimony Subjecting Confidential Witnesses To The Penalties Of Perjury ........................................................ 9

        1.    Confidential Witness No. 11 – Joseph Eye ............................................... 9

        2.    Confidential Witness No. 1- Arnold Fishman ......................................... 10

        3.    Confidential Witness No. 9 - Amul Modhera .......................................... 11

        4.    Confidential Witness No. 10 – Kemberly Abbott .................................... 11

        5.    Confidential Witness No. 3 – Rebecca Burns .......................................... 12

    C.    At a Minimum, the Later-Acquired Declarations Should Be Stricken Under the Sham Affidavit Doctrine .................................................................................. 13

CONCLUSION ............................................................................................................... 15

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bank of Illlinois v. Allied Signal Safety Restraint Sys.,*
    75 F. 3d 1162 (7th Cir. 1996) ............................................................... 14

*Beckel v. Wal-Mart Associates, Inc.,*
    301 F.3d 621 (7th Cir. 2002) ............................................................. 14, 15

*Buckner v. Sam's Club, Inc.,*
    75 F.3d 290 (7th Cir. 1996) ................................................................. 14

*Cardenas v. Benter Farms,*
    No. IP 98-1067-C T/G, 2001 WL 292576, (S.D. Ind. Feb. 7, 2001) ........................ 5

*Dunn v. Menard, Inc.,*
    880 F.3d. 899 (7th Cir. 2018) ............................................................... 13

*Exterior Sys., Inc. v. Noble Composites, Inc.,*
    175 F. Supp. 2d 1112 (N.D. Ind. 2001) ...................................................... 5

*Freeman v. Chi. Musical Instrument Co.,*
    689 F.2d 715 (7th Cir. 1982) ............................................................... 5

*Installation Software Techs, Inc. v. Wise Solutions, Inc.,*
    2004 U.S.Dist. LEXIS 3388 ................................................................. 5

*Lichauco v. Kelly,*
    2019 WL 1532954 (N.D. Ill. April 9, 2019) ............................................... 14

*Owen v. Wangerin,*
    985 F.2d 312 (7th Cir. 1993) ............................................................... 6

*Shaw v. Williams,*
    2018 WL 3740665 (N.D. Ill. Aug. 7, 2018) ............................................... 14

*State Comp. Ins. Fund v. Drobot,*
    192 F. Supp.3d 1080 (C.D. Cal. 2016) ...................................................... 7

*United States v. Goot,*
    894 F.2d 231 (7th Cir. 1990) ............................................................... 5

*Whiting Corp v. White Machinery Corp.,*
    567 F.2d 713 (7th Cir. 1977) ............................................................... 4

**Rules**

American Bar Association Model Rules of Professional Conduct Rule 1.7(a)(2) ................ passim

Model Rule 1.4 .................................................................................................................... 6

ND.Ill. L.R. 83.50 ............................................................................................................... 3

**Regulations**

Fair Housing Act ................................................................................................................ 1

Plaintiff County of Cook ("the County") moves this Court to disqualify Defendants' counsel for the reasons set forth below.[1]

## BACKGROUND

The County filed this action against Bank of America Corporation and related entities on March 31, 2014, alleging that Defendants' predatory and discriminatory residential mortgage lending and servicing activities in violation of the Fair Housing Act resulted in unprecedented numbers of mortgage loan defaults, foreclosures and/or home vacancies among minority homeowners, thereby damaging the County. As in the original Complaint, the operative Second Amended Complaint (SAC) includes multiple references to eleven Confidential Witnesses (CWs) who were former employees of the Defendants with direct knowledge of the facts attributed to them. (*see*, *e.g.* SAC, ¶¶ 189, 193, 197, 199-200, 204-211, 243, 245, 246-250, 268-270, 274, 287, 356, 461-463, 478-479, and 497.) In addition to providing highly specific information used in the Complaint and the SAC, seven CWs later voluntarily provided sworn declarations to the County's investigator confirming the factual allegations attributed to them.

