IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COUNTY OF COOK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 14 C 2280 |
| | ) |
| BANK OF AMERICA | ) |
| CORPORATION, *et al.* | ) |
| | ) |
| Defendants. | ) |

ORDER

In this case, Cook County alleges that Bank of America and several related entities engaged in a range of discriminatory practices prohibited by the Fair Housing Act of 1968 ("FHA"), the effect of which has been a spate of home foreclosures concentrated in minority neighborhoods across the County. The County's 180-page Second Amended Complaint offers a detailed account of defendants' multifaceted "equity stripping scheme," which the County claims caused it a multitude of injuries including the diminution of its "tax digest," i.e., "the value of all real property subject to tax." Second Amended Complaint at ¶ 387.

On March 30, 2018, I issued a decision partially granting defendants' motion to dismiss the Second Amended Complaint in view of *Bank of America v. City of Miami*, 137 S. Ct. 1296, 1302 (2017) ("*City of Miami*"), which clarified that to recover damages for FHA violations, a plaintiff must plausibly allege "some direct

1

relation between the injury asserted and the injurious conduct alleged." *Id*. at 1299 (citation omitted). I concluded that many of the economic injuries the County asserted—including the injury to its tax digest—were too remote from defendants' misconduct to satisfy *City of Miami*'s "directness" requirement. The County now asks me to reconsider that ruling in light of the Eleventh Circuit's remand decision in *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019) ("*Miami on Remand*"), which held that the City of Miami could proceed to discovery on its claim for lost tax revenues.

In *Miami on Remand*, the Eleventh Circuit analyzed the jurisprudence supporting the Supreme Court's directness requirement and concluded that the defendants' "step-counting" approach—which substantially mirrors the arguments defendants raised in their motion to dismiss—was overly formalistic and "wooden." *Id*. at 1275. The court examined the City of Miami's allegations describing how the defendants' discriminatory foreclosures led to the City's lost tax revenues and concluded that the "general tendency" "not to go beyond the first step" when it comes to damages did not foreclose the City's claim for those losses. *Id*. at 1273, 1276. Having considered the Eleventh Circuit's decision closely, I conclude that while the court reached a compelling conclusion on the allegations before it, its analysis does not win the day for the County.

2

In *Miami on Remand*,

> [the City] claimed damages from each bank based on reduced property tax revenues, arguing that the Banks' lending policies caused minority-owned properties to fall into unnecessary or premature foreclosure, causing them to lose substantial value and, in turn, decreasing the values of surrounding properties … This reduced the City's tax base *and the tax revenue it took in*.

923 F.3d at 1269. (Emphasis added). *See also id.* at 1282 ("the City of Miami's tax-revenue injury seeks damages '*based upon reduced property tax revenues* resulting from (a) the decreased value of the vacant properties themselves, and (b) the decreased value of properties surrounding the vacant properties.'") (Emphasis added). Drawing all inferences in the City's favor, the court held that the chain of causation could be construed as comprising the following steps: "First, a bank extends predatory loans in violation of the FHA. Second, homeowners default. Third, the bank forecloses and the property values plummet, necessarily reducing the City's tax base and injuring its fisc." 923 F.3d at 1278.

Here, the County does not allege any decline in its aggregate tax revenues as a result of defendants' discrimination. To the contrary, the County "agrees that its total property tax revenue was relatively stable" throughout the period in which the tax digest was allegedly depleted. Pl.'s Supp. Mem. at 1. The County's claim for tax losses is instead based on the theory that the decline in the assessed value of properties affected by defendants'

3

discriminatory foreclosures "would have required the County to raise its Tax Rate to a level higher than it would have been in the absence of the foreclosures to maintain the Tax Levy, if all other factors remained constant." Decl. of S. Cowan at ¶ 10.[1] In other words, because the affected properties were expected to generate fewer tax dollars at a given tax rate, the County had to increase the share of the total tax burden on property owners in other neighborhoods and to raise other taxes to meet its budgetary needs. *Id*. at ¶¶ 9-10. But this theory muddies the waters by characterizing the County's damages as "the actual property tax *losses* on the individual properties adversely affected by the foreclosures Defendants caused," (emphasis added) since those "losses" had only a notional impact on the County's coffers.[2] The *actual* injury to the County's treasury occurred, if at all, much further down the causal chain.

