# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| COUNTY OF COOK, | ) |
| Plaintiff, | ) ) ) ) |
| v. | ) ) |
| BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE BANK, FSB, COUNTRYWIDE WAREHOUSE LENDING, LLC, BAC HOME LOANS SERVICING, LP, MERRILL LYNCH & CO., INC., MERRILL LYNCH MORTGAGE CAPITAL INC., and MERRILL LYNCH MORTGAGE LENDING, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

Case No. 14-cv-2280

District Judge Elaine E. Bucklo

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. GARY LACEFIELD**

The Court should exclude the proffered expert testimony of Dr. Gary Lacefield under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). Dr. Lacefield's interrelated opinions are that Defendants discriminated against African American and Hispanic borrowers when originating and servicing mortgage loans. Under *Daubert*, the Court "must determine [i] whether the witness is qualified; [ii] whether the expert's methodology is scientifically reliable; and [iii] whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). Dr. Lacefield's proposed testimony fails all of these elements.

First, Dr. Lacefield's discrimination opinions are not scientifically reliable because they are based on an idiosyncratic methodology that is not consistent with any recognized manner of fair lending analysis of the type needed in this case. Dr. Lacefield admitted that no one else uses his self-invented set of supposed criteria for identifying loan risk, let alone lending discrimination, and that no one else uses his method of testing for discrimination without controlling for well-recognized confounding factors such as creditworthiness; all academics, peer journals, government agencies, and private companies (other than ones he has convinced to hire him) conduct fair lending analyses using a completely different approach. Thus, Dr. Lacefield's methodology is not "generally accepted," and his opinions are inadmissible. *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2010).

Second, Dr. Lacefield's testimony will not assist the trier of fact, because (i) he fails to compare borrowers who were similarly situated, a requirement both in the field of fair lending and under black letter law, and (ii) he made inexplicable decisions on what data he analyzed and how, such as by ascribing to Defendants loans he admits were likely made by other lenders. In a case where a question is whether *Defendants* made decisions that treated borrowers *differently*, these

1

opinions that *someone* made decisions that treated borrowers *who may not have been similar* differently are utterly unhelpful.

Third, Dr. Lacefield is unqualified to offer the opinions at issue, because they consist mainly of conclusions he draws from statistical analyses, but he admits he is neither a statistician nor an economist and has no other qualification to proffer his opinion.

Finally, Dr. Lacefield's personal opinions about the underlying factual circumstances of Defendants' alleged conduct must be excluded for the separate and additional reasons that they are incompetent and impermissible under Rule 702.

## ARGUMENT

### I. DR. LACEFIELD'S "METHOD" IS NOT RELIABLE.

A critical component of this Court's *Daubert* gatekeeper role is to ensure that an expert only presents opinions based on an accepted and reliable method. As such, the Seventh Circuit has held that expert testimony may not be based on a method that is used only by the expert and is not "generally accepted by anyone other than" the expert. *Allen*, 600 F.3d at 818. "[E]ven a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019).

Dr. Lacefield's self-created method, generally speaking, involves (i) looking at the loan data for a series of lending and servicing characteristics, which he calls "delimiters," that he identifies as hallmarks of "predatory" loans or servicing outcomes, then (ii) comparing the relative presence of those "delimiters" in the census-tract population of all White borrowers, on the one hand, to all African American and Hispanic borrowers, on the other hand, and (iii) designating every minority loan with a "delimiter" in that neighborhood as an instance of lending or servicing discrimination. Because Dr. Lacefield is the only person to use this method to draw a conclusion

of discrimination, his proposed testimony must be excluded under *Daubert*.

