# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| COUNTY OF COOK,<br><br>                    Plaintiff,<br><br>    v.<br><br>BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE BANK, FSB, COUNTRYWIDE WAREHOUSE LENDING, LLC, BAC HOME LOANS SERVICING, LP, MERRILL LYNCH & CO., INC., MERRILL LYNCH MORTGAGE CAPITAL INC., AND MERRILL LYNCH MORTGAGE LENDING, INC.,<br><br>                    Defendants. | CIVIL ACTION No.: 1:14-cv-2280 |

**EXPERT REPORT OF CHARLES D. COWAN, PH.D.**

**November 9, 2020**

# Table of Contents

I.      Introduction ....................................................................................................................3

II.     Professional Qualifications and Compensation...............................................................4

   A.      Professional Experience ...........................................................................................5

   B.      Experience in Academia............................................................................................5

   C.      Publications ..............................................................................................................6

   D.      Professional Societies ..............................................................................................6

   E.      Compensation ..........................................................................................................6

III.    Comparisons of Foreclosure Rates, APR, and High-Risk Products .................................6

   A.      Loan Data Analyzed...................................................................................................6

   B.      Foreclosure data .................................................................................................... 10

   C.      Foreclosure rate comparison between White and Minority borrowers.......................... 11

   D.      Factors contributing to difference in foreclosure rates ........................................ 16

      i.      Analysis of APR, foreclosures, and discrimination............................................. 16

      ii.     Loan products and discrimination.................................................................... 20

IV.     Conclusions ................................................................................................................ 23

## I. Introduction

1.  I have been retained by Evangelista Worley LLC and Milberg Phillips Grossman LLP, counsel for Cook County ("Plaintiff") in this action against the Bank of America entities, including Countrywide and Merrill Lynch ("Defendants"). I was asked to evaluate whether Defendants (i) initiated foreclosures[1] on Minority borrowers at higher rates than on White borrowers; (ii) issued higher cost loans to Minority borrowers, and (iii) issued higher-risk products to Minority borrowers. These latter two factors are generally known to increase the probability of default for borrowers.

2.  Further, I was asked to quantify the costs incurred by the County, including prejudgment interest, on foreclosures on different groups of loans following different theories of damages. In this report, the "Cowan Liability Report", I address the first task. I address the second task in a separate report (the "Cowan Damages Report").

3.  Based on my analysis, it is my opinion that:

*   Defendants foreclosed on Minority loans at higher rates than on White loans, after controlling for factors associated with the credit-risk profile of the borrower.

*   Similarly, foreclosure rates are higher in neighborhoods with greater concentration of minorities, controlling for those same factors.

---

[1] For practical purposes, in this report I use the term "foreclosed" and "foreclosure" to refer to loans for which the foreclosure process was initiated, regardless of whether or not the foreclosure process was completed. I understand that these are the loans that are considered as the group of loans that generate injury to the Plaintiff.

- Defendants charged higher Annual Percentage Rates (APRs) to minority borrowers when compared to similarly situated White borrowers.

- In the same way, APRs are higher in neighborhoods with a greater concentration of minorities.

- Minority borrowers were issued higher-risk products at higher rates than similarly situated White borrowers.

- In like fashion, the proportion of higher-risk products is higher in neighborhoods with greater concentration of minorities.

4. This report summarizes analyses I conducted and the conclusions I developed based on these analyses. The materials on which I relied for purposes of this report are listed in Exhibit 3. I reserve the right to amend this report should new information become available to me.

## II. Professional Qualifications and Compensation

5. I have over forty years of experience in statistical research and design. I received my Bachelor of Arts degree in Economics from the University of Michigan, my Master of Arts degree in Economics from the University of Michigan, and my doctorate in Mathematical Statistics from the George Washington University. I currently consult for numerous public and private sector entities on the design, implementation, and evaluation of research, and the synthesis of statistical and sampling techniques for measurement. My professional experience and academic tenure are included in my curriculum vitae, a true and correct copy of which is attached as Exhibit 1.

A. Professional Experience

6. I have designed numerous large and complex research programs. These include the Post Enumeration Program for the U.S. Census Bureau to evaluate the Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation ("RTC"), and evaluation studies conducted for the Department of Justice, the Department of Defense, and the Department of the Treasury.

7. From January 2002 to the present, I have been a Member of Analytic Focus LLC. My firm provides analytic services in the public and private sectors. My firm has multiple projects with the federal government involving audits and other review services. The firm helps businesses and nonprofits optimize their operations and estimate the economic impact of their activities. Included in the firm offerings are expert witness and consulting services in litigation. A list of cases in which I have given expert testimony during the previous four years is attached as Exhibit 2.

B. Experience in Academia

8. I have taught graduate and undergraduate courses in sampling theory, statistics, and computational methods for analysis. I recently retired from my position as Professor in the School of Public Health at the University of Alabama at Birmingham.

9. I also served as an Associate Professor of Statistics at George Washington University from 1993 to 1998, and served as a Visiting Research Professor at the Survey Research Laboratory of the University of Illinois from 1983 to 1989.

### C. Publications

10. I have co-authored two books: one on evaluation of survey and census methods, and one on econometric measures related to the welfare of the U.S. economy.  I also have written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.  A listing of these publications is included at pages 4 to 7 of my curriculum vitae, attached as Exhibit 1.

### D. Professional Societies

11. I am a member of the American Statistical Association and have held memberships in other professional societies.  My positions on professional committees are listed at page 3 of my C.V., attached as Exhibit 1.

### E. Compensation

12. I am being compensated for my work on this engagement at the rate of $775 per hour for my time.  The payment of my fees is not contingent on the opinions I express in connection with this engagement.

## III. Comparisons of Foreclosure Rates, APR, and High-Risk Products

### A. Loan Data Analyzed

13. The population of concern for this analysis consisted of loans originated or purchased by Defendants.  Defendants provided multiple files containing information about loan and borrower characteristics which appear to have been prepared in

compliance with formats required by the Home Mortgage Disclosure Act (HMDA).[2]  The format of the data provided to me includes several codes lacking descriptions for categorical variables.  In those instances, I consulted the 2006 HMDA reporting guidelines to understand the codes used in the dataset.[3]  Across all of the files provided to me, there were a total of 365,854 loans, out of which 365,650 were considered.[4]  I refer to this dataset as the "Origination" dataset.

14. The Origination data includes information about race and ethnicity of the borrowers and co-borrowers for the loans.  HMDA allows mortgage lenders to report up to five racial designations and one ethnicity designation for each borrower and co-borrower, a total of 12 variables.  In order to conduct the analysis, I summarized the information from these 12 variables into one summary variable as follows:

a.      If any of the 12 variables indicated a race that is "Black," the loan is designated as a loan issued to a "Black" borrower;

b.      If the loan was not previously categorized as a loan to a "Black" borrower and if any of the 12 variables indicated an ethnicity of "Hispanic," the loan was designated as a loan to a "Hispanic" borrower;

c.      If the loan was not previously categorized as a loan to a "Black" or "Hispanic" borrower and if any of the 12 variables indicated any race that was not White

---

[2] See https://ffiec.cfpb.gov/.

[3] *See* "A Guide to HMDA Reporting: Getting It Right!" (Edition Effective Jan 1, 2006) at https://www.ffiec.gov/hmda/pdf/2006guide.pdf.

[4] 204 loans are excluded from this analysis because (a) originators are not related to the Defendant (e.g. Fleet Bank, Mobility Home Loans, Paragon Financial Mortgage, SA Mortgage Services, and SRC Mortgage) and/or (b) the loans may not be actually originated.  With regard to (b), loans with the following Action codes are excluded: 2 (application approved but not accepted), 3 (application denied), 4 (application withdrawn), and 5 (files closed for incompleteness).  Loans with action codes of "NA" were included to consider the possibility that some of those loan records with actions of NA could reflect originated or purchased loans that Defendants did not identify.

(e.g. Native Americans, Pacific Islanders, or Asian), the loan was designated as a loan to an "Other" minority borrower;

d.   If the loan was not previously categorized as a loan to a "Black", "Hispanic", or "Other" minority borrower and if any of the 12 variables indicated "White," the loan was designated as a loan made to a "White" borrower;

e.   If the loan was not previously categorized as a loan to a "Black", "Hispanic", "Other", or "White" borrower, the loan is designated as "Unknown."

