# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| COUNTY OF COOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BANK OF AMERICA CORPORATION, | ) | Case No. 14-cv-2280 |
| BANK OF AMERICA, N.A., | ) | |
| COUNTRYWIDE FINANCIAL | ) | District Judge Elaine E. Bucklo |
| CORPORATION, | ) | |
| COUNTRYWIDE HOME LOANS, INC., | ) | |
| COUNTRYWIDE BANK, FSB, | ) | |
| COUNTRYWIDE WAREHOUSE LENDING, | ) | |
| LLC, BAC HOME LOANS SERVICING, LP, | ) | |
| MERRILL LYNCH & CO., INC., MERRILL | ) | |
| LYNCH MORTGAGE CAPITAL INC., and | ) | |
| MERRILL LYNCH MORTGAGE LENDING, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE DR. CHARLES COWAN'S COST TABULATIONS**

The Court should exclude the cost tabulations of the County's proffered expert witness, Charles Cowan, Ph.D. under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1] Dr. Cowan purported "to perform a tabulation of costs to the County for activities associated with foreclosures that the County processed for subsets of loans indicated by counsel." Ex. 1 ¶ 10.[2] He did so by applying estimates of certain categories of alleged foreclosure costs developed by County employees to four alternative loan population "scenarios" specified to him by the County's counsel. For multiple separate and independent reasons, his tabulation opinions are inadmissible under *Daubert*.

First, the Court should exclude all of Dr. Cowan's cost tabulations because Dr. Cowan did not conduct any of the analysis underlying his opinions. Rather, he relied upon County employees (none of whom have been designated as experts) to estimate foreclosure processing costs. Those cost estimates involved far more than reviewing County records to identify the amount spent on a particular service—the employees exercised judgment as to which of the County's costs to allocate to foreclosure processing and then how to allocate those costs to Defendants. Dr. Cowan simply acted as a conduit for the opinions of non-expert County employees: he does not offer any opinions as to the reasonableness, accuracy, or reliability of those estimates, nor does he offer opinions on the County's instructions on how to apply the cost estimates to the loans identified by counsel.

Second, the cost estimates that Dr. Cowan blindly relied on in developing his tabulations are based on unreliable assumptions and methodologies. The estimate of costs for the Clerk of Court Chancery Division (Cost 1) for processing foreclosure cases is based on the unsupported assumption that the cost of each court action directly correlates with the number of docket entries

---

[1] Dr. Cowan submitted two expert reports in this matter. This motion concerns his Cost Calculation Report. Defendants are separately moving to exclude the liability opinions that are the subject of his other report.

[2] All exhibit references are to the exhibits attached to the accompanying Declaration of Benjamin Cox.

1

in that action, and also includes costs that are unrelated to foreclosure cases. This Court knows full well that not all docket entries require similar amounts of work. The sheer number of docket entries may be the only method the County's counsel could think of to attribute costs to individual cases, but it is not a reliable or valid one. The methodology used to estimate the costs for providing security for court hearings (Cost 6) and motion filings (Cost 7) is also plainly unreliable because it has yielded estimates that exceed the total court security budget by a wide margin.

Finally, the loan population "scenarios" to which Dr. Cowan heedlessly applied the County employees' cost estimates are likewise the product of unreliable methodologies and will not assist the finder of fact. Two of those loan populations include thousands of loans that the County's own experts have not identified as discriminatory, including loans to White borrowers. And for each of the four scenarios, Dr. Cowan included thousands of loans that did not even end in foreclosure, which is an essential predicate to the County's sole remaining damages claim.

## SUMMARY OF DR. COWAN'S PROFFERED COST TABULATIONS

Counsel for the County specified to Dr. Cowan four different (but partially overlapping) loan population "scenarios":

1. Count I Cost Calculation: Loans identified by Dr. Gary Lacefield as discriminatory in origination and servicing.

2. Count II Cost Calculation: Loans identified by Dr. Lacefield as discriminatory in origination or servicing.

3. Count II-Alternative Cost Calculation: All loans (including loans to White borrowers) in neighborhoods with a high concentration of minority borrowers.