On October 8, 2019, Goodwin Procter LLP ("Goodwin"), counsel for Defendants, sent a letter to Plaintiff's counsel, stating that it now represented nine of the original eleven CWs and, "[a]*ccordingly, you may not contact these witnesses directly, and you should contact our Firm if you wish to speak with or depose any of them*. (Declaration of Jennifer S. Czeisler ("Cziesler Decl."), ¶¶ 2-11, Ex. A.) The October 8 letter attached new sworn declarations from each of the nine CWs. (*Id*., at Ex.'s B-J.)

Remarkably, all nine of these new sworn declarations include statements that partially

---

[1] The County is cognizant of the unusual nature of this motion and the severity of the relief requested. The extraordinary conduct establishing Defendants' counsel's conflicted representation, however, compels this result.

recant or entirely disavow, the very same factual statements these witnesses previously provided to the County's investigator, include other patently false or misleading statements, or directly conflict with prior sworn statements they gave to the County's investigator at a much later date. For example, contrary to their prior representations to the County's investigators, and in most instances contrary to the facts they confirmed in their prior declarations, the CWs now represented by Goodwin state such things as: the factual references attributed to them in the Complaint are a "surprise;" their statements are taken "out of context;" their statements are not based on personal knowledge; they disclaim any memory of their statements, they deny consent to attribution of any of their statements, and/or renounce the truth of their prior sworn statements. (*See, e.g.*, *Id.*) Ex. B (Fishman Decl. ¶¶ 5-9), Ex. C (Lashmet Decl., ¶¶ 4-10); Ex. D (Eye Decl., ¶¶ 4-9).) All of this evidences potential perjury with respect to one set of CW declarations or another.

Goodwin's concurrent representation of the Bank of America Defendants and these nine CWs presents a non-waivable conflict of interest. At the very least, it presents an egregious appearance of impropriety. Goodwin has exposed most of these individual witnesses – their own clients -- to perjury, even though none of them had any interest at stake in this litigation before Goodwin's successful efforts to co-opt them for the benefit of Bank of America and Goodwin's representation of Bank of America. Goodwin's duty to zealously represent Bank of America puts the firm in direct conflict with its duty of loyalty to the CWs that it also purports represent. Goodwin thus placed itself in the disqualifying position of having concurrent non-waivable conflicts, conflicts that cannot be ethically remedied, even by withdrawing from representation of one client in favor of another.

In connection with this motion, the County retained Professor Roy D. Simon, Jr., a leading expert in the field of legal ethics. He is the Distinguished Professor of Legal Ethics Emeritus at

Hofstra University School of Law, serves as a legal ethics advisor to law firms, and is the author of the twenty editions of Simon's New York Rules of Professional Conduct Annotated, as well as other books in the field of professional responsibility. (*See* Declaration of Roy D. Simon ("Simon Decl."), ¶¶ 1, 4, Ex. A.). Based upon his analysis of the facts and circumstances concerning Goodwin's newly achieved representation of nine of the eleven CWs,[2] and its procurement of contradictory sworn declarations by five of them, Professor Simon opines that Goodwin's conduct in advising [the CWs] or persuading them to recant or limit prior statements or declarations creates serious concurrent conflicts of interest between the Defendants and the CWs, under the American Bar Association Model Rules of Professional Conduct ("Model Rules"), Rule 1.7(a)(2),[3] that are non-waivable. (Simon Decl., ¶¶ 2-3, 38-42, 44, 66.) He further opines that Goodwin is necessarily disqualified from simultaneously representing both the nine CWs and the Bank of America defendants. (*Id.* at ¶ 2(d)(i), and (viii).) These disqualifying conflicts raise salient questions of serious misconduct by Goodwin, and an egregious appearance of impropriety.

The County served a subpoena upon Goodwin on October 21, 2019, requesting Goodwin's communications, retainer agreements, conflict waivers (if any), disclosures to these nine CWs, documents concerning the nature of Goodwin's conduct of any internal ethics analysis and documents reflecting any conflict checks with respect to the CW retentions, along with the terms of the retentions. (Czeisler Decl., Ex. K.) Professor Simon similarly finds it necessary to obtain this information. (Simon Decl., ¶ 66-67.) On November 4, 2019, Goodwin objected to the County's subpoena in its entirety, refusing to provide any of what was requested. (Czeisler Decl., Ex. L.)[4]

---

[2] CW2 and CW4 are the two individuals who did not supply Goodwin with a declaration. Either these CWs could not be located, or they did not wish to provide a declaration to Goodwin in its effort to reverse or otherwise undermine the CWs' prior statements.