The County identifies a cascade of negative effects that *tax increases* can have on the local economy. These include "political repercussions on County officials" as well as "negative effects on

---

[1] I note that the Second Amended Complaint does not include allegations that County *actually* implemented tax increases to compensate for the decline in its tax digest, but that is not the basis on which the County's proximate causation theory fails. My analysis would be the same even if the complaint alleged facts consistent with those asserted in the S. Cowan declaration.

[2] *See* Pl.'s Supp. Mem. at 11 n. 2 (admitting that there is "unlikely to be any reasonable factual dispute" that the County raised taxes from other sources "to generally achieve level annual property tax revenue").

4

the County's other revenues, and future revenues and growth, because they adversely impact the prosperity of businesses and the community at large." *See* Pl.'s Supp. Mem. at 10; S. Cowan Decl. at ¶ 11. *Id*. Indeed, the County explains that "raising the tax rate disadvantages the County in competition for new businesses and business expansion compared to neighboring counties with lower tax rates," and that tax increases have an "increasingly deleterious adverse impact on economic activity" that "continue[s] to harm total revenues on a going forward basis." *Id*. But this forward-looking series of adverse events only reinforces the attenuated nature of the County's tax injury.

First, while it may well be that a decline in the assessed value of affected properties influences the difficult and complex decisions the County must make in the exercise of its taxing authority, numerous other factors—social, political, and economic—necessarily bear on those decisions as well. Further, even assuming that some sort of tax increase results inexorably from a decline in affected home values, the measure of damages the County anticipates to its "total revenues on a going forward basis" depends on the extent to which businesses indeed decide to flee to the greener pastures of surrounding counties—a decision that would presumably turn on innumerable independent variables unrelated to the competing counties' comparative tax rates. Accordingly, just as it would be "exceedingly difficult to trace causation from the

5

Banks' predatory practices" to the local grocer's diminished profits, *Miami on Remand*, 923 F.3d at 1290, it would be impossible to trace a decline in the County's future tax revenues back to defendants' discriminatory practices with any reasonable degree of certainty.

In short, however inevitably defendants' FHA violations may have caused a decline in affected home values, and however precisely Hedonic regression analysis may be used to ascertain defendants' responsibility for that decline, there is nothing plausibly resembling a direct causal chain between defendants' misconduct and the far-reaching negative effects the County attributes to an increase in tax rates. The County's losses are instead a good illustration of the "ripples of harm" that undoubtedly flow to any number of participants in the local economy, but that are outside the reach of even the most generous interpretation of the proximate causation analysis that *City of Miami* requires.

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979), which the County cites as authority for its damages theory, is not to the contrary. As I explained in my decision on defendants' motion to dismiss, *Gladstone* held that the diminution of a municipality's "tax base" falls within the scope of injuries that can support Article III standing under the FHA. *Id*. at 110. *Gladstone* was not concerned with the question of proximate

6

causation, however, and while the Court observed that "[o]ther harms flowing from the realities of a racially segregated community are not unlikely," it offered no guidance on the types of injuries for which a municipality may recover money damages under the statute.

In short, nothing in *Gladstone*, *Miami on Remand*, or any other authority cited in the County's motion to reconsider or its supplemental submissions persuades me to revisit my conclusion that the County's tax losses are too remote to satisfy *City of Miami*'s standard for proximate causation. The County's motion for reconsideration is denied.

                                      **ENTER ORDER:**

                                      **Elaine E. Bucklo**
                              United States District Judge

Dated: December 19, 2019