### A. Only Dr. Lacefield Uses His Invented "Delimiter" Method.

Dr. Lacefield's methodology of identifying borrowers who have been discriminated against solely based on whether a so-called "delimiter" was present in the borrower's loan or servicing history—without regard to other circumstances—has no grounding in the field of fair lending and is used by no one else. Ex. 1, Lacefield Rpt. ¶¶ 76-113, 135-143.[1] Dr. Lacefield described a "delimiter" as a "red flag" that "is based upon a critical . . . underwriting or servicing criteria." Ex. 19, Lacefield Tr. 142:13-144:4. Dr. Lacefield admitted that (1) he developed the list of "delimiters" himself (*id.* at 202:10-204:5); (2) delimiters are not explained in any written materials used by regulators, industry, or academics (*id.* at 203:23-204:1, 222:16-22); (3) he is the only person who uses his method to assess fair lending compliance (*id.* at 130:11-136:22); (4) no other regulator, lender, or financial institution since at least 1998 has used a method like his (*id.* at 134:8-136:22); and (5) he is not aware of a single peer-reviewed academic paper that supports, recommends, or even discusses such a method (*id.* at 134:23-135:7). All of the other experts in this case were unfamiliar with Dr. Lacefield's methodology. *See, e.g.*, Ex. 11, Courchane Rpt. ¶ 28 (Dr. Lacefield's "approach is unlike any other that I have seen used to assess fair lending issues, either by a government agency, a peer-reviewed academic paper, or an industry participant."); Ex. 12, Stedman Rpt. ¶¶ 17, 33, 38 (same). In fact, the *County's* own expert, Dr. Charles Cowan, had never even heard of the term "delimiter" used in the fair lending context, and testified that, to his knowledge, no federal regulator, academic, or court had ever used "delimiters" in the context of fair lending compliance testing. Ex. 20, Cowan Tr. 227:20-228:21.

Because Dr. Lacefield's self-invented "delimiter" method "is novel and unsupported by

---

[1] All exhibit references are to the exhibits attached to the accompanying Declaration of Benjamin Cox.

3

any article, text, study, scientific literature or scientific data produced by others in his field," it must be excluded under *Daubert*. *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002); *Lieberman v. Am. Dietetic Ass'n*, 1996 WL 521176, at *2 (N.D. Ill. Sept. 9, 1996) (Bucklo, J.) (excluding testimony where expert provided "no citations or even references to any authorities, peer-reviewed articles, or studies" to validate method).[2] It makes no difference that Dr. Lacefield has used his method before, as his own use does not render the method "generally accepted." *See Allen*, 600 F.3d at 818 (reliability of method cannot be established by reference to the expert's "own previous (and similarly unsupported)" use of that method); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term.").

The record also shows that Dr. Lacefield's "delimiters" are not used because they are not meaningful metrics for analyzing whether a borrower was discriminated against in the type of loan she obtained or in how her loan was serviced. Despite his admission that an "individual delimiter on its own may not indicate a discriminatory effect" (Ex. 17, Response to Spolin Rpt., at 1), Dr. Lacefield faulted every loan in which he identified any "delimiter" and a statistically significant disparity. Ex. 19, Lacefield Tr. 166:1-171:15. This included, for example, "Delimiter 1" for his loan origination test, which measures whether the loan amount was more than 2.5 times the borrower's income (Ex. 1, Lacefield Rpt. ¶ 92; Ex. 19, Lacefield Tr. 146:8-9) and which, Dr. Lacefield claims, suggests that the borrower "did not have the ability to repay" the loan (Ex. 19, Lacefield Tr. 143:22-144:22). But Dr. Lacefield admitted that if the "loan-to-value ratio was . . .

---

[2] *See also Groobert v. Pres. & Dirs. of Georgetown Coll.,* 219 F. Supp. 2d 1, 9 (D.C. Cir. 2002) (expert testimony is "unreliable when an expert choses to utilize her own unique methodology rather than the proper analysis which is well-known and respected"); *Schmaltz v. Norfolk & W. Ry. Co.*, 878 F. Supp. 1119, 1124 (N.D. Ill. 1995) (Bucklo, J.) (excluding expert testimony where experts knew of no documented cases or peer reviewed studies to support their opinions).