15. Table 1 below reports the distribution of the new race/ethnicity designation. From the table we see that about 28.7% of the loans do not have any race/ethnicity information.

**Table 1: Distribution of loans by race/ethnicity designation assigned**

| Race/Ethnicity | Number of Loans | Proportion of Loans |
|----------------|-----------------|---------------------|
| White          | 156,500         | 42.8%               |
| Black          | 40,350          | 11.0%               |
| Hispanic       | 40,750          | 11.1%               |
| Others         | 23,144          | 6.3%                |
| Unknown        | 104,906         | 28.7%               |
| **Total**      | **365,650**     | **100.0%**          |

16. Because a very large portion of loans in the Origination data do not have race/ethnicity information, and because I was asked to evaluate differences observed for minority neighborhoods, I supplemented my data and analyses with demographic information about the concentration of minority population at the Census Tract level.[5]

---

[5] BoA file DEC_10_SF1_GCTPH1.CY07_with_ann Cook Cty Census Tracts AAA.xlsx contained this information. This is a file that was provided by counsel and which I understand was obtained from the Census Bureau and reflects data obtained in the 2010 Decennial Census.

The demographic data was merged with the Origination data using Census tract.[6] Table 2 below reports the distribution by minority concentration. Table 3 cross-tabulates loans by race/ethnicity and minority concentration.

**Table 2: Distribution of loans by tract minority concentration groups**

| Minority Concentration | Number of Loans | Proportion of Loans |
|---|---|---|
| < 30% | 127,912 | 35.0% |
| 31-50% | 76,593 | 20.9% |
| 51-70% | 50,864 | 13.9% |
| 71-90% | 40,572 | 11.1% |
| 91-100% | 64,265 | 17.6% |
| Unknown | 5,444 | 1.5% |
| **Total** | **365,650** | **100.0%** |

**Table 3: Distribution of loans by minority concentration and race/ethnicity**

| Minority Concentration | White | Black | Hispanic | Others | Unknown | Total |
|---|---|---|---|---|---|---|
| < 30% | 82,714 | 1,589 | 6,119 | 7,470 | 30,020 | **127,912** |
| 31-50% | 40,563 | 2,562 | 7,028 | 8,225 | 18,215 | **76,593** |
| 51-70% | 20,877 | 4,330 | 8,026 | 4,693 | 12,938 | **50,864** |
| 71-90% | 7,566 | 7,533 | 10,291 | 1,675 | 13,507 | **40,572** |
| 91-100% | 4,250 | 24,227 | 9,217 | 967 | 25,604 | **64,265** |
| Unknown | 530 | 109 | 69 | 114 | 4,622 | **5,444** |
| **Total** | **156,500** | **40,350** | **40,750** | **23,144** | **104,906** | **365,650** |

---

[6] If a loan does not have Census tract, I look up Census Tract from property address using the Geocoding website (https://geomap.ffiec.gov/FFIECGeocMap/GeocodeMap1.aspx). For about 1.5% of the loans, I was unable to identify the appropriate Census tract.

B. Foreclosure data

17. Foreclosure data was obtained from two sources. The first source was Defendant's data. Defendants provided several variables (foreclosure indicator,[7] foreclosure referral date, foreclosure sale date, and liquidation date[8]) that were indicative of loan entering the foreclosure process at some point.

18. To address potential deficiencies in the data provided by Defendants and to allow for the inclusion of foreclosures initiated by any other subsequent servicer for loans originated or acquired by Defendants, I supplemented the foreclosure data using a flag that was derived by matching name and addresses (or parcel), or court-case information to foreclosure cases in Cook County's Docket Database (second source). The loans that I could match through this process are referred to in the Cowan Damages Report as the Itemized Case Cost loans.

19. Table 4 below cross-tabulates the foreclosure indicators from the two sources. Note that 27,815 loans are found to be foreclosed in Cook County's database but not reported in the Defendant's loan data while 15,271 loans are reported as foreclosure in Defendant's data but are not found reported as foreclosures in the Cook County's

---

[7] The variable name in the original data is "forclflg".
[8] Once all sources of foreclosure data discussed in this section was considered, liquidation date added 3 loans to the count of foreclosures considered.

foreclosure data.  For my analyses, I designate loans as foreclosed if foreclosure is found in either of these two sources.[9]

**Table 4: Cross-tabulation of foreclosure sources**

| Foreclosure Flag | Not Found in County's Docket Database | Found in County's Docket Database (Itemized Case Cost loans) | Total |
|---|---|---|---|
| NO | 279,843 | 27,815 | 307,658 |
| YES | 15,271 | 42,721 | 57,992 |
| Total | 295,114 | 70,536 | 365,650 |

## C.  Foreclosure rate comparison between White and Minority borrowers

20. Using the combined foreclosure information obtained from the two sources, I summarize the foreclosure rate within race/ethnicity groups (See Table 5 below).  On average, loans provided to Black and Hispanic borrowers foreclosed at higher rates than loans provided to White borrowers.

21. For loans for which the race/ethnicity information is not available, I provide a breakdown by minority concentration.  For each of these subgroups, I also find that the foreclosure rates are higher than for loans in low minority concentration areas.  Table 6 compares foreclosure rates by areas with different minority concentrations.  In this table, the foreclosure rate increases with the percentage of minority in the area.

---

[9] Foreclosure that are found in the County database but not in the Defendants database could be the result of deficiencies in Defendant's data or the identification of foreclosures initiated by other entities which are not tracked by Defendants. Foreclosures that are found in the Defendants' database but not in the County's database could be the result of the imperfect matching between the two data sources.

**Table 5: Foreclosure rate by race/ethnicity**

| Race/Ethnicity | Foreclosure Rate | Difference from White in Percentage Points |
|---|---|---|
| White | 14.07% | |
| Black | **31.84%** | 17.77% |
| Hispanic | **31.04%** | 16.97% |
| Others | 13.41% | -0.65% |
| Unknown: | | |
|   < 30% | 22.35% | 8.28% |
|   31-50% | 26.53% | 12.46% |
|   51-70% | 32.58% | 18.51% |
|   71-90% | 40.90% | 26.84% |
|   91-100% | 42.79% | 28.73% |
|   unknown | 63.98% | 49.91% |
| Aggregate | 23.47% | |

**Table 6: Foreclosure rate by minority concentration group**

| Minority Concentration | Foreclosure Rate | Difference from the "<30%" Group in Percentage Points |
|---|---|---|
| < 30% | 14.12% | |
| 31-50% | 18.62% | 4.50% |
| 51-70% | 24.61% | 10.50% |
| 71-90% | 33.09% | 18.98% |
| 91-100% | 38.10% | 23.99% |
| Unknown | 56.14% | 42.02% |
| **Aggregate** | **23.47%** | |

**Chart 1: Foreclosure Rate as a Function of Minority Concentration**



22. One may argue that the difference in foreclosure rates could be driven by the difference in the credit quality. Chart 2 below shows that foreclosure rates in minority loans are consistently higher than foreclosure rates in White loans across FICO groups. The same is true with respect to minority concentration groups, where regardless of the FICO group, the foreclosure rates are higher for tracts with higher concentration of minority population (See Chart 3).

**Chart 2: Foreclosure rates by race/ethnicity and FICO Score**



**Chart 3: Foreclosure rates by minority concentration group and FICO Score**



23. Tables 5 and 6 and Charts 2 and 3 compare foreclosure rates without controlling for other influential factors, except FICO score. To control for other possible influences, I performed multivariate regression analyses. The variables used as control variables in the regression are variables that are typically used in the financial industry[10] to estimate the ability and willingness to repay loans: borrower FICO score, equity level (loan-to-value ratio), loan amount, loan purpose, loan lien, loan type (fixed, ARM, HELOAN, or HELOC), owner occupancy, income, and documentation. In addition to these variables, I add the race and minority concentration group indicators. Details of the regression analyses of foreclosure are provided in Appendix A.1.