4. Count III Cost Calculation: All loans made to minority borrowers.

For each of these scenarios, Dr. Cowan purported to identify which of the specified loans had gone into foreclosure and hence should be included in his tabulation. In doing so, Dr. Cowan included both: (a) loans that he purported to match to foreclosures in the County's records ("Itemized Case

Cost Loans"), and (b) loans that he could not match to such foreclosures but that he speculated may have entered foreclosure anyway ("Estimated Case Cost Loans").

Counsel for the County also provided Dr. Cowan with estimates developed by County employees relating to seven categories of supposed foreclosure-related costs: (1) Foreclosure Docket Activity (Clerk of Court Chancery Division); (2) Foreclosure Case Proceeding (Chief Judge); (3) Eviction (Sheriff); (4) Fuel Charge (Sheriff); (5) Depreciation Charge (Sheriff); (6) Courtroom Security – Hearing (Sheriff); and (7) Courtroom Security – Filing (Sheriff). Relying without question or confirmation on those cost estimates, Dr. Cowan then tabulated the total costs supposedly attributable to Defendants for each of these seven specified cost categories for each of the four specified loan populations scenarios.

**ARGUMENT**

The Court employs "a three-step analysis before admitting expert testimony." *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). "It must determine [i] whether the witness is qualified; [ii] whether the expert's methodology is scientifically reliable; and [iii] whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* The proponent of an expert's testimony bears the burden to establish by a preponderance of the evidence that the testimony is admissible. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

**I.     DR. COWAN'S COST TABULATIONS ARE INHERENTLY UNRELIABLE BECAUSE THEY ARE BASED ON THE METHODOLOGIES AND JUDGMENTS OF NON-EXPERT COUNTY EMPLOYEES.**

As an initial matter, all of Dr. Cowan's cost opinions should be excluded because he did not perform any of the underlying analysis. Rather, he simply "tabulate[d]" the costs that were determined by County employees. He accepted the employees' cost estimates without question

3

and applied (again, without question) the County's specified methodologies. The problem, however, is that the cost estimates and allocation methodologies involved expert judgments made not by Dr. Cowan, but by the County's non-expert employees. For example, Richard Abrams estimated costs for the Chancery Division by allocating costs from the County's budget to the Chancery Division based upon the assumption that every docket entry in the Circuit Court results in the same cost to the Clerk's Office. *See* Ex. 2 (cost estimate). Darren Ganir estimated costs for the Sheriff based on a "model" he created from a two-phase study involving interviews of court security personnel and time trials he designed. Ex. 3 at 6-10 (interrogatory responses); Ex. 4, Ganir Tr. 65:3-66:22; Ex. 5 (cost estimate). Jim Anderson arrived at costs for the Chief Judge by estimating (based on the judgment of another employee) the percentage of time each employee dedicated to mortgage foreclosure cases and multiplying that percentage by the employee's salary. *See, e.g.*, Ex. 6 (cost estimate). All of these judgments were based on the "specialized knowledge" of County employees; the County's municipal government expert even called Messrs. Ganir, Abrams, and Anderson the County's "employee-expert[s]." Ex. 7, Hildreth Rpt. ¶ 20.

Dr. Cowan played no role in these expert judgments (nor would he be qualified to do so). Instead, he "assume[d] that the cost calculations and instructions on how to apply them . . . are accurate," and did "not provide an opinion about the methodologies used for calculating the costs or for deriving the rules to apply the costs." Ex. 1, Cowan Cost Rpt. ¶ 39; Ex. 21, Cowan II Tr. 30:2-19; 71:2-20 ("I relied on a lot of numbers being provided because I'm not an expert in any of these things. . . . I'm not going to offer an opinion about somebody else's input given that I didn't have an opportunity to review [them]. . . . I simply don't have an opinion because it's completely outside of my area of expertise."). But an expert witness cannot present opinions based on the analysis and judgment of others who were not offered as experts and whose analysis he made no