[3] This Court applies the American Bar Association Model Rules of Professional Conduct. ND.Ill. L.R. 83.50. Model Rule 1.7 addresses attorney's conflicts of interest in concurrent representation.

[4] Plaintiff intends to file a motion to compel production from Defendants, addressing Defendants' complete refusal to produce any documents in response to the County's October 21, 2019 subpoena.

The Court should disqualify Goodwin from representing Bank of America and its defendant entities, given its misconduct with regard to the CWs. While a drastic remedy, it is a commensurate and necessary one. If any doubt exists as to the appropriate remedy, Goodwin should be required to reveal in discovery the full facts and circumstances under which Goodwin came to represent each of the CWs, what each CW was told[5] (including about any potential conflicts), and what Goodwin did to attempt to clear its un-waivable conflict. (*see, e.g.*, Simon Decl., ¶ 47.) At bare minimum, the CWs should be provided independent, unconflicted counsel, at Goodwin's expense, so they may be independently informed as to the nature of Goodwin's behavior and how best to respond to the untenable predicament in which Goodwin has placed them.

The County further requests that the Court impose sanctions against Goodwin for the attorneys' fees costs required for the preparation and presentment of this Motion, according to proof, including the amounts expended in connection with Professor Simon's engagement and work in this matter and any discovery the County must undertake. Finally, the County requests discovery on the factual matters at issue, including depositions of the CWs, and requests that those deposition would not count toward the County's twenty deposition limit.

## LEGAL STANDARDS

Generally, if a law firm is involved in a concurrent representation conflict and cannot obtain a waiver of the conflict by both clients, there is a stringent standard of review. The court must consider "the duty of undivided loyalty which an attorney owes to each of his clients." *Whiting Corp v. White Machinery Corp.*, 567 F.2d 713, 716 (7th Cir. 1977) "The attorney

---

[5] There is a genuine question of whether the attorney-client privilege would apply to any communications between Goodwin and the CWs, namely if it is shown that Goodwin's representation of the CWs is primarily for the benefit of Bank of America, not the CWs. (*see* Simon Decl., ¶¶ 52-66.)

4

[or law firm] must be prepared to show, at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his [or her] representation." (citation omitted). *Installation Software Techs, Inc. v. Wise Solutions, Inc.*, 2004 U.S. Dist. LEXIS 3388 *9. While disqualification motions are viewed with extreme caution because they can be used as an harassment tool, *Freeman v. Chi. Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982), the Seventh Circuit has instructed courts to resolve doubts in favor of disqualification. *See Exterior Sys., Inc. v. Noble Composites, Inc.*, 175 F. Supp. 2d 1112, 1115 (N.D. Ind. 2001) (citing *United States v. Goot*, 894 F.2d 231, 235 (7th Cir. 1990)). A district court possesses "broad discretion" in determining whether disqualification is required in a particular case. *Cardenas v. Benter Farms*, No. IP 98-1067-C T/G, 2001 WL 292576, at *1 (S.D. Ind. Feb. 7, 2001).

## ARGUMENT

### A. The Analysis of Legal Ethics Expert Professor Roy Simon Suggests Goodwin's Conflicts Require Disqualification

#### 1. Goodwin has Serious, Concurrent Conflicts of Interest

Professor Simon, a legal ethics expert, has submitted to the Court a declaration containing his opinions on the ethical impacts of Goodwin's current representation of virtually all the CWs (nine of eleven). Critical among those opinions is that Goodwin has concurrent non-waivable conflicts of interest in its representation of both the Defendants and the five CWs who have signed conflicting declarations sworn under penalty of perjury. (Simon Decl., ¶¶ 3, 37-51; *see also*, §(B), *infra*.) Professor Simon explains that concurrent, unwaivable conflicts exist under Model Rule 1.7 (a)(2) where, as here, "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client [...]" (Model Rule 1.7 (a)(2); Simon Decl., ¶ 38.)