4

60 percent" such that the borrower had "40 percent equity . . . in that loan," then that loan is "probably not one that should be identified as inability to repay" notwithstanding Delimiter 1. *Id.* 144:23-146:3. Dr. Lacefield also admitted that numerous other factors would prevent Delimiter 1 from accurately identifying either discrimination or a "predatory" loan, including a positive credit history, a favorable debt-to-income ("DTI") ratio, or substantial reserve assets. *Id.* at 147:13-149:11; *see also* Ex. 13, Spolin Rpt. ¶¶ 54-55 (Delimiter 1 is unsupported and "not a relevant metric"); Ex. 21, HUD 4155.1 Ch. 4.C.3.c (HUD guidelines allow for maximum DTI of 43% and make no mention of Dr. Lacefield's Delimiter 1); Ex. 17, Response to Spolin Rpt., at 8 (conceding that delimiters are not "exact criteria for underwriting a loan").[3] In sum, Dr. Lacefield's idiosyncratic "delimiter" method is not accepted by anyone else (and hardly supported by his own testimony) because, among other things, it fails to reflect that lending decisions are properly, and must be, based on a totality of material factors, not each of his invented ones.

> **B. Only Dr. Lacefield Uses a Bivariate Approach that Does Not Control for Other Material Factors.**

Even apart from "delimiters," Dr. Lacefield's methodology is unique in that he simply compared all minority borrowers to all non-minority borrowers, without attempting to control for other relevant variables; this is called a "bivariate" analysis because it compares only two numbers.

The other experts in this case agree that the only method accepted in the field for assessing fair lending compliance is multivariate regression or another similarly complex analysis that allows the statistician "to correct for salient explanatory variables." Ex. 11, Courchane Rpt. ¶¶ 59-61 (multivariate regression is the method used by federal regulators and financial institutions); Ex.

---

[3] Dr. Lacefield's other delimiters are similarly novel, unsupported, and unhelpful. *See* Ex. 11, Courchane Rpt. App. 2, pp. 78-79 (problems with Dr. Lacefield's origination delimiters); *id.* at 83-85 (problems with Dr. Lacefield's servicing delimiters); Ex. 14, Bryar Rpt. ¶ 68 (problems with Dr. Lacefield's servicing delimiters); Ex. 13, Spolin Rpt. ¶¶ 53-56 (problems with Dr. Lacefield's origination delimiters).

12, Stedman Rpt. ¶ 35 (same, citing FFIEC guidelines); *see also* Ex. 22, Braunstein Statement, at 8 ("During a targeted pricing review, the Federal Reserve collects additional information . . . to determine whether any pricing disparity by race or ethnicity is fully attributable to legitimate factors . . ."). Indeed, Dr. Cowan, another County expert, determined that a multivariate regression was necessary in this case instead of Dr. Lacefield's bivariate method because a multivariate regression allows for an "apples-to-apples comparison." Ex. 20, Cowan Tr. 72:23-74:13. Dr. Cowan testified that "the problem" with Dr. Lacefield's approach of simply "comparing white borrowers to black borrowers" one variable at a time is that no consideration is given to alternative explanatory variables such as, for example, the fact that "on average the white borrowers historically have had higher credit scores than the black borrowers": "by doing a regression analysis, you remove the effect of credit scores [and other variables] so that you're doing an apples-to-apples comparison." *Id.* 74:1-13; *id.* 72:25-73:25 ("A multi-variant [sic] regression analysis is designed specifically to look at a difference that you may have that could be a function of a number of different variables; so credit score, debt-to-income ratio, loan value. So what you want to do is remove the impact of those variables from the analysis so that the only thing that's left is a study of the differences that you're trying to look at."). This principle is well-recognized in the caselaw as well. *E.g.*, *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 537-38 (7th Cir. 1998) (a valid "statistical study" must "correct for salient explanatory variables").

In short, Dr. Lacefield's use of a simplistic, bivariate analysis is also unique to him. This too requires the exclusion of his opinions under *Daubert*.

      **C.**    **Dr. Lacefield's Combination of His Unique Delimiter Method With His Unique Bivariate Method is Not Generally Accepted.**

Given that *only* Dr. Lacefield uses his self-invented delimiter methodology, and that he is also the *only* one who uses bivariate analysis to test for lending discrimination, it necessarily

6

follows that he is the *only* person who uses both of them together—which is just what he has done in this case. Because that resulting methodology indisputably is not "generally accepted by anyone other than" Dr. Lacefield himself, his testimony must be excluded. *Allen*, 600 F.3d at 818.