24. The regression results confirm that on average minority borrowers foreclose at higher rates than White borrowers, even after controlling for other factors. The Black and Hispanic loan indicators have coefficients that are greater than the baseline (White loans) and are highly significant. After considering and holding constant other risk-related characteristics, being Black or Hispanic increases the probability of a loan being

---

[10] See, for example, Demyanyk, Yuliya, and Otto Van Hemert. "Understanding the Subprime Mortgage Crisis." The Review of Financial Studies, vol. 24, no. 6, 2011, pp. 1848–1880, 2009. "Moody's Approach to Rating US RMBS Using the MILAN Framework" at pages 16-17. Moody's Investor Services includes the similar variables when estimating the probability of default for individual loans when rating RMBS. These variables include: FICO score, combined-loan-to-value-ratio, original property value over US median, loan purpose, occupancy type, debt-to-income, ARM loan, and documentation. The methodology paper is available at https://www.moodys.com/researchdocumentcontentpage.aspx?docid=PBS_1201303.

foreclosed. Likewise, after controlling for other risk-related factors, the likelihood of getting foreclosed increases with the proportion of minority concentration groups.

### D. Factors contributing to difference in foreclosure rates

25. So far my analytical results indicate that minority borrowers tend to suffer foreclosure at higher rates than White borrowers. In my previous analyses I have addressed possible explanations for the foreclosure rate based on factors that are generally associated with the borrower.

26. However, of particular interest to the inquiry at hand are the factors controlled by lenders such as loan interest rates and fees, financial advice (i.e. recommendation for the most suitable products for the borrower), services (i.e. the ease of making payments, reaching out to customers early when they start to fall behind on payments), the willingness to work with borrowers if they are in hardship, etc. In this report, I was asked to examine two of these factors: Annual Percentage Rate ("APR") and loan products offered. In the following sections I address these two factors.

i. *Analysis of APR, foreclosures, and discrimination*

27. In mortgage markets, loan interest rates and fees are summed into a single measure, known as Annual Percentage Rate (APR). The APR is a measure of a loan's total cost. Intuitively, high loan costs means high mortgage payments, and the higher the mortgage payment, the more likely that the loan is to default and foreclose. Chart 4 below

confirms this intuition. For loans for which APR is available in the data,[11] I first sort the loans by APR and then divide them into four groups (also known as quartiles). Each group contains approximately 25% of the loans in the data.

28. The first group (1st Quartile) contains the loans with the lowest APRs. And the 4th group (4th Quartile) contains loans with the highest APRs. This exercise is performed separately for fixed-rate loans and ARM loans. As shown in the chart, the foreclosure rate increases as APR increases. And the pattern can be observed in both fixed-rate loans and ARM loans.

**Chart 4: Foreclosure rates by APR quantiles for Fixed and ARM loans**



---

[11] About 12% of the loans do not have APR values and some APR values can be as low as 0% and as high as 98%. To avoid influence from these outliers, in this analysis I exclude loans with APR values that are lower than the 0.05 percentile or greater than the 99.95 percentile of the distribution.

29. APR is set by lenders based on borrower characteristics and the market interest rate at the time.  In a fair lending market, APR should strictly be determined by market interest rate and lending risks.  The higher the lending risk, the higher the APR generally, since the interest increase is needed to offset the higher likelihood of foreclosure.

30. Chart 4 is a reflection of higher foreclosures for higher APRs charged, indicating that the APRs being computed are reasonable for the full group of borrowers.  However, the APR is a function of overall risk and not factors that by themselves would not increase the risk of default, like race or ethnicity.   It is unlawful to set APR differentially by borrower's race and ethnicity.

31. In this section, I test whether race and ethnicity has an influence on how the Defendant set APR after controlling for market interest rate and risk factors.  I perform multivariate linear regression analyses in which the variable to be explained is APR adjusted for (that is, minus the) prime interest[12] rate at origination.[13]

32. Variables representing risk factors in my regressions include borrower's credit score, the size of the down payment (loan-to-value ratio), lien status, owner occupancy,

---

[12] The prime interest rate used here was downloaded from: https://fred.stlouisfed.org/series/PRIME.

[13] Multivariate linear regression has been used in academic literature to explore discrimination in mortgage pricing. For example, see Bayer, Ferreira, and Ross (2018) at 182 which uses this method to demonstrate that minorities are more likely to have high cost loans than whites. The control for similar characteristics including: loan amount, income, loan-to-value-ratio, credit score, debt-to-income, race, and ethnicity variables.  Antinolfi, Gaetano and Brunetti, Celso and Im, Jay, Mortgage Rates and Credit Risk: Evidence from Mortgage Pools (December 2, 2016).  Justiniano, Alejandro and Primiceri, Giorgio E. and Tambalotti, Andrea, The Mortgage Rate Conundrum (2017-11-01). FRB of NY Staff Report No. 829.

the ability to provide full documentation, the size of the loan, loan type (fixed, ARM, Home Equity loans), purpose (purchase or refinance), and income.[14]

33. The regression results (presented in Appendix B) indicate that race/ethnicity plays a significant role in determining loan APR.  Even after controlling for market interest rate and risk factors, loans provided to minority borrowers are charged higher APRs than loans provided to White borrowers.

34. As seen in Appendix A.2, the regression coefficient for Black borrowers is 0.251, which means that on average, Black borrowers pay APRs that are 0.251% higher than those charged to White borrowers with similar characteristics.  Similarly, the coefficient for Hispanic is 0.195 indicating that, on average, Hispanic borrowers pay APRs that are 0.195% higher than those charged to White borrowers with similar characteristics.

35. The results also hold when I compare the areas with different level of minority concentration.  The areas with less than 30% minority serves as base for comparison.  As reported in Appendix A.2, the coefficient for the areas with 31-50% minority is 0.014 indicating that on average borrowers in these areas pay 0.014% higher APRs than borrowers with similar characteristics but who live in areas with less than 30% minority.

36. I find that APR differentials increase as the minority concentration increase.  For the areas with 91-100% minority concentration, borrowers on average pay APRs that are

---

[14] These variables are the same as those used in the previous analysis of foreclosure rates. As noted earlier, these variables (or those similar in nature) are also used by Moody's Investors Services when estimating the risk of individual loans in RMBS. Moody's, *supra* note 10.

0.348% higher than borrowers with similar characteristics but who live in areas with less than 30% minority concentration.

ii.    *Loan products and discrimination*

37. Next I investigate loan products offered to the borrowers.  In a typical lending market, banks are required to provide full information about loan products and advise customers to select the best products that are suitable to their circumstances.  If banks serve all customers fairly, all borrowers should have equal access to loan information.  There is no reason for why one group of borrowers would tend to pick a risky product more often than the other group.  Consequently, in this section I test whether the tendency for a borrower to receive a risky mortgage loan product from the Defendants is the same across race/ethnicity groups.

38. For this exercise, I need to identify risky products.  Although the academic literature suggests some loan features that would make products risky (for example, Interest-Only, Balloon Payment, etc.), variables representing these features are not directly available in the Defendants' data.  Although some keywords can be extracted from the product names, there is no guarantee that the product names perfectly describe the product features. Thus, rather than identifying risky products from the product names, I determine risky products empirically.

39. For each product in the dataset, I estimate the foreclosure rate for each product category.  I then assign a product that has a foreclosure rate that exceeds 30% to be

considered a risky product.  The 30% value for a foreclosure rate is exceptionally high relative to a more common benchmark of 10% for a high foreclosure rate.  I choose 30% because it still demonstrates the point I am making about minority groups having very high foreclosure rates and steering while avoiding any argument that foreclosures were high during the financial crisis.  To avoid the criticism that I recycle the foreclosure-minority relation, the foreclosure rates by product are estimated from loans to White borrowers only.[15]

40. In addition, to obtain reliable estimates, I exclude loan products that have less than 30 loans from this analysis.[16]  As a result, there are 207 loan products in this analysis, 48 of which have foreclosure rate exceeding 30% and are designated (by me) as risky products.[17]  This loan product classification is merged back to the loan dataset in order to estimate the proportion of borrowers that are offered risky products.