4

attempt to verify. For example, in *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 615 (7th Cir. 2002), the Seventh Circuit affirmed exclusion of an expert whose opinions were based on a model, developed by his assistants, which included "a host of discretionary expert judgments," as the expert did not "determine whether the techniques were appropriately chosen and applied." Likewise, in *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, the court excluded an expert's loss calculation because his "theory and the precise number of additional workers and shifts needed came from the [party's] employees, on whom [the expert] uncritically relied." 387 F. Supp. 2d 794, 807 (N.D. Ill. 2005), *amended*, 2005 WL 8178971 (N.D. Ill. Sept. 8, 2005).

Thus, where Dr. Cowan's tabulations are based entirely on the discretionary judgments of County employees, such that he is merely a "'mouthpiece' for [] non-testifying expert[s]," those tabulations must be excluded. *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 657 (N.D. Ill. 2006); *see also Auto Indus. Supplier Emp. Stock Ownership Plan v. Ford Motor Co.*, 435 F. App'x 430, 456 (6th Cir. 2011) (expert's "acceptance of other's work and incorporating it into a report simply does not meet the reliability component necessary for expert testimony").

## II. DR. COWAN'S COST TABULATION FOR THE CLERK OF COURT CHANCERY DIVISION IS UNRELIABLE AND UNHELPFUL.

Even if Dr. Cowan had performed or endorsed the underlying methodology (which he did not), his cost tabulations for the Clerk of Court Chancery Division (Cost 1) should still be excluded because they wrongly assume that the cost of each foreclosure case varies based directly on the number of docket entries, and because they include costs that have no connection to foreclosure processing.

### A. The Number of Docket Entries Is Not A Reliable Method of Estimating and Assigning Chancery Division Costs.

In tabulating Cost 1, Dr. Cowan relied on cost estimates prepared by Mr. Abrams, who calculated the Chancery Division's share of the Clerk of Court's budgeted costs by dividing the

5

number of docket entries in Chancery cases by the total number of docket entries for all Circuit Court cases, and applying that ratio to the Clerk's budgeted costs. *See* Ex. 2 (cost estimate); Ex. 8, Abrams Tr. 12:9-24. Mr. Abrams then generated a "cost per docket entry" by dividing the "Chancery" costs by the number of Chancery Division docket entries. *See* Ex. 2. Dr. Cowan multiplied this "cost per docket entry" by the number of docket entries for the at-issue loans to tabulate the Chancery Division's costs for those loans. Ex. 1, Cowan Cost Rpt. ¶ 33.

This methodology assumes that the cost of every action filed in the Circuit Court is determined by, and varies directly with, the number of docket entries in that case. Ex. 8, Abrams Tr. 41:19-24 (the "per docket" cost is the average cost of any entry, not just in Chancery). There is no basis for this assumption. The County never adjusted its appropriations for the Clerk based on the number of docket entries, and there is no correlation between the number of docket entries in the Circuit Court and the Clerk's overall costs:



Ex. 9, Gerardi Rpt. ¶ 40. Indeed, the vast majority of the Clerk's costs do not change based on the number of docket entries: nearly all of the Clerk's costs are for employee salaries, but employees were not paid based on the amount of work they performed and the Clerk did not hire a single additional employee to process foreclosures. Ex. 9, Gerardi Rpt. ¶ 35; Ex. 10, Glaser Rpt. ¶¶ 18,

6

29; Ex. 11, DeFranco III Tr. 147:17-148:2; *see also, e.g.*, Ex. 8, Abrams Tr. 97:15-98:4 ("rental and leasing" cost category would "probably not" change based on foreclosure volume); 80:15-82:5 (certain "contractual services" costs would not change based on foreclosure volume).