There can be no dispute that Goodwin has an ethical obligation to zealously and loyally

represent all its clients within the bounds of the law, to communicate with all of them fully and candidly per Model Rule 1.4, and to avoid assisting any of them in illegal conduct. (Simon Decl., ¶ 39.) However, as Professor Simon illustrates, there is a significant risk that some of the CWs will back away from their latest sworn declarations and revert to their original ones. (*Id*.) If that happens, Goodwin will be required to advise the CW regarding whether to do so. (*Id*.) That advice will necessarily include an admonition regarding the importance of not committing perjury. (*Id.*) However, advising the CWs to revert to a truthful declaration that accuses Defendants of misconduct conflicts with Goodwin's duty to zealously represent Bank of America in denying that conduct. (*Id.*) Goodwin possesses sharply conflicting duties.

As another example, if the County calls a CW as a witness to vouch for his or her original sworn declaration, Goodwin will be barred from impeaching or cross-examining them because cross-examining a current client is a conflict of interest. (Simon Decl., at ¶ 39(c).) In other words, if the CWs testify consistently with the information attributed to them in the County's SAC, Goodwin cannot seek to impeach or cross-examine those witnesses on behalf of Defendants because those witnesses are now Goodwin clients. (*Id.*)

Goodwin cannot "reasonably believe," as required by Model Rule 1.7(b), that its simultaneous representation of Defendants and the CWs will not be materially limited by its responsibilities to each client, where the defense, in part, is now connected with the new statements of the CWs. The interests of the Defendants are so intertwined and adverse to the statements attributed to the CWs that a non-waivable conflict has been created. *See e.g., Owen v. Wangerin,* 985 F.2d 312, 317 (7th Cir. 1993) (affirming disqualification of counsel even when a conflict waiver was executed and the lawyer had not yet determined whether his representation would be adversely affected by his competing personal interests).

6

The court's analysis in *State Comp. Ins. Fund v. Drobot*, 192 F. Supp.3d 1080 (C.D. Cal. 2016) (SCIF), is analogous to the unwaivable conflict at issue here. In SCIF, the court disqualified the law firm that represented the civil plaintiff because the firm also represented one of the defendants in a somewhat related criminal action. Of particular note, the court recounted its "obligation, independent of all the other legal authority discussed here, 'to preserve public trust in the scrupulous administration of justice and the integrity of the bar.'" 192 F.2d at 1098 (internal citation omitted). Then, after concluding that SCIF's lawyer "represented a client with directly adverse interests," and that "it would be unthinkable to permit an attorney to assume a position at a trial or a hearing where he could not advocate the interests of one client without adversely injuring those of the other," the SCIF court quoted the language in the lawyer's own waiver letter as providing the very reasons why the lawyer's conflict was unwaivable -- the same reasons why Goodwin's conflict here is unwaivable and requires Goodwin's disqualification:

> [C]oncurrent representations give rise to a risk that the Firm may favor the interests of one client over the other, that the Firm's exercise of independent judgment to one client may be impaired by its relationship with the other client, that the Firm may not be able to present the appropriate positions, claims, or defenses for one client in order to avoid taking positions adverse to the other client, that the Firm may be restricted from forcefully advocating one client's position for fear of losing the confidence of the other client, that the Firm may be required to limit its representation and not be able to give each client complete legal advice as a result of its obligation to the other client, and that there may be an appearance of impropriety in the representation of both clients simultaneously.

(*State Comp. Ins. Fund,* 192 F. Supp.3d at 1113-14.) Finally, the SCIF court noted that the conflict could not be repaired by dropping one of the clients. (*State Comp. Ins. Fund,* 192 F. Supp.3d at 1114.) Under the "hot potato" rule, a "'law firm that knowingly undertakes adverse concurrent representation cannot avoid disqualification by withdrawing from the representation of the less favored client.'" (*Id.*) The "hot potato" rule reflects that the "duty of loyalty to an existing client is so important, so sacred, so inviolate that "not even by withdrawing from the relationship can an attorney evade it." (*Id.*)

7

Based on the undeniable circumstances here, Professor Simon concludes that there is a "significant risk" that Goodwin's representation of Defendants will be "materially limited" by Goodwin's responsibilities to "another client." (Simon Decl., ¶ 40-41.) Disqualification is thus warranted.