## II. DR. LACEFIELD'S METHOD IS INCAPABLE OF ASSESSING FAIR LENDING DISCRIMINATION.

It is enough for *Daubert* purposes that no one else uses Dr. Lacefield's methodology to test for discrimination. But there is also a related, though independent, ground for striking his opinions, which is that they are inherently unreliable for each of the three separate reasons discussed below.

### A. Dr. Lacefield's Method Does Not Compare "Similarly Situated" Borrowers.

Dr. Lacefield's method is deficient because he makes no attempt to compare similarly situated borrowers, which is both a requirement in the field of fair lending and a legal requirement mandated by the Seventh Circuit. Whether assessing disparate treatment or disparate impact, a discrimination claim requires proof that minority borrowers received different outcomes than *similarly situated* White borrowers. *See Chavez v. Illinois State Police*, 251 F.3d 612, 638 (7th Cir. 2001) (any "statistics proffered" as proof of discrimination "must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated"). This is not in dispute. Dr. Lacefield confirmed that every peer-reviewed article he is aware of says that statistical analysis of lending discrimination requires that the populations being compared be "similarly situated." Ex. 19, Lacefield Tr. 42:1-10; *see* Ex. 1, Lacefield Rpt. ¶ 55.

Statistical comparators are "similarly situated" when they are "directly comparable . . . in all material respects," *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 603 (7th Cir. 2020), and "similar enough to eliminate confounding variables," *Williams v. Bd. of Educ. of City of Chi.*, 982 F.3d 495, 505-06 (7th Cir. 2020). *See also McDonald v. Village of Winnetka,* 371 F.3d 992, 1002 (7th Cir. 2004) ("similarly situated individuals must be very similar indeed"). In the context of lending

7

discrimination, this means that the borrowers being compared "are equally creditworthy." *Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 715 (7th Cir. 1998); *see also Boykin v. Bank of Am. Corp.*, 162 F. App'x 837, 839 (11th Cir. 2005) (explaining that "comparator's credit qualifications and loan details must be nearly identical to the Plaintiff's").

Dr. Lacefield does not do this in any way. Instead, he measured disparities in the prevalence of his "delimiters" without assessing whether those disparities were caused by differences in DTI, LTV, credit score, or numerous other factors. Ex. 11, Courchane Rpt. ¶ 60; Ex. 12, Stedman Rpt. ¶¶ 41-45. This is an especially critical failure because Dr. Lacefield admitted that differences in origination outcomes might be explained by differences in creditworthiness. Ex. 19, Lacefield Tr. 144:23-149:11 (identifying DTI, LTV, positive credit history and other potential nondiscriminatory explanations for the Delimiter 1 disparity); *see also* Ex. 12, Stedman Rpt. ¶¶ 28-29, 42-44; Ex. 13, Spolin Rpt., ¶¶ 48-52; Ex. 11, Courchane Rpt. ¶¶ 20, 29. He similarly admitted that differences in foreclosure outcomes might be explained by differences in post-closing events. Ex. 19, Lacefield Tr. 463:7-464:12 (death, divorce, job loss and income reduction are potential nondiscriminatory explanations for observed disparity in foreclosures); *see also* Ex. 11*,* Courchane Rpt. ¶¶ 18-19, 51. And he admitted that differences in modification outcomes might be explained by differences in finances and qualifications. Ex. 19, Lacefield Tr. 362:18-363:18 (changed financial circumstances, divorce, additional debt and "pretty much anything you can imagine" are possible nondiscriminatory explanations for observed disparity in loan modification outcomes); *see also* Ex. 14, Bryar Rpt. ¶¶ 66-68; Ex. 11, Courchane Rpt. ¶¶ 29, 38.