41. Table 7 below compares the proportion of loans made by lending via a risky product by race/ethnicity.  Approximately 11% of White borrowers obtain loans that are based on risky loan products.  In contrast, the proportion of risky loan products is 21.5% for Black borrowers and 22.5% for Hispanic borrowers.

---

[15] Previously I show that foreclosure rates are higher for minority borrower than for White borrowers. If the foreclosure rates by product are estimated from all loans, it is likely that the products with high foreclosure rate are dominated by minority loans.  Therefore, any correlation between risky product and minority shown would not provide new insights (but will still be valid).

[16] Approximately 1.6% of the loans are excluded.

[17] The full loan dataset contains 770 loan products.

42. I conclude that there is a greater tendency for Defendants' minority borrowers to receive riskier mortgage loan products than white borrowers. Similarly, I find that the relative frequency of risky loan products is higher in high minority concentration areas, as shown in the table below.

**Table 7: Proportion of risky-products used by race/ethnicity**

| Race/Ethnicity | Proportion of loans that are originated using high risk loan products |
|---|---|
| White | 11.0% |
| Black | **21.5%** |
| Hispanic | **22.5%** |
| Others | 9.6% |
| Unknown | 26.1% |

**Table 8: Proportion of risky-products used by minority group concentration**

| Minority Concentration | Proportion of loans that are originated using high risk loan products |
|---|---|
| < 30% | 11.2% |
| 31-50% | 14.3% |
| 51-70% | 18.2% |
| 71-90% | 24.2% |
| 91-100% | 28.8% |
| unknown | 13.8% |

43. Of course, borrower characteristics may influence the decision to select a high-risk product. Thus, I repeat this analysis using a logistic regression to control for borrower characteristics. The regression results (reported in Appendix A.3) are consistent with my

results above: risky products are disproportionately offered to minority groups and in minority neighborhoods even after controlling for borrower characteristics.

44. Even after controlling for borrower characteristics, I conclude that the lenders were more likely to steer Black and Hispanic minority borrowers toward riskier mortgage loan products than white borrowers were steered toward those products.

## IV. Conclusions

45. My conclusions are as follows, based on the analyses presented in earlier sections.

   a. Foreclosure rates are exceptionally high (greater than 30%) for Blacks and Hispanics.

   b. After accounting for credit score, a factor that usually is considered in loan origination, an analysis shows that the foreclosure rates for Blacks and Hispanics are significantly higher than rates for non-minorities.

   c. Even after accounting for numerous factors, including credit score, that are typically considered in loan origination, an analysis shows that the foreclosure rates for Blacks and Hispanics are significantly higher than rates for non-minorities.

   d. In the same way, the cost of a loan summarized in the Annual Percentage Rate (APR) is higher for Blacks and Hispanics than for non-minorities.

e.  Again, accounting for numerous factors, including credit score, that are typically considered in loan origination, an analysis shows that APR rates for Blacks and Hispanics are significantly higher than rates for non-minorities.

f.  Blacks and Hispanics also were steered into higher risk loan products than non-minorities.

g.  Even after holding constant numerous other factors typically considered in loan origination and in the choice of loan products, Blacks and Hispanics were steered into higher risk loan products than non-minorities at significantly higher rates.

November 9, 2020
San Antonio, TX

_____
Charles D. Cowan, Ph.D.

# Exhibit 1

# CHARLES D. COWAN, Ph.D.
ANALYTIC FOCUS LLC



## KEY QUALIFICATIONS

Charles D. Cowan is Managing Partner of ANALYTIC FOCUS LLC.  Dr. Cowan has 40 years of experience in statistical research and design.  He consults for numerous public and private sector entities on the design, implementation, and evaluation of research and the synthesis of statistical and sampling techniques for measurement.

Dr. Cowan has designed some of the largest and most complex research programs conducted by the Federal Government, including the Post Enumeration Program conducted by the Bureau of the Census to evaluate the 1980 Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation in 1990-95, and many evaluation studies conducted for the Justice Department, the Department of Defense, the Department of Housing and Urban Development, and the Treasury Department.  He has provided expert advice to corporations and government agencies on the incorporation of complex research designs in demographic and economic measurement problems, including:

- Development of procedures used by the Resolution Trust Corporation and the FDIC for determination of the value of all assets held by the RTC\FDIC taken from failed banks and S&Ls.   Results from this research were used in quarterly reports to Congress on the loss to the American taxpayer that resulted from these failures.  These estimates of anticipated recoveries on assets were also used by the RTC and FDIC for financial reporting.

- Establishment of audit and sampling methods to determine the completeness and reliability of reporting and record systems.   These procedures were used to both expand and streamline bank examinations for safety and soundness and also compliance measurement for the FDIC.    These sampling techniques are applied in the audit of Federal agencies concerned with regulatory review of operations and systems, and related systems for banks, regulatory agencies, and law firms;

- Application of econometric and biometric procedures for measurement of credit risk in large portfolios of loans.  These models are frequently used for a variety of purposes within financial institutions, such as the pricing of loans, the management of customers long term, decision making on workouts for delinquent loans, and for establishment of economic and regulatory reserves.

- Evaluation of research conducted for the Department of Defense, for the National Institutes of Health, and for the Department of Agriculture, each in response to Congressional inquiries on the validity of published results, and also for defendants in lawsuits involving evidence proffered by plaintiffs in furtherance of their suit.

- Model fitting and development of projection methods to measure the likelihood of loss or errors in recording in loans held by banks or put up for auction; measurement of the likelihood of fraud and/or noncompliance in systems, including bank holding companies, trading activities for brokers, and systems for compliance with health department and judicial requirements;

- Development of procedures used by the Bureau of the Census for apportionment of population for revenue sharing purposes and the estimation of the undercount in the Decennial Census of Population and Housing. These procedures include application of capture-recapture methods to measure the size of the undercount in the decennial census, use of network sampling as an alternative measure for population size, and measurement of the reliability of data collected in the Census.

- Development of statistical methods to quantify the size of populations, including nomadic populations for the Census of Somalia, the undercount and overcount in the Census of Egypt, the number of missing children in Chicago, IL, and the number of homeless persons and families needing services in several large cities with transient populations.

Dr. Cowan teaches graduate and undergraduate courses in survey methods, statistics, and computer methods for analysis. He is the co-author of two books, one on evaluation of survey and census methods and one on econometric measures related to the welfare of the U.S. economy. He has written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.

Prior to cofounding ANALYTIC FOCUS LLC, Dr. Cowan was a Director with ARPC and with Price Waterhouse, where he specialized in financial research and audit sampling. From 1991 to 1996, Dr. Cowan was the Chief Statistician for the Resolution Trust Corporation and the Federal Deposit Insurance Corporation, where he designed research necessary to measure the loss from the Savings & Loan Crisis of the late 1980's. Dr. Cowan also served as the Chief Statistician for the U.S. Department of Education, where he designed large-scale surveys of educational institutions to measure resource needs and availability, and for Opinion Research Corporation, where he designed predictive models of demand for automobile manufacturers, banks, and large horizontally diverse firms like GE and AT&T. Dr. Cowan worked for the U.S. Bureau of the Census, where he was the Chief of the Survey Design Branch and developed many of the techniques in use today for the evaluation of coverage in surveys and censuses.

## EDUCATION

Ph.D., Mathematical Statistics, The George Washington University, 1984
M.A., Economics, The University of Michigan, 1973
B.A., English and B.A., Economics, The University of Michigan, 1972

## PROFESSIONAL EXPERIENCE

Co-Founder, ANALYTIC FOCUS LLC, January, 2002 to present.

Director, ARPC, November, 1999 to December, 2001.

Director, PricewaterhouseCoopers LLP, January 1997 to November, 1999.

Chief Statistician, Federal Deposit Insurance Corporation / RTC, 1991 to 1996.

Chief Statistician, Opinion Research Corporation, 1989 to 1991.

Chief Statistician, National Center for Education Statistics, US Dept. of Education, 1986 to 1989.

Bureau of the Census: Assistant Division Chief, International Statistical Programs Center, 1984 to 1986; Staff Liaison for Statistical Litigation Support, 1983 to 1984; Chief, Survey Design Branch, Statistical Methods Division, 1978 to 1983; Acting Chief, Survey Analysis and Evaluation Branch, Demographic Surveys Division, 1976 to 1978; Office of the Chief, Statistical Research Division, 1975 to 1976

Survey Research Center, Oregon State University: Manager, 1974 to 1975

Institute for Social Research, U. of Michigan: Assistant Study Director, 1972 to 1974.