There is no support for this methodology, which Mr. Abrams chose simply "[b]ecause [he] couldn't figure out anything else." Ex. 8, Abrams Tr. 22:22-23:1. Mr. Abrams had never before used the number of docket entries to estimate costs for the Clerk's Office (even though he had served as CFO of the Clerk's Office). *Id.* 20:4-22:10. He did not perform any calculations to verify whether his assumption was accurate; he did not consider, for example, whether the ratio of Chancery docket entries to docket entries in other divisions was similar to the ratio of Chancery employee salaries to employee salaries in other divisions. *See* Ex. 8, Abrams Tr. 73:23-74:8. Even Mr. Abrams recognized the flaws in his own methodology, acknowledging that determining the "actual cost" was "very difficult" as there was "no way to actually come up with a process of allocating all costs to a [sic] chancery." *Id.* 38:9-20. Because a methodology based on a per-docket allocation of costs is not reliable, Dr. Cowan's tabulations—which not only rely upon cost estimates prepared with this methodology but also apply the same per-docket assumptions in calculating total costs—should be excluded.[3]

### B. Dr. Cowan's Chancery Division Cost Tabulation Does Not Reflect Costs Incurred by the Chancery Division to Process Foreclosure Cases.

Dr. Cowan's cost tabulation for the Chancery Division (Cost 1) should also be excluded because it includes costs that are completely unrelated to processing mortgage foreclosures.

---

[3] *See, e.g.*, *Kolcraft Enters., Inc. v. Chicco USA, Inc.*, 2018 WL 10772693, at *4 (N.D. Ill. July 16, 2018) (excluding opinion because "no evidence or analysis ties the [methodology theory] to the particular facts of the case, [and so] any damages calculation based on that number must be rejected"); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (striking opinion based on a "complete lack of economic analysis to quantitatively support the [damages] apportionment").

7

This Court has held that the County may only recover its "increased out-of-pocket costs" for "processing the discriminatory foreclosures." Dkt. No. 204 at 19-20; Dkt. No. 228 at 1-2. However, Mr. Abrams's analysis included costs not just for the Chancery Division—the only division which processes foreclosures—but also for all other Circuit Court divisions. Ex. 8, Abrams Tr. 33:9-16. Thus, "there would be some costs not associated with Chancery" reflected in the cost estimates. Ex. 8, Abrams Tr. 30:8-12. For example, the Traffic Division incurs costs for printing traffic tickets: a portion of these costs are assigned to the Chancery Division under Mr. Abrams and Dr. Cowan's methodology. *Id.* 29:18-30:7; Ex. 11, DeFranco III Tr. 226:21-228:4 (Clerk's office incurs other costs unrelated to the Chancery Division).[4] The reason Mr. Abrams aggregated all of the Clerk's costs rather than isolating the Chancery Division's costs (and then further isolating just those costs for processing foreclosures) is that he "didn't want to spend a long period of time doing this." Ex. 8, Abrams Tr. 69:17-21; *see also, e.g., id.* 80:5-10 (did not know or consider whether certain expenditures were related to foreclosure cases).

Therefore, Dr. Cowan's tabulations for Cost 1 should be excluded because they do not reliably measure foreclosure processing costs and do not assist the trier of fact in estimating those costs that have a "direct relationship" to the at-issue foreclosures. Dkt. No. 228 at 1-2; *see Bowman for J.B. v. Int'l Bus. Machs. Corp.*, 2013 WL 12290828, at *7-8 (S.D. Ind. Aug. 16, 2013) (damages estimate was "neither an accurate portrayal of the damages incurred in this case nor the correct population set from which to extrapolate damages," so expert's opinion was not "sufficiently tied to the facts of the case [and did not] aid the jury in resolving a factual dispute").[5]

---

[4] Further, some of the costs incurred by the Chancery Division are not for foreclosure processing because that division is also responsible for other types of cases, such as mechanic's liens, receiverships, and contract matters. *See* Ex. 25.