**2.      Goodwin's Serious Conflicts Are Not Waivable, and Even if They Could Be Waived, Goodwin Did Not Obtain Valid Waivers**

Professor Simon opines that Goodwin's conflicts cannot be waived. Simon Decl. at ¶¶ 43-47. Goodwin may only overcome its concurrent conflicts of interest if it "*reasonably believes* that [it] will be able to *provide competent and diligent representation to each affected client*" and "*each affected client gives informed consent, confirmed in writing*." Simon Decl. at ¶ 44, *citing* Model Rule 1.7(b)(1), (4) (emphasis added). Goodwin cannot "reasonably believe" as required by 1.7(b)(1), that its simultaneous representation of Defendants and the CWs will not be materially limited by its responsibilities to each client, because the defense is now connected with the new sworn statements of the CWs.

Here also, considerable doubt exists as whether the CW clients gave informed consent. Simon Decl. at ¶¶ 46, 47. For Goodwin to have obtained "informed consent" to the representation, the firm must provide adequate information and explanation about the material risks of, and reasonably available alternatives, to the proposed course of conduct. (Model Rule 1.0(e) (defining "informed consent"); Simon Decl. at ¶ 46). Thus, for informed consent to exist here, Goodwin would have been reasonably required to explain, at a minimum: (a) if the CW signs under penalty of perjury two opposite, contradictory declarations, the CW must be committing perjury in one of them; (b) if a client disavows under penalty of perjury an earlier statement made under penalty of perjury, the client is exposed to impeachment by the original sworn statement; (c) Goodwin's clients will suffer harm if a CW stands by his or her original declaration, since Defendants have a

vested interest in negating and denying the CWs' original declarations; (d) a significant risk to the other CWs will arise if even one CW decides to revert to his or her original declaration testimony; and (e) the CWs have the alternative of retaining other counsel (instead of Goodwin) or not having counsel at all. (Simon Decl., ¶¶ 47 (a)-(e).) If the non-stakeholder CW was actually informed of these considerations, it is highly unlikely that consent would have been given.

**B.     The Contradictory or Recanting Sworn Testimony Subjecting Confidential Witnesses to the Penalties of Perjury**

The original Complaint contained quotations and observations from eleven CWs. Their observations to investigators and their sworn statements supported Plaintiff's allegations. At some point after the names of the CWs were produced in discovery three things happened: (a) Goodwin located nine of the eleven CWs; (b) Goodwin was retained as counsel for all nine CWs; and (c) Goodwin procured declarations from all nine CWs that now criticize the case theory or conjure some other reason to cast doubt on the validity of the CW's prior sworn statements or declarations.

Five of the nine CWs that Goodwin now purportedly represents previously had provided declarations under penalty of perjury to the County's investigators. (Declaration of Wolfram Worms ("Worms Decl."); Ex. A, Declaration of Kemberly Abbott Decl. (CW 10) ;Ex. B, Fishman Decl. (CW 1); Ex. C, Modhera Decl. CW 9); Ex. D, Burns Deel. (CW 3). Ex. E, Eye Decl. (CW 11). The dramatic conflicts and contradictions in the five CWs' new declarations, under penalty of perjury, after they individually hired Goodwin as their attorneys, are discussed below.

**1.     Confidential Witness No. 11 – Joseph Eye**

*Before*. The statements attributed to Joseph Eye are found in paragraphs 204-205, 210, 243, 246, 248-249 of the SAC. In these paragraphs, Mr. Eye provided relevant information concerning broker behavior designed to increase loan fees and commensurate broker compensation. On December 12, 2018, Mr. Eye signed a sworn declaration in which he identified himself as CW11,

9

attested to his personal knowledge of the CW11 allegations in the SAC, and affirmed that he believed the allegations were true and correct. (Worms Decl., Ex. E.)