Dr. Lacefield's opinions are unreliable where he concedes he "fail[ed] to correct for any potential explanatory variables. . . ." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997); *Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 461 (N.D. Ill. 2009) ("Although an expert

need not include all measurable variables . . . certain factors are crucial to statistical evidence"). This is not just a failure to meet industry standards (although it is certainly that); it is a failure to meet the legal standards that a trier of fact must assess in discrimination cases. *Id.*; *see also Janes v. Chicago Bd. of Educ.*, 2002 WL 31557619, at *8 (N.D. Ill. Nov. 18, 2002) ("significant likelihood that [expert's] statistical probability opinion will actually mislead the jury" because it "did not account for other factors that might have" explained the identified disparities); *State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*, 980 F. Supp. 2d 1031, 1038 (N.D. Ind. 2013) (same). While Dr. Lacefield was not necessarily required to "control for *every* conceivable variable," his "failure to control for *any* likely confounding variables" is plainly inadequate. *Forte v. Liquidnet Holdings, Inc.*, 2015 WL 5820976, at *7 (S.D.N.Y. Sept. 30, 2015) (emphasis added).

There is also a second, related failure with Dr. Lacefield's approach that one does not need to be a statistician to grasp: Dr. Lacefield compares borrowers from all years instead of comparing borrowers from the same year, or even the same decade. So, for example, there is a loan originated in 1976 that he compared against loans originated in 2009 and later. Ex. 11, Courchane Rpt. ¶¶ 30-37. It is a matter of common sense that a borrower taking out a loan during the Ford Administration cannot be viewed as similarly situated to a borrower taking out a loan during the Obama Administration. *See Purtue*, 963 F.3d at 603; *Williams*, 982 F.3d at 505; *McDonald,* 371 F.3d at 1002. Indeed, the other experts agree that interest rates, loan products, the lending environment, and innumerable other factors all changed significantly year to year, let alone decade to decade. Ex. 11, Courchane Rpt. ¶¶ 21-23, 30-38, 54-58; Ex. 12, Stedman Rpt. ¶¶ 28-29, 42-45.

**B.      Dr. Lacefield's Method Erroneously Includes Irrelevant Loans.**

A second, independent reason Dr. Lacefield's methodology is incapable of identifying lending discrimination is that he admits he includes in his analysis loans that should not have been

9

included. First, he inexplicably attributes origination misconduct to Defendants for tens of thousands of loans that he does not know if Defendants actually originated. Ex. 19, Lacefield Tr. 100:10-111:3 (regarding tens of thousands of loans for which the lender institution ID was not populated in the data: "I don't know that [Defendants] underwrote all of those loans or how many they did underwrite, *if any*") (emphasis added). Second, he identifies tens of thousands of borrowers of unknown race as victims of discrimination, even though many may have been *White* borrowers. Ex. 19, Lacefield Tr. 182:18-185:21 ("Q: [A] person could have ended up on the list even though they were white? A: Possibly, they could have"); Ex. 11, Courchane Rpt. ¶ 85.

Thus, his testimony does not even "fit" the County's case, and has more potential to mislead the jury than to educate. *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 344 (7th Cir. 1995) ("[T]he suggested scientific testimony must 'fit' the issue to which the expert is testifying."); *accord Poulter v. Cottrell, Inc.*, 2014 WL 5293595, at *4 (N.D. Ill. June 24, 2014).

### C. Dr. Lacefield's Method Is Incapable of Assessing Disparate Impact.

The third, independent reason why Dr. Lacefield's opinions are unhelpful for assessing disparate *impact* specifically is because he "failed to identify any specific [policy] responsible for the alleged disparate impact." *Bennett v. Nucor Corp.*, 656 F.3d 802, 817 (8th Cir. 2011) ("statistical evidence was inadequate" to support disparate impact claim where expert could not causally connect disparity to a "specific policy"); Ex. 12, Stedman Rpt. ¶ 35 (same).