## PROFESSIONAL ASSOCIATIONS

Professor, Statistics, University of Alabama – Birmingham, 2002-2020.  Retired.
Associate Professor, Statistics, George Washington University, 1993 - 1998.
Visiting Research Professor, Survey Research Laboratory, U. of Illinois, 1983 - 1989.
Consultant, Dept. of Community Psychiatry, Johns Hopkins U., July 1985 - Dec 1987.

## PROFESSIONAL SOCIETIES – MEMBERSHIPS

American Statistical Association (ASA)

## PROFESSIONAL SOCIETIES - POSITIONS

President, Research Industry Coalition, 1999-2000
Council Member, Research Industry Coalition, Representative from ASA, 1995-2000
President, Washington/Baltimore Chapter of AAPOR, 1998
Program Chair, American Association for Public Opinion Research, 1991-1992
Program Chair, Section on Survey Research Methods, ASA, 1989-90
Secretary-Treasurer, AAPOR, 1985-1986
Associate Secretary-Treasurer, AAPOR, 1984-1985
Editorial Board, Public Opinion Quarterly, 1980-1984
Editorial Board, Marketing Research, 1989-2000
Chair, Conference Committee, AAPOR, 1982-1989
Chair, Committee on Privacy and Confidentiality, ASA, 1980-1981

## PUBLICATIONS

Strumpel, Burkhard; Cowan, Charles; Juster, F. Thomas; and Schmiedeskamp, Jay; editors, <u>Surveys of Consumers 1972-73, Contributions to Behavioral Economics</u>, Ann Arbor: The Institute for Social Research, 1975.

Duncan, Greg, and Cowan, Charles D., "Labor Market Discrimination and Nonpecuniary Work Rewards" in <u>Surveys of Consumers 1972-73, Contributions to Behavioral Economics</u>, Ann Arbor: The Institute for Social Research, 1975.

Curtin, Richard T. and Cowan, Charles D. "Public Attitudes Toward Fiscal Progress" in <u>Surveys of Consumers 1972-73, Contributions to Behavioral Economics</u>, Ann Arbor: The Institute for Social Research, 1975.

Goldfield, Edwin D.; Turner, Anthony G.; Cowan, Charles D.; Scott, John C., "Privacy and Confidentiality as Factors in Survey Response" in <u>Public Data Use</u>, Vol. 6, No 4, July 1978.

Cowan, Charles D., and Spoeri, Randall K., "Statistical Distance Measures and Test Site Selection: Some Considerations", <u>Proceedings of the Computer Science and Statistics: Eleventh Annual Symposium on the Interface, 1978</u>.

Bushery, John R., Cowan, Charles D., and Murphy, Linda R., "Experiments in Telephone-Personal Visit Surveys", <u>Proceedings of the Amer. Stat. Assoc., Sect. on Survey Research Methods, 1978</u>.

Spoeri, Randall K., and Cowan, Charles D., "On the Use of Distance Measures in Test Site Selection: A Practical Application Using Census Data", <u>Proceedings of the American Statistical Association, Section on Business and Economic Statistics, 1978</u>.

Cowan, Charles D.; Murphy, Linda R.; Wiener, Judy, US Bureau of the Census, "Effects of Supplemental Questions on Victimization Estimates from the National Crime Survey" in <u>Proceedings of the</u> <u>American Statistical Association, Sect. on Survey Research Methods</u>, 1978.

Bateman, David V.; Cowan, Charles D., US Bureau of the Census, "Plans for the 1980 Census Coverage Evaluation" in <u>Proceedings of the American Statistical Association, Section on Survey Research Methods</u>, 1979.

Hogan, Howard, and Cowan, Charles D., "Imputations, Response Errors, and Matching in Dual System Estimation", <u>Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980</u>.

Schwartz, Sidney H., Cowan, Charles D., and Sausman, Kenneth R., "Optimization in the Design of a Large-Scale State Sample", <u>Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980</u>.

Cowan, Charles D., "Modifications to Capture-Recapture Estimation in the Presence of Errors in the Data" presented at the meetings of the American Statistical Association, Biometrics Section, 1982 (no proceedings).

Fay, Robert; Cowan, Charles, US Bureau of the Census, "Missing Data Problems in Coverage Evaluation Studies" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1983.

Cowan, Charles D.; Fay, Robert E., "Estimates of Undercount in the 1980 Census" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D. "Interviews and Interviewing", The Social Science Encyclopedia, Routledge and Kegan Paul, Publishers, The Netherlands, 1984.

Wei, L. J. and Cowan, Charles D. "Selection Bias", Encyclopedia of Statistical Science, John Wiley and Sons, New York, N.Y., 1984.

Cowan, Charles D. and Malec, Donald J. "Capture-Recapture Models When Both Sources Have Clustered Observations", Journal of the American Statistical Association, June 1986, Vol. 81, # 394, pp. 347-353, and Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D., The Effects of Misclassification on Estimates from Capture-Recapture Studies. Unpublished doctoral dissertation, The George Washington University, September 1984.

Sudman, Seymour; Cowan, Charles D., "Questionnaire Design Activities in Government Statistics Offices" in Special Issue on Questionnaire Design, Jour. of Official Statistics, Vol. 1, No. 2, 1985.

Cowan, Charles D. "Misclassification of Categorical Data", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1985.

Cowan, Charles D., Biemer, Paul P., Magnani, Robert J., and Turner, Anthony G., Evaluating Censuses of Population and Housing, Statistical Training Document, ISP-TR-5, U.S. Department of Commerce, Bureau of the Census, 1985.

Cowan, Charles D., Turner, Anthony G., and Stanecki, Karen "Design of the Somali Post Enumeration Survey (1986-1987)", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

Cowan, Charles D. and Malec, Donald J. "Sample Allocation for a Multistage, Multilevel, Multivariate Survey", <u>Proceedings of the Fourth Annual Research Conference (ARC IV)</u>, U.S. Bureau of the Census, 1988.

Frey, Carolin M., McMillen, Marilyn M., Cowan, Charles D., Horm, John W., and Kessler, Larry G.. "Representativeness of the Surveillance, Epidemiology, and End Results Program Data: Recent Trends in Mortality Rates", <u>Journal of the National Cancer Institute</u>, Vol. 84, # 11, June 3, 1992.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless, A Review" in <u>Homelessness, Health, and Human Needs</u>. Institute of Medicine, National Academy Press, National Academy of Sciences, Washington, D.C., 1988.

Cowan, Charles D., "Standards for Statistical Surveys in the Federal Government: Practices in the Center for Education Statistics", <u>Proceedings of the American Statistical Association, Section on Survey Methods Research, 1988</u>.

Sudman, Seymour, Sirken, Monroe G., and Cowan, Charles D., "Sampling Rare and Elusive Populations", <u>Science</u>, Vol. 240, pp. 991-996, May 20, 1988.

Cowan, Charles D., "Mall Intercepts and Clinical Trials: The Philosophy of Inference from Different Types of Research Designs" in <u>Marketing Research: A Magazine of Management & Applications</u>, Vol. 1, No. 1, March 1989.

Cowan, Charles D., "Mall Intercepts: Principles of Design for Research" in <u>Proceedings of the Seventh Annual Advertising Research Foundation Research Quality Workshop</u>, Sept. 1989.

Cowan, Charles D., "Estimating Census and Survey Undercounts Through Multiple Service Contacts" in <u>Housing Policy Debate: Counting the Homeless: The Methodologies, Policies, and Social Significance Behind the Numbers</u>, Volume 2, Issue 3, pp. 869-882, 1991.

Cowan, Charles D., "Ratio vs. Regression Estimators in a Large Scale Survey of S&L's" in <u>Proceedings of the Section on Survey Research Methods, American Statistical Assoc., 1992.</u>

Cowan, Charles D., "A Longitudinal Survey and Reality Check for the Value of Financial Assets" in <u>Proceedings of Statistics Canada Symposium 92: Design and Analysis of Longitudinal Surveys</u>, November 1992.