[5] *See Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir. 1995) (expert "testimony must 'fit' the issue to which the expert is testifying to the extent that it is tied to the facts of the case and will aid the jury in resolving a factual dispute"); *Poulter v. Cottrell, Inc.*, 2014 WL 5293595, at *4 (N.D. Ill. June

## III. DR. COWAN'S COURT SECURITY COST TABULATIONS ARE UNRELIABLE.

Dr. Cowan's court security cost tabulations (Costs 6 and 7, *see* Ex. 1, Cowan Cost Rpt. Tbl. 1 & Ex. 12, Cowan Cost Rpt. App. 3) should also be excluded: they are based entirely on illogical and unreliable assumptions provided by County employees—assumptions that are also contradicted by empirical evidence.[6]

To tabulate court security costs, Dr. Cowan used Mr. Ganir's cost estimate, which he derived by estimating the average time spent performing a court security-related service and multiplying that cost by the hourly wage of the personnel who performed the service. *See* Ex. 13 (cost estimate). Mr. Ganir estimated costs for three specific services: entry screening, building security, and courtroom deputy. Based on assumptions provided by Carlo DeFranco (another employee of the Clerk's Office), Dr. Cowan then applied Mr. Ganir's costs to the at-issue foreclosures. For each court hearing (Cost 6), Dr. Cowan assumed that two people appeared in court and therefore multiplied Mr. Ganir's average court security cost by two. For each motion filing (Cost 7), Dr. Cowan assumed that one person appeared in court and multiplied Mr. Ganir's average court security cost by one. Dr. Cowan then tabulated costs for each case based on the number of hearings and motions listed on the docket.

There are a number of problems with this methodology. First, it is illogical to double "courtroom deputy" costs for each hearing, as those costs do not change whether one, two, or seven

---

24, 2014) ("Helpfulness is sometimes phrased as a matter of 'fit' between the suggested testimony and the issue that it is meant to support.").

[6] "Even where a witness is an expert in the relevant field, the evidentiary reliability demanded by Daubert is not present when his or her opinion is speculative or rests on an unsound basis." *Loeffel Steel Prods., Inc.*, 387 F. Supp. 2d at 817. Thus, "[t]he judge must look behind the expert's ultimate conclusion and analyze the adequacy of its foundation." *Id.* If the court determines the foundation of the expert's opinion to be inadequate, the court should "exclude [the] evidence because it is too 'speculative' as a matter of law." *Target Mkt. Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 (7th Cir. 1998).

people attended the hearing, where only one deputy (at most) was assigned to each courtroom. Ex. 9, Gerardi Rpt. ¶ 55; Ex. 14, Connelly Tr. 105:2-6; Ex. 15 at 2. Dr. Cowan also improperly assigned costs for "courtroom deputy" to each motion filing even though motions were filed with the Clerk and not in courtrooms. Ex. 16, DeFranco II Tr. 206:20-24, 225:2-21.

Second, Dr. Cowan's calculations are based on unsupported assumptions. There are no records of who entered the courthouse. Ex. 16, DeFranco II Tr. 233:21-234:13; Ex. 17, DeFranco I Tr. 145:6-146:2; 177:13-178:1. The sole basis for Dr. Cowan's methodology is the testimony of Mr. DeFranco, an employee of the Clerk's Office (not the Sheriff), who simply guessed that "on average" two people would have shown up for a hearing, and one person would have shown up to file a motion. Ex. 17, DeFranco I Tr. 115:9-16; *see also* Ex. 21, Cowan II Tr. 68:10-17 ("I'm not an expert on deputies in courtrooms, so I'm relying on what Mr. DeFranco said . . . ."). For hearings (Cost 6), Mr. DeFranco ballparked the number of attendees at two per hearing because determining the actual number of attendees was impossible. Ex. 17, DeFranco I Tr. 129:6-22. Mr. DeFranco's estimate, however, is based solely on his interactions with the subset of people who *did* appear for hearings, and he had no way of counting those who failed to show up, which he acknowledged occurred. Ex. 17, DeFranco I Tr. 91:8-22, 116:3-23, 131:1-20. Indeed, the County itself estimated that, through 2010, "about 90% of homeowners defaulted on their foreclosure cases by not even showing up in court." *See* Ex. 5 at -0136667. For all these reasons, Mr. DeFranco's anecdotes are "simply inadequate to support the conclusions reached" by Dr. Cowan. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

Likewise, the assumption that one individual appeared at the courthouse for each motion filing is unfounded. For motion filings (Cost 7), parties had several different mechanisms by which they could file documents, including in-person filing, bulk filing through couriers, and e-filing.