*After*. On July 23, 2019, after Goodwin secured its representation of him, Eye signed a declaration that claims surprise that he was identified as a CW. (Czeisler Decl., Ex. D, ¶ 4.) Directly contrary to his original declaration, he goes on to say that some of the allegations attributed to him in the SAC are "potentially misleading or inaccurate." (*Id*., at ¶ 6.) He further goes so far as to renounce paragraph 243 concerning the approval of borrowers with low credit scores in an attempt to undermine the allegation entirely by swearing his lack of knowledge of Countrywide's loan approval exception policy and declares that Countrywide's design of the exception policy "cannot be true." (*Id*., at ¶ 7.)

Mr. Eye further declared that, as far as he can recall, he was never told that his statements would be used to support the allegations of the complaint. (*Id*. at ¶ 9.) Yet, he originally swore that he reviewed his allegations and to his belief they are true.

### 2.    Confidential Witness No. 1- Arnold Fishman

*Before*. The allegations attributed to Mr. Fishman relate to Countrywide's assessment of exorbitant fees, leaving the borrower in a worse condition after refinancing. (*See*, SAC, ¶¶ 199-200.) On June 22, 2015, Mr. Fishman executed a declaration in which he confirmed that he had reviewed the original complaint in this action. (Worms Decl,, Ex. B,  ¶2).  He further confirmed that the paragraphs attributed to him as CW1 were true and correct and based his "knowledge, experience, and best recollection. "(*Id*.)

*After*. On July 26, 2019, over four years later, after he apparently retained Goodwin, Mr. Fishman claims surprise that he is a witness, that his statements are "taken out of context," that his memory is now unclear or "vague" as to his statement that "people in minority neighborhoods [paid] higher prices for mortgage loans." (SAC, ¶ 211.) He further states that had he known his

prior statements would be attributed to him in this lawsuit, he "would not have consented because he does not believe those allegations are true." (Czeisler Decl., at Ex. B, ¶ 9.)

### 3. Confidential Witness No. 9 - Amul Modhera

*Before*. Mr. Modhera is a former Bank of America loan officer. The allegations attributed to him relate to Bank of America's compensation to brokers for placement of borrowers into higher interest loans (SAC, ¶ 206), as well as lack of training of Bank of America brokers, and the brokers' ability to target certain borrowers. (SAC, ¶ 287.) On May 28, 2015, Mr. Modhera signed a declaration in which he swore that he reviewed the allegations attributed to him and that he believes them to be true and correct. (Worms Decl., Ex. C, ¶ 2.)

*After*. Mr. Modhera signed a new declaration on July 16, 2019, in which he attests to his personal knowledge that he "did not witness any acts of discrimination, and that he does not want "to act as a witness on behalf of [Plaintiff]." (Czeisler Decl., Ex. F, ¶ 4.) He further states that the paragraphs in the SAC attributed to him are "taken out of context." He also states that he "cannot say precisely what training broker's sales personnel received" but in the next sentence declares his disagreement with [Plaintiff's] characterization that brokers and their sales personnel were able to "target borrowers in any manner that they saw fit." (*Id*., at ¶ 5.)

### 4. Confidential Witness No. 10 – Kemberly Abbott

*Before*. Ms. Abbott was a loan account manager for First Franklin Financial. She informed Plaintiff's investigators that loan brokers were not eligible for yield spread premiums if they allowed borrowers to buy out of the pre-payment penalties that were built into loan programs that First Franklin offered. (SAC, ¶ 207) She also indicated that while certain appraisals were supposed to be within one mile of the property at issue, appraisers would inflate values by using comparables outside a mile radius. (*Id*., at ¶ 274.) Ms. Abbott signed a declaration on May 21, 2015, swearing that she reviewed the original complaint, and the allegations attributed to her as CW 10 were true

11

and correct. (Worms Decl., Ex A, ¶ 2.)

*After.* More than four years later, June 11, 2019, Ms. Abbott, after speaking with Goodwin, signed a declaration stating that she did *not* read the complaint that contains the allegations attributable to her, that she cannot even recall why she signed her declaration applicable to this action, that she believes the allegations are inaccurate, and completely denies that she made the attributed statements. (Czeisler Decl., Ex. E., ¶¶ 3-4.) She further states that her original statement to investigators concerning improper use of comparables is "out of context" and that appraising property is "not an exact science." (*Id.*, at ¶ 7.) Finally, she gives an opinion that she is not aware of any basis "at all" upon which to claim "that First Franklin discriminated against minority borrowers." (*Id.*, at ¶ 9.)