Instead, Dr. Lacefield relied on vague, unwritten, or hypothetical policies such as "any policy that they had" for "incentivizing loan officers to make loans, especially bad loans" and "the policy of not giving everyone the opportunity to have a loan modification." Ex. 19, Lacefield Tr. 231:11-243:2; *see also City of Los Angeles v. Wells Fargo & Co.*, 2015 WL 4398858 at *8 (C.D. Cal. July 17, 2015) (recognizing that only actual policies are actionable in disparate impact case);

10

Ex. 12, Stedman Rpt. ¶¶ 34-37; 46-47 (industry-standard method for assessing disparate impact prohibits reliance on "hypothetical or generalized" policies). Without connecting any perceived disparity to an actual *policy*, his testimony cannot help the trier of fact in determining whether any disparity was caused by a specific policy, as the law requires. *See Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 424 (7th Cir. 2000) ("statistics standing alone could not prove causation; they could only show a relation"); *Poulter*, 2014 WL 5293595, at *4. In fact, Dr. Lacefield admitted that he did not make any attempt to differentiate between disparate treatment and disparate impact when identifying allegedly discriminatory loans. Ex. 19, Lacefield Tr. 119:16-23.

### III. DR. LACEFIELD'S OPINIONS ARE BASED ON STATISTICAL ANALYSIS HE IS NOT QUALIFIED TO OFFER.

At his deposition, Dr. Lacefield readily and unequivocally conceded that he is "absolutely not" an expert in statistics or economics. Ex. 19, Lacefield Tr. 24:20-25:3. Yet his opinions are based almost entirely on statistical analysis. The heart of his report is a lengthy section entitled "*Statistical Analysis* of Defendants' Mortgage Loan and Servicing Data. . . ." (Ex. 1, Original Rpt. ¶¶ 76-156 (emphasis added)), in which he presents statistical analysis regarding the prevalence of certain lending characteristics (the "delimiters") among groups of African American and Hispanic borrowers compared to non-Hispanic White borrowers, and concludes, on the basis of this analysis, that Defendants engaged in discriminatory conduct. *Id*.

Dr. Lacefield represents throughout his report that he performed these statistical tests himself. *See, e.g., id.* at ¶ 114 ("I tested . . ."), ¶ 129 ("I conducted . . ."). But he admitted at his deposition that this was not true. Ex. 19, Lacefield Tr., 52:22-24 ("I don't do the analysis myself, no. . . . I'm not an expert in doing the statistics."). In fact, Dr. Lacefield did not even supervise the statisticians at the consulting firm (Analytic Focus) who performed the statistical analysis because he was not qualified to do so. Ex. 19, Lacefield Tr. 55:5-6 ("Q: Did you supervise their

11

statistical work? A: No, because I'm not a statistician."); *see id.* at 282:22-284:14 ("Q: You could not develop a model to test those hypothesis statistically. You would need someone like Analytic Focus to do that? . . . A: Yes, that would be correct."). Once Dr. Lacefield received Analytic Focus's statistical analysis,[4] he made no attempt to independently determine whether the findings were statistically valid. *Id.* at 55:7-56:13. The only thing he personally did was give Analytic Focus the delimiters: "and then [] they do what they do . . . the statistics." *Id.* at 54:15-55:3.

On these facts, the statistical analysis presented by Dr. Lacefield—but developed and performed by Analytic Focus, without even his supervision—is inadmissible. *See Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 615 (7th Cir. 2002) (affirming exclusion of expert who offered opinion based on model developed by assistants); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664-66 (S.D.N.Y. 2007) (excluding statistical analysis as "nothing but conduit testimony" where expert did not perform the statistical modeling) (citing *Dura Auto.*).

Statistical modeling and analysis, both generally and specifically in the field of fair lending compliance testing, is complex. *See, e.g.*, Ex. 11, Courchane Rpt. ¶ 60; Ex. 12, Stedman Rpt. ¶ 27. When constructing a statistical model to assess fair lending compliance, "professional" and "technical judgment" (*see Dura Automotive*, 285 F.3d at 615) must be exercised in making myriad decisions: how to batch the data set for analysis (such as by year, product type, investor, and other factors) and which variables to control for. *See* Ex. 12, Stedman Rpt. ¶¶ 27-29 (factors impacting construction of a viable statistical model to assess fair lending compliance); Ex. 11, Courchane Rpt. ¶¶ 30-37, 59-61 (same). Regardless of whether Dr. Lacefield can "read the results" generated