Cowan, Charles D., and Wittes, Janet, "Intercept Studies, Clinical Trials, and Cluster Experiments: To Whom Can We Extrapolate?" in <u>Controlled Clinical Trials</u>, Vol.15, pp.24-29, 1994.

Cowan, Charles D.; Klena, Mathew J., Resolution Trust Corp, "Allocation of Proceeds from Bulk Auctions to Individual Assets" in <u>Proceedings of the American Statistical Association, Section on Business and Economic Statistics</u>, 1995.

Cowan, Charles D. "Statistical Sampling as a Management Tool in Banking" in <u>FDIC Banking Review</u>, 1997, Vol. 10, No. 1.

Cowan, Charles D., "Coverage, Sample Design, and Weighting in Three Federal Surveys" in <u>Journal of Drug Issues</u>, October 2001.

Cowan, Charles D., "Use of Mass Appraisals in Toxic Tort Litigation Involving Loss of Value" in <u>Proceedings of the International Association of Assessment Officers</u>, October 2002.

Cowan, Adrian M. and Cowan, Charles D., "Default Correlation: An Empirical Investigation of a Subprime Lender", <u>The Journal of Banking and Finance</u>, March 2004.

Cowan, Charles D. and Cowan, Adrian M., "A Survey Based Assessment of Financial Institution Use of Credit Scoring for Small Business Lending", <u>SBA Report 283</u>, Nov. 2006

Keith, Scott W., Wang, Chenxi, Fontaine, Kevin R., Cowan, Charles D. and Allison, David B. "Body Mass Index and Headache Among Women: Results From 11 Epidemiologic Datasets", <u>Obesity</u>, Volume 16, Issue 2 (February 2008) 16: 377-383; doi:10.1038/oby.2007.32

Cowan, Adrian M. and Cowan, Charles D., "The Dynamics of Credit Quality and Implications for the Pricing of Small Business Loans", <u>The International Journal of Banking and Finance</u>, 2007/08 (March) Vol. 5. Number 2:2008: 31-60

Brock, David W., Thomas, Olivia, Cowan, Charles D., Hunter, Gary R., Gaesser, Glenn A., and Allison, David B., "Association between Physical Inactivity and Prevalence of Obesity in the United States", <u>Journal of Physical Activity and Health</u>, January, 2009

Cowan, Adrian M. and Cowan, Charles D., Disparate Impact Analyses: Relevant Numbers, Relevant Populations (August 3, 2009). Available at SSRN: https://ssrn.com/abstract=1443560 or http://dx.doi.org/10.2139/ssrn.1443560

Cowan, Charles D., "Use of Statistical Analysis to Measure Damages", in <u>Comprehensive Guide to Economic Damages, Fourth Edition</u>, Business Valuation Resources, LLC, Portland, ME, April, 2016. Revised and republished in Fifth Edition, 2018.

Cowan, Charles D., "Qui Custodiat Custodiens?", <u>International In-House Counsel Journal</u>, Cambridge, England, October 20.

Exhibit 2

Past Testimony, Charles D. Cowan

**Financial:**

Homeward Residential as Master Servicer for Option One Mortgage Loan Trust 2006-2 v. Sand Canyon Corporation, f/k/a Option One Mortgage Corporation. Worked for plaintiff.  Deposed in January 2015; deposed again in September 2015; hearing, June 2017.

Western Southern Life Insurance Company v. Bank of New York Mellon. Worked for plaintiff. Deposition, January 2016.  Testified at trial, January 2017.

MBIA v Credit Suisse. Worked for plaintiff.  Deposed in January 2016.  Trial in July 2019.

FHFA v. RBS.  Worked for plaintiff.  Deposed in October 2016.

Mass Mutual v. Credit Suisse First Boston Mortgage Securities Corp. et al. Worked for plaintiff. Deposed in November 2016.  Trial in August 2017.

FDIC as Receiver for Colonial Bank v. Credit Suisse First Boston Mortgage Securities Corp.; Credit Suisse Management LLC; Credit Suisse Securities (USA) LLC; First Horizon Asset Securities, Inc.; First Horizon Home Loan Corporation; FTN Financial Securities Corp.; and HSBC Securities (USA) Inc.; FDIC as Receiver for Receiver for Colonial Bank v RBS Securities Inc. Worked for plaintiff. Deposed in March 2017.

Mass Mutual v. Goldman Sachs et al.. Worked for plaintiff.  Deposed in May 2017.

CUNA v. Morgan Stanley.  Worked for plaintiff.  Deposed in May 2017.

CUNA v. Credit Suisse.  Worked for plaintiff.  Deposed in July 2017.  Deposed on rebuttal report, September 2017.

FHLB – Chicago v. Morgan Stanley.  Worked for plaintiff.  Deposed in October 2017.

FDIC as Receiver for Guaranty Bank v RBS Securities Inc. Worked for plaintiff.   Deposed in November 2017.

People of the State of California v Morgan Stanley et al., Worked for plaintiff.  Deposed in January 2018.

FDIC as Receiver for Receiver for Guaranty Bank v Goldman, Sachs & Co. and Deutsche Bank Securities. Worked for plaintiff.  Deposed in January 2018.

Christopher S. Porrino, Attorney General of New Jersey on behalf of Amy G. Kopleton, Deputy Chief of the New Jersey Bureau of Securities, v.  Credit Suisse Securities (USA) LLC, Credit Suisse

First Boston Mortgage Securities Corp., and DLJ Mortgage Capital, Inc., Worked for plaintiff. Deposed in November 2018.

Federal Home Loan Bank of Boston v. Nomura; Federal Home Loan Bank of Boston v. Credit Suisse Securities (USA) LLC, Credit Suisse First Boston Mortgage Securities Corp.,. Worked for plaintiff. Deposed in January 2019, day 1, February 2019, day 2.

Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc. and Morgan Stanley Mortgage Capital Holdings LLC, as successor to Morgan Stanley Mortgage Capital Inc., Worked for plaintiff. Deposed in May 2019.

AMBAC Assurance Corporation et al v. First Franklin et al. Worked for plaintiff. Deposed in December 2019.

**Financial - non RMBS**
In Re Riddell Concussion Reduction Litigation. Worked for plaintiff. Deposed Jan. 2017.

IPOX Schuster, LLC v. Nikko Asset Worked for defendants. Deposed in July 2017.

Charles Baird and Lauren Slayton, as individuals, and on behalf of all others similarly situated, and on behalf of the BlackRock Retirement Savings Plan v. BlackRock Institutional Trust Company, N.A.; BlackRock, Inc.; The BlackRock, Inc. Retirement Committee; The Investment Committee of the Retirement Committee; The Administrative Committee of the Retirement Committee; The Management Development & Compensation Committee, Catherine Bolz, Chip Castille, Paige Dickow, Daniel A. Dunay, Jeffrey A. Smith; Anne Ackerley, Amy Engel, Nancy Everett, Joseph Feliciani Jr., Ann Marie Petach, Michael Fredericks, Corin Frost, Daniel Gamba, Kevin Holt, Chris Jones, Philippe Matsumoto, John Perlowski, Andy Phillips, Kurt Schansinger, Tom Skrobe; Kathleen Nedl, Marc Comerchero, Joel Davies, John Davis, Milan Lint, Laraine McKinnon, and Mercer Investment Consulting. Worked for plaintiffs. Deposed in May 2019.

**Disparate Impact \ Discrimination:**
River Cross Land Company, LLC v. Seminole County, FL. Worked for plaintiff. Deposition, October 2019.

**Construction Defects:**
Abad v. Western Pacific Housing. Worked for defense. Deposition, October 2016.

Stanton v. Richmond American Homes of Nevada Inc. Worked for defense. Deposition, October 2016.

Park et al. v. Meritage Homes. Worked for defense. Deposition, December 2017.

Vizcayne North Condominium Association, Inc. v W.G. Yates & Sons Construction Company, et al. (also South Condominium Association and Master). Worked for defense.  Deposition, February 2017.

Donald Melosh, et al. v. Western Pacific Housing, Inc., JAMS Case No.: 1100091610, Construction Defects.  Worked for defense. Deposition, March, 2020.