10

The Clerk maintained no statistics on the frequency with which these different filing methods were used. Ex. 17, DeFranco I Tr. 177:13-178:1. The County has accepted e-filings since January 2014, and filing a document electronically would not use court security resources. Ex. 17, DeFranco I Tr. 174:16-176:3; Ex. 18, GAO No. 2014-02. Even prior to e-filing, parties could use couriers who would bulk file many documents from different cases at the same time. Ex. 17, DeFranco I Tr. 72:19-73:7; Ex. 16, DeFranco II Tr. 209:10-17. Parties also often filed many documents at the same time, but Dr. Cowan assigns each a separate cost. *See* Cox Decl. ¶¶ 28-29.

Third, and finally, Dr. Cowan does not even apply Mr. Ganir's estimate of court hearing costs (Cost 6) consistent with Mr. DeFranco's instructions. Mr. DeFranco testified that to accurately determine the number of court hearings, one would have to review the docket for both (i) the activity description and (ii) the court hearing date information. Ex. 17, DeFranco I Tr. 161:6-12; *see also id.* 160:5-161:5 ("[Y]ou got to go by court date because that's key.") Because multiple separate activity descriptions may reference the same court hearing, the only way to accurately identify the number of hearings is by referencing the court hearing date. However, Dr. Cowan tabulated the number of court hearings for each at-issue foreclosure solely by adding up activity descriptions. *See* Ex. 12, Cowan Cost Rpt. App. 3; Ex. 1, Cowan Cost Rpt. ¶ 34. Dr. Cowan did not analyze court hearing date information, and thus, the methodology he used to allocate costs to Defendants is unreliable even by the County's own standards.

That all of these defects render Dr. Cowan's tabulations of Cost 6 and Cost 7 inherently unreliable can be shown empirically, by extrapolating the court hearing and motion filing averages to all cases processed by the Circuit Court. Using the County's methodology, the court security "cost" for all Circuit Court cases would have dwarfed the whole personnel budget for the entirety of the Court Services Division of the Sheriff—the division responsible for providing court security

11

services not only for the Circuit Court but for all other court buildings in Cook County. *See* Ex. 9, Gerardi Rpt. ¶ 56. Dr. Cowan's methodology is unreliable because it would produce a windfall for the County many times the actual costs of providing court security.

## IV. DR. COWAN INCLUDES COSTS FOR LOANS TO WHITE BORROWERS AND LOANS THAT NEVER ENTERED FORECLOSURE.

### A. The Count II-Alternative and Count III Cost Tabulations Include Loans to White Borrowers and Loans the County Admits Are Not Discriminatory.

The County asked Dr. Cowan to tabulate Cost 1-Cost 7 for four different sets of loans, based on different potential liability scenarios. Two of those scenarios—Count II-Alternative (*see* Ex. 1, Cowan Cost Rpt. ¶¶ 57-58) and Count III (*see* Ex. 1, Cowan Cost Rpt. ¶¶ 59-62)—include loans that are not discriminatory, such as loans made to White borrowers. These calculations must therefore be excluded because they are entirely unhelpful to a trier of fact who will be asked to determine what, if any, damages were caused by discrimination against minority borrowers.[7]