### 5. Confidential Witness No. 3 – Rebecca Burns

*Before.* Ms. Burns is a former branch manager who was employed with Countrywide from 1995 through 2005. (Czeisler Decl., Ex. G, ¶ 2.) The allegations attributed to her relate to Countrywide's "big push" to sell adjustable rate mortgages ("ARMS") when borrowers were "tight on qualifying" (SAC, ¶ 189), as well as Countrywide's hiring of African American and Latino account executives to market and sell Countrywide loans to African American and Latino borrowers in their communities. (SAC, ¶ 462). On November 29, 2018, Ms. Burns signed a declaration under penalty of perjury swearing that she "reviewed the Second Amended Complaint in this matter, including paragraphs 189 and 462 attributed to [her] as Confidential Witness No. 3 (or CW3)," and that "the allegations in the paragraphs attributed to me as CW3 are true and correct based on my knowledge and experience." (Worms Decl., Ex. D, ¶ 2.)

*After.* Ms. Burns signed a new declaration on August 23, 2019. In her new declaration, Ms. Burns asserts that she is "surprised to learn" that she was identified as a confidential witness in the lawsuit, and that some of the factual statements she swore to regarding Countrywide's

practices are "potentially misleading or inaccurate." (Czeisler Decl., Ex. G, ¶¶ 4-5.) Although she swore that she read, reviewed and confirmed all of the statements attributed to her in the SAC, Ms. Burns now asserts she "was never told that what [she] said would be used in support of a lawsuit that concerns borrowers in Illinois" and "if she had been asked whether her statements could be used in support of such a lawsuit, she would not have agreed." (*Id.*, ¶ 9.) Ms. Burns claims she did not use the word "tactics" or did not mean to imply anything negative about the allegation that Countrywide management was well aware of loan officers' "tactics" in advising borrowers they could refinance when their interest rate increased. (*Id.,* ¶ 6.) She denies now that she said "management assumed the buyer would refinance or sell before the rate reset on an ARM, or simply did not care what happened to the borrower because, by the time the rates did reset, Countrywide would have passed the risk of default on to the investors either by selling or securitizing the loan." (*Id.*) Finally, with regard to paragraph 462 of the SAC, which is attributed to her, she now rescinds any implication of impropriety by Countrywide's hiring of African American and Latinos to market and sell Countrywide loans. (*Id.,* ¶ 7.)

## C. At a Minimum, the Later-Acquired Declarations Should Be Stricken Under the Sham Affidavit Doctrine

Regardless of any outcome, the newly-acquired sworn CW declarations should be stricken under the principles of the Seventh Circuit's "sham affidavit doctrine." (Simon Decl., at ¶¶ 48-49.) Under that doctrine, courts may disregard sworn affidavits or other statements made under penalty of perjury that contradict prior statements also made under penalty of perjury. *See Dunn v. Menard, Inc*., 880 F.3d. 899, 910 (7th Cir. 2018). The doctrine extends beyond the parties to include sworn statements made by any witnesses who contradicts his or her prior sworn testimony.

*Bank of Illinois v. Allied Signal Safety Restraint Sys.,* 75 F. 3d 1162, 1169 (7th Cir. 1996).[6]  Such supplemental affidavits, typically written by an affiant's lawyer and when offered to contradict an affiant's prior sworn testimony to create an issue of fact, "are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy." *Beckel v. Wal-Mart Associates, Inc.,* 301 F.3d 621, 623 (7th Cir. 2002).  *See also Shaw v. Williams*, 2018 WL 3740665 (N.D. Ill. Aug. 7, 2018) (observing that generally "a party may not create issues of fact by introducing affidavits that contradict prior testimony unless the affidavit explains any discrepancies, mistakes, or ambiguous testimony in earlier depositions").