---

[4] The full statistical results are in Dr. Lacefield's Appendices 3A (Ex. 4), 3B (Ex. 5), 3C (Ex. 6), and 5 (Ex. 8). Loans identified as discriminatory on the basis of these results are in Appendices 4 ("Predatory and Discriminatory Loans – Origination") (Ex. 7) and 6 ("Predatory and Discriminatory Loans – Servicing") (Ex. 9). All that Dr. Lacefield did to compile the list of loans identified in Appendices 4 and 6 was to combine spreadsheets with results generated by Analytic Focus. Ex. 19, Lacefield Tr. 285:11-288:9.

12

by a statistical model created by someone else (Ex. 19, Lacefield Tr. 52:11-13), he lacks "the necessary expertise to determine" whether the "techniques" employed by Analytic Focus to model fair lending compliance were "appropriately chosen and applied." *Dura Auto.*, 285 F.3d at 615.

Dr. Lacefield is not qualified to provide any basis for the Court to conclude that the statistical model and analysis itself is reliable, so all of the statistical analysis is inadmissible (as are the remainder of Dr. Lacefield's opinions, all of which derive from the statistical analysis). *Id.* ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science."); *see also Orthofix Inc. v. Lemanski*, 2015 WL 12990115, at *4 (E.D. Mich. Sept. 29, 2015) (excluding expert testimony that "relied on data compilations and summaries that were prepared by someone else").

**IV. DR. LACEFIELD'S OPINIONS ABOUT DEFENDANTS' ALLEGED PRACTICES ARE IMPROPER AND MUST BE EXCLUDED.**

Setting aside the invalid statistical analyses performed by others, the remainder of Dr. Lacefield's report consists of incendiary statements, general pronouncements of wrongdoing lacking factual basis, and legal conclusions. Ex. 1, Original Rpt. ¶¶ 4-29. He also offers a 66-page compiled appendix containing a combination of selective quotes and personal commentary about topics such as Defendants' "management philosophy," "predatory servicing practices" and how "Countrywide Ignored a Borrower's Ability to Repay a Loan." Ex. 10, App. 7 ¶¶ 8-14, 46, 58. All of these "opinions" should be struck as inadmissible.

Dr. Lacefield opines that Defendants acted "intentionally" and displayed "depraved indifference" and "callous disregard" toward minority borrowers, adding a series of conclusions that one or more Defendants committed predatory practices, discriminated, or took certain action or adopted certain policies which he appears to find objectionable or improper. Ex. 1, Original Rpt. ¶¶ 29, 159; *see also, e.g.*, Ex. 10, App. 7 ¶¶ 46, 48, 55. These types of opinions and associated

13

commentary are not helpful to the trier of fact nor the product of any recognized method, nor within the particular expertise of *any* "expert" witness. Certainly, Dr. Lacefield's "background gives him no expert insight into the motivations, intent, and state of mind of a corporation." *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at *24 (N.D. Ill. Mar. 31, 2017). Dr. Lacefield is "no more qualified than the jury" to draw such inferences. *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991).

In support of his opinions, Dr. Lacefield purports to rely on an assemblage of various unproven and unverified "facts" gleaned from public sources and case documents. *See generally* Ex. 3, App. 2; Ex. 10, App. 7. But he did nothing to verify these sources, and in almost all instances his statements are "supported" by a single citation that takes no account of other, related materials in the record, produced documents, and public domain. Ex. 19, Lacefield Tr. 250:13-265:10. Rather than "perform a meaningful review of [Defendants'] compliance programs and controls" (Ex. 12, Stedman Rpt. ¶ 49, *et seq.*), he instead blindly relies on things like uninformed declarations by disgruntled employees such as Mr. Winston (who has repeatedly attempted to sue his former employer, Countrywide), whom Dr. Lacefield has not attempted to interview (nor has he attempted to interview anyone else who worked at Bank of America or Countrywide to verify his allegations). *See*, *e.g.*, Ex. 10, App. 7 ¶¶ 42-60; Ex. 19, Lacefield Tr. 66:10-20, 260:22-265:10.