**Other Cases:**
Estate of Evan Press v Northport Health Services of Arkansas, LLC and NHS Management, LLC. Wrongful Injury Suit in Alabama.  Worked for defendants.  Deposition, July 2017.

Pudlowski v. St. Louis Rams.  Worked for plaintiff.  Deposed in September 2017.  Deposed again in October 2018.

Elena Tyurina v. Urbana Tahoe TC LLC, Urbana Tahoe Beverage Company, LLC dba Beach Retreat and Lodge Tahoe, and Action Motorsports of Tahoe, Inc.  Worked for Defendant.  Deposition, April 2018.

In Re: Dicamba Herbicides Litigation.  Product Defect case.  Worked for plaintiffs.  Deposition, March 2019.

Otter Products et al, v. Phone Rehab et al.   Deceptive Sales. Worked for plaintiff.  Deposed in November 2019.

Thomas Allegra et al v. Luxottica Retail North America.  Worked for plaintiff.  Deposed in December 2019.

Westgate Resorts v. Reid Hein & Associates, dba Timeshare Exit Team.  Tortious Interference case.  Worked for plaintiffs.  Deposition, March 2020.

Charles Copley et al Bactolac Pharmaceutical, Inc. et al.  Worked for Plaintiffs, Deposed August 2020.

Mildred Clemmons et al v. Samsung Electronics of America, Inc.  Worked for plaintiffs. Deposed in October 2020.

Exhibit 3

# Exhibit 3: Materials Relied On

**Complaint**

1. Cook v BOA - Second Amended Complaint, dated July 7th, 2017.

**Data provided by Defendants**

1. BANA0000720958
2. BANACC0000148420-CONFIDENTIAL
3. BANACC0000156105 CONFIDENTIAL-1
4. BANACC0000156106 CONFIDENTIAL
5. BANACC0000156107 CONFIDENTIAL
6. BANACC0000156110 CONFIDENTIAL
7. BANACC0000156112 CONFIDENTIAL
8. BANACC0000156114 CONFIDENTIAL
9. BANACC0000156115 CONFIDENTIAL
10. BANACC0000156116 CONFIDENTIAL
11. BANACC0000244943 CONFIDENTIAL
12. BANACC0000633677

**Research Articles**

1. Demyanyk, Yuliya, and Otto Van Hemert. "Understanding the Subprime Mortgage Crisis." The Review of Financial Studies, vol. 24, no. 6, 2011, pp. 1848–1880, 2009.
2. Moody's Approach to Rating US RMBS Using the MILAN Framework" at pages 16-17.
3. Bayer, P., Ferreira, F., & Ross, S. L. (2018). What drives racial and ethnic differences in high-cost mortgages? The role of high-risk lenders. The Review of Financial Studies, 31(1), 175-205.
4. Antinolfi, Gaetano and Brunetti, Celso and Im, Jay, Mortgage Rates and Credit Risk: Evidence from Mortgage Pools (December 2, 2016).
5. Justiniano, Alejandro and Primiceri, Giorgio E. and Tambalotti, Andrea, The Mortgage Rate Conundrum (2017-11-01). FRB of NY Staff Report No. 829.

**Other Documents**

1. Appendix 2 of the Cowan Liability Report ("FC_Found_verified_loan-cases").
2. BoA file DEC_10_SF1_GCTPH1.CY07_with_ann Cook Cty Census Tracts AAA_AF Revised.xlsx.
3. Loan program recode 01132020.

**Other Resources**

1. Prime interest rate downloaded from https://fred.stlouisfed.org/series/PRIME
2. "A Guide to HMDA Reporting: Getting It Right!" (Edition Effective Jan 1, 2006) at https://www.ffiec.gov/hmda/pdf/2006guide.pdf.

**Other Reports**

1. Expert Report of Charles D. Cowan, Ph.D. on Cost Calculations, dated November 9, 2020, including appendices and materials.

# APPENDIX A

**Appendix A:  Regression Results**

The following list of explanatory variables are used in the regressions.

- Indicator variables represent Race/Ethnicity (RACE): Black, Hispanic, Other, and Unknown.  White is the baseline.
- Indicator variables represent percentage minority at Census Tract level (CONC): 31-50%, 51-70%, 71-90%, 91-100%, and Unknown.  Census Tract with concentration of <30% is the baseline.
- Borrower Credit Score.  If borrower credit score is not available, lower than 300, or greater than 850, I flag it by using Borrower Credit Score missing dummy variable.
- Combined loan-to-value ratio (CLTV).  Extreme outliers (lower than the 0.05 percentile or higher than 99.95 percentile of the distribution) are removed. If CLTV is missing, I flag it by CLTV missing dummy variable.
- Loan Amount (in log form). Extreme outliers (lower than the 0.05 percentile or higher than 99.95 percentile of the distribution) are removed. If Loan Amount is missing, I flag it by Loan Amount missing dummy variable.
- Borrower Income (in log form).  Extreme outliers (lower than the 0.05 percentile or higher than 99.95 percentile of the distribution) are removed. If Borrower Income is missing, I flag it by Borrower Income missing dummy variable.
- Indicators represents Loan Purpose.
- Indicators represent Lien.[1]
- Indicators represent Occupancy status.
- Indicators represent Documentation type.
- Indicators represent loan type: Fixed, ARM, HELOAN, and HELOC, and unknown. ARM is the benchmark.

**1.  Foreclosure Regression.**

The Dependent variable is foreclosure indicator (Yes or No).

**Logistic Regression Results**

| | *Dependent variable:* | |
|---|---|---|
| | Foreclosure (Yes/No) | |
| | (1) | (2) |

---

[1] To obtain information on the lien of for the loans I supplement the lien variable provided in the data from Defendants with information that can be extracted from the loan program designation in the variable "loanprogname" and a re-categorized version of this variable provided by another expert in this case, Dr. Gary Lacefield (See "Loan program recode 01132020.xlsx"). I also use this file to supplement information when identifying indicators of loan type.

| | | |
|---|---|---|
| Race: Black | 0.340*** | |
| | (0.015) | |
| Race: Hispanic | 0.578*** | |
| | (0.014) | |
| Race: Other | -0.003 | |
| | (0.022) | |
| Race: Unknown | 0.414*** | |
| | (0.014) | |
| Minority Concentration: 31-50% | | 0.198*** |
| | | (0.014) |
| Minority Concentration: 51-70% | | 0.415*** |
| | | (0.015) |
| Minority Concentration: 51-90% | | 0.623*** |
| | | (0.015) |
| Minority Concentration: 91-100% | | 0.725*** |
| | | (0.014) |
| Minority Concentration: Unknown | | 0.594*** |
| | | (0.041) |
| FICO Score | -0.008*** | -0.007*** |
| | (0.0001) | (0.0001) |
| FICO Score missing | -4.576*** | -4.327*** |
| | (0.054) | (0.054) |
| CLTV | 0.027*** | 0.025*** |
| | (0.0003) | (0.0003) |
| CLTV missing | 0.782*** | 0.717*** |
| | (0.054) | (0.054) |
| (ln) Loan Amount | 0.014 | 0.093*** |
| | (0.009) | (0.009) |
| Loan Amount missing | 1.751*** | 2.053*** |
| | (0.097) | (0.098) |
| (ln) Borrower Income | -0.171*** | -0.144*** |
| | (0.010) | (0.010) |
| Borrower Income missing | -0.425*** | -0.265*** |
| | (0.045) | (0.044) |
| Purpose: Home Improvement | -0.152*** | -0.179*** |
| | (0.033) | (0.033) |
| Purpose: Refinance | 0.021** | 0.008 |
| | (0.010) | (0.010) |
| Purpose: Unknown | -2.352*** | -2.298*** |
| | (0.110) | (0.113) |
| Lien: Second | -0.272*** | -0.162*** |
| | (0.021) | (0.021) |
| Lien: Unknown | -0.366*** | -0.354*** |

|  |  |  |
|---|---|---|
|  | (0.011) | (0.011) |
| Owner Occupied | -0.317*** | -0.246*** |
|  | (0.017) | (0.018) |
| Unknown Occupancy Status | -0.547*** | -0.434*** |
|  | (0.085) | (0.087) |
| Full Documentation | -0.209*** | -0.219*** |
|  | (0.010) | (0.010) |
| Unknown Documentation | -6.132*** | -6.328*** |
|  | (0.168) | (0.170) |
| Type: Fixed Rate | 0.135*** | 0.117*** |
|  | (0.012) | (0.012) |
| Type: HELOAN | 0.770*** | 0.907*** |
|  | (0.022) | (0.022) |
| Type: HELOC | 1.943*** | 2.071*** |
|  | (0.135) | (0.135) |
| Type: Unknown | 5.476*** | 5.567*** |
|  | (0.114) | (0.118) |
| Constant | 1.669*** | 0.910*** |
|  | (0.165) | (0.167) |
| Period Dummies | Yes | Yes |
| Observations | 365,650 | 365,650 |
| Log Likelihood | -158,429.600 | -157,776.900 |
| Akaike Inf. Crit. | 316,965.300 | 315,661.800 |