For the Count II-Alternative cost calculation, Dr. Cowan purported to tabulate costs for all loans that entered foreclosure that are located in a minority *neighborhood* (a neighborhood that is more than 50% minority). Ex. 1, Cowan Cost Rpt. ¶ 58. For the Count III cost calculation, Dr. Cowan purported to tabulate costs for all loans that entered foreclosure that (i) were made to minority borrowers; or (ii) had no reported race information but where the property was located in a minority *neighborhood*. But White borrowers also live in minority neighborhoods; indeed, they make up a large proportion of the borrowers in those neighborhoods. *See, e.g.*, Ex. 19, Cowan Liability Rpt. Tbl. 3 (20,877 of the 50,864 loans in "51-70%" minority neighborhood were made to White borrowers). Even so, Dr. Cowan "d[id] not consider the race or ethnicity of the

---

[7] The other two damages scenarios are based on loans identified by Dr. Gary Lacefield, and should be excluded for the reasons provided in the motion to exclude Dr. Lacefield's opinions.

12

borrowers" in performing his calculations, and he conceded that "White borrowers may also be included in these calculations." Ex. 1, Cowan Cost Rpt. ¶ 58.

This methodology is unreliable and unhelpful to the trier of fact for two reasons. First, the racial composition of a neighborhood is simply not a reliable indicator of any individual borrower's race.[8] Dr. Cowan's damages calculations include loans that were made to borrowers who are not alleged to have been the target of discrimination (such as White borrowers), as many of the loans made to borrowers in minority neighborhoods were not made to racial minorities. Ex. 21, Cowan II Tr. 99:18-100:1; 104:16-105:3; 106:3-5; Ex. 1, Cowan Cost Rpt. ¶ 58. In fact, the single largest population of borrowers in Dr. Cowan's "majority minority" neighborhood (51%-70% minority concentration) are not minorities: there are nearly twice as many non-Hispanic White borrowers in that neighborhood as African American or Hispanic borrowers. *See* Ex. 19, Cowan Liability Rpt. Tbl. 3; Ex. 22, Courchane Rpt. ¶ 85. Thus, of the damages calculated by Dr. Cowan for the Count II-Alternative loans, a greater proportion are attributable to foreclosures on loans made to White borrowers than to loans made to African American or Hispanic borrowers.

Second, even if neighborhood composition were a reliable proxy for a borrower's race (and, as just explained, it is not), neither Dr. Cowan nor Dr. Lacefield opine that all loans made to minority borrowers are discriminatory. Ex. 21, Cowan II Tr. 104:16-105:3; 36:20-24; 42:5-11. In fact, 11,272 loans made to African American or Hispanic borrowers did not have any origination delimiters under Dr. Lacefield's test. Ex. 20, Marsha Courchane Decl. ¶ 9. Yet, both the Count II-Alternative and Count III cost calculations include non-discriminatory loans made to minority borrowers.

---

[8] *See Broussard v. Maples*, 535 F. App'x 825, 829 (11th Cir. 2013) (affirming exclusion of expert opinion because use of Hispanic student enrollment data an unreliable proxy for the influx of immigrants into local labor market).

13

This case is about allegedly discriminatory loans to minority borrowers. Dr. Cowan's Count II-Alternative and Count III calculations are not based on a reliable methodology for calculating costs for those loans, and are therefore unhelpful to the trier of fact as they encompass loans that are not alleged to violate any law.

### B. Dr. Cowan Includes Costs For Loans Where No Foreclosure Complaint Was Filed.

In addition, the Court should strike certain loans from each of Dr. Cowan's four cost calculations because Dr. Cowan used a flawed methodology in which he swept in loans for which there was no evidence of a foreclosure filing.

Itemized Case Cost Loans. The County's docket database does not identify either property address or loan number. Ex. 1, Cowan Cost Rpt. ¶ 15. For certain loans, Dr. Cowan attempted to "match" loans with foreclosures by comparing the property address and borrower name in the loan data with those same fields in third-party foreclosure data purchased by the County. Ex. 1, Cowan Cost Rpt. ¶ 16. Dr. Cowan then attempted to control for certain "false positives," such as foreclosure cases that were filed after the loan was paid off. *Id.* ¶¶ 21-27. Dr. Cowan's analysis produced a list of loans where "there is not enough evidence to confirm [the loan associated with the foreclosure] was not originated by Defendants." Ex. 1, Cowan Cost Rpt. ¶ 28.