The sham affidavit doctrine applies here to strike the CWs' new declarations. As discussed above, Goodwin continues to have non-waivable conflicts of interest with the CWs, barring it from representing them. Nevertheless, Goodwin inexplicably convinced all but two of the CWs to hire a global law firm and then proceeded to recant or disavow their prior sworn declarations in new sworn declarations. The CWs offer no credible explanations for the assertions in their new declarations, in some cases years after their initial sworn statements. For those CWs that gave contradictory sworn declarations, those declarations do not "explain discrepancies, mistakes or ambiguities" in prior declaration testimony. These particular CWs simply reverse themselves with assertions in direct conflict with the unambiguous material fact statements supporting the County's claims that the CWs swore to in their original declarations.

It is simply not plausible that these CWs all voluntarily exposed themselves to the penalties

---

[6] The Seventh Circuit has long applied the doctrine to prevent parties from manufacturing sham issues of fact to thwart summary judgment. *Bank of Illlinois v. Allied Signal Safety Restraint Sys.,* 75 F. 3d 1162, 1168 (7th Cir. 1996).  *See also Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996) (affirming district court's decision to strike supplemental affidavits it determined were a "clear attempt" to "shore up obvious gaps" in plaintiff's case with "phantom evidence" contradictory to the plaintiffs' sworn testimony); *Lichauco v. Kelly*, 2019 WL 1532954 (N.D. Ill. April 9, 2019) (disregarding inconsistent affidavit contradicting prior sworn testimony).

of perjury by disavowing earlier statements and swearing to contradictory facts. The only reasonable conclusion is that the declarations are shams, manufactured by Goodwin to create fact issues, with the goal of nullifying all of the CW attributions in the SAC, and all of the original declarations. To be sure, this conduct is solely to the benefit of Goodwin's long-time client, Bank of America – not for the CWs in the least. These *post hoc* declarations lack credibility, are potentially fraudulent, and have no weight. *See Beckel,* 301 F.3d at 623. (Simon Decl, ¶ 49.)

## CONCLUSION

The County respectfully requests that the Court disqualify Goodwin from its simultaneous representation of the CWs and the Bank of America Defendants. In this matter, such dual representation is ethically untenable and presents non-consentable concurrent conflicts of interest in violation of Model Rule 1.7. The County further requests that the CWs be provided independent counsel, paid for by Goodwin, and that the County be awarded sanctions in the amount of its costs, expert fees, and attorney time in presenting this motion, including for all discovery of the factual matters at issue and any depositions of the CWs. Finally, depositions of the CWs should not count toward the County's twenty deposition limit.

Dated: December 2, 2019

Respectfully Submitted,

**KIMBERLY M. FOXX,**
**STATE'S ATTORNEY FOR COOK COUNTY**

*//s/ Kenneth A. Wexler*
Kenneth A. Wexler
Mark J. Tamblyn *(pro hac vice)*
Umar Sattar
**WEXLER WALLACE LLP**
55 West Monroe, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 346-2222
kaw@wexlerwallace.com
mjt@wexlerwallace.com
us@wexlerwallace.com

15

James M. Evangelista
*jim@ewlawllc.com*
David J. Worley
*david@ewlawllc.com*
Kristi Stahnke McGregor
*kristi@ewlawllc.com*
**EVANGELISTA WORLEY, LLC**
8100A Roswell Road
Suite 100
Atlanta, GA 30350
Telephone: (404) 205-8400

Sanford P. Dumain (*pro hac vice*)
Peggy J. Wedgworth (*pro hac vice*)
Jennifer S. Czeisler (*pro hac vice*)
J. Birt Reynolds (*pro hac vice*)
Roy Shimon (*pro hac vice*)
Dolgora Dorzhieva (*pro hac vice*)
Ezra Salami (*pro hac vice*)
**MILBERG PHILLIPS GROSSMAN LLP**
One Pennsylvania Plaza, Suite 1920
New York, NY 10119
Telephone: (212) 594-5300

***Special Assistant State's Attorneys***

16

## CERTIFICATE OF SERVICE

I hereby certify that on this day I served the above and foregoing **PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY** on all parties by causing a true and correct copy to be filed with the court's electronic filing system, which should automatically send a copy to all counsel of record.

Dated: December 2, 2019                           Respectfully Submitted,


                                                  */s/ Kenneth A. Wexler*_____
                                                  Kenneth A. Wexler

17