The public sources on which Dr. Lacefield relies do not support his opinions in any event. *See* Ex. 11, Courchane Rpt., 80 (Table A2.2 – Rebuttal to Dr. Lacefield's App. 7). He relies on data and allegations at the national level instead of data specific to Cook County. *See*, *e.g.*, Ex. 10, App. 7 ¶ 3 (relying on allegations in national settlement with DOJ); *see also* Ex. 12, Stedman Rpt. ¶ 71 n.108. He does not distinguish between his sources, improperly relying on statements from Countrywide employees to support his opinions against Bank of America, and statements

14

from government reports involving Bank of America to support opinions against Countrywide. *See generally* Ex. 10, App. 7; *see also* Ex. 11, Courchane Rpt. ¶ 41 n.25, ¶ 62 n.41. This "'kitchen sink' approach," whereby Dr. Lacefield compiles whatever he can find on the internet and fit within his preconceived notions about Defendants, is the very antithesis of a "coherent method of analysis." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 274 (7th Cir. 2004).

Dr. Lacefield has offered improper expert testimony in civil litigation before. *See Tavernini v. Bank of Am., N.A.*, 2013 WL 12045198, at *1 (E.D. Tex. June 18, 2013) (report included illicit "legal opinion" and "[h]is whole report is irrelevant."); *Cloward v. Aurora Loan Servs. LLC*, 2013 WL 12143968, at *2 (E.D. Tex. Apr. 3, 2013) (striking report that offered legal conclusions and did not adequately explain methodology); *Soufimanesh v. U.S. Bank, N.A.*, 2013 WL 12140950, at *2 (E.D. Tex. Apr. 3, 2013) ("All of Dr. Lacefield's testimony consists of legal conclusions."). This Court should exclude his personal opinion and legal testimony here as well.

### V. OPINIONS IN ALL OF DR. LACEFIELD'S REPORTS MUST BE EXCLUDED.

To be clear, the above-described defects in Dr. Lacefield's proffered testimony apply to all five of the reports he has submitted. His initial report (Ex. 1) contains essentially all of his opinions, while his four additional reports (Ex. 15-18), offered in "response" to reports from Defendants' experts, almost entirely duplicate his initial report, often word-for-word. *See* Ex. 19, Lacefield Tr. 62:1-8 (confirming that all of his opinions are in the five reports). Indeed, if the County were to contend that any of those response reports contain new opinions, those new opinions would be untimely and inadmissible for that further reason as well. *See, e.g., Procter & Gamble Co. v. McNeil-PPC, Inc.*, 615 F. Supp. 2d 832, 838 (W.D. Wis. 2009).

### CONCLUSION

For the foregoing reasons, the Court should grant this motion and exclude all testimony and expert reports of Dr. Gary Lacefield in connection with this litigation.

15

Dated: March 31, 2021

/s/ *Matthew S. Sheldon*

Matthew S. Sheldon
*MSheldon@goodwinlaw.com*
Thomas M. Hefferon
*THefferon@goodwinlaw.com*
Levi Swank (*pro hac vice*)
*LSwank@goodwinlaw.com*
GOODWIN PROCTER LLP
1900 N. Street, N.W.
Washington, DC 20036
Tel.: (202) 346-4000
Fax: (202) 346-4444

Yvonne Chan
*ychan@goodwinlaw.com*
Benjamin R. Cox (*pro hac vice*)
*bcox@goodwinlaw.com*
Courtney L. Hayden (*pro hac vice*)
*chayden@goodwinlaw.com*
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
Tel.: (617) 570-1000
Fax: (617) 523-1231

Ryan Dunigan
*RDunigan@winston.com*
Joseph Laurence Motto
*jmotto@winston.com*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel.: (312) 558-5600
Fax: (312) 558-5700

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2021, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

*/s/ Matthew S. Sheldon*
One of the attorneys for Defendants