*Note:* *p<0.1; **p<0.05; ***p<0.01

## 2. APR regression

The dependent variable is APR subtracted by the prevailing prime interest rate at origination. Prime interest rate data can be downloaded from Federal Reserve Bank of St. Louis website (https://fred.stlouisfed.org/series/PRIME). To avoid influence from outliers, I do not use loans that have APR values lower than the 0.05 percentile or greater than the 99.95 percentile of the APR distribution in this analyses.

<b>Linear Regression Results</b>

| | *Dependent variable:* | |
|---|---|---|
| | APR minus Prime Rate | |
| | (1) | (2) |
| Race: Black | 0.251*** | |
| | (0.007) | |
| Race: Hispanic | 0.195*** | |
| | (0.007) | |
| Race: Other | -0.122*** | |
| | (0.009) | |
| Race: Unknown | -0.059*** | |
| | (0.007) | |
| Minority Concentration: 31-50% | | 0.014** |
| | | (0.006) |
| Minority Concentration: 51-70% | | 0.079*** |
| | | (0.007) |
| Minority Concentration: 51-90% | | 0.221*** |
| | | (0.007) |
| Minority Concentration: 91-100% | | 0.348*** |
| | | (0.007) |
| Minority Concentration: Unknown | | -0.042** |
| | | (0.018) |
| FICO Score | -0.006*** | -0.006*** |
| | (0.00004) | (0.00004) |
| FICO Score missing | -3.711*** | -3.669*** |
| | (0.026) | (0.026) |
| CLTV | 0.010*** | 0.010*** |
| | (0.0001) | (0.0001) |
| CLTV missing | 0.072*** | 0.038 |
| | (0.025) | (0.025) |
| (ln) Loan Amount | -0.387*** | -0.352*** |

|  |  |  |
|---|---|---|
|  | (0.004) | (0.004) |
| Loan Amount missing | -0.737*** | -0.576*** |
|  | (0.045) | (0.045) |
| (ln) Borrower Income | 0.046*** | 0.045*** |
|  | (0.004) | (0.004) |
| Borrower Income missing | 0.034* | -0.052*** |
|  | (0.019) | (0.019) |
| Purpose: Home Improvement | -0.021 | -0.019 |
|  | (0.015) | (0.015) |
| Purpose: Refinance | -0.114*** | -0.123*** |
|  | (0.005) | (0.005) |
| Purpose: Unknown | -0.160*** | -0.186*** |
|  | (0.027) | (0.027) |
| Lien: Second | 1.060*** | 1.100*** |
|  | (0.011) | (0.011) |
| Lien: Unknown | -0.233*** | -0.212*** |
|  | (0.005) | (0.005) |
| Owner Occupied | -0.106*** | -0.066*** |
|  | (0.008) | (0.008) |
| Unknown Occupancy Status | -0.040 | -0.029 |
|  | (0.035) | (0.035) |
| Full Documentation | 0.169*** | 0.147*** |
|  | (0.005) | (0.005) |
| Unknown Documentation | 0.103*** | 0.172*** |
|  | (0.028) | (0.028) |
| Type: Fixed Rate | 0.019*** | 0.021*** |
|  | (0.006) | (0.006) |
| Type: HELOAN | 1.159*** | 1.159*** |
|  | (0.011) | (0.011) |
| Type: HELOC | -1.373*** | -1.384*** |
|  | (0.066) | (0.066) |
| Type: Unknown | -0.431*** | -0.441*** |
|  | (0.026) | (0.026) |
| Constant | 6.145*** | 5.780*** |
|  | (0.075) | (0.075) |
| Period Dummies | Yes | Yes |
| Observations | 307,736 | 307,736 |
| $R^2$ | 0.518 | 0.519 |
| Adjusted $R^2$ | 0.518 | 0.519 |
| Residual Std. Error | 1.131 (df = 307683) | 1.130 (df = 307682) |

| | | |
|---|---|---|
| F Statistic | 6,361.559*** (df = 52; 307683) | 6,271.236*** (df = 53; 307682) |

*Note:* *p<0.1; **p<0.05; ***p<0.01

### 3. Risky Loan Program regression

The dependent variable is an indicator for risky loan programs. To determine risky loan programs, I first estimate the foreclosure rate by loan program. I then flag the loan program with ex-post foreclosure rate greater than 30% as risky loan programs.

**Logit Regression Results**

| | *Dependent variable:* | |
|---|---|---|
| | Risky Loan Programs | |
| | (1) | (2) |
| Race: Black | 0.056*** | |
| | (0.018) | |
| Race: Hispanic | 0.522*** | |
| | (0.017) | |
| Race: Other | -0.060** | |
| | (0.027) | |
| Race: Unknown | 0.450*** | |
| | (0.018) | |
| Minority Concentration: 31-50% | | 0.050*** |
| | | (0.017) |
| Minority Concentration: 51-70% | | 0.089*** |
| | | (0.018) |
| Minority Concentration: 51-90% | | 0.213*** |
| | | (0.019) |
| Minority Concentration: 91-100% | | 0.264*** |
| | | (0.017) |
| Minority Concentration: Unknown | | -0.363*** |
| | | (0.065) |
| FICO Score | -0.007*** | -0.007*** |
| | (0.0001) | (0.0001) |
| FICO Score missing | -4.875*** | -4.763*** |
| | (0.067) | (0.066) |
| CLTV | 0.034*** | 0.034*** |
| | (0.0004) | (0.0004) |
| CLTV missing | -1.793*** | -1.776*** |
| | (0.148) | (0.149) |
| (ln) Loan Amount | -1.131*** | -1.135*** |

| | | |
|---|---|---|
| | (0.010) | (0.010) |
| Loan Amount missing | -3.783*** | -3.895*** |
| | (0.141) | (0.140) |
| (ln) Borrower Income | 0.603*** | 0.616*** |
| | (0.013) | (0.013) |
| Borrower Income missing | 2.959*** | 3.189*** |
| | (0.060) | (0.058) |
| Purpose: Home Improvement | -0.023 | -0.042 |
| | (0.037) | (0.037) |
| Purpose: Refinance | 0.107*** | 0.104*** |
| | (0.012) | (0.012) |
| Purpose: Unknown | -2.677*** | -2.511*** |
| | (0.128) | (0.131) |
| Lien: Second | -2.344*** | -2.294*** |
| | (0.028) | (0.028) |
| Lien: Unknown | -0.003 | 0.012 |
| | (0.013) | (0.013) |
| Owner Occupied | 0.299*** | 0.339*** |
| | (0.022) | (0.022) |
| Unknown Occupancy Status | 2.098*** | 2.130*** |
| | (0.122) | (0.120) |
| Full Documentation | -0.191*** | -0.214*** |
| | (0.012) | (0.012) |
| Unknown Documentation | -0.824*** | -0.880*** |
| | (0.235) | (0.235) |
| Constant | -1.941*** | -1.930*** |
| | (0.595) | (0.595) |
| Period Dummies | Yes | Yes |
| Observations | 342,499 | 342,499 |
| Log Likelihood | -105,185.000 | -105,717.400 |
| Akaike Inf. Crit. | 210,468.000 | 211,534.800 |

*Note:* *p<0.1; **p<0.05; ***p<0.01