This methodology did not actually match loans to foreclosures. Instead, Dr. Cowan determined that some loans did not match foreclosures, excluded those, and included the rest in his cost tabulations because "there is not enough evidence" one way or the other to determine whether a foreclosure was filed. Dr. Cowan did not even consult the loan data to determine if there was an indication of foreclosure activity for these loans even though there are data fields in the loan data that would reflect foreclosure activity. Ex. 23, Hailey Trimble Decl. ¶¶ 4-6. But there is no indication of *any* foreclosure activity in the loan data for 14,777 of the loans that Dr. Cowan

14

purported to "match" to a foreclosure case. *Id.* The Court should strike these 14,777 loans from Dr. Cowan's Itemized Case Cost Loan cost tabulations.

<u>Estimated Case Cost Loans</u>. For certain other loans, Dr. Cowan did not even purport to match the loan to a foreclosure case. Ex. 1, Cowan Cost Rpt. ¶ 29; Ex. 21, Cowan II Tr. 64:7-19. In other words, the County has *no* record of any foreclosure that occurred for the borrower name and property address identified in the loan data. Ex. 1, Cowan Cost Rpt. ¶ 29. Dr. Cowan nonetheless tabulated costs for these loans based on his belief that "Defendants' [loan] data provide an indication that the loan *potentially* entered a foreclosure process." Ex. 1, Cowan Cost Rpt. ¶ 29 (emphasis added); *see also* Ex. 21, Cowan II Tr. 64:7-19.

This approach is flawed and unreliable, as the "forcflag" and "foreclosurereferraldate" data fields on which Dr. Cowan relies do not indicate a foreclosure filing. Ex. 24, Justin Dahl Decl. ¶ 5. The Court should strike from Dr. Cowan's Estimated Case Cost Loan cost tabulations the 7,294 loans where Dr. Cowan relied solely on "forcflag" and "foreclosurereferraldate" data to find that a foreclosure occurred. Ex. 20, Marsha Courchane Decl. ¶ 10.

## CONCLUSION

For the foregoing reasons, the Court should exclude Dr. Cowan's cost tabulations.

15

| | |
|---|---|
| Dated: March 31, 2021 | */s/ Matthew S. Sheldon* |
| | Matthew S. Sheldon |
| | *MSheldon@goodwinlaw.com* |
| | Thomas M. Hefferon |
| | *THefferon@goodwinlaw.com* |
| | Levi Swank (*pro hac vice*) |
| | *LSwank@goodwinlaw.com* |
| | GOODWIN PROCTER LLP |
| | 1900 N. Street, N.W. |
| | Washington, DC 20036 |
| | Tel.: (202) 346-4000 |
| | Fax: (202) 346-4444 |
| | |
| | Yvonne Chan |
| | *ychan@goodwinlaw.com* |
| | Benjamin R. Cox (*pro hac vice*) |
| | *bcox@goodwinlaw.com* |
| | Courtney L. Hayden (*pro hac vice*) |
| | *chayden@goodwinlaw.com* |
| | GOODWIN PROCTER LLP |
| | 100 Northern Ave. |
| | Boston, MA 02210 |
| | Tel.: (617) 570-1000 |
| | Fax: (617) 523-1231 |
| | |
| | Ryan Dunigan |
| | *RDunigan@winston.com* |
| | Joseph Laurence Motto |
| | *jmotto@winston.com* |
| | WINSTON & STRAWN LLP |
| | 35 West Wacker Drive |
| | Chicago, IL 60601 |
| | Tel.: (312) 558-5600 |
| | Fax: (312) 558-5700 |
| | |
| | *Attorneys for Defendants* |

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 31, 2021, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

                                                      */s/ Matthew S. Sheldon*
                                                      One of the attorneys for Defendants